UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GARY B. FILLER and LAWRENCE
PERLMAN, Trustees of the TRA
Rights Trust,

    Plaintiffs,

v.

DEXIA, S.A. and DEXIA BANK
BELGIUM (formerly known as
ARTESIA BANKING CORP., S.A.),

    Defendants.

04 - 10477 PBS

**JURY TRIAL DEMANDED**

MAGISTRATE JUDGE Bowler

Civil Action No. _____

RECEIPT # _____
AMOUNT $ 150
SUMMONS ISSUED ✓
LOCAL RULE 4.1 ____
WAIVER FORM ____
MCF ISSUED ____
BY DPTY. CLK. T.O.M
DATE 3/9/04

**COMPLAINT**

Plaintiffs, by their attorneys, as and for their complaint, allege the following upon knowledge as to themselves and their own actions, and as to Seagate Technology, Inc. ("Seagate") and the actions of Seagate and its representatives. As to all other matters, plaintiffs' allegations are based upon investigation of counsel, which included, among other things, review of a confidential report to the Belgian prosecutor conducting the criminal investigation into Lernout & Hauspie Speech Products, N.V. ("L&H"), which report quotes extensively from non-public documents created by defendants, and review of non-public documents created by senior officers of L&H, including Pol Hauspie ("Hauspie"), Jo Lernout ("Lernout") and Nico Willaert ("Willaert"), and by L&H's public accountants (Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren ("KPMG Belgium") and KPMG LLP ("KPMG U.S.") (collectively "KPMG"). Plaintiffs believe that their information-and-belief allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

1

## **NATURE OF THE ACTION**

1. This action arises out of the massive fraud that was perpetrated at L&H and is related to other actions currently pending in this District, including *Filler et al. v. Lernout, et al.*, 02-CV-10302-PBS (the "Filler Action."). The principal defendants in the Filler Action include: (i) L&H's senior officers and directors, (ii) KPMG, and (iii) a number of other entities and individuals that played significant roles in the fraud. L&H is not a defendant in that action because it filed for bankruptcy and was subsequently liquidated.

2. Plaintiffs bring the instant action against defendants DEXIA, S.A. and DEXIS BANK BELGIUM ("Dexia Belgium") (collectively "Dexia") based on newly-discovered evidence demonstrating that Artesia Banking Corporation, S.A. ("Artesia") was another key participant in the fraud at L&H before it was acquired by Dexia in 2001. On June 24, 2003, Dexia revealed that it had been notified that it was a suspect in the Belgian criminal investigation into L&H because of actions taken by Artesia in 1998 and 2000.

3. This action seeks to recover damages sustained by Seagate when it sold its nearly $170 million interest in Dragon Systems, Inc. ("Dragon") for artificially inflated, and ultimately worthless, L&H stock. Seagate purchased L&H stock in a merger of Dragon into a subsidiary of L&H that was consummated only months before public exposure of fraudulent transactions and accounting practices that had enabled L&H to falsely inflate its revenues by at least 50% since 1997. In 1999 alone, fully 70% of L&H's revenue was fictional and has since been reversed. These fraudulent transactions and practices were the underpinning of a material artificial inflation of the value of L&H stock.

4. A critical element of the fraud at L&H was a scheme whereby parties related to L&H established, funded and operated sham entities that entered into bogus software licensing

2

arrangements that were intended to and did artificially inflate L&H's profits. The scheme accounted for approximately 10% of L&H's 1998 revenues and approximately 25% of its 1999 revenues.

5. As has now been revealed, L&H could not have accomplished its fraud without the knowing participation of Artesia. Artesia provided L&H and its principals with critical off-balance sheet financing, which L&H then utilized to set up so-called Language Development Companies ("LDCs") and Cross-Language Development Companies ("CLDCs"), which L&H misrepresented to the public as unaffiliated "strategic partners." The LDCs and CLDCs then paid these funds back to L&H in the form of licensing fees. To outside investors, the LDCs and CLDCs appeared to be legitimate customers of L&H that had licensed millions of dollars of L&H software. In reality, however, the LDCs and CLDCs were nothing more than corporate shells utilized by L&H to artificially inflate its revenues, as Artesia knew.

