We have conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of [the relevant time period], and the results of their operations and their cash flows for each of the years in the three-year period ended [on December 31 of the fiscal year], in conformity with generally accepted accounting principles in the United States.

68.    KPMG consented to the inclusion of its 1998 Audit Report in L&H's Annual Report on Form 20-F filed with the SEC on June 30, 1999. On January 6, 2000, KPMG also consented to the incorporation by reference of its 1998 Audit Report in Registration Statements filed by L&H with the SEC on Form F-3 on January 7, 2000. That Registration Statement was provided to Seagate as "L&H's latest public filing" in the course of Seagate's due diligence in connection with the Merger.

### Seagate Relied On False Oral Representations by KPMG and L&H Principals

69.    In addition to L&H representations in press releases and public filings, Seagate relied upon specific oral representations by Lernout, Hauspie, Bastiaens, Dammekens, and KPMG confirming the accuracy of L&H's public disclosures.

70.    On several occasions during negotiation of L&H's purchase of Dragon, Bastiaens told Ellen Chamberlain, a Seagate employee acting as interim Chief Financial Officer of Dragon, that L&H's projections were on target for the first and second quarters of 2000. Bastiaens made those statements at meetings at the Boston, Mass., offices of Cowan & Co., L&H's investment bankers in connection with the Merger, in February and March 2000.

71.    From December 13 to 15, 1999, Ms. Chamberlain met with Lernout and Hauspie in Belgium, where Ms. Chamberlain expressed concern that the FLV Fund was funding the start-

up companies that were providing substantial percentages of L&H's software licensing revenues. Both Lernout and Hauspie assured Ms. Chamberlain that: (a) they had no financial interest in any of the start-up companies; (b) any licensing of L&H software by those start-up entities was the result of arms-length negotiation; and (c) even though they were both on the board of the FLV Fund, they were not active in its decision-making.

72.    On or about March 22, 2000, approximately one week before the Merger Agreement was executed, Dammekens participated in a conference call during which Ms. Chamberlain questioned him about the basis for his comfort with L&H's revenue recognition. Dammekens stated that he was comfortable with L&H's disclosures of revenue because he and his team reviewed all L&H contracts before financial results were released, including the fiscal year 1999 results that had been released in January 2000.

73.    During the course of due diligence prefatory to the merger, Ms. Chamberlain had repeatedly asked to speak with KPMG, and was told that she could not because their audit of L&H's 1999 financial statements had not been completed. Ms. Chamberlain was finally able to question representatives of KPMG during the March 22, 2000 conference call, in which those representatives participated. The KPMG personnel who participated in the call knew that the purpose of the call was to provide information to Seagate representatives as an important part of Seagate's due diligence with respect to the Merger.

74.    During the March 22, 2000 conference call, a KPMG partner told Ms. Chamberlain, among other things, that: (a) KPMG expected to sign off on its audit of L&H's 1999 financial statements in two to three weeks; (b) The only open audit issues were "a couple of revenue issues" in Korea regarding one or two customers, but nothing that would cause an adjustment; and a "couple" of contract confirmations had not yet been received; and KPMG had yet to complete minor tests of L&H's capitalization of its R&D expense, such as checking timesheets of engineers who had billed time to certain projects; (c) In the course of the 1999 audit, no adjustments had been booked by the auditors; (d) KPMG did not at that time

21

anticipate any material adjustment of L&H's 1999 financial statements; and (e) KPMG was "comfortable" with L&H's revenue recognition.

75.    Ms. Chamberlain was aware that, in 1999, L&H had been investigated by the SEC in connection with an aggressive means of accounting for acquisitions. L&H had used a "purchase" method of accounting for goodwill, taking it as a one-time charge against earnings for "in-process research and development." L&H's methods, audited and approved by KPMG, impermissibly allowed L&H to avoid the long-term depression of earnings caused by amortization of goodwill. The SEC required L&H to restate its financial results for 1997 and the first six months of 1998.

76.    When Ms. Chamberlain, during the March 22, 2000, conference call, inquired about the status of SEC inquiries into L&H accounting practices, the KPMG Belgium representative told her that all issues from SEC inquiries into L&H accounting practices had been resolved.

