**Redacted**

141.    In the second quarter of 1999, L&H requested that LDF receive a $20 million loan from Artesia. Artesia's internal documents relating to LDF reveal that the bank was fully aware of the fraud being perpetuated at L&H. Specifically, according to an internal email from an Artesia employee (hereafter, Artesia Employee 7), dated June 21, 1999:

**Redacted**

Another internal document from Artesia's credit file quoted in the Report noted:

**Redacted**

142.    Although the loan to LDF was withdrawn before it was finalized, on June 25, 1999, Artesia granted a $20 million line of credit to Lernout, Hauspie and Willaert personally. The internal Artesia credit file for Lernout, Hauspie and Willaert quoted in the Report notes that

**Redacted**

This time, however, Artesia demanded that

40

**Redacted**

(Emphasis supplied).

### Artesia Conceals Its Role

147.  Artesia took affirmative steps to cover up its role in the fraud at L&H after the investigation of that fraud began in November 2000. Loeff Claeys Verbeke, one of the law firms charged with that investigation and co-author of the Audit Committee Report, asked Artesia about L&H's possible role in securing financing for LIC. On November 24, 2000, Artesia sent a letter to Loeff Claeys Verbeke in response to that inquiry. According to the Report, Artesia's letter stated:

**Redacted**

(emphasis supplied).

148.  Artesia made no mention of the credit default swaps executed by the principals of L&H — Lernout, Hauspie and Willaert — on the LIC transaction so as not to disclose its complicity in the fraud. As a result, the Audit Committee Report makes no mention of Artesia's role in the fraud. Likewise, none of the Wall Street Journal articles that disclosed the fraud at L&H mentioned any role by Artesia.

43

149. Consequently, Plaintiffs did not discover the role of Artesia until an article in *The Belgian Financial Times* on June 24, 2003. Prior to that time, despite diligent efforts by Plaintiffs and counsel, Plaintiffs were unaware of Artesia's role in the fraud at L&H.

### FIRST CLAIM FOR RELIEF

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

150. Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

151. This Count is asserted against Dexia for violations of § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 as promulgated thereunder.

152. Dexia S.A., and/or Dexia Bank Belgium, as acquiror of Artesia, is liable to Plaintiffs for Artesia's wrongful conduct as set forth herein.

153. Artesia, singly and in concert with L&H and its senior officers and directors directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Seagate. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Seagate to exchange its shares of Dragon for the common stock of L&H at an artificially inflated price.

154. Artesia engaged in acts, practices, and a course of business and employed devices, schemes, and artifices to defraud which operated as a fraud on Seagate by investing funds in companies for the purpose of those companies purchasing product from L&H for the sole purpose of L&H publicly reporting artificially inflated revenues and earnings. Artesia knowingly engaged in these acts, practices, and course of business and employed devices, schemes, and artifices to defraud.

155. As a result of the dissemination of the false and misleading statements set forth above, the market price of L&H common stock was artificially inflated and Seagate was induced to purchase the common stock of L&H at an artificially inflated price. In ignorance of the false

and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by defendant, Seagate relied, to its detriment, on the integrity of the market price of the stock, and the false and misleading statements made directly by L&H to Seagate. Had Seagate known the truth, it would not have entered into the Merger and purchased L&H common stock at inflated prices.

156. Artesia's scienter is demonstrated by internal documents quoted in the Report, set forth at ¶¶119-146 above, and demonstrating, *inter alia*, that:

   a. Artesia knew that its $6 million loan to Radial was used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,.

   b. Artesia knew that its $6 million loan to LIC was used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,

   c. Artesia knew that the LDCs were not independent of L&H but were rather controlled by L&H,

   d. Artesia knew that the LDCs were shell corporations, with no assets, operations, or employees,

   e. Artesia knew that the credit default swaps were used by L&H to conceal from the SEC and the investing public that the LDCs were related parties,.

   f. Artesia knew that if Lernout, Hauspie and Willaert were included in the loan documents as guarantors of the loans, L&H would have to disclose that the LDCs were related parties.

157. Seagate suffered substantial damages as a result of the wrongs herein alleged in an amount to be proven at trial, but not less than $150,806,377.62.

158. By reason of the foregoing, Artesia directly violated § 10(b) of the 1934 Act and Rule 10b-5, as promulgated thereunder in that it: (a) employed devices, schemes, and artifices to defraud; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Seagate in connection with its purchase of shares of the common stock of L&H in exchange for shares of Dragon.

## SECOND CLAIM FOR RELIEF

## CONSPIRACY TO COMMIT COMMON LAW FRAUD

159. Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein and assert this count against Dexia.

160. Dexia S.A., and/or Dexia Bank Belgium, as acquirer of Artesia, is liable to plaintiffs for Artesia's wrongful conduct.

161. At all times relevant to this complaint, L&H, Lernout, Hauspie and Willaert were perpetrating a fraud against Seagate, as set forth above at ¶¶37-118. These parties made all of the materially false and misleading statements identified above, knowing that Seagate and the investing public would rely on those statements in connection with their purchases of L&H stock. In addition, L&H falsely represented to Seagate, among other things, that its 1998 and 1999 financial statements were prepared in conformity with U.S. GAAP. Ultimately, L&H was forced to admit that these statements were false and to announce its intent to restate its financial results for 1998, 1999 and the first two quarters of 2000.

