**EXHIBIT B HEREOF TO BE FILED UNDER SEAL – <u>DO NOT SCAN EXHIBIT B</u>**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GARY B. FILLER and LAWRENCE
PERLMAN, Trustees of the TRA
Rights Trust,

               Plaintiffs,

v.

DEXIA, S.A. and DEXIA BANK
BELGIUM (formerly known as
ARTESIA BANKING CORP., S.A.)

              Defendants.

<u>**Jury Trial Demanded**</u>

CA No. 04-10477-PBS

**DECLARATION OF SUSAN M. DAVIES IN SUPPORT OF MOTION FOR LEAVE
TO FILE CONFIDENTIAL PORTIONS OF FILLER COMPLAINT UNDER SEAL**

      SUSAN M. DAVIES, declares pursuant to 28 U.S.C. § 1746 that:

      1.     I am an attorney with the Gregory P. Joseph Law Offices LLC, which

represents plaintiffs Gary B. Filler and Lawrence Perlman, Trustees of the TRA Rights

Trust ("Filler Plaintiffs"). I am over the age of 18 and am fully competent to testify.

I submit this declaration in support of the Filler Plaintiffs' Motion for Leave to File

Confidential Portions of Complaint Under Seal.

      2.     Filler Plaintiffs' complaint in this action was filed on March 9, 2004 in

redacted form (hereinafter "Filler Plaintiffs' Redacted Complaint"). A true and correct

copy of Filler Plaintiffs' Redacted Complaint is annexed hereto as **Exhibit A.**

      3.     The allegations in the Filler Plaintiffs' complaint are based upon, *inter*

*alia*, a free-translation of an internal report prepared by a panel of experts for the Belgian

authorities responsible for conducting the criminal investigation into L&H in Belgium

**EXHIBIT B HEREOF TO BE FILED UNDER SEAL – <u>DO NOT SCAN EXHIBIT B</u>**

(the "Report"). The Report is not publicly available. To Filler Plaintiffs' knowledge, information contained in the Report is not available currently from any public source. As the Court is aware, the Belgian criminal investigation remains pending.

4.    For the reasons set forth in the accompanying Filler Plaintiffs' and Baker Plaintiffs' Joint Motion for Leave to File Confidential Portions of Complaints Under Seal, the Filler Plaintiffs' Redacted Complaint does not include the names of any employees of Artesia Banking Corporation (now known as Dexia Bank Belgium) who are identified in the Report. Nor does Filler Plaintiffs' Redacted Complaint include any direct quotes from the Report.

5.    An unredacted version of Filler Plaintiffs' complaint in this action is annexed hereto as **Exhibit B**. For the Court's convenience, the portions of the unredacted complaint that do not appear in the Filler Plaintiffs' Redacted Complaint, and that Filler Plaintiffs' hereby seek leave to file under seal, are highlighted in **Exhibit B**.

6.    I have conferred on behalf of Filler Plaintiffs and Baker Plaintiffs with Sean M. Murphy, Esq. of Clifford Chance US LLP, 220 Park Avenue, New York, NY, counsel representing Dexia, S.A. in the related action *Quaak, et al. v. Dexia, S.A.*, CA No. 03-11566-PBS that is pending before this Court. Mr. Murphy, who has been provided with courtesy copies of the redacted and unredacted versions of the Filler Plaintiffs' and Baker Plaintiffs' complaints and has reviewed the instant motion papers prior to their filing, has indicated that Dexia, S.A. will not oppose the filing under seal of the unredacted versions of the Filler Plaintiffs' and Baker Plaintiffs' complaints.

WHEREFORE, for these reasons set forth in the accompanying Filler Plaintiffs' and Baker Plaintiffs' Joint Motion for Leave to File Confidential Portions of Complaints

**EXHIBIT B HEREOF TO BE FILED UNDER SEAL – <u>DO NOT SCAN EXHIBIT B</u>**

Under Seal, the Filler Plaintiffs respectfully request the Court to direct the Clerk to accept

for filing under seal in this action, the unredacted version of Filler Plaintiffs' complaint

that is annexed hereto as **Exhibit B**.

      I declare under penalty of perjury that the foregoing is true and correct.  Executed

in New York, New York this  17th day of March 2004.

 

 

_____

SUSAN M. DAVIES



EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GARY B. FILLER and LAWRENCE
PERLMAN, Trustees of the TRA
Rights Trust,

                      Plaintiffs,

v.

DEXIA, S.A. and DEXIA BANK
BELGIUM (formerly known as
ARTESIA BANKING CORP., S.A.),

                      Defendants.

**JURY TRIAL DEMANDED**

**04-10477 PBS**

Civil Action No. _____

**COMPLAINT**

Plaintiffs, by their attorneys, as and for their complaint, allege the following upon
knowledge as to themselves and their own actions, and as to Seagate Technology, Inc.
("Seagate") and the actions of Seagate and its representatives. As to all other matters, plaintiffs'
allegations are based upon investigation of counsel, which included, among other things, review
of a confidential report to the Belgian prosecutor conducting the criminal investigation into
Lernout & Hauspie Speech Products, N.V. ("L&H"), which report quotes extensively from non-
public documents created by defendants, and review of non-public documents created by senior
officers of L&H, including Pol Hauspie ("Hauspie"), Jo Lernout ("Lernout") and Nico Willaert
("Willaert"), and by L&H's public accountants (Klynveld Peat Marwick Goerdeler
Bedrijfsrevisoren ("KPMG Belgium") and KPMG LLP ("KPMG U.S.") (collectively "KPMG").
Plaintiffs believe that their information-and-belief allegations are likely to have evidentiary
support after a reasonable opportunity for further investigation and discovery.

1

## NATURE OF THE ACTION

1.    This action arises out of the massive fraud that was perpetrated at L&H and is related to other actions currently pending in this District, including *Filler et al. v. Lernout, et al.*, 02-CV-10302-PBS (the "Filler Action."). The principal defendants in the Filler Action include: (i) L&H's senior officers and directors, (ii) KPMG, and (iii) a number of other entities and individuals that played significant roles in the fraud. L&H is not a defendant in that action because it filed for bankruptcy and was subsequently liquidated.

2.    Plaintiffs bring the instant action against defendants DEXIA , S.A. and DEXIS BANK BELGIUM ("Dexia Belgium") (collectively "Dexia") based on newly-discovered evidence demonstrating that Artesia Banking Corporation, S.A. ("Artesia") was another key participant in the fraud at L&H before it was acquired by Dexia in 2001. On June 24, 2003, Dexia revealed that it had been notified that it was a suspect in the Belgian criminal investigation into L&H because of actions taken by Artesia in 1998 and 2000.

3.    This action seeks to recover damages sustained by Seagate when it sold its nearly $170 million interest in Dragon Systems, Inc. ("Dragon") for artificially inflated, and ultimately worthless, L&H stock. Seagate purchased L&H stock in a merger of Dragon into a subsidiary of L&H that was consummated only months before public exposure of fraudulent transactions and accounting practices that had enabled L&H to falsely inflate its revenues by at least 50% since 1997. In 1999 alone, fully 70% of L&H's revenue was fictional and has since been reversed. These fraudulent transactions and practices were the underpinning of a material artificial inflation of the value of L&H stock.

4.    A critical element of the fraud at L&H was a scheme whereby parties related to L&H established, funded and operated sham entities that entered into bogus software licensing

2

arrangements that were intended to and did artificially inflate L&H's profits. The scheme accounted for approximately 10% of L&H's 1998 revenues and approximately 25% of its 1999 revenues.

5.     As has now been revealed, L&H could not have accomplished its fraud without the knowing participation of Artesia. Artesia provided L&H and its principals with critical off-balance sheet financing, which L&H then utilized to set up so-called Language Development Companies ("LDCs") and Cross-Language Development Companies ("CLDCs"), which L&H misrepresented to the public as unaffiliated "strategic partners." The LDCs and CLDCs then paid these funds back to L&H in the form of licensing fees. To outside investors, the LDCs and CLDCs appeared to be legitimate customers of L&H that had licensed millions of dollars of L&H software. In reality, however, the LDCs and CLDCs were nothing more than corporate shells utilized by L&H to artificially inflate its revenues, as Artesia knew.

6.     Artesia understood that the LDCs and CLDCs were nothing more than corporate fictions, with no real assets or operations. Indeed, Artesia's own internal "risk evaluation" documents, which are quoted in a May 28, 2001 confidential report prepared by a panel of experts for prosecutors in Belgium (the "Report"), summed up the strategic partners as follows:

**Redacted**
                                                                (emphasis supplied).

7.     Artesia also understood that it was L&H who was ultimately responsible for ensuring that the loans would ultimately be repaid. Indeed, after the fraud was revealed, L&H admitted that it had initially financed the operations of the LDCs and CLDCs. Accordingly, Artesia requested that L&H's senior officers, Pol Hauspie ("Hauspie"), Jo Lernout ("Lernout") and Nico Willaert ("Willaert") provide personal guarantees. This presented an enormous problem for L&H, however. Under U.S. Generally Accepted Accounting Principles ("GAAP"),

if L&H officers personally guaranteed these loans, the strategic partners would be considered "related parties" to L&H, and that fact would have to be disclosed on L&H's financial statements, thus revealing the sham nature of L&H revenues from those entities.

8.    To solve this problem, Artesia devised a scheme that would protect its interests and, at the same time, conceal the fact that Hauspie, Lernout and Willaert were personally guaranteeing the loans to strategic partners. Artesia and these L&H officers entered into agreements called "credit default swaps." In essence, the credit default swaps simply moved the loan guarantees to side letters that were not included in the loan documents and, hence, not disclosed to the SEC or investing public. L&H was thus able to record the entire amount of the fictitious license fees as revenue without making any "related party" disclosure that would have alerted the SEC and investing public to the fraud. In total, Artesia made loans worth tens of millions of dollars to L&H-related parties between 1997 and 1999. All of these amounts were then paid back to L&H and fraudulently recorded as revenue.

9.    Artesia's own internal documents confirm that Artesia knowingly entered into these credit default swaps for the sole purpose of defrauding the SEC and the investing public. For example, an email from an employee (hereafter Artesia Employee 1) at Artesia to another Artesia employee (hereafter Artesia Employee 2) and other Artesia employees dated September 21, 1999, quoted in the Report, states

**Redacted**

10.    In return for its knowing participation in this fraud, Artesia continued to receive lucrative banking fees. Artesia also charged excessive interest rates in connection with these loans and received equity interests in the strategic partners with an understanding that L&H

4

would ultimately arrange for buy-outs of the strategic partners at a premium. In sum, Artesia received high returns and a future pay-off in return for financing the fraudulent transactions at the outset.

