## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GARY B. FILLER and LAWRENCE PERLMAN, Trustees of the TRA Rights Trust,<br><br>            Plaintiffs,<br><br>v.<br><br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., S.A.)<br><br>            Defendants. | **Jury Trial Demanded**<br><br><br><br>CA No. 04-10477-PBS |

## PROOF OF SERVICE UPON DEFENDANT
## DEXIA BANK BELGIUM

I, Susan M. Davies, attorney for the above-named plaintiffs, state that defendant Dexia Bank Belgium was served in Belgium on June 14, 2004 with a Summons and a copy of the Complaint in this action.

Defendant Dexia Bank Belgium was properly served in accordance with Federal Rule of Civil Procedure 4(h)(2) and the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, to which Belgium is a party.

The original proof of service upon defendant Dexia Bank Belgium by the Belgian Central Authority – comprising the original proof of service (in French) with attached copies of the Summons and Amended Complaint in French and English – is annexed hereto as **Exhibit A**.

An English translation of the proof of service in Exhibit A is annexed hereto as

**Exhibit B**.

Dated at New York, this 15th day of March 2005.

SIGNED UNDER THE
PENALTIES OF PERJURY

_____/s/ Susan M. Davies_____
Susan M. Davies, N.Y. Atty Reg. # 2413508
GREGORY P. JOSEPH LAW OFFICES LLC
805 Third Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 407-1200

KOTIN, CRABTREE, AND STRONG, LLP
Nicholas M. Kelley, BBO #265640
Amy C. Mainelli, BBO #657201
One Bowdoin Square
Boston, Massachusetts 02114

# EXHIBIT A

Case Name: Filler v. Dexia
Defendant: Dexia Bank Belgium
Court Case No.: 04-10477PBS

## CERTIFICATE
### *ATTESTATION*

The undersigned authority has the honour to certify, in conformity with article 6 of the Convention,
*L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,*

**BACOB DEXIA GROUP**

**1 4 -06- 2004**

1)   **that the document has been served***
*1.    que la demande a été exécutée*
- the (date)
- *le (date)*
- at (place, street, number)    *25 Rue de Trèves 1000 Bruxelles*
- *à (localité, rue numéro)*

- in one of the following methods authorised by article 5-
- *dans une des formes suivantes prévues à l'article 5:*
   [  ]  (a)   in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the Convention*.
       a)      *selon les formes légales (article 5, alinéa premier, lettre a).*
   [  ]  (b)   in accordance with the following particular method*:
       b)      *selon la forme particulière suivante:* _____

   [  ]  (c)   by delivery to the addressee, who accepted it voluntarily.*
       c)      *par remise simple*

The documents referred to in the request have been delivered to:
*Les documents mentionnés dans la demande ont été remis à:*
- (identity and description of person)    *Patricia VAN CAPPELLEN*
- *(identité et qualité de la personne)*    *conseil juridique*
- relationship to the addressee (family, business or other):
- *liens de parenté, de subordination o autres, avec le destinataire de l'acte:* _____

2)   **that the document has not been served, by reason of the following facts*:**
*2.    que la demande n'a pas été exécutée, en raison des faits suivants:*

_____
_____
_____
_____

In conformity with the second paragraph of article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement*.

*Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint.*

LIST OF DOCUMENTS: Summons in a Civil Case, Complaint, Translation

**Annexes**
*Annexes*
**Documents returned:**
*Pièces renvoyées:*

_____
_____          **Done at** *Bruxelles* _____ , **the** *14/6/04*
_____          *Fait à* _____ , *le*
_____

In appropriate cases, documents establishing the service:          **Signature and/or stamp.**
*Le cas échéant, les documents justificatifs de l'exécution:*          *Signature et/ou cachet.*
_____
_____
_____          **BACOB DEXIA GROUP**
_____
                                                                     **1 4 -06- 2004**

*     Delete if inappropriate.          . 2
      *Rayer les mentions inutiles.*

APPLICANT IS AUTHORIZED TO SERVE JUDICIAL PROCESS UNDER THE UNITED STATES FEDERAL RULES OF CIVIL PROCEDURE AND
UNDER THE RULES OF CIVIL PROCEDURE OF THE STATE OF:  Massachusetts

# REQUEST

# FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS

*DEMANDE*
*AUX FINS DE SIGNIFICATION OU DE NOTIFICATION A L'ÉTRANGER*
*D'UN ACTE JUDICIAIRE OU EXTRAJUDICIAIRE*

Convention on the Service abroad of judicial and extrajudicial documents in civil or
commercial matters, signed at The Hague, November 15, 1965.

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile*
*ou commerciale, signée à La Haye, le 15 Novembre 1965.*

| Identity and address of the applicant<br>*Identité et adresse du requérant*<br><br>**Ann  Mickow**<br>**APS INTERNATIONAL, LTD**<br>**APS International Plaza**<br>**7800 Glenroy Road**<br>**Minneapolis, Minnesota  55439-3122**<br>**U.S.A.**<br>**Tel. 952.831.7776     Fax: 952.831.8150**<br>**Email: AMickow@CivilActionGroup.com** | Address of receiving authority<br>*Adresse de l'autorité destinataire*<br><br>**MINISTERE DE LA JUSTICE**<br>**Boulevard de Waterloo 115**<br>**Bruxelles**<br><br>**1000**<br>**Belgium** |

The undersigned applicant has the honour to transmit – in duplicate – the documents listed below and, in conformity with article 5 of the above-
mentioned Convention, requests prompt service of one copy thereof on the addressee, i.e.,
(identity and address)
*Le requérant soussigné a l'honneur de faire parvenir -- en double exemplaire -- à l'autorité destinataire les documents ci-dessous énumérés, en la priant*
*conformément à l'article 5 de la Convention précitée, d'en faire remettre sans retard un exemplaire au destinataire, savoir:*

(identité et adresse)      Dexia Bank Belgium
Boulevard Pacheco 44,  B-1000 Brussels, Belgium
Tel:

[  ]  (a)  in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the Convention.*
       a)   *selon les formes légales (article 5, alinéa premier, lettre a).*
[X]  (b)  in accordance with the following particular method (sub-paragraph (b) of the first paragraph of article 5)*:
       b)   *selon la forme particulière suivante (article 5, alinéa premier, lettre b);By personally delivering the documents into the hands of any officer,*
*managing agent or any other agent authorized to accept service of process upon the defendant.  If you are unable to effect service by this method, please*
*proceed with service in accordance with sub-paragraph (a) above.*
[  ]  (c)  by delivery to the addressee, if he accepts it voluntarily (second paragraph of article 5)*.
       c)   *le cas échéant, par remise simple (article 5, alinéa 2).*

The authority is requested to return or to have returned to the applicant a copy of the documents – and of the annexes* – with a certificate as provided
on the reverse side.
*Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte -- et de ses annexes -- avec l'attestation figurant au verso.*

List of documents
*Enumération des pièces*

Summons in a Civil Case
Complaint
Translation

Done at
*Fait à*  Minneapolis, Minnesota, U.S.A.               , the
                                                         *le*  4-12-04

Signature and/or stamp.
*Signature et/ou cachet.*

* Delete if inappropriate.
  *Rayer les mentions inutiles.*

(Formerly OBD-116 which was formerly LAA-116,
both of which may still be used)

USM-94
(Est. 11/22/77)

Arrondissement judiciaire
**BRUXELLES**



**Police Locale - Zone 5344**
**Commissariat 4**
**rue de Bériot 2A  1210  Saint-**
**Josse-Ten_Noode**
**02/220.27.49**

## PRO JUSTITIA

N° PV. **Subséquent** : **BR. .L6.046417/2004**  du : **18/05/2004**

*Numéro de notice : 181DS/04*

---

**Avis au Parquet :**

Ce 18/05/2004 à 07h35, NOUS LEFFLER Guy inspecteur de police, portons respectueusement à la connaissance de Monsieur le Procureur du Roi, que de renseignements obtenus auprès de DEXIA Banque, service « INFOCEL », situé en C/C Av Galilée n°5, il appert que en ce qui concerne la remise d'actes judiciaires, ceux-ci sont à transmettre auprès de la nomée VAN CAPPELLEN Patricia, service juridique situé rue de Trèves n°25 à 1000 Bruxelles.
Dont acte clos, an ce 18/05/2004.

