divulgations du revenu de L&H car lui et son équipe avaient passé en revue tous les contrats de
L&H avant la publication des résultats financiers, entre autres les résultats de l'exercice 1999 qui
avaient été publiés en janvier 2000.

73.     Dans le cadre de la diligence raisonnable préliminaire à la fusion,
Mme Chamberlain avait demandé à plusieurs reprises à parler avec KPMG et on lui avait dit
qu'elle ne pouvait pas le faire car leur audit des états financiers de L&H pour 1999 n'étaient pas
terminés. Mme Chamberlain a finalement pu questionner des représentants de KPMG pendant la
conférence téléphonique du 22 mars 2000 à laquelle ont participé ces représentants. Le personnel
de KPMG qui a participé à la conférence savait que l'objectif de l'appel était la fourniture
d'informations à des représentants de Seagate, ce qui constituait une partie importante de la
diligence raisonnable exercée par Seagate à l'égard de la fusion.

74.     Pendant la conférence téléphonique du 22 mars 2000, un associé de KPMG a dit
à Mme Chamberlain, entre autres, que (a) KPMG prévoyait d'approuver en signant son audit des
états financiers de L&H pour 1999 dans deux ou trois semaines, (b) les seules questions
pendantes de l'audit étaient « deux questions sur le revenu » en Corée concernant un ou deux
clients, mais rien qui n'entraîne une régularisation; et « deux » confirmations de contrat n'avaient
pas encore été reçus ; et KPMG devait achever des tests mineurs de la capitalisation par L&H de
ses frais de R&D, comme la vérification de relevés du temps de travail d'ingénieurs qui avaient
facturé des heures de travail pour certains projets, (c) dans le cadre de l'audit 1999, aucune
régularisation n'avait été inscrite par les auditeurs, (d) KPMG ne prévoyait pas, à ce moment-là
de régularisation importante des états financiers de L&H pour 1999 et (e) KPMG était « à l'aise »
avec la comptabilisation des revenus de L&H.

75.     Mme Chamberlain avait connaissance du fait que, en 1999, L&H avait fait l'objet
d'une enquête par la SEC relative à une méthode agressive de comptabilisation des acquisitions.
L&H avait utilisé un mode « d'achat » pour la comptabilisation du fonds commercial, le
considérant comme un frais unique par rapport aux gains pour la « recherche et le développement

en cours ». Les méthodes de L&H, auditées et approuvées par KPMG, ont permis de façon inadmissible à L&H d'éviter un abaissement des gains à long terme causé par l'amortissement du fonds commercial. La SEC a imposé à L&H de redresser ses résultats financiers pour 1997 et les six premiers mois de 1998.

76.    Lorsque Mme Chamberlain, pendant la conférence téléphonique du 22 mars 2000, s'est informée du statut de l'enquête de la SEC sur les méthodes comptables de L&H, le représentant de KPMG Belgium lui a dit que toutes les questions liées à l'enquête de la SEC sur les méthodes comptables de L&H avaient été résolues.

### Confiance ultérieure envers l'opinion sans réserve de KPMG Belgium pour 1999

77.    Le 27 avril 2000, KPMG, par dessus la signature de KPMG Belgium, a délivré son rapport sans réserve sur les états financiers de L&H pour 1999, confirmant les représentations verbales de KPMG en date du 22 mars 2000, selon lesquelles son audit n'avait découvert aucune erreur ou acte irrégulier important dans les états financiers non audités délivrés en janvier :

> Nous avons audité les bilans consolidés ci-joints de Lernout & Hauspie Speech Products N.V. et leurs filiales (la Société) à la date du 31 décembre 1998 et du 31 décembre 1999 et leurs comptes d'exploitation générale consolidés connexes, les capitaux propres, les mouvements de trésorerie et le résultat global (perte) pour chacune des années au cours de la période de trois ans terminée le 31 décembre 1999…
>                                    * * *
> A notre avis, les états financiers consolidés mentionnés plus haut présentent raisonnablement, à tous égards importants, la position financière de Lernout & Hauspie Speech Products N.V. et ses filiales à la date du 31 décembre 1998 et du 31 décembre 1999 et les résultats de leurs activités commerciales et de leurs mouvements de trésorerie pour chacune des années de la période de trois ans terminée le 31 décembre 1999, en conformité avec les principes comptables généralement reconnus aux Etats-Unis.

78.    Seagate était en droit de résilier l'Accord de fusion avant sa conclusion s'il apparaissait que les états financiers non audités de L&H pour 1999, publiés avant la signature de l'Accord de fusion comportaient des inexactitudes importantes :

(a)    L'Accord de fusion comprenait les déclarations et les garanties de L&H selon

lesquelles : (i) tous les documents de L&H déposés auprès de la SEC depuis

janvier 1998 ne contenaient aucune fausse déclaration de fait important ou

aucune omission importante ; (ii) tous les états financiers inclus dans les documents de L&H déposés auprès de la SEC étaient conformes, à tous égards importants, aux exigences comptables ainsi qu'aux règles et règlements publiés de la SEC et étaient préparés conformément aux P.C.G.R. américains et (iii) les états financiers consolidés non audités de L&H pour l'exercice clos le 31décembre 1999 étaient préparés conformément aux P.C.G.R. américains et « présentent raisonnablement, à tous égards importants, la position financière consolidée de [L&H] à la date des présentes ».

(b)    La section 9.1 de l'Accord de fusion permettait à Seagate de résilier l'Accord à tout moment antérieur à sa conclusion « s'il y avait une violation d'une représentation [ou] garantie ... qui rende les conditions citées dans la section 7.3(a) ... impossibles d'être satisfaites ».

(c)    La section 7.3(a) de l'Accord de fusion prévoyait que les représentations et garanties de [L&H] seraient correctes et conformes à la vérité à tous égards importants à la date de sa conclusion ».

79.    Si KPMG n'avait pas donné une opinion sans réserve indiquant que les états financiers de L&H pour 1999 étaient préparés conformément aux P.C.G.R. américains ou avait, d'une autre manière, qualifié son rapport sur les états financiers de L&H pour 1999, ceci aurait signalé à Seagate que les états financiers non audités de L&H pour l'exercice terminé le 31 décembre 1999 n'étaient pas préparés conformément aux P.C.G.R. américains et la fusion n'aurait pas été exécutée.

### Seagate s'est fiée à l'intégrité du marché des titres L&H

80.    Parmi les facteurs que Seagate a considérés lors de la fixation du prix de ses avoirs Dragon que L&H a payés avec des actions L&H, était le cours des actions L&H. A toutes les époques en cause, le marché des actions L&H était efficient car les actions ordinaires L&H satisfaisaient les conditions d'admission à la cote et étaient cotées en bourse et activement

négociées sur les marchés NASDAQ et EASDAQ qui étaient des marchés automatisés et hautement efficients.

81.    En tant qu'émetteur réglementé, L&H déposait périodiquement des rapports publics auprès de la SEC. L&H communiquait aussi régulièrement avec des investisseurs publics via des mécanismes de communication du marché, y compris par le biais de diffusion régulière de communiqués de presse sur les principales agences de transmission et par le biais d'autres divulgations publiques de grande envergure, telles que les communications avec la presse financière, les analystes de valeurs mobilières et d'autres services de rapport financier.

82.    Le marché des titres L&H digérait rapidement les informations courantes concernant L&H en provenance des sources accessibles au public décrites plus haut et répercutaient ces informations sur le prix des actions L&H.

83.    En conséquence, à toutes les époques en cause – y compris le moment où Seagate négociait le prix qu'elle accepterait en actions L&H, le moment où Seagate a signé l'Accord de fusion et le moment où la fusion a été exécutée – le cours des actions L&H était frauduleusement gonflé par les fausses déclarations et les non divulgations des défendeurs.

### La fraude commise chez L&H

84.    Dans les mois qui ont suivi la conclusion de la fusion Dragon, il a été révélé que la croissance « record » de L&H était un leurre. A la fin de mai 2001, moins d'une année après la conclusion de la transaction Dragon, des organismes de réglementation américains et européens avaient commencé des enquêtes sur la fraude commise chez L&H, les actions L&H avaient été radiées de la cote en Europe et aux Etats-Unis, L&H était en faillite et Lernout, Hauspie, Willaert et Bastiaens avaient été arrêtés pour différentes accusations au pénal liées à la fraude commise chez L&H. Les actions L&H évaluées à presque 170 millions de dollars lorsque Seagate les avaient reçues en échange d'une participation dans Dragon étaient absolument sans aucune valeur.

