91.     On September 22, 2000, *The Wall Street Journal* reported that the SEC had commenced an investigation into L&H's accounting practices in January 2000. In fact, on or about January 24, 2000, the SEC had issued a request for documents to L&H, which focused on L&H's revenue recognition practices and, in particular, on the Company's contracts and relationships with its so-called "strategic partners." Subsequently, the SEC raised the status of the investigation to "formal."

92.     On September 22 and 26, 2000, *The Wall Street Journal* also raised significant additional questions about L&H's revenue, specifically about 30 Singapore and Belgian start-up companies that accounted for nearly all of L&H's Asian revenues reported in 1998 and 1999. The articles also raised concerns that the FLV Fund had financial connections to eight start-ups with close links to L&H, and that those start-ups accounted for a large portion of L&H's 1998 and 1999 revenues. One of the transactions questioned involved the eight Singapore start-ups which were initially funded by the FLV Fund without any disclosures relating to their nature as related-party transactions.

93.     On September 26, 2000, *The Wall Street Journal* reported that the Brussels-based EASDAQ stock exchange had launched a formal investigation into L&H. On the same date, Bloomberg News reported that the EASDAQ would also investigate the FLV Fund.

94.     On October 18, 2000, *The Wall Street Journal* reported that L&H was refusing to provide the SEC with the names of the investors behind the thirty corporate customers that were the focus of the SEC investigation, and who accounted for approximately 25% of the Company's 1999 revenues and 10% of its 1998 revenues. While L&H admitted that it had helped start the 30 companies and initially financed their operations, the Company maintained that the firms were owned by independent investors interested in developing new applications for L&H speech software. L&H released new details about the operations of 17 of the 30 companies, which revealed that these companies had no real corporate existence whatsoever, and certainly no economic substance apart from L&H. Of these 17 companies, none had any direct employees. Seven companies were relying on L&H employees to do work for them and had agreed to repay

L&H for its services. The other 10 had not started developing software, though they had paid hefty licensing fees to L&H. According to *The Wall Street Journal*, the 30 companies were all registered at just a few common addresses in Belgium and Singapore, and many had common officers and nominee shareholders.

95.    On November 9, 2000, L&H "provided an update on the status of the mid-year audit of the Company that it had commissioned last August and of the ongoing audit committee inquiry" and announced that "[a]s a result of errors and irregularities identified in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000." L&H's announcement of "accounting irregularities" was, in accounting terms, tantamount to an admission of fraud. Statement of Auditing Standards No. 53 issued by the American Institute of Certified Public Accountants defines "irregularities" as "intentional misstatements or omissions" in financial statements, meaning that there was fraud in their preparation.

96.    That day, the NASDAQ suspended trading in L&H shares. Just before the suspension, L&H shares were changing hands at $3.525, more than 95% below the record high of $72.50 they reached in March, when the company claimed a market capitalization of more than $10 billion. The slide wiped out more than $9 billion of the company's stock market value.

97.    On November 17, 2000, *The Wall Street Journal* reported that L&H's independent auditor, KPMG, had withdrawn its audit report on L&H's 1998 and 1999 financial statements, stating that its prior audit opinions "should no longer be relied upon."

98.    On November 21, 2000, *The Wall Street Journal* reported that the EASDAQ had suspended trading in the FLV Fund. The article described the FLV Fund as an investment vehicle over which Jo Lernout and Pol Hauspie "exercise considerable influence over its affairs," with "a history of investing in L&H customers, typically small companies that pay license fees to L&H."

99.    On November 29, 2000, L&H filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware. According to a November 30, 2000 *Wall*

*Street Journal* article, the decision to file for bankruptcy protection came after L&H executives discovered that $100 million in cash was missing from the Company's South Korean unit.

100. On December 14, 2000, *The Wall Street Journal* reported on the thirty "strategic partners" that comprised a significant portion of L&H's revenues, revealing that Mercator was the ultimate owner of 16 of the 30 start-ups and that the FLV Fund had funded, at least in part, approximately 8 of the remaining 14.

101. On January 5, 2001, the Associated Press reported that the Belgian judge presiding over L&H's Belgium bankruptcy proceeding acknowledged that there is "no doubt there was fraud" at L&H.

102. In late April of 2001, South Korean authorities began investigating allegations against the Korean Banks, as well as certain former L&H Korea employees.

103. On or about April 27, 2001, Lernout, Hauspie and Willaert were arrested in Belgium and charged with forgery and stock manipulation. On May 26, 2001, Bastiaens was arrested by United States officials in Winchester, Massachusetts, in response to a Belgian warrant. Bastiaens was subsequently extradited to Belgium, where he has been charged with fraud, insider trading, stock market manipulation, and accounting law violations.

### The "Strategic Partner" Fraud

104. On December 19, 2000, L&H publicly revealed the findings of the Audit Committee Report, which had previously been presented to the L&H Board of Directors on November 20, 2000. The Audit Committee Report concluded, in part, that: (a) L&H had improperly recorded as much as $277 million in revenue during 1998, 1999 and the first half of 2000; (b) the Company should reverse all of its Korean revenues recorded during 1999 and 2000, amounting to approximately $182 million; and (c) software license revenues from twenty-four of the thirty "strategic partners" were doing nothing more than funding L&H's research and development through related-party transactions.

