EXHIBIT C

1

1  UNITED STATES DISTRICT COURT

2  FOR THE DISTRICT OF MASSACHUSETTS

3  Civil Action No. 02-CV-11589-PBS

4  -------------------------------------x

5  IN RE LERNOUT & HAUSPIE SECURITIES

6  LITIGATION,

7

8  THIS DOCUMENT RELATES TO ALL ACTIONS

9

10 -------------------------------------x

11                    January 20, 2004

12                    9:30 a.m.

13

14

15

16            Deposition of ELLEN

17  CHAMBERLAIN, pursuant to Notice, held at

18  the offices of Davis Polk & Wardwell,

19  Esqs., 450 Lexington Avenue, New York, New

20  York, before Jineen Pavesi, a Registered

21  Professional Reporter, Registered Merit

22  Reporter, Certified Realtime Reporter and

23  Notary Public of the State of New York.

24

25

2

1    A P P E A R A N C E S :

2

   GREGORY P. JOSEPH LAW OFFICES LLC

3    805 Third Avenue

   New York, New York 10022

4        Attorneys for Filler Plaintiffs and
         Witness

5    BY:    GREGORY P. JOSEPH, ESQ.

6

7    REED SMITH LLP

   2500 One Liberty Place

8    1650 Market Street

   Philadelphia, Pennsylvania 19103

9        Attorneys for Baker Plaintiffs

   BY:    ALAN K. COTLER, ESQ.

10

11

   BOIES SCHILLER & FLEXNER, LLP

12    255 S. Orange Avenue

   Orlando, Florida 32801

13        Attorneys for Baker Plaintiffs

   BY:    KAREN DYER, ESQ.

14

15

   BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

16    1285 Avenue of the Americas

   New York, New York 10019

17        Attorneys for Plaintiff Stonington
         Partners, Inc.

18    BY:    JAVIER BLEICHMAR, ESQ.
         ERIK SANDSTEDT, ESQ.

19

20

   WILLCOX, PIROZZOLO & McCARTHY, P.C.

21    50 Federal Street

   Boston, Massachusetts 02110

22        Attorneys for Bamberg Plaintiffs

   BY:    JAMES J. NICKLAUS, ESQ.

23

24

25

3

A P P E A R A N C E S   (Continued):

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
        Attorneys for KPMG
BY:    MICHAEL CARROLL, ESQ.
        SEAN KNOWLES, ESQ.


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
        Attorneys for S.G. Cowen
BY:    MARK LEBOVITCH, ESQ.

GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109
        Attorneys for Joseph Lernout
BY:    IRAIDA J. ALVAREZ, ESQ.

MORRISON COHEN SINGER & WEINSTEIN, LLP
750 Lexington Avenue
New York, New York 10022
        Attorneys for Pol Hauspie and Nico
        Wilbert
BY:    JAY R. SPEYER, ESQ.

ALSO PRESENT:
        COHEN & FIERMAN, ESQ.
        4 Faneuil Hall Marketplace
        Boston, Massachusetts 02109
        BY:    THOMAS W. EVANS, ESQ.
        (On behalf of Mercator)

        KEVIN GALLAGHER, Videographer

4

1

2              S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED

5    by and between the Attorneys for the

6    respective parties hereto that filing and

7    sealing be and the same are hereby waived.

8          IT IS FURTHER STIPULATED AND

9    AGREED that all objections except as to

10   the form of the question, shall be

11   reserved to the time of the trial.

12         IT IS FURTHER STIPULATED AND

13   AGREED that the within examination may be

14   signed and sworn to before any notary

15   public with the same force and effect as

16   though signed and sworn to before this

17   Court.

18

19

20

21

22

23

24

25

5

1

2          THE VIDEO TECHNICIAN:  On the

3   record at approximately 9:32 a.m.

4          This is the videotaped

5   deposition of nonparty witness Ellen

6   Chamberlain taken in U.S. District Court

7   for the District of Massachusetts, Case

8   No. 02-CV-11589-PBS, the caption is In re

9   Lernout & Hauspie Securities Litigation.

10          The deposition is being held

11   today, January 20, 2004, at the offices of

12   Davis Polk Wardwell.

13          I am Kevin Gallagher,

14   videographer, the court reporter is Jineen

15   Pavesi, we are from the independent firm

16   of Veritext Reporting Services.

17          The counsel will identify

18   themselves for the record.

19          MR. JOSEPH:  Gregory Joseph for

20   the witness and the Filler plaintiffs.

21          MR. CARROLL:   Good morning,

22   Michael Carroll for KPMG LLP, the

23   defendant, accompanied by my colleague,

24   Sean Knowles, this morning.

25          MR. SANDSTEDT:  Erik Sandstedt

6

1

2  and Javier Bleichmar from Bernstein

3  Litowitz Berger & Grossmann LLP,

4  representing the Stonington Partner

5  plaintiffs.

6         MR. EVANS:  Thomas Evans,

7  appearing for Cohen & Fierman and

8  representing Mercator.

9         MS. ALVAREZ:  Iraida J. Alvarez

10 from Goodwin Procter representing Joseph

11 Lernout.

12        MR. NICKLAUS:  Jim Nicklaus,

13 Willcox, Pirozzolo & McCarthy,

14 representing the Bamberg plaintiffs.

15 E L L E N    C H A M B E R L A I N,

16 having first been duly sworn by a Notary

17 Public of the State of New York, was

18 examined and testified as follows:

19 EXAMINATION BY

20 MR. CARROLL:

21        Q.    Could you begin by giving us

22 your name, please.

23        A.    Ellen Chamberlain.

24        Q.    You understand you are here to

25 give a deposition under oath in a

7

1                        CHAMBERLAIN

2    litigation related to Lernout & Hauspie?

3        A.    I do.

4        Q.    Have you been through this sort

5    of thing before?

6        A.    I have.

7        Q.    So you understand how the rules

8    work for the deposition?

9        A.    You probably should go over

10   whatever the rules are, I don't recollect.

11       Q.    You understand you are under

12   oath and have to testify truthfully, yes?

13       A.    Yes.

14       Q.    You have the stenographer to

15   your left who is recording

16   stenographically with her magic fingers

17   everything that's said here, understood?

18       A.    Yes.

19       Q.    And as well, there is a video

20   camera that's creating a video and audio

21   record of the proceeding.

22       A.    Yes.

23       Q.    If you don't understand any of

24   the questions at any time, please let me

25   know, otherwise I will assume that you do

8

                    CHAMBERLAIN

1    understand the question.

2                    Agree?

3    A.        Okay.

4    Q.        You can consult with your able

5    counsel if there is some need to do that,

6    but you must let us know before you do

7    that so that we can allow that to happen,

8    understood?

9    A.        Okay.

10                   MR. CARROLL:    For counsel, I

11   don't know if there is a protocol already

12   in the case, but for my purposes, one

13   objection suffices for all, you need not

14   go around the table repeating objections,

15   I'm sure there will be none, but in the

16   unusual event that there are, let's have a

17   stipulation that an objection by one

18   covers all of you.

19                   Second, no speaking objections,

20   please; all objections, as far as I am

21   concerned, are reserved except as to form,

22   and if I need an explanation of the form

23   objection, I will ask for it, otherwise it

24   suffices to say "objection to form."

9

CHAMBERLAIN

1

2      Q.    Any questions before we begin?

3      A.    No.

4      Q.    You have had an opportunity to

5  prepare in advance for your deposition

6  here today?

7      A.    I met with Gregory yesterday,

8  yes.

9      Q.    I am not going to ask about

10 your discussions with counsel, those are

11 privileged as between you, I just wanted

12 to make sure you had an opportunity to try

13 to refresh your recollection by reviewing

14 events related to Lernout & Hauspie and

15 also reviewing documents, yes?

16     A.    I did.

17     Q.    Do you feel that you are here

18 ready to give your best testimony in this

19 case today?

20     A.    Yes.

21     Q.    Shall we start?

22     A.    Sure.

23     Q.    Do you still work for a company

24 called Seagate Technologies?

25     A.    I do not.

10

                    CHAMBERLAIN

1

2       Q.      Did you at one time work for

3   that company?

4       A.      I did.

5       Q.      For what period of time?

6       A.      1985 through 1999.

7       Q.      When in 1999 did you stop

8   working for Seagate?

9       A.      I need to go back and make sure

10  it is 1999 or 2000.

11              It is November of 2000 that I

12  stopped working for Seagate, sorry,

13  November of 2000.

14      Q.      Are you sure of that or shall

15  we spend a moment on that, too?

16      A.      I'm sure of that.

17      Q.      In the years 1999 and 2000,

18  what position did you hold at Seagate?

19      A.      I held numerous positions; do

20  you want me to go through the sequence of

21  them.

22      Q.      I focused on those two years in

23  particular.

24              Were you the chief financial

25  officer, the CFO for Seagate in those two

11

1                     CHAMBERLAIN

2   years?

3        A.    Will you repeat what two years.

4        Q.    Sure, 1999 and 2000.

5        A.    No, I was not the CFO of

6   Seagate.

7        Q.    What position did you hold at

8   Seagate in 1999 and 2000, just focused on

9   that time period for now?

10        A.    V.P. of finance.

11        Q.    V.P. of finance.

12              Were you the CFO of Seagate at

13   some other point in time?

14        A.    I was not.

15        Q.    Never the chief financial

16   officer of Seagate?

17        A.    Never the chief financial

18   officer of Seagate.

19        Q.    Who held that position in 1999

20   and 2000?

21        A.    Don Waite -- no, excuse me,

22   Charles Pope.

23        Q.    In 1999 and 2000, did you

24   report at Seagate to Mr. Waite?

25        A.    No, I didn't.

12

CHAMBERLAIN

1

Q.     Who did you report to?

A.     Charles Pope.

Q.     He was CFO and you were vice-president of finance?

A.     Correct.

Q.     You had held the position of V.P. of finance for what period of time prior to '99?

A.     November 1995 I became a V.P. of Seagate Technology.

Q.     Mr. Waite, is it W-A-I-T-E?

A.     Correct.

Q.     What position at Seagate did he hold in '99 and 2000?

A.     Chief administrative officer.

Q.     Who did he report to at Seagate?

A.     Steve Luczo.

Q.     What position did Mr. Luczo hold?

A.     CEO, he might have had other acronyms, I am not sure.

Q.     During '99 and 2000, in addition to your vice-president position

13

1                    CHAMBERLAIN

2 at Seagate, did you also hold a position

3 at another company?

