101

CHAMBERLAIN

1

2      A.      Worldwide financials.

3      Q.      The reference to "need a policy

4  and procedures manual" you understood to

5  be a statement that the company needed to

6  get a policy and procedures manual?

7      A.      Correct.

8      Q.      You were being told here that

9  the company didn't have a policy and

10  procedures manual.

11     A.      I couldn't say that

12  definitively.

13     Q.      If they needed to get one --

14     A.      They might not have had an

15  updated one.

16     Q.      Are you able to tell us from

17  this entry, "need a policy and procedures

18  manual," whether you understood they

19  needed an update or whether they needed to

20  get a manual?

21     A.      I would assume they needed to

22  get a manual.

23     Q.      Your assumption was they didn't

24  have one?

25     A.      No.

102

CHAMBERLAIN

1

2     Q.    Your assumption was they needed

3  to get a manual?

4     A.    Yes.

5     Q.    They needed to get a manual

6  because they didn't have one?

7     A.    Or they didn't have a current

8  one, I don't know; they needed a policy

9  and procedures manual.

10     Q.    Did you ask any questions

11  during this phone call about which it was,

12  whether they needed an update or whether

13  they needed to get one?

14     A.    No, this was a pretty benign

15  comment.

16     Q.    You consider the points under

17  management letter comments to be pretty

18  benign points?

19     A.    The ones that I have written

20  down here?

21     Q.    Yes.

22     A.    At the time that we were doing

23  this audit, yes.

24     Q.    The reference to "internal

25  audit," which is the next of these

103

CHAMBERLAIN

1

2  management letter comment points, did you

3  understand that was a recommendation you

4  were being told had been made to Lernout &

5  Hauspie that it should get an internal

6  audit department?

7       A.    Correct.

8       Q.    You understood that at that

9  point in time Lernout & Hauspie did not

10  have internal auditors?

11       A.    Correct.

12       Q.    The last item, "report

13  quarterly to audit committee," you

14  understood this was a recommendation for

15  who to be reporting quarterly to the audit

16  committee, the auditors?

17       A.    That's normally what occurs,

18  yes.

19       Q.    Did you understand from this

20  recommendation that you were being told

21  that the auditors were recommending that

22  they report quarterly and had not been

23  reporting quarterly before?

24       A.    I can't answer the latter part,

25  I don't know if they ever reported before.

104

1                CHAMBERLAIN

2        Q.      Did you at least understand if

3    they were recommending that they do this,

4    report quarterly --

5        A.      They could have stopped.

6                MR. JOSEPH:  Give him a chance

7    to finish and he will usually give you a

8    chance to finish.

9                If he doesn't, I will do my

10   best to see that it happens.

11       Q.      Did you at least understand

12   from the statement that they needed to

13   report quarterly to the audit committee,

14   that for some period of time at least that

15   was not happening?

16       A.      That was the recommendation.

17       Q.      And it was the recommendation

18   that they start doing that because for

19   some period at least they had not been

20   doing it?

21       A.      Correct.

22       Q.      Another set of handwritten

23   entries that you read into the record as

24   corresponding to the written questions

25   about adjustments is on the left margin of

105

                    CHAMBERLAIN

1

2   the page, it has four bulleted points,

3   four entries with dots in front of them,

4   and the first one starts "revenue Korea."

5           Do you see those?

6       A.    Yes, I do.

7       Q.    Am I correct these are four

8   dotted items that you believe were

9   associated in the phone call with the

10  discussion of the adjustments subject?

11      A.    Those are answers that came out

12  of the discussion of that bullet point.

13          Just as one question asked here

14  can lead to another one.

15      Q.    Very well, I think I understand

16  that, but let's make sure.

17          This information that begins

18  "revenue Korea," you're telling us doesn't

19  relate to the topic of adjustments, but it

20  was information that you learned in the

21  followup discussion that followed from the

22  topic of adjustments?

23      A.    Correct.

24      Q.    The first bulleted item is

25  "revenue Korea" and then "1, 2 customers."

106

CHAMBERLAIN

1

2          Does the "1, 2 customers" go

3   with the "revenue Korea"?

4          A.    Yes, it does.

5          Q.    Who provided that information,

6   do you remember?

7          A.    Same, this was all conversation

8   that was done by the same gentleman who

9   gave me the management points.

10         Q.    You believe that the four

11  bulleted items on the left here were

12  provided by Bob, the individual from KPMG

13  U.S.?

14         A.    Correct.

15         Q.    Not Stephan?

16         A.    Correct.

17         Q.    You're sure about that?

18         A.    Correct.

19         Q.    The "revenue Korea 1, 2

20  customers," what does that refer to?

21         A.    These were the four open audit

22  issues that they told me were left before

23  there would be --  before they were

24  finished with the audit, revenue Korea was

25  that they were awaiting one or two

107

CHAMBERLAIN

1
2  confirmations for customers in Korea.

3       Q.    So these items beginning

4  "revenue Korea," you understood were open

5  items in the audit that you were told

6  about that were still being worked on?

7       A.    Correct.

8       Q.    The first one was revenue in

9  Korea, and it related to confirmations,

10 they were still waiting for one or two

11 customers?

12      A.    Correct.

13      Q.    Your memory is clear it related

14 to confirmations?

15      A.    Correct.

16      Q.    Do you remember the dollar

17 amount of this revenue in Korea for these

18 one or two customers?

19      A.    Do not.

20      Q.    Did you ask?

21      A.    I don't recollect whether I did

22 or not.

23      Q.    The next item is, did you read

24 that as, "capitalized," is "cap" short

25 for capitalized?

108

1                    CHAMBERLAIN

2       A.     Yes.

3       Q.       "Capitalized some R&D

4  expenses, walk through timesheet

5  database."

6                Have I read it correctly?

7       A.     Yes.

8       Q.     What does that relate to?

9       A.     Companies can capitalize R&D

10 expenses while they are working on a new

11 product until it reaches technological

12 feasibility.

13               So they needed to go through

14 the timesheet database to make sure that

15 the company had properly capitalized those

16 people that worked in research and

17 development.

18      Q.     This is something the company

19 needed to do?

20      A.     No, this is something the

21 auditors needed to do.

22      Q.     Before the audit work could be

23 finished?

24      A.     Right.

25      Q.     Did you have any sense for the

109

1          CHAMBERLAIN

2    dollar amount of R&D expenses involved?

3        A.    No.

4        Q.    Any sense for what transactions

5    were involved?

6        A.    What transactions, I don't

7    understand.

8        Q.    Whether these R&D expenses that

9    had been capitalized were capitalized in

10   connection with any acquisitions, for

11   example.

12       A.    No, I wouldn't know if it was

13   their products or other companies'

14   products.

15       Q.    Did you ask any questions about

16   that issue?

17       A.    Don't recollect.

18       Q.    Did you ask any questions about

19   what the dollar amount of these expenses

20   was?

21       A.    No.

22       Q.    Next item is "allocation of

23   reserves," and you have that in quotes,

24   and then next to it, "-warranty."

25            Why is "allocation of reserves"

110

1                    CHAMBERLAIN

2   in quotes?

3        A.    I was writing down exactly what

4   was said.

5        Q.    So this is an instance where

6   those three words were used exactly and

7   that's why you put them in quotes?

8        A.    That's my belief.

9        Q.    Next to it the hyphen and

10  "warranty."

11       A.    It was the allocation of

12  reserves within the warranty area of the

13  balance sheet.

14       Q.    Do you have an understanding of

15  what that referred to?

16       A.    What particular products?

17       Q.    Yes.

18       A.    No.

19       Q.    Did you have an understanding

20  of the dollar amount of this?

21       A.    Minor.

22       Q.    Was there a discussion or was

23  that just your understanding?

24       A.    I remember the balance sheet on

25  what they had in warranty, I remember it

111

CHAMBERLAIN

1  wasn't a significant item.

2

3     Q.    You remember from having looked

4  at the balance sheet already?

5     A.    Previous balance sheets, yes.

6     Q.    Having a sense for what the

7  magnitude of this area was?

8     A.    Yes.

9     Q.    Is it fair to say it was not an

10  area that you were concerned with because

11  it was pretty small?

12     A.    Yes.

13     Q.    The next item finishing this

14  series of handwritten bullets on the left

15  side is, correct me if I read it wrong,

16  "deferred tax assets, provide budget info

17  to show realize in Belgium, need to split

18  into legal entities."

19          Have I read it correctly?

20     A.    Yes.

21     Q.    What does this refer to, if you

22  remember?

23     A.    In order to have defer tax

24  assets on the balance sheet of the nature

25  that they were talking to, you needed to

112

CHAMBERLAIN

1

2      make sure that the entity, the U.S.

3      entity, because it was a U.S. tax asset,

4      would eventually earn or realize revenue.

5                  It is part of GAAP and deferred

6      tax assets.

7          Q.     Is this a standard type of item

8      for a multinational company?

9          A.     I don't know if I could answer

10     that.

11         Q.     Is it an item you were familiar

12     with either from your years as an auditor

13     or your years as a financial officer?

14         A.     Yes.

15                MR. JOSEPH:  Did you have

16     something you wanted to add to your prior

17     answer?

18         A.     It doesn't have to be a

19     multinational company; U.S. companies face

20     the same item in deferred tax assets.

21                You need to prove its ultimate

22     realizability.

23         Q.     Was there any discussion about

24     the dollar amount of this item?

25         A.     Not that I recollect.

113

CHAMBERLAIN

1

2    Q.    Did you ask what the dollar

3    amount was that was at issue?

4    A.    I did not.

5    Q.    Was this an item that you had

6    some familiarity with already from having

7    reviewed balance sheets or income

8    statements for Lernout & Hauspie?

9    A.    No.

10    Q.    We have finished reading the

11    items in the left margin, the four

12    bulleted items that you had identified,

13    correct?

14    A.    Correct.

15    Q.    I think you also read one other

16    entry as possibly related to this

17    discussion following the adjustments topic

18    and that was the item over to the right

19    that says "nothing in rev past 90 days,"

20    is that correct?

21    A.    Correct.

22    Q.    Having been through as much as

23    we have been through so far, are you able

24    to remember any better whether this does

25    in fact go with the same discussion or

114

CHAMBERLAIN

1
2  whether it relates to something else?

