CHAMBERLAIN

1
2  being issued by a Belgian firm?

3       A.    It doesn't tell me that it is

4  being issued by a Belgian firm.

5       Q.    The fact that it is signed by a

6  firm with that Belgium name that I can't

7  pronounce --

8       A.    KPMG is not a Belgium name,

9  those initials are KPMG.

10      Q.    And after it,

11  Bedrijfsrevisoren?

12      A.    Not familiar with that.

13      Q.    Have you ever seen that name

14  used in this country, ma'am?

15      A.    I have not personally seen it

16  used in this country.

17      Q.    Do you see the city underneath

18  the audit opinion is Brussels, Belgium?

19      A.    Common practice is the audit

20  firm who heads up the office signs the

21  opinion.

22      Q.    Who heads up the audit, you

23  mean.

24      A.    No, who is the signer of this

25  particular item, their city, their office

202

1                    CHAMBERLAIN

2    is on there.

3              So whoever signed this

4    document, just as it is today, they will

5    write where it is issued out of.

6         Q.    So your understanding was that

7    it was common practice that if the

8    document, for example, the audit opinion,

9    said Brussels, Belgium, that meant it was

10   issued by an auditor in that office,

11   Brussels, Belgium?

12        A.    It was issued by KPMG and the

13   Belgian partner was responsible for

14   signing that report.

15        Q.    In fact do you remember you

16   were told that a Belgian auditor was

17   responsible for this audit of Lernout &

18   Hauspie?

19        A.    I don't remember being told

20   that.

21        Q.    Let me show you Chamberlain

22   Exhibit 10, Bates Nos. TRA 00266 through

23   286.

24              (Chamberlain Exhibit 10, Bates

25   Nos. TRA 00266 through 286, was marked for

203

CHAMBERLAIN

1

2  identification, as of this date.)

3       Q.     Is this your handwriting on the

4  first, second and third page of this

5  exhibit?

6       A.     Yes, it is.

7       Q.     Do you see on the second

8  page -- let me do a little more

9  foundation.

10              Do you recognize this as the

11  due diligence list that was used by the

12  Dragon team in connection with the Lernout

13  & Hauspie transaction?

14       A.     One of the many lists.

15       Q.     It has numbered items, this

16  goes up to 28 numbered items, and was it

17  your practice at the time to divide the

18  due diligence for the transaction into

19  various categories and number the

20  categories?

21       A.     Yes, that was the practice.

22       Q.     On the second page, am I

23  correct item 27 on this list of 28 is the

24  item relating to talking to the

25  accountants for Lernout & Hauspie, do you

204

1                     CHAMBERLAIN

2    see that?

3         A.      Yes.

4         Q.      Underneath that you've written

5    something; do you see that?

6         A.      Yes.

7         Q.      What you've written, is that

8    "William"?

9         A.      It looks like Wilhelm.

10        Q.      "Wilhelm audit partner in

11   Brussels Monday."

12                What does that refer to, ma'am?

13        A.      Sounds like that individual

14   wasn't going to be in Brussels until

15   Monday.

16        Q.      Do you remember being told by

17   someone in connection with making that

18   note that the audit partner in charge of

19   the L&H audit was a gentleman by the name

20   of Wilhelm who was an audit partner in

21   Brussels?

22        A.      I do not have a specific

23   memory.

24        Q.      Is that what this entry

25   indicates?

205

1                        CHAMBERLAIN

2          A.    I can't tell that; that could

3    be the audit partner is in Brussels, I

4    don't know what city he was from, he is

5    going to be there on Monday.

6          Q.    And his name was Wilhelm?

7          A.    Yes.

8          Q.    A Belgium name?

9          A.    Could be.

10         Q.    You understood in advance of

11   the phone call on the 22nd that there was

12   a Wilhelm who was the audit partner for

13   this Lernout & Hauspie audit, didn't you?

14         A.    I understood in a multinational

15   audit there are lots of audit partners

16   that sit to do an audit.

17               Wilhelm just was an audit

18   partner.

19         Q.    I'm sorry, Wilhelm was not  --

20         A.    Was an audit partner.

21         Q.    Who provided this information

22   to you that you have written down here?

23         A.    Allan Forsey.

24         Q.    You have written "open" next to

25   item 27, as well, correct?

206

1                          CHAMBERLAIN

2          A.      Because no meeting was set up.

3          Q.      So you made this entry sometime

4     before March 22nd, we know that, yes?

5          A.      Yes.

6          Q.      At a time when you had not yet

7     had the meeting to have a discussion with

8     the accountants for Lernout & Hauspie,

9     true?

10         A.      That's certainly what it

11    suggests, it says open.

12         Q.      Is it correct that you are

13    wanting to get this scheduled, this

14    discussion with the auditors for Lernout &

15    Hauspie?

16         A.      Yes, I wanted to get it

17    scheduled.

18         Q.      That's why you are talking to

19    Mr. Forsey about it, correct?

20         A.      Correct.

21         Q.      And he tells you in effect he

22    is going to set up a meeting with Wilhelm,

23    the audit partner in Brussels?

24         A.      No, he didn't say that, I don't

25    see that --

207

CHAMBERLAIN

1

2    Q.    The words "Wilhelm audit

3  partner in Brussels Monday."

4    A.    Might have meant he was just

5  making a phone call to that guy on Monday,

6  I don't know if he was setting up the

7  meeting.

8    Q.    Do you remember what this

9  handwritten item means?

10    A.    Ultimately Carl Dammekens set

11  up the meeting, not Allan Forsey.

12    Q.    Do you remember why you have

13  written down the name "Wilhelm audit

14  partner in Brussels Monday" next to the

15  fact that this is an open item on this

16  document?

17    A.    That he is somebody that Allan

18  must have been talking to or that was a

19  partner on the job and he was going to be

20  in Brussels on Monday.

21    Q.    Can we agree once again on this

22  document you've nowhere written down the

23  name of Bob, this KPMG U.S. partner?

24    A.    Let me take a look.

25    MR. JOSEPH:    Document speaks

208

1                    CHAMBERLAIN

2  for itself.

3              You may answer the question.

4              (Witness perusing document.)

5       A.    I don't see anything that

6  indicates Bob.

7       Q.    When you had the phone call on

8  March 22, 2000, was it your understanding

9  that Bob was filling in because Wilhelm,

10 the Belgian audit partner, was on

11 vacation?

12      A.    I was told that the audit

13 partner in charge of the job was on

14 vacation and that I specifically asked

15 after that if the individual on the phone

16 was versed with the issues.

17      Q.    But you were told on the March

18 22 phone call that the audit partner in

19 charge of the Lernout & Hauspie engagement

20 was on vacation?

21      A.    Yes.

22      Q.    Did you ever travel to Belgium

23 in connection with the Lernout & Hauspie

24 transaction?

25      A.    I did.

209

1                    CHAMBERLAIN

2        Q.    How many times?

3        A.    Once.

4        Q.    When was that?

5        A.    To get exact dates I would need

6   to look at my calendar, but it was in

7   December before Christmas sometime.

8        Q.    Who did you make that trip

9   with?

10       A.    Dragon personnel, Janet.

11       Q.    Janet Baker?

12       A.    Yes.

13       Q.    Anyone else from Dragon?

14       A.    No.

15       Q.    The gentleman you referred to

16  earlier, Brad, I have forgotten his last

17  name, forgive me --

18       A.    Desmarais.

19       Q.    Thank you.

20             Did he make the trip to Belgium

21  with you in December?

22       A.    He did not.

23       Q.    Was it a two-day visit?

24       A.    To the best of my recollection,

25  it was one long day and I can't remember

210

CHAMBERLAIN

1

2 how much in the morning we did.

3      Q.    But it was one long day of

4 meeting with people?