6. Artesia understood that the LDCs and CLDCs were nothing more than corporate fictions, with no real assets or operations. Indeed, Artesia's own internal "risk evaluation" documents, which are quoted in a May 28, 2001 confidential report prepared by a panel of experts for prosecutors in Belgium (the "Report"), summed up the strategic partners as follows:

**Redacted**

(emphasis supplied).

7. Artesia also understood that it was L&H who was ultimately responsible for ensuring that the loans would ultimately be repaid. Indeed, after the fraud was revealed, L&H admitted that it had initially financed the operations of the LDCs and CLDCs. Accordingly, Artesia requested that L&H's senior officers, Pol Hauspie ("Hauspie"), Jo Lernout ("Lernout") and Nico Willaert ("Willaert") provide personal guarantees. This presented an enormous problem for L&H, however. Under U.S. Generally Accepted Accounting Principles ("GAAP"),

3

if L&H officers personally guaranteed these loans, the strategic partners would be considered "related parties" to L&H, and that fact would have to be disclosed on L&H's financial statements, thus revealing the sham nature of L&H revenues from those entities.

8.  To solve this problem, Artesia devised a scheme that would protect its interests and, at the same time, conceal the fact that Hauspie, Lernout and Willaert were personally guaranteeing the loans to strategic partners. Artesia and these L&H officers entered into agreements called "credit default swaps." In essence, the credit default swaps simply moved the loan guarantees to side letters that were not included in the loan documents and, hence, not disclosed to the SEC or investing public. L&H was thus able to record the entire amount of the fictitious license fees as revenue without making any "related party" disclosure that would have alerted the SEC and investing public to the fraud. In total, Artesia made loans worth tens of millions of dollars to L&H-related parties between 1997 and 1999. All of these amounts were then paid back to L&H and fraudulently recorded as revenue.

9.  Artesia's own internal documents confirm that Artesia knowingly entered into these credit default swaps for the sole purpose of defrauding the SEC and the investing public. For example, an email from an employee (hereafter Artesia Employee 1) at Artesia to another Artesia employee (hereafter Artesia Employee 2) and other Artesia employees dated September 21, 1999, quoted in the Report, states

**Redacted**

10.  In return for its knowing participation in this fraud, Artesia continued to receive lucrative banking fees. Artesia also charged excessive interest rates in connection with these loans and received equity interests in the strategic partners with an understanding that L&H

would ultimately arrange for buy-outs of the strategic partners at a premium. In sum, Artesia received high returns and a future pay-off in return for financing the fraudulent transactions at the outset.

11.     Within a year after the Dragon merger closed, the fraud had unraveled. The SEC and Belgian prosecutor commenced investigations into the fraud. L&H announced that as a result of "errors and irregularities," its financial results for 1998 through the first half of 2000 would be restated. L&H's stock was delisted in Europe and the United States. L&H went into bankruptcy and was subsequently liquidated. L&H's senior officers were arrested in Belgium on criminal charges relating to the fraud at L&H.

12.     It was not, however, until June 24, 2003, that Dexia announced that the Belgian prosecutor investigating the L&H fraud had notified Dexia that it was a suspect because of actions taken by Artesia in connection with L&H in 1998 through 2000. Until then, Artesia's role in the fraud had not been disclosed. The next day, an article in *De Financieel Economische Tiqd* (the "*Belgian Financial Times*"), entitled "Artesia Knew [L&H] Was Playing With Fire," reported that, according to the Belgian investigators, Artesia was "an exceptionally important banker to [L&H] involved in just about everything surrounding L&H." Belgian prosecutors had secretly seized records from Artesia in February 2001 that "contained a treasure of information" regarding the L&H fraud.

13.     According to the article, these records (which are not available to plaintiffs or the public) show that Artesia made multiple loans in 1998 and 1999. These loans totaled millions of dollars, which was used to artificially inflate L&H's revenues. The article also reported that, according to the Belgian Justice Department, Artesia "knew that the top management of [L&H] was involved in practices that would not be tolerated by the American SEC."

## JURISDICTION AND VENUE

14. This action arises under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, under Section 20(a) of the Exchange act, 15 U.S.C. §78t(a), and under state law.