### Subsequent Reliance on KPMG Belgium's Unqualified Opinion for 1999

77.    On April 27, 2000, KPMG, over the signature of KPMG Belgium, issued its unqualified report on L&H's 1999 financial statements, confirming KPMG's oral representations, on March 22, 2000, that its audit had uncovered no material errors or improprieties in the unaudited financial statements issued in January:

> We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31, 1998 and December 31, 1999, and their related consolidated statements of operations, shareholders' equity, cash flows and comprehensive income (loss) for each of the years in the three-year period ended December 31, 1999....
>
> *    *    *
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of December 31, 1998 and December 31, 1999 and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1999, in conformity with generally accepted accounting principles in the United States.

78.    Seagate was entitled to terminate the Merger Agreement prior to closing if it became apparent that L&H's unaudited financial statements for 1999, released prior to execution of the Merger Agreement, were materially misstated:

(a)    The Merger Agreement included L&H's representations and warranties that: (i) all of L&H's filings with the SEC since January, 1998, did not contain any untrue statement of material fact or any material omission; (ii) that all financial statements included in L&H's SEC filings complied in all material respects with SEC accounting requirements and published rules and regulations, and were prepared in accordance with U.S. GAAP; and (iii) that L&H's unaudited consolidated financial statements for the year ended December 31, 1999 were prepared in accordance with U.S. GAAP and "fairly present in all material respects the consolidated financial position of [L&H] as of the date thereof."

(b)    Section 9.1 of the Merger Agreement allowed Seagate to terminate the Agreement at any time prior to closing "if there has been a breach of any representation [or] warranty ... which causes the conditions set forth in section 7.3(a) ... to be incapable of being satisfied"

(c)    Section 7.3(a) of the Merger Agreement provided that "representations and warranties of [L&H] shall be true and correct in all material respects as of the closing date."

79.    Had KPMG not given an unqualified opinion stating that L&H's 1999 financial statements were prepared in accordance with U.S. GAAP, or had it otherwise qualified its report on L&H's 1999 financial statements, this would have communicated to Seagate that L&H's unaudited financial statements for the year ended December 31, 1999 were not prepared in accordance with U.S. GAAP and the Merger would not have been consummated.

### Seagate Relied on the Integrity of the Market for L&H Securities

80.    Among the factors Seagate considered in setting the price for its Dragon holdings, which L&H paid for in L&H stock, was the market price of L&H stock. At all relevant times, the

market for L&H stock was efficient because L&H common stock met the requirements for listing, and was listed and actively traded on the NASDAQ and the EASDAQ, which were automated and highly efficient markets.

81.    As a regulated issuer, L&H filed periodic public reports with the SEC. L&H also regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

82.    The market for L&H stock promptly digested current information regarding L&H from the publicly-available sources described above and reflected such information in the price of L&H stock.

83.    Consequently, at all relevant times — including the time Seagate was negotiating the price it would accept in L&H stock, the time Seagate executed the Merger Agreement, and the time the Merger was consummated — the price of L&H stock was fraudulently inflated by defendants' misrepresentations and non-disclosures.

### The Fraud at L&H

84.    Within months after the Dragon Merger closed, L&H's "record" growth was revealed to be a complete sham. By the end of May 2001, less than a year after the Dragon transaction closed, U.S. and European regulators had commenced investigations into the fraud at L&H, L&H stock had been delisted in Europe and the U.S., L&H was in bankruptcy, and Lernout, Hauspie, Willaert and Bastiaens had been arrested on various criminal charges relating to fraud at L&H. The L&H stock valued at nearly $170 million when Seagate received it in exchange for a stake in Dragon was utterly worthless.

85.    Until its acquisition of Dictaphone Corporation in May, 2000, L&H had been able to file information with the SEC as a foreign private issuer subject to less detailed disclosure requirements than those applied to U.S. entities. Shortly after the Merger was consummated, on June 30, 2000, L&H filed a Form 10-K, which included financial statements for fiscal year 1999

24

audited by KPMG, and also filed a Form 10-Q, which included unaudited financial statements for the first quarter of fiscal year 2000, both of which contained, for the first time in an SEC filing by L&H, the geographic breakdown of sales required by the SEC in filings by U.S. companies.

86.    The filings purported to reveal that out of 1999 revenue of $344.2 million, Korea contributed $62.9 million and Singapore contributed $80.3 million (collectively, over 41% of total L&H revenues), up from combined revenues of less than $300,000 in 1998.