162. Artesia conspired with L&H, Lernout, Hauspie and Willaert to defraud the SEC and the investing public, including Seagate. Among other things, as detailed above at ¶¶ 119-149, Artesia knowingly and willfully devised a scheme to conceal the fact that L&H officers were guarantors of millions of dollars in loans that were made to L&H-controlled entities, including the LDCs, and then paid back to L&H as licensing fees. In so doing, Artesia, knowingly enabled L&H to recognize the entire amount of the loans as revenue, in blatant violation of GAAP, and misrepresent such amounts in their public statements detailed above.

163. In furtherance of the conspiracy, Artesia committed the following overt acts

   a. On or about September 29, 1998, Artesia made a $6 million loan to Radial, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

   b. On or about December 22, 1998, Artesia made a $6 million loan to LIC, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

   c. On or about June 25, 1999, Artesia awarded Lernout, Hauspie and Willaert a $20 million line of credit, which they then used to make payments to L&H through the LDCs in the form of licensing fees, which were improperly included as revenue on L&H's financial statements.

164. Artesia committed this misconduct intentionally, with full knowledge of the fraud being perpetrated at L&H. Specifically, Artesia's internal documents, set forth above at ¶¶119-146, demonstrate that, *inter alia*:

   a. Artesia knew that its $6 million loan to Radial was used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,

   b. Artesia knew that its $6 million loan to LIC was used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,

    c.    Artesia knew that the LDCs were not independent of L&H but were rather controlled by L&H,

    d.    Artesia knew that the LDCs were shell corporations, with no assets, operations, or employees,

    e.    Artesia knew that the credit default swaps were used by L&H to conceal from the SEC and the investing public that the LDCs were related parties,

    f.    Artesia knew that if Lernout, Hauspie and Willaert were included in the loan documents as guarantors of the loans, L&H would have to disclose that the LDCs were related parties.

165.    As a consequence of the foregoing, Seagate suffered damages in an amount to be proven at trial, but not less that $150,806,377.62.

### THIRD CLAIM FOR RELIEF

### AIDING AND ABETTING COMMON LAW FRAUD

166.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein and assert this count against Dexia.

167.    Dexia S.A., and/or Dexia Bank Belgium, by acquiring Artesia is liable to Plaintiffs for Artesia's wrongful conduct.

168.    At all times relevant to this complaint, L&H, Lernout, Hauspie and Willaert were perpetrating a fraud against Seagate, as set forth above in ¶¶ 37-118. These parties made all of the materially false and misleading statements identified above, knowing that Seagate and the investing public would rely on those statements in connection with their purchases of L&H stock. In addition, L&H falsely represented to Seagate, among other things, that its 1998 and 1999 financial statements were prepared in conformity with U.S. GAAP. Ultimately, L&H was forced to admit that these statements were false and to announce its intent to restate its financial results for 1998, 1999 and the first two quarters of 2000.

48

169. Artesia substantially assisted L&H in perpetrating the fraudulent scheme. Specifically,

    a. On or about September 29, 1998, Artesia made a $6 million loan to Radial, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

    b. On or about December 22, 1998, Artesia made a $6 million loan to LIC, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements

    c. On or about June 25, 1999, Artesia awarded Lernout, Hauspie and Willaert a $20 million line of credit, which they then used to make payments to L&H through the LDCs in the form of licensing fees, which were improperly included as revenue on L&H's financial statements.

170. At all times relevant to this complaint, Artesia knew of the fraud perpetrated by L&H. Specifically, as set forth in internal Artesia documents described above at ¶¶119-146:

    a. Artesia knew that its $6 million loan to Radial was used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,

    b. Artesia knew that its $6 million loan to LIC was used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,.

    c.    Artesia knew that the LDCs were not independent of L&H but were rather controlled by L&H,

    d.    Artesia knew that the LDCs were shell corporations, with no assets, operations, or employees,

    e.    Artesia knew that the credit default swaps were used by L&H to conceal from the SEC and the investing public that the LDCs were related parties,

    f.    Artesia knew that if Lernout, Hauspie and Willaert were included on the loan documents as guarantors of the loans, L&H would have to disclose that the LDCs were related parties.

171.    As a consequence of the foregoing, Seagate suffered damages in an amount to be proven at trial, but not less than $150,806,377.62.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Awarding Plaintiffs all compensatory damages suffered as a result of the wrongful conduct of the defendants in an amount to be determined at trial, including lost profits and consequential and incidental damages;

B.    Awarding Plaintiffs punitive damages in an amount to be determined at trial;

C.    Awarding Plaintiffs pre-judgment and post-judgment interest;

D.    Awarding Plaintiffs their costs and expenses incurred in this action, including fees for plaintiffs' attorneys and experts;

E.    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of

defendant's trading activities or their other assets so as to assure that plaintiffs have an effective remedy; and

      F.    Granting such other and further relief as the Court may deem just and proper.

Dated: March 8, 2004

            GARY B. FILLER and LAWRENCE PERLMAN
            By their attorneys,

            _____
            Gregory P. Joseph, N.Y. Atty Reg. #1645852
            GREGORY P. JOSEPH LAW OFFICES LLC
            805 Third Avenue, 31st Floor
            New York, NY 10022
            Telephone: (212) 407-1200

**OF COUNSEL**

Laurence H. Reece, III, BBO #414460
Alana A. Prills, BBO #652881
REECE & ASSOCIATES, P.C.
One Bowdoin Square
Boston, Massachusetts 02114
Telephone: (617) 747-7550

550256