11. Within a year after the Dragon merger closed, the fraud had unraveled. The SEC and Belgian prosecutor commenced investigations into the fraud. L&H announced that as a result of "errors and irregularities," its financial results for 1998 through the first half of 2000 would be restated. L&H's stock was delisted in Europe and the United States. L&H went into bankruptcy and was subsequently liquidated. L&H's senior officers were arrested in Belgium on criminal charges relating to the fraud at L&H.

12. It was not, however, until June 24, 2003, that Dexia announced that the Belgian prosecutor investigating the L&H fraud had notified Dexia that it was a suspect because of actions taken by Artesia in connection with L&H in 1998 through 2000. Until then, Artesia's role in the fraud had not been disclosed. The next day, an article in *De Financieel Economische Tiqd* (the *"Belgian Financial Times"*), entitled "Artesia Knew [L&H] Was Playing With Fire," reported that, according to the Belgian investigators, Artesia was "an exceptionally important banker to [L&H] involved in just about everything surrounding L&H." Belgian prosecutors had secretly seized records from Artesia in February 2001 that "contained a treasure of information" regarding the L&H fraud.

13. According to the article, these records (which are not available to plaintiffs or the public) show that Artesia made multiple loans in 1998 and 1999. These loans totaled millions of dollars, which was used to artificially inflate L&H's revenues. The article also reported that, according to the Belgian Justice Department, Artesia "knew that the top management of [L&H] was involved in practices that would not be tolerated by the American SEC."

5

**JURISDICTION AND VENUE**

14.    This action arises under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, under Section 20(a) of the Exchange act, 15 U.S.C. §78t(a), and under state law.

15.    This Court has subject matter jurisdiction over this case pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa; 28 U.S.C. §1331; and principles of supplemental jurisdiction, 28 U.S.C. §1367.  Independently, this Court has subject matter jurisdiction as a consequence of the diversity of citizenship of the parties pursuant to 28 U.S.C. §1332.

16.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1391(b).

17.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

**PARTIES AND UNNAMED ACTORS**

18.    Plaintiffs Gary B. Filler and Lawrence Perlman (the "Trustees") are the former Co-Chairmen of the Board of Seagate and currently the Trustees of the TRA Rights Trust, a trust organized under the laws of the State of Delaware (the "Trust").  The Trust is the sole successor in interest to Seagate for and on behalf of the stockholders of Seagate in respect of any and all claims and causes of action possessed by Seagate arising out of, in connection with, or relating to Seagate's acquisition or ownership of shares of, or holdings in, L&H.  The Trustees have the sole authority to bring any such claim, action, suit or proceeding against L&H and its affiliates, and/or any of L&H's officers, directors, agents, representatives, and their respective affiliates, and any other person or entity, whether at law or in equity, arising out if, in connection with, or relating to Seagate's acquisition or ownership of shares of, or holdings in, L&H.  Seagate and Dragon are Delaware corporations.  The former shareholders of Seagate who are the beneficiaries of the Trust are legally entitled, through the Trust, to the sole and exclusive benefit

6

of any and all claims arising out of Seagate's ownership of L&H securities. The former Seagate shareholders are not entitled to seek damages or recover on behalf of Seagate or the Trust and do not, and never did, directly hold any of the claims asserted in this action by the Trust. The Trust was created in connection with Seagate's March 29, 2000 agreement to merge into a subsidiary of Veritas Software Corporation (a $12 billion merger) and sell its operating assets to Suez Acquisition Company (Cayman) Limited (a $2 billion leveraged buyout) (collectively, a $14 billion transaction). The Trust was created primarily for the purpose of collecting, managing, investing and distributing to Seagate's former shareholders hundreds of millions of dollars in potential future tax refunds and credits ( "tax rights") due Seagate for tax periods prior to the closing of the Veritas Transaction. The name "TRA Rights Trust" itself reflects this purpose ("TRA" stands for "Tax Rights Amounts"). The Trust is a thriving, *bona fide* entity with a corpus at March 2002 of $176 million. The Trustees had, by March 2002, collected nearly $46 million in federal and state Tax Rights and distributed $28.5 million to the former Seagate shareholders. As of March 2003, the Trustees have distributed more than $45 million to the former Seagate shareholders.

19.    Defendant Dexia S.A. is a financial institution based in Belgium and, as a result of its acquisition of Artesia in 2001, is one of the three largest banks in that country. It has over €350 billion in assets. Dexia S.A. regularly transacts business in the United States. It has numerous financial services subsidiaries in the United States including Dexia Credit Local New York Agency, Financial Security Assurance, Dexia Bank Belgium New York Branch, Artesia Mortgage Capital Corp., Astris Finance, Dexia Global Structured Finance, and Dexia Securities U.S.A.

20.    Defendant Dexia Belgium is a wholly-owned subsidiary of Dexia S.A. and regularly transacts business in the United States. The Dexia Bank Belgium New York Branch is headquartered in New York, New York.

21.    Artesia was a wholly-owned subsidiary of Acrofin CVBA, a Belgian financial services group. On March 31, 2001, Dexia S.A. announced that it was acquiring Artesia

7

Banking Corporation from Acrofin, and that Artesia would be merged into Dexia S.A.'s wholly-owned banking subsidiary Dexia Bank Belgium. Artesia continuously and systematically transacted business in the United States prior to its acquisition by Dexia through its subsidiaries.

22.     Artesia's wholly-owned subsidiary Artesia Mortgage Capital Corp. ("Artesia Mortgage"), conducted business in the United States through its headquarters in Delaware and offices at 1180 NW Maple St. Suite 202, Issaqua, Washington 98027. Artesia Mortgage continues to conduct business under the same name although it is now owned by Dexia instead of Artesia, and, since 1996, has closed loans with a principal balance of approximately $2 billion.

23.     Artesia also conducted business in the United States prior to its acquisition by Dexia through its wholly-owned subsidiary Artesia North America (headquartered in Delaware), and its fifty-percent owned joint venture, Artesia Securities, headquartered in New York.

24.     Artesia was a member of the bank lending syndicate that provided $450 million in financing to L&H for the acquisition of Dictaphone. The borrowers of the funds were Dictaphone (of Stratfield, Connecticut), L&H, and the FLV Fund, jointly and severally.

### L&H and its Senior Officers

25.     L&H was formed in 1987 by Lernout and Hauspie. Its three core technologies were automatic speech recognition, text-to-text speech conversions, and digital speech compression. L&H was headquartered in Ieper, Belgium and Burlington, Massachusetts. Until it was delisted on December 8, 2000, L&H common stock was listed on the NASDAQ under the ticker symbol "LHSP" or "LHSEQ." L&H stock was also traded on the EASDAQ until it was "indefinitely suspended" on or about November 9, 2000. On November 29, 2000, L&H filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware, and contemporaneously commenced bankruptcy proceedings in Belgium. L&H has since been liquidated.

26.     L&H Holdings USA, Inc. ("L&H USA") was a Delaware corporation, a wholly owned subsidiary of L&H, and the successor corporation to Dragon. On November 29, 2000,

8

L&H USA also filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware and was subsequently liquidated.

27.    Jo Lernout is a defendant in the Filler Action, in which the Court has denied his motion to dismiss claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Lernout was one of the founders of L&H. Lernout was President of L&H from January, 1994 until February, 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Lernout served as a member of the Board of Directors of L&H until his resignation on January 16, 2001. Lernout was forced out of his remaining role as the Chief Technology Officer of L&H at the end of February, 2001. In April 2001, Lernout was arrested in Belgium for criminal charges related to the fraud at L&H.

28.    Pol Hauspie is a defendant in the Filler Action, in which the Court has denied his motion to dismiss claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Hauspie was one of the founders of L&H. Hauspie was Chairman of L&H from January 1994 until October 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Hauspie resigned his board seat on November 22, 2000. In April 2001, Hauspie was arrested in Belgium for criminal charges related to the fraud at L&H.

29.    Gaston Bastiaens ("Bastiaens") is a defendant in the Filler Action, in which the Court has denied his motion to dismiss claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Bastiaens joined L&H as President in September 1996, and was appointed Chief Executive Officer of L&H in May, 1997. Bastiaens resigned those offices on August 25, 2000, and his board seat on November 9, 2000. In May 2001, Bastiaens was arrested in Massachusetts and extradited to Belgium for criminal charges related to the fraud at L&H.

30.    Nico Willaert is a defendant in the Filler Action, in which the Court has denied his motion to dismiss claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Willaert joined L&H as a director in 1992 and remained on the Board of Directors until November 22, 2000. Willaert was also a Managing Director of L&H from April 1993, and Co-Vice-Chairman of L&H from January 1994, until he resigned those offices on November 9, 2000. In April 2001, Willaert was arrested in Belgium for criminal charges related to the fraud at L&H.

31.    Carl Dammekens ("Dammekens") is a defendant in the Filler Action, in which the Court has granted plaintiffs' motion for a default judgment on claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Dammekens joined L&H in 1990 as Corporate Controller, and served as a Senior Vice President of Finance from 1993 and as Acting Chief Financial Officer of L&H from 1996 until his appointment as Chief Financial Officer on July 7, 1999. On November 9, 2000, L&H announced that Dammekens would be replaced as Chief Financial Officer.

32.    Flanders Language Valley Fund ("FLV Fund") is a defendant in the Filler Action, in which the Court has denied its motion to dismiss claims against it under Section 10(b) of the Exchange Act and state law claims of common law fraud. FLV Fund is a Belgian venture capital fund organized by Hauspie and Lernout, among others, to make strategic investments. FLV Fund stock is traded on the EASDAQ stock exchange under the symbol "FLVF." FLV Fund has United States offices in Los Altos Hills, California and in Woburn, Massachusetts. Hauspie and Lernout served as directors of FLV Fund in 1996 and 1997, and after 1997 each continued to "spend a portion of his time on activities relating to the FLV Fund." The FLV Fund was one of the entities related to L&H through which L&H secretly funded its claimed customers. At all relevant times, the financial statements of the FLV Fund were audited by KPMG.