---

**Parties concernées:**

### DEXIA

**Siège social et d'exploitation**
1210 SAINT-JOSSE-TEN-NOODE, Avenue Galilée, 5

---

**Transmis à M. :**

Procureur du Roi à BRUXELLES          (Original)

---

Transmis le : *25/5/04*

Le commissaire :

Annexes :

Réservé au Parquet
*Sans suite X*

AO 440 (Rév. 10/93) Citation dans une action civile – SDNY WEB 4/99

## TRIBUNAL FEDERAL DE 1ᵉ INSTANCE DES ETATS-UNIS
## DISTRICT DU MASSACHUSETTS

Gary B. Filler et Lawrence Perlman,
fiduciaires de la fiducie TRA Rights Trust,

**CITATION A COMPARAITRE
DANS UNE ACTION CIVILE**

les demandeurs,

contre

**AFFAIRE N° 04-10477PBS**

Dexia, S.A. et Dexia Bank Belgium
(anciennement dénommée Artesia Banking
Corp., S.A.),

Les défendeurs.

A : (nom et adresse du défendeur)

Dexia Bank Belgium
Boulevard Pachéco 44
B-1000 Bruxelles
Belgique

**VOUS ETES PAR LES PRESENTES SOMMES DE COMPARAITRE** et vous devez
faire signifier à l'AVOCAT DU DEMANDEUR (nom et adresse)

Me Alana A. Prills
Reece & Associates, P.C.
One Bowdoin Square
Boston, Massachusetts 02114
Etats-Unis d'Amérique
Téléphone : (617) 747-7550

une réponse à la plainte qui vous est signifiée par les présentes dans les __20__ jours à compter du
lendemain de la signification de cette citation. A défaut de quoi, un jugement par défaut sera rendu
contre vous pour le redressement demandé dans la plainte. Vous devez également déposer votre
réponse auprès du greffier du tribunal dans un délai raisonnable après la date de la signification.

__TONY ANASTAS_____
GREFFIER

_____9 MARS 2004_____
DATE

_____*[Signature]*_____
(PAR LE) GREFFIER ADJOINT

*[Tampon du tribunal]*

TRIBUNAL FEDERAL DE 1<sup>e</sup> INSTANCE DES ETATS-UNIS
DISTRICT DU MASSACHUSETTS

| | |
|---|---|
| GARY B. FILLER et LAWRENCE PERLMAN, fiduciaires de la fiducie TRA Rights Trust, | **DEMANDE DE PROCES DEVANT JURY** |
| les demandeurs, | Action civile n° 04- 10477-PBS |
| contre | |
| DEXIA, S.A. et DEXIA BANK BELGIUM (anciennement dénommée ARTESIA BANKING CORP., S.A.), | |
| Les défendeurs. | |

### PLAINTE

Les demandeurs, par l'intermédiaire de leurs avocats, à titre de plainte, allèguent ce qui suit en vertu de connaissances en ce qui concerne eux-mêmes et leurs propres actions et en ce qui concerne Seagate Technology, Inc. (« Seagate ») et les actions de Seagate et de ses représentants. En ce qui concerne toutes les autres matières, les allégations des demandeurs sont fondées sur l'enquête effectuée par leurs avocats, laquelle comprenait, entre autres, l'examen d'un rapport confidentiel au procureur belge dirigeant l'enquête judiciaire sur Lernout & Hauspie Speech Products, N.V. (« L&H »), qui rapporte des citations largement extraites de documents non publics créés par les défendeurs et l'examen de documents non publics créés par des cadres de direction de L&H, entre autres Pol Hauspie (« Hauspie »), Jo Lernout (« Lernout ») et Nico Willaert (« Willaert ») et par les experts-comptables de L&H (Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren (« KPMG Belgium ») et KPMG LLP (« KPMG U.S. ») (collectivement « KPMG »). Les demandeurs pensent que leurs allégations fondées sur des informations et des opinions sont susceptibles d'être appuyées par des preuves lorsqu'ils auront eu la possibilité raisonnable d'effectuer une enquête supplémentaire et la communication préalable.

### NATURE DE L'ACTION

1.      La présente action est fondée sur la fraude massive qui a été commise chez L&H et est liée à d'autres actions actuellement en instance dans le présent district, entre autres *Filler et Al. c. Lernout, et al.,* 02-CV-10302-PBS ( « l'Action Filler »). Les principaux défendeurs dans l'Action Filler comprennent : (i) des cadres de direction et des administrateurs de L&H, (ii) KPMG et (iii) un certain nombre d'autres entités et personnes physiques qui ont joué des rôles importants dans la fraude. L&H ne fait pas partie des défendeurs dans cette action car elle a déposé son bilan et a été liquidée par la suite.

2.      Les demandeurs intentent la présente action contre les défendeurs, DEXIA, S.A. et DEXIS BANK BELGIUM (« Dexia Belgium ») (collectivement « Dexia ») fondée sur des preuves nouvellement découvertes démontrant qu'Artesia Banking Corporation, S.A. (« Artesia ») était un autre participant clé de la fraude commise chez L&H avant d'être acquise par Dexia en 2001. Le 24 juin 2003, Dexia a révélé avoir été notifiée qu'elle était considérée comme suspecte dans l'enquête judiciaire belge sur L&H en raison de mesures prises par Artesia en 1998 et en 2000.

3.      La présente action a pour but le recouvrement de dommages-intérêts pour le préjudice subi par Seagate lors de la vente des intérêts qu'elle détenait dans Dragon Systems, Inc. (« Dragon ») d'un montant de presque 170 millions de dollars pour des actions L&H au cours arbitrairement gonflé et, en fin de compte, sans aucune valeur. Seagate a acheté des titres L&H lors d'une fusion de Dragon dans une filiale de L&H qui a été exécutée quelques mois seulement avant l'exposition publique des transactions et des méthodes comptables frauduleuses qui avaient permis à L&H de gonfler faussement ses revenus d'au moins 50 % depuis 1997. Rien qu'en 1999, un total de 70 % du revenu de L&H était fictif et a depuis été annulé. Ces transactions et ces méthodes frauduleuses ont servi de fondement à une inflation artificielle importante de la valeur des actions L&H.

4.      Un des éléments essentiels de la fraude commise chez L&H était un stratagème

2

frauduleux par lequel des personnes morales liées à L&H ont établi, financé et exploité des entités

fictives qui ont conclu de faux accords d'octroi de licences d'utilisation de logiciels qui étaient

destinés à et ont effectivement gonflé arbitrairement les profits de L&H. Ce stratagème a

représenté environ 10 % des revenus de L&H en 1998 et environ 25 % de ses revenus en 1999.

     5.     Comme il vient d'être révélé, L&H n'aurait pas pu accomplir sa fraude sans la

participation en connaissance de cause d'Artesia. Artesia a fourni à L&H et ses mandants un

financement essentiel hors bilan que L&H a alors utilisé pour monter de soi-disant sociétés de

développement de langue (« SDL ») et sociétés de développement de langues croisées

(« SDLC ») que L&H a faussement représentées au grand public comme des « partenaires

stratégiques » non affiliés. Les SDL et SDLC ont alors reversé ces fonds à L&H sous forme de

droits de licence. Pour les investisseurs extérieurs, les SDL et SDLC semblaient être d'honnêtes

clients de L&H qui avaient pris des logiciels de L&H sous licence pour un montant de plusieurs

millions de dollars. Mais en réalité, les SDL et SDLC n'étaient rien de plus que des coquilles

vides utilisées par L&H pour gonfler arbitrairement ses revenus, ce que savait Artesia.