85.    Jusqu'à son acquisition de Dictaphone Corporation en mai 2000, L&H avait pu

déposer des informations auprès de la SEC en tant qu'émetteur privé étranger, soumis à moins d'obligations de communication d'informations détaillées que celles appliquées aux entités américaines. Peu de temps après la réalisation de la fusion, le 30 juin 2000, L&H a déposé un formulaire 10-K qui comprenait des états financiers pour l'exercice 1999 audités par KPMG et a aussi déposé un formulaire 10-Q qui comprenait les états financiers non audités pour le premier trimestre de l'exercice 2000, tous deux contenant, pour la première fois dans un document déposé par L&H auprès de la SEC, la décomposition géographique des ventes exigée par la SEC dans les documents déposés par des sociétés américaines.

86.    Les documents déposés étaient censés révéler que, sur le revenu 1999 de l'ordre de 344,2 millions de dollars, la Corée avait contribué 62,9 millions de dollars et Singapour avait contribué 80,3 millions de dollars (collectivement, plus de 41 % du revenu total de L&H), en augmentation des revenus combinés de moins de 300.000 USD en 1998.

87.    Après le dépôt du formulaire 10-K le 30 juin 2000, des reporters de *The Wall Street Journal* ont commencé une enquête sur les clients de L&H à Singapour et en Corée. Ils ont commencé à rapporter les résultats de cette enquête dans un article publié le 8 août 2000. L'article divulguait qu'un grand nombre des sociétés que L&H avait identifiées comme clients coréens avaient nié avoir fait des affaires avec L&H.

88.    Bien que L&H ait essayé de rejeter ces allégations et ait déclaré que tous les revenus coréens étaient exacts, le 15 août 2000, *The Wall Street Journal* a rapporté que L&H avait commandé un audit intérimaire de la société en milieu d'année à KPMG. L'objectif de cet audit était de « calmer les inquiétudes concernant les résultats financiers de la division [de L&H] pour la Corée du sud ».

89.    Le 25 août 2000, L&H a annoncé que Bastiaens avait démissionné de sa position de président et PDG de L&H. Bastiaens a été remplacé par John Duerden, l'ancien PDG de Dictaphone. Bastiaens est resté comme administrateur de L&H.

90.    Le 20 septembre 2000, le conseil d'administration de L&H a autorisé son comité

d'audit à « mener les enquêtes qu'il jugeait nécessaires sur certaines méthodes comptables et

autres de la Société qui faisaient l'objet d'une enquête officielle menée par la [SEC], « d'après un

rapport fourni au comité d'audit deux mois plus tard, le 20 novembre 2000 (le « Rapport du

comité d'audit »), par les conseillers dont les services avaient été retenus par le comité d'audit –

le cabinet d'avocats américain Bryan Cave LLP, le cabinet d'avocats belge Loeff Claeys Verbeke

et le cabinet d'expertise comptable Arthur Andersen LLP (les « Conseillers du comité d'audit »).

91.    Le 22 septembre 2000, *The Wall Street Journal* a rapporté que la SEC avait lancé

une enquête sur les méthodes comptables de L&H en janvier 2000. En fait, le ou vers le

24 janvier 2000, la SEC avait fait une demande de documents à L&H, laquelle était centrée sur

les méthodes de comptabilisation du revenu et, en particulier, sur les contrats et les relations de la

Société avec ses soi-disant « partenaires stratégiques ». Par la suite, la SEC a haussé le statut de

l'enquête au niveau « officiel ».

92.    Les 22 et 26 septembre 2000, *The Wall Street Journal* a également soulevé

d'importantes questions supplémentaires sur les revenus de L&H, en particulier sur 30 jeunes

entreprises à Singapour et en Belgique qui représentaient presque tous les revenus asiatiques

déclarés par L&H pour 1998 et 1999. Les articles ont également soulevé des inquiétudes du fait

que FLV Fund avait des rapports financiers avec huit jeunes entreprises qui étaient étroitement

liées à L&H et que ces jeunes entreprises représentaient une grande partie des revenus 1998 et

1999 de L&H. Une des transactions contestées concernait les huit jeunes entreprises à Singapour

qui avaient été initialement financées par FLV Fund sans aucune divulgation relative à leur nature

d'opérations entre personnes apparentées.

93.    Le 26 septembre 2000, *The Wall Street Journal* a rapporté que la bourse

EASDAQ basée à Bruxelles avait lancé une enquête officielle sur L&H. A la même date,

Blomberg News a rapporté que l'EASDAQ enquêterait aussi sur FLV Fund.

94.    Le 18 octobre 2000, *The Wall Street Journal* a rapporté que L&H avait refusé de

fournir à la SEC les noms des investisseurs derrière les trente entreprises clientes qui constituaient

le centre d'attention de l'enquête de la SEC et qui représentaient environ 25 % des revenus 1999 de la Société et 10 % de ses revenus 1998. Alors que L&H a reconnu avoir aidé le lancement des 30 entreprises et initialement financé leurs activités commerciales, la Société a soutenu que ces entreprises appartenaient à des investisseurs indépendants intéressés au développement de nouvelles applications pour les logiciels de la parole de L&H. L&H a publié de nouveaux détails sur les activités commerciales de 17 des 30 entreprises, qui ont révélé que ces sociétés n'avaient aucune personnalité juridique quelle qu'elle soit et certainement aucune substance économique en-dehors de L&H. Sur ces 17 entreprises, aucune n'avait d'employés directs. Sept sociétés s'appuyaient sur des employés de L&H pour faire des travaux pour elles et avaient consenti à repayer L&H pour ses services. Les 10 autres n'avaient pas commencé à développer de logiciels bien qu'elles aient versé des droits de licence importants à L&H. D'après *The Wall Street Journal*, les 30 entreprises étaient toutes enregistrées à juste quelques adresses communes en Belgique et à Singapour et beaucoup avaient des dirigeants et des actionnaires prête-noms communs.

95.    Le 9 novembre 2000, L&H « a fourni une mise à jour du statut de l'audit en milieu d'année de la Société qu'elle avait commandé en août dernier et de l'enquête en cours du comité d'audit » et a annoncé que « [e]n conséquence des erreurs et des irrégularités identifiées lors de l'enquête du comité d'audit, la Société prévoit de redresser ses états financiers pour les périodes 1998, 1999 et pour la première moitié de 2000 ». L'annonce par L&H d'« irrégularités comptables » était, en termes de comptabilité, équivalents à une admission de fraude. La norme de vérification n° 53 délivrée par l'American Institute of Certified Public Accountants définit le terme « irrégularités » comme « déclarations erronées ou omissions intentionnelles » dans les états financiers, signifiant qu'une fraude a été commise lors de leur préparation.

96.    Ce jour-là, le NASDAQ a suspendu le négoce des actions L&H. Juste avant la suspension, les actions L&H s'échangeaient à 3,525 USD, plus de 95 % au-dessous du chiffre record de 72,50 USD atteint en mars, lorsque la société avait déclaré une capitalisation boursière

de plus de 10 milliards de dollars. La chute a effacé plus de 9 milliards de dollars de la valeur au marché des actions de la société.

97.    Le 17 novembre 2000, *The Wall Street Journal* a rapporté que l'auditeur indépendant de L&H, KPMG, avait retiré son rapport d'audit sur les états financiers de L&H pour 1998 et 1999, déclarant que ses précédentes opinions de vérificateur « ne devaient plus être invoquées ».

98.    Le 21 novembre 2000, *The Wall Street Journal* a rapporté que l'EASDAQ avait suspendu le négoce des actions FLV Fund. L'article décrivait FLV Fund comme un véhicule d'investissement dans lequel Jo Lernout et Pol Hauspie « exercent une influence considérable sur ses affaires » avec « des antécédents d'investissements dans des clients de L&H, habituellement de petites sociétés qui paient des droits de licence à L&H ».

99.    Le 29 novembre 2000, L&H a demandé la protection de la loi sur les faillites aux termes du Chapitre 11 devant le tribunal de la faillite pour le district du Delaware. D'après un article paru le 30 novembre 2000 dans *The Wall Street Journal*, la décision de demander la protection de la loi sur les faillites a été prise après que des cadres de L&H ont découvert que la somme de 100 millions de dollars en espèces était manquante dans l'unité sud-coréenne de la Société.

100.    Le 14 décembre 2000, *The Wall Street Journal* a fait un compte-rendu des trente « partenaires stratégiques » qui comprenaient une partie importante des revenus de L&H, révélant que Mercator était l'ultime propriétaire de 16 des 30 jeunes entreprises et que FLV Fund avait financé au moins en partie environ 8 des 14 autres.

101.    Le 5 janvier 2001, l'*Associated Press* a signalé que le juge belge présidant la procédure de faillite belge de L&H reconnaissait qu'il n'y avait « aucun doute qu'il y avait eu une fraude » commise chez L&H.