105. With respect to license revenues from "strategic partners," i.e., the LDCs and CLDCs, the Audit Committee Advisors concluded that revenue from 24 of the 30 new

companies was incorrectly booked. The report concluded that the companies were not buying software licenses, but were actually paying L&H employees to develop future products, in effect funding the company's own R&D needs. The Audit Committee Report recommended, at a minimum, reversing approximately $83 million in licensing revenue, and stated that if the investors are related parties, as the evidence suggests, the funded amounts should be recognized as a liability:

> It appears, based on our review, that the original LDC concept involved the sale of rights and tools to an independent third party and the separate use of those tools by the third party to develop L&H compatible products in a particular language. The wording of the contracts corroborate this concept. However, it also appears that shortly after the first few LDC contracts were signed, L&H personnel realized that the LDC investors were primarily financial investors and L&H would have to provide more services to the LDCs than they originally thought. Eventually, L&H assumed responsibility for the development work for a contemplated additional fee. Although it appears to us that, by December 1998 L&H and the LDCs knew that L&H would be performing some or all of the services or development work for the LDCs, future contracts were not changed to reflect that understanding. Except for Turkish and Farsi, contracts reflecting that the LDCs would pay L&H for the services or development work were not executed until November 3, 2000. To our knowledge, except for Turkish and Farsi, the LDCs have not yet been invoiced for the development work performed to date.
>
> *        *        *
>
> We believe, based on our review of certain internal documents and outside marketing material and limited discussions with the investors or their representatives, that the investors anticipated, in substance, that they were buying the future rights to a product (language) to be developed by L&H and thus were effectively funding the Company's research and development efforts to build that language.
>
> If the investors are not related parties, accounting for such transactions would require deferral of all the revenues and recognition over the development period.... If the investors are related parties, the relevant accounting literature presumes that the related party investors will be repaid and the funded amounts are recognized as a liability.

106.    In fact, the investors were related parties, and what L&H recognized as license revenue should not merely have been deferred, it should have been stated as a liability. Although the Audit Committee report redacted the names of the investors it did manage to discover and connect to L&H, news reports revealed those names and their affiliations with L&H.

29

107.    A September 22, 2000 *Wall Street Journal* article revealed that eight of the shell start-ups were funded by defendant FLV Fund, which is audited by KPMG.  According to a November 6, *Wall Street Journal* article, another four were organized as subsidiaries of Language Investment Co., whose chief executive officer, Willem Hardeman, sits on the Board of the FLV Fund.  And a December 14, 2000 *Wall Street Journal* article reveals that another sixteen were owned by Mercator, whose chairman, Louis Verbeke is a name partner in the law firm that acted as L&H's main counsel and as an Audit Committee Advisor — Loeff, Claeys, Verbeke.  Mr. Verbeke and Mercator separately hold stakes in L&H.  Mercator also owns 6.9% of L&H Holding Co., a vehicle through which defendants Lernout and Hauspie control L&H.  L&H's financial statements and other disclosures misleadingly omitted these relationships.  Indeed, as previously set forth, L&H affirmatively and falsely represented that these "licensees" were "unaffiliated customers" and that 1998 and 1999 revenues from companies funded by the FLV Fund were *de minimis*.

108.    More recently, in June 2003, it was further revealed that the entities were funded by tens of millions of dollars in loans secretly guaranteed by L&H principals — Lernout, Hauspie and Willaert.

109.    In essence, L&H represented to the public that the LDCs and CLDCs were unaffiliated entities who were paying L&H tens of millions of dollars in licensing fees for the right to develop L&H software for use with specific languages.  The contracts gave L&H an option to acquire the strategic partner and the developed product.  Thus, to the public, unaffiliated parties were providing substantial revenue to L&H and were also bearing the cost and the risk of developing software.

110.    In reality, the LDCs and CLDCs were uncreditworthy start-up shells with no funds to pay the license fees and no resources to perform the research and development work contemplated by the contracts they signed with L&H.  Instead, L&H and its employees performed the development work, bearing all the research and development costs.

30

111.    The scheme operated to inflate L&H's stock price in two ways.  First, the license fees reported as revenue were in fact the proceeds of loans guaranteed by L&H principals.  Thus, a multi-million liability was reported as profit.  Second, L&H did not report its research and development costs as an expense, which would immediately reduce earnings.  Instead, it exercised its options to purchase the entities and their finished products and then capitalized the majority of the purchase price as goodwill.  L&H was then able to amortize the cost of these capitalized assets over an extended period of time.

112.    The SEC requires publicly-traded companies to present their financial statements in accordance with GAAP.  17 C.F.R. §210.4-01(a)(1).  That regulation states that financial statements filed with the SEC that are not prepared in conformity with GAAP "will be presumed to be misleading, despite footnote or other disclosures, unless the Commission has otherwise provided."

113.    L&H's accounting constituted flagrant violation of GAAP in several ways.  Statement of Financial Accounting Standard (SFAS) No. 68, *Research and Development Arrangements* requires that "[t]he financial reporting of an enterprise that is party to a research and development arrangement should represent faithfully what it purports to represent and should not subordinate substance to form."

114.    At a minimum, under SFAS No. 68, and under SOP 97-2, L&H was required to account for the arrangement as a long-term construction contract and defer recognition of revenues from the start-up shells over the development period.  SFAS No. 68 provides that:

> An enterprise shall determine the nature of the obligation it incurs when it enters into an arrangement with other parties who fund its research and development.
>
> *             *             *
>
> To the extent that the financial risk associated with the research and development has been transferred because repayment of any of the funds provided by the other parties depends solely on the results of the research and development having future economic benefit, the enterprise shall account for its obligation as a contract to perform research and development for others.

SFAS No. 68 ¶¶4, 10. SOP 97-2, which "provides guidance on when revenue should be recognized and in what amounts for licensing, selling, leasing, or otherwise marketing computer software" states that:

> If an arrangement to deliver software or a software system, either alone or together with other products or services, requires significant production, modification, or customization of software, the entire arrangement should be accounted for in conformity with Accounting Research Bulletin (ARB) No. 45, Long-Term Construction-Type Contracts....

SOP 97-2 ¶7.

115.    Even if the licenses had not required contract accounting, under SOP 97-2, L&H should not have recognized revenue from them because the licensee's absence of resources made it clear that collectibility was not probable. SOP 97-2 does not permit revenue to be recognized until "Collectibility is probable."