4        A.    I did.

5        Q.    What position was that and at

6 what company?

7        A.    I held the position as

8 temporary CFO at Dragon Systems.

9        Q.    When did you take on that

10 position?

11       A.    In the capacity of CFO?

12       Q.    Yes, please.

13       A.    I am thinking; October.

14       Q.    Of '99?

15       A.    That would be correct.

16       Q.    And you held that position

17 until when?

18       A.    May of 2000.

19       Q.    In addition to yourself, did

20 Mr. Waite from Seagate also take on an

21 officer position at Dragon?

22       A.    He did.

23       Q.    What position was that?

24       A.    Chief executive officer.

25       Q.    For what period of time was he

14

1                  CHAMBERLAIN

2    CEO?

3        A.    I know that he began in

4    October, I don't know what his formal last

5    date was.

6        Q.    When you stopped in May of 2000

7    at Dragon, was Mr. Waite still the acting

8    CEO at Dragon?

9        A.    He was.

10       Q.    So at least for the period

11   October '99 through May of 2000, Mr. Waite

12   was the CEO at Dragon and you were the

13   CFO, chief financial officer?

14       A.    That's correct.

15       Q.    During that same period of time

16   both of you also continued to hold officer

17   positions at Seagate, correct?

18       A.    That's correct.

19       Q.    So you were serving two masters

20   at the same time?

21           MR. JOSEPH:   Objection to form,

22   you may answer.

23       A.    Yes.

24       Q.    Rather unusual?

25       A.    No.

15

1                    CHAMBERLAIN

2       Q.      Had you ever done that before?

3       A.      You serve a lot of masters when

4  you work in a job.

5       Q.      Had you ever served two

6  different companies at the same time

7  before as officers?

8       A.      Yes.

9       Q.      Which companies was that?

10      A.      Seagate Technology and Seagate

11 Software.

12      Q.      I take it from the first name

13 that those two companies are part of the

14 Seagate family?

15      A.      They are.

16      Q.      Had you ever before served for

17 two different companies such as Seagate

18 and Dragon at the same time?

19      A.      No.

20      Q.      During that period of time that

21 you held positions both at Dragon and

22 Seagate, whose interests were you looking

23 out for, Seagate's or Dragon's?

24      A.      Dragon's.

25      Q.      How is it, then, in your

16

CHAMBERLAIN

1

2    mind --

3        A.    I would like to restate that;

4    all parties, I was there representing the

5    shareholders.

6        Q.    Of which companies?

7        A.    Whoever they were; there were

8    numerous shareholders in Dragon.

9        Q.    What about the shareholders in

10   Seagate, were you looking out for their

11   interests at the same time, as well?

12       A.    They were one of the

13   shareholders; not of Seagate's, Seagate's

14   shareholders were not a shareholder of

15   Dragon.

16       Q.    But you continued as a Seagate

17   officer during this period?

18       A.    I did.

19       Q.    Ordinarily an officer of a

20   company, as you understand it, owes

21   obligations to the shareholders of that

22   company, correct?

23       A.    Correct.

24       Q.    So were you continuing to serve

25   the interests of Seagate's shareholders at

17

CHAMBERLAIN

1

2    the same time you were serving the

3    interests of Dragon's shareholders?

4            MR. JOSEPH:  Calls for a legal

5    conclusion.

6            You may answer.

7        A.    Yes.

8        Q.    Were there any times when you

9    encountered a conflict in the course of

10   holding both these positions at two

11   different companies?

12           MR. JOSEPH:  Objection to form.

13           You may answer.

14       A.    Not that I recollect.

15       Q.    When you joined Dragon in

16   October of '99, was Dragon in financial

17   trouble?

18       A.    Yes.

19       Q.    What kind of financial trouble

20   was it in?

21       A.    They were running short on

22   cash.

23       Q.    How low on cash were they?

24       A.    I don't remember the specific

25   number.

18

CHAMBERLAIN

1

2    Q.    Was one of the tasks that you

3  had to undertake while you held a position

4  at Dragon to find sources of cash to

5  enable Dragon to stay in operation?

6    A.    Yes.

7    Q.    What were the sources of cash

8  that you found?

9    A.    I worked to reduce the number

10  of sales and receivables so I would pour

11  in more cash from my vendors, I reduced

12  expenses to preserve cash and there was

13  also a loan that Seagate made as a bridge

14  loan.

15    Q.    When did Seagate make that

16  bridge loan?

17    A.    I can't remember the exact

18  date.

19    Q.    Was it after you joined Dragon

20  in October?

21    A.    Yes.

22    Q.    Whose interest did you

23  represent in connection with that loan,

24  Seagate's or Dragon's?

25    A.    Both.

19

CHAMBERLAIN

1

2     Q.    So you were representing both

3   the lender and the borrower?

4     A.    Let me go back and say I

5   negotiated that lending agreement with

6   Seagate on behalf of Dragon.

7     Q.    So you were not representing

8   Seagate in connection with that loan?

9          MR. JOSEPH:  Objection, calls

10  for a legal conclusion.

11          You may answer the question.

12    A.    No, I was representing Dragon.

13    Q.    Who was representing Seagate?

14    A.    I don't recall specifically who

15  I negotiated with.

16    Q.    But it is your memory there was

17  some other colleague of yours at Seagate

18  that you were negotiating arm's length

19  with over the terms of this loan?

20    A.    Correct.

21    Q.    Were you negotiating with your

22  boss, Mr. Pope?

23    A.    No.

24    Q.    With somebody who works for

25  you?

20

CHAMBERLAIN

1

2       A.      No.

3       Q.      As the V.P. of finance, was the

4   loan handled by the finance department at

5   Seagate?

6       A.      Yes, it would have been handled

7   by the finance department at Seagate.

8       Q.      That's the department that you

9   were the vice-president of?

10      A.      No.

11      Q.      There is a different finance

12  department?

13      A.      Yes.

14      Q.      What was the amount of the loan

15  that Seagate extended to Dragon?

16      A.      I am not sure of the exact

17  dollar amount; we were prepared to infuse

18  $10 million.

19      Q.      Did you ultimately have to

20  infuse the $10 million?

21      A.      Don't remember the exact

22  amount.

23      Q.      Did there come a point in time

24  when you were able to find another source

25  of cash for Dragon that got Seagate off

21

                    CHAMBERLAIN

1

2  the hook?

3       A.    Can you clarify that question,

4  I don't understand.

5       Q.    Do you remember that as an

6  alternative, an alternative source of

7  funding, you were able to find somebody

8  else who could fund Dragon's cash needs so

9  that Seagate would not have to come up

10  with more money while you were both with

11  Dragon and Seagate?

12       A.    I don't remember anybody else.

13       Q.    Did you work on the transaction

14  involving Lernout & Hauspie in the spring

15  of 2000?

16       A.    I did.

17       Q.    What role did you play in that

18  transaction?

19       A.    I was a member of the team that

20  worked to negotiate the terms and come up

21  with a contract.

22       Q.    Were you in charge of the team?

23       A.    No.

24       Q.    Who was in charge of the team?

25       A.    My role was to coordinate the

22

                        CHAMBERLAIN

1

2    team.

3         Q.    What do you mean by

4    "coordinate"?

5         A.    To coordinate the roles of the

6    attorneys, the staff, to communicate to

7    the Dragon personnel, et cetera.

8         Q.    Am I correct that there were a

9    number of outside advisers that were hired

10   in connection with that transaction and

11   those advisers were all reporting to you?

12             MR. JOSEPH:  There are two

13   questions; you may answer both of them.

14        A.    I can't answer that they

15   thought they were reporting to me.

16        Q.    Did you give them instructions?

17        A.    Yes, I gave them instructions.

18        Q.    These advisers included

19   Goldman, Sachs?

20        A.    Correct.

21        Q.    Arthur Andersen?

22        A.    Correct.

23        Q.    So you had an accounting firm

24   and an investment banking firm working on

25   your team for this transaction?

23

                    CHAMBERLAIN

1

2        A.      All in various roles and

3    degrees of roles, correct.

4        Q.      And you also had outside

5    lawyers as part of this team?

6        A.      Correct.

7        Q.      Any other members of the team

8    who were not employees of Dragon or

9    Seagate?

10              MR. JOSEPH:  Objection to the

11   implication there were team members from

12   Seagate, but you may answer the question.

13       A.      On the team formally, no.

14       Q.      Informally?

15       A.      Can't recollect.

16       Q.      Do you remember that one of the

17   things that was negotiated as part of the

18   deal with Lernout & Hauspie was that

19   Lernout & Hauspie would guarantee a $10

20   million loan from Fleet Bank?

21       A.      I would have to look at

22   documents, I don't recollect that

23   specifically.

24       Q.      You have no memory of a $10

25   million line of credit from Fleet Bank?

24

1                    CHAMBERLAIN

2        A.      There was a line of credit from

3    Fleet Bank; I don't recollect the dollar

4    amount.

5        Q.      You have no memory that as part

6    of the agreement with Lernout & Hauspie,

7    Lernout & Hauspie guaranteed that so that

8    Seagate would not have to guarantee that

9    line of credit?

10       A.      I would have to look at the

11   agreement to refresh my memory.

12              MR. CARROLL:   We will mark

13   this as Chamberlain Exhibit 1.

14              (Chamberlain Exhibit 1, Bates Nos.

15   BAKE 010660 through 10815, was marked for

16   identification, as of this date.)

17              MR. CARROLL:   For the record,

18   this is a multipage document with Bates

19   Nos. BAKE 010660 through 10815.

20              MR. JOSEPH:  This copy doesn't

21   have the table of contents.

22              This is not the merger

23   agreement, I'm sorry, this is the bank

24   agreement, excuse me.

25              (Witness perusing document.)

25

CHAMBERLAIN

1

2    Q.    Does this refresh your memory?

3    A.    I was asking for the merger

4 agreement; you asked if there was a

5 condition that Lernout & Hauspie guarantee

6 the loan, this is a loan document.

7    I don't know if there was a

8 condition unless you show me the purchase

9 agreement.

10    Q.    In answering my questions, you

11 were focused on the word "condition," and

12 we are interpreting it legally, as whether

13 that was a legal obligation in the merger

14 agreement?