3      A.    That one I did tell you belongs

4  to this discussion.

5      Q.    So you're sure of that?

6      A.    Yes.

7      Q.    What does that refer to?

8      A.    It goes to at that time one of

9  the bullet points about revenue

10 recognition within software companies, and

11 in order to be able to record that revenue

12 underneath GAAP, you had to ascertain that

13 it was collectible.

14           So there was practice in some

15 companies that auditors would force --

16 sorry -- would suggest that a policy be

17 you don't recognize anything that hasn't

18 been collected after a certain amount of

19 days, because you can't prove

20 collectibility if something had terms on

21 it that was six months out in the past, so

22 I asked them if there was anything,

23 because the DSO, days sales outstanding,

24 within Lernout & Hauspie had been high in

25 the past, so I asked them was there

115

1                CHAMBERLAIN

2    anything recognized in revenue that was

3    past 90 days after invoice date, and

4    nothing was in revenue past 90 days.

5         Q.    Did you understand that this

6    was nothing in the sense there wasn't a

7    penny or that if there was anything, it

8    wasn't material?

9         A.    Correct, materiality.

10        Q.    Who made this statement, was

11   this made by either Stephan or Bob or by

12   Dammekens, can you tell us?

13        A.    To my recollection, everything

14   we've talked about in this question was by

15   U.S.

16        Q.    By Bob?

17        A.    By Bob.

18        Q.    By this question, just for the

19   sake of the record, we're referring to the

20   adjustments item and the entries that have

21   followed the adjustments item?

22        A.    Yes, Question No. 4.

23             THE VIDEO TECHNICIAN:  We've

24   come to the end of Tape No. 1.

25             Going off the record at

116

CHAMBERLAIN

1
2      approximately 11:40.

3              (Recess taken.)

4              THE VIDEO TECHNICIAN:  Going

5      on the record at approximately 11:49 a.m..

6      BY MR. CARROLL:

7          Q.    Do you still have Exhibit 6 in

8      front of you?

9          A.    I do.

10         Q.    I think we had discussed the

11     entry "nothing in rev past 90 days," and

12     you had explained what that meant.

13              Anything else to add on that

14     item before I move to the next one.

15         A.    Not in that item.

16         Q.    The section that we just

17     discussed, there were four collections, if

18     you will, of questions related to four

19     topics, are all under the heading

20     "General," is that right?

21         A.    Correct.

22         Q.    And then there is another

23     section that begins midway down on the

24     page, typed, headed "Income Statement,"

25     correct?

117

                              CHAMBERLAIN

1

2        A.      Correct.

3        Q.      The first question is "Are any

4  issues anticipated with way company

5  recognizes revenue?"

6              I don't see any handwritten

7  item under or next to that item to

8  associate with that item; is there any?

9        A.      I don't see any either.

10       Q.      Was that item not discussed?

11       A.      All the questions on this page

12 were discussed.

13       Q.      Is there any reason why you did

14 not write down any information pertaining

15 to that item?

16       A.      There was nothing that I

17 thought warranted or needed to be jotted

18 down.

19       Q.      Do I take it, then, it was your

20 practice during this call to write down

21 information that struck you as important

22 and not write down things if they were

23 unimportant?

24       A.      Not necessarily so.

25              It wouldn't --revenue is an

118

1                    CHAMBERLAIN

2    important item, however, if I was told

3    there were no issues around it, I wouldn't

4    have written down anything.

5              That doesn't mean it wasn't an

6    important item.

7         Q.    I am just asking, there is no

8    handwritten item you can identify as going

9    with this issue, this question, "are any

10   issues anticipated with way company

11   recognizes revenue," correct?

12        A.    Correct.

13        Q.    And you don't remember why that

14   is, that is, why it is you didn't write

15   anything down?

16        A.    I think I just stated that it

17   was because there wasn't anything that

18   warranted me writing anything down.

19        Q.    You didn't hear anything when

20   it was discussed that struck you as

21   important enough to be written down?

22        A.    That would be correct.

23        Q.    You were generally during this

24   call trying to write down anything that

25   you heard that you thought was important,

119

1                    CHAMBERLAIN

2     correct?

3                    MR. JOSEPH:   Asked and

4     answered.

5                    You may answer it again.

6          A.    Yes.

7          Q.    The next typed item under

8     "income statement" is "Has SEC SAB 101

9     been considered in relation to the

10    recognition of revenue on nonrefundable

11    royalty payments?"

12                   Have I read that correctly?

13         A.    Yes.

14         Q.    Is there any handwritten

15    information you wrote down for this item?

16         A.    No, there isn't.

17         Q.    Any reason why you didn't write

18    anything down for this item?

19         A.    I had no clear knowledge of SEC

20    SAB 101, I believe this was a question

21    that came from Arthur Andersen.

22         Q.    The accountants that were

23    assisting you?

24         A.    The accountants that were on

25    the phone call.

120

CHAMBERLAIN

1

2      Q.      They were on the phone call

3  helping you, ma'am, correct?

4      A.      At my request, they were on the

5  phone call.

6      Q.      Were they part of the enemy

7  team or part of your team?

8      A.      They were part of my team.

9              Who is the enemy?

10     Q.      Well, the team that you were

11  negotiating with on the other side, there

12  are two sides of the transaction.

13     A.      Oh, okay.

14     Q.      They were on your side of the

15  transaction, yes?

16     A.      Yes.

17     Q.      Those are the only items under

18  income statement, the two that we have

19  just read, correct?

20     A.      That is correct.

21     Q.      So we have two typed items

22  under income statement and no handwritten

23  items for that section of this page,

24  correct?

25     A.      Correct.

121

1                    CHAMBERLAIN

2        Q.     The next section on the page is

3    headed "Purchase Accounting."

4             The first typed question is,

5    "Why have there been no restructuring

6    charges associated with the acquisitions?"

7             Have I read it correctly?

8        A.     Yes.

9        Q.     Can you read to us any of your

10   handwritten notations that correspond to

11   that question.

12            (Witness perusing document.)

13       A.     "Yes, but not highlighted from

14   within, Dictaphone expected end of April,

15   do not in process R&D or restructure."

16       Q.     Can you tell us who provided

17   that information during the phone call?

18       A.     No.

19       Q.     The reference to Dictaphone,

20   what did you understand that was a

21   reference to?

22       A.     The company that Lernout &

23   Hauspie was going to acquire.

24       Q.     Did you understand during your

25   negotiations for the Dragon transaction

122

CHAMBERLAIN

1
2  that Lernout & Hauspie was also in the

3  process of doing a transaction to acquire

4  another company, Dictaphone?

5        A.      Not until late in the process.

6        Q.      Is late in the process March

7  22nd of 2000, the time of this phone call?

8        A.      We knew at that time.

9        Q.      How far in advance of this

10  point in time, March 22nd, had you learned

11  that?

12        A.      I couldn't tell you

13  specifically.

14        Q.      Did you as part of your work on

15  the Dragon transaction have any

16  conversations with anyone involved in the

17  Dictaphone transaction?

18        A.      I did not.

19        Q.      Did you instruct anybody on

20  your team to do that?

21        A.      I did not.

22        Q.      Am I correct that you were

23  unaware of any due diligence that the

24  Dictaphone people may have been doing in

25  connection with their transaction?

123

CHAMBERLAIN

1

2    A.    That's not correct.

3    Q.    What's not correct about that?

4    A.    I was aware of items that they

5 were doing on the due diligence, the

6 Dictaphone folks.

7    Q.    What items were you aware the

8 Dictaphone folks were doing?

9    A.    I was aware they were reviewing

10 the audit workpapers, had reviewed the

11 audit workpapers of KPMG.

12    Q.    Who told you that?

13    A.    Allan Forsey.

14    Q.    When did he tell you that?

15    A.    Can't tell you the specific

16 date.

17    Q.    Anything else Mr. Forsey or

18 anyone else told you about the due

19 diligence that the Dictaphone people were

20 performing on their transaction?

21    A.    That they had met with the

22 auditors and that they had found nothing.

23    Q.    I'm sorry, that who had met

24 with the auditors?

25    A.    That the Dictaphone folks had

124

1                    CHAMBERLAIN

2    met with KPMG, reviewed the '98

3    workpapers, and there weren't any issues.

4         Q.    Who did you understand the

5    Dictaphone folks were that had done that

6    work?

7         A.    I don't know.

8         Q.    Did you understand it was an

9    accounting firm or Dictaphone's own

10   employees?

11        A.    I couldn't say.

12        Q.    Did you have any understanding

13   that Dictaphone had an accounting firm,

14   Deloitte & Touche, assisting it in its

15   transaction?

16        A.    Did not.

17        Q.    Mr. Forsey told you all of

18   those things?

19        A.    Yes.

20        Q.    Did you follow up on what he

21   told you by asking any of the Dictaphone

22   folks for access to their due diligence

23   work?

24        A.    No, because I was going to do

25   my own due diligence work.

125

CHAMBERLAIN

1

2      Q.      But as part of your due

3    diligence, you chose not to review any

4    audit workpapers, correct?

5      A.      That's not true; I wanted to

6    review the 1999 audit workpapers, but I

7    was not allowed to review the '99

8    workpapers.

9      Q.      And you chose not to review the

10   workpapers for prior audits, '98 or '97?

11     A.      That's correct.

12     Q.      You also did not ask to speak

13   to any of the Dictaphone personnel who had

14   performed that work in connection with

15   their transaction?

16     A.      That's correct.

17     Q.      For purposes of your

18   transaction, the Dragon transaction, you

19   were relying on your own due diligence,

20   not on any due diligence that may have

21   been done by Dictaphone?

22     A.      That's correct.

23     Q.      Returning to Exhibit 6, please,

24   under "purchase accounting," the second

25   item listed is "why has there been no R&D

126

1                    CHAMBERLAIN

2    write-off in 1999?"

3              Have I read that correctly?

4         A.    Yes.

5         Q.    Can you read for us, please,

6    any of your handwritten notes that

7    correspond to that item.

8         A.    "Acquisition didn't qualify so

9    didn't write-off because deal with human

10   translation, why no articulate acquisition

11   of development only, no new startup

12   projects."