5      A.    Yes.

6      Q.    Could you tell us, please, what

7 was the purpose of this trip?

8      A.    There was an agenda for that

9 trip and to adequately answer that

10 question I would like to see the agenda

11 for it, it was put together by the bankers

12 and a few others that listed all the

13 things that we went over there to discuss.

14      Q.    By all means I will dig it out

15 if we can and provide it to you.

16           I just wanted to get a general

17 sense; can you tell us generally why it is

18 that you are going to have a meeting in

19 Belgium in December of 1999?

20      A.    A, for due diligence; primarily

21 due diligence and that ranges the whole

22 way from product integration to financial,

23 et cetera, it was still part of the due

24 diligence process.

25      Q.    I don't think we have

211

1              CHAMBERLAIN

2    established yet; was this meeting a

3    meeting in connection with the Lernout &

4    Hauspie transaction?

5         A.    Yes, it was.

6         Q.    Who did you meet with --

7         A.    A potential Lernout & Hauspie

8    transaction.

9         Q.    Were you already doing due

10   diligence on that transaction in December

11   of 1999?

12        A.    We were doing preliminary work,

13   yes.

14        Q.    Do you remember who you met

15   with during your December trip?

16        A.    I can remember some people I

17   met with on that December trip.

18        Q.    Who do you remember meeting

19   with?

20        A.    Joe Lernout was there, Pol

21   Hauspie was there, Carl Dammekens came in

22   and out of the room, Allan Forsey was

23   there, we had a banking representative

24   there, Janet was there, Roel Pieper came

25   in at the end of the day, and there were

212

                    CHAMBERLAIN

1

2  some other individuals that ran R&D that

3  came in and talked to Janet during the

4  time we were there.

5       Q.    Any KPMG personnel who were

6  present for any of this meeting in

7  December of '99?

8       A.    I don't remember at this time

9  one being there.

10            MR. CARROLL:   Let me show you

11 what we will mark next as Chamberlain

12 Exhibit 11, Bates Nos. SGC 007791 through

13 95, first page is headed "Meeting Agenda,"

14 December 12, addressed to Project NEON

15 Team Members from a Matt Howson.

16            Do you recognize this document?

17       (Chamberlain Exhibit 11, Bates

18 Nos. SGC 007791 through 95, was marked for

19 identification, as of this date.)

20       A.    I do.

21       Q.    Can you tell us what this is?

22       A.    This is the meeting agenda for

23 a visit to Belgium.

24       Q.    For the same visit we have just

25 been talking about, this is the meeting

213

CHAMBERLAIN

1

2  agenda for that visit?

3      A.    Yes, it is.

4      Q.    Did all of the attendees who

5  are listed here, did all of those

6  attendees in fact attend the meeting?

7      A.    I could not tell you the folks

8  under SG Cowen, whether all of them did, I

9  know Ben Howe did.

10          The rest of them I can't

11 remember.

12          Yes, the NEON did, yes, the

13 LIGHT people did, and, yes, Richard Wayner

14 was there from Goldman, Sachs.

15      Q.    Does this now enable you to

16 confirm for us that no one from KPMG,

17 either KPMG Belgium or KPMG U.S., was

18 present for this meeting?

19      A.    That's what the agenda says.

20      Q.    Is your memory inconsistent

21 with this agenda?

22      A.    No, my memory is not

23 inconsistent with the agenda.

24      Q.    Had you been provided with a

25 due diligence package of information prior

214

                    CHAMBERLAIN

1
2    to this meeting?

3         A.    Yes.

4         Q.    Who had provided that

5    information?

6         A.    Bankers, some came from Allan

7    Forsey directly.

8         Q.    Was there a due diligence book

9    at this point in time?

10        A.    There were --  I don't know if

11   "book," yes.

12              Usually, my list, I put

13   together everything I receive and the

14   questions that have been asked.

15        Q.    Going back to the numbered due

16   diligence list that we looked at a moment

17   ago, Exhibit 10, the numbered paragraphs

18   on that due diligence list, the 28

19   numbered paragraphs, do those correspond

20   to how you would have had your due

21   diligence book organized?

22        A.    No, this was a followup due

23   diligence, they were asked several times

24   during the process, so I am not sure how

25   they would have been organized.

215

CHAMBERLAIN

1

2      Q.     The information that you had up

3  to this point in December of 1999 related

4  to due diligence, you had collected that

5  information from the bankers who were

6  assisting you?

7      A.     Or it could have come directly

8  from the company.

9      Q.     So the information that you had

10  for due diligence came either from Lernout

11  & Hauspie or from which banker?

12      A.     It came from L&H's banker,

13  Cowen.

14      Q.     SG Cowen?

15      A.     Yes.

16      Q.     Am I correct that none of the

17  information that you had from due

18  diligence for December 1999 had come from

19  my client, KPMG U.S.?

20      A.     That is a correct statement.

21      Q.     In fact, did KPMG U.S., my

22  client, ever give you any written

23  documentation connected with your due

24  diligence?

25            MR. JOSEPH:   Objection, asked

216

1                   CHAMBERLAIN

2    and answered.

3              You may answer again.

4         A.    No.

5         Q.    The agenda, Exhibit 11 that we

6    are looking at, refers to a dinner that

7    was to be held on Tuesday night.

8              Did that dinner occur and did

9    you attend it?

10        A.    Yes, I did.

11        Q.    Who was that dinner with, was

12   it with all of the attendees or a smaller

13   group?

14        A.    Smaller group.

15        Q.    Can you tell us, as best you

16   can remember, who was the smaller group

17   that attended the dinner?

18        A.    Pol.

19        Q.    Mr. Hauspie?

20        A.    Mr. Lernout, Janet.

21        Q.    Janet Baker?

22        A.    Myself, Roel Pieper, and I know

23   my banker was there.

24        Q.    Mr. Wayner?

25        A.    Yes, other people I couldn't

217

                    CHAMBERLAIN

1

2    tell you.

3        Q.    What was discussed during the

4    dinner?

5        A.    I have no specific recollection

6    of things discussed during the dinner.

7        Q.    Do you remember where the

8    dinner was held?

9        A.    I don't remember the name of

10   the restaurant.

11       Q.    Do you remember what town?

12       A.    No.

13       Q.    Were you in Ieper, were you in

14   Brussels, were you somewhere else?

15       A.    I said I don't remember.

16       Q.    No harm in trying.

17       Q.    As a result of this meeting and

18   dinner during this December trip, did the

19   two sides, Dragon and Lernout & Hauspie,

20   agree to enter exclusive negotiations for

21   a deal?

22       A.    There was nothing entered into

23   formally.

24       Q.    I don't mean to limit it

25   formally.

218

CHAMBERLAIN

1

2          By the end of this meeting in

3    December, was there any understanding that

4    had been reached about whether Lernout &

5    Hauspie and Dragon were going to work

6    toward a transaction?

7        A.    We had talked about working

8    towards a transaction, they needed to

9    provide us a letter to do so.

10       Q.    What kind of letter?

11       A.    Probably a formal letter of

12   intent.

13           There certainly was no

14   exclusivity.

15       Q.    In Exhibit 11, if you will turn

16   to the second page you will see there is

17   what appears to be an unsigned letter

18   addressed to Janet Baker from Lernout &

19   Hauspie.

20           Is that the type of letter you

21   were just referring to?

22       A.    That would be a letter that

23   would, yes, allow us to move forward.

24       Q.    Was a letter signed with L&H to

25   enter exclusive negotiations sometime in

219

1                    CHAMBERLAIN

2  December?

3        A.      No.

4        Q.      Did there come a time at some

5  point when you did execute such a letter

6  agreement with Lernout & Hauspie?

7        A.      Sometime in the new year.

8        Q.      Does that mean January or later

9  than that?