15. This Court has subject matter jurisdiction over this case pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa; 28 U.S.C. §1331; and principles of supplemental jurisdiction, 28 U.S.C. §1367. Independently, this Court has subject matter jurisdiction as a consequence of the diversity of citizenship of the parties pursuant to 28 U.S.C. §1332.

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1391(b).

17. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PARTIES AND UNNAMED ACTORS

18. Plaintiffs Gary B. Filler and Lawrence Perlman (the "Trustees") are the former Co-Chairmen of the Board of Seagate and currently the Trustees of the TRA Rights Trust, a trust organized under the laws of the State of Delaware (the "Trust"). The Trust is the sole successor in interest to Seagate for and on behalf of the stockholders of Seagate in respect of any and all claims and causes of action possessed by Seagate arising out of, in connection with, or relating to Seagate's acquisition or ownership of shares of, or holdings in, L&H. The Trustees have the sole authority to bring any such claim, action, suit or proceeding against L&H and its affiliates, and/or any of L&H's officers, directors, agents, representatives, and their respective affiliates, and any other person or entity, whether at law or in equity, arising out if, in connection with, or relating to Seagate's acquisition or ownership of shares of, or holdings in, L&H. Seagate and Dragon are Delaware corporations. The former shareholders of Seagate who are the beneficiaries of the Trust are legally entitled, through the Trust, to the sole and exclusive benefit

6

of any and all claims arising out of Seagate's ownership of L&H securities. The former Seagate shareholders are not entitled to seek damages or recover on behalf of Seagate or the Trust and do not, and never did, directly hold any of the claims asserted in this action by the Trust. The Trust was created in connection with Seagate's March 29, 2000 agreement to merge into a subsidiary of Veritas Software Corporation (a $12 billion merger) and sell its operating assets to Suez Acquisition Company (Cayman) Limited (a $2 billion leveraged buyout) (collectively, a $14 billion transaction). The Trust was created primarily for the purpose of collecting, managing, investing and distributing to Seagate's former shareholders hundreds of millions of dollars in potential future tax refunds and credits ( "tax rights") due Seagate for tax periods prior to the closing of the Veritas Transaction. The name "TRA Rights Trust" itself reflects this purpose ("TRA" stands for "Tax Rights Amounts"). The Trust is a thriving, *bona fide* entity with a corpus at March 2002 of $176 million. The Trustees had, by March 2002, collected nearly $46 million in federal and state Tax Rights and distributed $28.5 million to the former Seagate shareholders. As of March 2003, the Trustees have distributed more than $45 million to the former Seagate shareholders.

19.     Defendant Dexia S.A. is a financial institution based in Belgium and, as a result of its acquisition of Artesia in 2001, is one of the three largest banks in that country. It has over €350 billion in assets. Dexia S.A. regularly transacts business in the United States. It has numerous financial services subsidiaries in the United States including Dexia Credit Local New York Agency, Financial Security Assurance, Dexia Bank Belgium New York Branch, Artesia Mortgage Capital Corp., Astris Finance, Dexia Global Structured Finance, and Dexia Securities U.S.A.

20.     Defendant Dexia Belgium is a wholly-owned subsidiary of Dexia S.A. and regularly transacts business in the United States. The Dexia Bank Belgium New York Branch is headquartered in New York, New York.

21.     Artesia was a wholly-owned subsidiary of Acrofin CVBA, a Belgian financial services group. On March 31, 2001, Dexia S.A. announced that it was acquiring Artesia

7

Banking Corporation from Acrofin, and that Artesia would be merged into Dexia S.A.'s wholly-owned banking subsidiary Dexia Bank Belgium. Artesia continuously and systematically transacted business in the United States prior to its acquisition by Dexia through its subsidiaries.

22. Artesia's wholly-owned subsidiary Artesia Mortgage Capital Corp. ("Artesia Mortgage"), conducted business in the United States through its headquarters in Delaware and offices at 1180 NW Maple St. Suite 202, Issaqua, Washington 98027. Artesia Mortgage continues to conduct business under the same name although it is now owned by Dexia instead of Artesia, and, since 1996, has closed loans with a principal balance of approximately $2 billion.