87.    After the June 30, 2000 Form 10-Q was filed, reporters from *The Wall Street Journal* commenced an investigation into L&H's customers in Singapore and Korea. It began reporting the results of this investigation in an article published on August 8, 2000. The article disclosed that many of the companies which L&H had identified as Korean customers had denied that they did business with L&H.

88.    Although L&H attempted to deny these allegations and claimed that all Korean revenues were accurate, on August 15, 2000, *The Wall Street Journal* reported that L&H had commissioned a mid-year interim audit of the company by KPMG. The goal of the audit was to "allay concerns about the financial results of [L&H's] South Korean division."

89.    On August 25, 2000, L&H announced that Bastiaens had resigned from his position as president and CEO of L&H. Bastiaens was replaced by John Duerden, the former CEO of Dictaphone. Bastiaens remained a director of L&H.

90.    On September 20, 2000, the L&H Board of Directors authorized its Audit Committee to "conduct such inquiries as it deemed appropriate into certain accounting and other practices of the Company that were the subject of a formal investigation being conducted by the [SEC]," according to a report provided to the Audit Committee two months later, on November 20, 2000 (the "Audit Committee Report"), by the advisors retained by the audit committee -- the U.S. law firm Bryan Cave LLP, the Belgian law firm Loeff Claeys Verbeke, and the accounting firm of Arthur Andersen LLP (the "Audit Committee Advisors").

25

91.    On September 22, 2000, *The Wall Street Journal* reported that the SEC had commenced an investigation into L&H's accounting practices in January 2000. In fact, on or about January 24, 2000, the SEC had issued a request for documents to L&H, which focused on L&H's revenue recognition practices and, in particular, on the Company's contracts and relationships with its so-called "strategic partners." Subsequently, the SEC raised the status of the investigation to "formal."

92.    On September 22 and 26, 2000, *The Wall Street Journal* also raised significant additional questions about L&H's revenue, specifically about 30 Singapore and Belgian start-up companies that accounted for nearly all of L&H's Asian revenues reported in 1998 and 1999. The articles also raised concerns that the FLV Fund had financial connections to eight start-ups with close links to L&H, and that those start-ups accounted for a large portion of L&H's 1998 and 1999 revenues. One of the transactions questioned involved the eight Singapore start-ups which were initially funded by the FLV Fund without any disclosures relating to their nature as related-party transactions.

93.    On September 26, 2000, *The Wall Street Journal* reported that the Brussels-based EASDAQ stock exchange had launched a formal investigation into L&H. On the same date, Bloomberg News reported that the EASDAQ would also investigate the FLV Fund.

94.    On October 18, 2000, *The Wall Street Journal* reported that L&H was refusing to provide the SEC with the names of the investors behind the thirty corporate customers that were the focus of the SEC investigation, and who accounted for approximately 25% of the Company's 1999 revenues and 10% of its 1998 revenues. While L&H admitted that it had helped start the 30 companies and initially financed their operations, the Company maintained that the firms were owned by independent investors interested in developing new applications for L&H speech software. L&H released new details about the operations of 17 of the 30 companies, which revealed that these companies had no real corporate existence whatsoever, and certainly no economic substance apart from L&H. Of these 17 companies, none had any direct employees. Seven companies were relying on L&H employees to do work for them and had agreed to repay

26

L&H for its services. The other 10 had not started developing software, though they had paid hefty licensing fees to L&H. According to *The Wall Street Journal*, the 30 companies were all registered at just a few common addresses in Belgium and Singapore, and many had common officers and nominee shareholders.

95.    On November 9, 2000, L&H "provided an update on the status of the mid-year audit of the Company that it had commissioned last August and of the ongoing audit committee inquiry" and announced that "[a]s a result of errors and irregularities identified in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000." L&H's announcement of "accounting irregularities" was, in accounting terms, tantamount to an admission of fraud. Statement of Auditing Standards No. 53 issued by the American Institute of Certified Public Accountants defines "irregularities" as "intentional misstatements or omissions" in financial statements, meaning that there was fraud in their preparation.