33.    Flanders Language Valley Foundation ("FLV Foundation"), also known as S.A.I.L. Trust V.Z.W. ("S.A.I.L. Trust"), is a defendant in the Filler Action, in which the Court has granted plaintiffs' motion for a default judgment on claims against it under Section 10(b) of

the Exchange Act and state law claims of aiding and abetting common law fraud. FLV Foundation purports to be a non-profit entity established in 1995 by Hauspie, Lernout, and the Government of Flanders, among others, to support economic development and assist in financing the infrastructure of the Flanders Language Valley region. S.A.I.L. Trust holds a one third interest in FLV Management, N.V. ("FLV Manager") of common law fraud, aiding and abetting common law fraud, and negligent misrepresentation of the Ex), and has the right to appoint five of its directors. FLV Manager is the manager of the FLV Fund.

34.    Mercator & Noordstar, N.V. ("Mercator") is a defendant in the Filler Action, in which the Court has denied its motion to dismiss claims against it under Section 10(b) of the Exchange Act and state law claims of aiding and abetting common law fraud. Mercator is an insurance company based in Antwerp, Belgium. At all relevant times, Mercator owned 6.9% of L&H Holding, which, in turn, owned 8.9% of L&H. Mercator also directly owned a 0.2% stake in L&H.

35.    KPMG Belgium is a defendant in the Filler Action, in which the court has denied its motion to dismiss claims against it under Section 10(b) of the Exchange Act and state law claims of common law fraud, aiding and abetting common law fraud, and negligent misrepresentation. KPMG Belgium participated in KPMG's audits of L&H from 1991, when it absorbed the Belgian accounting firm of Behets, Boes & Co., which had been auditing L&H since the late 1980's. KPMG Belgium was the signatory to KPMG's unqualified reports on L&H's financial statements for the years 1998 and 1999, among others; gave an opinion that those financial statements were prepared in accordance with U.S. GAAP; stated that its audit was conducted in accordance with U.S. GAAS; and consented to L&H's inclusion of KPMG Belgium's reports on those financial statements in filings with the SEC.

36.    KPMG U.S. is a defendant in the Filler Action, in which the Court has denied its motion to dismiss claims against it under Section 10(b) of the Exchange Act and state law claims of common law fraud, aiding and abetting common law fraud, and negligent misrepresentation. KPMG U.S. is a public accounting firm based in the United States, and played a primary role in

11

the 1997, 1998 and 1999 audits of L&H financial statements. A team of KPMG U.S. auditors performed field work at L&H's U.S. operations, and the international team as a whole was guided by Robert McLamb, a U.S. partner charged with reviewing L&H financial statements for compliance with U.S. GAAP. Another U.S. partner, Glen Davison, was responsible for reviewing L&H financial statements for compliance with SEC rules and regulations. KPMG U.S. performed extensive services for L&H in other areas as well, such as tax advice, consulting, and acquisitions advice. Robert McLamb was the "relationship partner" on L&H's engagement of KPMG in connection with the acquisition of Dragon.

## SUBSTANTIVE ALLEGATIONS

37.    L&H was a speech recognition software manufacturer that was founded in 1987 by Lernout and Hauspie. Its three core technologies were automatic speech recognition, text-to-speech conversion, and digital speech compression. In 1995, L&H completed its initial public offering and commenced trading on NASDAQ. From 1987 through 1995, L&H was not profitable and produced only a few million dollars in annual revenues

38.    In the third quarter of 1996, L&H began to expand its business. L&H's sales were reported as quadrupling between 1995 and 1996, and the period following was reported as one of unprecedented growth. In 1997, L&H's total reported revenues increased 220% to $99.4 million from $31 million in 1996. In 1998 L&H claimed that revenues rose 113% to $211.6 million, and by 1999 revenues were claimed to be $344 million.

39.    The expansion of L&H's business was fueled primarily through the practice of acquiring complementary businesses and technologies as a means of supplementing its own internal development activities. From 1996 onwards, L&H acquired at least 20 such companies, using its own stock as currency for over 40% of the acquisitions that took place from 1998 to 2000, including L&H's acquisition of Dragon, a company in which Seagate owned a substantial stake.

12

### Seagate's Purchase of L&H Shares

40.    On March 27, 2000, L&H, L&H USA, Dragon, and certain of the principal stockholders of Dragon, including Seagate, entered into an agreement (the "Merger Agreement") pursuant to which L&H would acquire Dragon in a stock-for-stock transaction (the "Merger.")

41.    On June 7, 2000, the transactions contemplated by the Merger Agreement were consummated, and Seagate acquired 3,871,489 shares of L&H common stock. On that date, L&H was valued at $43.125 per share. Thus, Seagate purchased L&H shares for an interest in Dragon valued at approximately $166,957,963.

### Seagate Relied on Public Disclosures of Record Growth and Revenues

42.    In agreeing to accept L&H shares in exchange for its interest in Dragon, and in setting the price of Dragon relative to L&H's stock price, Seagate relied on the truth and accuracy of L&H's extensive public disclosures regarding its business and revenues and the propriety of its financial statements, many of which Seagate directly examined and all of which were incorporated in the market price of L&H securities. These disclosures and assurances portrayed L&H as a technology company whose innovative products were propelling record global revenues.

43.    Every quarter in 1998, and 1999, L&H proclaimed exponential increases in revenues and attributed them to its scores of "new contracts to license its core technologies."

44.    L&H's announced its first quarter 1998 revenues in a press release dated April 28, 1998, attached as an exhibit to a Form 6-K/A dated May 26, 1998: "[f]or the first quarter of 1998, L&H's total revenues were $35.1 million, an increase of 112% over reported revenues of $16.6 million for the first quarter of 1997." Bastiaens was quoted as attributing L&H's performance to "our tremendous success in securing contracts," which the press release numbered at "a record-breaking 40 contracts."

45.    In a July 28, 1998 press release, filed with the SEC on a Form 6-K dated August 5, 1998 and signed by Bastiaens, L&H announced total second quarter 1998 revenues of "$45 million, an increase of 113% over reported revenues of $21.1 million for the second quarter of

1997." In that press release, Lernout attributed the results to increased demand for L&H products and "new contract bookings," as did Bastiaens, who stated that "[d]uring Q2 we signed 42 new contracts."

46.    In an October 27, 1998, press release, filed with the SEC on a Form 6-K on October 28, 1998, L&H announced that, "for the third quarter of 1998, L&H's total revenues were $54.9 million, an increase of 97% over reported revenues of $27.9 million for the third quarter of 1997."

47.    On April 7, 1999, L&H "announced results for the fourth quarter of 1998 of $76 million in revenue, or a 126% increase in the reported revenue of $33.8 million for the fourth quarter 1997."

48.    In L&H's 1998 Annual Report filed with the SEC on Form 20-F and signed by Bastiaens, L&H stated that "for the fiscal year 1998, the company reported total revenue of $211.6 million or an increase of 113% over the reported revenues of $99.4 million for fiscal year 1997."

49.    The L&H 1998 Annual Report to Shareholders, filed with the SEC on a Form 6-K on June 1, 1999 contains a letter to shareholders trumpeting "a year of major milestones.... For the fourth consecutive year, revenues grew by more than 100% over the year before. In fiscal 1998, the company reported total revenues of $211.6 million or an increase of 113 percent over the $99.4 million reported for 1997.... L&H ... signed a record 160 new contracts to license its core technologies."

50.    On May 18, 1999, L&H announced that "for the first quarter of 1999, L&H's total revenues were $70.7 million, an increase of 102% over reported revenues of $35.1 million for the first quarter of 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications."

51.    In a press release dated July 28, 1999, filed with the SEC on a Form 6-K dated August 2, 1999, L&H announced that its second quarter 1999 "total revenues were $76.0 million,

an increase of 69% over reported revenues of $45.0 million. L&H's total revenues for the six months ending June 30, 1999 were $146.7 million, an increase of 83% over reported revenues of $80.1 million for the same period in 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications." L&H reported that in the second quarter, the Technologies and Solutions division "signed 57 new contracts (45 of which were related to core speech technology)."

52.    In a press release dated October 27, 1999, filed with the SEC on a Form 6-K dated November 3, 1999, L&H announced that its third quarter 1999 "total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998. L&H's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998."

53.    In a press release dated February 9, 2000, filed with the SEC on a Form 6-K/A dated February 14, 2000, L&H announced that, "[f]or the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5% increase in the reported revenue of $76.7 million for the fourth quarter of 1998. For the fiscal 1999 [sic], the company reported total revenues of $344 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998." The company attributed growth to the "Technologies and Solutions Division sign[ing] a record of 80 contracts for the quarter." In that press release, Bastiaens stated that "[i]n 1999 we experienced a strong demand for speech and language technologies, applications and solutions, specifically in the Enterprise and Telephony area. This increase was mainly the result of internal growth and created a positive cash flow from operations of $68 million, reflecting the maturity of our operations."

### Seagate Relied on Disclosure of Exorbitant License
### Revenues from Purportedly Unaffiliated "Strategic Partners"

54.    Seagate also relied on L&H's attribution of significant revenues to what it reported as license fees from unaffiliated "strategic partners" who contracted with L&H to develop its software for specific applications and languages.

55.    In 1996, shortly after Bastiaens arrived at L&H, the company announced that Dictation Consortium NV ("Dictation"), "a private company in which the FLV Fund has an investment," had licensed L&H software in order to develop L&H's continuous automated speech recognition technology.  As of December 31, 1996, FLV Fund and FLV Management together owned 61% of Dictation and defendants Lernout and Hauspie were directors of FLV Fund Management.  Dictation provided L&H with $26.6 million in revenue over the next two years, approximately one quarter of its 1996 sales and 19% of 1997 sales.  Since Dictation bore the research and development costs, they did not shrink L&H's bottom line, as they should have. In May 1998, L&H announced that it had obtained the software developed by Dictation by purchasing the company for $26.9 million, most of which represented goodwill and could thus be amortized over seven years.

56.    In 1997, L&H entered into a similar arrangement with a company formed in March 1997, by anonymous venture capitalists, called Brussels Translation Group ("BTG"). According to L&H's 1998 Annual Report on Form 20-F, L&H granted BTG an exclusive license to use L&H speech processing technology and associated data bases to develop an internet translation service.  The agreement called for BTG to pay L&H $3.5 million in license fees, plus royalties.  In May 1997, the license fee was increased by $1.5 million, and L&H also entered into an agreement to provide BTG with engineering services, under which BTG paid L&H approximately $30 million.

57.    In June, 1999, L&H acquired BTG for approximately $42 million in cash plus the assumption of BTG's $17 million start-up debt.  As in the Dictation Consortium transaction, L&H was able to obtain a product without deducting the research and development expense.