     6.     Artesia comprenait que les SDL et les SDLC n'étaient rien de plus que des

sociétés fictives sans actifs réels ni activité commerciale. En fait, les propres documents internes

d'Artesia portant sur « l'évaluation des risques », qui sont cités dans un rapport confidentiel en

date du 28 mai 2001, préparé par un groupe d'experts pour des procureurs de Belgique (le

« Rapport »), résumaient les partenaires stratégiques comme suit : « <u>En réalité, ces sociétés ne</u>

<u>représentent rien (aucune activité, aucun actif)</u>. » (Emphase ajoutée).

     7.     Artesia comprenait aussi que c'était L&H qui était responsable en fin de compte

de s'assurer que les prêts seraient finalement remboursés. En vérité, une fois la fraude révélée,

L&H a admis avoir initialement financé les activités commerciales des SDL et des SDLC. En

conséquence, Artesia a demandé que les cadres de direction de L&H, Pol Hauspie (« Hauspie »),

Jo Lernout (« Lernout ») et Nico Willaert (« Willaert ») donnent leur garantie personnelle.

Cependant, ceci présentait un énorme problème pour L&H. En vertu des principes comptables

généralement reconnus aux Etats-Unis (« PCGR »), si les cadres dirigeants de L&H garantissaient personnellement ces prêts, les partenaires stratégiques seraient considérés comme des « personnes morales apparentées » à L&H et ce fait devrait être divulgué sur les états financiers de L&H, révélant ainsi la nature fictive des revenus de L&H provenant de ces entités.

8.    Pour résoudre ce problème, Artesia a formulé un stratagème frauduleux qui protégerait ses intérêts et, en même temps, dissimulerait le fait que Hauspie, Lernout et Willaert garantissaient personnellement les prêts aux partenaires stratégiques. Artesia et ces cadres dirigeants de L&H ont conclu des accords appelés « swaps sur défaillance ». Pour l'essentiel, les swaps sur défaillance ont simplement changé les garanties de prêt en lettres marginales qui n'ont pas été incluses dans les documents de prêt et, de ce fait, n'ont pas été divulguées à la Commission des valeurs mobilières des Etats-Unis (SEC) ou au public investisseur. L&H était ainsi en mesure d'inscrire tout le montant des droits de licence fictifs comme revenu sans avoir à divulguer l'existence de « personnes morales apparentées », ce qui aurait alerté la SEC et le public investisseur au sujet de la fraude. Au total, Artesia a effectué des prêts d'une valeur de dizaines de millions de dollars à des personnes morales apparentées à L&H entre 1997 et 1999. Toutes ces sommes ont été ensuite repayées à L&H et comptabilisées frauduleusement comme revenu.

9.    Les propres documents internes d'Artesia confirment qu'Artesia a conclu ces swaps sur défaillance en connaissance de cause dans le seul but de frauder la SEC et le public investisseur. Par exemple, un courriel de P. Rabaey chez Artesia à G. Dauwe et d'autres employés d'Artesia en date du 21 septembre 1999, cité dans le Rapport, déclare que : « [l]es garanties privées n'ont cependant pas été signées par Jo [Lernout], Pol [Hauspie] et Nico [Willaert] afin d'éviter des problèmes éventuels avec la SEC. C'est pourquoi nous n'avons pas les garanties et une solution est recherchée au moyen de swaps sur défaillance ».

10.    En échange de sa participation à la fraude en connaissance de cause, Artesia a continué à recevoir des frais bancaires lucratifs. Artesia a également imposé des taux d'intérêt

excessifs relatifs à ces prêts et a reçu des titres participatifs de ces partenaires stratégiques avec l'entendement que L&H s'arrangerait en fin de compte pour le rachat des partenaires stratégiques avec une prime. En somme, Artesia a reçu des rendements élevés et un rachat futur en échange du financement des transactions frauduleuses d'entrée de jeu.

11.    Dans l'année qui a suivi la conclusion de la fusion Dragon, la fraude a été dénouée. La SEC et le procureur belge ont commencé des enquêtes sur la fraude. L&H a annoncé que, à la suite d'« erreurs et irrégularités », ses résultats financiers pour 1998 jusqu'à la première moitié de l'année 2000 seraient redressés. Les actions L&H ont été radiées de la cote en Europe et aux Etats-Unis. L&H a fait faillite et a été par la suite liquidée. Des cadres de la direction de L&H ont été arrêtés en Belgique pour des accusations au pénal liées à la fraude commise chez L&H.

12.    Cependant, ce n'est pas avant le 24 juin 2003 que Dexia a annoncé que le procureur belge enquêtant sur la fraude commise chez L&H avait notifié Dexia qu'elle était considérée comme suspecte en raison de mesures prises par Artesia relatives à L&H entre 1998 et 2000. Jusqu'alors, le rôle d'Artesia dans la fraude n'avait pas été divulgué. Le lendemain, un article paru dans *De Financieel Economische Tiqd* (l'équivalent belge du « *Financial Times* »), intitulé « Artesia savait que [L&H] jouait avec le feu », a signalé que, d'après les enquêteurs belges, Artesia était « un banquier d'une importance exceptionnelle pour [L&H] impliqué dans pratiquement tout ce qui touchait à L&H ». Les procureurs belges avaient secrètement saisi des dossiers d'Artesia en février 2001 qui « contenaient un trésor d'informations » concernant la fraude commise chez L&H.

13.    D'après cet article, ces dossiers (qui n'ont pas été mis à la disposition des demandeurs ou du grand public) montrent qu'Artesia a fait de multiples prêts en 1998 et 1999. Ces prêts se sont montés à plusieurs millions de dollars qui ont été utilisés pour gonfler artificiellement les revenus de L&H. L'article signalait également que, d'après le ministère de la justice belge, Artesia « savait que la haute direction de [L&H] était impliquée dans des pratiques qui ne seraient pas tolérées par la SEC américaine ».

## COMPETENCE ET LIEU DU PROCES

14.      Cette action est fondée sur la section 10(b) de la loi américaine de 1934 sur la bourse des valeurs mobilières (la « Loi sur la bourse »), § 78j(b) du titre 15 du Code des Etats-Unis et la règle 10b-5 promulguée en conséquence, § 240.10b-5 du titre 17 du Code des réglementations fédérales, sur la section 20(a) de la Loi sur la bourse, § 78t(a) du titre 15 du Code des Etats-Unis et sur le droit étatique.

15.      Le tribunal susmentionné dispose de la compétence d'attribution dans cette affaire aux termes de la section 27 de la Loi sur la bourse, § 78aa du titre 15 du Code des Etats-Unis, du § 1331 du titre 28 du Code des Etats-Unis et des principes de compétence supplémentaire, § 1367 du titre 28 du Code des Etats-Unis. Indépendamment de cela, le tribunal dispose de la compétence d'attribution en conséquence de la diversité des citoyennetés des parties aux termes du § 1332 du titre 28 du Code des Etats-Unis.

16.      Le présent district est le lieu approprié du procès en vertu de la section 27 de la Loi sur la bourse, § 78aa du titre 15 du Code des Etats-Unis et § 1391(b) du titre 28 du Code des Etats-Unis.

17.      En connexion avec les actions alléguées dans cette plainte, les défendeurs, directement ou indirectement, ont utilisé les moyens et institutions du commerce entre Etats, y compris mais sans s'y limiter, le courrier, les communications téléphoniques entre Etats et les installations des bourses et de marchés nationaux.