102.    A la fin d'avril 2001, les autorités sud-coréennes ont lancé une enquête sur les allégations portées contre les banques coréennes, ainsi que sur certains anciens employés coréens

de L&H.

103.    Le ou vers le 27 avril 2001, Lernout, Hauspie et Willaert ont été arrêtés en Belgique et accusés de falsification et de manipulation des cours. Le 26 mai 2001, Bastiaens a été arrêté par des fonctionnaires des Etats-Unis à Winchester, au Massachusetts, en réponse à un mandat d'arrestation belge. Bastiaens a été par la suite extradé en Belgique où il est maintenant accusé de fraude, délit d'initié, manipulation des cours du marché et violations de lois comptables.

### La fraude avec les « partenaires stratégiques »

104.    Le 19 décembre 2000, L&H a publiquement révélé les conclusions du Rapport du comité d'audit qui avaient été auparavant présentées au conseil d'administration de L&H le 20 novembre 2000. Le Rapport du comité d'audit concluait, en partie, que (a) L&H avait abusivement comptabilisé la somme de 277 millions de dollars de revenu en 1998, 1999 et la première moitié de 2000, (b) la société devait annuler tous ses revenus coréens enregistrés en 1999 et 2000, qui s'élevaient à environ 182 millions de dollars et (c) les revenus des droits de licence provenant des vingt-quatre des trente « partenaires stratégiques » ne faisaient rien d'autre que financer la recherche et le développement de L&H par le biais d'opérations entre personnes morales apparentées.

105.    En ce qui concerne les revenus des licences provenant des « partenaires stratégiques », c'est-à-dire les SDL et SDLC, les Conseillers du comité d'audit ont conclu que les revenus provenant de 24 des 30 nouvelles entreprises avaient été incorrectement comptabilisés. Le rapport a conclu que les sociétés n'achetaient pas de licences d'utilisation de logiciel, mais payaient en réalité des employés de L&H pour le développement de futurs produits, finançant en fait les propres besoins de la société en matière de R&D. Le Rapport du comité d'audit recommandait, au moins, d'annuler environ 83 millions de dollars de revenus de licences et déclarait que, si les investisseurs étaient des personnes morales apparentées, comme les preuves le donnaient à penser, les montants financés devaient être comptabilisés comme dette :

Il apparaît, basé sur notre révision comptable, que le concept original des SDL comprenait la vente de droits et d'outils à un tiers indépendant et l'emploi séparé de ces outils par le tiers pour le développement de produits compatibles avec L&H dans une langue particulière. Le libellé des contrats corrobore ce concept. Cependant, il apparaît également que, peu de temps après les quelques premiers contrats de SDL ont été signés, le personnel de L&H a réalisé que les investisseurs de SDL étaient principalement des investisseurs financiers et que L&H devrait fournir plus de services aux SDL que ce qui avait été initialement pensé. En fin de compte, L&H a assumé la responsabilité du travail de développement en échange d'honoraires supplémentaires prévus. Bien qu'il nous semble que, en décembre 1998, L&H et les SDL aient su que L&H effectuerait certains ou tous les services ou le travail de développement pour les SDL, les contrats conclus à l'avenir n'ont pas été modifiés pour tenir compte de cet arrangement. A l'exception du turc et du persan, les contrats tenant compte du fait que les SDL paieraient à L&H les services ou le travail de développement n'ont pas été signés avant le 3 novembre 2000. A notre connaissance, à l'exception du turc et du persan, les SDL n'ont pas encore été facturés pour le travail de développement effectué à ce jour.

* * *

Nous pensons, en nous basant sur l'examen de certains documents internes et de la documentation de marketing externe et les discussions limitées avec les investisseurs ou leurs représentants que les investisseurs escomptaient, pour l'essentiel, acheter les droits futurs sur un produit (langue) qui serait développé par L&H et ont ainsi effectivement financé les efforts de recherche et développement de la société pour construire cette langue.

Si les investisseurs ne sont pas des personnes morales apparentées, la comptabilisation de ces transactions nécessiterait un report de tous les revenus et la comptabilisation tout au long de la période de développement… Si les investisseurs sont des personnes morales apparentées, la littérature comptable s'y rapportant présume que les investisseurs/ personnes apparentées seront remboursés et que les montants financés sont comptabilisés comme dettes.

106.    En fait, les investisseurs étaient des personnes morales apparentées et, ce que L&H avait comptabilisé comme revenu de licences n'aurait pas dû être simplement reporté, cela aurait dû être déclaré comme dette. Bien que le Rapport du comité d'audit ait rédigé les noms des investisseurs qu'il avait réussi à découvrir et à rattacher à L&H, des rapports publiés par la presse ont révélé ces noms et leurs affiliations avec L&H.

107.    Un article du *Wall Street Journal* en date du 22 septembre a révélé que huit des jeunes coquilles vides étaient financées par le défendeur, FLV Fund, dont les comptes sont audités par KPMG. D'après un article du *Wall Street Journal* en date du 6 novembre, quatre autres étaient constituées comme filiales de Language Investment Co., dont le PDG, Willem Hardeman, siège au conseil d'administration de FLV Fund. Et un article du *Wall Street Journal*

en date du 14 décembre 2000 révèle que seize autres appartenaient à Mercator dont le président du conseil d'administration, Louis Verbeke, est un associé du cabinet juridique (qui porte son nom) qui remplissait les fonctions de principal conseil et de Conseiller du comité d'audit de L&H – Loeff, Claeys, Verbeke. M. Verbeke et Mercator détenaient séparément des participations dans L&H. Mercator détient également 6,9 % de L&H Holding Co., un organe par lequel les défendeurs, Lernout et Hauspie, contrôlent L&H. Les états financiers de L&H et d'autres divulgations omettaient, de manière à induire en erreur, ces relations. En vérité, comme indiqué précédemment, L&H a représenté de manière affirmative et fausse le fait que ces « preneurs de licences » étaient des « clients non affiliés » et que les revenus de 1998 et 1999 provenant de sociétés financées par FLV Fund étaient *de minimis*.

108.    Plus récemment, en juin 2003, il a été en outre révélé que les entités étaient financées par des dizaines de millions de dollars de prêts secrètement garantis par des mandants de L&H – Lernout, Hauspie et Willaert.

109.    L&H a essentiellement présenté au grand public le fait que les SDL et SDLC étaient des entités non affiliées qui payaient à L&H des dizaines de millions de dollars de droits de licence pour le droit de développer des logiciels de L&H destinés à des langues particulières. Les contrats donnaient à L&H une option d'acquérir le partenaire stratégique et le produit développé. Ainsi, pour le grand public, des personnes morales non affiliées fournissaient un revenu important à L&H et supportaient aussi les frais et le risque de développer des logiciels.

110.    En réalité, les SDL et SDLC étaient de jeunes coquilles vides insolvables, sans aucun fonds pour payer les droits de licence et aucune ressource pour effectuer le travail de recherche et développement envisagé par les contrats qu'elles avaient signés avec L&H. Au lieu de cela, L&H et ses employés effectuaient le travail de développement, supportant tous les frais de recherche et développement.

111.    Le stratagème frauduleux avait pour effet de gonfler le cours des actions L&H de deux manières. Premièrement, les droits de licence rapportés comme revenu étaient en fait le

produit de prêts garantis par des mandants de L&H. Ainsi, une dette de plusieurs millions était

déclarée comme profit. Deuxièmement, L&H n'a pas déclaré ses frais de recherche et

développement comme dépense, ce qui aurait immédiatement réduit ses gains. A la place, elle a

exercé ses options d'achat des entités et de leurs produits finis, puis a capitalisé la plus grande

partie du prix d'achat en tant que fonds commercial. L&H a alors pu amortir les frais de ces actifs

capitalisés au cours d'une période de temps étendue.

113. La SEC exige que les sociétés cotées en bourse présentent leurs états financiers

conformément aux PCGR, § 210.4-01(a)(1) du titre 17 du Code des réglementations fédérales.

Cette réglementation déclare que les états financiers déposés auprès de la SEC, qui ne sont pas

préparés en conformité avec les PCGR « seront présumés être trompeurs, malgré l'emploi de

notes en bas de page ou autres divulgations, sauf disposition contraire de la Commission ».

113. La comptabilité de L&H constituait une violation flagrante des PCGR de

plusieurs manières. La norme comptable (SFAS) n° 68, *Arrangements pour la recherche et le

développement* exige que « [l]e rapport comptable d'une entreprise qui est une partie à un

arrangement pour la recherche et le développement représente fidèlement ce qu'elle est censée

représenter et ne subordonne pas la substance à la forme ».