116.    In addition, since the start-up shells were related parties, the funds should have been treated as liabilities:

> If the enterprise is obligated to repay any of the funds provided by the other parties regardless of the outcome of the research and development, the enterprise shall estimate and recognize that liability. This requirement applies whether the enterprise may settle the liability by paying cash, by issuing securities or by some other means.

AS § R55.103.

117.    L&H's treatment of the start-up shells also violated SFAS No. 57, *Related Party Disclosures*, which requires "disclosures of material related party transactions" including:

a.    The nature of the relationship(s) involved.

b.    A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

c.    The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period.

     d.     Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

AS § R36.102.

118.     Notes to L&H financial statements for 1997, 1998, and 1999 contain long lists of "related parties" accompanied by none of the detail required by SFAS No. 57. Moreover, the connections to related parties revealed by the Audit Committee Report demonstrate that L&H affirmatively misrepresented the amount of revenue it recognized from the start-up shells who provided 10% of L&H's 1998 revenue and 25% of its 1999 revenue. In its 1998 Annual Report on Form 20-F, L&H stated that only 3.7% of its 1998 revenue was provided by "companies funded in part by the FLV Fund." In Notes to its 1999 financial statements, L&H stated that 0.3% of 1999 revenues were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

## Artesia's Role in the "Strategic Partner" Fraud

119.     On June 24, 2003, Dexia announced that it had been notified by the Belgian prosecutor investigating the L&H fraud that it was a suspect because of actions taken by Artesia in connection with L&H in 1998 through 2000. According to a June 25, 2003 article in *The Belgian Financial Times*, entitled "Artesia Knew [L&H] Was Playing With Fire," the Belgian Justice Department investigators determined that Artesia was "an exceptionally important banker to [L&H] ... involved in just about everything surrounding [L&H]."

120.     According to the article, Belgian prosecutors secretly seized records from Artesia in February 2001, which "contained a treasure of information" regarding the L&H fraud. According to those records, Artesia issued three separate loans in 1998 and 1999, totaling more than $30 million, which were funneled through strategic partners to artificially inflate L&H's revenues. According to the article, the Belgian Justice Department's investigation revealed that Artesia "knew that the top management of [L&H] was involved in practices that would not be tolerated by the American SEC." None of this information had previously been made public.

Indeed, as discussed more fully below, Artesia had lied to the L&H Audit Committee to conceal its involvement.

121.   The June 25, 2003 *Belgian Financial Times* article stated that it was Artesia that had devised a method for concealing the fact that Lernout, Hauspie and Willaert guaranteed financing to certain LDCs and CLDCs. Artesia structured transactions known as "credit default swaps" in lieu of personal guarantees that would have had to have been revealed in the LDC and CLDC loan paperwork.

### Artesia's Longstanding Role in L&H Misconduct

122.   Artesia had previously assisted L&H in its financial machinations. On March 25, 1998, an Illinois company known as Vasco Data Security International ("Vasco"), a customer of L&H's Burlington, Massachusetts office, purported to license $800,000 of L&H software. The technology covered by L&H's license, however, was useless to Vasco, which only agreed to pay the licensing fee in order to obtain a $3 million loan from L&H that it desperately needed. The loan was originally due on January 4, 1999, but Vasco could not pay it when it came due. Hauspie took advantage of the situation to require Vasco to enter into a second license agreement with L&H worth $900,000, and to backdate the agreement December 31, 1998. According to Vasco's former Chief Technology Officer, Hauspie threatened to call the loan due on January 4, 1999 if Vasco refused to backdate the contract. Vasco acceded and L&H fraudulently recorded the $900,000 in 1998.

123.   Because Vasco still did not have the resources to repay the loan in early 1999, Lernout and Hauspie arranged for Artesia to organize and manage an $11.5 million private placement of Vasco common stock. On April 15, 1999, Artesia completed the private placement and wired the $11.5 million to Vasco's account in the United States. Vasco used these funds, in part, to repay L&H. The investors in the private placement included LHIC (a company formed by Lernout and Hauspie to invest in companies that specialized in speech and language based products), which invested $5 million. LHIC obtained a 7% ownership stake in Vasco and a seat on the company's board of directors. That seat was filled by Hauspie. Another top investor in

Vasco was Mercator, which purchased approximately $1 million of Vasco stock through the private placement managed by Artesia.

124.    Artesia was also key player in the creation of BTG, providing the initial financing that allowed BTG to operate. Artesia lent a total of $22.9 million to BTG with the intent that L&H would find external investors to repay the loan. However, L&H never disclosed the identities of the ultimate owners of BTG, and, according to a December 7, 2000 article, *The Wall Street Journal* was only able to trace ownership "through a Luxembourg company to two entities based in the Channel Islands, but no further."

### Artesia's Role in Financing the Strategic Partners

125.    Following the Dictation, BTG and Vasco transactions, L&H's senior officers and Artesia expanded their scheme into what ultimately would be described by *The Wall Street Journal* as "Dictation Consortium-type structure … but on steroids." Instead of creating one shell company (like Dictation or BTG) to funnel fictitious revenue to L&H, L&H created a series of holding companies financed by Artesia. These holding companies, in turn, financed multiple LDCs, which then paid "licensing fees" back to L&H.

126.    One such holding company was Radial Belgium N.V. ("Radial"). On September 29, 1998, Artesia loaned approximately $6 million to Radial, which wired this money, in $2 million installments, to three LDCs: (a) the Slavic Development Company N.V., (b) the Farsi Development Company N.V., and (c) the Bahassa Development Company N.V. These LDCs were supposed to develop speech recognition products in Slavic, Farsi and Bahassa. The Slavic, Farsi and Bahassa LDCs, however, used the $2 million to pay L&H licensing fees. L&H then booked the entire $6 million in revenue in the third quarter of 1998. None of these LDCs had bona fide offices or any operations that would have enabled them to develop speech recognition products.