15    A.    Ask the question again.

16    Q.    The question was simply do you

17 remember in connection with the Lernout &

18 Hauspie deal you were able to arrange for

19 Lernout & Hauspie to guarantee the Fleet

20 Bank loan so that Seagate would not have

21 to?

22    A.    No.

23    Q.    If Lernout & Hauspie had not

24 guaranteed this loan, Seagate would have

25 been on the hook for this loan, correct?

26

CHAMBERLAIN

1

2       A.      That is correct.

3       Q.      And were you involved in

4   arranging for Lernout & Hauspie to supply

5   this guarantee and not Seagate?

6       A.      I did have some involvement.

7       Q.      What involvement did you have?

8       A.      I remember speaking with Allan

9   Forsey, going through and speaking with

10  Fleet Bank.

11          I remember that it was Allan

12  Forsey that had a relationship with Fleet

13  Bank.

14      Q.      Who is Allan Forsey?

15      A.      He is a member of the Lernout &

16  Hauspie finance team, I don't recollect

17  exact title.

18      Q.      When Lernout & Hauspie became

19  the guarantor on this Fleet Bank loan, did

20  Seagate continue to have any guarantee

21  responsibility with connection to any

22  Fleet lines of credit to Dragon?

23          MR. JOSEPH:  Assumes facts not

24  in evidence.

25          You may answer.

27

                    CHAMBERLAIN

1

2      A.    I would have to look at these

3  documents to see if Seagate had any

4  remaining residual guarantee.

5      Q.    As you sit here, can you recall

6  any remaining residual guarantee that

7  Seagate may have had?

8            MR. JOSEPH:   Same objection,

9  you may answer.

10     A.    No.

11     Q.    Did Seagate have any direct

12  loans it had extended to Dragon during the

13  period that you were both serving as an

14  officer of Seagate and Dragon?

15           MR. JOSEPH:   Asked and

16  answered.

17           You may answer again.

18     A.    I did answer that previously;

19  yes, we were prepared to do a bridge loan

20  and money was lent.

21     Q.    The reason I came back is you

22  said you were prepared to do a bridge

23  loan; I am asking did Seagate actually

24  fund anything and how much did Seagate

25  fund?

28

CHAMBERLAIN

1

2        MR. JOSEPH:  Asked and

3   answered, you may answer again.

4        A.    I don't recollect the amount.

5        Q.    By the time you left Dragon in

6   May of 2000, did Seagate have any loans it

7   had funded that were still outstanding?

8        A.    I don't recollect on what day,

9   on May 5th in particular, I don't know.

10        Q.    Are you comfortable remembering

11   that by the summer of 2000 Seagate was no

12   longer exposed to any funds it had loaned

13   to Dragon?

14        A.    I couldn't answer that, I was

15   not working in the Dragon role at that

16   time and I was not working as V.P. finance

17   role.

18        Q.    You are familiar with the fact,

19   I assume, that later in 2000 Lernout &

20   Hauspie filed for bankruptcy?

21        A.    Yes.

22        Q.    When Lernout & Hauspie filed

23   for bankruptcy, did Seagate, to your

24   knowledge, still have any loans

25   outstanding to Dragon?

29

CHAMBERLAIN

1    A.    I would have no idea.

2    Q.    If Dragon had not received the

3    $10 million loan from Fleet Bank

4    guaranteed by Lernout & Hauspie, would

5    Dragon have been able to continue in

6    operation?

7              MR. JOSEPH:  Objection,

8    hypothetical, inadequate facts.

9              You may answer.

10   A.    I don't think I could give that

11   clear answer.

12   Q.    Let me ask this way; were you

13   concerned in your capacity as an officer

14   of Dragon at that point that without that

15   money Dragon would not have been able to

16   stay afloat?

17             MR. JOSEPH:  Objection, form.

18             You may answer it.

19   A.    It would depend upon whether

20   there was a transaction completed with

21   Lernout & Hauspie.

22   Q.    Without a transaction with

23   Lernout & Hauspie at that point in time,

24   you were concerned that Dragon could not

30

                    CHAMBERLAIN

1

2    continue to stay afloat?

3              MR. JOSEPH:  I very much

4    apologize, I just don't know what point in

5    time you're talking about, Mike.

6         Q.    If you need clarification on

7    the point of time, I will be happy to

8    provide it.

9              MR. JOSEPH:  Otherwise you may

10   proceed to answer with my objection as to

11   foundation and form.

12             You can answer.

13        A.    Are we talking about April

14   24th, May 5th?

15        Q.    I don't mean to tax your memory

16   with a particular date, ma'am.

17             I am asking at this period of

18   time, the spring of 2000, we can break it

19   by month, if it changes you let me know,

20   were you concerned that if Dragon didn't

21   get the deal with Lernout & Hauspie,

22   Dragon was going under?

23        A.    No.

24        Q.    That was not a concern you had?

25        A.    Correct.

1                    CHAMBERLAIN

2        Q.        During the period from October

3    through June, the Lernout & Hauspie

4    transaction closed in early June, do you

5    remember that?

6        A.        I was not there at the closing

7    time.

8        Q.        But you had signed the

9    documents and do you remember that it was

10   set to close in June?

11       A.        I don't remember what the

12   closing date was.

13       Q.        In fact do you remember that

14   you were required to give an officer

15   certificate in connection with the

16   closing?

17       A.        Don't recollect it.

18       Q.        We will get to that.

19                 At any rate, during that period

20   of time, October '99 through May of 2000,

21   generally am I correct that you were

22   worried that Dragon, if it didn't find a

23   partner or somebody else to buy them out,

24   could not continue in business?

25       A.        A partner and a buyout was one

32

1                    CHAMBERLAIN

2    of the alternatives for meeting the

3    short-term cash problems with Dragon.

4              We talked about other

5    alternatives which included taking the

6    company public and whether or not Seagate

7    wanted to make additional investments in

8    Dragon.

9         Q.    Do you remember taking the

10   company public had been tried in early '99

11   and had failed because Dragon's operations

12   were so poor?

13        A.    I couldn't answer that, I

14   wasn't there in '99 and I'm not sure of

15   the reason why or I am not sure that that

16   is a reason why the IPO did not go

17   through.

18        Q.    But you remember that the IPO

19   idea had collapsed before you came onboard

20   to Dragon in October of '99?

21        A.    I do.

22        Q.    You were not seriously

23   considering an IPO after October of '99?

24        A.    We were considering an IPO as

25   an alternative.

33

CHAMBERLAIN

1

2        Q.     And the bankers told you it

3    wouldn't work because the operations were

4    so bad, correct?

5        A.     That is not true.

6        Q.     Why didn't you pursue the IPO?

7        A.     We thought that the preferable

8    alternative was to find a partner, but if

9    a partner could not be found or the price

10   was not suitable, we were going to go down

11   the path of an IPO.

12       Q.     So in your mind there were

13   three options, find somebody else to come

14   in and buy them out to partner with them,

15   do an IPO, or Seagate would have to put in

16   more money?

17       A.     That's correct.

18       Q.     What was Seagate's equity stake

19   in Dragon when you came onboard to Dragon

20   in October of '99?

21       A.     Relative to dollars or

22   percentage?

23       Q.     Either way you can remember it.

24       A.     Approximately 30 percent.

25       Q.     At that point in time do you

34

1                    CHAMBERLAIN

2    remember, October of '99 when you came

3    onboard, whether in addition to the 30

4    percent stock interest in Dragon, Seagate

5    also had an outstanding loan?

6         A.    The bridge financing that we

7    have discussed, yes.

8         Q.    After you came onboard to

9    Dragon, am I correct that some of the

10   problems you faced included keeping

11   employees at Dragon from leaving?

12        A.    Yes, certainly those in the

13   finance department.

14        Q.    One of the big concerns was

15   that people were basically ready to give

16   up on Dragon, the employees, and your

17   managers were starting to leave?

18        A.    My managers weren't leaving,

19   the finance managers weren't leaving.

20        Q.    Managers in other areas of the

21   business were leaving?

22        A.    That's true.

23        Q.    In addition, the company was

24   incurring large quarterly losses, the

25   company being Dragon?

35

                    CHAMBERLAIN

1

2        A.      That's correct.

3        Q.      At the point in time you came

4  in, yes?

5        A.      Correct.

6        Q.      Do you remember how much money

7  Dragon lost for its fiscal year 1999?

8        A.      I do not.

9        Q.      Do you remember whether it was

10  in the neighborhood of $22 million?

11        A.      I don't remember.

12        Q.      We will show you some documents

13  later.

14              Did you look at any loan or

15  valuation type documents in preparing for

16  your deposition today or not really?

17        A.      I didn't look at any loan

18  documents.

19        Q.      Any financial documents?

20        A.      Could you specify what

21  financial documents are?

22        Q.      I really don't mean to fence,

23  I'm just asking as a general matter; did

24  you look at some financial

25  statement-related documents.

36

CHAMBERLAIN

A.    Tell me what a financial document is so I can answer.

Q.    That's not a term that is meaningful to you?

A.    It is a broad term, I am asking you to narrow it.

Q.    Did you look at any documents in getting ready for your deposition today, ma'am, that in any way reflected financial performance of Dragon during the period you were there?

A.    I do not believe I did.

Q.    One of the documents I think you said you did look at in getting ready for your deposition today was the merger agreement itself, is that correct?

A.    Yes.

MR. CARROLL:    Let's mark that as Exhibit 2.

(Chamberlain Exhibit 2, Bates Nos. TRA 00719 through 796, was marked for identification, as of this date.)

Q.    Do you recognize this as a copy of the merger agreement?

37

1                    CHAMBERLAIN

2         A.    I do.

3              MR. CARROLL:    It bears the

4   Bates Nos. TRA 00719 through 796.

5         Q.    Can you tell us the role that

6   you played in the negotiation of this

7   agreement, please.

8         A.    Fairly active role.

9         Q.    That's very general, as you

10  were just saying a moment ago, so could

11  you give me some more detail.

12        A.    I worked with the Dragon

13  members and with the attorneys and with

14  the CEO of Dragon to come up with this

15  agreement.

16        Q.    I would like to focus on a

17  couple of aspects of the agreement first,

18  if I could.

19        A.    Sure.

20        Q.    Are there any representations

21  by my client, KPMG LLP, that are contained

22  in this merger agreement?

23              MR. JOSEPH:  Objection, the

24  document speaks for itself.