13        Q.    Who provided that information

14   during the phone call?

15        A.    KPMG did.

16        Q.    Bob or Stephan?

17        A.    I can't recollect.

18        Q.    Do you recollect anything that

19   Stephan said during this phone call?

20        A.    He had a relatively minor role.

21        Q.    You've written his name at the

22   top of the page, so I'm just curious

23   whether any of the information on this

24   page that appears beneath his name is

25   information that came from him?

127

                    CHAMBERLAIN

1

2      A.    I couldn't definitively say if

3  anything on this page came from him.

4      Q.    On this particular item that

5  you just read to us corresponding to "why

6  has there been no R&D write-off in 1999,"

7  you're not certain whether this was

8  Stephan or Bob?

9      A.    Correct.

10     Q.    The item in your notes that

11 says "why no Articulate," what does that

12 refer to?

13     A.    They did an acquisition or, if

14 acquisition is the right word, with

15 Articulate Systems, and they acquired only

16 developed technology, there was no

17 projects that are in the works, so there

18 wouldn't be a write-off of in process R&D.

19     Q.    The item "why no Articulate,"

20 is that a question you asked or is that --

21     A.    That's --

22     Q.       -- information that Stephan

23 or Bob provided?

24     A.    That's a question I asked.

25     Q.    Was Articulate a transaction

128

CHAMBERLAIN

1

2    that you knew about from your work already

3    prior to this phone call?

4         A.    Yes.

5         Q.    Did the information provided in

6    response to this item make sense to you?

7         A.    Yes.

8         Q.    As a former auditor and

9    experienced financial business person, did

10   you disagree with any of the accounting

11   information provided with respect to this

12   item?

13        A.    No, I did not disagree.

14        Q.    The next item is, typed

15   portion, "There seem to be different lives

16   attributed to goodwill from different

17   transactions.  How do you arrive at the

18   useful lives for goodwill, how is the

19   argument made against impairment of their

20   assets?"

21             Have I read it correctly?

22        A.    Yes.

23        Q.    Would you please read to us any

24   of your handwritten notes that relate to

25   this item.

CHAMBERLAIN

1

2      A.      "No issues from KPMG, seven

3    technology, 15 servicer translation."

4      Q.     Could you tell us what this

5    relates to, what does this topic relate to

6    and the information you received, it all

7    seems to relate to goodwill, could you

8    explain this to us.

9              (Witness perusing document.)

10     A.     When you acquire a company, if

11   you pay more at this time, if you paid

12   more than what the purchase price was for

13   a company, you needed to get a valuation

14   and assign some of that valuation to the

15   assets, realizable value, and developed

16   technology, certain of it was assigned to

17   in process, there were a lot of different

18   things that got valued.

19             One of the items that remained

20   were goodwill or develop technology, and I

21   was asking the question about what lives

22   were there in those two items and were

23   they sure on develop technology, one of

24   the items that you had to do at that time

25   was to go out and look at the expected

CHAMBERLAIN

1

2 cash flow from anything that was on the

3 balance sheet as develop technology and

4 prove or show that it was going to have

5 the value that was on the balance sheet.

6     Q.    Does this item that you are

7 describing to us, goodwill and develop

8 technology, does this relate to contracts

9 that Lernout & Hauspie has with customers

10 or something else?

11     A.    It relates to something else.

12     Q.    It relates to their R & D

13 activities?

14     A.    It relates to their

15 acquisitions.

16     Q.    With respect to this issue, the

17 information that you got was to the effect

18 that no issues from KPMG, seven

19 technology, is that it?

20     A.    That was the normal life

21 assigned to technology.

22     Q.    So seven years technology, 15

23 service or translation?

24     A.    Correct.

25     Q.    Was that information for this

131

CHAMBERLAIN

1

2     item provided by Stephan or Bob or someone

3     else?

4          A.     It was provided by KPMG.

5          Q.     Are you able to tell us whether

6     it was provided by Stephan or by Bob?

7          A.     On this specific question, it

8     is my recollection that it was provided by

9     Bob.

10         Q.     Your recollection is when you

11    talked about this item and asked about

12    goodwill and develop technology, Bob told

13    you that KPMG had no issues based on what

14    he had seen, that there was seven years

15    being used for technology and 15 years

16    being used for service or translation?

17         A.     Correct.

18         Q.     Did you have any objection or

19    problem with the seven years for

20    technology and the 15 years for service or

21    translation?

22         A.     Not if KPMG didn't.

23         Q.     Based on your experience as an

24    auditor and as a financial officer, seven

25    years for technology and 15 years for

132

1                     CHAMBERLAIN

2    service or translation was not

3    unreasonable?

4         A.     Not unreasonable if they could

5    prove the cash flow, et cetera.

6         Q.     Next item, "How are the

7    earn-out agreements structured, is any

8    compensation expense recorded on these?"

9              Could you read to us any

10   handwritten notes that go along with this

11   item.

12        A.     "No compensation expense

13   recorded based on revenue and gross margin

14   targets achievement as probable, then in

15   goodwill."

16        Q.     Who provided this information?

17        A.     This is a phone call I had with

18   KPMG, this was provided by KPMG.

19        Q.     Are you saying this was a

20   different phone call than the March 22nd

21   phone call?

22        A.     No, same phone call.

23        Q.     I am focused on this item,

24   which I think is the last one on the page.

25        A.     KPMG.

133

CHAMBERLAIN

1

2      Q.      Can you tell us whether this

3   was Stephan or Bob?

4              (Witness perusing document.)

5      A.      It is my belief it was Bob.

6      Q.      And this item, "earn-out

7   agreements and compensation expense

8   recorded," is this another item that

9   relates to purchase accounting?

10     A.      This related to an acquisition

11  that they had done.

12     Q.      Which acquisition?

13     A.      I can't recollect, they had a

14  lot during that time.

15     Q.      But this again, this item and

16  your handwritten entry, relates to an

17  acquisition activity by Lernout & Hauspie,

18  not to any of their contract business?

19     A.      That's correct.

20     Q.      And that's generally for this

21  purchase accounting section, purchase

22  accounting by definition refers to

23  acquisition activities, not to contract

24  business for Lernout & Hauspie, correct?

25     A.      Correct.

134

CHAMBERLAIN

1

2     Q.    Shall we turn to the second

3  page.

4          (Witness complying.)

5     Q.    The first item on page 2, the

6  typed entry says, "AR DSO appears to be

7  high for the period ended September 1999,

8  excluding the effective acquisitions,

9  what, if any, was the impact to revenue

10  recognition as a result of the high level

11  of AR."

12          Have I read it correctly?

13     A.    Yes.

14     Q.    AR is short for?

15     A.    Accounts receivable.

16     Q.    DSO is short for?

17     A.    Days sales outstanding.

18     Q.    Can you read any of your

19  handwritten notes that relate to this?

20     A.    "Will not deteriorate, could

21  be higher, continue to focus on."

22     Q.    Can you tell us who provided

23  that information.

24     A.    Carl Dammekens.

25     Q.    What does this item refer to,

135

                    CHAMBERLAIN

1

2   what's this issue with AR DSO?

3        A.    If it goes back to the first

4   page, which has to do with revenue

5   recognition, that if there is something

6   that is not being collected, that's a

7   clear indication that there is a

8   problem -- not necessarily, but it could

9   be an indication that there is a problem

10  with revenue recognition.

11       Q.    Next item begins, "Unbilled

12  receivables are relatively large, why,

13  what are normal terms for billings, do

14  some contracts provide for terms greater

15  than one year, are there revenue

16  recognition issues associated with these?"

17            Have I read it correctly?

18       A.    Yes.

19       Q.    Am I correct there is no

20  handwritten notation by you that goes to

21  this item?

22       A.    Correct.

23       Q.    Do you remember why you have no

24  handwritten entry for this item?

25       A.    I do not remember definitively.

136

CHAMBERLAIN

1

2     Q.     The next item reads, "Is there

3   any accrual for post-contract customer

4   support (PCS).  Are there maintenance

5   agreements, and if so, how are they

6   accounted for? Are they separately billed;

7   is the revenue associated with PCS

8   recognized at the time of billing?"

9           Have I read that correctly?

10    A.    Yes.

11    Q.    Any handwritten notations that

12  correspond to this?

13    A.     "Separate bill."

14    Q.    Can you tell us who provided

15  that information?

16    A.    KPMG.

17    Q.    Can you tell us if it was

18  Stephan or Bob?

19    A.    I can't.

20    Q.    Are you certain this item was

21  not provided to you by Mr. Dammekens?

22    A.    No, this was a question

23  directed at the auditors.

24    Q.    Is "separate bill" the only

25  handwritten notation in your notes that

137

```
 1                   CHAMBERLAIN
 2    corresponds to this item?
 3         A.    Yes.
 4         Q.    At the time did Dragon's
 5    business involve this same issue, PCS and
 6    how to account for it?
 7         A.    Very minimally, yes.
 8         Q.    Same question for Seagate; is
 9    that an issue that Seagate faced in its
10    accounting?
11         A.    Not Seagate Technology.
12         Q.    Any member of the Seagate
13    family?
14         A.    Yes.
15         Q.    Which one?
16         A.    Seagate Software.
17         Q.    Did Dragon and Seagate Software
18    handle PCS in a similar way, that is, was
19    it separately billed?
20              MR. JOSEPH:  Separate point in
21    time for the question?
22              MR. CARROLL:   Any time unless
23    the witness needs to clarify further.
24         A.    I can't say that everything was
25    separately billed within Seagate Software;
```

138

                    CHAMBERLAIN

1    it was a policy to separately bill.

2         Q.    That was the general policy, to

3    separately bill, yes?

4

5         A.    Yes.

6         Q.    And you considered that policy

7    to be an acceptable policy, correct?

8         A.    To separately bill, yes.

9         Q.    Next item --

10        A.    It was a preferred policy.

11        Q.    It was the preferred policy to

12   separately bill?

13        A.    Yes.

14        Q.    Next typed item reads, "For

15   investments accounted for in the equity

16   method, are there any commitments to fund

17   operations; if so, are there losses taken

18   beyond the value of the investments on

19   these?"