10       A.      I would need to see the date on

11 the document.

12       Q.      You are unable to remember?

13       A.      I am unable to remember whether

14 it was late January or beginning February.

15       Q.      Do you see on the second page

16 of Exhibit 11 there is a reference to

17 consideration and a description of 280

18 million in cash and 270 million in LIGHT

19 common stock.

20               Do you see that?

21       A.      Yes, I see it.

22       Q.      Was there a time during the

23 negotiations with Lernout & Hauspie when

24 the deal you were contemplating was to be

25 partly cash and partly Lernout & Hauspie

220

                    CHAMBERLAIN

1

2   stock?

3       A.    Is that not what we read?

4       Q.    I am now asking if you have a

5   memory of that, ma'am.

6       A.    It started with cash and then

7   it went to cash and stock and then it went

8   to stock.

9       Q.    When you say it started there,

10  does that mean that Dragon's initial

11  desire in the negotiation was to have an

12  all cash transaction?

13      A.    That's a correct statement.

14      Q.    As the transaction went

15  forward, it went forward as an all stock

16  transaction, with the exception of the $10

17  million loan guarantee, correct?

18      A.    That is correct.

19      Q.    Was that change from all cash

20  to stock, a change made at the request of

21  Lernout & Hauspie or at the request of

22  Dragon?

23      A.    Lernout & Hauspie.

24            MR. CARROLL:  Do you want to

25  take a short break?

221

CHAMBERLAIN

1

2          MR. JOSEPH:  Sure.

3              THE VIDEO TECHNICIAN:  Going

4     off the record at approximately 2:30 p.m..

5              (Recess taken.)

6              THE VIDEO TECHNICIAN:  Back on

7     the record at approximately 2:39 p.m.,

8     this is the beginning of Tape No. 3.

9      BY MR. CARROLL:

10         Q.    I want to look back again to

11    Exhibit 10.

12              Do you have it now?

13         A.    Yes.

14         Q.    I am going to use the Bates

15    page numbers at the bottom.

16              If you will turn about five

17    pages in to the page TRA 00271.

18              (Witness complying.)

19         Q.    It is a page you have to turn

20    sideways to read, there is information

21    inside of a block with the name at the top

22    Digital Sai-Young Ltd., and the caption

23    "exclusivity" underneath that.

24              Are you with me?

25         A.    Yes.

222

1                    CHAMBERLAIN

2        Q.     You will see if you flip there

3   are a number of pages that follow this one

4   in the same format, that is, they are all

5   in some type of block text with an

6   exclusivity caption at the top but with

7   different, what appear to be, different

8   company names at the top.

9               Do you see that?

10       A.     Yes, I do.

11       Q.     It continues through TRA 00276.

12              So the documents in that

13  section of Exhibit 10, 271 through 276, do

14  you recognize these?

15              (Witness perusing document.)

16       A.     It looks like it is in response

17  to question No. 10.

18       Q.     Question No. 10 on page 1 of

19  this exhibit on the due diligence list, is

20  that right?

21       A.     Correct.

22       Q.     That's the item that refers to

23  full detail on exclusives and market lead

24  time contracts?

25       A.     That's what it looks like.

223

CHAMBERLAIN

1

2      Q.    Can you tell us who prepared

3  these pages, TRA 00271 through 276?

4      A.    No.

5      Q.    Did someone on your team for

6  the transaction prepare these or did

7  someone on the Lernout & Hauspie, L&H

8  side, prepare these?

9      A.    I can't answer that, I don't

10  know.

11      Q.    Was there any discussion you

12  remember about these particular pages?

13      A.    I don't have a specific memory

14  today.

15      Q.    Do you have any memory of the

16  names of the companies that are listed at

17  the top of these pages, Digital Sai-Young,

18  EPC, Hung Chang, IBM --

19          MR. JOSEPH:    International

20  Business Computer.

21          MR. CARROLL:    Fair point.

22      Q.    International Business

23  Computer, Voice Tech, any of those names

24  ring a bell with you?

25      A.    No, they don't.

224

CHAMBERLAIN

1

2      Q.      Can you at least confirm to me

3   that these pages were not provided to you

4   by anybody at KPMG U.S.?

5      A.      KPMG U.S. was not at this

6   meeting.

7      Q.      And so you did not get these

8   pages from KPMG U.S., correct?

9      A.      I did not get them from KPMG

10   U.S.

11      Q.      Did Arthur Andersen prepare any

12   analyses for you in connection with your

13   due diligence for the L&H transaction?

14      A.      Analyses, none that I am aware

15   of.

16      Q.      Did you get any opinions from

17   Arthur Andersen in connection with the

18   Dragon/L&H transaction?

19      A.      Did not.

20      Q.      Let me show you what we have

21   marked as Chamberlain Exhibit 12.

22          (Chamberlain Exhibit 12, Bates No.

23   TRA 10175, was marked for identification,

24   as of this date.)

25          MR. CARROLL:  It is a one-page

225

1              CHAMBERLAIN

2    document, Bates No. TRA 10175.

3         Q.    Is this your handwriting on

4    this document?

5         A.    No, it isn't.

6         Q.    Do you recognize the

7    handwriting?

8         A.    Yes, I do.

9         Q.    Would you tell us whose

10   handwriting it is?

11        A.    Don Waite's.

12        Q.    Have you seen this document

13   before?

14        A.    Not that I recollect.

15        Q.    At the top there is a reference

16   to Ritz Boston and Ellen, which I presume

17   is a reference to you.

18             Did you have occasion in

19   connection with working on the L&H/Dragon

20   transaction to visit Boston in connection

21   with that transaction, to visit L&H's U.S.

22   offices in connection with the

23   transaction?

24        A.    Yes.

25        Q.    How often did you make a visit

226

1                    CHAMBERLAIN
2    to L&H's U.S. offices?
3         A.    Maybe two or three times.
4         Q.    Am I correct no one from KPMG
5    U.S. ever accompanied you or was with you
6    in any of those visits?
7         A.    KPMG with me?
8         Q.    Yes.
9         A.    No.
10        Q.    There is a reference in Exhibit
11   12 under Dragon, the first handwritten
12   item says "no direction, key people have
13   no idea of goals and objectives."
14             Do you remember having any
15   discussions with Mr. Waite after you had
16   taken a position at Dragon and he had as
17   well about the people problems that Dragon
18   was facing?
19        A.    It was an everyday thing.
20        Q.    What was the everyday thing,
21   please describe it.
22        A.    That people had felt that with
23   the IPO gone, that possibly there wasn't
24   going to be any end for them, that there
25   wasn't any direction within that company,

227

CHAMBERLAIN

1

2   so they felt like what was their future.

3       Q.     Anything else on this subject?

4       A.     On morale?

5       Q.     Yes.

6       A.     I don't know what else to say,

7   ask me something.

8       Q.     How did you get up to speed on

9   the state of morale at Dragon, as you just

10  described it?

11      A.     I was asked to go out to Boston

12  in late August to do an assessment of the

13  company and I spent a couple of weeks out

14  there interviewing a lot of people to try

15  to ascertain what the problem was.

16      Q.     When you say "what the problem

17  was," what do you mean?

18      A.     Why the financial performance

19  was gone, why the morale was low.

20      Q.     Who sent you on this

21  assignment?

22      A.     Don Waite.

23      Q.     How had Seagate become aware of

24  this situation prior to your visit in

25  August to Dragon?

228

CHAMBERLAIN

1

2    A.    I wouldn't know specifically, I

3    can make an assumption.

4        Seagate was a board member on

5    Dragon's board of directors; I don't know

6    how they specifically, but that would be

7    my...

8    Q.    Was Mr. Waite the one at

9    Seagate who briefed you on this subject

10    before you went on this assignment?