23. Artesia also conducted business in the United States prior to its acquisition by Dexia through its wholly-owned subsidiary Artesia North America (headquartered in Delaware), and its fifty-percent owned joint venture, Artesia Securities, headquartered in New York.

24. Artesia was a member of the bank lending syndicate that provided $450 million in financing to L&H for the acquisition of Dictaphone. The borrowers of the funds were Dictaphone (of Stratfield, Connecticut), L&H, and the FLV Fund, jointly and severally.

### L&H and its Senior Officers

25. L&H was formed in 1987 by Lernout and Hauspie. Its three core technologies were automatic speech recognition, text-to-text speech conversions, and digital speech compression. L&H was headquartered in Ieper, Belgium and Burlington, Massachusetts. Until it was delisted on December 8, 2000, L&H common stock was listed on the NASDAQ under the ticker symbol "LHSP" or "LHSEQ." L&H stock was also traded on the EASDAQ until it was "indefinitely suspended" on or about November 9, 2000. On November 29, 2000, L&H filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware, and contemporaneously commenced bankruptcy proceedings in Belgium. L&H has since been liquidated.

26. L&H Holdings USA, Inc. ("L&H USA") was a Delaware corporation, a wholly owned subsidiary of L&H, and the successor corporation to Dragon. On November 29, 2000,

8

L&H USA also filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware and was subsequently liquidated.

27. Jo Lernout is a defendant in the Filler Action, in which the Court has denied his motion to dismiss claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Lernout was one of the founders of L&H. Lernout was President of L&H from January, 1994 until February, 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Lernout served as a member of the Board of Directors of L&H until his resignation on January 16, 2001. Lernout was forced out of his remaining role as the Chief Technology Officer of L&H at the end of February, 2001. In April 2001, Lernout was arrested in Belgium for criminal charges related to the fraud at L&H.

28. Pol Hauspie is a defendant in the Filler Action, in which the Court has denied his motion to dismiss claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Hauspie was one of the founders of L&H. Hauspie was Chairman of L&H from January 1994 until October 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Hauspie resigned his board seat on November 22, 2000. In April 2001, Hauspie was arrested in Belgium for criminal charges related to the fraud at L&H.

29. Gaston Bastiaens ("Bastiaens") is a defendant in the Filler Action, in which the Court has denied his motion to dismiss claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Bastiaens joined L&H as President in September 1996, and was appointed Chief Executive Officer of L&H in May, 1997. Bastiaens resigned those offices on August 25, 2000, and his board seat on November 9, 2000. In May 2001, Bastiaens was arrested in Massachusetts and extradited to Belgium for criminal charges related to the fraud at L&H.

30. Nico Willaert is a defendant in the Filler Action, in which the Court has denied his motion to dismiss claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Willaert joined L&H as a director in 1992 and remained on the Board of Directors until November 22, 2000. Willaert was also a Managing Director of L&H from April 1993, and Co-Vice-Chairman of L&H from January 1994, until he resigned those offices on November 9, 2000. In April 2001, Willaert was arrested in Belgium for criminal charges related to the fraud at L&H.

31. Carl Dammekens ("Dammekens") is a defendant in the Filler Action, in which the Court has granted plaintiffs' motion for a default judgment on claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Dammekens joined L&H in 1990 as Corporate Controller, and served as a Senior Vice President of Finance from 1993 and as Acting Chief Financial Officer of L&H from 1996 until his appointment as Chief Financial Officer on July 7, 1999. On November 9, 2000, L&H announced that Dammekens would be replaced as Chief Financial Officer.

32. Flanders Language Valley Fund ("FLV Fund") is a defendant in the Filler Action, in which the Court has denied its motion to dismiss claims against it under Section 10(b) of the Exchange Act and state law claims of common law fraud. FLV Fund is a Belgian venture capital fund organized by Hauspie and Lernout, among others, to make strategic investments. FLV Fund stock is traded on the EASDAQ stock exchange under the symbol "FLVF." FLV Fund has United States offices in Los Altos Hills, California and in Woburn, Massachusetts. Hauspie and Lernout served as directors of FLV Fund in 1996 and 1997, and after 1997 each continued to "spend a portion of his time on activities relating to the FLV Fund." The FLV Fund was one of the entities related to L&H through which L&H secretly funded its claimed customers. At all relevant times, the financial statements of the FLV Fund were audited by KPMG.