96.    That day, the NASDAQ suspended trading in L&H shares. Just before the suspension, L&H shares were changing hands at $3.525, more than 95% below the record high of $72.50 they reached in March, when the company claimed a market capitalization of more than $10 billion. The slide wiped out more than $9 billion of the company's stock market value.

97.    On November 17, 2000, *The Wall Street Journal* reported that L&H's independent auditor, KPMG, had withdrawn its audit report on L&H's 1998 and 1999 financial statements, stating that its prior audit opinions "should no longer be relied upon."

98.    On November 21, 2000, *The Wall Street Journal* reported that the EASDAQ had suspended trading in the FLV Fund. The article described the FLV Fund as an investment vehicle over which Jo Lernout and Pol Hauspie "exercise considerable influence over its affairs," with "a history of investing in L&H customers, typically small companies that pay license fees to L&H."

99.    On November 29, 2000, L&H filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware. According to a November 30, 2000 *Wall*

*Street Journal* article, the decision to file for bankruptcy protection came after L&H executives discovered that $100 million in cash was missing from the Company's South Korean unit.

100.    On December 14, 2000, *The Wall Street Journal* reported on the thirty "strategic partners" that comprised a significant portion of L&H's revenues, revealing that Mercator was the ultimate owner of 16 of the 30 start-ups and that the FLV Fund had funded, at least in part, approximately 8 of the remaining 14.

101.    On January 5, 2001, the Associated Press reported that the Belgian judge presiding over L&H's Belgium bankruptcy proceeding acknowledged that there is "no doubt there was fraud" at L&H.

102.    In late April of 2001, South Korean authorities began investigating allegations against the Korean Banks, as well as certain former L&H Korea employees.

103.    On or about April 27, 2001, Lernout, Hauspie and Willaert were arrested in Belgium and charged with forgery and stock manipulation. On May 26, 2001, Bastiaens was arrested by United States officials in Winchester, Massachusetts, in response to a Belgian warrant. Bastiaens was subsequently extradited to Belgium, where he has been charged with fraud, insider trading, stock market manipulation, and accounting law violations.

### The "Strategic Partner" Fraud

104.    On December 19, 2000, L&H publicly revealed the findings of the Audit Committee Report, which had previously been presented to the L&H Board of Directors on November 20, 2000. The Audit Committee Report concluded, in part, that: (a) L&H had improperly recorded as much as $277 million in revenue during 1998, 1999 and the first half of 2000; (b) the Company should reverse all of its Korean revenues recorded during 1999 and 2000, amounting to approximately $182 million; and (c) software license revenues from twenty-four of the thirty "strategic partners" were doing nothing more than funding L&H's research and development through related-party transactions.

105.    With respect to license revenues from "strategic partners," i.e., the LDCs and CLDCs, the Audit Committee Advisors concluded that revenue from 24 of the 30 new

28

companies was incorrectly booked. The report concluded that the companies were not buying software licenses, but were actually paying L&H employees to develop future products, in effect funding the company's own R&D needs. The Audit Committee Report recommended, at a minimum, reversing approximately $83 million in licensing revenue, and stated that if the investors are related parties, as the evidence suggests, the funded amounts should be recognized as a liability:

> It appears, based on our review, that the original LDC concept involved the sale of rights and tools to an independent third party and the separate use of those tools by the third party to develop L&H compatible products in a particular language. The wording of the contracts corroborate this concept. However, it also appears that shortly after the first few LDC contracts were signed, L&H personnel realized that the LDC investors were primarily financial investors and L&H would have to provide more services to the LDCs than they originally thought. Eventually, L&H assumed responsibility for the development work for a contemplated additional fee. Although it appears to us that, by December 1998 L&H and the LDCs knew that L&H would be performing some or all of the services or development work for the LDCs, future contracts were not changed to reflect that understanding. Except for Turkish and Farsi, contracts reflecting that the LDCs would pay L&H for the services or development work were not executed until November 3, 2000. To our knowledge, except for Turkish and Farsi, the LDCs have not yet been invoiced for the development work performed to date.
>
> *    *    *
>
> We believe, based on our review of certain internal documents and outside marketing material and limited discussions with the investors or their representatives, that the investors anticipated, in substance, that they were buying the future rights to a product (language) to be developed by L&H and thus were effectively funding the Company's research and development efforts to build that language.
>
> If the investors are not related parties, accounting for such transactions would require deferral of all the revenues and recognition over the development period.... If the investors are related parties, the relevant accounting literature presumes that the related party investors will be repaid and the funded amounts are recognized as a liability.