16

Instead L&H was able to record nearly $35 million in revenues and then, when it purchased BTG, L&H capitalized the acquisition price, turning what would normally be an expense into an asset.

58.     Although critics charged that L&H earnings were inflated by the Dictation and BTG transactions because those companies were related to L&H, L&H falsely maintained that, except for the FLV Fund involvement in, the companies were owned by unaffiliated "private investors" whom L&H refused to identify.

59.     In late 1998 L&H expanded its reliance on customers modeled on Dictation, helping to create 30 start-up companies incorporated in Belgium and Singapore. Those companies were funded by unidentified private investors whom L&H insisted were "unaffiliated with us." In an April 7, 1999 press release, L&H announced among the highlights of fiscal year 1998:

> [L&H began] development of approximately 20 additional exotic languages with its financial and technological partners.   During 1998, contracts were signed for the following languages: Ukraine, Polish, Czech, Slavic, Bahasa, Greek and Farsi, to support a range of speech technologies.... In order to develop these additional languages within certain time and financial constraints, L&H is working with partners who will undertake the localization and development of these language areas and share the financial rewards. L&H will license its tools to the partners and will secure the quality of the various applications and languages.

60.     In its 1998 Annual Report on Form 20-F, L&H expanded its description of these transactions:

> Pursuant to these agreements, we have exclusively licensed our speech and language technology development tools to strategic partners that are unaffiliated with us to develop and localize our technology for specified new languages. Our strategic partners also have exclusive rights ... to develop, market, and distribute products incorporating the developed technology. I n addition to one-time l icense fees, w e have rights to r eceive royalties based on our partners' net revenues from sales of products incorporating the developed technology.

(emphasis added.)

61.     Initial license fees paid by these assertedly unaffiliated "strategic partners" accounted for 10% of L&H's claimed 1998 revenue and 25% of claimed 1999 revenue, far in

17

excess of the 3.7% of 1998 revenue that L&H stated, in its 1998 Annual Report on Form 20-F,

was provided by "companies funded in part by the FLV Fund," and the 0.3% of 1999 revenues

that L&H stated, in its 1999 10-K, were provided by "companies funded in part by the FLV Fund

and L&H Investment Co."

62.     L&H underscored the purported legitimacy of its licensing revenues with false

public descriptions of a conservative revenue recognition policy.  In notes to its 1997, 1998 and

1999 financial statements, audited by KPMG, L&H stated that:

> The Company recognizes revenue from the sale of its software licenses upon
> satisfaction of all of the following criteria: signing of the license agreement,
> shipment of the products, when no contractual terms remain unsatisfied and, if
> applicable, when a royalty report is received from the customer.  The Company
> generally receives, on a quarterly basis, royalty reports from each customer who
> has signed a license contract.  The reports detail the number of units or products
> that the customer shipped during that period.  The number of units multiplied by
> the applicable contractual rate per unit is the amount that the Company records as
> revenue.    Before recording this revenue, the Company determines that all
> significant obligations have been satisfied and that collection of the receivable is
> probable. ...
>
> The Company from time to time enters into nonrefundable minimum royalty
> agreements with customers.  Under these arrangements the Company delivers its
> technologies or products to the customer contemporaneously with the execution
> of the agreement.  Revenue from nonrefundable minimum royalty agreements is
> recognized upon satisfaction of all of the following criteria: signing of the
> licensing agreement; no additional significant production, modification or
> customization of the software is required; delivery has occurred; the fee is fixed
> and determinable, and; collection is probable.  For arrangements that include
> multiple elements, the fee is allocated to the various elements based on vendor
> specific objective evidence of fair value.
>
> In all such cases, the Company only recognizes revenue when collection of the
> related receivable is probable.

63.     These disclosures were also false.  As detailed below, investigators have

discovered, and L&H has confirmed, that its "strategic partners" were in fact shell start-up

ventures established by parties related to L&H (and audited by KPMG), including defendants

FLV Fund, S.A.I.L. Trust, and LHIC, as a means of funding research and development off the books, and the hefty "license fees" from those "customers" recorded by L&H were a sham.

64.    Moreover, as further detailed below, the ventures were funded by tens of millions of dollars in loans that were secretly guaranteed by L&H principals Lernout, Hauspie and Willaert. The lender was Artesia, whose non-public internal documents, the substance of which have only recently been obtained by plaintiffs, demonstrate that Artesia made the loans with full knowledge that the "strategic partners" were shams, that the proceeds of the loans would be funneled back to L&H who would falsely describe them in its financial statements as "license fees" from "unaffiliated entities," that such reporting violated U.S. Generally Accepted Accounting Principles ("GAAP"), and that the sole purpose of the transaction was to evade the reporting requirements of the SEC. Indeed, it was Artesia who conceived a structure for the guarantees — credit default swaps — that would permit L&H to maintain secrecy and thereby accomplish its fraud.

### Seagate Relied on Written Assurances of KPMG

65.    In each of its Annual Reports for 1998 and 1999, filed with the SEC, L&H stated that its financial statements were prepared in accordance with U.S. GAAP. KPMG bolstered the credibility of L&H's disclosures by issuing unqualified reports on its audits of L&H's 1997, 1998 and 1999 financial statements and consenting to the inclusion of those reports in L&H's SEC filings.

66.    An auditor is supposed to give an "unqualified opinion" or "clean opinion" only when no significant limitations affect the performance of the auditor and when the evidence obtained in the audit discloses no material deficiencies in the financial statement and or unusual circumstances that affect the auditor's report. American Institute of Certified Public Accountants (AICPA), "Understanding Audits and the Auditor's Report — A Guide for Financial Statement Users," 2nd ed., 1996, at 15.

67.    On April 9, 1999, KPMG reported on L&H's 1998 financial statements, stating:

19

We have conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of [the relevant time period], and the results of their operations and their cash flows for each of the years in the three-year period ended [on December 31 of the fiscal year], in conformity with generally accepted accounting principles in the United States.

68.    KPMG consented to the inclusion of its 1998 Audit Report in L&H's Annual Report on Form 20-F filed with the SEC on June 30, 1999. On January 6, 2000, KPMG also consented to the incorporation by reference of its 1998 Audit Report in Registration Statements filed by L&H with the SEC on Form F-3 on January 7, 2000. That Registration Statement was provided to Seagate as "L&H's latest public filing" in the course of Seagate's due diligence in connection with the Merger.

### Seagate Relied On False Oral Representations by KPMG and L&H Principals

69.    In addition to L&H representations in press releases and public filings, Seagate relied upon specific oral representations by Lernout, Hauspie, Bastiaens, Dammekens, and KPMG confirming the accuracy of L&H's public disclosures.

70.    On several occasions during negotiation of L&H's purchase of Dragon, Bastiaens told Ellen Chamberlain, a Seagate employee acting as interim Chief Financial Officer of Dragon, that L&H's projections were on target for the first and second quarters of 2000. Bastiaens made those statements at meetings at the Boston, Mass., offices of Cowan & Co., L&H's investment bankers in connection with the Merger, in February and March 2000.

71.    From December 13 to 15, 1999, Ms. Chamberlain met with Lernout and Hauspie in Belgium, where Ms. Chamberlain expressed concern that the FLV Fund was funding the start-

up companies that were providing substantial percentages of L&H's software licensing revenues. Both Lernout and Hauspie assured Ms. Chamberlain that: (a) they had no financial interest in any of the start-up companies; (b) any licensing of L&H software by those start-up entities was the result of arms-length negotiation; and (c) even though they were both on the board of the FLV Fund, they were not active in its decision-making.

72.    On or about March 22, 2000, approximately one week before the Merger Agreement was executed, Dammekens participated in a conference call during which Ms. Chamberlain questioned him about the basis for his comfort with L&H's revenue recognition. Dammekens stated that he was comfortable with L&H's disclosures of revenue because he and his team reviewed all L&H contracts before financial results were released, including the fiscal year 1999 results that had been released in January 2000.

73.    During the course of due diligence prefatory to the merger, Ms. Chamberlain had repeatedly asked to speak with KPMG, and was told that she could not because their audit of L&H's 1999 financial statements had not been completed. Ms. Chamberlain was finally able to question representatives of KPMG during the March 22, 2000 conference call, in which those representatives participated. The KPMG personnel who participated in the call knew that the purpose of the call was to provide information to Seagate representatives as an important part of Seagate's due diligence with respect to the Merger.

74.    During the March 22, 2000 conference call, a KPMG partner told Ms. Chamberlain, among other things, that: (a) KPMG expected to sign off on its audit of L&H's 1999 financial statements in two to three weeks; (b) The only open audit issues were "a couple of revenue issues" in Korea regarding one or two customers, but nothing that would cause an adjustment; and a "couple" of contract confirmations had not yet been received; and KPMG had yet to complete minor tests of L&H's capitalization of its R&D expense, such as checking timesheets of engineers who had billed time to certain projects; (c) In the course of the 1999 audit, no adjustments had been booked by the auditors; (d) KPMG did not at that time

anticipate any material adjustment of L&H's 1999 financial statements; and (e) KPMG was "comfortable" with L&H's revenue recognition.

75.    Ms. Chamberlain was aware that, in 1999, L&H had been investigated by the SEC in connection with an aggressive means of accounting for acquisitions. L&H had used a "purchase" method of accounting for goodwill, taking it as a one-time charge against earnings for "in-process research and development." L&H's methods, audited and approved by KPMG, impermissibly allowed L&H to avoid the long-term depression of earnings caused by amortization of goodwill. The SEC required L&H to restate its financial results for 1997 and the first six months of 1998.

76.    When Ms. Chamberlain, during the March 22, 2000, conference call, inquired about the status of SEC inquiries into L&H accounting practices, the KPMG Belgium representative told her that all issues from SEC inquiries into L&H accounting practices had been resolved.

### Subsequent Reliance on KPMG Belgium's Unqualified Opinion for 1999

77.    On April 27, 2000, KPMG, over the signature of KPMG Belgium, issued its unqualified report on L&H's 1999 financial statements, confirming KPMG's oral representations, on March 22, 2000, that its audit had uncovered no material errors or improprieties in the unaudited financial statements issued in January:

> We have audited the accompanying consolidated balance sheets of Lernout & Hauspie
> Speech Products N.V. and subsidiaries (the Company) as of December 31, 1998 and
> December 31, 1999, and their related consolidated statements of operations, shareholders'
> equity, cash flows and comprehensive income (loss) for each of the years in the three-
> year period ended December 31, 1999....
>
> \*    \*    \*
>
> In our opinion, the consolidated financial statements referred to above present fairly, in
> all material respects, the financial position of Lernout & Hauspie Speech Products N.V.
> and subsidiaries as of December 31, 1998 and December 31, 1999 and the results of their
> operations and their cash flows for each of the years in the three-year period ended
> December 31, 1999, in conformity with generally accepted accounting principles in the
> United States.