## LES PARTIES ET LES ACTEURS NON DENOMMES

18.      Les demandeurs, Gary B. Filler et Lawrence Perlman (les « Fiduciaires ») sont les anciens co-présidents du conseil d'administration de Seagate et actuellement les Fiduciaires de TRA Rights Trust, une fiducie constituée aux termes des lois de l'Etat du Delaware (la « Fiducie »). La Fiducie est le seul ayant cause de Seagate au profit et pour le compte des actionnaires de Seagate en ce qui concerne toutes les réclamations et les causes d'action appartenant à Seagate découlant de, en connexion avec ou liées à l'acquisition ou la détention par

6

Seagate d'actions ou de participations dans L&H. Les Fiduciaires ont l'autorité exclusive de faire

valoir une réclamation, d'intenter une action, de faire un procès ou d'entamer une procédure

contre L&H et ses affiliées et/ou des cadres dirigeants, des administrateurs, des mandataires, des

représentants de L&H et de ses affiliées respectives, ainsi que toute autre personne ou entité, que

ce soit en droit ou en équité, découlant de, en connexion avec ou liées à l'acquisition ou la

détention par Seagate d'actions ou de participations dans L&H. Seagate et Dragon sont des

sociétés de capitaux du Delaware. Les anciens actionnaires de Seagate qui sont les bénéficiaires

de la Fiducie sont légalement fondés, par le biais de la Fiducie à bénéficier exclusivement de

toutes les réclamations fondées sur la détention par Seagate de titres L&H. Les anciens

actionnaires de Seagate ne sont pas fondés à réclamer des dommages-intérêts ou à se faire

dédommager pour le compte de Seagate ou de la Fiducie et ne se réclament pas et ne se sont

jamais réclamés des droits allégués dans cette action par la Fiducie. La Fiducie a été créée en

rapport avec l'accord de Seagate en date du 29 mars 2000 pour fusionner dans une filiale de

Veritas Software Corporation (une fusion d'un montant de 12 milliards de dollars) et pour vendre

ses actifs d'exploitation à Suez Acquisition Company (Cayman) Limited (une acquisition par

emprunt d'un montant de 2 milliards de dollars) (collectivement, une transaction d'un montant de

14 milliards de dollars). La Fiducie a été créée principalement aux fins de recueillir, gérer,

investir et distribuer aux anciens actionnaires de Seagate des centaines de millions de dollars de

futurs remboursements et crédits d'impôt potentiels (des « Droits fiscaux ») dus à Seagate pour

les périodes fiscales antérieures à la signature de la transaction Veritas. Le nom « TRA Rights

Trust » en lui-même reflète cet objectif (« TRA » signifie [en anglais] « Montants des droits

fiscaux »). La Fiducie est une entité prospère, *bona fide*, qui disposait d'un capital de

176 millions de dollars à la date de mars 2002. Les Fiduciaires avaient, à la date de mars 2002,

recueilli près de 46 millions de dollars de Droits fiscaux fédéraux et étatiques et distribué

28,5 millions de dollars aux anciens actionnaires de Seagate. A la date de mars 2003, les

Fiduciaires ont distribué plus de 45 millions de dollars aux anciens actionnaires de Seagate.

19.      Le défendeur, Dexia S.A., est une institution financière basée en Belgique et, en conséquence de son acquisition d'Artesia en 2001, est une des trois plus grandes banques de ce pays. Son actif est constitué de plus de 350 milliards d'Euros. Dexia S.A. effectue régulièrement des affaires aux Etats-Unis. Elle a un grand nombre de filiales prestataires de services financiers aux Etats-Unis, entre autres Dexia Credit Local New York Agency, Financial Security Assurance, Dexia Bank Belgium New York Branch, Artesia Mortgage Capital Corp., Astris Finance, Dexia Global Structured Finance et Dexia Securities U.S.A.

20.      Le défendeur, Dexia Belgium, est une filiale en toute propriété de Dexia S.A. et elle effectue régulièrement des affaires aux Etats-Unis. Dexia Bank Belgium New York Branch a son siège social à New York, dans l'Etat de New York.

21.      Artesia était une filiale en toute propriété d'Acrofin CVBA, un groupe de services financiers belges. Le 31 mars 2001, Dexia S.A. a annoncé qu'elle faisait l'acquisition d'Artesia Banking Corporation auprès d'Acrofin et qu'Artesia fusionnerait pour former Dexia Bank Belgium, une filiale bancaire en toute propriété de Dexia S.A. Artesia faisait des affaires, de manière continue et systématique, aux Etats-Unis avant son acquisition par Dexia par l'intermédiaire de ses filiales.

22.      Artesia Mortgage Capital Corp., une filiale en toute propriété d'Artesia (« Artesia Mortgage »), faisait des affaires aux Etats-Unis par l'intermédiaire de son siège social au Delaware et de ses bureaux sis 1180 NW Maple St., Suite 202, Issaqua, Washington 98027. Artesia Mortgage continue à faire des affaires sous le même nom bien qu'elle appartienne maintenant à Dexia au lieu d'Artesia et, depuis 1996, a conclu des prêts avec un solde du principal s'élevant à environ 2 milliards de dollars.

23.      Artesia a également fait des affaires aux Etats-Unis avant son acquisition par Dexia par l'intermédiaire d'Artesia North America, sa filiale en toute propriété (dont le siège social est sis au Delaware) et Artesia Securities, une co-entreprise dont elle détient 50 % du capital et dont le siège social est sis dans l'Etat de New York.

24.    Artesia est membre du consortium bancaire qui a fourni 450 millions de dollars de financement à L&H pour l'acquisition de Dictaphone. Les emprunteurs des fonds étaient Dictaphone (de Stratfield, au Connecticut), L&L et FLV Fund, conjointement et solidairement.

### L&H et ses cadres de direction

25.    L&H a été formée en 1987 par Lernout et Hauspie. Ses trois technologies de base étaient la reconnaissance automatique de la parole, la conversion texte à parole et la compression numérique de la parole. Le siège social de L&H était à Ieper, en Belgique et à Burlington au Massachusetts. Jusqu'au moment où elle a été radiée de la cote le 8 décembre 2000, les actions ordinaires L&H étaient cotées au NASDAQ sous le symbole « LHSP » ou « LHSEQ ». Les actions L&H étaient également négociées sur l'EASDAQ jusqu'au moment où elle a été « suspendue pour une période indéterminée » le ou vers le 9 novembre 2000. Le 29 novembre 2000, L&H a demandé la protection judiciaire à l'égard de ses créanciers aux termes du chapitre 11 du Code de la faillite des Etats-Unis, devant le tribunal de la faillite de Wilmington, au Delaware, et a, en même temps, entamé une procédure de faillite en Belgique. L&H a depuis été liquidée.

26.    L&H Holdings USA, Inc. (« L&H USA ») était une société de capitaux du Delaware, une filiale en toute propriété de L&H et la société remplaçante de Dragon. Le 29 novembre 2000, L&H USA a également demandé la protection judiciaire à l'égard de ses créanciers aux termes du chapitre 11 du Code de la faillite des Etats-Unis, devant le tribunal de la faillite de Wilmington, au Delaware, et a depuis été liquidée.

27.    Jo Lernout fait partie des défendeurs dans l'action Filler, dans laquelle le tribunal a rejeté sa requête demandant le rejet des réclamations contre lui aux termes des sections 10(b) et 20(a) de la Loi sur la bourse et des réclamations en vertu des lois étatiques pour fraude en droit commun et complicité de fraude en droit commun. Lernout était un des fondateurs de L&H. Lernout a été président de L&H de janvier 1994 à février 1996, coprésident du conseil d'administration de L&H à partir de 1996 et directeur général de L&H à partir de 1987 jusqu'à sa

démission de ces fonctions le 9 novembre 2000. Lernout a rempli les fonctions de membre du

conseil d'administration de L&H jusqu'à sa démission le 16 janvier 2001. Lernout a été forcé de

démissionner de son dernier rôle en tant que directeur en chef des technologies de L&H fin

février 2001. En avril 2001, Lernout a été arrêté en Belgique pour des accusations au pénal liées à

la fraude commise chez L&H.

        28.     Pol Hauspie fait partie des défendeurs dans l'action Filler, dans laquelle le

tribunal a rejeté sa requête demandant le rejet des réclamations contre lui aux termes des sections

10(b) et 20(a) de la Loi sur la bourse et des réclamations en vertu des lois étatiques pour fraude en

droit commun et complicité de fraude en droit commun. Hauspie était un des fondateurs de L&H.