114. Au moins, aux termes de la norme SFAS n° 68 et aux termes de l'énoncé de

principe 97-2, L&H était tenue de comptabiliser l'arrangement comme un contrat de construction

à long terme et de reporter la comptabilisation du revenu des jeunes coquilles vides tout au long

de la période de développement. La norme SFAS n° 68 stipule que :

> Une entreprise déterminera la nature de l'obligation qu'elle encourt lorsqu'elle conclut un
> arrangement avec d'autres parties pour financer sa recherche et son développement.
> * * *
> Dans la mesure où le risque financier lié à la recherche et au développement a été
> transféré car le remboursement de fonds quels qu'ils soient fournis par les autres parties
> dépend uniquement des résultats de la recherche et du développement présentant un
> avantage économique dans l'avenir, l'entreprise tiendra compte de son obligation comme
> un contrat pour effectuer la recherche et le développement pour d'autres.

Norme SFAS n° 68, §§ 4, 10. L'énoncé de principe 97-2, qui « fournit des consignes sur le

moment où le revenu doit être comptabilisé et selon quels montants pour l'accord de licence, la

vente, la location ou, à d'autres égards, la commercialisation de logiciels » stipule que :

> Si un arrangement pour la délivrance de logiciels ou d'un système logiciel, soit seul soit
> en même temps que d'autres produits ou services, nécessite une production, une
> modification ou une personnalisation importante du logiciel, tout l'arrangement devra
> être comptabilisé en conformité avec le Bulletin de recherche comptable (ARB) n° 45,
> Contrats types – Construction à long terme...

Norme SFAS n° 97-2, § 7.

115.    Même si les licences n'avaient pas imposé de comptabilisation du contrat, en

vertu de l'énoncé de principe 97-2, L&H n'aurait pas dû comptabiliser le revenu qu'elle en

retirait car l'absence de ressources du preneur de licence montrait clairement que la possibilité de

recouvrement était peu probable. L'énoncé de principe 97-2 ne permet pas de comptabiliser le

revenu avant que « la possibilité de recouvrement ne soit probable ».

116.    De plus, comme les jeunes coquilles vides étaient des personnes morales

apparentées, les fonds auraient dû être traités comme dette :

> Si l'entreprise est obligée de rembourser des fonds quels qu'ils soient fournis par les
> autres personnes morales indépendamment du résultat de la recherche et du
> développement, l'entreprise estimera et comptabilisera cette dette. Cette obligation
> s'applique que l'entreprise puisse acquitter cette dette en la payant au comptant, en
> émettant des titres ou de toute autre manière.

AS, § R55.103.

117.    Le traitement par L&H des jeunes coquilles vides violait également la norme

SFAS n° 57, *Divulgations des personnes morales apparentées*, qui exige « les divulgations

d'opérations importantes avec des personnes morales apparentées », entre autres :

    a.    la nature de la/des relations en question.

    b.    une description des transactions, y compris les transactions auxquelles aucun
        montant ou valeur nominale n'a été attribué pour chacune des périodes pour
        lesquelles des comptes de résultat sont présentés, ainsi que toute autre
        information considérée nécessaire pour une compréhension des effets des
        opérations sur les états financiers.

    c.    les montants en dollars des opérations pour chacune des périodes pour lesquelles
        les comptes de résultat sont présentés et les effets de tout changement de la

méthode d'établissement des modalités par rapport à celles utilisées pendant la période précédente.

    d.    les montants dus par ou aux personnes morales apparentées à la date de chaque bilan présenté et, s'ils ne sont pas apparents à d'autres égards, les modalités et la manière d'un règlement.

AS § R36.102.

    118.    Les notes aux états financiers de L&H pour 1997, 1998 et 1999 contiennent de longues listes de « personnes morales apparentées » qui ne sont accompagnées par aucun des détails exigés par la norme SFAS n° 57. En outre, les relations avec les personnes morales apparentées révélées par le Rapport du comité d'audit démontrent que L&H a faussement présenté de manière affirmative le montant du revenu qu'elle a comptabilisé en provenance des jeunes coquilles vides qui ont fourni 10 % du revenu de L&H en 1998 et 25 % de son revenu en 1999. Dans son rapport annuel 1998 sur le formulaire 20-F, L&H a déclaré que seulement 3,7 % de son revenu 1998 était fourni par « des sociétés financées en partie par FLV Fund ». Dans les notes à ses états financiers de 1999, L&H a déclaré que 0,3 % du revenu 1999 était fourni par « des sociétés financées en partie par FLV Fund et L&H Investment Co. ».

### Rôle d'Artesia dans la fraude avec les « partenaires stratégiques »

    119.    Le 24 juin 2003, Dexia a annoncé qu'elle avait été notifiée par le procureur belge enquêtant sur la fraude commise chez L&H qu'elle faisait partie des suspects en raison des mesures prises par Artesia en relation avec L&H entre 1998 et 2000. D'après un article de *The Belgian Financial Times* en date du 25 juin 2003, intitulé « Artesia savait que [L&H] jouait avec le feu », les enquêteurs du ministère de la justice belge ont déterminé qu'Artesia était « un banquier d'une importance exceptionnelle pour [L&H] … impliqué dans pratiquement tout ce qui touchait à [L&H] ».

    120.    D'après l'article, les procureurs belges avaient secrètement saisi des dossiers d'Artesia en février 2001, lesquels « contenaient un trésor d'informations » concernant la fraude commise chez L&H. D'après ces dossiers, Artesia avait délivré trois prêts séparés en 1998 et

1999, pour un total de plus de 30 millions de dollars qui avaient été canalisés par l'intermédiaire des partenaires stratégiques afin de gonfler artificiellement les revenus de L&H. D'après cet article, l'enquête du ministère de la justice belge a révélé qu'Artesia « savait que la haute direction de [L&K] était impliquée dans des pratiques qui ne seraient pas tolérées par la SEC américaine ». Aucune de ces informations n'avait été rendue publique auparavant. En vérité, comme indiqué plus en détail ci-après, Artesia avait menti au comité d'audit de L&H afin de dissimuler sa participation.

121.    L'article de *The Belgian Financial Times* en date du 25 juin 2003 indiquait que c'était Artesia qui avait conçu une méthode pour dissimuler le fait que Lernout, Hauspie et Willaert avaient garanti le financement de certaines SDL et SDLC. Artesia avait structuré des opérations connues sous le nom de « swaps sur défaillance » au lieu de garanties personnelles qui auraient dû être révélées dans les documents de prêts aux SDL et SDLC.

### Rôle joué de longue date par Artesia dans l'action fautive de L&H

122.    Artesia avait auparavant aidé L&H dans ses machinations financières. Le 25 mars 1998, une société de l'Illinois, connue sous le nom de Vasco Data Security International (« Vasco »), une cliente du bureau de L&H à Burlington, au Massachusetts, était censée prendre sous licence des logiciels de L&H pour une valeur de 800.000 USD. Cependant, la technologie couverte par la licence de L&H était inutile pour Vasco qui a seulement consenti à payer les droits de licence afin d'obtenir de L&H un prêt de 3 millions de dollars dont il avait désespérément besoin. Le prêt était initialement dû le 4 janvier 1999, mais Vasco n'a pas pu le rembourser au moment où il est devenu exigible. Hauspie a profité de la situation pour demander à Vasco de conclure un deuxième contrat de licence avec L&H pour une valeur de 900.000 USD et d'antidater le contrat au 31 décembre 1998. D'après l'ancien directeur en chef des technologies de Vasco, Hauspie a menacé de demander le remboursement du prêt dû le 4 janvier 1999 si Vasco refusait d'antidater le contrat. Vasco a accepté et L&H a frauduleusement enregistré les 900.000 USD en 1998.

123.    Comme Vasco n'avait toujours pas les ressources nécessaires pour rembourser le prêt au début de l'année 1999, Lernout et Hauspie se sont arrangés pour qu'Artesia organise et gère un placement privé d'actions ordinaires Vasco pour la somme de 11,5 millions de dollars. Le 15 avril 1999, Artesia a réalisé le placement privé et a effectué un virement télégraphique de l'ordre de 11,5 millions de dollars sur le compte de Vasco aux Etats-Unis. Vasco a utilisé ces fonds, en partie, pour rembourser L&H. Les investisseurs du placement privé comprenaient LHIC (une société formée par Lernout et Hauspie pour investir dans des sociétés qui se spécialisaient dans des produits à commande vocale et langagière), qui a investi 5 millions de dollars. LHIC a obtenu une participation de 7 % dans Vasco et un siège dans le conseil d'administration de la société. Ce siège a été occupé par Hauspie. Un autre investisseur principal chez Vasco était Mercator qui avait acheté environ 1 million de dollars d'actions Vasco par le biais du placement privé géré par Artesia.