127.    Internal Artesia documents quoted in the Report demonstrate that Artesia knowingly entered into this transaction in furtherance of the fraud. They show that Artesia knew that its loan was to be used by Radial to finance the three LDCs (all of which had the same

business address), that the LDCs and Radial had been created by L&H, and that the monies

would be used by the LDCs to pay licensing fees in identical amounts to L&H. They also show

that Artesia knew that the loans would be guaranteed by Lernout, Willaert and Hauspie, and that

their actions would enable L&H to fraudulently conceal that fact from the SEC and the investing

public.

128.    Artesia recognized from the outset that the "strategic partners" had no equity

investors and that they were mere shell companies located one address. In an email dated

September 21, 1999, from P. Rabaey at Artesia to G. Dauwe and other Artesia employees,

Rabaey stated:

> Our loan … was used for the establishment of 3 Language Development Companies:
> Slavic, Farsi and Bahassa. Starting capital per company: $2 million. The 3 companies
> bought first of all software licenses from [L&H]. The objective is to repay our loan to
> Radial Belgium by attracting investors and to further increase the capital per Language
> Development company.

129.    Another document quoted in the Report states:

> [On September 29, 1998, Artesia advances loan to Radial] by way of a bridge financing
> for the establishment of the following language development companies THE SLAVIC
> DEVELOPMENT COMPANY N.V., THE FARSI DEVELOPMENT COMPANY N.V.,
> and THE BAHASSA DEVELOPMENT COMPANY N.V., all based at 2370 Arendonk,
> Schoolstraat 1A, in anticipation of the establishment of the Language Development Fund
> and the sign-up of investors.

130.    P. Rabaey's September 21, 1999 email also stated that "[t]he private guarantees,

however, were not signed by Jo [Lernout], Pol [Hauspie], and Nico [Willaert] so as to avoid

possible problems with the SEC. We have therefore no security and look for a solution via credit

default swaps." (emphasis supplied).

131.    Artesia knew that it was highly unusual for an individual to participate in credit

default swaps, and that Lernout, Hauspie and Willaert did so in this case solely to accomplish

their deception of the SEC and L&H's shareholders. An internal Artesia memorandum entitled

"Direction Internal Audit" from J.P. Cloes and F. Dankelman to K. Claessens and others, dated

January 31, 2000, notes that the credit default swaps executed by Lernout, Hauspie and Willaert

had "special characteristics (they are the only contracts of this type concluded with natural persons)." Artesia clearly understood, however, that "the credit default swaps were concluded in order to get around the guarantees that the other parties (= J. Lernout + P. Hauspie + N. Willaert...) did not wish to provide," as was stated in a February 14, 2000 internal Artesia memorandum stating the views of Geert Dauwe of Artesia (emphasis supplied).

132.    Moreover, Artesia was well aware that the sole reason for structuring Lernout's, Hauspie's and Willaert's guarantees as credit default swaps was to conceal the relationship between L&H and the strategic partners and that such concealment would render L&H financial statements misleading in violation of auditing standards and applicable law. An internal Artesia document quoted in the Report notes that Lernout, Hauspie and Willaert refused to execute a loan that made reference to the credit default swaps: "not signed by the borrowers (refused because of possible fiscal and auditing problems when filing the financial statements)." Accordingly, a June 15, 1999 internal Artesia email from P.Rabaey to B. Mommens concerning LIC and Radial and quoted in the Report states that Artesia did not identify Lernout, Hauspie and Willaert because "the client does not agree with mentioning the identity of the private individuals because by doing so a link is established between the debtor and the private individuals. It is not desirable to the client that there be such a direct link for the outside world to see" (emphasis supplied).

133.    Artesia also knew that the LDCs would not generate any real revenue to repay the loans, and that L&H intended to seek new investors who would act as a new source of funds. As P. Rabaey stated in a September 21, 1999 email: "The objective is to repay our loan to Radial Belgium by attracting investors and to further increase the capital per Language Development Company." Another internal Artesia document quoted in the Report states:

> The repayment of loans granted by Artesia to the holding company (=Radial Belgium) is totally dependent on whether investors can be found, which is very difficult to tie with a set time schedule. The subsidiaries (language development companies) themselves deploy almost no activities as long as there are no investors.... In actuality these companies represent nothing (no activities, no assets).

134.    The June 25, 2003 article in *The Belgian Financial Times* stresses the extent to which Artesia acted far outside the confines of an ordinary commercial banking relationship in order to accommodate the fraudulent scheme:

> On September 29, 1998, Artesia issued a loan to a Belgian company known as Radial in the amount of approximately $6 million. Artesia's own documents reveal that Radial was a "special purpose entity" created by senior officers of L&H for the express purpose of creating a nd funding LDCs. T hese s ame b ank d ocuments a lso s how t hat A rtesia w as aware that Lernout, Hauspie, and Willaert did not want to sign the required personal guarantees to obtain this and other LDC and CLDC loans "in order to avoid possible problems with the SEC." As a result, Artesia devised a scheme to have Lernout, Hauspie and Willaert guarantee the Radial loan using "credit default swaps." Unlike personal guarantees, however, these swaps do not have to be revealed in the loan letters of credit. However, the sale of credit default swaps to individual investors is highly unusual, demonstrating the degree to which Artesia was willing to go to participate in L&H's massive accounting fraud.

135.    After setting up Radial to manufacture revenues for L&H in the third quarter of 1998, L&H and Artesia replicated this scheme in the fourth quarter. The name of the holding company this time was Language Investment Co. ("LIC"). Artesia made a loan on December 22, 1998 to LIC for approximately $6 million. LIC then sent the funds in four installments of $1.5 million to four separate LDCs: the Greek, Hungarian, Polish and Czech development companies. These LDCs then immediately paid the funds to L&H as licensing fees so that L&H could book this "revenue" prior to year-end.