25              You may answer the question.

38

1               CHAMBERLAIN

2       A.      No, this is not a document that

3  KPMG signs at the back.

4       Q.      In connection with the merger

5  itself between Dragon and L&H, did you get

6  any written documentations from my client,

7  KPMG LLP, any written documentation that

8  they signed in connection with that merger

9  agreement?

10      A.      That they signed this merger

11  agreement?

12      Q.      Any other documents in

13  connection with the merger agreement that

14  my client, KPMG LLP, signed.

15      A.      No.

16      Q.      Am I correct that one of the

17  choices --

18              MR. JOSEPH:  Excuse me, I think

19  the witness wasn't finished.

20              MR. CARROLL:   I'm sorry.

21      A.      I would need to see documents,

22  but I believe they signed something so

23  that we could do a tax review.

24      Q.      Do you mean they signed some

25  consent allowing you to do a tax review?

1                    CHAMBERLAIN

2        A.      Yes, I have documents or had

3    documents, either they came in and looked

4    at our tax workpapers or vice versa.

5        Q.      Aside from that consent to

6    allowing people to exchange information,

7    my client, KPMG LLP, signed no documents

8    in connection with this merger

9    transaction, agreed?

10       A.      None that I can recollect.

11       Q.      Am I correct that one of the

12   choices you had when you were negotiating

13   this merger agreement was to request

14   audited financial statements from Lernout

15   & Hauspie?

16       A.      That is a choice.

17       Q.      And am I correct that you chose

18   not to insist on audited financial

19   statements as part of this merger

20   agreement?

21       A.      That is not correct.

22       Q.      Do you remember, before we turn

23   to it, that there is a provision in the

24   merger agreement in which Lernout &

25   Hauspie makes various representations

40

CHAMBERLAIN

1
2    about what it has provided to Dragon in
3    connection with the transaction?
4         A.    That's normal representation
5    that's in merger documents.
6         Q.    It is something you are
7    familiar with from your years in business,
8    correct?
9         A.    Yes.
10        Q.    And they work both ways, that
11   is, Dragon makes representations to
12   Lernout & Hauspie, Lernout & Hauspie makes
13   representations back, correct?
14        A.    Correct.
15        Q.    In addition to representations,
16   each side exchanges what are called
17   covenants, correct?
18        A.    Correct.
19        Q.    Covenants set forth
20   undertakings that each side agrees that it
21   will do in connection with the
22   transaction, yes?
23        A.    Correct.
24        Q.    Representations are where each
25   side is representing in writing I'm

41

                    CHAMBERLAIN

1    telling you this and you can count on it,

2    I am representing it, correct?

3        A.    Correct.

4        Q.    Am I correct that from the

5    Dragon side, in connection with the

6    transaction, one of the things Dragon

7    represented was that it had provided to

8    Lernout & Hauspie audited financial

9    statements for 1999?

10            MR. JOSEPH:  Objection, the

11    document speaks for itself.

12            You may answer.

13        A.    We did --  I don't know what

14    the document said; we did provide audited

15    financial statements from Dragon to

16    Lernout & Hauspie.

17        Q.    I am going to turn and direct

18    you to some paragraphs in the agreement.

19            If you will turn to page 13 of

20    the agreement, there is a section 3.4

21    headed  "Financial Statements."

22            (Witness perusing document.)

23        Q.    Are you there?

24        A.    Yes.

42

CHAMBERLAIN

1

2    Q.    You see it has some language in

3    it that says  "company has provided buyer

4    with audited consolidated financial

5    statements as of and for the year-ended

6    December 31, 1999," do you see that?

7        A.    That's correct.

8        Q.    "Company" in that statement

9    refers to Dragon, correct?

10       A.    Correct.

11       Q.    "Buyer" refers to Lernout &

12    Hauspie?

13       A.    Correct.

14       Q.    Does this refresh your memory

15    that in connection with this agreement,

16    Dragon represented to Lernout & Hauspie

17    that it had provided audited financial

18    statements for 1999?

19       A.    That's correct.

20       Q.    Let's look at it going the

21    other way; there will be a representation,

22    correct, in this document that runs from

23    the buyer, Lernout & Hauspie, over to

24    Dragon, yes?

25       A.    Correct.

43

CHAMBERLAIN

1

2      Q.     If you turn over to page 32 you

3   will see a section, small letter C, which

4   is part of section 4.4, headed  "Public

5   Filings Financial Statements," which

6   begins in the preceding page, 31, do you

7   see that?

8      A.     Page 32, sub-C?

9      Q.     Yes.

10     A.     Yes.

11     Q.     Am I correct this is the

12  provision that runs the other way, here we

13  have buyer representing what it has

14  provided, buyer, L&H, what it has provided

15  to Dragon, do you see that?

16     A.     I do.

17     Q.     And in this representation

18  Lernout & Hauspie provides that it has

19  given to Dragon unaudited financial

20  statements?

21     A.     That's correct.

22     Q.     For the year 1999, correct?

23     A.     Correct.

24     Q.     Am I correct, then, in doing

25  this transaction you made a decision to go

44

CHAMBERLAIN

1

2    with unaudited financial statements from

3    Lernout & Hauspie for 1999 in this

4    agreement rather than audited ones?

5        A.    Without reading the merger

6    agreement again to refresh myself, there

7    is usually a way to terminate the

8    transaction if there is a material event

9    or representation was not correct when you

10   are ready to close a document -- close a

11   deal.

12       Q.    I want to ask about that in a

13   moment, but I am simply asking was a

14   choice made by you and your team that, for

15   whatever reason, we will get to the

16   reasons, you would accept unaudited

17   financial statements for 1999 rather than

18   audited ones in these representations?

19       A.    Only to sign the document, not

20   to close the deal.

21       Q.    But for purposes of signing the

22   document, Dragon got unaudited financials

23   from Lernout & Hauspie, Lernout & Hauspie,

24   though, got audited financials from

25   Dragon, is that correct?

45

1                    CHAMBERLAIN

2        A.      Correct.

3        Q.      This agreement was signed on

4   March 27, is it, do you remember that?

5        A.      I don't remember the specific

6   date, I could look.

7                (Witness perusing document.)

8        Q.      Do you see the cover page of

9   the merger agreement is dated March 27th?

10       A.      Correct.

11       Q.      Do you see there are signatures

12   on this version that I have given?

13               MR. JOSEPH:   The document

14   speaks for itself, I will stipulate there

15   are signatures on it.

16       Q.      I am just seeing if this helps

17   make you comfortable that March 27th was

18   the date the deal was signed.

19       A.      Correct.

20       Q.      And the deal closed, we touched

21   on this earlier, do you remember it was at

22   least early June?

23       A.      I was not there for the

24   closing.

25               I do remember it was roughly in

46

CHAMBERLAIN

1

2     that time period.

3                    MR. CARROLL:    Mark that as

4     Exhibit 3.

5                    (Chamberlain Exhibit 3, document,

6     was marked for identification, as of this

7     date.)

8          Q.     I have handed you what has

9     been marked as Chamberlain Exhibit 3.

10                    Do you have Exhibit 3 in front

11    of you?

12         A.     I do.

13                    (Witness perusing document.)

14         Q.     Do you remember earlier I had

15    asked you whether you signed any

16    certificate in connection with the closing

17    of the Lernout & Hauspie transaction?

18         A.     Yes.

19         Q.     Is this in fact something that

20    you signed, titled "Officer Certificate"

21    in connection with closing the deal

22    between Dragon and Lernout & Hauspie?

23         A.     Yes.

24         Q.     Do you see the date on this

25    document is June 7, 2000?

47

CHAMBERLAIN

1

2          A.     I do.

3          Q.     Does this now enable you to

4    confirm that June 7, 2000, was the closing

5    date for the transaction?

6          A.     Yes.

7          Q.     And that in fact you did

8    participate in some way in this closing?

9          A.     I participated by signing a

10   normal officer certificate at the close.

11              I was not in Boston or at the

12   close.

13         Q.     What was your understanding of

14   the purpose of this document that you

15   signed in connection with the closing?

16         A.     I would have to read it.

17              Should I go through and read

18   it?

19         Q.     I was just wondering since it

20   is a normal officer certificate, as you

21   said, is that something that you are

22   familiar with?

23         A.     You are normally attesting,

24   without me reading it, that everything as

25   of the date of the signing is true and

48

CHAMBERLAIN

1

2    correct as of the date of the close.

3         Q.    Why don't you read it to

4    yourself quickly just to confirm that that

5    is in fact what this does.

6              (Witness perusing document.)

7         A.    Yes.

8         Q.    To make sure we all understand,

9    in this officer certificate you are

10   basically, on behalf of Dragon, confirming

11   in writing that the representations and

12   warranties in the agreement are still

13   true?

14        A.    That's correct.

15        Q.    And you were comfortable making

16   that representation --

17        A.    The reps and warranties that

18   Dragon has made are true.

19        Q.    Yes, the reps and warranties

20   that Dragon made in the merger agreement,

21   you are confirming in writing that those

22   things are true?

23        A.    And I believe there is a

24   materiality concept, but, yes.

25        Q.    Were you comfortable making

49

1                    CHAMBERLAIN

2    that representation on behalf of Dragon as

3    an officer even though you were no longer

4    employed by Dragon at that time?

5          A.    I was.

6          Q.    Do you remember I had asked you

7    previously whether you held the position

8    of chief financial officer at Dragon and

9    you said you did not  -- my mistake.

10              You didn't hold the position at

11   chief financial officer at Seagate but you

12   did hold that position at Dragon, correct?

13         A.    Correct.

14         Q.    As of June 7, 2000, however,

15   you were no longer chief financial officer

16   of Dragon?

17        A.    Without you showing me the

18   paperwork as to my resignation that was

19   done, I can't tell you the exact date.

20              I was not physically there.

21         Q.    Do you remember that you left

22   Dragon in May?

23         A.    Yes.

24         Q.    There was a farewell party for

25   you when you left?

50

CHAMBERLAIN

1

2      A.      Yes.

3      Q.      And this is now early June?

4      A.      Correct.

5      Q.      So this is after May; doesn't

6  that allow us to conclude that you were no

7  longer the CFO of Dragon when you signed

8  this certificate on June 7th?

9      A.      I would have had to have

10  resigned from that position and that is

11  usually done formally.

12      Q.      Is that normally done at a

13  board meeting of some sort?