20             Have I read it correctly?

21        A.    Correct.

22        Q.    Can you read any handwritten

23   notes that correspond to that?

24        A.    "No, no commitments, small one

25   and they did record the loss."

139

                        CHAMBERLAIN

1

2        Q.    Can you tell us who on the

3  phone call provided that information?

4        A.    KPMG.

5        Q.    Can you tell us whether it was

6  Bob or Stephan?

7        A.    I cannot.

8        Q.    Are you certain this

9  information was not provided by

10 Mr. Dammekens?

11       A.    Correct.

12             Can I have one moment, please,

13 with Gregory?

14       Q.    Yes, would you like to go off

15 the record for a moment?

16       A.    Yes.

17             THE VIDEO TECHNICIAN:  Going

18 off the record at approximately 12:15

19 p.m..

20             (Witness and counsel conferring

21 off the record.)

22             THE VIDEO TECHNICIAN:  Back on

23 the record at approximately 12:16.

24             MR. JOSEPH:  Mr. Carroll, the

25 witness having been told before hand she

1                    CHAMBERLAIN

2  should only answer the specific questions

3  asked, she has a sentence or two she would

4  like to perhaps elaborate and explain the

5  answers that you have heard so far.

6        A.     I want to clarify that with

7  each one of these questions, they were

8  directed at KPMG, the phone call was with

9  KPMG, the other people that attended were

10 there because they were advisers of

11 someone on the telephone call and/or it

12 was courtesy obviously that Carl be asked

13 to be on the phone call and he wanted to

14 be on the phone call.

15             So I just want to make sure

16 that each one of these questions, they

17 were directed at KPMG.

18       Q.     Ma'am, we have spent over an

19 hour going through these individually and

20 my first question is, are you telling us

21 you want to change any of the testimony

22 you've given as we've gone through each of

23 these questions and notations in

24 individual fashion?

25       A.     I do not.

141

CHAMBERLAIN

1

2          I wanted to repeat what I said

3     earlier in this testimony; that this was a

4     conversation that was held with KPMG.

5          Q.    But you're not seeking to

6     change any of the answers you've given as

7     to the particular questions and your

8     particular information you received and

9     the source for the information that you

10    received, am I correct?

11         A.    Correct.

12         Q.    Then I would like to proceed.

13         I think we were on the item on

14    page 2 relating to investments accounted

15    for on the equity method.

16         You had just read your

17    handwritten statements, is that where we

18    were?

19         A.    Yes.

20         Q.    Does this item, investments

21    accounted for on the equity method, relate

22    to acquisition activity?

23         A.    Not necessarily they acquired

24    them, but they had made an investment in

25    them.

142

CHAMBERLAIN

1

2    Q.    This would relate to activity

3  by L&H with respect to owning all or a

4  portion of another entity, correct?

5    A.    Correct.

6    Q.    This does not relate to

7  contract business of Lernout & Hauspie,

8  correct?

9    A.    Correct.

10    Q.    Next item, "How is the joint

11  venture with Intel accounted for, how much

12  management and assistance will be provided

13  to this company, have the auditors

14  recommended that it be consolidated?"

15          Have I read this item

16  correctly?

17    A.    Correct.

18    Q.    Can you read us any hand

19  written notes that go with this item?

20    A.    "Nothing has happened in the

21  entity so little expenses, will need to

22  review in 2000."

23    Q.    Can you tell us who was the

24  source of this information?

25    A.    KPMG.

143

1                    CHAMBERLAIN

2       Q.      Was it Stephan or Bob or do you

3    not remember?

4       A.      I can't remember if it was

5    Stephan or Bob; I will repeat that the

6    majority of this call was done by Bob, it

7    was led by Bob.

8       Q.      Again, you're not seeking to

9    change any of the answers you've given to

10   particular questions when I've asked you

11   can you tell me whether this particular

12   one was Stephan or Bob, am I correct?

13      A.      Correct.

14      Q.      As to this item, this item

15   relates to a joint venture with Intel, is

16   that correct?

17      A.      Correct.

18      Q.      You were basically told that

19   nothing much had happened on this joint

20   venture, is that right?

21      A.      Correct.

22      Q.      As you understood it, this item

23   referred only to Intel, not to L&H's

24   general contract business, correct?

25      A.      That's correct, this whole

144

1                    CHAMBERLAIN

2    section deals with the balance sheet, not

3    contracts.

4         Q.    By section, you're referring to

5    all of the items on page 2?

6         A.    Correct.

7         Q.    Of which there are two typed

8    items remaining, next-to-last is "what

9    jurisdiction(s) is the defer tax asset

10   associated with, are the operations in

11   these jurisdictions profitable, are there

12   any valuation allowances on the deferred

13   tax asset?"

14              Have I read that correctly?

15        A.    Correct.

16        Q.    Do you have any handwritten

17   notations that relate to this item?

18        A.    Do not.

19        Q.    Were you provided any

20   information with respect to this item?

21        A.    Yes, on the front page I was

22   told that it was still an open issue,

23   bullet point 4.

24        Q.    Is that the fourth of the

25   bullet points in the left margin we

CHAMBERLAIN

1

2    discussed previously that begins "deferred

3    tax assets"?

4        A.    Yes.

5        Q.    So when you got to this point

6    in the phone call, did you understand this

7    item had already been addressed?

8        A.    I understood that it was still

9    an open issue, you couldn't ask any of

10   these questions.

11       Q.    So there was nothing more to

12   discuss beyond what you had already

13   discussed?

14       A.    I am not sure if additional

15   questions were asked by anybody else, but

16   I didn't ask anything else.

17       Q.    The last typed item reads, "On

18   the 1994 TARSOPS, are there any issues

19   relating to the measurement dates for

20   long-lived options (i.e. 10 years)?"

21            Have I read it correctly?

22       A.    Correct.

23       Q.    Any handwritten items that you

24   have that go to this item.

25       A.    "Was brought up in a review

146

1                  CHAMBERLAIN

2    and they are clear.    Company aware for

3    future plans."

4         Q.     Was this information provided

5    to you by Carl or by someone from KPMG?

6         A.     KPMG.

7         Q.     Can you tell us whether this

8    particular item came from Stephan or Bob?

9         A.     Cannot.

10        Q.     Beneath that there is an item

11   with an arrow.

12               Can you read that for us,

13   please.

14        A.     "Carl, SAIL, 4.5 million

15   operating expense, continual per quarter,

16   amount when not finalized."

17        Q.     Is this some information that

18   you wrote down as coming from

19   Mr. Dammekens, is that who Carl is?

20        A.     Yes.

21        Q.     Did he provide this information

22   you've written here?

23        A.     Yes.

24        Q.     Can you tell us what this

25   refers to?

147

CHAMBERLAIN

1

2    A.    They had an entity that was not

3    consolidated with Lernout & Hauspie's

4    financial statements and I was asking what

5    type of run rate was it because I was told

6    that they were going to put it in the

7    future period onto the Lernout & Hauspie

8    financials, so I wanted to ask how much it

9    was so I knew if that would impact the

10   bottom line for Lernout & Hauspie, which

11   would affect the price per share of

12   earnings.

13       Q.    Were you satisfied with the

14   information Mr. Dammekens gave you on this

15   item?

16       A.    I was.

17       Q.    Have we now covered every

18   single typed subject matter listed for

19   this discussion, this conversation, on

20   March 22, 2000?

21       A.    No.

22       Q.    Which typed item have we

23   missed?

24       A.    Bullet or No. 4 underneath

25   "general," the one that begins with "on

148

1                          CHAMBERLAIN

2    the audit."

3          Q.     We did discuss that previously,

4    do you remember that?

5          A.     We did not discuss that, I read

6    it to you, we discussed "nothing in

7    revenue past 90 days," we did not discuss

8    "not aware of anything".

9          Q.     Where are you referring to?

10         A.     Under bullet No. 3.

11         Q.     I'm sorry, you're referring to,

12   on page 1, in the space under the third

13   item at the top of the page, the item that

14   begins "most subsidiaries appear to be

15   nonintegrated, what is the state of the

16   financial and operational controls over

17   these subsidiaries," and there is a

18   portion of writing under that that says

19   "not aware of anything," is that what you

20   are referring to?

21         A.     Yes, because it is pointing

22   down to point No. 4.

23         Q.     I thought you had read that

24   into the record already, so let's go back

25   to that particular item, that "not aware

149

1                    CHAMBERLAIN

2    of anything."

3                    That item that you wrote in

4    your handwriting goes to the --

5         A.    I'm sorry.

6         Q.        -- to the question beneath

7    it, is that correct?

8         A.    I'm sorry, did you not ask me

9    was there anything else that was written

10   on this page that we did not discuss?

11        Q.    Well, I was doing it in two

12   sections, so let's start again.

13                   Is there any typed question,

14   that's what I had asked, is there any

15   typed question on these two pages that we

16   have now not covered?

17                   MR. JOSEPH:  Objection to form.

18                   Are you asking whether you've

19   read it or whether you got all discussion

20   relating to it?

21                   MR. CARROLL:   I want to do

22   this the way I want to do it.

23                   MR. JOSEPH:  You have my

24   objection, answer the question.

25        Q.    Have we covered all of the

150

CHAMBERLAIN

1

2    typed questions that are on these two

3    pages, have I asked you about each one?

4            MR. JOSEPH:  Objection to form.

5            You may answer.

6        A.    You have read each one of these

7    questions to me off this piece of paper.

8        Q.    Have we discussed each of the

9    handwritten pieces of information you have

10    written down on these two pages?

11        A.    No, we have not.

12        Q.    Which handwritten piece of

13    information have we not discussed yet?

14        A.    "Not aware of anything."

15        Q.    Anything else that we have not

16    discussed on these two pages?

17        A.    Yes, to the right of bullet No.

18    2, "other questions."

19        Q.    "Other questions" is next to

20    the bullet relating to restatement,

21    correct?

22            MR. JOSEPH:  Objection to

23    characterization.

24            You may answer.

25        A.    It is next to the item dealing

151

                    CHAMBERLAIN

1

2    with the SEC and restatements.

3        Q.    And when I asked you previously

4    about that item you read that section of

5    your notes and told me it corresponded to

6    that item, item 2 on SEC restatements.