11    A.    He is the one who asked me to

12    go.

13    Q.    And he is the one who told you

14    generally what the problem was that you

15    were looking into?

16    A.    Yes.

17    Q.    Did you have some familiarity

18    with that problem already from your own

19    area of responsibility at Seagate, the

20    poor financial performance, for example,

21    of Dragon, was that something that you had

22    already become aware of as a result of

23    your financial involvement in Seagate?

24    A.    I was asked at certain times to

25    go out to Dragon and attend the board

229

                    CHAMBERLAIN

1

2    meetings through -- from the time Seagate

3    made investments in Dragon, so I had been

4    to Dragon numerous times.

5         Q.    What types of things did you do

6    during your two-week assignment in order

7    to be able to report back to Mr. Waite?

8         A.    I sat down and interviewed a

9    collective group of people.

10        Q.    Anything else?

11        A.    Sat and looked at the

12   financials with the CFO.

13        Q.    Anything else?

14        A.    Outside of the interviews and

15   financials, I don't have any other

16   specific memories.

17        Q.    Did you make a report to Mr.

18   Waite as a result of your work?

19        A.    I did.

20        Q.    What did you report to him?

21        A.    I believe there is a document

22   that lists my status report when I came

23   back and I would like to look at it to

24   refresh my memory.

25              I can't recite a whole --  I

230

CHAMBERLAIN

1

2  think it is an eight or ten-page document.

3      Q.    We will certainly look for

4  that.

5          Is it a document you looked at

6  yesterday in getting ready for your

7  deposition?

8      A.    I did.

9      Q.    Can you just, not exhaustively,

10  every particular item, but can you

11  summarize for us what your observations

12  and conclusions were.

13      A.    That indeed Dragon was going to

14  run out of cash, that there was a morale

15  problem, and that Janet needed to be

16  removed from being CEO.

17      Q.    Janet Baker?

18      A.    Yes.

19      Q.    Did you have a meeting with Mr.

20  Waite in which you discussed these

21  recommendations?

22      A.    I don't know if it was via

23  phone, e-mail, or presence.

24      Q.    And then what happened next?

25      A.    I don't know the exact timing,

231

                    CHAMBERLAIN

1

2    whether anything else happened in between,

3    but I was asked to go out to Dragon in a

4    more permanent capacity and to try to

5    change those things.

6        Q.    Was that something you proposed

7    or was that someone else's idea?

8        A.    I was asked by Don Waite to do

9    it.

10        Q.    In addition to yourself taking

11    on a position at Dragon, did Mr. Waite

12    himself also take on a position?

13        A.    Subsequent to me being there,

14    yes.

15        Q.    But you learned about that

16    after you started your position, not at

17    the same time?

18        A.    Correct.

19        Q.    We talked about this before;

20    you became the CFO at Dragon and Mr. Waite

21    became president?

22        A.    CEO.

23        Q.    Basically was the idea that

24    Seagate would take over the operations of

25    Dragon at that point and try to salvage

232

CHAMBERLAIN

1

2    the situation?

3        A.    No, we weren't taking over the

4    operations; we were there to try to

5    determine what the best strategy was for

6    Dragon, whether it was to try to find a

7    buyer, do a joint venture, do an IPO,

8    et cetera.

9        Q.    Did someone from Seagate have a

10    discussion with Janet Baker about her

11    leaving Dragon as a result of your work?

12        A.    I wasn't in on that discussion.

13        Q.    I am asking if you know whether

14    such a discussion happened.

15        A.    There were discussions that

16    were had with Janet, yes.

17        Q.    Was any decision reached as a

18    result of these discussions, was it

19    agreed, for example, that Janet Baker

20    would leave Dragon?

21        A.    No, it was agreed upon what is

22    reflected in the minutes, that Janet would

23    step away from the position of CEO and Don

24    would become the CEO and I would become

25    the CFO.

233

                    CHAMBERLAIN

1

2      Q.      Was Dragon insolvent when you

3  took over as CFO?

4      A.      Define the term "insolvent"; it

5  would mean to me --  sorry, define

6  "insolvent."

7      Q.      I am just a lawyer, not an

8  accountant or CFO, so if it has multiple

9  meanings to you that are relevant to your

10  answer, please enter us know.

11          In any sense that you might use

12  this word did you consider Dragon to be

13  insolvent?

14      A.      Dragon was collecting their

15  cash and they were paying their payables,

16  they were making payroll.

17          To me that's a company that's

18  still solvent.

19      Q.      Did they need to borrow money

20  to make the payroll?

21      A.      They were going to need to

22  borrow money to make the payroll.

23      Q.      Were they in default under

24  their bank loans?

25      A.      I believe they were in default

234

                    CHAMBERLAIN

1

2  in their bank loans from financial ratios.

3       Q.    Let me just finish up some of

4  your personal history, if I could.

5             Are you employed by anyone

6  today?

7       A.    I am a business owner.

8       Q.    What's the business?

9       A.    It is a bistro catering wine

10  merchant store.

11      Q.    Where is it located?

12      A.    Eugene, Oregon.

13      Q.    How long have you had that

14  business?

15      A.    April 2nd, 2003.

16      Q.    How is it going?

17      A.    It is fun.

18      Q.    Prior to that, just to close

19  the gap between your departure from Dragon

20  and the bistro in 2003, did you return to

21  Seagate and continue in the position of

22  V.P. of finance at Seagate up until April

23  of 2003?

24      A.    No, I left the physical

25  presence of being in Seagate about the

235

CHAMBERLAIN

1

2      second week of May of '99 --

3                    MR. JOSEPH:  2000.

4          A.    2000; I was on the payroll

5      until November of 2000 to the day that the

6      Seagate --  whatever date it was, the

7      transaction happened, Seagate going

8      private.

9                    I had no official job between

10     that date and buying a bistro.

11         Q.    Do you have any financial stake

12     that you are aware of in the outcome of

13     this litigation?

14         A.      Indirectly I would; I was a

15     potential --  I was a former --  I still

16     am a shareholder of the old Seagate

17     Technology company, so to some minute

18     amount, I would still have a financial

19     gain.

20         Q.    Any other stake other than

21     that?

22         A.    No.

23         Q.    Do you have retirement benefits

24     of any sort that you are being paid by

25     Seagate or any Seagate successor?

236

CHAMBERLAIN

1

2    A.    I do not.

3    Q.    Can you tell us anything about

4  an entity TRA Trust?

5    A.    It is after I left.

6    Q.    You had no involvement in any

7  transaction involving Seagate and any

8  trust that may have included any rights

9  relating to this litigation?

10   A.    Correct.

11        MR. CARROLL:  I will mark

12 Exhibit 13.

13        (Chamberlain Exhibit 13, Bates

14 Nos. SGC 008093 and 94, was marked for

15 identification, as of this date.)

16   Q.    I have placed in front of you

17 what has been marked as Exhibit 13, and

18 for the record, it is a two-page document,

19 Bates Nos. SGC 008093 and 94.

20        Have you seen this before?

21        (Witness perusing document.)

22   A.    No.

23        I don't know who Jennifer

24 Osmond is.

25   Q.    How about the second page, have

237

1                    CHAMBERLAIN

2   you seen this?

3        A.    Let me take a read.

4              (Witness perusing document.)

5        A.    I don't specifically remember

6   the document.

7        Q.    Do you remember any of the

8   issues referred to in the document, the

9   reference to golden eggs, for example?

10       A.    Yes.

11       Q.    What do you remember about

12  that?

13       A.    They were what Janet Baker

14  referred to as certain items that she

15  didn't even want to discuss in broad terms

16  with Paul and Joe because of the

17  competitive nature of their two

18  businesses, so she would refer to them as

19  golden eggs and wasn't going to discuss

20  them in further detail until we were down

21  the path.