33. Flanders Language Valley Foundation ("FLV Foundation"), also known as S.A.I.L. Trust V.Z.W. ("S.A.I.L. Trust"), is a defendant in the Filler Action, in which the Court has granted plaintiffs' motion for a default judgment on claims against it under Section 10(b) of

the Exchange Act and state law claims of aiding and abetting common law fraud. FLV Foundation purports to be a non-profit entity established in 1995 by Hauspie, Lernout, and the Government of Flanders, among others, to support economic development and assist in financing the infrastructure of the Flanders Language Valley region. S.A.I.L. Trust holds a one third interest in FLV Management, N.V. ("FLV Manager") of common law fraud, aiding and abetting common law fraud, and negligent misrepresentation of the Ex), and has the right to appoint five of its directors. FLV Manager is the manager of the FLV Fund.

34.    Mercator & Noordstar, N.V. ("Mercator") is a defendant in the Filler Action, in which the Court has denied its motion to dismiss claims against it under Section 10(b) of the Exchange Act and state law claims of aiding and abetting common law fraud. Mercator is an insurance company based in Antwerp, Belgium. At all relevant times, Mercator owned 6.9% of L&H Holding, which, in turn, owned 8.9% of L&H. Mercator also directly owned a 0.2% stake in L&H.

35.    KPMG Belgium is a defendant in the Filler Action, in which the court has denied its motion to dismiss claims against it under Section 10(b) of the Exchange Act and state law claims of common law fraud, aiding and abetting common law fraud, and negligent misrepresentation. KPMG Belgium participated in KPMG's audits of L&H from 1991, when it absorbed the Belgian accounting firm of Behets, Boes & Co., which had been auditing L&H since the late 1980's. KPMG Belgium was the signatory to KPMG's unqualified reports on L&H's financial statements for the years 1998 and 1999, among others; gave an opinion that those financial statements were prepared in accordance with U.S. GAAP; stated that its audit was conducted in accordance with U.S. GAAS; and consented to L&H's inclusion of KPMG Belgium's reports on those financial statements in filings with the SEC.

36.    KPMG U.S. is a defendant in the Filler Action, in which the Court has denied its motion to dismiss claims against it under Section 10(b) of the Exchange Act and state law claims of common law fraud, aiding and abetting common law fraud, and negligent misrepresentation. KPMG U.S. is a public accounting firm based in the United States, and played a primary role in

the 1997, 1998 and 1999 audits of L&H financial statements. A team of KPMG U.S. auditors performed field work at L&H's U.S. operations, and the international team as a whole was guided by Robert McLamb, a U.S. partner charged with reviewing L&H financial statements for compliance with U.S. GAAP. Another U.S. partner, Glen Davison, was responsible for reviewing L&H financial statements for compliance with SEC rules and regulations. KPMG U.S. performed extensive services for L&H in other areas as well, such as tax advice, consulting, and acquisitions advice. Robert McLamb was the "relationship partner" on L&H's engagement of KPMG in connection with the acquisition of Dragon.

## SUBSTANTIVE ALLEGATIONS

37. L&H was a speech recognition software manufacturer that was founded in 1987 by Lernout and Hauspie. Its three core technologies were automatic speech recognition, text-to-speech conversion, and digital speech compression. In 1995, L&H completed its initial public offering and commenced trading on NASDAQ. From 1987 through 1995, L&H was not profitable and produced only a few million dollars in annual revenues

38. In the third quarter of 1996, L&H began to expand its business. L&H's sales were reported as quadrupling between 1995 and 1996, and the period following was reported as one of unprecedented growth. In 1997, L&H's total reported revenues increased 220% to $99.4 million from $31 million in 1996. In 1998 L&H claimed that revenues rose 113% to $211.6 million, and by 1999 revenues were claimed to be $344 million.