106.    In fact, the investors were related parties, and what L&H recognized as license revenue should not merely have been deferred, it should have been stated as a liability. Although the Audit Committee report redacted the names of the investors it did manage to discover and connect to L&H, news reports revealed those names and their affiliations with L&H.

29

107.    A September 22, 2000 *Wall Street Journal* article revealed that eight of the shell start-ups were funded by defendant FLV Fund, which is audited by KPMG. According to a November 6, *Wall Street Journal* article, another four were organized as subsidiaries of Language Investment Co., whose chief executive officer, Willem Hardeman, sits on the Board of the FLV Fund. And a December 14, 2000 *Wall Street Journal* article reveals that another sixteen were owned by Mercator, whose chairman, Louis Verbeke is a name partner in the law firm that acted as L&H's main counsel and as an Audit Committee Advisor — Loeff, Claeys, Verbeke. Mr. Verbeke and Mercator separately hold stakes in L&H. Mercator also owns 6.9% of L&H Holding Co., a vehicle through which defendants Lernout and Hauspie control L&H. L&H's financial statements and other disclosures misleadingly omitted these relationships. Indeed, as previously set forth, L&H affirmatively and falsely represented that these "licensees" were "unaffiliated customers" and that 1998 and 1999 revenues from companies funded by the FLV Fund were *de minimis*.

108.    More recently, in June 2003, it was further revealed that the entities were funded by tens of millions of dollars in loans secretly guaranteed by L&H principals — Lernout, Hauspie and Willaert.

109.    In essence, L&H represented to the public that the LDCs and CLDCs were unaffiliated entities who were paying L&H tens of millions of dollars in licensing fees for the right to develop L&H software for use with specific languages. The contracts gave L&H an option to acquire the strategic partner and the developed product. Thus, to the public, unaffiliated parties were providing substantial revenue to L&H and were also bearing the cost and the risk of developing software.

110.    In reality, the LDCs and CLDCs were uncreditworthy start-up shells with no funds to pay the license fees and no resources to perform the research and development work contemplated by the contracts they signed with L&H. Instead, L&H and its employees performed the development work, bearing all the research and development costs.

111.    The scheme operated to inflate L&H's stock price in two ways.  First, the license fees reported as revenue were in fact the proceeds of loans guaranteed by L&H principals.  Thus, a multi-million liability was reported as profit.  Second, L&H did not report its research and development costs as an expense, which would immediately reduce earnings.  Instead, it exercised its options to purchase the entities and their finished products and then capitalized the majority of the purchase price as goodwill.  L&H was then able to amortize the cost of these capitalized assets over an extended period of time.

112.    The SEC requires publicly-traded companies to present their financial statements in accordance with GAAP.  17 C.F.R. §210.4-01(a)(1).  That regulation states that financial statements filed with the SEC that are not prepared in conformity with GAAP "will be presumed to be misleading, despite footnote or other disclosures, unless the Commission has otherwise provided."

113.    L&H's accounting constituted flagrant violation of GAAP in several ways. Statement of Financial Accounting Standard (SFAS) No. 68, *Research and Development Arrangements* requires that "[t]he financial reporting of an enterprise that is party to a research and development arrangement should represent faithfully what it purports to represent and should not subordinate substance to form."

114.    At a minimum, under SFAS No. 68, and under SOP 97-2, L&H was required to account for the arrangement as a long-term construction contract and defer recognition of revenues from the start-up shells over the development period.  SFAS No. 68 provides that:

> An enterprise shall determine the nature of the obligation it incurs when it enters into an arrangement with other parties who fund its research and development.
>
>         *       *       *
>
> To the extent that the financial risk associated with the research and development has been transferred because repayment of any of the funds provided by the other parties depends solely on the results of the research and development having future economic benefit, the enterprise shall account for its obligation as a contract to perform research and development for others.

SFAS No. 68 ¶¶4, 10. SOP 97-2, which "provides guidance on when revenue should be recognized and in what amounts for licensing, selling, leasing, or otherwise marketing computer software" states that:

> If an arrangement to deliver software or a software system, either alone or together with other products or services, requires significant production, modification, or customization of software, the entire arrangement should be accounted for in conformity with Accounting Research Bulletin (ARB) No. 45, Long-Term Construction-Type Contracts....