22

78.    Seagate was entitled to terminate the Merger Agreement prior to closing if it became apparent that L&H's unaudited financial statements for 1999, released prior to execution of the Merger Agreement, were materially misstated:

(a)    The Merger Agreement included L&H's representations and warranties that:  (i) all of L&H's filings with the SEC since January, 1998, did not contain any untrue statement of material fact or any material omission;  (ii) that all financial statements included in L&H's SEC filings complied in all material respects with SEC accounting requirements and published rules and regulations, and were prepared in accordance with U.S. GAAP; and (iii) that L&H's unaudited consolidated financial statements for the year ended December 31, 1999 were prepared in accordance with U.S. GAAP and "fairly present in all material respects the consolidated financial position of [L&H] as of the date thereof."

(b)    Section 9.1 of the Merger Agreement allowed Seagate to terminate the Agreement at any time prior to closing "if there has been a breach of any representation [or] warranty ... which causes the conditions set forth in section 7.3(a) ... to be incapable of being satisfied"

(c)    Section 7.3(a) of the Merger Agreement provided that "representations and warranties of [L&H] shall be true and correct in all material respects as of the closing date."

79.    Had KPMG not given an unqualified opinion stating that L&H's 1999 financial statements were prepared in accordance with U.S. GAAP, or had it otherwise qualified its report on L&H's 1999 financial statements, this would have communicated to Seagate that L&H's unaudited financial statements for the year ended December 31, 1999 were not prepared in accordance with U.S. GAAP and the Merger would not have been consummated.

### Seagate Relied on the Integrity of the Market for L&H Securities

80.    Among the factors Seagate considered in setting the price for its Dragon holdings, which L&H paid for in L&H stock, was the market price of L&H stock. At all relevant times, the

market for L&H stock was efficient because L&H common stock met the requirements for listing, and was listed and actively traded on the NASDAQ and the EASDAQ, which were automated and highly efficient markets.

81.     As a regulated issuer, L&H filed periodic public reports with the SEC. L&H also regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

82.     The market for L&H stock promptly digested current information regarding L&H from the publicly-available sources described above and reflected such information in the price of L&H stock.

83.     Consequently, at all relevant times — including the time Seagate was negotiating the price it would accept in L&H stock, the time Seagate executed the Merger Agreement, and the time the Merger was consummated — the price of L&H stock was fraudulently inflated by defendants' misrepresentations and non-disclosures.

### The Fraud at L&H

84.     Within months after the Dragon Merger closed, L&H's "record" growth was revealed to be a complete sham. By the end of May 2001, less than a year after the Dragon transaction closed, U.S. and European regulators had commenced investigations into the fraud at L&H, L&H stock had been delisted in Europe and the U.S., L&H was in bankruptcy, and Lernout, Hauspie, Willaert and Bastiaens had been arrested on various criminal charges relating to fraud at L&H. The L&H stock valued at nearly $170 million when Seagate received it in exchange for a stake in Dragon was utterly worthless.

85.     Until its acquisition of Dictaphone Corporation in May, 2000, L&H had been able to file information with the SEC as a foreign private issuer subject to less detailed disclosure requirements than those applied to U.S. entities. Shortly after the Merger was consummated, on June 30, 2000, L&H filed a Form 10-K, which included financial statements for fiscal year 1999

24

audited by KPMG, and also filed a Form 10-Q, which included unaudited financial statements for the first quarter of fiscal year 2000, both of which contained, for the first time in an SEC filing by L&H, the geographic breakdown of sales required by the SEC in filings by U.S. companies.

86.    The filings purported to reveal that out of 1999 revenue of $344.2 million, Korea contributed $62.9 million and Singapore contributed $80.3 million (collectively, over 41% of total L&H revenues), up from combined revenues of less than $300,000 in 1998.

87.    After the June 30, 2000 Form 10-Q was filed, reporters from *The Wall Street Journal* commenced an investigation into L&H's customers in Singapore and Korea. It began reporting the results of this investigation in an article published on August 8, 2000. The article disclosed that many of the companies which L&H had identified as Korean customers had denied that they did business with L&H.

88.    Although L&H attempted to deny these allegations and claimed that all Korean revenues were accurate, on August 15, 2000, *The Wall Street Journal* reported that L&H had commissioned a mid-year interim audit of the company by KPMG. The goal of the audit was to "allay concerns about the financial results of [L&H's] South Korean division."

89.    On August 25, 2000, L&H announced that Bastiaens had resigned from his position as president and CEO of L&H. Bastiaens was replaced by John Duerden, the former CEO of Dictaphone. Bastiaens remained a director of L&H.

90.    On September 20, 2000, the L&H Board of Directors authorized its Audit Committee to "conduct such inquiries as it deemed appropriate into certain accounting and other practices of the Company that were the subject of a formal investigation being conducted by the [SEC]," according to a report provided to the Audit Committee two months later, on November 20, 2000 (the "Audit Committee Report"), by the advisors retained by the audit committee -- the U.S. law firm Bryan Cave LLP, the Belgian law firm Loeff Claeys Verbeke, and the accounting firm of Arthur Andersen LLP (the "Audit Committee Advisors").

91.     On September 22, 2000, *The Wall Street Journal* reported that the SEC had commenced an investigation into L&H's accounting practices in January 2000. In fact, on or about January 24, 2000, the SEC had issued a request for documents to L&H, which focused on L&H's revenue recognition practices and, in particular, on the Company's contracts and relationships with its so-called "strategic partners." Subsequently, the SEC raised the status of the investigation to "formal."

92.     On September 22 and 26, 2000, *The Wall Street Journal* also raised significant additional questions about L&H's revenue, specifically about 30 Singapore and Belgian start-up companies that accounted for nearly all of L&H's Asian revenues reported in 1998 and 1999. The articles also raised concerns that the FLV Fund had financial connections to eight start-ups with close links to L&H, and that those start-ups accounted for a large portion of L&H's 1998 and 1999 revenues. One of the transactions questioned involved the eight Singapore start-ups which were initially funded by the FLV Fund without any disclosures relating to their nature as related-party transactions.

93.     On September 26, 2000, *The Wall Street Journal* reported that the Brussels-based EASDAQ stock exchange had launched a formal investigation into L&H. On the same date, Bloomberg News reported that the EASDAQ would also investigate the FLV Fund.

94.     On October 18, 2000, *The Wall Street Journal* reported that L&H was refusing to provide the SEC with the names of the investors behind the thirty corporate customers that were the focus of the SEC investigation, and who accounted for approximately 25% of the Company's 1999 revenues and 10% of its 1998 revenues. While L&H admitted that it had helped start the 30 companies and initially financed their operations, the Company maintained that the firms were owned by independent investors interested in developing new applications for L&H speech software. L&H released new details about the operations of 17 of the 30 companies, which revealed that these companies had no real corporate existence whatsoever, and certainly no economic substance apart from L&H. Of these 17 companies, none had any direct employees. Seven companies were relying on L&H employees to do work for them and had agreed to repay

L&H for its services.  The other 10 had not started developing software, though they had paid hefty licensing fees to L&H.  According to *The Wall Street Journal*, the 30 companies were all registered at just a few common addresses in Belgium and Singapore, and many had common officers and nominee shareholders.

95.     On November 9, 2000, L&H "provided an update on the status of the mid-year audit of the Company that it had commissioned last August and of the ongoing audit committee inquiry" and announced that "[a]s a result of errors and irregularities identified in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000."  L&H's announcement of "accounting irregularities" was, in accounting terms, tantamount to an admission of fraud.  Statement of Auditing Standards No. 53 issued by the American Institute of Certified Public Accountants defines "irregularities" as "intentional misstatements or omissions" in financial statements, meaning that there was fraud in their preparation.

96.     That day, the NASDAQ suspended trading in L&H shares.  Just before the suspension, L&H shares were changing hands at $3.525, more than 95% below the record high of $72.50 they reached in March, when the company claimed a market capitalization of more than $10 billion.  The slide wiped out more than $9 billion of the company's stock market value.

97.     On November 17, 2000, *The Wall Street Journal* reported that L&H's independent auditor, KPMG, had withdrawn its audit report on L&H's 1998 and 1999 financial statements, stating that its prior audit opinions "should no longer be relied upon."

98.     On November 21, 2000, *The Wall Street Journal* reported that the EASDAQ had suspended trading in the FLV Fund.  The article described the FLV Fund as an investment vehicle over which Jo Lernout and Pol Hauspie "exercise considerable influence over its affairs," with "a history of investing in L&H customers, typically small companies that pay license fees to L&H."

99.     On November 29, 2000, L&H filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware.  According to a November 30, 2000 *Wall*

*Street Journal* article, the decision to file for bankruptcy protection came after L&H executives discovered that $100 million in cash was missing from the Company's South Korean unit.

100.    On December 14, 2000, *The Wall Street Journal* reported on the thirty "strategic partners" that comprised a significant portion of L&H's revenues, revealing that Mercator was the ultimate owner of 16 of the 30 start-ups and that the FLV Fund had funded, at least in part, approximately 8 of the remaining 14.

101.    On January 5, 2001, the Associated Press reported that the Belgian judge presiding over L&H's Belgium bankruptcy proceeding acknowledged that there is "no doubt there was fraud" at L&H.

102.    In late April of 2001, South Korean authorities began investigating allegations against the Korean Banks, as well as certain former L&H Korea employees.

103.    On or about April 27, 2001, Lernout, Hauspie and Willaert were arrested in Belgium and charged with forgery and stock manipulation. On May 26, 2001, Bastiaens was arrested by United States officials in Winchester, Massachusetts, in response to a Belgian warrant. Bastiaens was subsequently extradited to Belgium, where he has been charged with fraud, insider trading, stock market manipulation, and accounting law violations.

### The "Strategic Partner" Fraud

104.    On December 19, 2000, L&H publicly revealed the findings of the Audit Committee Report, which had previously been presented to the L&H Board of Directors on November 20, 2000. The Audit Committee Report concluded, in part, that:  (a) L&H had improperly recorded as much as $277 million in revenue during 1998, 1999 and the first half of 2000; (b) the Company should reverse all of its Korean revenues recorded during 1999 and 2000, amounting to approximately $182 million; and (c) software license revenues from twenty-four of the thirty "strategic partners" were doing nothing more than funding L&H's research and development through related-party transactions.