Hauspie a été président du conseil d'administration de L&H de janvier 1994 à octobre 1996,

coprésident du conseil d'administration de L&H à partir de 1996 et directeur général de L&H à

partir de 1987 jusqu'à sa démission de ces fonctions le 9 novembre 2000. Hauspie a démissionné

de son siège au conseil d'administration le 22 novembre 2000. En avril 2001, Hauspie a été arrêté

en Belgique pour des accusations au pénal liées à la fraude commise chez L&H.

        29.     Gaston Bastiaens (« Bastiaens ») fait partie des défendeurs dans l'action Filler,

dans laquelle le tribunal a rejeté sa requête demandant le rejet des réclamations contre lui aux

termes des sections 10(b) et 20(a) de la Loi sur la bourse et des réclamations en vertu des lois

étatiques pour fraude en droit commun et complicité de fraude en droit commun. Bastiaens est

entré chez L&H en qualité de président en septembre 1996 et a été nommé président-directeur

général de L&H en mai 1997. Bastiaens a démissionné de ces fonctions le 25 août 2000 et de son

siège au conseil d'administration le 9 novembre 2000. En mai 2001, Hauspie a été arrêté au

Massachusetts et extradé en Belgique pour des accusations au pénal liées à la fraude commise

chez L&H.

        30.     Nico Willaert fait partie des défendeurs dans l'action Filler, dans laquelle le

tribunal a rejeté sa requête demandant le rejet des réclamations contre lui aux termes des sections

10(b) et 20(a) de la Loi sur la bourse et des réclamations en vertu des lois étatiques pour fraude en

droit commun et complicité de fraude en droit commun. Willaert est entré chez L&H en qualité d'administrateur en 1992 et est resté au conseil d'administration jusqu'au 22 novembre 2000. Willaert a également été directeur général de L&H à partir d'avril 1993 et co-vice-président du conseil d'administration de L&H à partir de janvier 1994 jusqu'à sa démission de ces fonctions le 9 novembre 2000. En avril 2001, Willaert a été arrêté en Belgique pour des accusations au pénal liées à la fraude commise chez L&H.

31.    Carl Dammekens (« Dammekens ») fait partie des défendeurs dans l'action Filler, dans laquelle le tribunal a accueilli la requête des demandeurs pour un jugement par défaut sur des réclamations contre lui aux termes des sections 10(b) et 20(a) de la Loi sur la bourse et des réclamations en vertu des lois étatiques pour fraude en droit commun et complicité de fraude en droit commun. Dammekens est entré chez L&H en 1990 en qualité de contrôleur de gestion et a rempli les fonctions de premier vice-président du service financier à partir de 1993 et de directeur financier intérimaire de L&H à partir de 1996 jusqu'à sa nomination en tant que directeur financier de L&H le 7 juillet 1999. Le 9 novembre 2000, L&H a annoncé que Dammekens serait remplacé en tant que directeur financier.

32.    Flanders Language Valley Fund (« FLV Fund ») fait partie des défendeurs dans l'action Filler, dans laquelle le tribunal a rejeté sa requête demandant le rejet des réclamations contre lui aux termes de la section 10(b) de la Loi sur la bourse et des réclamations en vertu des lois étatiques pour fraude en droit commun. FLV Fund est un fonds de capital risque belge organisé par Hauspie et Lernout, entre autres, pour procéder à des investissements stratégiques. Les actions FLV Fund sont négociées sur le marché boursier EASDAQ sous le symbole « FLVF ». FLV Fund a des bureaux aux Etats-Unis à Los Altos Hills en Californie et à Woburn au Massachusetts. Hauspie et Lernout ont rempli les fonctions d'administrateurs de FLV Fund en 1996 et 1997 et, après 1997, chacun a continué à « consacrer une partie de son temps à des activités liées à FLV Fund ». FLV Fund était une des entités liées à L&H par laquelle L&H finançait en secret ses prétendus clients. A toutes les époques en cause, les états financiers de

FLV Fund ont été audités par KPMG.

33.    Flanders Language Valley Foundation (« FLV Fondation »), également

dénommée S.A.I.L. Trust V.Z.W. (« S.A.I.L. Trust ») fait partie des défendeurs dans l'action

Filler, dans laquelle le tribunal a accueilli la requête des demandeurs pour un jugement par défaut

sur des réclamations contre elle aux termes de la section 10(b) de la Loi sur la bourse et des

réclamations en vertu des lois étatiques pour complicité de fraude en droit commun. FLV

Fondation est supposé être une entité à but non lucratif établie en 1995 par Hauspie, Lernout et le

Gouvernement de la Flandre, entre autres, pour appuyer le développement économique et aider au

financement de l'infrastructure de la région de la Flanders Language Valley. S.A.I.L.

Trust détient un tiers des intérêts dans FLV Management, N.V. (« FLV Manager ») pour fraude

en droit commun, complicité de fraude en droit commun et assertion inexacte et négligente de

l'Ex) [sic] et a le droit de nommer cinq de ses administrateurs. FLV Manager est le gestionnaire

de FLV Fund.

34.    Mercator & Noordstar, N.V. (« Mercator ») fait partie des défendeurs dans

l'action Filler, dans laquelle le tribunal a rejeté sa requête demandant le rejet des réclamations

contre lui aux termes de la section 10(b) de la Loi sur la bourse et des réclamations en vertu des

lois étatiques pour complicité de fraude en droit commun. Mercator est une compagnie

d'assurance basée à Antwerp, en Belgique. A toutes les époques en cause, Mercator détenait

6,9 % de L&H Holding laquelle, à son tour, détenait 8,9 % de L&H. Mercator détenait aussi

directement une participation de 0,2 % dans L&H.

35.    KPMG Belgium fait partie des défendeurs dans l'action Filler, dans laquelle le

tribunal a rejeté sa requête demandant le rejet des réclamations contre lui aux termes de la section

10(b) de la Loi sur la bourse et des réclamations en vertu des lois étatiques pour fraude en droit

commun, complicité de fraude en droit commun et assertion inexacte et négligente. KPMG

Belgium a participé aux audits de L&H par KPMG à partir de 1991, lorsque la société a absorbé

le cabinet d'expertise comptable belge Behets, Boes & Co. qui avait mené les audits de L&H

depuis la fin des années 80. KPMG Belgium a été le signataire des rapports sans réserve de KPMG sur les états financiers de L&H pour les exercices 1998 et 1999, entre autres, a donné une opinion selon laquelle ces états financiers étaient préparés conformément aux PCGR américains, a déclaré que son audit avait été mené conformément aux NVGR américains et a consenti à l'inclusion, par L&H, des rapports de KPMG Belgium sur ces états financiers dans les documents déposés auprès de la SEC.

36.     KPMG US fait partie des défendeurs dans l'action Filler, dans laquelle le tribunal a rejeté sa requête demandant le rejet des réclamations contre lui aux termes de la section 10(b) de la Loi sur la bourse et des réclamations en vertu des lois étatiques pour fraude en droit commun, complicité de fraude en droit commun et assertion inexacte et négligente. KPMG US est une firme d'experts-comptables implantée aux Etats-Unis et elle a joué un rôle principal dans les audits de 1997, 1998 et 1999 des états financiers de L&H. Une équipe d'auditeurs de KPMG US a effectué des vérifications sur place sur les activités commerciales aux Etats-Unis de L&H et l'équipe internationale dans sa totalité était guidée par Robert McLamb, un associé américain chargé de passer en revue les états financiers de L&H pour vérifier leur conformité avec les PCGR américains. Un autre associé américain, Glen Davison, était responsable de passer en revue les états financiers de L&H pour vérifier leur conformité avec les règles et règlements de la SEC. KPMG US a effectué des services extensifs pour L&H dans d'autres domaines également, tels que les conseils fiscaux, des services d'experts-conseils et des conseils en matière d'acquisition. Robert McLamb était « l'associé chargé des relations » pour l'engagement de KPMG par L&H en rapport avec l'acquisition de Dragon.