124.    Artesia était également un acteur principal dans la création de BTG, fournissant le financement initial qui a permis à BTG de fonctionner. Artesia a prêté un total de 22,9 millions de dollars à BTG avec l'intention que L&H trouverait des investisseurs externes pour rembourser le prêt. Cependant, L&H n'a jamais divulgué les identités des propriétaires ultimes de BTG et, selon un article en date du 7 décembre 2000, *The Wall Street Journal* a seulement pu retracer la propriété « par l'intermédiaire d'une société luxembourgeoise jusqu'à deux entités basées dans les Iles Anglo-Normandes, mais pas plus loin ».

### Rôle d'Artesia dans le financement des partenaires stratégiques

125.    Après les opérations portant sur Dictation, BTG et Vasco, les cadres de direction de L&H et Artesia ont agrandi leur stratagème frauduleux pour arriver à ce qui serait en fin de compte décrit par *The Wall Street Journal* comme une « structure de type Dictation Consortium... mais sur stéroïdes ». Au lieu de créer une coquille vide (comme Dictation ou BTG) pour acheminer le revenu jusqu'à L&H, L&H a créé une série de sociétés de portefeuille financées par Artesia. Ces sociétés de portefeuille ont, à leur tour, financé de multiples SDL qui

39

ont alors reversé des « droits de licence » à L&H.

126.     Une de ces sociétés de portefeuille était Radial Belgium N.V. (« Radial »). Le 29 septembre 1998, Artesia a prêté environ 6 millions de dollars à Radial, laquelle a effectué un virement télégraphique de cet argent, par versements échelonnés de 2 millions de dollars, à trois SDL : (a) Slavic Development Company, N.V., (b) Farsi Development Company N.V. et (c) Bahassa Development Company N.V. Ces SDL étaient supposées développer des produits de reconnaissance vocale pour le slave, le persan et l'indonésien. Cependant, les SDL pour le slave, le persan et l'indonésien ont utilisé les 2 millions de dollars pour payer des droits de licence à L&H. L&H a ensuite inscrit tous les 6 millions de dollars comme revenu pour le troisième trimestre de 1998. Aucune de ces SDL n'avait de bureaux ni d'activités commerciales *bona fide* qui leur auraient permis de développer des produits de reconnaissance vocale.

127.     Des documents internes d'Artesia cités dans le Rapport démontrent qu'Artesia a, en connaissance de cause, conclu cette transaction pour aider à l'avancement de la fraude. Ils indiquent qu'Artesia savait que son prêt serait utilisé par Radial pour financer les trois SDL (dont toutes avaient la même adresse professionnelle) que les SDL et Radial avaient été créées par L&H et que l'argent serait utilisé pour les SDL pour payer des droits de licence dans des montants identiques à L&H. Ils savaient aussi qu'Artesia savait que les prêts seraient garantis par Lernout, Willaert et Hauspie et que leurs actions permettraient à L&H de dissimuler frauduleusement ce fait à la SEC et au public investisseur.

128.     Artesia a reconnu dès le début que les « partenaires stratégiques » n'avaient pas d'investisseurs et qu'il s'agissait de simples coquilles vides localisées à une seule adresse. Dans un courriel daté du 21 septembre 1999, envoyé par P. Rabaey d'Artesia à G. Dauwe et d'autres employés d'Artesia, Rabaey déclarait :

> Notre prêt… a été utilisé pour établir 3 sociétés de développement de langue : le slave, le persan et l'indonésien. Capital de démarrage par société : 2 millions de dollars. Les 3 sociétés ont acheté avant tout des licences d'utilisation de logiciel de [L&H]. L'objectif est de rembourser notre prêt à Radial Belgium en attirant des investisseurs et d'augmenter encore plus le capital par société de développement de langue.

129.    Un autre document cité dans le Rapport déclare ce qui suit :

[Le 29 septembre 1998, Artesia accorde un prêt à Radial] au moyen d'un financement provisoire pour l'établissement des sociétés de développement de langue suivantes : THE SLAVIC DEVELOPMENT COMPANY, N.V., THE FARSI DEVELOPMENT COMPANY N.V. et THE BAHASSA DEVELOPMENT COMPANY N.V., toutes sises à 2370 Arendonk, Schoolstraat 1A, en prévision de l'établissement du Language Development Fund et de la signature d'investisseurs.

130.    Le courriel de P. Rabaey en date du 21 septembre 1999 déclarait également que « [c]ependant, les garanties privées n'ont pas été signées par Jo [Lernout], Pol [Hauspie] et Nico [Willaert] de manière à éviter des problèmes éventuels avec la SEC. Nous n'avons donc aucune garantie et nous recherchons une solution via les swaps sur défaillance ». (Emphase ajoutée.)

131.    Artesia savait qu'il était tout à fait inhabituel pour une personne physique de participer à des swaps sur défaillance et que Lernout, Hauspie et Willaert l'avaient fait dans ce cas uniquement pour tromper la SEC et les investisseurs de L&H. Un mémo interne d'Artesia intitulé « Audit interne des directives » de J.P. Cloes et F. Dankelman à K. Claessens et d'autres, daté du 31 janvier 2000, note que les swaps sur défaillance réalisés par Lernout, Hauspie et Willaert avaient des « caractéristiques spéciales (il s'agit des seuls contrats de ce type conclus avec des personnes physiques ». Cependant, Artesia comprenait clairement que « les swaps sur défaillance étaient conclus afin de contourner les garanties que les autres parties (= J. Lernout + P. Hauspie + N. Willaert...) ne souhaitaient pas fournir », comme il a été indiqué dans un mémo interne d'Artesia en date du 14 février 2000 indiquant les vues de Geert Dauwe d'Artesia (emphase ajoutée).

132.    De plus, Artesia était pleinement consciente du fait que la seule raison pour la structuration des garanties de Lernout, Hauspie et Willaert sous forme de swaps sur défaillance était de dissimuler la relation entre L&H et les partenaires stratégiques et que cette dissimulation rendrait les états financiers de L&H trompeurs en violation des normes d'audit et des lois en vigueur. Un document interne d'Artesia cité dans le Rapport note que Lernout, Hauspie et Willaert ont refusé de souscrire un prêt qui faisait référence aux swaps sur défaillance : « pas signé par les emprunteurs (ont refusé en raison de problèmes éventuels touchant au fisc ou à la vérification comptable lors du dépôt des états financiers) ». En conséquence, un courriel interne

d'Artesia en date du 15 juin 1999 de P. Rabaey à B. Mommens concernant LIC et Radial et cité dans le Rapport déclare qu'Artesia n'a pas identifié Lernout, Hauspie et Willaert car « <u>le client n'accepte pas la mention de l'identité des particuliers parce que, en agissant ainsi, un lien est établi entre le débiteur et les particuliers. Il n'est pas désirable pour le client qu'il y ait un lien direct que le monde extérieur verrait</u> » (emphase ajoutée).

133.    Artesia savait également que les SDL ne généreraient pas de revenu réel pour rembourser les prêts et que L&H prévoyait de chercher de nouveaux investisseurs qui serviraient de nouvelle source de fonds. Comme l'a indiqué P. Rabaey dans un courriel en date du 21 septembre 1999 : « L'objectif est de rembourser notre prêt à Radial Belgium en attirant des investisseurs et en augmentant encore plus le capital par société de développement de langue ». Un autre document interne d'Artesia cité dans le rapport déclare ce qui suit :

> Le remboursement des prêts accordés par Artesia à la société de portefeuille (= Radial Belgium) dépend entièrement de la possibilité de trouver des investisseurs, ce qui est très difficile à combiner avec un calendrier de travail fixe. Les filiales (sociétés de développement de langue) elles-mêmes ne déploient presque aucune activité aussi longtemps qu'il n'y a pas d'investisseur… En réalité, ces sociétés ne représentent rien (aucune activité, aucun actif).