136.    Artesia knew that those LDCs lacked the financial resources and technical knowledge necessary to develop L&H's software for use with additional languages. In fact, an internal Artesia document quoted in the Report makes clear that Artesia knew that the proceeds of its loan would be used immediately by these newly formed LDCs to pay for licensing fees to L&H, leaving the LDCs with no capital to perform their contractual obligation to develop L&H software for use with other languages. The document noted that the amounts financed by Artesia would provide the "start-up capital" for the four LDCs and "these amounts are used in each case as partial payment to [L&H] for the up-front fee of US$3,000 [meaning $3 million]. The balance

of the capital underwritten by LIC NV ... is to be paid in full in the course of the first half of 1999. LIC NV will do everything possible to find the necessary funds for this purpose."

137.    These loans were also secured by credit default swaps. According to an internal undated memorandum of Artesia written in connection with the loan to LIC and quoted in the Report, the loan was granted "under the condition that Lernout & Hauspie in turn guarantees the payment." Artesia again permitted Lernout, Hauspie and Willaert to use credit default swaps, rather than guarantees: "If Mr. J. Lernout, P. Hauspie, and N. Willaert do not accept signing a guarantee (for tax reasons), they seem willing to act as the counter-party in a credit default swap."

138.    The June 25, 2003 article in *The Belgian Financial Times* stressed the role of Artesia in furthering the "related party" fraud:

> Artesia engaged in a similar fraudulent transaction on December 22, 1998, issuing a loan to the Language Investment Company for the purpose of creating 4 LDCs so that L&H could recognize revenues from these LDCs in the fourth quarter of 1998. Again, Artesia used credit default swaps to conceal the fact that the principals of L&H had secretly guaranteed the loans used to set up the 4 LDCs in question.

139.    L&H continued to perpetuate the scheme in 1999. On March 31, 1999, L&H set up the Language Development Fund ("LDF") and transferred $12 million that same day to the bank accounts of seven LDCs at Artesia. The Greek, Czech, Hungarian and Polish Development Companies received $1.5 million each, and the Tamil, Thai and Hindi Development Companies received $2 million each. This time, the $12 million came from Mercator in the form of a $2 million capital contribution and a $10 million loan to LDF. All of these funds appeared in L&H's financial statements as revenue.

140.    Internal Artesia documents quoted in the Report leave no question that Artesia knew that these LDCs were shell entities created by L&H. A fax dated March 1999 from Ph. Depecker at L&H to Artesia states:

> The following companies are to be established, for which I need an account number: Thai Language Development Company N.V., Hindi Language Development Company N.V., and Tamil Language Development Company N.V.

The representative-director of these companies is in each case Mr. Tony Snauwaert, and the company seat will be 9900 Eekloo, Stationstraat 83. Could you get me three account numbers as soon as possible?

141.    In the second quarter of 1999, L&H requested that LDF receive a $20 million loan from Artesia. Artesia's internal documents relating to LDF reveal that the bank was fully aware of the fraud being perpetuated at L&H. Specifically, according to an internal email from B. Ferrand, dated June 21, 1999:

> LDF as overarching holding company is now 100% shareholder in 3 Language Development Companies ("LDC"): Tamil DC, Hindi DC, and Thai DC. [Six million dollars] of capital stock and the Mercator-Noordstar loan was channeled to these various LDCs which used it to buy licenses from [L&H] in the first quarter of 1999.
> ***
> In view of the fact that [L&H] books the sale of licenses as revenue, it is essential under GAAP rules that LDF be totally independent from [L&H]. Therefore, [L&H] cannot under any circumstances be a party involved in an agreement whose subject is the repayment of the requested financing. A credit default swap with Messsrs. Lernout, Hauspie and Willaert is however possible.
> ***
> [L&H] does not itself execute the R&D for these languages but has it done in various special purpose companies (see the work methods at Dictation Consortium, BTG, LIC). These companies buy a license for the use of software development kits and tool kits from [L&H] which permit the implementation of the speech and language technology in the various languages. The system offers [L&H] two advantages: 1) the R&D takes place outside their own profit and loss structure; 2) the royalties received can be booked immediately as revenue.

Another internal document from Artesia's credit file quoted in the Report noted: "Purpose of the [LDF] loan: bridge loan to capitalize subsidiaries of borrower for payment of license fees by subsidiaries to [L&H]."

142.    Although the loan to LDF was withdrawn before it was finalized, on June 25, 1999, Artesia granted a $20 million line of credit to Lernout, Hauspie and Willaert personally. The internal Artesia credit file for Lernout, Hauspie and Willaert quoted in the Report notes that "Language Development Fund N.V.... The file as presented has been withdrawn. In its stead and place agreement (to be ratified) for a loan of the same amount owed severally and jointly by Messrs. Jo Lernout, P. Hauspie, and Nico Willaert." This time, however, Artesia demanded that

the three individuals pledge 650,000 registered shares of L&H as collateral for the loan. The vast majority of this $20 million was used to fund six new LDCs (Malay, Vietnamese, and four other Indian languages not specified at the time), and this money was ultimately booked as revenue on L&H's financial statements. L&H did not reveal the source of the funds received by these LDCs in L&Hs Form 10-Q for the quarter ended June 30, 1999, or in its SEC Form 10K for the year ended December 31, 1999.

143.    By mid to late 1999, Artesia became increasingly concerned that its loans would not be repaid. The loans to Radial and LIC were due on June 30, 1999, and the $20 million personal loan to Lernout, Hauspie and Willaert was due in October 1999. To avoid a technical default, Artesia extended the loans to December 15, 1999. Artesia subsequently had multiple discussions with Hauspie, Lernout and Willaert to track their progress in attracting potential new investors in the LDCs, whose funds would be used by L&H to repay Artesia. In an internal memorandum dated September 7, 1999, B. Ferrand at Artesia reported a conversation that he had with Willaert and others the day before:

> Status of negotiations with external investors for the various Language Development Companies:
>     a. Negotiations with the Arabian investment fund are supposed to be finalized around September 30, 1999 = repayment RADIAL loan ([$6 million ] originally planned due date June 30, 1999) should take place around September 30, 1999 (at least in part)
>
>     b. Negotiations with the Russian investment fund will be continued in Moscow September 20 and 21. According to Nico Willaert this means then that
>
>         - either an amount of +/- [$25 million] will be available at LIC for repayment of the loans ([$6 million] originally planned due date June 30, 1999) and at Lernout/Hauspie /Willaert ([$20 million], due date October 1999
>
>         -or Artesia is to receive a bank guarantee (from the bankers of the Russian investment fund) as a surety for the current loan to LIC and Radial
>
> My impression is that these negotiations are still far from being finalized and that it is also very unlikely that a bank guarantee can be obtained.