14      A.      I can't answer that.

15          MR. CARROLL:   Mark that as

16  Exhibit 4.

17          (Chamberlain Exhibit 4, Bates Nos.

18  083447 through 452, KL 01649 through 424,

19  was marked for identification, as of this

20  date.)

21      Q.      This is Chamberlain Deposition

22  Exhibit 4.

23          (Witness perusing document.)

24          MR. CARROLL:   For the record,

25  two series of Bates numbers, Bates Nos.

51

1                    CHAMBERLAIN

2    083447 through 452, KL 01649 through 424.

3         Q.    Do you recognize this as

4    minutes of a board meeting of May 3 for

5    Dragon Systems?

6         A.    That's what it says.

7         Q.    Do you see that on page 4 there

8    is a reference to chief financial officer,

9    and if it is acceptable, I will just

10   paraphrase, in essence there is a

11   reference to the fact that Mr. Waite

12   suggests that you continue to retain CFO

13   position until May 31, do you see that?

14        A.    Yes.

15        Q.    Does this refresh your memory

16   that by June 7 you no longer held the

17   chief financial officer position at

18   Dragon?

19              (Witness perusing document.)

20        A.    If they approved this

21   suggestion by him, that would be correct.

22        Q.    Do you have any reason as you

23   sit here to think this suggestion was not

24   approved?

25        A.    I have no reason.

52

CHAMBERLAIN

1

2    Q.    I want to go back to Exhibit 2,

3  the merger agreement itself, and focus on

4  the covenants for the period between the

5  signing of the merger agreement, March

6  27th, and the closing of the agreement,

7  which we have now agreed is June 7th,

8  correct?

9    A.    Correct.

10    Q.    There are certain covenants in

11  the merger agreement that each side makes

12  to the other with respect to what will

13  happen or not happen during that period

14  post-agreement, pre-closing, yes?

15    A.    Correct.

16    Q.    And that's very common in

17  corporate transactions?

18    A.    Correct.

19    Q.    In this agreement as well, if

20  we look under article 5, for example,

21  titled "Conduct of Business," page 34, is

22  this the right article of the agreement,

23  article 5, in which we find the covenants

24  that each side is making to the other for

25  this period post-agreement, pre-closing?

53

CHAMBERLAIN

1

2          MR. JOSEPH:  Objection, the

3   document speaks for itself.

4          You may answer it.

5          (Witness perusing document.)

6      A.    I have to become familiar with

7   the layout of the document again, there is

8   reps and warranties at the time.

9      Q.    Did you spend some time

10  reviewing this agreement yesterday in

11  getting ready for your deposition?

12     A.    No, not in detail.

13     Q.    Article 5 on page 34 is headed

14  "Conduct of Business," and section 5.1 is

15  headed "Covenants of Company."

16          Do you see that?

17     A.    I do.

18     Q.    Do you see it starts by

19  referring to "during the period from the

20  date of the agreement continuing until the

21  deal is either terminated or closed"?

22     A.    Correct.

23     Q.    That's the very type of

24  covenant we are speaking of, yes?

25     A.    Yes.

54

                    CHAMBERLAIN

1

2     Q.    So this is a section where the

3   company, Dragon, is making covenants about

4   what it will do or not do during that

5   period, yes?

6     A.    Yes.

7     Q.    These covenants go on for

8   several pages, up to page 37.

9           MR. JOSEPH:   Okay.

10    Q.    Correct?

11    A.    Correct.

12    Q.    Basically more than 20

13  covenants, A through V as in Victor.

14    A.    Correct.

15    Q.    Then we have a section headed

16  "Options," in which the company here is

17  covenanting during the same period that it

18  won't take certain actions with respect to

19  stock options, yes?

20    A.    Correct.

21    Q.    And then if you are over to

22  page 38 we have a section titled

23  "Covenants of Buyer," section 5.3, and am

24  I correct this is the section in which

25  Lernout & Hauspie is covenanting from its

55

CHAMBERLAIN

1

2   side things that it will do or not do

3   during the period between the agreement

4   and the closing.

5                (Witness perusing document.)

6       A.    That is one section I again

7   would need to leaf through the rest of it

8   to make sure there wasn't other covenants.

9       Q.    And I will give you that

10  opportunity, you have my word, but for

11  purposes of making progress with respect

12  to this section 5.3, can you just agree

13  that this is a section in which Lernout &

14  Hauspie is setting forth covenants to

15  Dragon for this period between the

16  agreement and the closing?

17      A.    It appears so, yes.

18      Q.    And in this section there are

19  only four of them and the fourth one

20  refers to the prior three, so

21  substantively there are three covenants?

22      A.    Correct.

23      Q.    And there is no covenant here

24  in this agreement that says that during

25  this period post-agreement, pre-close,

56

CHAMBERLAIN

1

2    Lernout & Hauspie must give Dragon audited

3    financial statements, is that correct?

4         A.    That's correct.

5         Q.    You chose to do this

6    transaction without such a covenant?

7         A.    That's correct.

8         Q.    I promised I would give you an

9    opportunity to look elsewhere in the

10   agreement.

11              Are there any other covenants,

12   from flipping through these pages, not

13   contained in section 5.3 that were

14   covenants from Lernout & Hauspie for that

15   period, post-agreement and pre-closing?

16              MR. JOSEPH:  That I object to,

17   the document does speak for itself.

18              MR. CARROLL:   All right.

19        Q.    Did Dragon have to restate its

20   financial statements for 1998 and the

21   period of 1999?

22        A.    For a period of '99, yes; I

23   don't believe we restated '98's.

24        Q.    Is the restatement something

25   that happened on your watch, while you

57

                    CHAMBERLAIN

1   were CFO?

2        A.     Yes.

3        Q.     What was the problem that

4   required the restatement?

5        A.     It was a preference to be more

6   conservative in accounting.

7        Q.     Was there some problem that

8   resulted in the restatement or was there

9   just a decision that it would be nice to

10  restate?

11              MR. JOSEPH:  Objection to form.

12              You can answer.

13       A.     There wasn't a problem; there

14  was a decision by me to account for things

15  differently than what my predecessor did.

16       Q.     Was there a channel stuffing

17  problem in connection with the

18  restatement?

19       A.     You would have to define

20  "channel stuffing."

21       Q.     Is that a term you're not

22  familiar with?

23       A.     I understand what channel

24  stuffing is.

58

CHAMBERLAIN

1

2      Q.      What is channel stuffing?

3      A.      If a company recognizes a sale

4  when it gets into a channel that they

5  shift a lot of inventory into the channel

6  so that they can recognize the sale.

7      Q.      Basically as the term suggests,

8  it is where a company stuffs its supplier,

9  its customer channel, with an excess of

10  products so that it can book higher

11  revenues, correct?

12      A.      Correct.

13      Q.      Did that happen at Dragon?

14      A.      That was my opinion.

15      Q.      And that is a problem, channel

16  stuffing, it is illegal, isn't it?

17         MR. JOSEPH:  Objection.

18      A.      No, it is not illegal.

19         MR. JOSEPH:  Whether it is or

20  isn't --

21      Q.      In your view, as an experienced

22  financial officer, is channel stuffing

23  proper?

24         MR. JOSEPH:  Objection to form.

25         You can answer.

59

```
1                   CHAMBERLAIN

2        A.    No.

3        Q.    What was the extent of the

4   channel stuffing --  may we now describe

5   it as a problem that you discovered or

6   dealt with when you became CFO?

7              MR. JOSEPH:  Is the question

8   whether you can describe it as a problem

9   or the extent of it.

10             MR. CARROLL:    That's a fair

11  objection.

12             Not that your others weren't.

13       Q.    May we agree that channel

14  stuffing is a problem?

15       A.    Yes.

16       Q.    What was the extent of the

17  problem at Dragon?

18       A.    In my opinion, they had

19  inadequate amounts of inventory in the

20  channel, they had a fully replenished

21  channel.

22             There were too many weeks of

23  inventory.

24       Q.    How many weeks were there?

25       A.    I can't remember the exact
```

60

1                     CHAMBERLAIN

2    number.

3           Q.    What was the dollar amount of

4    the restated revenue?

5           A.    I can't remember that either

6    specifically.

7           Q.    Do you remember whether this

8    was a material amount?

9           A.    Yes, it was a material amount.

10          Q.    Had you known about the channel

11   stuffing problem before you became CFO?

12          A.    Yes.

13          Q.    How had you learned about it?

14          A.    I visited Dragon beginning in

15   August of 1999 and had numerous

16   conversations with personnel there.

17          Q.    When were the financial

18   statements restated?

19          A.    Which financial statements?

20          Q.    The ones that were restated.

21          A.    The '99?

22          Q.    Was it the '99s that were

23   restated?

24          A.    Yes, I answered that I did not

25   recollect the '98 total restatement, if

61

                        CHAMBERLAIN

1

2    there was one.

3                    '99s had not been formally

4    released, so all I did was restate the

5    internal financial documents for Q-1 and

6    Q-2.

7         Q.     Dragon had not previously

8    issued any kind of quarterly reports to

9    the street of its financial operations?

10        A.     No, they were a private

11   company.

12        Q.     Did you disclose the channel

13   stuffing problem to the lenders of Dragon,

14   to Fleet, for example?

15        A.     I don't recollect whether I

16   told Fleet anything.

17        Q.     Did you tell Lernout & Hauspie

18   about this channel stuffing problem in

19   connection with the merger negotiations?

20        A.     I don't remember specifically.

21                I'm sure the subject of

22   restatement of internal financials came

23   up.

24        Q.     But sitting here, you don't

25   remember whether you made a disclosure to

62

CHAMBERLAIN

1

2  L&H in connection with the transaction

3  about the fact that the restatement was

4  occurring because of a channel stuffing

5  problem?

6      A.    I do not.

7           There was nothing to restate in

8  a formal sense; internally there was

9  restatement.

10     Q.    Did you consider in connection

11 with the merger negotiations whether this

12 was something, the this being the channel

13 stuffing problem, that should be disclosed

14 to the other side in the negotiations?

15          MR. JOSEPH:   Objection,

16 misleading.

17          You may answer.

18     A.    No, I had restated my

19 financials and they were given an audited

20 set of financial statements.

21     Q.    Were any individuals at Dragon

22 fired because of the channel stuffing

23 situation?

24     A.    I don't recollect whether they

25 resigned, were fired.