7            Do you remember that?

8        A.    Correct.

9        Q.    Is that the item that it goes

10   with?

11       A.    Yes.

12       Q.    Is there something that you

13   want to tell us about that item that you

14   have not told us yet, namely "other

15   questions"?

16       A.    Yes.

17       Q.    What is it that you would like

18   to tell us.

19       A.    I asked during that same period

20   if there were any other questions being

21   asked by the SEC, had all questions been

22   cleared with the SEC.

23       Q.    Which did you ask?

24       A.    I'm sorry, I clarified; were

25   there any other questions being asked by

152

                    CHAMBERLAIN

1

2    the SEC.

3         Q.    Are you sure that's the way you

4    asked it after these four years?

5         A.    The subject matter is the same;

6    I can't tell you exact verbiage that came,

7    but I asked if there were any other things

8    from the SEC.

9         Q.    Let's read the entry here again

10   and spend a moment on it so we can make

11   sure we have a clear record, okay?

12        A.    Sure.

13        Q.    The typed item on page 2 that

14   we had previously covered, I am going to

15   go back to it and do it again, reads,

16   "There have been restatements of

17   financials in the past, when were the

18   restatements made, what periods were

19   restated, what were the reasons for the

20   restatements, what were the issues with

21   the SEC, have all R&D write-offs been

22   reviewed by the SEC?"

23             Have I read it correctly?

24        A.    Yes.

25        Q.    Were those questions asked

1                    CHAMBERLAIN

2    during this phone call?

3         A.     Yes.

4         Q.     Am I correct that next to those

5    questions you have written in your

6    handwriting the following language, or

7    actually, you read it, read to us, please,

8    of the notations you wrote.

9         A.     Have I not already read it?

10        Q.     I thought we had done this,

11   ma'am, I am doing this actually to make

12   sure we have a complete record because you

13   seem to believe that there is something

14   else you didn't say.

15        A.     I have indicated to you that

16   there are other questions that come out of

17   questions.

18              It is not written on that piece

19   of paper and I said all the way through

20   here there were different things that came

21   out that had not to do directly with the

22   question but get asked as a result of

23   asking questions.

24        Q.     Would you just --

25        A.     So I will read the print again.

154

CHAMBERLAIN

1

2      Q.    I would like for you to read to

3  us, as you did before, any handwritten

4  notation on this page that corresponds to

5  that second item.

6           MR. JOSEPH:  You may if you

7  want to; you have already done this once,

8  you need not do it again.

9           THE WITNESS:  I don't want to

10 do it again.

11     A.    I have read every word on here

12 along with the sentences.

13     Q.    I want to make sure that you

14 are not changing your testimony; are you

15 changing your testimony now with respect

16 to which language in your handwriting

17 corresponds to these questions relating to

18 the SEC and restatements?

19     A.    I am not changing my testimony;

20 that notation on the side dealt with that

21 paragraph.

22     Q.    In your handwritten notation to

23 the side you have written "1998 received

24 letter number of topics until April '99,

25 restated '97 in process, although asked

155

1                    CHAMBERLAIN

2    other question, restated first

3    three-quarters of 1998."

4              Have I read it correctly?

5         A.    Yes.

6         Q.    The restatement that is being

7    referred to here you understood to be a

8    restatement that had occurred for 1997 and

9    the first portion of 1998, correct?

10        A.    Correct.

11        Q.    You understood that this was a

12   restatement that was finished and had been

13   taken, correct?

14        A.    Restatement had been finished

15   and taken; what does the word "taken"

16   mean?

17        Q.    It had been reported, accounted

18   for?

19        A.    Yes, they had reissued

20   financial statements.

21        Q.    You had those reissued

22   financial statements?

23        A.    Yes.

24        Q.    You had those before this phone

25   call, correct?

CHAMBERLAIN

1

2      A.      Correct.

3      Q.      And the reference in your

4    handwritten notes to "although asked other

5    question," those words, "although asked

6    other question," is that language that

7    somebody on the phone call spoke or that

8    you spoke to others on the phone call?

9      A.      I asked if there were other

10   issues that came out of the SEC.

11     Q.      So is it your testimony that

12   that portion of your handwritten notes

13   does not refer to information you received

14   but refers to a question you asked,

15   namely, "although asked other question"?

16     A.      Will you repeat that question.

17     Q.      Is it your testimony that this

18   language, "although asked other question,"

19   does not refer to something someone else

20   said, this refers to something you asked,

21   is that what you are telling us?

22     A.      That is my question, yes.

23     Q.      Where is the answer to that

24   question?

25     A.      I was told it and I didn't

157

CHAMBERLAIN

1

2   write it down.

3        Q.    You didn't write it down?

4        A.    Yes.

5        Q.    Could you tell us why my

6   client's name, Bob, doesn't appear

7   anywhere on this document, you didn't

8   write Bob's name down?

9        A.    I have told you that before, I

10  have no idea, I didn't write down a lot of

11  people's names on the thing.

12       Q.    But your testimony is you

13  understood him to be  -- let me ask.

14            Is it your understanding that

15  Bob was somehow in charge of the audit?

16       A.    Yes.

17       Q.    And even though you had that

18  understanding, you wrote down Stephan's

19  name and not Bob's, is that correct?

20       A.    Yes.

21       Q.    Was Bob there for this whole

22  phone conversation?

23       A.    It wasn't a visual

24  conversation, so I don't know if Bob

25  stepped out of the room.

158

CHAMBERLAIN

1

2      Q.      Was he there at the beginning

3  of the conversation?

4      A.      Yes, he was.

5      Q.      Did people identify themselves

6  at the beginning so that you could write

7  down who was on the call?

8      A.      Yes, they did.

9      Q.      But you didn't write down his

10  name?

11      A.      No, I didn't.

12      Q.      Did you ever at any point this

13  time ever have another conversation with

14  Bob from KPMG U.S.?

15      A.      I did not.

16      Q.      Did you ever have a

17  conversation with anyone else from KPMG

18  U.S. related to Lernout & Hauspie?

19      A.      I did not.

20      Q.      After this phone conversation

21  on March 22nd, did you ask anybody working

22  on your team, on the transaction, to do

23  any followup work with Bob at KPMG U.S.?

24      A.      I did not.

25      Q.      Do you remember knowledge, as

159

CHAMBERLAIN

1

2  you sit here, does anybody else who

3  participated in this phone call on March

4  22nd have notes of that conversation?

5      A.    Brad could have taken notes, I

6  don't know; anybody on that phone call

7  could have taken notes, they were not

8  sitting with me.

9      Q.    In preparing for your

10  deposition today, did you review any notes

11  relating to this conversation other than

12  your notes which we just marked as Exhibit

13  6?

14      A.    I saw a list of questions that

15  Brad had that he was going to incorporate

16  into the questions to be asked KPMG.

17      Q.    You understood this to be a

18  list of questions Brad was preparing in

19  advance of the March 22nd phone call, is

20  that correct?

21      A.    Correct.

22      Q.    Did that list of questions have

23  recorded on it, based on your review of

24  it, any information that actually

25  happened, that actually came out of the

160

CHAMBERLAIN

1

2  conversation on March 22nd?

3      A.    Can perhaps I see the document

4  so that I am sure we are talking about the

5  same thing.

6      Q.    By all means.

7          MR. CARROLL:    We will mark

8  this as 7.

9          (Chamberlain Exhibit 7, Bates Nos.

10  TRA 0001 and 2, was marked for

11  identification, as of this date.)

12          MR. CARROLL:    We have marked

13  as Exhibit 7 a two-page document, Bates

14  Nos. TRA 0001 and 2.

15      Q.    Is this the document you were

16  referring to?

17      A.    Yes.

18      Q.    Are these Brad's notes?

19      A.    Yes --  no, this is Brad's

20  writing.

21      Q.    Fair point.

22          This is Brad's handwriting on

23  these two pages?

24      A.    Correct.

25      Q.    Can you identify this as a

161

CHAMBERLAIN

2  handwritten document Brad prepared in

3  advance of the March 22nd phone call.

4           (Witness perusing document.)

5       A.     Yes, this was prepared in

6  advance.

7       Q.     This was part of what you used

8  to come up with the typed questions that

9  appear on Exhibit 6, correct?

10      A.     Yes, it was Brad's input.

11      Q.     And after Brad's input, then

12 someone on your team prepared the typed

13 portion of Exhibit 6 with the typed

14 questions, correct?

15      A.     Correct.

16      Q.     Are there any other documents

17 that you are aware of that anybody has

18 that were prepared in connection with the

19 March 22nd phone call, as you sit here?

20      A.     I had a piece of paper with

21 some general subjects on it that I had

22 that I wanted to make sure made the list.

23      Q.     When you say make sure made the

24 list, you mean make sure made the list

25 that's the typed portion of Exhibit 6?

162

CHAMBERLAIN

1

2      A.      Correct.

3      Q.      Was the document you're

4  referring to handwritten or typed?

5      A.      Handwritten.

6      Q.      Other than that, are there any

7  other documents you're aware of sitting

8  here that relate to the March 22nd, 2000,

9  phone call?

10      A.      Any other documents relating to

11  questions that were going to go into this

12  phone call?

13      Q.      Yes.

14      A.      I am not aware of any other

15  ones.

16      Q.      In particular, with respect to

17  the discussion itself at the phone call

18  and the answers provided, am I correct

19  that the only document you were aware of

20  that has in it answers provided during

21  that phone call are your two pages of

22  notes, Exhibit 6?

23      A.      It is the only ones I have been

24  shown.

25      Q.      And the only ones you're aware

163

                    CHAMBERLAIN

1

2  of sitting here; I want to make sure there

3  is not some other set of notes from this

4  phone call that you know sitting here were

5  prepared, even if you have not seen them.

6       A.    I have no knowledge that they

7  were prepared.

8       Q.    On Exhibit 7, if you would,

9  please, that's the two pages of Brad's

10 questions for incorporation into the typed

11 questions for the discussion, are you with

12 me?

13      A.    Yes.

14      Q.    On the first page there is a

15 reference to CM and underneath that RF, do

16 you see that?

17      A.    I do.

18      Q.    Do you know what those refer

19 to?