22       Q.    Did you ever find out what they

23  were?

24       A.    I knew what some of them were,

25  yes.

238

1                    CHAMBERLAIN

2        Q.      Were these technology items?

3        A.      They were technology items.

4        Q.      Did the company have patets on

5    these technology items?

6        A.      I couldn't answer that

7    definitively.

8        Q.      Do you see the reference here

9    to there having been a discovery that ten

10   of Dragon's patents had expired?

11       A.      I see it, yes.

12       Q.      Any memory you have of that?

13       A.      None.

14       Q.      Above that there is a reference

15   to a run rate for Dragon of a 19 million

16   operating loss, do you see that?

17       A.      Yes.

18       Q.      It is a run rate based on

19   annualized projections for Q-1 2000,

20   correct?

21       A.      Yes.

22       Q.      Why the smile?

23       A.      You have four different

24   quarters, you can't pick any one and

25   annualize it.

239

CHAMBERLAIN

Q.    Does this indicate, however, that for the first quarter of 2000, at least, Dragon was having a bad quarter, that if it had been extended for the full year, it would have given you 19 million in operating losses?

A.    You can't deduce that from this.

Q.    Let me ask it this way; do you understand this to be saying that based on the results for Q-1 of 2000, if those results were replicated for the other three quarters of 2000, Dragon would have annual losses of 19 million?

A.    They aren't actual, first of all, this is a projection for Q-1, and so what they did is took what was going to happen in Q-4, multiplied it times four.

Q.    This was based on Q-4 results, do you believe?

A.    No, I'm sorry, they took Q-1's projections, multiplied it times four and came up with what they perceived to be the annual revenue and the annual operating

240

                    CHAMBERLAIN

1

2  loss.

3        Q.      If you did it that way, without

4  debating whether that's a reasonable way

5  or not, you generate a $19 million

6  operating loss, yes?

7        A.      Yes.

8        Q.      Do you remember what the

9  operating loss was for the preceding year?

10       A.      I do not.

11       Q.      Do you remember it was more

12 than 19 million?

13       A.      I don't remember what it was.

14       Q.      Let me show you a document.

15              MR. CARROLL:  This will be

16 Exhibit 14.

17              (Chamberlain Exhibit 14, Bates

18 Nos. TRA 13210 through 212, was marked for

19 identification, as of this date.)

20       Q.      I have handed you what has been

21 marked as Exhibit 14, it is three pages,

22 TRA 13210 through 212, first page appears

23 to be an e-mail from Mr. Waite to Carlin

24 Folkedal, but then embedded in the e-mail

25 is an e-mail I believe from yourself,

241

1                    CHAMBERLAIN

2    Ms. Chamberlain.

3        A.    Yes.

4        Q.    The last page of the exhibit is

5    a normalized profit and loss statement for

6    Dragon Systems.

7              Do you see that?

8        A.    I see the statement.

9        Q.    Do you recognize this exhibit,

10   the three pages?

11       A.    I recognize this is my Lotus

12   note schedule, or my Lotus notes memo,

13   this looks like a familiar worksheet.

14       Q.    Looking at the last page, the

15   worksheet, the last column has a net

16   operating loss, as I'm reading it,

17   normalized forecast for 1999, a loss of

18   more than $21 million.

19              Have I read that correctly?

20       A.    Yes.

21       Q.    Does that refresh your

22   recollection that the annualized loss in

23   '99 was actually more than the 19 million

24   forecast for 2000?

25              MR. JOSEPH:  Objection to form.

242

CHAMBERLAIN

1

2              You may answer.

3        A.      I don't know who forecast the

4  19 million, I didn't come to the company

5  until October.

6        Q.      Let me ask it more simply.

7              Does seeing the 21 million loss

8  figure for '99 now refresh your memory

9  that that was the rough size of the

10 operating loss Dragon had for 1999?

11       A.      Recognizing that on this

12 worksheet is a forecast for Q-4, not the

13 actual, I am indicating that it would

14 probably be approximately that.

15       Q.      Do you remember that your

16 basically right, it came in a little worse

17 than that, but it was a loss for the year

18 of more than $21 million?

19       A.      Okay; Q-4 looks better than

20 Q-3, doesn't it?

21       Q.      On this schedule, you mean?

22       A.      Yes.

23       Q.      On this schedule Q-4 is showing

24 a loss of $2-1/2 million as compared to a

25 loss in Q-3 of almost $6 million, is that

243

CHAMBERLAIN

1

2   what you are referring to?

3       A.     Yes, so it is hard to

4   understand an annualized loss of 19

5   million for the next year.

6       Q.     Let me ask about that.

7               On this schedule, did you

8   prepare this schedule, page 3 of this

9   exhibit?

10      A.     No, this was prepared by

11  somebody within the finance department of

12  Dragon.

13      Q.     Let's put to rest any more

14  guesswork about the year loss for Dragon

15  of '99, let me just show you the financial

16  statements.

17              This is Deposition Exhibit 15,

18  do you recognize this as the financial

19  statements as audited by Arthur Andersen,

20  the accounting firm that did the audit for

21  Dragon Systems, and that it contains the

22  audited financials for '98 and '99?

23              (Chamberlain Exhibit 15, audited

24  financials for '98 and '99, was marked for

25  identification, as of this date.)

244

CHAMBERLAIN

1

2      A.      I recognize it is Arthur

3  Andersen and they were located in Boston,

4  Massachusetts and it looks like '98 and

5  '99 financials.

6      Q.      If you will turn to page 3, can

7  you now confirm for us that the audited

8  net loss for Dragon Systems for 1999 was

9  $21.8 million?

10          MR. JOSEPH:   Document speaks

11  for itself.

12          You may answer the question.

13          (Witness perusing document.)

14      A.      Yes.

15      Q.      If you will turn back to the

16  preceding exhibit, 14, the three-pager,

17  the document at the bottom has a date of

18  November 22, 1999, do you see that?

19          (Witness perusing document.)

20      Q.      Bottom right, the path line, if

21  you will.

22      A.      Yes.

23      Q.      Indicating that perhaps it was

24  prepared in November, prior to the end of

25  the year.

245

1                     CHAMBERLAIN

2         A.     That's why it has a forecast

3    Q-4.

4         Q.     And a forecast Q-1, correct?

5         A.     Yes, that's the beginning of

6    our budget.

7         Q.     At this point in time you were

8    forecasting for Q-1 an operating profit

9    for Dragon, is that correct?

10        A.     I need -- yes, that's what it

11   says here, but I am not sure if that's the

12   target I was giving on the front of this

13   memo, so I need to look at the front of

14   the memo to ascertain whether it is the

15   forecast or target.

16        Q.     By all means.

17               (Witness perusing document.)

18        A.     I believe these are my targets

19   that I was giving John Shagoury; that he

20   had to cut out spending, reduce spending,

21   reprioritize his projects so that he could

22   hit the business model that I have on the

23   front for work in process.

24        Q.     Let me try to summarize that.

25               Are you saying that the

246

                    CHAMBERLAIN

1    forecast operating profit for Q-1 of 2000

2    that's shown here was the results forecast

3    if various operating objectives were

4    achieved?

5          A.    Yes.

6          Q.    And in fact those operating

7    objectives were not achieved in Q-1,

8    correct?

9          A.    You would need to show me the

10   actuals.

11         Q.    If you go back to Exhibit 13,

12   that's the two-page document, second page

13   of which has the memo from SG Cowen dated

14   March 7, that's the one.

15               (Witness perusing document.)

16         Q.    Do you see that's dated March

17   7, 2000, and based on that point most of

18   the way through Q-1, this is where Cowen

19   is projecting that the Q-1 results would

20   be negative, that you were generating

21   losses, that if annualized would get you

22   19 million?