39. The expansion of L&H's business was fueled primarily through the practice of acquiring complementary businesses and technologies as a means of supplementing its own internal development activities. From 1996 onwards, L&H acquired at least 20 such companies, using its own stock as currency for over 40% of the acquisitions that took place from 1998 to 2000, including L&H's acquisition of Dragon, a company in which Seagate owned a substantial stake.

### Seagate's Purchase of L&H Shares

40. On March 27, 2000, L&H, L&H USA, Dragon, and certain of the principal stockholders of Dragon, including Seagate, entered into an agreement (the "Merger Agreement") pursuant to which L&H would acquire Dragon in a stock-for-stock transaction (the "Merger.")

41. On June 7, 2000, the transactions contemplated by the Merger Agreement were consummated, and Seagate acquired 3,871,489 shares of L&H common stock. On that date, L&H was valued at $43.125 per share. Thus, Seagate purchased L&H shares for an interest in Dragon valued at approximately $166,957,963.

### Seagate Relied on Public Disclosures of Record Growth and Revenues

42. In agreeing to accept L&H shares in exchange for its interest in Dragon, and in setting the price of Dragon relative to L&H's stock price, Seagate relied on the truth and accuracy of L&H's extensive public disclosures regarding its business and revenues and the propriety of its financial statements, many of which Seagate directly examined and all of which were incorporated in the market price of L&H securities. These disclosures and assurances portrayed L&H as a technology company whose innovative products were propelling record global revenues.

43. Every quarter in 1998, and 1999, L&H proclaimed exponential increases in revenues and attributed them to its scores of "new contracts to license its core technologies."

44. L&H's announced its first quarter 1998 revenues in a press release dated April 28, 1998, attached as an exhibit to a Form 6-K/A dated May 26, 1998: "[f]or the first quarter of 1998, L&H's total revenues were $35.1 million, an increase of 112% over reported revenues of $16.6 million for the first quarter of 1997." Bastiaens was quoted as attributing L&H's performance to "our tremendous success in securing contracts," which the press release numbered at "a record-breaking 40 contracts."

45. In a July 28, 1998 press release, filed with the SEC on a Form 6-K dated August 5, 1998 and signed by Bastiaens, L&H announced total second quarter 1998 revenues of "$45 million, an increase of 113% over reported revenues of $21.1 million for the second quarter of

1997." In that press release, Lernout attributed the results to increased demand for L&H products and "new contract bookings," as did Bastiaens, who stated that "[d]uring Q2 we signed 42 new contracts."

46.     In an October 27, 1998, press release, filed with the SEC on a Form 6-K on October 28, 1998, L&H announced that, "for the third quarter of 1998, L&H's total revenues were $54.9 million, an increase of 97% over reported revenues of $27.9 million for the third quarter of 1997."

47.     On April 7, 1999, L&H "announced results for the fourth quarter of 1998 of $76 million in revenue, or a 126% increase in the reported revenue of $33.8 million for the fourth quarter 1997."

48.     In L&H's 1998 Annual Report filed with the SEC on Form 20-F and signed by Bastiaens, L&H stated that "for the fiscal year 1998, the company reported total revenue of $211.6 million or an increase of 113% over the reported revenues of $99.4 million for fiscal year 1997."

49.     The L&H 1998 Annual Report to Shareholders, filed with the SEC on a Form 6-K on June 1, 1999 contains a letter to shareholders trumpeting "a year of major milestones…. For the fourth consecutive year, revenues grew by more than 100% over the year before. In fiscal 1998, the company reported total revenues of $211.6 million or an increase of 113 percent over the $99.4 million reported for 1997…. L&H … signed a record 160 new contracts to license its core technologies."

50.     On May 18, 1999, L&H announced that "for the first quarter of 1999, L&H's total revenues were $70.7 million, an increase of 102% over reported revenues of $35.1 million for the first quarter of 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications."

51.     In a press release dated July 28, 1999, filed with the SEC on a Form 6-K dated August 2, 1999, L&H announced that its second quarter 1999 "total revenues were $76.0 million,

an increase of 69% over reported revenues of $45.0 million. L&H's total revenues for the six months ending June 30, 1999 were $146.7 million, an increase of 83% over reported revenues of $80.1 million for the same period in 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications." L&H reported that in the second quarter, the Technologies and Solutions division "signed 57 new contracts (45 of which were related to core speech technology)."