SOP 97-2 ¶7.

115.    Even if the licenses had not required contract accounting, under SOP 97-2, L&H should not have recognized revenue from them because the licensee's absence of resources made it clear that collectibility was not probable. SOP 97-2 does not permit revenue to be recognized until "Collectibility is probable."

116.    In addition, since the start-up shells were related parties, the funds should have been treated as liabilities:

> If the enterprise is obligated to repay any of the funds provided by the other parties regardless of the outcome of the research and development, the enterprise shall estimate and recognize that liability. This requirement applies whether the enterprise may settle the liability by paying cash, by issuing securities or by some other means.

AS § R55.103.

117.    L&H's treatment of the start-up shells also violated SFAS No. 57, *Related Party Disclosures*, which requires "disclosures of material related party transactions" including:

a.    The nature of the relationship(s) involved.

b.    A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

c.    The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period.

32

d.    Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

AS § R36.102.

118.    Notes to L&H financial statements for 1997, 1998, and 1999 contain long lists of "related parties" accompanied by none of the detail required by SFAS No. 57. Moreover, the connections to related parties revealed by the Audit Committee Report demonstrate that L&H affirmatively misrepresented the amount of revenue it recognized from the start-up shells who provided 10% of L&H's 1998 revenue and 25% of its 1999 revenue. In its 1998 Annual Report on Form 20-F, L&H stated that only 3.7% of its 1998 revenue was provided by "companies funded in part by the FLV Fund." In Notes to its 1999 financial statements, L&H stated that 0.3% of 1999 revenues were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

### Artesia's Role in the "Strategic Partner" Fraud

119.    On June 24, 2003, Dexia announced that it had been notified by the Belgian prosecutor investigating the L&H fraud that it was a suspect because of actions taken by Artesia in connection with L&H in 1998 through 2000. According to a June 25, 2003 article in *The Belgian Financial Times*, entitled "Artesia Knew [L&H] Was Playing With Fire," the Belgian Justice Department investigators determined that Artesia was "an exceptionally important banker to [L&H] ... involved in just about everything surrounding [L&H]."

120.    According to the article, Belgian prosecutors secretly seized records from Artesia in February 2001, which "contained a treasure of information" regarding the L&H fraud. According to those records, Artesia issued three separate loans in 1998 and 1999, totaling more than $30 million, which were funneled through strategic partners to artificially inflate L&H's revenues. According to the article, the Belgian Justice Department's investigation revealed that Artesia "knew that the top management of [L&H] was involved in practices that would not be tolerated by the American SEC." None of this information had previously been made public.

Indeed, as discussed more fully below, Artesia had lied to the L&H Audit Committee to conceal its involvement.

121.    The June 25, 2003 *Belgian Financial Times* article stated that it was Artesia that had devised a method for concealing the fact that Lernout, Hauspie and Willaert guaranteed financing to certain LDCs and CLDCs. Artesia structured transactions known as "credit default swaps" in lieu of personal guarantees that would have had to have been revealed in the LDC and CLDC loan paperwork.

### Artesia's Longstanding Role in L&H Misconduct

122.    Artesia had previously assisted L&H in its financial machinations. On March 25, 1998, an Illinois company known as Vasco Data Security International ("Vasco"), a customer of L&H's Burlington, Massachusetts office, purported to license $800,000 of L&H software. The technology covered by L&H's license, however, was useless to Vasco, which only agreed to pay the licensing fee in order to obtain a $3 million loan from L&H that it desperately needed. The loan was originally due on January 4, 1999, but Vasco could not pay it when it came due. Hauspie took advantage of the situation to require Vasco to enter into a second license agreement with L&H worth $900,000, and to backdate the agreement December 31, 1998. According to Vasco's former Chief Technology Officer, Hauspie threatened to call the loan due on January 4, 1999 if Vasco refused to backdate the contract. Vasco acceded and L&H fraudulently recorded the $900,000 in 1998.