105.    With respect to license revenues from "strategic partners," i.e., the LDCs and CLDCs, the Audit Committee Advisors concluded that revenue from 24 of the 30 new

companies was incorrectly booked. The report concluded that the companies were not buying software licenses, but were actually paying L&H employees to develop future products, in effect funding the company's own R&D needs. The Audit Committee Report recommended, at a minimum, reversing approximately $83 million in licensing revenue, and stated that if the investors are related parties, as the evidence suggests, the funded amounts should be recognized as a liability:

> It appears, based on our review, that the original LDC concept involved the sale of rights and tools to an independent third party and the separate use of those tools by the third party to develop L&H compatible products in a particular language. The wording of the contracts corroborate this concept. However, it also appears that shortly after the first few LDC contracts were signed, L&H personnel realized that the LDC investors were primarily financial investors and L&H would have to provide more services to the LDCs than they originally thought. Eventually, L&H assumed responsibility for the development work for a contemplated additional fee. Although it appears to us that, by December 1998 L&H and the LDCs knew that L&H would be performing some or all of the services or development work for the LDCs, future contracts were not changed to reflect that understanding. Except for Turkish and Farsi, contracts reflecting that the LDCs would pay L&H for the services or development work were not executed until November 3, 2000. To our knowledge, except for Turkish and Farsi, the LDCs have not yet been invoiced for the development work performed to date.
>
> *    *    *
>
> We believe, based on our review of certain internal documents and outside marketing material and limited discussions with the investors or their representatives, that the investors anticipated, in substance, that they were buying the future rights to a product (language) to be developed by L&H and thus were effectively funding the Company's research and development efforts to build that language.
>
> If the investors are not related parties, accounting for such transactions would require deferral of all the revenues and recognition over the development period.... If the investors are related parties, the relevant accounting literature presumes that the related party investors will be repaid and the funded amounts are recognized as a liability.

106.    In fact, the investors were related parties, and what L&H recognized as license revenue should not merely have been deferred, it should have been stated as a liability. Although the Audit Committee report redacted the names of the investors it did manage to discover and connect to L&H, news reports revealed those names and their affiliations with L&H.

107.    A September 22, 2000 *Wall Street Journal* article revealed that eight of the shell start-ups were funded by defendant FLV Fund, which is audited by KPMG. According to a November 6, *Wall Street Journal* article, another four were organized as subsidiaries of Language Investment Co., whose chief executive officer, Willem Hardeman, sits on the Board of the FLV Fund. And a December 14, 2000 *Wall Street Journal* article reveals that another sixteen were owned by Mercator, whose chairman, Louis Verbeke is a name partner in the law firm that acted as L&H's main counsel and as an Audit Committee Advisor — Loeff, Claeys, Verbeke. Mr. Verbeke and Mercator separately hold stakes in L&H. Mercator also owns 6.9% of L&H Holding Co., a vehicle through which defendants Lernout and Hauspie control L&H. L&H's financial statements and other disclosures misleadingly omitted these relationships. Indeed, as previously set forth, L&H affirmatively and falsely represented that these "licensees" were "unaffiliated customers" and that 1998 and 1999 revenues from companies funded by the FLV Fund were *de minimis*.

108.    More recently, in June 2003, it was further revealed that the entities were funded by tens of millions of dollars in loans secretly guaranteed by L&H principals — Lernout, Hauspie and Willaert.

109.    In essence, L&H represented to the public that the LDCs and CLDCs were unaffiliated entities who were paying L&H tens of millions of dollars in licensing fees for the right to develop L&H software for use with specific languages. The contracts gave L&H an option to acquire the strategic partner and the developed product. Thus, to the public, unaffiliated parties were providing substantial revenue to L&H and were also bearing the cost and the risk of developing software.

110.    In reality, the LDCs and CLDCs were uncreditworthy start-up shells with no funds to pay the license fees and no resources to perform the research and development work contemplated by the contracts they signed with L&H. Instead, L&H and its employees performed the development work, bearing all the research and development costs.

30

111.    The scheme operated to inflate L&H's stock price in two ways. First, the license fees reported as revenue were in fact the proceeds of loans guaranteed by L&H principals. Thus, a multi-million liability was reported as profit. Second, L&H did not report its research and development costs as an expense, which would immediately reduce earnings. Instead, it exercised its options to purchase the entities and their finished products and then capitalized the majority of the purchase price as goodwill. L&H was then able to amortize the cost of these capitalized assets over an extended period of time.

112.    The SEC requires publicly-traded companies to present their financial statements in accordance with GAAP. 17 C.F.R. §210.4-01(a)(1). That regulation states that financial statements filed with the SEC that are not prepared in conformity with GAAP "will be presumed to be misleading, despite footnote or other disclosures, unless the Commission has otherwise provided."

113.    L&H's accounting constituted flagrant violation of GAAP in several ways. Statement of Financial Accounting Standard (SFAS) No. 68, *Research and Development Arrangements* requires that "[t]he financial reporting of an enterprise that is party to a research and development arrangement should represent faithfully what it purports to represent and should not subordinate substance to form."

114.    At a minimum, under SFAS No. 68, and under SOP 97-2, L&H was required to account for the arrangement as a long-term construction contract and defer recognition of revenues from the start-up shells over the development period. SFAS No. 68 provides that:

> An enterprise shall determine the nature of the obligation it incurs when it enters into an arrangement with other parties who fund its research and development.
>
>         \*        \*        \*
>
> To the extent that the financial risk associated with the research and development has been transferred because repayment of any of the funds provided by the other parties depends solely on the results of the research and development having future economic benefit, the enterprise shall account for its obligation as a contract to perform research and development for others.

SFAS No. 68 ¶¶4, 10.  SOP 97-2, which "provides guidance on when revenue should be recognized and in what amounts for licensing, selling, leasing, or otherwise marketing computer software" states that:

> If an arrangement to deliver software or a software system, either alone or together with other products or services, requires significant production, modification, or customization of software, the entire arrangement should be accounted for in conformity with Accounting Research Bulletin (ARB) No. 45, Long-Term Construction-Type Contracts....

SOP 97-2 ¶7.

115.    Even if the licenses had not required contract accounting, under SOP 97-2, L&H should not have recognized revenue from them because the licensee's absence of resources made it clear that collectibility was not probable.  SOP 97-2 does not permit revenue to be recognized until "Collectibility is probable."

116.    In addition, since the start-up shells were related parties, the funds should have been treated as liabilities:

> If the enterprise is obligated to repay any of the funds provided by the other parties regardless of the outcome of the research and development, the enterprise shall estimate and recognize that liability.  This requirement applies whether the enterprise may settle the liability by paying cash, by issuing securities or by some other means.

AS § R55.103.

117.    L&H's treatment of the start-up shells also violated SFAS No. 57, *Related Party Disclosures*, which requires "disclosures of material related party transactions" including:

a.    The nature of the relationship(s) involved.

b.    A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

c.    The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period.

32

d.    Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

AS § R36.102.

118.    Notes to L&H financial statements for 1997, 1998, and 1999 contain long lists of "related parties" accompanied by none of the detail required by SFAS No. 57.  Moreover, the connections to related parties revealed by the Audit Committee Report demonstrate that L&H affirmatively misrepresented the amount of revenue it recognized from the start-up shells who provided 10% of L&H's 1998 revenue and 25% of its 1999 revenue.  In its 1998 Annual Report on Form 20-F, L&H stated that only 3.7% of its 1998 revenue was provided by "companies funded in part by the FLV Fund."  In Notes to its 1999 financial statements, L&H stated that 0.3% of 1999 revenues were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

### Artesia's Role in the "Strategic Partner" Fraud

119.    On June 24, 2003, Dexia announced that it had been notified by the Belgian prosecutor investigating the L&H fraud that it was a suspect because of actions taken by Artesia in connection with L&H in 1998 through 2000.  According to a June 25, 2003 article in *The Belgian Financial Times*, entitled "Artesia Knew [L&H] Was Playing With Fire," the Belgian Justice Department investigators determined that Artesia was "an exceptionally important banker to [L&H] … involved in just about everything surrounding [L&H]."

120.    According to the article, Belgian prosecutors secretly seized records from Artesia in February 2001, which "contained a treasure of information" regarding the L&H fraud.  According to those records, Artesia issued three separate loans in 1998 and 1999, totaling more than $30 million, which were funneled through strategic partners to artificially inflate L&H's revenues.  According to the article, the Belgian Justice Department's investigation revealed that Artesia "knew that the top management of [L&H] was involved in practices that would not be tolerated by the American SEC."  None of this information had previously been made public.

33

Indeed, as discussed more fully below, Artesia had lied to the L&H Audit Committee to conceal its involvement.

121.    The June 25, 2003 *Belgian Financial Times* article stated that it was Artesia that had devised a method for concealing the fact that Lernout, Hauspie and Willaert guaranteed financing to certain LDCs and CLDCs. Artesia structured transactions known as "credit default swaps" in lieu of personal guarantees that would have had to have been revealed in the LDC and CLDC loan paperwork.

### Artesia's Longstanding Role in L&H Misconduct

122.    Artesia had previously assisted L&H in its financial machinations. On March 25, 1998, an Illinois company known as Vasco Data Security International ("Vasco"), a customer of L&H's Burlington, Massachusetts office, purported to license $800,000 of L&H software. The technology covered by L&H's license, however, was useless to Vasco, which only agreed to pay the licensing fee in order to obtain a $3 million loan from L&H that it desperately needed. The loan was originally due on January 4, 1999, but Vasco could not pay it when it came due. Hauspie took advantage of the situation to require Vasco to enter into a second license agreement with L&H worth $900,000, and to backdate the agreement December 31, 1998. According to Vasco's former Chief Technology Officer, Hauspie threatened to call the loan due on January 4, 1999 if Vasco refused to backdate the contract. Vasco acceded and L&H fraudulently recorded the $900,000 in 1998.

123.    Because Vasco still did not have the resources to repay the loan in early 1999, Lernout and Hauspie arranged for Artesia to organize and manage an $11.5 million private placement of Vasco common stock. On April 15, 1999, Artesia completed the private placement and wired the $11.5 million to Vasco's account in the United States. Vasco used these funds, in part, to repay L&H. The investors in the private placement included LHIC (a company formed by Lernout and Hauspie to invest in companies that specialized in speech and language based products), which invested $5 million. LHIC obtained a 7% ownership stake in Vasco and a seat on the company's board of directors. That seat was filled by Hauspie. Another top investor in

Vasco was Mercator, which purchased approximately $1 million of Vasco stock through the private placement managed by Artesia.