## ALLEGATIONS DE FOND

37.     L&H était un fabricant de logiciels de reconnaissance de la parole qui a été fondé en 1987 par Lernout et Hauspie. Ses trois technologies de base étaient la reconnaissance automatique de la parole, la conversion texte à parole et la compression numérique de la parole. En 1995, L&H a achevé son placement initial de titres et a commencé à être négocié sur le

13

marché du NASDAQ. De 1987 à 1995, L&H n'était pas rentable et a produit seulement un revenu annuel de quelques millions de dollars.

38.     Au cours du troisième trimestre de 1996, L&H a commencé à développer son entreprise. Il a été rapporté que les ventes de L&H avaient quadruplé entre 1995 et 1996 et la période suivante a été rapportée comme celle d'une croissance sans précédent. En 1997, le revenu total déclaré de L&H avait augmenté de 220 %, passant de 31 millions de dollars en 1996 à 99,4 millions de dollars. En 1998, L&H a allégué que ses revenus avaient augmenté de 113 % pour atteindre 211,6 millions de dollars et, pour 1999, les revenus déclarés étaient de 344 millions de dollars.

39.     L'expansion des affaires de L&H était principalement alimentée par la pratique d'acquisition d'entreprises et de technologies complémentaires comme moyen de compléter ses propres activités de développement interne. A partir de 1996, L&H a acquis au moins 20 sociétés de ce type, utilisant ses propres titres comme monnaie pour plus de 40 % des acquisitions qui ont eu lieu de 1998 à 2000, entre autres l'acquisition de Dragon par L&H, une société dans laquelle Seagate détenait une participation importante.

### Achat d'actions L&H par Seagate

40.     Le 27 mars 2000, L&H, L&H USA, Dragon et certains des principaux actionnaires de Dragon, entre autres Seagate, ont conclu un accord (« l'Accord de fusion ») aux termes duquel L&H ferait l'acquisition de Dragon dans le cadre d'une transaction par échange de titres (la « Fusion »).

41.     Le 7 juin 2000, les transactions envisagées par l'Accord de fusion ont été exécutées et Seagate a acquis 3.871.489 actions ordinaires L&H. Ce jour-là, L&H était évaluée à 43,125 USD l'action. Ainsi, Seagate a acheté des actions L&H pour une participation dans Dragon évaluée à environ 166.957.963 USD.

### Seagate s'est fiée aux divulgations publiques sur la croissance et les revenus records

42.     En consentant à accepter les actions L&H en échange de sa participation dans

Dragon et en fixant le prix de Dragon par rapport au cours des titres L&H, Seagate s'est fiée à la

véracité et la précision du grand nombre de divulgations publiques de L&H concernant son

entreprise et ses revenus et à l'intégrité de ses états financiers, dont Seagate a directement

examiné un grand nombre et qui étaient tous incorporés dans le cours des titres L&H. Ces

divulgations et assurances présentaient L&H comme une entreprise spécialisée dans la

technologie dont les produits innovateurs entraînaient des revenus globaux records.

     43.    Chaque trimestre en 1998 et en 1999, L&H a proclamé des augmentations de

revenu exponentielles et les a attribuées au grand nombre de « nouveaux contrats de licence pour

ses technologies de base ».

     44.    L&H a annoncé ses revenus pour le premier trimestre 1998 dans un communiqué

de presse en date du 28 avril 1998, joint comme pièce à l'appui à un formulaire 6-K/A en date du

26 mai 1998 : « [p]our le premier trimestre de 1998, le revenu total de L&H était de 35,1 millions

de dollars, une augmentation de 112 % par rapport aux revenus déclarés de 16,6 millions de

dollars pour le premier trimestre de 1997 ». Bastiaens a été cité pour avoir attribué la performance

de L&H à « notre franc succès pour l'obtention de contrats », que le communiqué de presse a

calculés au « nombre record de 40 contrats ».

     45.    Dans un communiqué de presse en date du 28 juillet 1998, déposé auprès de la

SEC sur un formulaire 6-K en date du 5 août 1998 et signé par Bastiaens, L&H a annoncé un

revenu total pour le deuxième trimestre de 1998 de « 45 millions de dollars, une augmentation de

113 % par rapport aux revenus déclarés de 21,1 millions de dollars pour le deuxième trimestre de

1997 ». Dans ce communiqué de presse, Lernout attribuait les résultats à la demande accrue pour

les produits de L&H et à de « nouveaux enregistrements de contrats », comme l'a fait Bastiaens

qui a déclaré que « [a]u cours du 2$^e$ trimestre, nous avons signé 42 nouveaux contrats ».

     46.    Dans un communiqué de presse en date du 27 octobre 1998, déposé auprès de la

SEC sur un formulaire 6-K en date du 28 octobre 1998, L&H a annoncé que « pour le troisième

trimestre de 1998, le revenu total de L&H était de 54,9 millions de dollars, une augmentation de

97 % par rapport aux revenus déclarés de 27,9 millions de dollars pour le troisième trimestre de 1997 ».

47.    Le 7 avril 1999, L&H « a annoncé des résultats pour le quatrième trimestre de 1998 de 76 millions de dollars de revenu, soit une augmentation de 126 % du revenu déclaré de 33,8 millions de dollars pour le quatrième trimestre de 1997 ».

48.    Dans le rapport annuel 1998 de L&H déposé auprès de la SEC sur un formulaire 20-F et signé par Bastiaens, L&H a indiqué que « pour l'exercice 1998, la société a déclaré un revenu total de 211,6 millions de dollars, soit une augmentation de 113 % par rapport aux revenus déclarés de 99, 4 millions de dollars pour l'exercice 1997 ».

49.    Le rapport annuel 1998 pour les actionnaires de L&H, déposé auprès de la SEC sur un formulaire 6-K le 1ᵉʳ juin 1999, contient une lettre aux actionnaires proclamant « une année caractérisée par des jalons importants… Pour la quatrième année consécutive, le revenu a augmenté de plus de 100 % par rapport à l'année précédente. Pendant l'exercice 1998, la société a déclaré un revenu total de 211,6 millions de dollars, soit une augmentation de 113 % par rapport aux revenus déclarés de 99, 4 millions de dollars pour 1997… L&H… a signé un chiffre record de 160 nouveaux contrats de licence pour ses technologies principales ».

50.    Le 18 mai 1999, L&H a annoncé que « pour le premier trimestre de 1999, le revenu total de L&H était de 70,7 millions de dollars, une augmentation de 102 % par rapport aux revenus déclarés de 35,1 millions de dollars pour le premier trimestre de 1998. La société attribue l'augmentation du revenu au succès continu de L&H lors de l'accroissement du rôle joué par les technologies vocales et langagières dans une vaste gamme de marchés et d'applications ».

51.    Dans un communiqué de presse en date du 28 juillet 1999, déposé auprès de la SEC sur un formulaire 6-K en date du 2 août 1999, L&H a annoncé que pour son deuxième trimestre 1999 « son revenu total était de 76,0 millions de dollars, une augmentation de 69 % par rapport aux revenus déclarés de 45,0 millions de dollars. Le revenu total de L&H pour les six premiers mois terminés le 30 juin 1999 était de 146,7 millions de dollars, une augmentation de

83 % par rapport aux revenus déclarés de 80,1 millions de dollars pour la même période en 1998. La société attribue l'augmentation du revenu au succès continu de L&H lors de l'accroissement du rôle joué par les technologies vocales et langagières dans une vaste gamme de marchés et d'applications ». L&H a rapporté que, au cours du deuxième trimestre, la division Technologies et Solutions « avait signé 57 nouveaux contrats (dont 45 se rapportaient à la technologie vocale principale) ».