134.    Un article paru le 25 juin 2003 dans *The Belgian Financial Time* souligne l'étendue dans laquelle Artesia a agi, bien en dehors des limites d'une relation normale avec une banque commerciale afin de répondre aux besoins du stratagème frauduleux :

> Le 29 septembre 1998, Artesia a délivré un prêt à une société belge connue sous le nom de Radial pour un montant d'environ 6 millions de dollars. Les propres documents d'Artesia révèlent que Radial était une « entité à vocation spécifique » créée par des cadres de direction de L&H dans le but exprès de créer et de financer des SDL. Ces mêmes documents bancaires montrent également qu'Artesia avait connaissance du fait que Lernout, Hauspie et Willaert ne voulaient pas signer les garanties personnelles exigées pour obtenir ce prêt et d'autres prêts pour des SDL et SDLC « afin d'éviter des problèmes éventuels avec la SEC ». En conséquence, Artesia a conçu un stratagème frauduleux pour que Lernout, Hauspie et Willaert garantissent le prêt Radial à l'aide de swaps sur défaillance ». Mais, à l'inverse des garanties personnelles, ces swaps ne doivent pas être révélés dans des lettres de crédit pour prêts. Cependant, la vente de swaps sur défaillance à des investisseurs particuliers est tout à fait inhabituelle, ce qui démontre le degré jusqu'où Artesia était désireuse d'aller pour participer à la fraude comptable massive de L&H.

135.    Après avoir mis sur pied Radial afin de fabriquer des revenus pour L&H durant le troisième trimestre de 1998, L&H et Artesia ont répété ce stratagème frauduleux pour le

quatrième trimestre. Le nom de la société de portefeuille cette fois-ci était Language Investment Co. (« LIC »). Artesia a fait un prêt le 22 décembre 1998 à LIC pour environ 6 millions de dollars. LIC a ensuite envoyé les fonds en quatre versements échelonnés de 1,5 million de dollars à quatre SDL différentes : les sociétés de développement du grec, du hongrois, du polonais et du tchèque. Ces SDL ont alors immédiatement versé les fonds à L&H sous forme de droits de licence de sorte que L&H puisse inscrire ces « revenus » avant la fin d'exercice.

136.    Artesia savait que ces SDL manquaient des ressources financières et des connaissances techniques nécessaires pour développer les logiciels de L&H destinés à des langues supplémentaires. En fait, un document interne d'Artesia cité dans le Rapport indique clairement qu'Artesia savait que le produit de son prêt serait utilisé immédiatement par ces SDL nouvellement formées pour le paiement de droits de licence à L&H, ne laissant aux SDL aucun capital afin d'effectuer leurs obligations contractuelles pour le développement de logiciels L&H destinés à d'autres langues. Le document notait que les montants financés par Artesia fourniraient le « capital de démarrage » des quatre SDL et que « ces montants sont utilisés dans chaque cas comme paiement partiel à [L&H] des droits à l'avance de l'ordre de 3.000 USD [c'est-à-dire 3 millions de dollars]. Le solde du capital souscrit par LIC NV... doit être payé en intégralité dans le courant de la première moitié de 1999. LIC NV fera tout son possible pour trouver les fonds nécessaires à cette fin ».

137.    Ces prêts étaient également garantis par des swaps sur défaillance. D'après un mémo interne non daté d'Artesia écrit en rapport avec le prêt à LIC et cité dans le Rapport, le prêt a été accordé « sous la condition que Lernout & Hauspie à leur tour garantissent le paiement ». Artesia a de nouveau permis à Lernout, Hauspie et Willaert d'utiliser des swaps sur défaillance, plutôt que des garanties : « Si M. J. Lernout, P. Hauspie et N. Willaert n'acceptent pas de signer une garantie (pour des raisons fiscales), ils semblent désireux d'agir comme contre-partie dans un swap sur défaillance ».

138.    L'article paru le 25 juin 2003 dans *The Belgian Financial Times* soulignait le rôle

43

d'Artesia pour aider à l'avancement de la fraude « de la personne morale apparentée » :

> Artesis s'est livrée à une transaction frauduleuse similaire le 22 décembre 1998, en délivrant un prêt à Language Investment Company aux fins de créer 4 SDL de manière que L&H puisse comptabiliser un revenu provenant de ces SDL durant le quatrième trimestre de 1998. A nouveau, Artesia a utilisé des swaps sur défaillance pour dissimuler le fait que les mandants de L&H avaient secrètement garanti les prêts utilisés pour établir les 4 SDL en question.

139.    L&H a continué à perpétuer le stratagème frauduleux en 1999. Le 31 mars 1999, L&H a établi le Language Development Fund (« LDF ») et a viré 12 millions de dollars le même jour sur les comptes bancaires de sept SDL chez Artesia. Les sociétés de développement du grec, du tchèque, du hongrois et du polonais ont reçu chacune 1,5 million de dollars et les sociétés de développement du tamoul, du thaïlandais et de l'hindi ont reçu chacune 2 millions de dollars. Cette fois-ci, les 12 millions de dollars provenaient de Mercator sous la forme d'un apport de capitaux de l'ordre de 2 millions de dollars et d'un prêt de 10 millions de dollars à LDF. Tous ces fonds sont apparus sur les états financiers de L&H comme revenu.

140.    Des documents internes d'Artesia cités dans le Rapport ne laissent aucun doute sur le fait qu'Artesia savait que ces SDL étaient des coquilles vides créées par L&H. Une télécopie datée de mars 1999 de Ph. Depecker chez L&H à Artesia déclare ce qui suit :

> Les sociétés suivantes, pour lesquelles j'ai besoin d'un numéro de compte, doivent être établies : Thai Language Development Company N.V., Hindi Language Development Company N.V. et Tamil Language Development Company N.V.
>
> Le directeur-représentant de ces sociétés est, dans chaque cas, M. Tony Snauwaert et le siège de la société sera au 9900 Eekloo, Stationstraat 83. Pourriez-vous me donner trois numéros de compte dès que possible ?

141.    Pendant le deuxième trimestre de 1999, L&H a demandé que LDF reçoive un prêt de 20 millions de dollars d'Artesia. Des documents internes d'Artesia se rapportant à LDF révèlent que la banque avait pleine connaissance de la fraude commise chez L&H. Plus précisément, d'après un courriel interne en provenance de B. Ferrand, daté du 21 juin 1999 :

> LDF, en qualité de société de portefeuille en position dominante est maintenant actionnaire à 100 % de 3 sociétés de développement de langues (« SDL ») : Tamil DC, Hindi DC et Thai DC. [Six millions de dollars] de capital social et le prêt Mercator-Nordstar a été acheminé jusqu'à ces différentes SDL qui l'ont utilisé pour acheter des

licences de [L&H] pendant le premier trimestre de 1999.

\* \* \*

Vu le fait que [L&H] inscrit la vente de licences comme revenu, il est essentiel, en vertu des règles PCGR que LDF soit totalement indépendante de [L&H]. C'est pourquoi [L&H] ne peut, en aucun cas, être une partie impliquée dans un accord dont l'objet est le remboursement du financement demandé. Un swap sur défaillance avec Messrs. Lernout, Hauspie et Willaert est cependant possible.

\* \* \*

[L&H] ne réalise pas elle-même la R&D pour ces langues, mais le fait faire dans différentes sociétés à vocation spécifique (voir les méthodes de travail chez Dictation Consortium, BTG, LIC). Ces sociétés achètent une licence d'utilisation de kits de développement et de kits d'outils logiciels de [L&H] qui permettent la mise en application de la technologie verbale et langagière dans les différentes langues. Le système offre à [L&H] deux avantages : 1) la R&D a lieu en-dehors de sa propre structure de pertes et profits ; 2) les redevances reçues peuvent être immédiatement inscrites comme revenu.

Un autre document interne du dossier de crédit d'Artesia cité dans le Rapport notait ce qui suit :

« Objectif du prêt [LDF] : prêt-relais pour capitaliser les filiales de l'emprunteur pour le paiement de droits de licence par les filiales à [L&H] ».

142.    Bien que le prêt à LDF ait été retiré avant d'être finalisé le 25 juin 1999, Artesia a accordé une ligne de crédit de 20 millions de dollars à Lernout, Hauspie et Willaert personnellement. Le dossier de crédit interne d'Artesia pour Lernout, Hauspie et Willaert cité dans le Rapport note que « Language Development Fund N.V. ... Le dossier tel qu'il a été présenté a été retiré. A sa place, accord (à ratifier) pour un prêt du même montant dû conjointement et solidairement par Messrs. Jo Lernout, P. Hauspie et Nico Willaert ». Cependant, cette fois-ci, Artesia a demandé à ces trois particuliers de remettre 650.000 actions nominatives de L&H à titre de garantie pour le prêt. La plus grande partie de ces 20 millions de dollars a servi à financer six nouvelles SDL (le malaysien, le vietnamien et quatre autres langues indiennes non précisées à ce moment-là) et cet argent a été finalement inscrit comme revenu dans les états financiers de L&H. L&H n'a pas révélé la source des fonds reçus par ces SDL dans le formulaire 10-Q de L&H pour le trimestre terminé le 30 juin 1999, ni dans son formulaire 10K destiné à la SEC pour l'année terminée le 31 décembre 1999.