- Nico Willaert stresses that all loans made by Artesia within the framework of the establishment of the Language Development Companies will be repaid for sure around December 31, 1999 (Radial [$6 million], LIC [$6 million] and Lernout/Hauspie/Willaert [$20 million]).

144.    Similarly, on December 27, 1999, P. Cordonnier at Artesia reported in an email to B. Ferrand and other Artesia employees that he had received a telephone call from Willaert, who stated that "on Wednesday December 29, 1999, (sufficient) US$ will be available in an account of a Singapore bank to pay back the loans to LIC and Radial." Willaert also gave Mr. Cordonnier the details of the contact person in Singapore.

145.    On or about January 5, 2000, a Lebanese-Armenian businessman, Haroun Katchadourian, wired $36 million at the request of Lernout, Hauspie and Willaert to the Singapore bank account of Velstra, a Singaporean company owned by Mercator. This money was then used to pay off the $20 million line of credit, and the two $6 million loans to Radial and LIC.

**Belgian Prosecutor Concludes That Artesia Knowingly Participated in the L&H Fraud**

146.    On the basis of internal documents obtained from Artesia, a panel of experts retained by the Belgian prosecutors concluded that Artesia intentionally participated in the L&H fraud. The conclusions are damning:

Evaluation of the Financing

Three of the four members of L&H's executive committee [Lernout, Hauspie and Willaert] are negotiating credit default swaps with Artesia Bank for the loans to Radial, LIC and LDF (loan to LDF not approved). These loans are guaranteed by members of L&H's executive committee via credit default swaps for paying license fees to L&H (booked as revenue). The loan denied to LDF was approved for an identical amount to the three members of L&H's executive committee and also used for paying license fees to L&H (booked as revenue).

These loans were concluded at great urgency and just before the quarterly closing of accounts at L&H. Decisions had to be made always "on the double," which only can be explained by the approaching quarterly or yearly closings.

The choice of credit default swaps as financial guarantee is inspired by the intention of not having to report this sort of financial guarantee on the letter of

credit of the borrower and so as to avoid possible problems with the US SEC. The efforts of the members of L&H's executive committee to prevent that the credit default swaps appear on the letter of credit show that there was an awareness that this could lead to problems with revenue recognition and related parties. \*\*\*

It is irrelevant that Artesia Bank does not utilize the provided guarantees in which members of L&H's executive committee are involved.... Of crucial importance is the following finding: the provided guarantees (credit default swaps, the pledge of 650,000 L&H shares) in which 3 of the 4 members of L&H's executive committee are involved are a basic condition for granting of the loans to Radial, LIC and to Lernout/Hauspie/N. Willaert (3 members of the L&H executive committee), whereby these financial resources flow to the LDCs and subsequently to L&H for payment of license fees that are booked as revenue just before a quarter or a fiscal year closing. Because of the financing of license payment (credit default swap, loan to 3 members of the executive committee, pledging L&H shares) we consider the revenue based on the license agreements with the LDCs fictitious.

(Emphasis supplied).

### Artesia Conceals Its Role

147.    Artesia took affirmative steps to cover up its role in the fraud at L&H after the

investigation of that fraud began in November 2000. Loeff Claeys Verbeke, one of the law firms

charged with that investigation and co-author of the Audit Committee Report, asked Artesia

about L&H's possible role in securing financing for LIC. On November 24, 2000, Artesia sent a

letter to Loeff Claeys Verbeke in response to that inquiry. According to the Report, Artesia's

letter stated: "On December 22, 1998, ARTESIA BANK N.V. granted a credit line to N.V.

LANGUAGE INVESTMENT COMPANY in the amount of BEF 220,000,000; L&H provided

no guarantees for this loan" (emphasis supplied).

148.    Artesia made no mention of the credit default swaps executed by the principals of

L&H — Lernout, Hauspie and Willaert — on the LIC transaction so as not to disclose its

complicity in the fraud. As a result, the Audit Committee Report makes no mention of Artesia's

role in the fraud. Likewise, none of the Wall Street Journal articles that disclosed the fraud at

L&H mentioned any role by Artesia.

149.    Consequently, Plaintiffs did not discover the role of Artesia until an article in *The Belgian Financial Times* on June 24, 2003. Prior to that time, despite diligent efforts by Plaintiffs and counsel, Plaintiffs were unaware of Artesia's role in the fraud at L&H.

## FIRST CLAIM FOR RELIEF

## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

150.    Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

151.    This Count is asserted against Dexia for violations of § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 as promulgated thereunder.

152.    Dexia S.A., and/or Dexia Bank Belgium, as acquiror of Artesia, is liable to Plaintiffs for Artesia's wrongful conduct as set forth herein.

153.    Artesia, singly and in concert with L&H and its senior officers and directors directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Seagate. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Seagate to exchange its shares of Dragon for the common stock of L&H at an artificially inflated price.

154.    Artesia engaged in acts, practices, and a course of business and employed devices, schemes, and artifices to defraud which operated as a fraud on Seagate by investing funds in companies for the purpose of those companies purchasing product from L&H for the sole purpose of L&H publicly reporting artificially inflated revenues and earnings. Artesia knowingly engaged in these acts, practices, and course of business and employed devices, schemes, and artifices to defraud.