63

                    CHAMBERLAIN

1

2      Q.     But you do remember that heads

3  rolled, there were some people who left

4  the company because of this channel

5  stuffing problem?

6      A.     Correct.

7      Q.     Was that disclosed to Lernout &

8  Hauspie in connection with the merger

9  negotiation?

10      A.     I don't know if other people

11  disclosed it, I don't recollect disclosing

12  it.

13      Q.     Do you need to take a break?

14              MR. JOSEPH:  It is a good idea,

15  why don't we take a few minutes.

16              THE VIDEO TECHNICIAN:  Going

17  off the record at approximately 10:32

18  a.m..

19              (Recess taken.)

20              THE VIDEO TECHNICIAN:  We are

21  back on the report at approximately 10:41

22  a.m..

23              MR. CARROLL:  We had some

24  lawyers enter the deposition during the

25  last session.

64

```
 1              CHAMBERLAIN
 2          For the record, have we
 3   recorded the appearances with the court
 4   reporter.
 5          MR. SPEYER:  Jay Speyer from
 6   Morris Cohen representing Pol Hauspie and
 7   ico Wilbert.
 8          MR. LEBOVITCH:  Mark Lebovitch
 9   from Skadden, Arps representing SG Cowen.
10          MR. JOSEPH:  Alan Cotler, who
11   is representing the Bakers, also came in
12   and just stepped out for a moment.
13   BY MR. CARROLL:
14       Q.    I would like to turn next,
15   Ms. Chamberlain, to the subject of verbal
16   discussions with my client, KPMG LLP, in
17   connection with the Lernout &
18   Hauspie/Dragon merger.
19       A.    Okay.
20       Q.    At KPMG LLP, we also refer to
21   this in this case as KPMG U.S. to
22   distinguish it from other foreign KPMG
23   firms, understood; in other words, if I
24   use that reference, KPMG U.S., I want to
25   make sure you understand what I am
```

65

1                     CHAMBERLAIN

2    referring to.

3         A.    Okay.

4         Q.    Did you personally in

5    connection with the Dragon/Lernout &

6    Hauspie merger have any discussions,

7    either face-to-face or by telephone, with

8    my client, KPMG U.S.?

9         A.    I did.

10        Q.    How many discussions?

11        A.    One.

12        Q.    Without using any documents,

13   without the aid of any documents, are you

14   able to remember that discussion?

15        A.    I am.

16        Q.    When was the discussion?

17        A.    March 22nd.

18        Q.    Are you able to remember that

19   date almost four years later with no

20   documents?

21        A.    That date is pretty well

22   embedded in my mind.

23        Q.    Because of this lawsuit?

24        A.    Because of the first

25   questioning about this a long time ago,

66

1                        CHAMBERLAIN

2    yes.

3         Q.      You said March 22nd; that's

4    March 22nd, 2000, yes?

5         A.      Correct.

6         Q.      So it is going on four years?

7         A.      Correct.

8         Q.      Do you remember did the SEC,

9    personnel from the Securities and Exchange

10   Commission, more recently, within the last

11   half year, contact you and interview you

12   about the events related to the merger

13   between Dragon and Lernout & Hauspie?

14        A.      They contacted me.

15        Q.      Did you take some notes in

16   connection with your communication with

17   them?

18        A.      I did.

19             MR. CARROLL:    Let's mark this

20   as Chamberlain Exhibit 5.

21             (Chamberlain Exhibit 5, Bates No.

22   EC 00011, was marked for identification,

23   as of this date.)

24             MR. CARROLL:    It bears Bates

25   No. EC 00011.

67

CHAMBERLAIN

1

2     Q.    Are these notes you prepared of

3     a conversation you had with the SEC in May

4     of 2003?

5     A.    Correct.

6     Q.    Did you make these notes during

7     the conversation itself?

8     A.    I did.

9     Q.    This was a conversation you had

10    with a Mr. Charles Davis, an attorney at

11    the SEC, and a Mr. Lee, an accountant at

12    the SEC, is that correct?

13    A.    That is correct.

14    Q.    I want to focus on a comment in

15    the left margin of this exhibit that, if I

16    am reading it correctly, says "told them

17    has been three years."

18          Do you see that?

19    A.    Correct.

20    Q.    What does that comment refer

21    to?

22    A.    Told them it had been three

23    years since I had been at Dragon.

24    Q.    Was this a situation where you

25    were telling the SEC after they called you

68

CHAMBERLAIN

1
2  and said we have some questions for you,
3  you were telling them it has been three
4  years ago, it has been a long time, I am
5  not sure how much I remember?
6      A.    I don't recollect the specifics
7  of the note there.
8      Q.    Do you remember telling the SEC
9  that in this conversation when they first
10 contacted you; they contacted you and said
11 we want to ask you some questions, and do
12 you remember telling them in substance,
13 this was kind of a long time ago, it has
14 been three years, I am not sure how
15 helpful I can be?
16     A.    Generally, yes.
17     Q.    You agree that it is now even
18 later, it is now almost four years since
19 the events in question, yes?
20     A.    Correct.
21     Q.    In getting ready for your
22 testimony today, did you review any notes
23 that you had made back in March of 2000 in
24 connection with the one conversation you
25 remember having with my client, KPMG U.S.?

69

CHAMBERLAIN

1

2      A.      I did review those notes.

3      Q.      Without the assistance of those

4  notes, am I correct you were not really

5  able to remember the details of that

6  conversation these four years later?

7      A.      That is not a true statement.

8      Q.      Could you tell me, please,

9  before we look at the notes today --

10  although you reviewed them as recently as

11  yesterday, yes?

12      A.      Correct.

13      Q.      It is the document you have

14  most focused on in getting ready for your

15  testimony, correct?

16      A.      No, I saw a lot of documents

17  yesterday.

18      Q.      Tell me what you are able to

19  remember about the conversation with my

20  client, KPMG U.S., without the aid of your

21  notes four years later, everything you can

22  remember.

23      A.      I can remember having the

24  conversation with them because it is a

25  normal audit procedure, normal M&A

70

CHAMBERLAIN

1

2  procedure that I did in connection with

3  any of the acquisitions that I have been

4  on.

5        I was told they were not

6  complete with the audit so I couldn't see

7  the workpapers, which is a normal thing

8  that I do, is go in and review workpapers,

9  so I asked for a phone call.

10        The phone call is the one that

11  we are talking about on the note, so that

12  I could ask them, as best as I could, what

13  outstanding issues there were around the

14  audit or any other questions that I would

15  normally have for the accountants of

16  Lernout & Hauspie.

17    Q.    Anything else you remember

18  without the aid of your notes about what

19  was absolutely said in the conversation

20  before we refer to your notes?

21    A.    Yes, I asked what the open

22  issues were on the audit, I asked them

23  what adjustments they had asked Lernout &

24  Hauspie to post, and I asked them about

25  their SEC restatements.

                    CHAMBERLAIN

1

2              Those were primarily my

3    questions; other questions that were on

4    there were a collective team effort, but

5    those were ones that I was interested in,

6    what the open issues.

7         Q.    In your answer you say these

8    were things that you asked them and I want

9    to be very particular with respect to my

10   client KPMG U.S..

11             Was there a person from my

12   client, KPMG U.S., that you spoke with,

13   and if so, who?

14        A.    There was a person on the

15   telephone from U.S., yes, and his name was

16   Bob.

17        Q.    Anything else about him you

18   remember?

19        A.    No.

20        Q.    Don't remember his last name?

21        A.    I would not remember without

22   looking at notes what his last name was.

23        Q.    Did he speak during the

24   conversation?

25        A.    Yes.

72

                        CHAMBERLAIN

1

2      Q.     Without referring to any notes,

3   can you remember any particular statement

4   that Bob made?

5      A.     I would not be able to do that.

6      Q.     Was there anyone else from my

7   client, KPMG U.S., who participated, you

8   believe, in that phone call?

9      A.     For KPMG U.S., no.

10      Q.     Was there anyone from the

11   Belgium accounting firm referred to

12   sometimes in these proceedings as KPMG

13   Belgium --

14      A.     Yes, there was.

15      Q.     Let me finish.

16             -- who participated in this

17   phone call; please answer.

18      A.     Yes.

19      Q.     Do you remember any names?

20      A.     Without my notes, I don't think

21   I would remember.

22      Q.     Without your notes, do you

23   remember any statements made by any KPMG

24   Belgium representatives on the phone call?

25      A.     Not particulars.

73

CHAMBERLAIN

1

2      Q.      Is it your recollection there

3  was one person from KPMG Belgium on the

4  phone call or more than one?

5      A.      I recollect one.

6      Q.      Do you recall whether it was a

7  man or a woman?

8      A.      It was a man.

9      Q.      In addition to yourself, Bob,

10  and this one individual from KPMG Belgium

11  who, without your notes, you can't

12  remember the name, can you remember anyone

13  else who participated in this phone call?

14      A.      Carl Dammekens.

15      Q.      Anyone else from memory?

16      A.      Yes, the accountants from

17  Arthur Andersen.

18      Q.      The Arthur Andersen accountants

19  were working for you in this transaction,

20  correct?

21      A.      On that phone call they were,

22  yes.

23      Q.      What were their names, do you

24  remember?

25      A.      I remember Catherine Moi and

74

CHAMBERLAIN

1

2   the other guy's name was Rob Fraga.

3       Q.    Have we now identified all the

4   participants in the phone call, as best

5   you can remember?

6       A.    No, Allan Forsey was on the

7   telephone call and there were members of

8   Goldman, Sachs also, I don't know which

9   one.

10      Q.    One or more than one

11  individuals from Goldman, Sachs?

12      A.    I can't say, it was a

13  conference call.

14      Q.    Where were you for the

15  conference call?

16      A.    There was also one other person

17  who sat in, his name was Brad Desmarais.

18      Q.    Who was he?

19      A.    He was the controller at

20  Dragon.

21            That's all I can remember right

22  now that was on the call.

23      Q.    Where were you physically on

24  the call?

25      A.    Dragon, Newton.

75

1                    CHAMBERLAIN

2        Q.     Massachusetts?

3        A.     Massachusetts.

4        Q.     Where in Newton were you?

5        A.     In the Dragon offices.

6        Q.     Where in the Dragon offices

7   were you for the call?

8        A.     In my office.

9        Q.     Anyone physically present with

10  you?