20      A.    Catherine Moi and Robert Fraga.

21      Q.    The two accountants at Arthur

22 Andersen who were assisting you, correct?

23      A.    Correct.

24            (Continued on next page.)

25

164

CHAMBERLAIN

1

2    Q.    And the BS two-thirds of the

3   way down the page, that refers to balance

4   sheet?

5    A.    That would be my presumption.

6          MR. CARROLL:    Shall we break

7   for lunch?

8              THE VIDEO TECHNICIAN:  Going

9   off the record at approximately 12:40

10  p.m..

11          (Luncheon recess: 12:40 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

165

1

2          A F T E R N O O N      S E S S I O N

3                    1:45 p.m.

4    E L L E N      C H A M B E R L A I N,

5    resumed.

6    CONTINUED EXAMINATION

7    BY MR. CARROLL:

8                    THE VIDEO TECHNICIAN:  We are

9    now going back on the record at

10   approximately 1:31 p.m..

11        Q.    I would like to show you next

12   what has been marked as Exhibit 8, if I

13   may.

14             (Chamberlain Exhibit 8, Bates Nos.

15   KPMG U.S. 083441, it is numbered pages 1

16   through 6, was marked for identification,

17   as of this date.)

18             MR. CARROLL:  For the record,

19   it is headed "Dragon Systems, Inc.,

20   Meeting of the Board of Directors, March

21   27, 2000," bears Bates Nos. KPMG U.S.

22   083441, it is numbered pages 1 through 6.

23        Q.    First question,

24   Ms. Chamberlain, do you recognize this as

25   minutes for the March 27th board meeting

166

1                CHAMBERLAIN

2    of Dragon Systems?

3         A.    I recognize them as minutes,

4    yes.

5         Q.    Any reason to disagree with

6    this document as the minutes for the

7    meeting on March 27, 2000?

8         A.    No reason.

9         Q.    I had asked you earlier in your

10   testimony whether it was a condition of

11   the deal with Lernout & Hauspie that

12   Seagate be released from its guarantee on

13   the bank debt, do you remember that

14   subject?

15        A.    Yes, I remember you asking me.

16        Q.    And I think you said you were

17   not sure it was a condition.

18        A.    Correct.

19        Q.    If you will turn to page 2 of

20   these minutes, you see the top full

21   paragraph is describing some discussion by

22   Mr. Waite about the terms of the merger.

23              Do you see that?

24              (Witness perusing document.)

25        A.    Yes.

167

CHAMBERLAIN

1

2    Q.    Do you see the last sentence in

3    that paragraph Mr. Waite reported that

4    "the release of the guarantee provided by

5    Seagate Technology of the corporation's

6    current line of credit with Fleet Bank was

7    a condition to the closing of the

8    transaction," do you see that?

9    A.    Yes.

10    Q.    Does that refresh your memory

11    on this subject and confirm that in fact

12    it was a condition of the deal with L&H

13    that Seagate get taken off of the bank

14    debt obligation it had before?

15    A.    I see it in the minutes, but I

16    don't know that without seeing it written

17    in a purchase agreement, that would be

18    where a condition was.

19    It is just discussed here.

20    Q.    You were present at this board

21    meeting on March 27th?

22    A.    I was.

23    Q.    Do you remember it?

24    A.    Not intimately.

25    Q.    Do you remember this was the

168

CHAMBERLAIN

1

2   board meeting where the board of Dragon

3   approved the transaction with Lernout &

4   Hauspie?

5        A.    Not specifically.

6        Q.    Do you remember there was such

7   a board meeting that you attended where

8   the board was finally voting on doing a

9   deal with Lernout & Hauspie?

10       A.    Yes.

11       Q.    And you remember that you were

12  present for such a meeting?

13       A.    Yes.

14       Q.    Do you have any reason to

15  disagree with what's reported here as Mr.

16  Waite's comment that it was a condition of

17  the deal that Seagate be taken off of the

18  current line of credit?

19       A.    Do I have reason to disagree,

20  is that the question?

21       Q.    Right; this document says that

22  Mr. Waite said that and I'm asking you,

23  reading the document, do you have any

24  reason to disagree with the statement

25  that's reflected here.

169

1                        CHAMBERLAIN

2          A.    No.

3          Q.    Does this document refresh your

4    memory that a benefit that Seagate

5    received from the L&H deal was that

6    Seagate's guaranteed obligation on Dragon

7    debt was in fact released?

8          A.    Yes.

9          Q.    Do you see in the same

10   paragraph we have just been looking at on

11   page 2 of Exhibit 8 there is also a

12   reference to the fact that Lernout &

13   Hauspie will be providing a $10 million

14   guarantee for a line of credit to Dragon

15   during the period between signing the

16   agreement and the closing, do you see

17   that?

18         A.    Yes.

19         Q.    Does that refresh your memory

20   that in fact that was another condition,

21   if you will, of the deal that was

22   negotiated; namely, that Lernout would

23   come onboard and take over the guarantee

24   of Dragon's bank debt?

25              (Witness perusing document.)

170

1                    CHAMBERLAIN

2        A.    As a condition, that's what it

3    says.

4        Q.    You've no reason to disagree?

5        A.    I have no reason to disagree.

6        Q.    Farther down on page 2 of this

7    document there is a small paragraph that

8    refers to Dr. Janet Baker and then to

9    yourself, it says, "Dr. Janet Baker then

10   discussed briefly the corporation's cash

11   flow needs prior to the closing and

12   Ms. Chamberlain and Mr. Shagoury provided

13   brief updates on the corporation's

14   revenues and expenses to date."

15           Do you see that?

16       A.    Yes, I do.

17       Q.    Did you provide updates at this

18   board meeting on Dragon's revenues and

19   expenses up to that point in time?

20       A.    I have no reason to disbelieve

21   that.

22       Q.    What was the state of affairs

23   as you reported it on March 27th with

24   Dragon's revenues and expenses?

25       A.    I would need to have documents

CHAMBERLAIN

1
2    to refresh my memory.

3          Q.    These minutes, as I read them,

4    but you look at them to confirm this,

5    don't indicate that you reported on any

6    other subject at this board meeting.

7                Let me first ask do you have

8    any memory of making any other report at

9    this board meeting on March 27, other than

10   what is indicated here?

11         A.    I have to look at it, because I

12   don't know what's indicated here.

13               MR. JOSEPH:  The document

14   speaks for itself.

15               Are you asking whether she has

16   an independent recollection.

17               MR. CARROLL:  I did ask that.

18         Q.    I said do you have a memory?

19         A.    I don't have any independent

20   recollections of whatever is in here that

21   happened at the board meeting.

22         Q.    In particular, you have no

23   memory of reporting to the board when this

24   transaction was approved on March 27th

25   anything with respect to my client, KPMG

                    CHAMBERLAIN

1
U.S., correct?

3       A.      Correct.

4       Q.      You made no statements or

5   representations about anything KPMG U.S.

6   had said or done in connection with this

7   board meeting when the deal was approved,

8   correct?

9       A.      None that I can remember at

10  this time.

11      Q.      Am I correct that a vote was

12  taken on March 27th at the board meeting

13  and the transaction was approved, it was

14  decided to go forward with the

15  transaction?

16      A.      Do you want to point to the

17  page that it says that and I will be able

18  to answer.

19      Q.      Do you remember that we showed

20  you earlier the merger agreement, it is

21  dated March 27th.

22      A.      Right, but you asked me if the

23  transaction was approved in this document.

24      Q.      No, I actually asked you do you

25  remember at the board meeting --

173

                    CHAMBERLAIN

1

2       A.      Specifically approving it?

3       Q.      I will ask the question first

4   and we will see how we do.

5               Do you remember at the board

6   meeting you attended -- because I think

7   you said you do remember attending a board

8   meeting when the transaction was approved,

9   is that correct?

10      A.      That is correct.

11      Q.      So you remember that at the

12  board meeting on March 27th that you were

13  present for, the transaction was approved

14  and Dragon decides to go forward with the

15  deal with L&H, correct?

16      A.      They decided to sign a merger

17  agreement.

18      Q.      And that merger agreement is

19  the document we previously marked as

20  Exhibit 2, I believe, is that correct?

21              (Witness perusing document.)

22      A.      Correct.

23      Q.      I want to go back and ask

24  followup questions on two other items as

25  well.

174

CHAMBERLAIN

1           Do you still have your notes in

2  front of you, Exhibit 6, your notes of the

3  March 22, 2000, conversation?

4           MR. JOSEPH:  She has it.

5           MR. CARROLL:  Thank you.

6      Q.    Do you see in the right margin

7  near the top we had previously had some

8  questions and answers with respect to the

9  second item, the item that refers to the

10  SEC and to the restatement, and in

11  particular you had given some testimony

12  with respect to the words in your

13  handwriting that read "although asked

14  other question," do you see that?

15      A.    Yes, I do.

16      Q.    I believe your testimony, if I

17  have understood it, is that that is

18  actually something you said that you are

19  writing down in your handwriting, correct?

20      A.    I am paraphrasing what I am

21  being told on that conversation and it is

22  my handwriting.

23      Q.    What I want to be clear, the

24  words "although asked other question"

175

CHAMBERLAIN

2  appear right in the middle of a block of

3  handwriting of yours, correct?

4       A.    Correct.

5       Q.    The handwriting begins "1998

6  received letter, number of topics, until

7  April '99, restated '97, in process."

8            All of those words I just read,

9  are those words you said or someone said

10 to you?

11      A.    You will have to repeat the

12 words.

13      Q.    I am reading your handwriting

14 next to the second item relating to

15 restatement and SEC, your handwriting

16 begins "1998 received letter, number of

17 topics, until April '99, restated '97, in

18 process," do you see where I am?

19           (Witness perusing document.)

20      A.    Yes.

21      Q.    And we have talked about this

22 before, I'm not redoing everything, I want

23 to confirm something.

24           The words I just read, down to

25 where it starts "although," those words

176

CHAMBERLAIN

1

2    were not spoken by you, those are words or

3    information someone else provided during

4    the phone call, correct?