23               MR. JOSEPH:    Objection, assumes

24   facts not in evidence.

247

CHAMBERLAIN

1

2        You may answer.

3    A.    I don't know how he got that

4    $19 million number, I don't know how he

5    got a $70 million number in revenue.

6        He doesn't have anything --  I

7    don't know what his annualized projections

8    were for Q-1, it is March 7th, we didn't

9    close the books.

10    Q.    Do you remember whether in

11    2000, either the first quarter or second

12    quarter, up to the time you left, did

13    Dragon ever turn a profit in any of its Qs

14    prior to the L&H acquisition?

15    A.    Yes, in the beginning history

16    of the company it did.

17    Q.    No, fair enough, I did say

18    ever, didn't I.

19        Ever in 2000 for Q-1 or Q-2 of

20    2000, was Dragon able to turn a profit

21    prior to merging with L&H?

22    A.    Well, they merged on June 7, so

23    I can't answer for June 30th; as of March

24    31st, they did not turn a profit.

25    Q.    They were still in the red

248

CHAMBERLAIN

1

2   generating losses?

3        A.      Absolutely.

4        Q.      This will be Chamberlain

5   Exhibit 16, and for the record, it is a

6   multipage exhibit, Bates Nos. TRA 13119

7   through 125, first page is titled "Dragon

8   Systems, Inc., Minutes of Meeting, Board

9   of Directors, November 19, 1999."

10           (Chamberlain Exhibit 16, Bates

11   Nos. TRA 13119 through 125, was marked for

12   identification, as of this date.)

13           (Witness perusing document.)

14        Q.      Have you seen this before,

15   Ms. Chamberlain?

16        A.      I might have in my capacity at

17   Dragon.

18        Q.      The reason I wanted to show it

19   to you, I had asked you previously about

20   whether Dragon was in default on any of

21   its bank lines when you became CFO.

22           On that subject, if you will

23   look at the bottom of the first page of

24   the exhibit, you will see a reference to

25   Dragon defaulting under financial

249

CHAMBERLAIN

1

2  covenants on its line of credit with Fleet

3  Bank.

4          Do you see that?

5      A.    And that's what I answered.

6      Q.    This is consistent with your

7  memory that in November at least Dragon

8  was in default on its line of credit with

9  Fleet Bank?

10     A.    It was earlier than November,

11  but that's when it was reported to the

12  board.

13     Q.    If Dragon were unable to cure

14  that default, Dragon would be insolvent?

15     A.    No.

16          MR. JOSEPH:  Objection,

17  conclusion.

18     Q.    Did Fleet Bank have the right

19  to foreclose on that line of credit for

20  the default, do you remember?

21     A.    Yes, they could have recalled

22  the loan.

23     Q.    And if they had done that,

24  Dragon didn't have the money to repay the

25  loan, correct?

250

CHAMBERLAIN

1

2     A.    Dragon had abilities to find

3     other places to fund that loan.

4     Q.    Those other places being

5     Seagate?

6     A.    There were also other joint

7     ventures that were in the works at that

8     time.

9     Q.    But unless Dragon could find a

10    source of cash from someone such as

11    Seagate or some other outsider, it itself

12    did not have the money to pay the Fleet

13    Bank line at that point in time?

14    A.    I would have to see what the

15    financial position was of the company at

16    that time.

17          I did negotiate that those

18    financial covenants were waived by the

19    bank.

20    Q.    Do you remember they were

21    waived after Seagate agreed to extend a

22    guarantee?

23    A.    On the financials, guarantee

24    for what?

25    Q.    Well, if you will read exactly

251

1                    CHAMBERLAIN

2    where we were just looking on this

3    exhibit, Exhibit 16, you will see there is

4    a discussion of Seagate Technologies

5    willingness to guarantee the company's

6    obligations under such line of credit.

7              Do you see that?

8       A.    Let me see if it was agreed

9    upon.

10      Q.    And you will see the resolved

11   item on the next page recites the

12   agreement.

13             (Witness perusing document.)

14      A.    Seagate guaranteed it.

15      Q.    In exchange for the guarantee

16   and some other conditions, Fleet Bank

17   agreed to waive the default, correct?

18      A.    Yes.

19      Q.    The other conditions included

20   reducing the line of credit from 6 million

21   to 3 million, correct?

22      A.    Correct; they weren't up that

23   high, anyhow.

24      Q.    But had it not been for the

25   assistance of Seagate or someone else at

252

                    CHAMBERLAIN

1

2   that point in time, Dragon itself did not

3   have the means to pay off this loan?

4        A.    They did not have readily

5   available cash; there is a lot of

6   discussion about the means to pay it off

7   and how they could have paid it off.

8        Q.    This is Exhibit 17, a multipage

9   document, Bates Nos. TRA 08856 through

10  8866, first page is headed "Dragon/L&H

11  Transaction, Confidential Questions and

12  Answers."

13           (Chamberlain Exhibit 17, Bates

14  Nos. TRA 08856 through 8866, was marked

15  for identification, as of this date.)

16        Q.    Have you seen this before,

17  Ms. Chamberlain.

18           (Witness perusing document.)

19        A.    I don't have a specific memory

20  right now.

21        Q.    In connection with the L&H

22  transaction, do you remember that Dragon

23  prepared some answers to anticipated

24  questions it expected to receive from

25  people, including its own employees, about

253

CHAMBERLAIN

1

2   why they were doing the deal with L&H?

3        A.    It was very much my style to

4   have the company aware of what was

5   happening to them, so I know that we went

6   through a PR discussion about how we were

7   going to educate the employees as to what

8   was happening.

9        Q.    Is this exhibit part of that

10  PR?

11       A.    It looks like it, I don't know

12  if it made it into the actual one that

13  went to the employees.

14       Q.    If you will turn to page 3 of

15  the document, please, there is a question

16  in the middle of the page, the question

17  is, "Is this an acquisition or surrender?

18  Were we desperate?  Was this a fire sale?"

19            Do you see that?

20       A.    Sure do.

21       Q.    This was an example of the kind

22  of question you were contemplating

23  employees of the company might ask?

24       A.    It is the type of question that

25  an engineer asks, especially a software

254

1                CHAMBERLAIN

2    engineer.

3        Q.    There is an answer set forth

4    beneath that, and midway through that

5    answer, please review however much of it

6    you would like, I want to focus on two

7    sentences which read, "If this deal had

8    not come about, we would have continued to

9    operate as a stand-alone company.  There

10   were also other companies that expressed

11   an interest in investing in Dragon

12   Systems."

13            Do you see that?

14       A.    Yes.

15       Q.    Do you agree with that

16   statement?

17       A.    Yes.

18       Q.    Do you remember which other

19   companies had expressed an interest in

20   investing in Dragon?

21       A.    I can't specifically tell you

22   which ones wanted to invest as opposed to

23   the ones that we approached for full

24   acquisitions, which ones we approached for

25   joint ventures.

255

CHAMBERLAIN

1

2        I would have to refresh my

3  memory, there were a number of players

4  that we spoke to during that time.

5        Q.    Focusing on the sentence, "If

6  this deal had not come about, we would

7  have continued to operate as a stand-alone

8  company," was that a true statement, in

9  your view?

10       A.    We would have taken the company

11  public.

12       Q.    That was the other option you

13  would have pursued if you had not done an

14  L&H deal?

15       A.    It was one of the options that

16  we would have pursued.

17       Q.    Had you taken any steps to

18  pursue that option during the time you

19  were negotiating the transaction with L&H?

20       A.    Yes.

21       Q.    What steps had been taken?

22       A.    That's why the financials at

23  Dragon were restated; underneath all

24  accounting policies that I was a part of

25  and so that we went back and did those so

256

                    CHAMBERLAIN

1

2    that I would start having the ability to

3    be able to answer to all the financials

4    and they were consistently done.