52.   In a press release dated October 27, 1999, filed with the SEC on a Form 6-K dated November 3, 1999, L&H announced that its third quarter 1999 "total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998. L&H's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998."

53.   In a press release dated February 9, 2000, filed with the SEC on a Form 6-K/A dated February 14, 2000, L&H announced that, "[f]or the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5% increase in the reported revenue of $76.7 million for the fourth quarter of 1998. For the fiscal 1999 [sic], the company reported total revenues of $344 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998." The company attributed growth to the "Technologies and Solutions Division sign[ing] a record of 30 contracts for the quarter." In that press release, Bastiaens stated that "[i]n 1999 we experienced a strong demand for speech and language technologies, applications and solutions, specifically in the Enterprise and Telephony area. This increase was mainly the result of internal growth and created a positive cash flow from operations of $68 million, reflecting the maturity of our operations."

**Seagate Relied on Disclosure of Exorbitant License
Revenues from Purportedly Unaffiliated "Strategic Partners"**

54.     Seagate also relied on L&H's attribution of significant revenues to what it reported as license fees from unaffiliated "strategic partners" who contracted with L&H to develop its software for specific applications and languages.

55.     In 1996, shortly after Bastiaens arrived at L&H, the company announced that Dictation Consortium NV ("Dictation"), "a private company in which the FLV Fund has an investment," had licensed L&H software in order to develop L&H's continuous automated speech recognition technology. As of December 31, 1996, FLV Fund and FLV Management together owned 61% of Dictation and defendants Lernout and Hauspie were directors of FLV Fund Management. Dictation provided L&H with $26.6 million in revenue over the next two years, approximately one quarter of its 1996 sales and 19% of 1997 sales. Since Dictation bore the research and development costs, they did not shrink L&H's bottom line, as they should have. In May 1998, L&H announced that it had obtained the software developed by Dictation by purchasing the company for $26.9 million, most of which represented goodwill and could thus be amortized over seven years.

56.     In 1997, L&H entered into a similar arrangement with a company formed in March 1997, by anonymous venture capitalists, called Brussels Translation Group ("BTG"). According to L&H's 1998 Annual Report on Form 20-F, L&H granted BTG an exclusive license to use L&H speech processing technology and associated data bases to develop an internet translation service. The agreement called for BTG to pay L&H $3.5 million in license fees, plus royalties. In May 1997, the license fee was increased by $1.5 million, and L&H also entered into an agreement to provide BTG with engineering services, under which BTG paid L&H approximately $30 million.

57.     In June, 1999, L&H acquired BTG for approximately $42 million in cash plus the assumption of BTG's $17 million start-up debt. As in the Dictation Consortium transaction, L&H was able to obtain a product without deducting the research and development expense.

Instead L&H was able to record nearly $35 million in revenues and then, when it purchased BTG, L&H capitalized the acquisition price, turning what would normally be an expense into an asset.

58. Although critics charged that L&H earnings were inflated by the Dictation and BTG transactions because those companies were related to L&H, L&H falsely maintained that, except for the FLV Fund involvement in, the companies were owned by unaffiliated "private investors" whom L&H refused to identify.

59. In late 1998 L&H expanded its reliance on customers modeled on Dictation, helping to create 30 start-up companies incorporated in Belgium and Singapore. Those companies were funded by unidentified private investors whom L&H insisted were "unaffiliated with us." In an April 7, 1999 press release, L&H announced among the highlights of fiscal year 1998:

> [L&H began] development of approximately 20 additional exotic languages with its financial and technological partners. During 1998, contracts were signed for the following languages: Ukraine, Polish, Czech, Slavic, Bahasa, Greek and Farsi, to support a range of speech technologies.... In order to develop these additional languages within certain time and financial constraints, L&H is working with partners who will undertake the localization and development of these language areas and share the financial rewards. L&H will license its tools to the partners and will secure the quality of the various applications and languages.