123.    Because Vasco still did not have the resources to repay the loan in early 1999, Lernout and Hauspie arranged for Artesia to organize and manage an $11.5 million private placement of Vasco common stock. On April 15, 1999, Artesia completed the private placement and wired the $11.5 million to Vasco's account in the United States. Vasco used these funds, in part, to repay L&H. The investors in the private placement included LHIC (a company formed by Lernout and Hauspie to invest in companies that specialized in speech and language based products), which invested $5 million. LHIC obtained a 7% ownership stake in Vasco and a seat on the company's board of directors. That seat was filled by Hauspie. Another top investor in

34

Vasco was Mercator, which purchased approximately $1 million of Vasco stock through the private placement managed by Artesia.

124.    Artesia was also key player in the creation of BTG, providing the initial financing that allowed BTG to operate. Artesia lent a total of $22.9 million to BTG with the intent that L&H would find external investors to repay the loan. However, L&H never disclosed the identities of the ultimate owners of BTG, and, according to a December 7, 2000 article, *The Wall Street Journal* was only able to trace ownership "through a Luxembourg company to two entities based in the Channel Islands, but no further."

### Artesia's Role in Financing the Strategic Partners

125.    Following the Dictation, BTG and Vasco transactions, L&H's senior officers and Artesia expanded their scheme into what ultimately would be described by *The Wall Street Journal* as "Dictation Consortium-type structure … but on steroids." Instead of creating one shell company (like Dictation or BTG) to funnel fictitious revenue to L&H, L&H created a series of holding companies financed by Artesia. These holding companies, in turn, financed multiple LDCs, which then paid "licensing fees" back to L&H.

126.    One such holding company was Radial Belgium N.V. ("Radial"). On September 29, 1998, Artesia loaned approximately $6 million to Radial, which wired this money, in $2 million installments, to three LDCs: (a) the Slavic Development Company N.V., (b) the Farsi Development Company N.V., and (c) the Bahassa Development Company N.V. These LDCs were supposed to develop speech recognition products in Slavic, Farsi and Bahassa. The Slavic, Farsi and Bahassa LDCs, however, used the $2 million to pay L&H licensing fees. L&H then booked the entire $6 million in revenue in the third quarter of 1998. None of these LDCs had bona fide offices or any operations that would have enabled them to develop speech recognition products.

127.    Internal Artesia documents quoted in the Report demonstrate that Artesia knowingly entered into this transaction in furtherance of the fraud. They show that Artesia knew that its loan was to be used by Radial to finance the three LDCs (all of which had the same

35

business address), that the LDCs and Radial had been created by L&H, and that the monies

would be used by the LDCs to pay licensing fees in identical amounts to L&H. They also show

that Artesia knew that the loans would be guaranteed by Lernout, Willaert and Hauspie, and that

their actions would enable L&H to fraudulently conceal that fact from the SEC and the investing

public.

128.    Artesia recognized from the outset that the "strategic partners" had no equity

investors and that they were mere shell companies located one address. In an email dated

September 21, 1999, from Artesia Employee 1 at Artesia to Artesia Employee 2 and other

Artesia employees, Artesia Employee 1 stated:

**Redacted**

129.    Another document quoted in the Report states:

**Redacted**

130.    Artesia Employee 1's September 21, 1999 email also stated that

**Redacted**

(emphasis supplied).

131.    Artesia knew that it was highly unusual for an individual to participate in credit

default swaps, and that Lernout, Hauspie and Willaert did so in this case solely to accomplish

their deception of the SEC and L&H's shareholders. An internal Artesia memorandum entitled

"Direction Internal Audit" from two Artesia employees (Artesia Employees 3 and 4) to another

Artesia employee (Artesia Employee 5) and others, dated January 31, 2000, notes that the credit

36

default swaps executed by Lernout, Hauspie and Willaert had

**Redacted**                                                                    Artesia clearly understood,

however, that

as was

stated in a February 14, 2000 internal Artesia memorandum stating the views of Artesia

Employee 2 (emphasis supplied).

132.    Moreover, Artesia was well aware that the sole reason for structuring Lernout's,

Hauspie's and Willaert's guarantees as credit default swaps was to conceal the relationship

between L&H and the strategic partners and that such concealment would render L&H financial

statements misleading in violation of auditing standards and applicable law.  An internal Artesia

document quoted in the Report notes that Lernout, Hauspie and Willaert refused to execute a

loan that made reference to the credit default swaps:

**Redacted**

Accordingly, a June 15, 1999 internal Artesia email from Artesia Employee 1 to another Artesia

employee (Artesia Employee 6) concerning LIC and Radial and quoted in the Report states that

Artesia did not identify Lernout, Hauspie and Willaert because

**Redacted**

(emphasis supplied).

133.    Artesia also knew that the LDCs would not generate any real revenue to repay the

loans, and that L&H intended to seek new investors who would act as a new source of funds. As

Artesia Employee 1 stated in a September 21, 1999 email:

**Redacted**

Another internal Artesia document quoted in the Report states:

**Redacted**

37

**Redacted**

134.    The June 25, 2003 article in *The Belgian Financial Times* stresses the extent to which Artesia acted far outside the confines of an ordinary commercial banking relationship in order to accommodate the fraudulent scheme:

> On September 29, 1998, Artesia issued a loan to a Belgian company known as Radial in the amount of approximately $6 million. Artesia's own documents reveal that Radial was a "special purpose entity" created by senior officers of L&H for the express purpose of creating and funding LDCs. T hese s ame b ank d ocuments a lso s how t hat A rtesia w as aware that Lernout, Hauspie, and Willaert did not want to sign the required personal guarantees to obtain this and other LDC and CLDC loans "in order to avoid possible problems with the SEC." As a result, Artesia devised a scheme to have Lernout, Hauspie and Willaert guarantee the Radial loan using "credit default swaps." Unlike personal guarantees, however, these swaps do not have to be revealed in the loan letters of credit. However, the sale of credit default swaps to individual investors is highly unusual, demonstrating the degree to which Artesia was willing to go to participate in L&H's massive accounting fraud.

135.    After setting up Radial to manufacture revenues for L&H in the third quarter of 1998, L&H and Artesia replicated this scheme in the fourth quarter. The name of the holding company this time was Language Investment Co. ("LIC"). Artesia made a loan on December 22, 1998 to LIC for approximately $6 million. LIC then sent the funds in four installments of $1.5 million to four separate LDCs: the Greek, Hungarian, Polish and Czech development companies. These LDCs then immediately paid the funds to L&H as licensing fees so that L&H could book this "revenue" prior to year-end.

136.    Artesia knew that those LDCs lacked the financial resources and technical knowledge necessary to develop L&H's software for use with additional languages. In fact, an internal Artesia document quoted in the Report makes clear that Artesia knew that the proceeds of its loan would be used immediately by these newly formed LDCs to pay for licensing fees to L&H, leaving the LDCs with no capital to perform their contractual obligation to develop L&H software for use with other languages. The document noted that the amounts financed by Artesia would provide the "start-up capital" for the four LDCs and            **Redacted**

38

**Redacted**

137.    These loans were also secured by credit default swaps.  According to an internal undated memorandum of Artesia written in connection with the loan to LIC and quoted in the Report, the loan was granted

**Redacted**        Artesia again permitted Lernout, Hauspie and Willaert to use credit default swaps, rather than guarantees:

**Redacted**

138.    The June 25, 2003 article in *The Belgian Financial Times* stressed the role of Artesia in furthering the "related party" fraud:

> Artesia engaged in a similar fraudulent transaction on December 22, 1998, issuing a loan to the Language Investment Company for the purpose of creating 4 LDCs so that L&H could recognize revenues from these LDCs in the fourth quarter of 1998.  Again, Artesia used credit default swaps to conceal the fact that the principals of L&H had secretly guaranteed the loans used to set up the 4 LDCs in question.

139.    L&H continued to perpetuate the scheme in 1999.  On March 31, 1999, L&H set up the Language Development Fund ("LDF") and transferred $12 million that same day to the bank accounts of seven LDCs at Artesia.  The Greek, Czech, Hungarian and Polish Development Companies received $1.5 million each, and the Tamil, Thai and Hindi Development Companies received $2 million each.  This time, the $12 million came from Mercator in the form of a $2 million capital contribution and a $10 million loan to LDF.  All of these funds appeared in L&H's financial statements as revenue.

140.    Internal Artesia documents quoted in the Report leave no question that Artesia knew that these LDCs were shell entities created by L&H.  A fax dated March 1999 from an L&H employee to Artesia states:

**Redacted**