124.    Artesia was also key player in the creation of BTG, providing the initial financing that allowed BTG to operate.  Artesia lent a total of $22.9 million to BTG with the intent that L&H would find external investors to repay the loan.  However, L&H never disclosed the identities of the ultimate owners of BTG, and, according to a December 7, 2000 article, *The Wall Street Journal* was only able to trace ownership "through a Luxembourg company to two entities based in the Channel Islands, but no further."

### Artesia's Role in Financing the Strategic Partners

125.    Following the Dictation, BTG and Vasco transactions, L&H's senior officers and Artesia expanded their scheme into what ultimately would be described by *The Wall Street Journal* as "Dictation Consortium-type structure … but on steroids."  Instead of creating one shell company (like Dictation or BTG) to funnel fictitious revenue to L&H,  L&H created a series of holding companies financed by Artesia.  These holding companies, in turn, financed multiple LDCs, which then paid "licensing fees" back to L&H.

126.    One such holding company was Radial Belgium N.V. ("Radial").  On September 29, 1998, Artesia loaned approximately $6 million to Radial, which wired this money, in $2 million installments, to three LDCs:  (a) the  Slavic Development Company N.V., (b) the Farsi Development Company N.V., and (c) the Bahassa Development Company N.V.  These LDCs were supposed to develop speech recognition products in Slavic, Farsi and Bahassa.  The Slavic, Farsi and Bahassa LDCs, however, used the $2 million to pay L&H licensing fees. L&H then booked the entire $6 million in revenue in the third quarter of 1998.  None of these LDCs had bona fide offices or any operations that would have enabled them to develop speech recognition products.

127.    Internal Artesia documents quoted in the Report demonstrate that Artesia knowingly entered into this transaction in furtherance of the fraud.  They show that Artesia knew that its loan was to be used by Radial to finance the three LDCs (all of which had the same

35

business address), that the LDCs and Radial had been created by L&H, and that the monies would be used by the LDCs to pay licensing fees in identical amounts to L&H. They also show that Artesia knew that the loans would be guaranteed by Lernout, Willaert and Hauspie, and that their actions would enable L&H to fraudulently conceal that fact from the SEC and the investing public.

128.    Artesia recognized from the outset that the "strategic partners" had no equity investors and that they were mere shell companies located one address. In an email dated September 21, 1999, from Artesia Employee 1 at Artesia to Artesia Employee 2 and other Artesia employees, Artesia Employee 1 stated:

**Redacted**

129.    Another document quoted in the Report states:

**Redacted**

130.    Artesia Employee 1's September 21, 1999 email also stated that

**Redacted**

(emphasis supplied).

131.    Artesia knew that it was highly unusual for an individual to participate in credit default swaps, and that Lernout, Hauspie and Willaert did so in this case solely to accomplish their deception of the SEC and L&H's shareholders. An internal Artesia memorandum entitled "Direction Internal Audit" from two Artesia employees (Artesia Employees 3 and 4) to another Artesia employee (Artesia Employee 5) and others, dated January 31, 2000, notes that the credit

36

default swaps executed by Lernout, Hauspie and Willaert had

**Redacted**

Artesia clearly understood,

however, that

as was

stated in a February 14, 2000 internal Artesia memorandum stating the views of Artesia

Employee 2 (emphasis supplied).

132.    Moreover, Artesia was well aware that the sole reason for structuring Lernout's,

Hauspie's and Willaert's guarantees as credit default swaps was to conceal the relationship

between L&H and the strategic partners and that such concealment would render L&H financial

statements misleading in violation of auditing standards and applicable law. An internal Artesia

document quoted in the Report notes that Lernout, Hauspie and Willaert refused to execute a

loan that made reference to the credit default swaps:

**Redacted**

Accordingly, a June 15, 1999 internal Artesia email from Artesia Employee 1 to another Artesia

employee (Artesia Employee 6) concerning LIC and Radial and quoted in the Report states that

Artesia did not identify Lernout, Hauspie and Willaert because

**Redacted**

(emphasis supplied).

133.    Artesia also knew that the LDCs would not generate any real revenue to repay the

loans, and that L&H intended to seek new investors who would act as a new source of funds. As

Artesia Employee 1 stated in a September 21, 1999 email:

**Redacted**

Another internal Artesia document quoted in the Report states

**Redacted**

37

**Redacted**

134.    The June 25, 2003 article in *The Belgian Financial Times* stresses the extent to which Artesia acted far outside the confines of an ordinary commercial banking relationship in order to accommodate the fraudulent scheme:

> On September 29, 1998, Artesia issued a loan to a Belgian company known as Radial in the amount of approximately $6 million. Artesia's own documents reveal that Radial was a "special purpose entity" created by senior officers of L&H for the express purpose of creating and funding LDCs. These same bank documents also show that Artesia was aware that Lernout, Hauspie, and Willaert did not want to sign the required personal guarantees to obtain this and other LDC and CLDC loans "in order to avoid possible problems with the SEC." As a result, Artesia devised a scheme to have Lernout, Hauspie and Willaert guarantee the Radial loan using "credit default swaps." Unlike personal guarantees, however, these swaps do not have to be revealed in the loan letters of credit. However, the sale of credit default swaps to individual investors is highly unusual, demonstrating the degree to which Artesia was willing to go to participate in L&H's massive accounting fraud.

135.    After setting up Radial to manufacture revenues for L&H in the third quarter of 1998, L&H and Artesia replicated this scheme in the fourth quarter. The name of the holding company this time was Language Investment Co. ("LIC"). Artesia made a loan on December 22, 1998 to LIC for approximately $6 million. LIC then sent the funds in four installments of $1.5 million to four separate LDCs: the Greek, Hungarian, Polish and Czech development companies. These LDCs then immediately paid the funds to L&H as licensing fees so that L&H could book this "revenue" prior to year-end.

136.    Artesia knew that those LDCs lacked the financial resources and technical knowledge necessary to develop L&H's software for use with additional languages. In fact, an internal Artesia document quoted in the Report makes clear that Artesia knew that the proceeds of its loan would be used immediately by these newly formed LDCs to pay for licensing fees to L&H, leaving the LDCs with no capital to perform their contractual obligation to develop L&H software for use with other languages. The document noted that the amounts financed by Artesia would provide the "start-up capital" for the four LDCs and                  **Redacted**

**Redacted**

137.    These loans were also secured by credit default swaps.  According to an internal undated memorandum of Artesia written in connection with the loan to LIC and quoted in the Report, the loan was granted

**Redacted**            Artesia again permitted Lernout, Hauspie and Willaert to use credit default swaps, rather than guarantees:

**Redacted**


138.    The June 25, 2003 article in *The Belgian Financial Times* stressed the role of Artesia in furthering the "related party" fraud:

> Artesia engaged in a similar fraudulent transaction on December 22, 1998, issuing a loan to the Language Investment Company for the purpose of creating 4 LDCs so that L&H could recognize revenues from these LDCs in the fourth quarter of 1998.  Again, Artesia used credit default swaps to conceal the fact that the principals of L&H had secretly guaranteed the loans used to set up the 4 LDCs in question.

139.    L&H continued to perpetuate the scheme in 1999.  On March 31, 1999, L&H set up the Language Development Fund ("LDF") and transferred $12 million that same day to the bank accounts of seven LDCs at Artesia.  The Greek, Czech, Hungarian and Polish Development Companies received $1.5 million each, and the Tamil, Thai and Hindi Development Companies received $2 million each.  This time, the $12 million came from Mercator in the form of a $2 million capital contribution and a $10 million loan to LDF.  All of these funds appeared in L&H's financial statements as revenue.

140.    Internal Artesia documents quoted in the Report leave no question that Artesia knew that these LDCs were shell entities created by L&H.  A fax dated March 1999 from an L&H employee to Artesia states:

**Redacted**

39

**Redacted**

141.    In the second quarter of 1999, L&H requested that LDF receive a $20 million loan from Artesia. Artesia's internal documents relating to LDF reveal that the bank was fully aware of the fraud being perpetuated at L&H. Specifically, according to an internal email from an Artesia employee (hereafter, Artesia Employee 7), dated June 21, 1999:

**Redacted**

Another internal document from Artesia's credit file quoted in the Report noted:

**Redacted**

142.    Although the loan to LDF was withdrawn before it was finalized, on June 25, 1999, Artesia granted a $20 million line of credit to Lernout, Hauspie and Willaert personally. The internal Artesia credit file for Lernout, Hauspie and Willaert quoted in the Report notes that

**Redacted**                                          This time, however, Artesia demanded that

40

the three individuals pledge 650,000 registered shares of L&H as collateral for the loan. The vast majority of this $20 million was used to fund six new LDCs (Malay, Vietnamese, and four other Indian languages not specified at the time), and this money was ultimately booked as revenue on L&H's financial statements. L&H did not reveal the source of the funds received by these LDCs in L&Hs Form 10-Q for the quarter ended June 30, 1999, or in its SEC Form 10K for the year ended December 31, 1999.

 143. By mid to late 1999, Artesia became increasingly concerned that its loans would not be repaid. The loans to Radial and LIC were due on June 30, 1999, and the $20 million personal loan to Lernout, Hauspie and Willaert was due in October 1999. To avoid a technical default, Artesia extended the loans to December 15, 1999. Artesia subsequently had multiple discussions with Hauspie, Lernout and Willaert to track their progress in attracting potential new investors in the LDCs, whose funds would be used by L&H to repay Artesia. In an internal memorandum dated September 7, 1999, Artesia Employee 7 reported a conversation that he had with Willaert and others the day before:

**Redacted**

41

**Redacted**

144.    Similarly, on December 27, 1999, an Artesia employee (hereafter, Artesia Employee 8) reported in an email to Artesia Employee 7 and other Artesia employees that he had received a telephone call from Willaert, who stated that

**Redacted**

Willaert also gave Artesia Employee 8 the details of the contact person in Singapore.

145.    On or about January 5, 2000, a Lebanese-Armenian businessman, Haroun Katchadourian, wired $36 million at the request of Lernout, Hauspie and Willaert to the Singapore bank account of Velstra, a Singaporean company owned by Mercator. This money was then used to pay off the $20 million line of credit, and the two $6 million loans to Radial and LIC.

### Belgian Prosecutor Concludes That Artesia Knowingly Participated in the L&H Fraud

146.    On the basis of internal documents obtained from Artesia, a panel of experts retained by the Belgian prosecutors concluded that Artesia intentionally participated in the L&H fraud. The conclusions are damning:

**Redacted**

**Redacted**

(Emphasis supplied).

### Artesia Conceals Its Role

147.    Artesia took affirmative steps to cover up its role in the fraud at L&H after the
investigation of that fraud began in November 2000. Loeff Claeys Verbeke, one of the law firms
charged with that investigation and co-author of the Audit Committee Report, asked Artesia
about L&H's possible role in securing financing for LIC. On November 24, 2000, Artesia sent a
letter to Loeff Claeys Verbeke in response to that inquiry. According to the Report, Artesia's
letter stated:

**Redacted**

(emphasis supplied).

148.    Artesia made no mention of the credit default swaps executed by the principals of
L&H — Lernout, Hauspie and Willaert — on the LIC transaction so as not to disclose its
complicity in the fraud. As a result, the Audit Committee Report makes no mention of Artesia's
role in the fraud. Likewise, none of the Wall Street Journal articles that disclosed the fraud at
L&H mentioned any role by Artesia.

43

149.    Consequently, Plaintiffs did not discover the role of Artesia until an article in *The Belgian Financial Times* on June 24, 2003.  Prior to that time, despite diligent efforts by Plaintiffs and counsel, Plaintiffs were unaware of Artesia's role in the fraud at L&H.

### FIRST CLAIM FOR RELIEF

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

150.    Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

151.    This Count is asserted against Dexia for violations of § 10(b) of the 1934 Act, 15 U.S.C.  § 78j(b), and Rule 10b-5 as promulgated thereunder.

152.    Dexia S.A., and/or Dexia Bank Belgium, as acquiror of Artesia, is liable to Plaintiffs for Artesia's wrongful conduct as set forth herein.

153.    Artesia, singly and in concert with L&H and its senior officers and directors directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Seagate.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Seagate to exchange its shares of Dragon for the common stock of L&H at an artificially inflated price.

154.    Artesia engaged in acts, practices, and a course of business and employed devices, schemes, and artifices to defraud which operated as a fraud on Seagate by investing funds in companies for the purpose of those companies purchasing product from L&H for the sole purpose of L&H publicly reporting artificially inflated revenues and earnings.  Artesia knowingly engaged in these acts, practices, and course of business and employed devices, schemes, and artifices to defraud.

155.    As a result of the dissemination of the false and misleading statements set forth above, the market price of L&H common stock was artificially inflated and Seagate was induced to purchase the common stock of L&H at an artificially inflated price.  In ignorance of the false

and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by defendant, Seagate relied, to its detriment, on the integrity of the market price of the stock, and the false and misleading statements made directly by L&H to Seagate. Had Seagate known the truth, it would not have entered into the Merger and purchased L&H common stock at inflated prices.

156.    Artesia's scienter is demonstrated by internal documents quoted in the Report, set forth at ¶¶119-146 above, and demonstrating, *inter alia*, that:

a.    Artesia knew that its $6 million loan to Radial was used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,.

b.    Artesia knew that its $6 million loan to LIC was used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,

c.    Artesia knew that the LDCs were not independent of L&H but were rather controlled by L&H,

d.    Artesia knew that the LDCs were shell corporations, with no assets, operations, or employees,

e.    Artesia knew that the credit default swaps were used by L&H to conceal from the SEC and the investing public that the LDCs were related parties,.

f.    Artesia knew that if Lernout, Hauspie and Willaert were included in the loan documents as guarantors of the loans, L&H would have to disclose that the LDCs were related parties.

157.    Seagate suffered substantial damages as a result of the wrongs herein alleged in an amount to be proven at trial, but not less than $150,806,377.62.

45

158.    By reason of the foregoing, Artesia directly violated § 10(b) of the 1934 Act and Rule 10b-5, as promulgated thereunder in that it: (a) employed devices, schemes, and artifices to defraud; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Seagate in connection with its purchase of shares of the common stock of L&H in exchange for shares of Dragon.

## SECOND CLAIM FOR RELIEF

## CONSPIRACY TO COMMIT COMMON LAW FRAUD

159.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein and assert this count against Dexia.

160.    Dexia S.A., and/or Dexia Bank Belgium, as acquirer of Artesia, is liable to plaintiffs for Artesia's wrongful conduct.

161.    At all times relevant to this complaint, L&H, Lernout, Hauspie and Willaert were perpetrating a fraud against Seagate, as set forth above at ¶¶37-118. These parties made all of the materially false and misleading statements identified above, knowing that Seagate and the investing public would rely on those statements in connection with their purchases of L&H stock. In addition, L&H falsely represented to Seagate, among other things, that its 1998 and 1999 financial statements were prepared in conformity with U.S. GAAP. Ultimately, L&H was forced to admit that these statements were false and to announce its intent to restate its financial results for 1998, 1999 and the first two quarters of 2000.

162.    Artesia conspired with L&H, Lernout, Hauspie and Willaert to defraud the SEC and the investing public, including Seagate. Among other things, as detailed above at ¶¶ 119-149, Artesia knowingly and willfully devised a scheme to conceal the fact that L&H officers were guarantors of millions of dollars in loans that were made to L&H-controlled entities, including the LDCs, and then paid back to L&H as licensing fees. In so doing, Artesia, knowingly enabled L&H to recognize the entire amount of the loans as revenue, in blatant violation of GAAP, and misrepresent such amounts in their public statements detailed above.

163.    In furtherance of the conspiracy, Artesia committed the following overt acts

    a.    On or about September 29, 1998, Artesia made a $6 million loan to Radial, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

    b.    On or about December 22, 1998, Artesia made a $6 million loan to LIC, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

    c.    On or about June 25, 1999, Artesia awarded Lernout, Hauspie and Willaert a $20 million line of credit, which they then used to make payments to L&H through the LDCs in the form of licensing fees, which were improperly included as revenue on L&H's financial statements.

164.    Artesia committed this misconduct intentionally, with full knowledge of the fraud being perpetrated at L&H.  Specifically, Artesia's internal documents, set forth above at ¶¶119-146, demonstrate that, *inter alia*:

    a.    Artesia knew that its $6 million loan to Radial was used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,

    b.    Artesia knew that its $6 million loan to LIC was used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,

47

    c.        Artesia knew that the LDCs were not independent of L&H but were rather controlled by L&H,

    d.        Artesia knew that the LDCs were shell corporations, with no assets, operations, or employees,

    e.        Artesia knew that the credit default swaps were used by L&H to conceal from the SEC and the investing public that the LDCs were related parties,

    f.        Artesia knew that if Lernout, Hauspie and Willaert were included in the loan documents as guarantors of the loans, L&H would have to disclose that the LDCs were related parties.

165.    As a consequence of the foregoing, Seagate suffered damages in an amount to be proven at trial, but not less that $150,806,377.62.

## THIRD CLAIM FOR RELIEF

## AIDING AND ABETTING COMMON LAW FRAUD

166.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein and assert this count against Dexia.

167.    Dexia S.A., and/or Dexia Bank Belgium, by acquiring Artesia is liable to Plaintiffs for Artesia's wrongful conduct.

168.    At all times relevant to this complaint, L&H, Lernout, Hauspie and Willaert were perpetrating a fraud against Seagate, as set forth above in ¶¶ 37-118. These parties made all of the materially false and misleading statements identified above, knowing that Seagate and the investing public would rely on those statements in connection with their purchases of L&H stock. In addition, L&H falsely represented to Seagate, among other things, that its 1998 and 1999 financial statements were prepared in conformity with U.S. GAAP. Ultimately, L&H was forced to admit that these statements were false and to announce its intent to restate its financial results for 1998, 1999 and the first two quarters of 2000.

48

169.    Artesia substantially assisted L&H in perpetrating the fraudulent scheme. Specifically,

a.      On or about September 29, 1998, Artesia made a $6 million loan to Radial, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the L DCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

b.      On or about December 22, 1998, Artesia made a $6 million loan to LIC, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the L DCs as licensing fees, which were improperly included as revenue on L&H's financial statements

c.      On or about June 25, 1999, Artesia awarded Lernout, Hauspie and Willaert a $20 million line of credit, which they then used to make payments to L&H through the LDCs in the form of licensing fees, which were improperly included as revenue on L&H's financial statements.

170.    At all times relevant to this complaint, Artesia knew of the fraud perpetrated by L&H. Specifically, as set forth in internal Artesia documents described above at ¶¶119-146:

a.      Artesia knew that its $6 million loan to Radial was used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,

b.      Artesia knew that its $6 million loan to LIC was used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,.

49

c.    Artesia knew that the LDCs were not independent of L&H but were rather controlled by L&H,

d.    Artesia knew that the LDCs were shell corporations, with no assets, operations, or employees,

e.    Artesia knew that the credit default swaps were used by L&H to conceal from the SEC and the investing public that the LDCs were related parties,

f.    Artesia knew that if Lernout, Hauspie and Willaert were included on the loan documents as guarantors of the loans, L&H would have to disclose that the LDCs were related parties.

171.    As a consequence of the foregoing, Seagate suffered damages in an amount to be proven at trial, but not less than $150,806,377.62.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Awarding Plaintiffs all compensatory damages suffered as a result of the wrongful conduct of the defendants in an amount to be determined at trial, including lost profits and consequential and incidental damages;

B.    Awarding Plaintiffs punitive damages in an amount to be determined at trial;

C.    Awarding Plaintiffs pre-judgment and post-judgment interest;

D.    Awarding Plaintiffs their costs and expenses incurred in this action, including fees for plaintiffs' attorneys and experts;

E.    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of

50

defendant's trading activities or their other assets so as to assure that plaintiffs have an effective

remedy; and

        F.        Granting such other and further relief as the Court may deem just and

proper.


Dated:  March 8, 2004


                                  GARY B. FILLER and LAWRENCE PERLMAN
                                  By their attorneys,

                                  Gregory P. Joseph, N.Y. Atty Reg. #1645852
                                  GREGORY P. JOSEPH LAW OFFICES LLC
                                  805 Third Avenue, 31st Floor
                                  New York, NY  10022
                                  Telephone:  (212) 407-1200

**OF COUNSEL**

Laurence H. Reece, III, BBO #414460
Alana A. Prills, BBO #652881
REECE & ASSOCIATES, P.C.
One Bowdoin Square
Boston, Massachusetts  02114
Telephone:  (617) 747-7550


550256