52.    Dans un communiqué de presse en date du 27 octobre 1999, déposé auprès de la SEC sur un formulaire 6-K en date du 3 novembre 1999, L&H a annoncé que pour son troisième trimestre de 1999, « le revenu total était de 87,5 millions de dollars, une augmentation de 59 % par rapport aux revenus déclarés de 54,9 millions de dollars pour le troisième trimestre de 1998. Le revenu total de L&H pour les neuf mois terminés le 30 septembre 1999 étaient de 234,2 millions de dollars, une augmentation de 74 % par rapport aux revenus déclarés de 134,9 millions de dollars pour la même période en 1998 ».

53.    Dans un communiqué de presse en date du 9 février 2000, déposé auprès de la SEC sur un formulaire 6-K/A en date du 14 février 2000, L&H a annoncé que « [p]pour le quatrième trimestre de 1999, le revenu total de L&H était de 110 millions de dollars, soit une augmentation de 43,5 % du revenu déclaré de 76,7 millions de dollars pour le quatrième trimestre de 1998. Pour l'exercice 1999 [sic], la société a annoncé un revenu total de 344 millions de dollars, soit une augmentation de 62,7 % par rapport au revenu déclaré de 211,6 millions de dollars pour 1998 ». La société a attribué la croissance à « la signature, par la division Technologies et solutions, d'un nombre record de 80 contrats pour le trimestre ». Dans ce communiqué de presse, Bastiaens a déclaré que « [e]n 1999, nous avons ressenti une forte demande pour les technologies, les applications et les solutions vocales et langagières, en particulier dans les domaines de l'entreprise et de la téléphonie. Cette augmentation a été principalement le résultat d'une croissance interne et a créé une rentrée de trésorerie positive en provenance des activités commerciales pour un montant de 68 millions de dollars, ce qui montre

bien la maturité de nos activités ».

**Seagate s'est fiée à la divulgation des revenus exorbitants tirés
des licences accordées à des « partenaires stratégiques » prétendument non affiliés**

54.     Seagate s'est également fiée à l'attribution par L&H de revenus importants à ce qu'elle rapportait comme droits de licence provenant de « partenaires stratégiques » non affiliés qui avaient passé des contrats avec L&H pour le développement de logiciels destinés à des applications et des langues particulières.

55.     En 1996, peu de temps après l'entrée de Bastiaens chez L&H, la société a annoncé que Dictation Consortium NV (« Dictation »), « une société fermée dans laquelle FLV Fund avait un investissement », avait pris sous licence des logiciels de L&H afin de développer la technologie de reconnaissance automatisée continue de la parole de L&H. A la date du 31 décembre 1996, FLV Fund et FLV Management détenaient ensemble 61 % du capital de Dictation et les défendeurs, Lernout et Hauspie, étaient administrateurs de FLV Fund Management. Dictation a procuré un revenu de 26,6 millions de dollars à L&H au cours des deux années suivantes, environ un quart de ses ventes de 1996 et 19 % de ses ventes de 1997. Comme Dictation supportait les frais de recherche et développement, ceux-ci n'ont pas réduit le profit de L&H comme ils l'auraient dû. En mai 1998, L&H a annoncé avoir obtenu le logiciel développé par Dictation par l'achat de la société pour la somme de 26,9 millions de dollars, dont la plus grande partie représentait le fonds commercial et pouvait ainsi être amorti sur sept ans.

56.     En 1997, L&H a conclu un arrangement similaire avec une société formée en mars 1997 par des investisseurs en capital-risque anonymes, appelée Brussels Translation Group (« BTG »). D'après le rapport annuel 1998 de L&H sur le formulaire 20-F, L&H a accordé à BTG une licence exclusive d'utilisation de la technologie de traitement de la parole de L&H et des bases de données s'y rapportant pour le développement d'un service de traduction sur Internet. L'accord demandait à BTG de verser à L&H 3,5 millions de dollars à titre de droits de licence, plus des redevances. En mai 1997, les droits de licence ont été augmentés de 1,5 million

de dollars et L&H a également conclu un accord pour la fourniture à BTG de services

d'ingénierie, aux termes duquel BTG a payé à L&H une somme d'environ 30 millions de dollars.

57.    En juin 1999, L&H a fait l'acquisition de BTG pour la somme d'environ

42 millions de dollars au comptant plus la prise en charge des dettes encourues lors du lancement

de BTG pour un montant de 17 millions de dollars. Comme pour la transaction portant sur

Dictation Consortium, L&H a pu obtenir un produit sans avoir à déduire les frais de recherche et

développement. A la place, L&H a pu comptabiliser presque 35 millions de dollars de revenus et

ensuite, lorsqu'elle a acheté BTG, L&H a capitalisé le prix d'acquisition, transformant ce qui

serait normalement une dépense en un actif.

58.    Bien que des critiques aient allégué que les revenus de L&H étaient gonflés par

les transactions portant sur Dictation et BTG car ces sociétés étaient liées à L&H, L&H a

faussement soutenu que, à l'exception de la participation de FLV Fund, ces sociétés appartenaient

à des « investisseurs privés » non affiliés que L&H a refusé d'identifier.

59.    A la fin de l'année 1998, L&H a étendu son recours à des clients sur le modèle de

Dictation, aidant à la création de 30 jeunes entreprises constituées en personnes morales en

Belgique et à Singapour. Ces sociétés ont été financées par des investisseurs privés non identifiés

qui, ce que L&H a affirmé avec insistance, étaient « non affiliées avec nous ». Dans un

communiqué de presse en date du 7 avril 1999, L&H a annoncé, parmi les points saillants de

l'exercice 1998 :

> [L&H a commencé] le développement d'environ 20 langues exotiques supplémentaires
> avec ses partenaires financiers et technologiques. En 1998, des contrats ont été signés
> pour les langues suivantes : l'ukrainien, le polonais, le tchèque, le slave, l'indonésien, le
> grec et le persan à l'appui d'une gamme de technologies vocales… Afin de développer
> ces langues supplémentaires en fonction de certaines contraintes temporelles et
> financières, L&H travaille avec des partenaires qui entreprendront la localisation et le
> développement des ces domaines linguistiques et partageront les rétributions financières.
> L&H accordera ses outils sous licence aux partenaires et s'assurera de la qualité des
> différentes applications et langues.

60.    Dans son rapport annuel 1998 sur le formulaire 20-F, L&H a donné une

description plus détaillée de ces transactions :

Aux termes de ces accords, nous avons accordé une licence exclusive pour nos outils de développement de technologies vocales et langagières à des partenaires stratégiques <u>qui ne sont pas affiliés avec nous</u> pour le développement et la localisation de notre technologie pour de nouvelles langues particulières. Nos partenaires stratégiques ont également des droits exclusifs… pour le développement, la commercialisation et la distribution de produits incorporant la technologie développée. En plus des droits de licence payables une seule fois, nous avons le droit de recevoir des redevances basées sur le revenu net de nos partenaires provenant des ventes de produits incorporant la technologie développée.

[Emphase ajoutée.]

61.    Les droits de licence initiaux payés par ces « partenaires stratégiques » prétendument non affiliés ont représenté 10 % du revenu allégué de L&H pour 1998 et 25 % du revenu allégué pour 1999, largement supérieurs aux 3,7 % du revenu de 1998 qui, ce que L&H a déclaré dans son rapport annuel 1998 sur le formulaire 20-F, a été fourni par « des sociétés financées en partie par FLV Fund » et aux 0,3 % du revenu de 1999 qui, ce que L&H a déclaré dans son formulaire 10-K de 1999, a été fourni par « des sociétés financées en partie par FLV Fund et L&H Investment Co. ».

62.    L&H a souligné la soi-disant légitimité des revenus tirés des licences par de fausses descriptions publiques d'une politique prudente de comptabilisation des revenus. Dans des notes figurant dans ses états financiers de 1997, 1998 et 1999 audités par KPMG, L&H déclarait ce qui suit :

La Société comptabilise le revenu provenant de la vente de ses licences d'utilisation de logiciel dès la satisfaction de tous les critères suivants : signature de l'accord de licence, expédition des produits lorsqu'aucune modalité contractuelle ne reste inexécutée et, le cas échéant, lorsqu'un rapport sur les redevances est reçu en provenance du client. La Société reçoit généralement chaque trimestre des rapports sur les redevances de chaque client qui a signé un contrat de licence. Les rapports détaillent le nombre d'unités ou de produits que le client a expédiés durant cette période. Le nombre d'unités multiplié par le taux contractuel applicable par unité est le montant que la Société comptabilise comme revenu. Avant de comptabiliser ce revenu, la Société détermine que toutes les obligations importantes ont été satisfaites et que l'encaissement des créances est probable…

De temps à autre, la Société conclut des accords de redevances minimales non remboursables avec des clients. En vertu de ces arrangements, la Société délivre ses technologies ou produits au client en même temps qu'elle conclut le contrat. Le revenu tiré des accords de redevances minimales non remboursables est comptabilisé dès la satisfaction de tous les critères suivants : signature de l'accord de licence, aucune production , modification ou personnalisation importante supplémentaire du logiciel n'est

nécessaire, la livraison a eu lieu, les droits sont fixés et déterminables et l'encaissement est probable. Pour les arrangements qui comprennent des éléments multiples, les droits sont alloués aux différents éléments en fonction de la preuve objective de juste valeur marchande propre au fournisseur.

Dans tous ces cas, la Société ne comptabilise le revenu que lorsque l'encaissement de la créance correspondante est probable.

63.    Ces divulgations étaient également fausses. Comme indiqué en détail plus bas, les enquêteurs ont découvert et L&H a confirmé que ses « partenaires stratégiques » étaient en fait de jeunes entreprises à risque sans actifs réels, établies par des personnes morales appaentées à L&H (et auditées par KPMG), entre autres les défendeurs, FLV Fund, S.A.I.L. Trust et LHIC, comme moyens de financer la recherche et le développement sans figurer dans la comptabilité, et les « droits de licence » importants provenant de ces « clients » comptabilisés par L&H étaient un leurre.

64.    De plus, comme indiqué en détail plus bas, les entreprises à risques étaient financées par des dizaines de millions de dollars de prêts qui étaient garantis en secret par les mandants de L&H, Lernout, Hauspie et Willaert. Le prêteur était Artesia dont les documents internes non publics, dont la substance n'a été que récemment obtenue par les demandeurs, démontrent qu'Artesia a effectué les prêts tout en sachant que les « partenaires stratégiques » étaient des leurres, que le produit des prêts serait réacheminé à L&H qui les décrirait faussement dans ses états financiers comme « droits de licence » provenant d'« entités non affiliées », que cette comptabilisation était en violation des principes comptables généralement reconnus (« PCGR ») des Etats-Unis et que le seul but de la transaction était de se soustraire aux exigences de déclaration de la SEC. En vérité, c'était Artesia qui avait conçu une structure pour les garanties – les swaps sur défaillance – qui permettrait à L&H de garder le secret et, de ce fait, d'accomplir sa fraude.

### Seagate s'est fiée aux assurances par écrit de KPMG

65.    Dans chacun de ses rapports annuels pour 1998 et 1999, déposés auprès de la SEC, L&H a déclaré que ses états financiers étaient préparés conformément aux P.C.G.R.

américains. KPMG a appuyé la crédibilité des divulgations de L&H par la délivrance de rapports sans réserve pour ses audits des états financiers de L&H pour les années 1997, 1998 et 1999 et par le consentement à l'inclusion de ces rapports dans les documents de L&H déposés auprès de la SEC.

66.     Un auditeur est supposé donner une « opinion sans réserve » ou « opinion favorable » uniquement lorsqu'aucune limite importante n'affecte la performance de l'auditeur et lorsque les documents probants obtenus lors de l'audit ne divulguent aucune déficience importante dans l'état financier et/ou des circonstances inhabituelles qui affectent le rapport de l'auditeur. American Institute of Certified Public Accountants (AICPA), « Comprendre les audits et le rapport d'auditeur – Guide pour les utilisateurs d'états financiers », 2$^e$ édit., 2996 au 15.

67.     Le 9 avril 1999, KPMG a fait un rapport sur les états financiers de L&H pour 1998, déclarant ce qui suit :

> Nous avons mené nos audits conformément aux principes comptables généralement reconnus aux Etats-Unis. Ces principes exigent que nous planifions et effectuions l'audit de manière à nous assurer raisonnablement sur le fait de savoir si les états financiers sont exempts d'inexactitudes importantes. Un audit comprend l'examen, par sondages, des documents probants à l'appui des montants et des divulgations dans les états financiers. Un audit comprend également l'évaluation des principes comptables utilisés et des estimations importantes faites par la direction, ainsi que l'évaluation de la présentation d'ensemble des états financiers. Nous pensons que nos audits fournissent un fondement raisonnable pour notre opinion.
>
> A notre opinion, les états financiers consolidés mentionnés plus haut présentent raisonnablement, à tous égards importants, la position financière de Lernout & Hauspie Speech Products N.V. et ses filiales à la date de [la période de temps concernée] et les résultats de leurs activités commerciales et de leurs mouvements de trésorerie pour chacune des années au cours de la période de trois ans terminée [le 31 décembre de l'exercice] en conformité avec les principes comptables généralement reconnus aux Etats-Unis.

68.     KPMG a consenti à l'inclusion de son rapport d'audit pour 1998 dans le rapport annuel de L&H sur le formulaire 20-F déposé auprès de la SEC le 30 juin 1999. Le 6 janvier 2000, KPMG a également consenti à l'incorporation par référence de son rapport d'audit pour 1998 dans les déclarations d'enregistrement déposées par L&H déposé auprès de la SEC sur le formulaire F-3 le 7 janvier 2000. Cette déclaration d'enregistrement a été fournie à Seagate

comme « le plus récent document public déposé publi par L&H » dans le cadre de la diligence raisonnable dont a fait preuve Seagate en relation avec la fusion.

### Seagate s'est fiée aux fausses représentations verbales faites par KPMG et les mandants de L&H

69.     En plus des déclarations de L&H dans les communiqués de presse et les documents publiquement déposés, Seagate s'est fiée à certaines représentations verbales faites par Lernout, Hauspie, Bastiaens, Dammekens et KPMG confirmant l'exactitude des divulgations publiques de L&H.

70.     A plusieurs occasions au cours des négociations pour l'achat par L&H de Dragon, Bastiaens a dit à Ellen Chamberlain, une employée de Seagate remplissant les fonctions de directeur financier intérimaire de Dragon, que les projections de L&H étaient satisfaites pour les premier et deuxième trimestres de 2000. Bastiaens a fait ces déclarations lors de rencontres dans les bureaux de Cowan & Co, à Boston au Massachusetts, les services bancaires d'investissement de L&H en rapport avec la fusion en février et en mars 2000.

71.     Du 13 au 15 décembre 1999, Mme Chamberlain a rencontré Lernout et Hauspie en Belgique où Mme Chamberlain a exprimé ses inquiétudes du fait que FLV Fund finançait les jeunes entreprises qui fournissaient des pourcentages importants des revenus tirés des licences d'utilisation de logiciels de L&H. Lernout et Hauspie ont tous deux assuré à Mme Chamberlain que : (a) ils n'avaient aucun intérêt financier dans une quelconque des jeunes entreprises, (b) toute licence d'utilisation de logiciel de L&H par ces nouvelles entités était le résultat de négociations conclues dans les conditions normales du marché et (c) bien qu'ils soient tous deux dans le conseil d'administration de FLV Fund, ils n'intervenaient pas dans les prises de décision.

72.     Le ou vers le 22 mars 2000, environ une semaine avant que l'Accord de fusion ne soit signé, Dammekens a participé à une conférence téléphonique durant laquelle Mme Chamberlain l'a questionné sur le fondement de son accord présumé avec la comptabilisation du revenu de L&H. Dammekens a déclaré qu'il se sentait à l'aise avec les