143.    Entre la mi et la fin juin 1999, Artesia est devenue de plus en plus inquiète que

ses prêts ne soient pas remboursés. Les prêts accordés à Radial et LIC étaient dus le 30 juin 1999

et le prêt personnel de 20 millions de dollars accordé à Lernout, Hauspie et Willaert était dû en

octobre 1999. Pour éviter une défaillance technique, Artesia a prolongé les prêts jusqu'au

15 décembre 1999. Par la suite, Artesia a eu de nombreuses discussions avec Lernout, Hauspie et

Willaert afin de suivre leur progrès pour attirer de nouveaux investisseurs potentiels dans les SDL

dont les fonds seraient utilisés par L&H pour rembourser Artesia. Dans un mémo interne daté du

7 septembre 1999, B. Ferrand chez Artesia a rapporté une conversation qu'il avait eue avec

Willaert et d'autres le jour précédent :

> Statut des négociations avec les investisseurs externes pour les différentes Language
> Development Companies :

>> a.     Les négociations avec le fonds de placement arabe sont censées
>> être finalisées vers le 30 septembre 1999 = le remboursement du prêt RADIAL
>> ([6 millions de dollars] date d'échéance initialement prévue pour le 30 juin 1999)
>> devrait avoir lieu vers le 30 septembre 1999 (en partie du moins)

>> b.     Les négociations avec le fonds de placement russe seront
>> poursuivies à Moscou les 20 et 21 septembre. D'après Nico Willart, cela signifie
>> que

>>> - soit un montant de +/- [25 millions de dollars] sera disponible
>>> chez LIC pour le remboursement des prêts ([6 millions de dollars] date
>>> d'échéance initialement prévue pour le 30 juin 1999) et chez
>>> Lernout/Hauspie/Willaert [20 millions de dollars], date d'échéance en
>>> octobre 1999

>>> - soit Artesia doit recevoir une garantie bancaire (des banquiers
>>> du fonds de placement russe) comme cautionnement du prêt en cours à
>>> LIC et Radial

> Mon impression est que ces négociations sont encore loin d'être finalisées et
> qu'il est aussi très improbable qu'une garantie bancaire puisse être obtenue.

>> • Nico Willaert souligne que tous les prêts accordés par Artesia dans le
>> cadre de l'établissement des Language Development Companies seront
>> remboursés pour sûr vers le 31 décembre 1999 (Radial [6 millions de dollars],
>> LIC [6 millions de dollars] et Lernout/Hauspie/Willaert [20 millions de dollars]).

144.     De manière similaire, le 27 décembre 1999, P. Cordonnier chez Artesia a

rapporté dans un courriel envoyé à B. Ferrand et d'autres employés d'Artesia qu'il avait reçu un

appel téléphonique de Willaert qui avait déclaré que, le mercredi 29 décembre 1999,

(suffisamment de) dollars américains seraient disponibles sur un compte d'une banque de Singapour pour rembourser les prêts accordés à LIC et Radial ». Willaert avait aussi donné à M. Cordonnier les coordonnées de la personne à contacter à Singapour.

145.    Le ou vers le 5 janvier 2000, un home d'affaires libanais-arménien, Haroun Katchadourian, a effectué un virement télégraphique de l'ordre de 36 millions de dollars à la demande de Lernout, Hauspie et Willaert sur le compte bancaire à Singapour de Velstra, une société singapourienne appartenant à Mercator. Cet argent a alors été utilisé pour payer intégralement les 20 millions de dollars de la ligne de crédit et les deux prêts de 6 millions de dollars à Radial et LIC.

### Le procureur belge conclut qu'Artesia a participé en connaissance de cause à la fraude commise chez L&H

146.    Sur la base de documents internes obtenus auprès d'Artesia, un groupe d'experts dont les services ont été retenus par les procureurs belges a conclu qu'Artesia avait intentionnellement participé à la fraude commise chez L&H. Les conclusions sont accablantes :

Evaluation du financement

Trois des quatre membres du comité exécutif de L&H [Lernout, Hauspie et Willaert] sont en train de négocier des swaps sur défaillance avec Artesia Bank pour les prêts à Radial, LIC et LDF (prêt à LDF pas approuvé). Ces prêts sont garantis par des membres du comité exécutif de L&H via les swaps sur défaillance pour le paiement de droits de licence à L&H (inscrits comme revenu). Le prêt refusé à LDF a été approuvé pour un montant identique aux trois membres du comité exécutif de L&H et également utilisé pour payer des droits de licence à L&H (inscrits comme revenu).

Ces prêts ont été conclus de toute urgence et juste avant la clôture trimestrielle des comptes de L&H. Des décisions ont dû être faites toujours « au pas de course », ce qui peut seulement s'expliquer par le rapprochement de la clôture trimestrielle ou annuelle.

Le choix des swaps sur défaillance comme garantie financière est inspiré par l'intention de ne pas avoir à rapporter cette sorte de garantie financière sur la lettre de crédit de l'emprunteur et afin d'éviter des problèmes éventuels avec la SEC américaine. Les efforts des membres du comité exécutif de L&H pour éviter que les swaps sur défaillance n'apparaissent sur la lettre de crédit montrent que l'on savait que ceci pouvait mener à des problèmes touchant à la comptabilisation du revenu et à des personnes morales apparentées.

***

Il est sans intérêt qu'Artesia Bank n'utilise pas les garanties fournies dans lesquelles des membres du comité exécutif de L&H sont impliqués... La constatation suivante est de la

47

plus haute importance : les garanties fournies (swaps sur défaillance, la remise en garantie de 650.000 actions L&H) dans lesquelles 3 des 4 membres du comité exécutif de L&H sont impliqués sont une condition de base pour l'octroi des prêts à Radial, à LIC et à Lernout/Hauspie/N. Willaert (3 membres du comité exécutif de L&H), par lesquels ces ressources financières s'écoulent jusqu'aux SDL et, par la suite, jusqu'à L&H pour le paiement de droits de licence qui sont inscrits comme revenu juste avant une clôture trimestrielle ou en fin d'exercice. <u>A cause du financement du paiement des licences (swaps sur défaillance, prêt à 3 membres du comité exécutif, remise en garantie d'actions L&H), nous considérons le revenu basé sur les accords de licence avec les SDL comme étant fictif.</u>

(Emphase ajoutée.)

### Artesia dissimule son rôle

147.    Artesia a pris des mesures concrètes pour dissimuler son rôle dans la fraude commise chez L&H après le début de l'enquête sur cette fraude en novembre 2000. Loeff Claeys Verbeke, un des cabinets juridiques chargé de l'enquête et co-auteur du Rapport du comité d'audit, a questionné Artesia sur le rôle éventuel de L&H pour assurer le financement de LIC. Le 24 novembre 2000, Artesia a envoyé une lettre à Loeff Claeys Verbeke en réponse à cette demande de renseignements. D'après le rapport, la lettre d'Artesia déclarait ce qui suit : « Le 22 décembre 1998, ARTESIA BANK N.V. a accordé une ligne de crédit à N.V. LANGUAGE INVESTMENT COMPANY pour le montant de 220.000.000 de francs belges ; <u>L&H n'a fourni aucune garantie pour ce prêt</u> » (emphase ajoutée).

148.    Artesia n'a fait aucune mention des swaps sur défaillance exécutés par les mandants de L&H - Lernout, Hauspie et Willaert – sur la transaction avec LIC de manière à ne pas divulguer sa complicité dans la fraude. En conséquence, le Rapport du comité d'audit ne fait aucune mention du rôle d'Artesia dans la fraude. De même, aucun des articles du *Wall Street Journal* qui a divulgué la fraude commise chez L&H n'a mentionné un rôle quelconque joué par Artesia.

149.    En conséquence, les demandeurs n'ont pas découvert le rôle d'Artesia avant la parution d'un article dans *The Belgian Financial Times* le 24 juin 2003. Avant cette date, malgré les efforts diligents des demandeurs et de leurs avocats, les demandeurs n'avaient pas

connaissance du rôle d'Artesia dans la fraude commise chez L&H.

## PREMIÈRE DEMANDE DE REDRESSEMENT

## VIOLATION DE LA SECTION 10(b) DE LA LOI SUR LA BOURSE ET DE LA RÈGLE 10b-5 DE LA SEC

150.    Les demandeurs répètent et allèguent de nouveau toutes les allégations qui précèdent comme si elles étaient intégralement citées dans les présentes.

151.    Ce chef d'accusation est allégué contre Dexia pour violations du § 10(b) de la loi de 1934, § 78j(b) du titre 15 du Code des Etats-Unis, et de la règle 10b-5 promulguée en conséquence.

152.    Dexia S.A. et/ou Dexia Bank Belgium, en sa qualité d'acquéreur d'Artesia, est responsable envers les demandeurs de la conduite préjudiciable d'Artesia comme indiqué dans les présentes.

153.    Artesia, à elle seule et de concert avec L&H et ses cadres de direction et administrateurs, s'est directement livrée à un plan frauduleux, un stratagème et une conduite illicite unifiés, aux termes desquels elle s'est livrée sciemment ou de manière insouciante à des actions, transactions, pratiques et activités professionnelles qui ont produit les effets d'une fraude et d'une tromperie à l'égard de Seagate. Le but et l'effet desdits stratagème frauduleux, plan et conduite illicite étaient, entre autres, d'inciter Seagate à échanger ses actions Dragon contre des actions ordinaires L&H à un prix artificiellement gonflé.

154.    Artesia s'est livrée à des actions, des pratiques et des activités professionnelles et a employé des dispositifs, des stratagèmes frauduleux et des artifices pour frauder, ce qui a produit les effets d'une fraude à l'égard de Seagate, par l'investissement de fonds dans des sociétés dans le but que ces sociétés achèteraient des produits de L&H aux seules fins que L&H rapporte publiquement des revenus et des gains artificiellement gonflés. Artesia s'est livrée à ces actions, pratiques et activités professionnelles et a employé des dispositifs, des stratagèmes frauduleux et des artifices en vue de commettre une fraude, en connaissance de cause.

49

155.    En conséquence de la diffusion des déclarations fausses et trompeuses citées plus haut, le cours des actions ordinaires L&H était artificiellement gonflé et Seagate a été incitée à acheter les actions ordinaires L&H à un cours artificiellement gonflé. Ignorant la nature fausse et trompeuse des déclarations décrites plus haut, ainsi que les dispositifs et les manoeuvres trompeurs et manipulateurs employés par le défenseur, Seagate s'est fiée, à son détriment, à l'intégrité du cours des actions et aux déclarations fausses et trompeuses faites directement par L&H à Seagate. Si Seagate avait connu la vérité, elle n'aurait pas conclu la fusion ni acheté des actions ordinaires L&H à des prix gonflés.

156.    Le fait qu'Artesia connaissait le caractère illégal de sa conduite est démontré par des documents internes cités dans le Rapport, comme indiqué dans les §§ 119 à 146 ci-dessus et révélant, *inter alia*, que :

a.    Artesia savait que son prêt de 6 millions de dollars à Radial était utilisé pour financer trois SDL qui verseraient les 6 millions de dollars à L&H et que les SDL étaient des coquilles vides sans aucune activité commerciale ni objectif autres que la création d'un revenu fictif pour L&H,

b.    Artesia savait que son prêt de 6 millions de dollars à LIC était utilisé pour financer quatre SDL qui verseraient les 6 millions de dollars à L&H et que les SDL étaient des coquilles vides sans aucune activité commerciale ni objectif autres que la création d'un revenu fictif pour L&H,

c.    Artesia savait que les SDL n'étaient pas indépendantes de L&H, mais étaient contrôlées par L&H,

d.    Artesia savait que les SDL étaient des coquilles vides, sans actif, ni activités commerciales ni employés,

     e.     Artesia savait que les swaps sur défaillance étaient utilisés par L&H afin de dissimuler à la SEC et au public investisseur que les SDL étaient des personnes morales apparentées,

     f.     Artesia savait que si Lernout, Hauspie et Willaert étaient inclus dans les documents de prêt comme garants des prêts, L&H aurait à divulguer que les SDL étaient des personnes morales apparentées.

157.    Seagate a subi des dommages considérables en conséquence des fautes alléguées dans les présentes, pour un montant qui sera démontré lors du procès, mais qui n'est pas inférieur à 150.806.377,62 USD.

158.    En raison de ce qui précède, Artesia a directement violé le § 10(b) de la loi de 1934 et la règle 10b-5 promulguée en conséquence du fait qu'elle : (a) a employé des dispositifs, stratagèmes frauduleux et artifices en vue de commettre une fraude et (c) s'est livrée à des actions, des pratiques et des activités professionnelles qui ont produit les effets d'une fraude et d'une tromperie à l'égard de Seagate, en relation avec son achat d'actions ordinaires L&H en échange d'actions Dragon.

## DEUXIEME DEMANDE DE REDRESSEMENT

## ENTENTE DELICTUEUSE POUR COMMETTRE UNE FRAUDE EN DROIT COMMUN

159.    Les demandeurs répètent et allèguent de nouveau toutes les allégations citées dans les paragraphes qui précèdent comme si elles étaient intégralement citées dans les présentes et allèguent ce chef d'accusation contre Dexia.

160.    Dexia S.A. et/ou Dexia Bank Belgium, en sa qualité d'acquéreur d'Artesia, est responsable envers les demandeurs de la conduite préjudiciable d'Artesia.

161.    A toutes les époques se rapportant à la plainte, L&H, Lernout, Hauspie et Willaert ont commis une fraude contre Seagate, comme indiqué plus haut dans les §§ 37 à 118. Ces parties ont fait toutes les déclarations fausses et trompeuses quant au fond identifiées plus

haut, sachant que Seagate et le public investisseur se fieraient à ces déclarations relatives à leurs achats d'actions L&H. De plus, L&H a faussement fait valoir à Seagate, entre autres, que ses états financiers pour 1998 et 1999 étaient préparés conformément aux PCGR américains. En fin de compte, L&H a été forcée d'admettre que ces déclarations étaient fausses et d'annoncer son intention de redresser ses états financiers pour les années 1998, 1999 et les deux premiers trimestres de 2000.

162.    Artesia s'est entendue illicitement avec L&H, Lernout, Hauspie et Willaert pour frauder la SEC et le public investisseur, entre autres Seagate. Entre autres, comme indiqué en détail plus haut, dans les §§ 119 à 149, Artesia a sciemment et délibérément conçu un stratagème frauduleux pour dissimuler le fait que des dirigeants de L&H étaient les garants de prêts d'un montant de plusieurs millions de dollars qui étaient faits à des entités contrôlées par L&H, entre autres les SDL, puis repayés à L&H sous forme de droits de licence. En agissant ainsi, Artesia a en connaissance de cause permis à L&H de comptabiliser tout le montant des prêts comme revenu, en violation flagrante des PCGR et a faussement représenté ces montants dans ses déclarations publiques comme indiqué plus haut en détail.

163.    Pour aider à l'avancement de l'entente délictueuse, Artesia a commis les actes manifestes suivants :

        a.    Le ou vers le 29 septembre 1998, Artesia a fait un prêt de 6 millions de dollars à Radial, une entité liée à L&H, lequel était garanti par Lernout, Hauspie et Willaert par le biais de swaps sur défaillance, puis a été repayé à L&H par l'intermédiaire des SDL sous forme de droits de licence qui ont été incorrectement inclus comme revenu sur les états financiers de L&H.

        b.    Le ou vers le 22 décembre 1998, Artesia a fait un prêt de 6 millions de dollars à LIC, une entité liée à L&H, lequel était garanti par Lernout, Hauspie et Willaert par le biais de swaps sur défaillance, puis a été

repayé à L&H par l'intermédiaire des SDL sous forme de droits de licence qui ont été incorrectement inclus comme revenu sur les états financiers de L&H.

c.     Le ou vers le 25 juin 1999, Artesia a accordé à Lernout, Hauspie et Willaert une ligne de crédit de 206 millions de dollars, qu'ils ont alors utilisée pour effectuer des paiements à L&H par l'intermédiaire des SDL sous forme de droits de licence qui ont été incorrectement inclus comme revenu sur les états financiers de L&H.

164.     Artesia a commis cette inconduite de manière intentionnelle, en ayant pleine connaissance de la fraude commise chez L&H. Plus précisément, les documents internes d'Artesia, cités plus haut dans les §§ 119 à 146, démontrent que, *inter alia* :

a.     Artesia savait que son prêt de 6 millions de dollars à Radial était utilisé pour financer trois SDL qui verseraient les 6 millions de dollars à L&H et que les SDL étaient des coquilles vides sans aucune activité commerciale ni objectif autres que la création d'un revenu fictif pour L&H,

b.     Artesia savait que son prêt de 6 millions de dollars à LIC était utilisé pour financer quatre SDL qui verseraient les 6 millions de dollars à L&H et que les SDL étaient des coquilles vides sans aucune activité commerciale ni objectif autres que la création d'un revenu fictif pour L&H,

c.     Artesia savait que les SDL n'étaient pas indépendantes de L&H, mais étaient contrôlées par L&H,

d.     Artesia savait que les SDL étaient des coquilles vides, sans actif, ni activités commerciales ni employés,