155.    As a result of the dissemination of the false and misleading statements set forth above, the market price of L&H common stock was artificially inflated and Seagate was induced to purchase the common stock of L&H at an artificially inflated price. In ignorance of the false

and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by defendant, Seagate relied, to its detriment, on the integrity of the market price of the stock, and the false and misleading statements made directly by L&H to Seagate. Had Seagate known the truth, it would not have entered into the Merger and purchased L&H common stock at inflated prices.

156.    Artesia's scienter is demonstrated by internal documents quoted in the Report, set forth at ¶¶119-146 above, and demonstrating, *inter alia*, that:

a.    Artesia knew that its $6 million loan to Radial was used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,.

b.    Artesia knew that its $6 million loan to LIC was used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,

c.    Artesia knew that the LDCs were not independent of L&H but were rather controlled by L&H,

d.    Artesia knew that the LDCs were shell corporations, with no assets, operations, or employees,

e.    Artesia knew that the credit default swaps were used by L&H to conceal from the SEC and the investing public that the LDCs were related parties,.

f.    Artesia knew that if Lernout, Hauspie and Willaert were included in the loan documents as guarantors of the loans, L&H would have to disclose that the LDCs were related parties.

157.    Seagate suffered substantial damages as a result of the wrongs herein alleged in an amount to be proven at trial, but not less than $150,806,377.62.

45

158.    By reason of the foregoing, Artesia directly violated § 10(b) of the 1934 Act and Rule 10b-5, as promulgated thereunder in that it: (a) employed devices, schemes, and artifices to defraud; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Seagate in connection with its purchase of shares of the common stock of L&H in exchange for shares of Dragon.

## SECOND CLAIM FOR RELIEF

## CONSPIRACY TO COMMIT COMMON LAW FRAUD

159.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein and assert this count against Dexia.

160.    Dexia S.A., and/or Dexia Bank Belgium, as acquirer of Artesia, is liable to plaintiffs for Artesia's wrongful conduct.

161.    At all times relevant to this complaint, L&H, Lernout, Hauspie and Willaert were perpetrating a fraud against Seagate, as set forth above at ¶¶37-118. These parties made all of the materially false and misleading statements identified above, knowing that Seagate and the investing public would rely on those statements in connection with their purchases of L&H stock. In addition, L&H falsely represented to Seagate, among other things, that its 1998 and 1999 financial statements were prepared in conformity with U.S. GAAP. Ultimately, L&H was forced to admit that these statements were false and to announce its intent to restate its financial results for 1998, 1999 and the first two quarters of 2000.

162.    Artesia conspired with L&H, Lernout, Hauspie and Willaert to defraud the SEC and the investing public, including Seagate. Among other things, as detailed above at ¶¶ 119-149, Artesia knowingly and willfully devised a scheme to conceal the fact that L&H officers were guarantors of millions of dollars in loans that were made to L&H-controlled entities, including the LDCs, and then paid back to L&H as licensing fees. In so doing, Artesia, knowingly enabled L&H to recognize the entire amount of the loans as revenue, in blatant violation of GAAP, and misrepresent such amounts in their public statements detailed above.

46

163.    In furtherance of the conspiracy, Artesia committed the following overt acts

a.      On or about September 29, 1998, Artesia made a $6 million loan to Radial, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

b.      On or about December 22, 1998, Artesia made a $6 million loan to LIC, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

c.      On or about June 25, 1999, Artesia awarded Lernout, Hauspie and Willaert a $20 million line of credit, which they then used to make payments to L&H through the LDCs in the form of licensing fees, which were improperly included as revenue on L&H's financial statements.

164.    Artesia committed this misconduct intentionally, with full knowledge of the fraud being perpetrated at L&H. Specifically, Artesia's internal documents, set forth above at ¶¶119-146, demonstrate that, *inter alia*:

a.      Artesia knew that its $6 million loan to Radial was used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,

b.      Artesia knew that its $6 million loan to LIC was used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,

47

    c.      Artesia knew that the LDCs were not independent of L&H but were rather controlled by L&H,

    d.      Artesia knew that the LDCs were shell corporations, with no assets, operations, or employees,

    e.      Artesia knew that the credit default swaps were used by L&H to conceal from the SEC and the investing public that the LDCs were related parties,

    f.      Artesia knew that if Lernout, Hauspie and Willaert were included in the loan documents as guarantors of the loans, L&H would have to disclose that the LDCs were related parties.

165.    As a consequence of the foregoing, Seagate suffered damages in an amount to be proven at trial, but not less that $150,806,377.62.

## THIRD CLAIM FOR RELIEF

## AIDING AND ABETTING COMMON LAW FRAUD

166.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein and assert this count against Dexia.

167.    Dexia S.A., and/or Dexia Bank Belgium, by acquiring Artesia is liable to Plaintiffs for Artesia's wrongful conduct.

168.    At all times relevant to this complaint, L&H, Lernout, Hauspie and Willaert were perpetrating a fraud against Seagate, as set forth above in ¶¶ 37-118. These parties made all of the materially false and misleading statements identified above, knowing that Seagate and the investing public would rely on those statements in connection with their purchases of L&H stock. In addition, L&H falsely represented to Seagate, among other things, that its 1998 and 1999 financial statements were prepared in conformity with U.S. GAAP. Ultimately, L&H was forced to admit that these statements were false and to announce its intent to restate its financial results for 1998, 1999 and the first two quarters of 2000.

169.    Artesia substantially assisted L&H in perpetrating the fraudulent scheme.
Specifically,

a.    On or about September 29, 1998, Artesia made a $6 million loan to Radial, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

b.    On or about December 22, 1998, Artesia made a $6 million loan to LIC, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements

c.    On or about June 25, 1999, Artesia awarded Lernout, Hauspie and Willaert a $20 million line of credit, which they then used to make payments to L&H through the LDCs in the form of licensing fees, which were improperly included as revenue on L&H's financial statements.

170.    At all times relevant to this complaint, Artesia knew of the fraud perpetrated by L&H. Specifically, as set forth in internal Artesia documents described above at ¶¶119-146:

a.    Artesia knew that its $6 million loan to Radial was used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,

b.    Artesia knew that its $6 million loan to LIC was used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H,.

      c.      Artesia knew that the LDCs were not independent of L&H but were rather controlled by L&H,

      d.      Artesia knew that the LDCs were shell corporations, with no assets, operations, or employees,

      e.      Artesia knew that the credit default swaps were used by L&H to conceal from the SEC and the investing public that the LDCs were related parties,

      f.      Artesia knew that if Lernout, Hauspie and Willaert were included on the loan documents as guarantors of the loans, L&H would have to disclose that the LDCs were related parties.

171.     As a consequence of the foregoing, Seagate suffered damages in an amount to be proven at trial, but not less than $150,806,377.62.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

      A.      Awarding Plaintiffs all compensatory damages suffered as a result of the wrongful conduct of the defendants in an amount to be determined at trial, including lost profits and consequential and incidental damages;

      B.      Awarding Plaintiffs punitive damages in an amount to be determined at trial;

      C.      Awarding Plaintiffs pre-judgment and post-judgment interest;

      D.      Awarding Plaintiffs their costs and expenses incurred in this action, including fees for plaintiffs' attorneys and experts;

      E.      Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of

defendant's trading activities or their other assets so as to assure that plaintiffs have an effective

remedy; and

        F.     Granting such other and further relief as the Court may deem just and

proper.


Dated: March 8, 2004


                       GARY B. FILLER and LAWRENCE PERLMAN
                       By their attorneys,



                       Gregory P. Joseph, N.Y. Atty Reg. #1645852
                       GREGORY P. JOSEPH LAW OFFICES LLC
                       805 Third Avenue, 31st Floor
                       New York, NY 10022
                       Telephone: (212) 407-1200

**OF COUNSEL**

Laurence H. Reece, III, BBO #414460
Alana A. Prills, BBO #652881
REECE & ASSOCIATES, P.C.
One Bowdoin Square
Boston, Massachusetts 02114
Telephone: (617) 747-7550


550256

# EXHIBIT B

Case Name: Filler v. Dexia
Defendant: Dexia Bank Belgium
Court Case No.: 04-10477PBS

## CERTIFICATE
### *ATTESTATION*

**The undersigned authority has the honour to certify, in conformity with article 6 of the Convention,**
*L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,*

1)   **that the document has been served\***
*1.   que la demande a été exécutée*

    **- the (date)**            BACOB DEXIA GROUP
    *- le (date)*              06 / 14 / 2004
    **- at (place, street, number)**
    *- à (localité, rue numéro)*     25 Rue de Trèves, 1000 Bruxelles

    **- in one of the following methods authorised by article 5-**
    *- dans une des formes suivantes prévues à l'article 5:*
      [ ]  **(a)  in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the Convention\*.**
          *a)   selon les formes légales (article 5, alinéa premier, lettre a).*
      [ ]  **(b)  in accordance with the following particular method\*:**
          *b)   selon la forme particulière suivante:*
      [ ]  **(c)  by delivery to the addressee, who accepted it voluntarily.\***
          *c)   par remise simple*

**The documents referred to in the request have been delivered to:**
*Les documents mentionnés dans la demande ont été remis à:*
    **- (identity and description of person)**
    *- (identité et qualité de la personne)*     Patricia VAN CAPPELLEN,
                                        Legal Department

    **- relationship to the addressee (family, business or other):**
    *- liens de parenté, de subordination o autres, avec le destinataire de l'acte:*

2)   **that the document has not been served, by reason of the following facts\*:**
*2.   que la demande n'a pas été exécutée, en raison des faits suivants:*

**In conformity with the second paragraph of article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement\*.**

*Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint.*

**LIST OF DOCUMENTS: Summons in a Civil Case, Complaint, Translation**

**Annexes**
*Annexes*
**Documents returned:**
*Pièces renvoyées:*

                                    **Done at**                 **, the**
                                      *Fait à*  Brussels,           *le*  06/14/2004

**In appropriate cases, documents establishing the service:**
*Le cas échéant, les documents justificatifs de l'exécution:*     **Signature and/or stamp.**
                                             *Signature et/ou cachet.*

                                    **BACOB DEXIA GROUP**

                                         06 / 14 / 2004

                                        *[Signature]*

  \*   **Delete if inappropriate**
      *Rayer les mentions inutiles*

Judiciary District of
BRUSSELS

# PROJUSTITIA

Local Police Force – Area 5344
Police Station 4
Rue de Bériot 2A  1210  Saint-
Josse-Ten_Noode
02/220.27.49

Subsequent Official Report N° BR.L6.046417/2004
dated 05/18/2004

*Notification Number : 181 DS/04*

---

Notification to Public Prosecutor's office:

---

On this 18th of May, 2004, at 7:35 a.m., I, LEFFLER Guy, Police Inspector, am
respectfully informing the King's Prosecutor that, based on information obtained from
DEXIA Bank, "INFOCEL" Department, located in C/C Av Galilée N° 5, it appears that,
concerning the delivery of judicial writs, these writs should be forwarded to VAN
CAPPELLEN Patricia, Legal Department, rue de Trèves N° 25, 1000 Brussels.
Writ recorded and closed on 05/18/2004.

*[Signature]*

---

Interested parties:

---

### DEXIA

### Headquarters and business address
1210 SAINT-JOSSE-TEN-NOODE, Avenue Galilée, 5

---

Sent to:

---

The King's Prosecutor  in BRUSSELS        (Original)

| | | |
|---|---|---|
| ---------------------------------- | ---------------- | ---------------------- |
| Sent on:  05/23/2004 | Attachments: | For Prosecutor's office use only |

The Commissioner of Police:
  VANDERPAS Paul
  Senior Inspector
Record Department Officer
  Area 5344

Record of conviction

*No action taken X*