11       A.     Brad was.

12       Q.     Anyone else?

13       A.     Not that I recollect.

14       Q.     What time of day was the call,

15  do you remember?

16       A.     In the morning.

17       Q.     How long did the call last?

18       A.     Over an hour.

19       Q.     Less than two hours?

20       A.     I couldn't say for sure.

21       Q.     Without looking at notes?

22       A.     Correct.

23       Q.     Have I exhausted your memory of

24  the call before turning to your notes?

25       A.     That's all I can remember at

76

CHAMBERLAIN

1

2      this present time.

3                    MR. CARROLL:    Mark that as

4      Exhibit 6.

5                    (Chamberlain Exhibit 6, Bates Nos.

6      TRA 12578 and 79, was marked for

7      identification, as of this date.)

8          Q.    We have marked this as

9      Chamberlain Exhibit 6.

10                   MR. CARROLL: For the record,

11     Bates Nos. TRA 12578 and 79.

12         Q.    First question; can you

13     identify these as the notes you took of

14     this conversation.

15                   (Witness perusing document.)

16         A.    These are the notes.

17         Q.    These are all the notes?

18         A.    Yes.

19         Q.    The document consists of

20     typewritten subjects and questions and

21     then has handwriting underneath, in the

22     margins, on the two documents, correct?

23         A.    Correct.

24         Q.    All of the handwriting is

25     yours.

77

```
1                    CHAMBERLAIN

2               (Witness perusing document.)

3        A.     Yes, it is.

4        Q.     Were all of the handwritten

5   items on the document placed there during

6   the call?

7        A.     Yes, they were.

8        Q.     So that when you started the

9   call, did you have in front of you on your

10  desk the two pages of the exhibit with

11  just the typed portion?

12       A.     I think I had probably a

13  dial-in number for the conference call,

14  some sort of front memo to it, but these

15  were the ones that were the questions.

16       Q.     The typed questions, these were

17  prepared by whom?

18       A.     They were prepared by Brad

19  based upon input from myself, Brad, and

20  Arthur Andersen.

21       Q.     So it was a team effort,

22  collaborative, where you identified

23  questions that you had for the Lernout &

24  Hauspie accountants and then they were

25  physically put together by Brad, is that
```

78

                    CHAMBERLAIN

1

2    correct?

3         A.    Correct.

4         Q.    Did you get through all of

5    these questions during the call?

6         A.    We did.

7         Q.    What I would like to do is go

8    through question by question, section by

9    section, and have you read into the record

10   the corresponding handwriting that goes

11   with each of the questions, okay,

12   understand?

13        A.    Yes, I understand.

14        Q.    I want to start at the top and

15   above the heading "LIGHT NEON

16   Transaction," that was the code name for

17   the transaction, correct?

18        A.    Correct.

19        Q.    Lernout & Hauspie was LIGHT and

20   Dragon was NEON, correct?

21        A.    Correct.

22        Q.    You have a handwritten item

23   right at the top of the first page that

24   says "Stephan from KPMG."

25             Have I read it correctly?

79

CHAMBERLAIN

1

2     A.    Yes.

3     Q.    What does that refer to?

4     A.    A person who was on the

5  telephone call.

6     Q.    Is that the person from KPMG

7  Belgium whose name you could not remember

8  before?

9     A.    To the best of my recollection.

10    Q.    Why did you write his name at

11  the top of the document?

12    A.    I can't say.

13    Q.    Did you understand going into

14  this call that KPMG in Belgium were the

15  auditors for Lernout & Hauspie?

16    A.    KPMG were the auditors for

17  Lernout & Hauspie.

18    Q.    Did you understand that the

19  principal auditors who were signing off on

20  the audit was the Belgium firm, KPMG

21  Belgium, with a long Belgium name?

22    A.    No.

23    Q.    Did you send a team over to

24  KPMG Belgium to review materials as part

25  of the transaction?

80

1                    CHAMBERLAIN

2          A.      To KPMG Belgium?

3          Q.      Yes.

4                  Did you have a team that met

5    with personnel from KPMG Belgium?

6          A.      No.

7          Q.      Did any of your teams ever

8    review workpapers of KPMG Belgium in

9    connection with the transaction?

10         A.      Did not.

11         Q.      Did you understand that the

12   main workpapers for the audit work were in

13   Belgium?

14         A.      I was told you can't see the

15   workpapers until an audit was completed.

16                 Where they were physically

17   residing, I have no idea.

18         Q.      Did you consider looking at the

19   workpapers for prior audits, '98 or 1997?

20         A.      No.

21         Q.      Did you understand in this

22   phone call who Stephan from KPMG in

23   Belgium was, what his role was?

24         A.      My belief was that he was a

25   manager at KPMG.

81

CHAMBERLAIN

1

2     Q.     In Belgium or in the U.S.?

3     A.     To me there is no

4  differentiation; if you are a partner in

5  an audit firm, you're a partner in an

6  audit firm.

7     Q.     Are you saying that you did not

8  understand -- withdrawn, let me rephrase

9  it.

10          Are you saying that you

11  understood that all of the people in

12  Belgium and in the U.S. and in any other

13  countries where there might be accountants

14  were all members of the same KPMG firm?

15     A.     Correct, for purposes of

16  signing an audit report they are.

17     Q.     Did you ever have a discussion

18  about that subject with my client, KPMG

19  U.S.?

20     A.     No.

21     Q.     The Arthur Andersen accountants

22  who assisted you in this transaction,

23  where were they from, the United States or

24  somewhere else?

25     A.     United States.

82

1                    CHAMBERLAIN

2       Q.      Did you in connection with the

3    Dragon/Lernout & Hauspie transaction look

4    at any audit opinions that had ever been

5    issued on Lernout & Hauspie by any KPMG

6    firm?

7       A.      I would need to go back and

8    review whether that was produced as part

9    of the due diligence process.

10      Q.      Sitting here, do you have any

11   memory of having looked at any audit

12   opinion issued by any KPMG firm?

13      A.      I know I reviewed 10-Ks or

14   their equivalents and normally audit

15   opinions are in there.

16      Q.      I will come back to that and

17   see if I can show you a document or two to

18   refresh your memory.

19              At the top next to the name

20   Stephan --  before I ask that, let me ask

21   something else.

22              Am I correct that there is no

23   reference anywhere in your handwritten

24   notes to Bob, the individual who you

25   explained you understood was on the call

83

CHAMBERLAIN

1

2    from KPMG U.S.?

3          A.      Correct.

4          Q.      The only reference you have in

5    your notes to a KPMG person is to Stephan,

6    correct?

7          A.      Written, correct.

8          Q.      The first question that you

9    have typed reads "When is audit sign-off

10   expected for 1999, when will annual report

11   be filed with the SEC?"

12              Have I read it correctly?

13         A.      Correct.

14         Q.      Could you read into the record

15   any entries in your handwritten notes that

16   go with that question.

17         A.      "To the best of my

18   recollection, two to three weeks before

19   final sign-off, waiting on answers for

20   company, still drafting the financial

21   statements, Carl maybe by the end of May."

22              Without me reading every other

23   note on this page, those are the ones that

24   go to that particular question.

25         Q.      I don't want to leave any

84

                    CHAMBERLAIN

1

2  uncertainty on this issue, so take a

3  moment if you need to, to confirm for us,

4  after reading these two pages, they are

5  only two pages, to make sure that those

6  are the only handwritten entries that go

7  with that first question.

8              (Witness perusing document.)

9      A.    I need a moment to go and look

10  at all the stuff that's in the top half

11  here to figure out exactly which ones so I

12  don't leave one out.

13      Q.    All right, let me see if this

14  is agreeable.

15             I am going to go through all of

16  these in order, so as I go through these,

17  you'll have an opportunity to see them all

18  and if at any time you run across one that

19  you believe should go to an earlier

20  question, you can just indicate then.

21             Is that acceptable?

22      A.    Sure.

23      Q.    In the statement that you just

24  read, the handwritten notations that you

25  made, the referenced "Carl" that you read,

85

1                    CHAMBERLAIN

2    is that Carl Dammekens?

3         A.    Yes.

4         Q.    What's the significance of the

5    fact that you put his name along with the

6    information that you recorded there for

7    the first question?

8         A.    Because Carl was telling me

9    that he would have the financial

10   statements, the draft of the annual

11   report, et cetera, by the end of May.

12        Q.    So that indicated you were

13   getting that information from Carl during

14   the call?

15        A.    No, I didn't particularly ask

16   for the information at the end of May;

17   what I asked is when it would be

18   completed.

19        Q.    And this is what Mr. Dammekens

20   told you?

21        A.    Yes.

22        Q.    The next item in type, the type

23   question says, "There have been

24   restatements of financials in the past;

25   when were the restatements made, what

86

                    CHAMBERLAIN

1

2   periods were restated, what were the

3   reasons for the restatements, what were

4   the issues with the SEC, have all R&D

5   write-offs been reviewed by the SEC?"

6           Have I read that correctly?

7       A.     Yes.

8       Q.     Those questions are grouped

9   together as the second item on this page,

10  correct?

11      A.     Correct.

12      Q.     Could you read into the record,

13  please, any handwritten notations you made

14  during this call with reference to that

15  second group of questions.

16      A.     Again, without reading them

17  all, I am going to say it is "the 1998

18  received letter where a number of topics

19  until 4/99 restated, '97 in progress,

20  although ask other questions and restated

21  first three-quarters of '98."

22      Q.     What is the reference to "in

23  progress," is that "in progress" or "in

24  process"?

25      A.     My notes or the written

87

```
1                    CHAMBERLAIN
2  question?
3       Q.    I was following up on your
4  reading of your handwritten notes.
5       A.    In process.
6       Q.    Do you remember what that
7  refers to?
8       A.    Yes, it was my knowledge or it
9  was my understanding that there was an
10 issue with the SEC about one of the
11 acquisitions that Lernout & Hauspie did,
12 on how much was stated as goodwill and how
13 much was written off as in process R&D.
14      Q.    How is it you were familiar
15 with this issue?
16      A.    It had quite a lot of press.
17      Q.    Was it an issue that was, as
18 you understood it, unique to Lernout &
19 Hauspie, or was it an issue that numerous
20 companies, technology companies, had been
21 faced with?
22      A.    I would say it is not unique to
23 Lernout & Hauspie.
24      Q.    Was it an issue that Seagate
25 Technology had been faced with?
```

88

                    CHAMBERLAIN

1

2    A.    I can't tell you whether we

3  ever had an SEC comment on in process R&D.

4    Q.    Can you remember the names of

5  any other companies that did have that

6  issue with the SEC when all the publicity

7  had occurred?

8    A.    No.

9    Q.    Am I correct that this issue

10 that's covered by these four questions

11 relating to a restatement done in

12 connection with the SEC, this was an issue

13 that you knew about before this phone call

14 on March 22nd, 2000?

15    A.    Yes, I knew Lernout & Hauspie

16 had SEC probes.

17    Q.    How had you first learned that,

18 in connection with the publicity that you

19 referred to or something else?

20    A.    Some in publicity and I would

21 have to tell you that it was common

22 knowledge of most of the people that were

23 involved in the transaction, my

24 accountants might have said it, I don't

25 know.

89

                    CHAMBERLAIN

1

2      Q.    The issue as you understood it

3   related to a restatement that had been

4   made of 1997 and some quarters for 1998,

5   is that correct?

6      A.    As it pertained to R&D, yes.

7      Q.    The handwritten entries that

8   relate to this subject, the SEC, the

9   restatement, and the in process R&D, can

10  you tell from looking at your notes who on

11  the phone call provided this information?

12     A.    No, I cannot.

13     Q.    And you have no memory separate

14  from your notes of who provided that

15  information?

16     A.    Correct.

17     Q.    The next set of questions in

18  typed form first; "Most subsidiaries

19  appear to be nonintegrated.  What is the

20  state of the financial and operational

21  controls over these subsidiaries?"

22          Have I read this item

23  correctly?

24          (Witness perusing document.)

25     A.    Correct.

90

CHAMBERLAIN

1

2        Q.      Would you read for us into the

3    record any handwritten entries you have

4    that relate to this item.

5        A.      "All contracts are reviewed of

6    significance by Carl and team, not aware

7    of anything done before press release,

8    company if comfortable," is what the notes

9    say.

10       Q.      Are you able to remember who

11   made those statements that you've just

12   read into the record?

13       A.      No.

14       Q.      The reference that you just

15   read to us to "Carl and team," is that to

16   Mr. Dammekens and his team at Lernout &

17   Hauspie?

18       A.      I was also told that KPMG were

19   active in the review process before

20   financials were press-released; that is

21   the comment "done before press release."

22       Q.      Let me first ask and then I

23   will come back to that answer of yours; I

24   was following up on what you've written

25   here, which says  "all contracts are

91

CHAMBERLAIN

2  reviewed of significance by Carl and

3  team."

4           Does Carl refer to Carl

5  Dammekens and does the team refer to the

6  team working for him at Lernout & Hauspie?

7      A.    It does not exclusively deal

8  with the team of Lernout & Hauspie.

9      Q.    Now following up on your

10  answer, I believe your testimony is that

11  you also came to understand during this

12  phone call --

13      A.    Correct.

14      Q.       -- that KPMG had some

15  involvement in reviewing contracts, as

16  well?

17      A.    I would like to restate that; I

18  was made aware during due diligence

19  processes that KPMG was very active in

20  reviewing financials prior to press

21  releases.

22      Q.    Someone told you that?

23      A.    Yes.

24      Q.    Who told you that, Carl

25  Dammekens?

92

1                    CHAMBERLAIN

2        A.       I know that Allan Forsey did, I

3   am not sure if Carl Dammekens did.

4        Q.       But you remember Allan Forsey

5   telling you that?

6        A.       Right.

7        Q.       Anyone else tell you that, that

8   you can remember?

9        A.       Not without trying to look

10  through due diligence notes.

11       Q.       With respect to your notes of

12  this phone call, is there anything here

13  that enables you to remember that anyone

14  else other than Mr. Forsey and possibly

15  Mr. Dammekens told you that?

16       A.       Correct.

17       Q.       The next typed item, "On the

18  audit of 1999, what adjustments have been

19  booked at the recommendation of the

20  auditors? What adjustments have been

21  recommended by the auditors but not

22  recorded?"

23                Have I read it correctly?

24       A.       Correct.

25       Q.       Can you read for us into the

93

CHAMBERLAIN

1

2  record any handwritten entries you have

3  that correspond to that item.

4          (Witness perusing document.)

5      A.    I would like a moment to look

6  across the page.

7      Q.    Certainly.

8          (Witness perusing document.)

9      A.    Management points by KPMG in

10  the top right-hand corner, "one system,

11  need a policy and procedures manual,

12  internal audit, report quarterly to the

13  audit committee, revenue in Korea, one or

14  two customers, capitalization of some R&D

15  expenses, walk through timesheet database,

16  allocation of reserves, warranty, defer

17  tax assets provide budget info to show

18  realize in Belgium, need to split into

19  legal entities. Reclassifications only,

20  not booked, will not tell us about past

21  adjustments, nothing in revenue past 90

22  days, documentation footnotes and rep

23  letters."

24      Q.    Are you finished?

25      A.    I am not certain where the "not

94

CHAMBERLAIN

1

2  aware of anything" fits in right now, I

3  believe it is in that line.

4      Q.    The "not aware of anything" is

5  the item that's written beneath the

6  preceding topic that we just discussed,

7  but there is some sort of line underneath

8  of it and you're not sure whether it

9  corresponds to the questions beneath it or

10  the questions above it?

11      A.    Yes.

12      Q.    Let me follow up on each of the

13  entries that you just identified for this

14  item, okay?

15      A.    Okay.

16      Q.    Let me start with the

17  information that appears immediately in

18  the space beneath the item, and

19  immediately beneath the space appears

20  "reclassifications only, not booked, will

21  not tell us about past adjustments," and

22  then there are some items with dots in

23  front of them, "documentation, footnotes,

24  rep letters."

25          Have I read that correctly?

95

CHAMBERLAIN

1

2      A.      Correct.

3      Q.      First question; given that that

4  entry appears immediately in the blank

5  space beneath the typed question, can you

6  tell us whether that was the first thing

7  that you wrote down when this subject was

8  discussed?

9      A.      I cannot tell you whether it

10  was the first thing written down.

11      Q.      Are you able to put the items

12  in sequence that you just identified that

13  go along with this item, the sequence in

14  which they were discussed?

15      A.      No.

16      Q.      Can you tell for us who

17  provided the information in this first

18  entry, beginning "reclassifications only,"

19  and finishing with "rep letters," can you

20  tell us, if you remember, who the source

21  of that was?

22      A.      The top two I can tell you were

23  from KPMG.

24      Q.      By "top two," you mean

25  "reclassifications only, not booked"?

96

CHAMBERLAIN

1

2    A.    And "will not tell us about

3    past adjustments."

4         As to "documentation, rep

5    letters," I cannot tell you for sure.

6    Q.    When you say KPMG, are you

7    referring to Stephan or to Bob or do you

8    not remember?

9    A.    I couldn't tell you.

10   Q.    The entry to "will not tell us

11   about past adjustments," did you

12   understand that to mean that the

13   accountants were refusing to provide any

14   information on so-called past adjustments?

15   A.    Correct.

16   Q.    Can you explain for us your

17   understanding of past adjustments, what

18   are past adjustments, as you used that

19   term?

20   A.    Past adjustments are what

21   auditors find to, in their opinion, what

22   should be booked by management in the

23   financials in that particular area and

24   what normal practice was is you would go

25   through and collect all of the past

97

                    CHAMBERLAIN

1    adjustments that the opinion the auditing

2    firm would be and they would be looked at

3    in totality to determine whether it would

4    materially misstate the financial

5    statements.

6         Q.    If I understand correctly, past

7    adjustments is a place where you could

8    find out from accountants whether there

9    were accounting disagreements they had

10   with a client that might not otherwise be

11   reported publicly?

12        A.    That's a correct statement.

13        Q.    You understood from this call

14   that you were not going to be provided

15   that information?

16        A.    Correct.

17        Q.    Another entry that you

18   identified as going along with this

19   question is at the top of the page, right

20   side, and it is headed  "Management Points

21   by KPMG," and there were four points

22   beneath that, I will read them one more

23   time so it is clear; "one system, need a

24   policy and procedures manual, internal

98

1                    CHAMBERLAIN

2      audit, report quarterly to audit

3      committee."

4                Have I read it correctly?

5           A.     Yes, you have.

6           Q.     And is it your recollection

7      that these items go with the questions

8      related to adjustments in the typed

9      portion of the document?

10          A.     Yes.

11          Q.     Can you tell us who on the

12     phone call provided the information in

13     this portion of your notes, the portion

14     headed "Management Points by KPMG"?

15          A.     I believe it was the partner on

16     the job.

17          Q.     The partner from KPMG on the

18     job?

19          A.     Correct.

20          Q.     Do you know who that partner

21     was?

22          A.     Bob.

23          Q.     So this is an item that you

24     believe was provided to you in the phone

25     call from Bob from KPMG U.S.?

99

CHAMBERLAIN

1

2       A.      That's correct.

3       Q.      And the reference to

4   "management points by KPMG," did you

5   understand this to be a reference to what

6   are called management comment letter

7   points?

8       A.      Correct.

9       Q.      And management comment letter

10  points are a type of document that an

11  auditor can use to report to his client

12  areas for improvement, is that correct?

13      A.      I think it is required to be

14  done as part of an audit process.

15      Q.      Whether it is required or not,

16  the point of the management letter comment

17  is the auditor is making recommendations

18  to a client about areas for improvement?

19      A.      Yes.

20      Q.      These management comment

21  letters is something that you are familiar

22  with from your years of experience in

23  corporate finance?

24      A.      Yes, as well as I was an

25  auditor.

100

1                    CHAMBERLAIN

2        Q.      As well as during your prior

3    experience as an auditor?

4        A.      Correct.

5        Q.      Did Seagate Technologies, for

6    example, get management comment letters

7    from its auditor?

8        A.      Yes.

9        Q.      In your experience, is it

10   common for most companies to receive

11   management comment letters from their

12   auditor?

13       A.      Yes.

14       Q.      The items listed here, that you

15   have listed here, refer to "one system,

16   need a policy and procedures manual,

17   internal audit, and report quarterly to

18   audit committee."

19               Did you understand these were

20   all recommendations for improvements that

21   KPMG had made to Lernout & Hauspie?

22       A.      Yes.

23       Q.      The "one system" refers to one

24   system, developing a system to handle all

25   worldwide operations, correct?