5        A.    Correct.

6        Q.    The next little phrase,

7    "although asked other question," that

8    entry, if I understand what you are

9    saying, is not information somebody else

10   commented at the meeting, but it is

11   actually your words that you've written

12   down here, is that right?

13       A.    No.

14       Q.    The "although asked other

15   question," is that a statement or

16   information that somebody else said in the

17   conversation?

18       A.    Yes.

19       Q.    And then following that

20   language you also have written a plus

21   sign, "restated first three-quarters of

22   '98," those words were also said by

23   somebody else during the conversation?

24       A.    Correct.

25       Q.    So none of this handwriting

                    CHAMBERLAIN

1

2   then, including the phrase "although asked

3   other question," none of that is anything

4   that you said during this March 22

5   conversation?

6        A.    None of those written words.

7        Q.    And all of that information

8   came from the same source during this

9   conversation?

10       A.    Yes.

11       Q.    And that source was?

12       A.    KPMG.

13       Q.    But you are unclear whether

14  that was Stephan or Bob, is that correct?

15       A.    I thought I said that was Bob;

16  if I did not, I should have said it was

17  Bob.

18       Q.    So if before you said you

19  weren't sure, you would now be changing

20  that and you're telling us you are sure it

21  is Bob?

22            MR. JOSEPH:  Object to the

23  form.

24            You can answer the question.

25       Q.    Are you sure this is Bob or can

178

1                CHAMBERLAIN

2  you not be sure whether this is Bob or

3  Stephan?

4        A.     This is Bob.

5        Q.     You're sure of that now?

6        A.     Yes.

7        Q.     So Bob said in essence the

8  portion of this that includes "although

9  asked other question," that came from him?

10       A.     Yes.

11       Q.     What did you understand he was

12  referring to when he said that?

13       A.     The inquiry that caused the

14  restatement of the financial statements in

15  1998 and 1999.

16       Q.     You understood that he was

17  referring to the restatement for 1997 and

18  1998?

19       A.     No, 1998 and part of 1999,

20  wasn't it, until April of '99 or

21  something.

22              So '97 and '98.

23       Q.     So you understood that he was

24  referring to the restatement for '97 and a

25  portion of '98?

179

CHAMBERLAIN

1

2          A.    Yes.

3          Q.    In connection with the

4    transaction, I'm going to move back to the

5    merger agreement, Exhibit 2, do you

6    remember whether any representations were

7    made with respect to litigation?

8          A.    I could certainly look at the

9    document and tell you.

10         Q.    If you will go to Exhibit 2,

11   maybe I can assist you.

12               First, can you tell me is it

13   common in connection with a corporate

14   acquisition, corporate merger, for the

15   merger document to contain representations

16   with respect to litigation?

17         A.    Yes, it is.

18         Q.    That's something you're

19   familiar with from your years of

20   experience?

21         A.    Yes.

22         Q.    First if you will turn to page

23   20 of Exhibit 2, do you see there is a

24   section 3.11 headed  "Litigation"?

25         A.    Yes.

180

1                   CHAMBERLAIN

2        Q.      There is a representation in

3   this section to the effect that "there is

4   no action, suit, or proceeding, claim,

5   arbitration, or investigation thereto

6   against company or any of its

7   subsidiaries," and it continues, do you

8   see that?

9               MR. JOSEPH:  Document speaks

10  for itself, you can answer.

11       A.      Yes.

12       Q.      The company that's referred to

13  here again, this is Dragon?

14       A.      Yes.

15       Q.      So this is Dragon making a

16  representation that there are no

17  litigations, including investigations,

18  relating to Dragon that would have a

19  material adverse affect?

20       A.      Correct.

21       Q.      And Dragon gave such a

22  representation in connection with this

23  transaction as set forth here, yes?

24       A.      Correct.

25       Q.      Did you negotiate for such a

CHAMBERLAIN

1

2    representation back from Lernout & Hauspie

3    in this merger agreement?

4         A.    I would need to look.

5         Q.    You're welcome to look

6    throughout the entirety, there is a table

7    of contents in the front, the reps and

8    warranties set forth in the table of

9    contents from Lernout & Hauspie is in

10   article 4 beginning at page 29, do you see

11   that?

12              (Witness perusing document.)

13        Q.    I will just tell you that I

14   find no such representation in this merger

15   agreement from Lernout & Hauspie.

16        A.    Okay.

17        Q.    Are you aware of one?

18              MR. JOSEPH:   Objection,

19   document speaks for itself.

20              You can certainly answer as to

21   your awareness.

22        A.    I am not aware.

23        Q.    Did you handle the negotiation

24   over provisions in this agreement such as

25   the litigation reps and warranties or did

182

CHAMBERLAIN

1

2    lawyers on behalf of Dragon handle that?

3        A.    Lawyers on behalf of Dragon and

4    lawyers hired by Dragon worked on the

5    litigation part of due diligence.

6        Q.    Which lawyers was that?

7        A.    It would be Paul Cohen and Sara

8    Rothermel.

9        Q.    Which firm?

10        A.    Paul was a Dragon in-house

11    counsel and Sara worked for Hale and Dorr.

12        Q.    Did you ever speak with Paul

13    and Sara or any other lawyers about the

14    fact that L&H was not making any

15    representations about litigation in the

16    merger agreement?

17            MR. JOSEPH:  Objection to form.

18            You can answer.

19        A.    I don't recollect any.

20        Q.    If you will go back to your

21    notes of the March 22nd phone call one

22    more time, please, Exhibit 6.

23        A.    Can I ask a question?

24            MR. JOSEPH:  Certainly.

25        A.    Or point to something in here.

183

                    CHAMBERLAIN

1

2          On the rep side for the buyer,

3   do they not rep that there are no

4   undisclosed liabilities?

5          That would be in page 32.

6          Litigation that's expected to

7   have a material affect is something that

8   needs to be recorded as a liability.

9      Q.   Let's first clarify the record;

10  you are looking at page 32 of the merger

11  agreement, section 4.5, which is headed

12  "No Undisclosed Liabilities," is that

13  correct?

14     A.   That's correct.

15     Q.   Are you telling us it was your

16  understanding at the time that this

17  section included a litigation

18  representation?

19     A.   No, what I am saying is you

20  asked if there was anything that had to

21  deal with litigation and section 4.5 would

22  cover litigation that was significant

23  enough that it needed to be brought out

24  here as to either an unrecorded or

25  recorded liability.

184

                    CHAMBERLAIN

1                   No liabilities either accrue,

2       contingent or otherwise.

3           Q.      Let's go back to the Dragon

4       side of the representations, article 3.

5                   Do you see on page 14 Dragon

6       has a section that's headed "No

7       Undisclosed Liabilities," and contains

8       representations about no undisclosed

9       liabilities, do you see that?

10          A.      I do.

11          Q.      In addition, Dragon also had an

12      undertaking that dealt explicitly with

13      litigation including investigations,

14      correct?

15          A.      Correct.

16          Q.      This agreement that was

17      negotiated with Lernout & Hauspie, Dragon

18      did not negotiate a litigation provision

19      coming from Lernout & Hauspie, correct?

20                  MR. JOSEPH:   Document speaks

21      for itself.

22                  You may answer.

23          A.      Correct.

24          Q.      In other words, Dragon got a

185

CHAMBERLAIN

1

2  representation about no undisclosed

3  liabilities, but it did not get

4  representation specific as to litigation

5  of the type Dragon gave to Lernout &

6  Hauspie?

7      A.    Dragon was being bought,

8  Lernout & Hauspie was the buyer.

9      Q.    I am simply asking about the

10  state of play with respect to the

11  representations.

12          Am I correct that Dragon gave

13  explicit representations about litigation,

14  including investigations, and Lernout &

15  Hauspie did not?

16          MR. JOSEPH:  Document speaks

17  for itself.

18          You may answer.

19      A.    Well, I would have to look at

20  investigations, because I saw it said

21  compliance with in that material, no

22  undisclosed liabilities, it says

23  "liabilities either accrued, contingent or

24  otherwise."

25      Q.    You're reading from the

                                                      186

1                    CHAMBERLAIN

2    language of section 4.5 under "no

3    undisclosed liabilities"?

4         A.    I am.

5         Q.    If you will flip back to page

6    20, the section headed "litigation" is a

7    section in which Dragon represents that

8    there are no litigations, including

9    investigations, that are reasonably likely

10   to materially adversely affect them,

11   correct?

12              MR. JOSEPH:  Objection,

13   argumentative at this point.

14              The document speaks for itself,

15   asked and answered.

16              MR. CARROLL:  No, I am just

17   trying to make sure we are clear.

18              MR. JOSEPH:  You may answer it

19   again.

20        A.    It is there, you just read it.

21        Q.    That representation with

22   respect to litigation explicitly was not

23   made by Lernout & Hauspie in this merger

24   agreement, is that correct?

25        A.    Those words were not used.

187

CHAMBERLAIN

1

2      Q.      That entire provision was not

3  used, correct?

4      A.      Those words were not used.

5      Q.      The entirety of section 3.11,

6  there was no parallel litigation section

7  that was provided by Lernout & Hauspie?

8      A.      Word-for-word, there is not.

9      Q.      Stay focused on section 4.5,

10  please.

11          Was it your understanding --  I

12  will give you a chance to get there first.

13          (Witness perusing document.)

14      Q.      Was it your understanding at

15  the time that section 4.5 required the

16  disclosure by L&H of any SEC inquiry or

17  investigation activity?

18      A.      If it would have a significant

19  affect on the financial statements, yes.

20      Q.      But if it was not determined to

21  have a significant impact on the financial

22  statements, it would not need to be

23  disclosed, correct?

24      A.      I don't understand or can

25  converse the words "reasonably likely to

188

                    CHAMBERLAIN

1

2    have material affect," that's a legal

3    term, but what it should have done, if it

4    would have an affect materially, they

5    would have had to disclose it.

6         Q.    Is it your position that any

7    SEC investigation or inquiry would be

8    required for disclosure or only in certain

9    circumstances?

10         A.    Only if it would have a

11    material affect on the financial

12    statements.

13         Q.    And if it would not have a

14    material impact on the financials, it

15    would not need to be disclosed, correct?

16         A.    That's correct.

17         Q.    Go back to your notes, Exhibit

18    6, please.

19              (Witness complying.)

20         Q.    You had earlier made some

21    reference to a phrase on the first page of

22    this document, and I want to make sure we

23    have all of your testimony related to the

24    phrase.

25         A.    Okay.

189

CHAMBERLAIN

1

2      Q.    There is a phrase under the

3  third item on the first page, the item

4  that starts "most subsidiaries appear to

5  be nonintegrated," there is a phrase in

6  the middle of your handwriting under there

7  that says "not aware of anything."

8            Do you see that?

9      A.    Correct.

10     Q.    Is it your testimony that that

11 item, "not aware of anything," actually

12 refers to the typed item beneath it,

13 namely what adjustments have been booked

14 at the recommendation of the auditors?

15     A.    That's a correct statement.

16     Q.    Is in fact "not aware of

17 anything" the answer to that first

18 question, "what adjustments have been

19 booked at the recommendation of the

20 auditors," and the answer is "not aware of

21 anything"?

22     A.    No.

23     Q.    Have you written in the

24 language "not aware of anything" with a

25 line right after that question?

190

CHAMBERLAIN

1

2    A.    Yes, I have.

3    Q.    Why have you written in a line

4    right after that question if it is not the

5    answer to that question?

6    A.    Because booked and asked and

7    they wanted to be booked could be two

8    different items.

9    Q.    Does "not aware of anything"

10   relate to both adjustments booked and

11   adjustments asked for but not booked?

12   A.    And adjustments -- what that

13   relates to is I asked if there was

14   anything that they were aware of that

15   would cause an adjustment.

16   Q.    So the answer "not aware of

17   anything" relates to anything that would

18   cause an adjustment in the books, is that

19   correct?

20   A.    That is a correct statement.

21   Q.    Would these be material

22   adjustments or any adjustments, ma'am?

23   A.    They would only answer on

24   materiality.

25   Q.    And you understood it to be any

191

CHAMBERLAIN

1  material adjustments?

2      A.      Yes.

3      Q.      And this information, "not

4  aware of anything," do you remember

5  whether this came from Stephan or Bob or

6  someone else?

7      A.      These were all answered by Bob.

8      Q.      You're now sure of that?

9      A.      The "not aware of anything" was

10 answered by Bob.

11     Q.      And that indicates, as you

12 understood it, Bob was telling you he was

13 not aware of anything that would require

14 material adjustments to the books, is that

15 correct?

16     A.      That is a correct statement.

17     Q.      Have we now covered all of the

18 handwritten notations that you made in

19 connection with the March 22 phone

20 conversation?

21             MR. JOSEPH:  Objection to form.

22             You may answer.

23     A.      We did not address U.S. GAAP up

24 in the corner.

192

CHAMBERLAIN

1

2     Q.    Corner?

3     A.    Up in the top center of the

4 page.

5     Q.    Over to the right from "Stephan

6 from KPMG"?

7     A.    Correct.

8     Q.    There is a reference to U.S.

9 GAAP?

10     A.    Correct.

11     Q.    Was that reference made in

12 response to one of the typed items or in

13 response to something else?

14     A.    It was in a general

15 conversation before we started on were the

16 financials in accordance with U.S. GAAP.

17     Q.    This was a general conversation

18 you had before you covered any of the

19 typed items in the sheet, is that correct?

20     A.    Correct.

21     Q.    So if I understand this, you

22 had this sheet with all the typed

23 questions to cover in the conversation and

24 you began with some other things that were

25 not typed up for the conversation?

193

1                    CHAMBERLAIN

2        A.    To the best of my recollection.

3        Q.    The U.S. GAAP reference, is

4   that a reference to the fact that the

5   financials were prepared on a U.S. GAAP

6   basis as opposed to a European basis?

7        A.    That would be a correct

8   statement.

9        Q.    That's how you understood it?

10       A.    Yes.

11       Q.    You did not understand in this

12  conversation that the auditors who had not

13  finished the audit yet were issuing an

14  opinion on the '99 financials as being in

15  accordance with U.S. GAAP, correct?

16       A.    Can you restate that, there

17  were a few negatives.

18       Q.    You did not understand that the

19  auditors who had not completed an audit

20  yet were representing to you in this

21  conversation that the '99 financials in

22  fact were in accordance with U.S. GAAP?

23            MR. JOSEPH:  Objection to form.

24       A.    I am still having trouble,

25  there was a lot of negatives.

194

                        CHAMBERLAIN

1

2          Q.     At the end of an audit, based

3    on your experience as an auditor and as a

4    financial person, you're familiar with the

5    fact that an auditor will issue a written

6    opinion that contains the auditor's

7    certification with respect to the

8    financials.

9          A.     I understand that.

10         Q.     You did not understand this to

11   be a certification for the '99 financials,

12   correct?

13         A.     No, or I would have been

14   reviewing them.

15         Q.     You can put your notes aside.

16               I would like to talk about your

17   background as an auditor, because you've

18   mentioned before that somewhere early in

19   your career you were an auditor.

20               When was that and can you

21   describe for us what you did as an

22   auditor.

23         A.     I spent seven years working for

24   Ernst & Ernst or Ernst & Whinney or Ernst

25   & Young between the years of 1978 to 1985,

CHAMBERLAIN

1

2   so six-and-a-half years, in capacities in

3   Toledo and in San Jose working from an

4   entry level accountant to the last

5   position held was a supervisor.

6          I also have background being

7   the individual who organized the audits

8   for Seagate Technology and coordinated the

9   work of the outside auditors from the

10  years 1989 to roughly 1995.

11       Q.    When did you join Seagate,

12  please.

13       A.    March of 1985.

14       Q.    You moved directly from was it

15  then Ernst & Whinney?

16       A.    Yes.

17       Q.    You moved directly from Ernst &

18  Whinney to Seagate?

19       A.    I went to work for a startup

20  company that got acquired by Seagate.

21       Q.    What is the name of the startup

22  company?

23       A.    Grenex.

24       Q.    Was Grenex at the time an Ernst

25  & Whinney client?

196

1                    CHAMBERLAIN

2         A.     Yes, it was.

3         Q.     Was Seagate at the time an

4    Ernst & Whinney client?

5         A.     Yes.

6         Q.     Had you worked on the Grenex

7    audit engagement before you moved and

8    joined Grenex?

9         A.     Grenex didn't have an audit

10   done.

11        Q.     Same question for Seagate; had

12   you worked on the Seagate audit as an

13   auditor before you became a part of

14   Seagate?

15        A.     I did not.

16        Q.     What types of companies did you

17   audit while you were at Ernst & Whinney?

18        A.     Varied; I did high tech

19   companies in the San Jose area, lot of

20   them startup companies, and in the Toledo

21   area more of it was nonprofit, hospital

22   work.

23        Q.     Did you work on any

24   multinational engagements while you were

25   at Ernst & Whinney?

197

1                    CHAMBERLAIN

2        A.      Yes.

3        Q.      Which ones?

4        A.      I can't name all of them.

5        Q.      Were there many?

6        A.      I can think of three or four

7    that come to my head, but I can't tell

8    you.

9        Q.      Can you mention the ones that

10   have come to your mind?

11       A.      I know I did work for TRW,

12   which is multinational.

13               I can't think of others right

14   now.

15       Q.      In connection with your work on

16   multinational engagements, at the time did

17   you have occasion to work with auditors in

18   foreign countries?

19       A.      I wasn't in a position high

20   enough at that time that I would have been

21   coordinating the audits across legal or

22   world.

23       Q.      I'm sorry?

24       A.      Across the world, I wouldn't

25   have been the one that was coordinating

198

CHAMBERLAIN

1

2 that and having conversations.

3        Q.    You started to say across legal

4 something, did you mean across different

5 legal entities?

6        A.    No.

7        Q.    Did you understand at the time

8 that Ernst & Whinney was one big worldwide

9 firm or did you understand that there were

10 different firms in different countries on

11 those multinational engagements that you

12 worked on?

13       A.    Ernst & Whinney was one firm.

14       Q.    That was your understanding

15 back when you worked with them?

16       A.    We acted as one firm; did

17 somebody ever show me an organization

18 chart that showed me how everybody was

19 incorporated, no, but we acted and

20 followed the same policies across the

21 world.

22       Q.    Did you work during your years

23 at Ernst & Whinney on any engagements

24 where the audit, principal audit office,

25 was a foreign office?

199

                    CHAMBERLAIN

1

2        A.      I can't recollect any.

3        Q.      Did you work on any engagements

4   at Ernst & Whinney where the audit opinion

5   was issued by an affiliate firm, if you

6   will, in a foreign country?

7                MR. JOSEPH:  Objection, form.

8                You may answer.

9        A.      I don't recollect working at

10  Ernst & Whinney at that time and where my

11  position was in the career, whether there

12  were foreign officers that signed certain

13  audit reports.

14       Q.      Let me show you what has been

15  marked as Chamberlain Exhibit 9.

16               I had previously asked you

17  whether you saw any audit opinions for

18  earlier years, prior to 1999, relating to

19  Lernout & Hauspie.

20               Do you remember that general

21  subject area?

22               (Chamberlain Exhibit 9, Bates

23  numbered KPMG U.S. 088674, was marked for

24  identification, as of this date.)

25       A.      Yes.

200

CHAMBERLAIN

1

2      Q.    Do you remember I asked you

3  also whether those audit opinions for

4  those years were issued by a KPMG firm in

5  Belgium with a long messy Belgium name, do

6  you remember that?

7            MR. JOSEPH:   I don't recall

8  messy.

9      A.    No.

10      Q.    It was close to messy, the

11  record will reflect what it reflects.

12            I have placed in front of you

13  what has been marked as Exhibit 9, a

14  one-page document Bates numbered KPMG U.S.

15  088674, headed "Lernout & Hauspie Speech

16  Products NV and Subsidiaries, Independent

17  Auditor's Report," dated April 9, 1999,

18  and the messy name which we will provide

19  later the spelling for is Klynveld Peat

20  Marwick Goerdeler Bedrijfsrevisoren.

21            Do you see that?

22      A.    Yes, I do.

23      Q.    Does this refresh your memory

24  that the audit opinions for L&H that had

25  been issued for years prior to '99 were