5         Q.    Fair enough.

6              I think you are explaining that

7    you were making preparations that would

8    have equipped you to pursue the idea of a

9    public offering, yes?

10        A.    Yes.

11        Q.    My question was slightly

12   different or I meant it to be different,

13   which is, had any approaches been made,

14   had any work by bankers been performed for

15   a public offering during the period

16   starting in December of '99 when you were

17   actively negotiating with Lernout &

18   Hauspie?

19        A.    We did not engage any bankers

20   to follow an IPO.

21        Q.    Am I correct that there were no

22   other acquisitions that were options at

23   that point in time?

24              MR. JOSEPH:  Objection to form.

25              You may answer.

257

1                    CHAMBERLAIN

2        Q.        Do you understand what I am

3    saying?

4        A.        We were underneath an

5    exclusivity that we could not talk to

6    other people from the time that we signed

7    the merger agreement and it might have

8    been before then, not knowing what the

9    timing of the paperwork was, so we

10   couldn't have discussions with other

11   people during that time.

12             So we would have gone back and

13   picked up where we left off and tried to

14   contact the players that we had.

15       Q.        But at that point in time there

16   were no other active discussions that were

17   going on for an acquisition with some

18   other company?

19       A.        I repeat; we were forbidden to

20   have those conversations underneath our

21   agreements with Lernout & Hauspie.

22       Q.        At least you agree with the

23   statement set forth in this document, that

24   if the L&H deal had not happened, Dragon

25   would have continued to operate as a

258

                    CHAMBERLAIN

1    stand-alone company?

3         A.    For at least a short period of
4    time; it takes a while to get a deal done.

5         Q.    There had been previous
6    discussions with another company connected
7    to Ford Motor Company about a potential
8    transaction, correct?

9         A.    Correct.

10        Q.    Those discussions were over by
11   the time you went forward with the L&H
12   transaction, correct?

13        A.    That's correct.

14        Q.    That's Visteon, is that
15   correct?

16        A.    Correct.

17        Q.    The Visteon transaction did not
18   happen?

19        A.    Obviously.

20        Q.    And it was your view that it is
21   not a viable option if the L&H transaction
22   had also not happened, Visteon was no
23   longer on the board?

24        A.    Visteon wouldn't have gone for
25   a full acquisition.

259

                    CHAMBERLAIN

1

2        Q.      Was there any --

3               MR. JOSEPH:  I am not sure

4   whether she was finished or not.

5        A.      They would have come back to

6   discuss about a joint venture or owning

7   some of the part of the technology.

8        Q.      But not a full acquisition?

9        A.      No.

10       Q.      Was there any other company

11  that had been identified and you had had

12  discussions with prior to June of 2000

13  about a full acquisition?

14       A.      Yes.

15       Q.      Who was that?

16       A.      We talked to Psion, we talked

17  to Sony or representatives of Dragon

18  talked to Sony.

19              The bankers also made a list of

20  companies that were potential partners, I

21  don't think we contacted any of them on

22  there, I think we stuck with the four that

23  we had identified previously.

24       Q.      Is it your recollection there

25  had been some communications with both

260

1                    CHAMBERLAIN

2    Psion and Sony about a possible

3    acquisition?

4         A.    Both joint venture as well as

5    acquisition.

6         Q.    I want to focus on the

7    acquisition.

8         A.    Go ahead.

9         Q.    Had Psion or Sony expressed

10    interest in an acquisition as opposed to

11    some kind of venture?

12         A.    It is hard for me to keep

13    straight which one was which now, I would

14    really have to go back and look at papers

15    to know whether it was a hundred percent

16    acquisition or it was a capital infusion.

17         Q.    Had the discussions with either

18    of those entities, Psion or Sony,

19    progressed beyond the very preliminary

20    stage?

21         A.    Psion came in and did due

22    diligence.

23         Q.    When was that?

24         A.    November or December.

25         Q.    Due diligence for what type of

261

CHAMBERLAIN

1

2      transaction?

3          A.      A purchase.

4          Q.      Had a price been agreed on or

5      established?

6          A.      I cannot recollect whether we

7      got a potential range from them.

8          Q.      What happened after they came

9      in and did due diligence?

10         A.      I don't necessarily remember

11     those sequence of events, so I don't know,

12     conversations were happening with both

13     Janet and Don with Psion, but they

14     retracted their interest in looking at the

15     company as an acquisition.

16         Q.      Psion retracted its interest?

17         A.      Yes.

18         Q.      When was that?

19         A.      We are still in the

20     November/December time frame.

21         Q.      Let me turn now to Sony.

22              Had Sony expressed interest in

23     a possible acquisition at some point?

24         A.      I believe that they were joint

25     venture; again, I can't remember whether

262

CHAMBERLAIN

1

2    an acquisition was talked about or a joint

3    venture was talked about with Sony.

4        Q.    Had they progressed to the

5    stage of doing due diligence?

6        A.    No.

7        Q.    What stage had they progressed

8    to?

9        A.    Just discussions.

10        Q.    With whom on the Dragon side?

11        A.    Don and Janet.

12        Q.    Were you involved in those

13    discussions?

14        A.    No.

15        Q.    Did you understand those

16    discussions had gotten to the price stage

17    or to the terms stage?

18        A.    They hadn't.

19        Q.    Did you learn at some point

20    that Sony had retracted its interest?

21        A.    Yes.

22        Q.    When was that?

23        A.    Don't know the exact timing.

24        Q.    Was it late '99, early 2000?

25        A.    It was obviously in November or

263

1                    CHAMBERLAIN

2    December, because we did not sign a letter

3    of intent and have negotiations with other

4    people.

5         Q.    By 2000, other than L&H there

6    were no other companies that had expressed

7    an interest in an acquisition and not

8    retracted that interest?

9         A.    No, we were still working with

10   Visteon when it turned in early 2000.

11        Q.    When you say it turned --

12        A.    You said in early 2000 we were

13   working with Visteon.

14        Q.    You're right, I am just

15   following up, you used the phrase

16   "turned."

17             Were you continuing to explore

18   Visteon in early 2000 and then did there

19   come a point when Visteon retracted its

20   interest?

21        A.    Yes, we were underneath an

22   exclusivity period with Visteon in early

23   2000 and we did not renew that exclusivity

24   when it ran out.

25        Q.    Did Visteon retract its

264

CHAMBERLAIN

1

2      interest?

3          A.     I believe that was more that we

4      weren't coming to mutual terms.

5          Q.     "We" meaning Dragon and

6      Visteon were not making progress toward

7      getting a deal done?

8          A.     Correct.

9          Q.     At that point you decided that

10     the only game in town to be pursued was

11     Lernout & Hauspie?

12         A.     No, what we decided was we

13     could keep the doors open for two

14     companies by not signing an exclusivity

15     with Visteon.

16         Q.     Did there come a point in time

17     when Visteon retracted its interest, went

18     away?

19         A.     Yes.

20         Q.     When was that?

21         A.     Prior to us signing any

22     exclusivity with L&H.

23         Q.     By the time you signed the

24     exclusivity with L&H, L&H was the only

25     game in town?

1                   CHAMBERLAIN

2        A.    It was the only one that we

3   committed we would talk to for a while.

4        Q.    When you signed the exclusivity

5   with L&H, there was no other company that

6   you are aware of at that point in time

7   that has had discussions about an

8   acquisition and is still interested in

9   pursuing those discussions?

10       A.    Not to my knowledge.

11             Again, you said the word

12   acquisition.

13       Q.    Yes, I am focusing on

14   acquisition.

15       A.    Okay.

16       Q.    I want to change gears

17   slightly.

18             Are you familiar with

19   accounting concept of sell-in versus

20   sell-through as accounting methodology?

21       A.    Yes.

22       Q.    To get us started in this area,

23   can you generally describe what that

24   accounting issue is in very general terms.

25       A.    There is different ways

266

CHAMBERLAIN

1

2   companies can recognize revenue, they can

3   recognize it differently depending upon

4   the type of industry that they are.

5           Software companies were moving

6   in the direction that they would only

7   recognize software when it got to the end

8   user, the end user was not your

9   distribution channel, so sell-in means you

10  were selling it into the distributor,

11  sell-out means it was getting to the end

12  user.

13          Q.     There were two different

14  methods, sell-in and sell-out, for

15  accounting for revenues?

16          A.     That's correct.

17          Q.     Which one of those methods

18  would you say is more aggressive from an

19  accounting perspective?

20          A.     Sell-in.

21          Q.     Why is that more aggressive?

22          A.     You don't know whether it is

23  going to get sold out.

24          Q.     In other words, you're booking

25  the revenue when you sell it to a

267

CHAMBERLAIN

1

2    distributor before you know whether the

3    product is going to be sold to an ultimate

4    consumer?

5        A.    Yes.

6        Q.    The issue is those distributors

7    often have return rights to send unsold

8    product back to the manufacturer, correct?

9        A.    They could.

10       Q.    What method of accounting was

11   Dragon on prior to its acquisition of L&H

12   in this area, sell-in or sell-through?

13       A.    When I restated the financial

14   statements when I got there, it was on

15   sales-out.

16       Q.    It was on sales-out after your

17   restatement work?

18       A.    Correct.

19       Q.    Prior to that what method was

20   it on?

21       A.    I believe they were doing

22   sales-in.

23       Q.    Did the company agree to change

24   its accounting methodology after you

25   became CFO, the company, Dragon, and to

268

CHAMBERLAIN

1

2      change to a sell-out method rather than

3      sell-in?

4          A.    Who is the company?

5          Q.    Dragon.

6          A.    Who in particular had to agree

7      to that; I was the CFO, I made the CEO

8      aware of my accounting policies.

9          Q.    So you actually made the change

10     in accounting policy happen?

11         A.    Yes.

12               I had that discussion with our

13     auditors, too.

14         Q.    Seagate, which methodology was

15     Seagate on in 1999 and 2000, sell-in or

16     sell-out?

17               MR. JOSEPH:  Objection --

18         A.    I didn't work for Seagate,

19     Seagate who?

20               MR. JOSEPH: Technology or

21     Software?

22         Q.    Any of the Seagate family that

23     have this issue of a choice of sell-in or

24     sell-out for a software product, can you

25     tell me whether they were on a sell-in or

269

1                  CHAMBERLAIN

2    sell-out basis?

3         A.    You still need to narrow it,

4    Seagate had a lot of subsidiaries, some of

5    those had software, some had hard disk

6    drives.

7              I can't answer for all the

8    subsidiaries.

9              If you want to ask about the

10   software company --

11        Q.    Yes, software, please.

12        A.    The Seagate software was based

13   upon number of weeks that we allowed in

14   the channel, i.e., number of weeks had to

15   support how many weeks sales were

16   projected for next quarter on that

17   particular product.

18             So I set an accounting policy

19   that there could be no more than let's

20   just use, because I had that position for

21   a while, six weeks of inventory in

22   England.

23        Q.    Let me see if I understand

24   correctly.

25             You were using a sell-in

270

CHAMBERLAIN

1

2    accounting policy for the software of

3    Seagate with a limit on how many weeks of

4    inventory you would allow to be in that

5    sell-in channel?

6        A.    No, I was using a modified

7    sales-out approach for Seagate Software,

8    not Seagate Technology, and I could only

9    monitor that because Seagate Software had

10   hundreds of distributors, so the best that

11   I could do was try to monitor the level of

12   inventory, you could not get sales-out

13   reporting from 200 distributors and hope

14   to close your books.

15       Q.    You were doing sales-out but

16   not with respect to the actual sales-out

17   numbers as reported by the distributors,

18   but instead you were using inventory

19   channel information as the basis for that.

20       A.    How much I was going to sell in

21   the next quarter and it also got compared

22   to how much I was selling for that

23   distributor, so we could not say that they

24   were going to sell three times what they

25   sold last quarter.

271

1                    CHAMBERLAIN

2        Q.     Were you reserving for returns

3   under that methodology?

4        A.     You reserve for any known

5   returns or product upgrades, et cetera,

6   those were specific and over and above the

7   six-week reserve or five-week reserve --

8        Q.     If you are on --

9              MR. JOSEPH:   Five-week reserve?

10       A.     That was in addition to

11  providing for having a level amount of

12  inventory in the channel.

13       Q.     If you are on a pure sell-out

14  methodology, do you have reserves for

15  things like returns?

16       A.     Yes.

17             MR. JOSEPH:   Can we take a

18  minute, it has been an hour.

19             MR. CARROLL:   Yes, please do.

20             THE VIDEO TECHNICIAN:   Going

21  off the record at approximately 3:41.

22             (Recess taken.)

23             THE VIDEO TECHNICIAN:   Going

24  back on the record at approximately 3:52

25  p.m..

272

                    CHAMBERLAIN

1
2    BY MR. CARROLL:

3        Q.    One more exhibit, Chamberlain

4    Exhibit 18, which I have placed in front

5    of you.

6            For the record, Bates Nos. TRA

7    11130 through 141, it appears to be a file

8    tab on the first page saying "detailed

9    meetings with management."

10           Do you recognize this document?

11       (Chamberlain Exhibit 18, Bates

12   Nos. TRA 11130 through 141, was marked for

13   identification, as of this date.)

14       A.    I don't recognize the tab, I

15   recognize the document.

16       Q.    Is this document, starting on

17   page 2 of the exhibit forward, does it

18   contain your interview notes of the

19   interviews you conducted during your

20   two-week assignment you described earlier?

21       A.    Yes, it does; not all of them,

22   but these were some of those interviews.

23       Q.    That were typed up?

24       A.    Yes.

25       Q.    You can put that to the side.

273

CHAMBERLAIN

1

2          A few more background questions
3    and we are near the end for my
4    questioning, anyway.
5          Have you testified previously
6    in any type of proceeding, and if so, can
7    you tell us when and in what proceeding?
8       A.    Can't tell you exactly when; it
9    would be the early Nineties, it is
10   whenever Seagate had a pending class
11   action suit.
12         And I didn't testify, I did a
13   deposition; legalities, sorry.
14         MR. JOSEPH:  That's okay.
15      Q.    It was a deposition, it wasn't
16   in court?
17      A.    Right.
18      Q.    It was in a lawyer's conference
19   room?
20      A.    Yes.
21      Q.    But it was under oath and there
22   was a stenographer as there is here today
23   typing away?
24      A.    Yes.
25      Q.    This was in the early Nineties,

274

```
1                    CHAMBERLAIN
2  you say?
3        A.     Could have been the
4  mid-Nineties, I can't remember when the
5  class action proceedings were.
6        Q.     Did you testify for one day or
7  more than one day?
8        A.     One day.
9        Q.     Do you remember the name of the
10 lawyer who was representing you or the law
11 firm who was representing you?
12       A.     I do not.
13       Q.     Do you have a copy of your
14 transcript anywhere?
15       A.     I do not.
16       Q.     Do you remember the name of the
17 case or any parts of the name of the case?
18            MR. JOSEPH:   Seagate was in it.
19            MR. CARROLL:   Thank you.
20       A.     Seagate, it had three class
21 actions, so it had to be either 1, 2, or
22 3.
23       Q.     Was this litigation pending out
24 east or out west; do you remember where
25 the lawsuit was?
```