60. In its 1998 Annual Report on Form 20-F, L&H expanded its description of these transactions:

> Pursuant to these agreements, we have exclusively licensed our speech and language technology development tools to strategic partners <u>that are unaffiliated with us</u> to develop and localize our technology for specified new languages. Our strategic partners also have exclusive rights ... to develop, market, and distribute products incorporating the developed technology. In addition to one-time license fees, we have rights to receive royalties based on our partners' net revenues from sales of products incorporating the developed technology.

(emphasis added.)

61. Initial license fees paid by these assertedly unaffiliated "strategic partners" accounted for 10% of L&H's claimed 1998 revenue and 25% of claimed 1999 revenue, far in

17

excess of the 3.7% of 1998 revenue that L&H stated, in its 1998 Annual Report on Form 20-F, was provided by "companies funded in part by the FLV Fund," and the 0.3% of 1999 revenues that L&H stated, in its 1999 10-K, were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

62. L&H underscored the purported legitimacy of its licensing revenues with false public descriptions of a conservative revenue recognition policy. In notes to its 1997, 1998 and 1999 financial statements, audited by KPMG, L&H stated that:

> The Company recognizes revenue from the sale of its software licenses upon satisfaction of all of the following criteria: signing of the license agreement, shipment of the products, when no contractual terms remain unsatisfied and, if applicable, when a royalty report is received from the customer. The Company generally receives, on a quarterly basis, royalty reports from each customer who has signed a license contract. The reports detail the number of units or products that the customer shipped during that period. The number of units multiplied by the applicable contractual rate per unit is the amount that the Company records as revenue. Before recording this revenue, the Company determines that all significant obligations have been satisfied and that collection of the receivable is probable. …
>
> The Company from time to time enters into nonrefundable minimum royalty agreements with customers. Under these arrangements the Company delivers its technologies or products to the customer contemporaneously with the execution of the agreement. Revenue from nonrefundable minimum royalty agreements is recognized upon satisfaction of all of the following criteria: signing of the licensing agreement; no additional significant production, modification or customization of the software is required; delivery has occurred; the fee is fixed and determinable, and; collection is probable. For arrangements that include multiple elements, the fee is allocated to the various elements based on vendor specific objective evidence of fair value.
>
> In all such cases, the Company only recognizes revenue when collection of the related receivable is probable.

63. These disclosures were also false. As detailed below, investigators have discovered, and L&H has confirmed, that its "strategic partners" were in fact shell start-up ventures established by parties related to L&H (and audited by KPMG), including defendants

FLV Fund, S.A.I.L. Trust, and LHIC, as a means of funding research and development off the books, and the hefty "license fees" from those "customers" recorded by L&H were a sham.

64.  Moreover, as further detailed below, the ventures were funded by tens of millions of dollars in loans that were secretly guaranteed by L&H principals Lernout, Hauspie and Willaert. The lender was Artesia, whose non-public internal documents, the substance of which have only recently been obtained by plaintiffs, demonstrate that Artesia made the loans with full knowledge that the "strategic partners" were shams, that the proceeds of the loans would be funneled back to L&H who would falsely describe them in its financial statements as "license fees" from "unaffiliated entities," that such reporting violated U.S. Generally Accepted Accounting Principles ("GAAP"), and that the sole purpose of the transaction was to evade the reporting requirements of the SEC. Indeed, it was Artesia who conceived a structure for the guarantees — credit default swaps — that would permit L&H to maintain secrecy and thereby accomplish its fraud.

### Seagate Relied on Written Assurances of KPMG

65.  In each of its Annual Reports for 1998 and 1999, filed with the SEC, L&H stated that its financial statements were prepared in accordance with U.S. GAAP. KPMG bolstered the credibility of L&H's disclosures by issuing unqualified reports on its audits of L&H's 1997, 1998 and 1999 financial statements and consenting to the inclusion of those reports in L&H's SEC filings.

66.  An auditor is supposed to give an "unqualified opinion" or "clean opinion" only when no significant limitations affect the performance of the auditor and when the evidence obtained in the audit discloses no material deficiencies in the financial statement and or unusual circumstances that affect the auditor's report. American Institute of Certified Public Accountants (AICPA), "Understanding Audits and the Auditor's Report — A Guide for Financial Statement Users," 2nd ed., 1996, at 15.

67.  On April 9, 1999, KPMG reported on L&H's 1998 financial statements, stating: