1                    CHAMBERLAIN

2          A.    It is the famous attorney that

3    was always doing them out west, Milberg.

4          Q.    Milberg Weiss?

5          A.    Yes.

6          Q.    Do you remember how the

7    litigation was resolved?

8          A.    No.

9          Q.    Were you involved in resolving

10   it?

11         A.    No.

12         Q.    Was there a settlement of any

13   sort?

14         A.    Can't recollect that either.

15         Q.    Do you remember what the

16   allegations were in the lawsuit?

17         A.    No.

18         Q.    What types of topics did you

19   cover in your testimony, just generally;

20   were you covering accounting issues or

21   something else?

22         A.    Accounting issues.

23         Q.    What types of accounting

24   issues?

25         A.    Adjustments that were made to

276

                    CHAMBERLAIN

1

2    the financials during the close process.

3        Q.     Top-down adjustments?

4        A.     I don't know what a top-down

5    adjustment is.

6        Q.     Adjustments that were made to

7    the financial statements by management as

8    opposed to line accounting personnel?

9        A.     I don't think that's an

10   answerable question.

11       Q.     If you can't answer it, that's

12   the end of it, so I will just ask it

13   again.

14       A.     Well, I personally make the

15   journal entries, decisions are made by

16   management.

17       Q.     These adjustments that were at

18   issue in the lawsuit, who had directed

19   that the adjustments be made?

20       A.     I don't recollect.

21       Q.     But it was somebody in senior

22   management?

23       A.     I don't recollect.

24       Q.     What was the magnitude of the

25   adjustments, do you remember?

277

CHAMBERLAIN

1

2    A.    I don't recollect that either.

3    Q.    Where was your deposition taken

4  physically, where were you?

5    A.    West Coast, either San Jose or

6  San Francisco.

7    Q.    At whose office?

8    A.    I don't recollect that.

9    Q.    Is that the only time you have

10  given testimony?

11    A.    Yes.

12    Q.    No other proceeding, including

13  an arbitration or mediation, in which you

14  have testified?

15    A.    Correct.

16    Q.    Ever been interviewed by the

17  SEC other than the occasion related to

18  Lernout & Hauspie by Mr. Charles Davis and

19  Mr. Lee?

20    A.    Interview?

21    Q.    I will start there.

22    A.    In my responsibilities through

23  Seagate Technology and Software, there

24  were lots of proceedings that we did.

25        Questions come back from the

                    CHAMBERLAIN

1

2   SEC when you write proxies, when you write

3   annual reports, when you are trying to do

4   a merger, you have to respond to those,

5   sometimes you have questions, followup

6   with them, live, to make sure you

7   understand those.

8             Somewhere in my history I have

9   had conversations with the SEC.

10       Q.    With accountants with the SEC

11  or with attorneys, other than the occasion

12  with respect to Lernout & Hauspie?

13       A.    I wouldn't know if they were

14  accountants or attorneys that were asking

15  the questions.

16       Q.    Has Seagate been involved in

17  any SEC investigations while you have been

18  employed there?

19       A.    Long span of time; I am

20  assuming yes, that would be a true

21  statement, and I can recollect

22  specifically a NASDAQ one, but there were

23  ten years worth of my career that I was

24  not in a corporate responsibility, so you

25  don't learn what's happening in the

                    CHAMBERLAIN

1

2    corporate realm of SEC investigations.

3        Q.    I am simply asking whether you

4    were responsible for it or not whether, to

5    your knowledge, you were --

6        A.    You said to your knowledge

7    right now; yes, they had SEC

8    investigations.

9        Q.    Did you participate in any of

10   those investigations in the sense of

11   providing any information to the SEC as

12   part of those investigations?

13       A.    I can't recall when we had the

14   NASDAQ whether there was SEC investigation

15   at the same time.

16            I know that was a lot of

17   responses back to them.

18       Q.    You did play some role in the

19   NASDAQ investigation?

20       A.    I did.

21       Q.    What role was that?

22       A.    Getting to recollection

23   everything that happened from the day that

24   the financials were first printed in the

25   company until the day that they were

1                    CHAMBERLAIN

2    released to the market.

3         Q.    When was the NASDAQ

4    investigation?

5         A.    I can't remember the year.

6         Q.    Was it in the Nineties?

7         A.    Yes.

8         Q.    Late Nineties, early?

9         A.    Early to mid.

10        Q.    Was the NASDAQ investigation

11   publicly disclosed by Seagate?

12        A.    I don't know that.

13        Q.    The other SEC investigations

14   that occurred, whether you were involved

15   in them or not at Seagate, were all of

16   those disclosed publicly?

17        A.    I have no idea whether they

18   were or not.

19        Q.    Did you personally ever

20   participate in disclosing an SEC

21   investigation or a NASDAQ investigation to

22   anyone while you were at Seagate?

23        A.    I think I have answered; I

24   cannot recollect disclosing to the street,

25   if that's the question, a pending NASDAQ

1                    CHAMBERLAIN

2    or SEC investigation, I can't remember

3    specific detail.

4            I might have.

5        Q.    Have you ever personally been

6    named as a party in a litigation, either

7    as a plaintiff or a defendant?

8        A.    No, outside of this, no.

9            MR. JOSEPH:  No, you are not a

10    party.

11        A.    No.

12        Q.    When you were CFO at Dragon,

13    who paid your salary for your services as

14    a CFO at Dragon?

15        A.    Seagate.

16        Q.    Same question for Mr. Waite; as

17    acting CEO of Dragon, who paid his salary?

18        A.    Seagate.

19        Q.    This is Chamberlain Deposition

20    Exhibit 19.

21            (Chamberlain Exhibit 19, Bates

22    Nos. EC 00001 through 10, was marked for

23    identification, as of this date.)

24            MR. CARROLL:  For the record,

25    this is a multipage document, Bates Nos.

282

CHAMBERLAIN

1

2   EC 00001 through 10.

3        Q.    Do you recognize these as

4   redacted pages from your calendar for 1999

5   and 2000?

6              (Witness perusing document.)

7        A.    Yes.

8        Q.    I have a question about just a

9   few items.

10             If you would turn, please, to

11  January 2000, page 6, for the 19th and

12  20th there is reference to "PWC DD," do

13  you see that?

14             (Witness perusing document.)

15       A.    Oh, yes.

16       Q.    Can you tell us what that

17  refers to?

18       A.    My recollection was it was a

19  tax issue, but I can't recollect any

20  specifics.

21       Q.    Was it a tax issue related in

22  any way to Lernout & Hauspie?

23       A.    No, I believe it was a tax

24  issue with Dragon; it was a tax issue

25  dealing with Dragon.

283

CHAMBERLAIN

1

2      Q.      Does PWC stand for

3   PricewaterhouseCoopers?

4      A.      Yes.

5      Q.      They were assisting you with

6   that tax issue?

7      A.      Yes.

8      Q.      If you would turn over, please,

9   to May of 2000.

10             May 5th is the last entry

11   provided in this exhibit to us with any

12   unredacted information and also there is a

13   reference on May 5th to "my goodbye party

14   at Westin," yes?

15      A.      Yes.

16      Q.      Does this help you remember

17   that May 5th was your last day of

18   physically being on the job as CFO of

19   Dragon?

20      A.      I have indicated previously it

21   was my last physical day in Boston at

22   Dragon.

23      Q.      Am I correct you have no other

24   entries in your calendar for May or for

25   June relating to Dragon, which is why none

284

1                    CHAMBERLAIN

2    have been provided to us in this case,

3    correct?

4         A.    Correct.

5         Q.    In connection with your

6    deposition today, did you receive a

7    subpoena asking for documents?

8         A.    Yes, I did.

9         Q.    Did you conduct a search for

10   any documents you might have relating in

11   any way to your time at Dragon or to the

12   L&H transaction?

13        A.    Yes, I did.

14        Q.    And have you provided any and

15   all documents you have to your able

16   counsel, Mr. Joseph?

17        A.    Yes, I have.

18        Q.    In conducting your search for

19   documents, did you search not only for

20   hard copies but also for electronic

21   documents, e-mails, and such?

22        A.    I don't have any of that

23   electronic e-mails, that was all

24   Seagate's, I left Seagate, it is their

25   computer systems.

285

CHAMBERLAIN

1

2      Q.      When you left Seagate, you left

3  behind any computers you would have used

4  in connection with Dragon and L&H matters?

5      A.      And I couldn't access Lotus

6  notes, so I got rid of all my Lotus notes.

7      Q.      On your personal computer?

8      A.      Yes.

9      Q.      When was that that you got rid

10  of them?

11      A.      When I moved to Oregon a month

12  later.

13      Q.      You moved to Oregon when?

14      A.      End of May.

15      Q.      Of?

16      A.      2000.

17      Q.      Was Seagate subsequently

18  acquired by another company, was there an

19  acquisition involving Seagate?

20      A.      There is a very complicated

21  transaction dealing with Seagate, they

22  weren't really acquired, but it does

23  appear to be on paperwork they were

24  acquired.

25      Q.      You will be happy to know for

286

CHAMBERLAIN

1

2    purposes of the next question I don't need

3    to go into the detail of that transaction.

4            My question is simply this; do

5    you know whether the corporate entity that

6    has taken over for Seagate in any way

7    still has any computers from the time you

8    were employed there?

9        A.    I would have no idea, it has

10   been four years since I have left.

11       Q.    In connection with preparing

12   for your deposition today, did you speak

13   to anybody other than your counsel and any

14   family members, I mean to exclude your

15   counsel or family members; did you have

16   any conversations with anyone else related

17   to appearing for your deposition?

18       A.    My employees know that I am out

19   here in Boston.

20       Q.    We can exclude that?

21       A.    My business partner knows I am

22   in Boston.

23            MR. JOSEPH:   You're not in

24   Boston, New York.

25       A.    New York, yes.

287

1              CHAMBERLAIN

2              I told my friends where I was

3    going.

4         Q.    I mean to exclude that.

5         A.    Is there a specific question

6    here?

7         Q.    Did you speak to anyone who was

8    involved in the L&H transaction or

9    involved with Dragon or Seagate in

10   connection with your coming to testify in

11   this case?

12        A.    I have not had a conversation

13   with anybody who was with Dragon or with

14   Seagate.

15        Q.    When was the last time you

16   spoke to the Bakers?

17        A.    Maybe May or June of that year,

18   2000.

19        Q.    Mr. Waite?

20        A.    I go down to the Bay area

21   often, since it was my home, so once in a

22   while I stop into Seagate; I saw him

23   sometime in 2003 on one of my visits.

24             MR. CARROLL:  I have no further

25   questions at this time.

288

CHAMBERLAIN

1

2          Thank you.

3          MR. JOSEPH:  If counsel would

4    identify themselves and the party they

5    represent before they begin.

6              THE VIDEO TECHNICIAN:  Off the

7    record at approximately 4:13 p.m..

8              (Pause.)

9              THE VIDEO TECHNICIAN:  Back on

10   the record at 4:14 p.m..

11   EXAMINATION BY

12   MS. ALVAREZ:

13        Q.    Hello, my name is Iraida

14   Alvarez and I represent Joseph Lernout and

15   I have some followup questions from your

16   earlier testimony.

17              You testified earlier that you

18   had on a trip to Belgium in December 14th,

19   1999, met with Mr. Joe Lernout, is that

20   correct?

21        A.    That's correct.

22        Q.    Was that the first time you met

23   him?

24        A.    I can't recollect whether I had

25   met him in the offices of Cowen before I

289

CHAMBERLAIN

1
2    went to Belgium.

3        Q.    Do you remember whether that

4    earlier meeting took place in the offices

5    of SG Cowen in Boston?

6        A.    Those are the only places I

7    went to before I went to Belgium, so if I

8    had met him before I went to Belgium, it

9    would be at Cowen's office.

10       Q.    At that first meeting in

11   Belgium, do you remember who else was

12   there besides Mr. Lernout when you first

13   met him?

14       A.    I don't recollect whether I met

15   him with the whole group that I recited

16   was invited to that meeting or whether I

17   met him out in the hallway prior to that.

18           That was the conglomerate of

19   people when I met him.

20       Q.    Who was the conglomerate of

21   people when you met him at that meeting in

22   Belgium?

23       A.    Janet Baker was there from L&H,

24   Joe and Pol was there, Roel Pieper was

25   there, there is another individual who was

290

CHAMBERLAIN

1

2    in charge of some sort of R&D project that

3    was there, Carl Dammekens was there, there

4    was Ben Howe and I can't remember how many

5    of Ben Howe's team was there, and my

6    banker, Rich Wayner, was there.

7         Q.    At that time when you met him,

8    did you know what his title and position

9    was at L&H?

10        A.    Yes.

11        Q.    What were his titles and

12   positions?

13        A.    He was either the -- he was

14   founder, he and his partners were founder;

15   to be truthful I don't remember who was

16   chairman and who was CEO.

17        Q.    How did you become aware of

18   that?

19        A.    I can't recollect that.

20        Q.    After that meeting, did you

21   ever meet Mr. Lernout in person again?

22        A.    He came back over during the

23   second round of negotiations with L&H and

24   I can't define whether it was at Cowen or

25   we had several meetings up in Burlington.

291

1                    CHAMBERLAIN

2        Q.      Do you remember when that was?

3        A.      Sometime in February or March,

4   I don't recollect exact dates.

5        Q.      After that meeting in February

6   or March of 2000, did you ever meet him

7   again in person?

8        A.      I can't answer definitively

9   whether I met him in April.

10                Have I met him after May 5,

11   2000, no; I can't remember whether

12   something slipped into April and I saw Joe

13   Lernout.

14        Q.      I am going to go back to that

15   first meeting in Belgium.

16                Can you tell me what did he

17   generally say at that time about the

18   Dragon merger?

19        A.      What he generally said; they

20   wanted Dragon's technology, they were

21   quite interested in making a transaction

22   occur.

23        Q.      Did he say anything specific to

24   you about any of the L&H subsidiaries?

25        A.      Both Joe and Pol took me on a

                    CHAMBERLAIN

1

2    tour and it was sometime during the

3    daylight to see the facilities.

4              When we were walking around

5    they were giving narratives and I was

6    asking questions about their history and

7    technology, et cetera.

8              During that conversation it did

9    come up, there were questions that I asked

10   about their various subsidiaries because

11   there was common knowledge that there were

12   less than arm's length transactions in the

13   past with some of the subsidiaries that

14   Joe and Pol were members of.

15             I was told at that time that

16   that was all taken care of, that was in

17   the past.

18        Q.    Do you remember what he

19   specifically said to you about the

20   subsidiaries?

21        A.    I can just remember the general

22   context of the thing, I can't remember

23   specific subsidiary.

24        Q.    Was it he who said they were

25   less than arm's length transactions?

293

CHAMBERLAIN

1

2     A.    I didn't say he said that; I

3 said it was common knowledge at that time

4 that there were relationships that were

5 less than arm's length transactions.

6          I asked him about it and he

7 said that everything was taken care of,

8 that it was arm's length transactions.

9     Q.    What did you understand by

10 "everything was taken care of"?

11    A.    That they had removed

12 themselves from positions that would deem

13 them to be related parties.

14    Q.    At that meeting did he say

15 anything to you specifically about the

16 licensing of the software by the startup

17 companies?

18    A.    I couldn't tell you if it was

19 at that Belgium meeting or it was with him

20 or whether it was my knowledge of

21 something that was spoken of in those

22 meetings about how they did licensing of

23 software.

24    Q.    Even if it was not at that

25 meeting, what did he say to you about the

294

CHAMBERLAIN

1

2    licensing of the software companies?

3        A.     The licensing to software

4    companies; that they were at arm's length.

5        Q.     Is that all he said about it?

6        A.     Yes, this is still in the

7    context of discussions of things that were

8    in the past.

9              But as I said, I can't remember

10   did it happen at that exact moment, the

11   same conversation, I don't know.

12             We had dinner that evening, we

13   talked a lot about their technologies,

14   where they were licensing their

15   technologies, into which countries they

16   were licensing their technologies.

17       Q.     Basically that's all you recall

18   about his comments on the software

19   licensing?

20       A.     Yes.

21       Q.     Did he say anything to you

22   specifically about the FLV fund?

23       A.     We talked about the FLV funds,

24   but I really can't remember specifics

25   because there were a lot of names that

295

CHAMBERLAIN

1
2 were very close to FLV, that organization

3 chart was hard to decipher, so I am not

4 sure, we talked about FLV and I don't know

5 in what context.

6     Q.    What exactly did he tell you

7 about the accounting of the subsidiaries?

8     A.    I don't know if we talked about

9 specific accounting of the subsidiaries;

10 all we talked about was whether those

11 relationships were at arm's length.

12     Q.    After that you said that you

13 met with him in February or March 2000.

14     A.    Yes, I said it would be

15 February or March.

16     He was at other banker

17 meetings.

18     Q.    Who was at that meeting?

19     A.    I don't know what particular

20 meeting it was.

21     I said it was one of the banker

22 meetings in February or March, I know he

23 came over to the states a couple of times

24 to help with negotiations, I don't

25 remember which meeting it was.

296

CHAMBERLAIN

1

2      Q.      Obviously it was a bankers

3   meeting, so SG Cowen was there?

4      A.      Yes.

5      Q.      And other than that, you don't

6   have any recollection of any individuals

7   that were there?

8      A.      Outside of Ben Howe sticking

9   his head in and out, I don't know of

10  anyone else, I can't remember exact

11  attenants at a meeting I can't remember

12  which meeting it is.

13     Q.      At that time did he make any

14  other statements to you about the

15  accounting of the subsidiaries or the

16  startup companies or the FLV fund?

17     A.      I don't have a specific memory

18  that I can call upon right now, nothing

19  that I can remember.

20     Q.      Subsequent to that February or

21  March 2000 meeting, do you remember him

22  making any other statements to you

23  regarding those topics?

24     A.      No.

25     Q.      Do you know whether Mr. Lernout

297

                    CHAMBERLAIN

1

2   had any role in the preparation of the

3   financial statements for L&H?

4        A.    Specific knowledge?

5        Q.    Do you know --

6        A.    I would hope he did in the

7   position of him in that company.

8        Q.    But do you know for a fact

9   whether he had any role?

10       A.    I wasn't there, so I wouldn't

11  know.

12       Q.    Do you know whether he had any

13  interactions with KPMG?

14       A.    I wouldn't know that either, I

15  wasn't present while KPMG was there.

16       Q.    Did he ever tell you about his

17  interactions with KPMG?

18       A.    No.

19       Q.    Or anything relating to KPMG?

20       A.    No.

21            MS. ALVAREZ:   That's all I

22  have, thanks.

23  EXAMINATION BY

24  MR. LEBOVITCH:

25       Q.    My name is Mark Levovitch and I

298

CHAMBERLAIN

1

2      represent SG Cowen.

3                    Earlier you described a phone

4      call that you had with a couple of parties

5      on March 22nd of 2000 and that was a call

6      you listed KPMG on; who were the parties,

7      you listed KPMG, right?

8          A.    Yes, I listed KPMG, I listed

9      folks from Arthur Andersen, I listed my

10     banking folks, I listed Carl Dammekens, I

11     said that Brad Desmarais was in the

12     telephone call, I think those are the

13     people.

14         Q.    Did you also mention Allan

15     Forsey being on the call?

16         A.    Yes, I did.

17         Q.    Was this an important call to

18     you?

19         A.    Very important call to me.

20         Q.    Why was it a very important

21     call to you?

22         A.    It is one of the procedures

23     that I did at all of my due diligence for

24     the acquisitions and that is, because the

25     audit was not completed, I could not get

299

CHAMBERLAIN

1

2  in and do my own work on the financial

3  statements, I had to rely on conversations

4  that I had on that phone call.

5          So it was important to my

6  diligence process.

7      Q.    Was anyone from SG Cowen on

8  that call?

9      A.    Not to my knowledge.

10     Q.    SG Cowen was involved in a lot

11  of other meetings in which you

12  participated, right?

13     A.    Yes.

14     Q.    Did you ask anybody why SG

15  Cowen was not on that call?

16     A.    I did not specifically ask

17  anybody.

18     Q.    Did anyone on the call say in

19  effect, wait, we need to get SG Cowen on

20  this call?

21     A.    Not to my recollection.

22     Q.    When you said you did not

23  specifically ask anybody, did you

24  generally raise an issue about SG Cowen

25  during that call?

300

CHAMBERLAIN

1

2       A.      It was my call to have with

3   KPMG and so my primary contact was to make

4   sure that Carl Dammekens got on the phone

5   and KPMG got on the phone.

6               The other people were because

7   L&H wanted them there or whatever, they

8   weren't necessarily my party to that.

9               I had my bankers, my team;

10  whoever else got asked was Carl's role.

11              MR. LEBOVITCH:  I have no

12  further questions.

13              MR. JOSEPH:  Does anybody else

14  have questions?

15              (No response.)

16              MR. JOSEPH:  I have some

17  questions.

18   BY MR. JOSEPH:

19      Q.      I am going to try to ask you to

20  direct your answers to the jury, which is

21  to the camera today.

22              Would you tell the jury a

23  little bit about yourself, your

24  educational background, please.

25      A.      I graduated in 1978 with a BS

301

                    CHAMBERLAIN
1

2   in business administration from Bowling

3   Green State University, and my other

4   formal education was an M.B.A. at Santa

5   Clara University and I think that was

6   completed in 1993.

7          Q.     Were you already working at

8   Seagate Technology or Seagate Software

9   when you received your M.B.A.?

10         A.     I was already working at

11  Seagate Technology.

12         Q.     Are you affiliated with any

13  Seagate entity today?

14         A.     I am not.

15         Q.     Are you affiliated working for

16  the TRA Rights Trust in any capacity?

17         A.     No, I am not.

18         Q.     When was it that you ceased

19  working for Seagate Technologies or

20  Seagate Software?

21         A.     Formally on November --

22  whenever the transaction consummated that

23  Seagate became a private company and so

24  that was in November of 2000.

25         Q.     That was after approximately

302

CHAMBERLAIN

1

2    how many years?

3    A.    15.

4    Q.    While you were at Seagate, did

5    you have any involvement in mergers and

6    acquisition activity?

7    A.    Yes, I spent most of my time

8    from '95 on doing mergers and acquisitions

9    and I did do a few early on in '93 and

10    '94.

11    Q.    Prior to coming to work for

12    Seagate, what was your job?

13    A.    Before coming to Seagate I

14    worked for seven years in the public

15    accounting firm of Ernst & Ernst, which

16    later merged and has various different

17    names today.

18        My role there was staff

19    accountant, I was a CPA, certified in

20    Ohio, so I was doing auditing of

21    companies.

22    Q.    You were a certified public

23    accountant, is that what you are referring

24    to?

25    A.    Yes, yes.

303

CHAMBERLAIN

1

2    Q.    In connection with the

3  acquisition of Dragon by Lernout &

4  Hauspie, do you have that acquisition in

5  mind?

6    A.    Yes.

7    Q.    Is there anything differently

8  in the way you approached that acquisition

9  than you had the numerous acquisitions you

10  referred to a few moments ago preceding

11  that one?

12    A.    I would say not; I used my --

13  this would be my 15th, 16th transaction, I

14  had done this prior to Seagate, so I had

15  my own due diligence list, I had my

16  process that I went about in trying to do

17  investments or acquisitions.

18    Q.    While you were at Seagate, were

19  you at any time involved in the audit or

20  coordinating the audit for Seagate

21  Technology, Inc.?

22    A.    In the role when I went to work

23  in corporate finance from the subsidiary,

24  Grenex, who became Seagate, I went to work

25  in the corporate finance function, part of

304

CHAMBERLAIN

1

2  my job was financials, as well as

3  coordinating around the world our

4  reporting for Seagate 10-Qs, et cetera, as

5  well as coordinating with the auditors the

6  audit of Seagate Technology.

7      Q.    You referred to around the

8  world; did Seagate have operations outside

9  the United States?

10     A.    Oh, yes, they had operations in

11  numerous countries.

12     Q.    How many employees did Seagate

13  Technology have?

14     A.    At the height, Seagate was

15  close to 100,000 employees.

16     Q.    What was your role with respect

17  to the audit during any period of your

18  employment at Seagate?

19     A.    I would be the front line

20  coordinator of all audit issues that would

21  be out in the fields, because they would

22  report those to the Scotts Valley location

23  and then it would be my responsibility to

24  resolve those with Ernst & Whinney and

25  Scotts Valley.

305

1                  CHAMBERLAIN

2       Q.    I want to direct your attention

3   to Chamberlain Exhibit No. 6.

4            Could you briefly identify that

5   once again; I know you testified about it

6   for a couple of hours earlier this

7   afternoon.

8       A.    This is the notes, my notes,

9   and also the questions that were prepared

10  for the March 22nd conversation with KPMG.

11      Q.    I want to direct your attention

12  to the third paragraph under "general."

13           Excuse me, to the second

14  paragraph under "general"; would you read

15  that to yourself so you have it in mind.

16           (Witness perusing document.)

17      A.    Yes, I am familiar with it.

18      Q.    Please correct me if I am

19  wrong, I believe you testified earlier in

20  response to questions from Mr. Carroll

21  that you asked about other issues with

22  respect to the SEC of the participants in

23  that call.

24           MR. CARROLL:  Object to the

25  characterization.

306

CHAMBERLAIN

1

2          Q.      Is that correct --

3          MR. CARROLL:  And leading.

4          Go ahead.

5          Q.      Am I correct or incorrect about

6     that?

7          A.      I told Mr. Carroll that there

8     were other questions that came out of this

9     question that were not written down on the

10    piece of paper.

11         Q.      What were the other questions

12    that you remember that came out of the

13    questions in the second paragraph of

14    Chamberlain Exhibit 6 on page TRA 12578 to

15    which you were referring?

16         A.      I asked him at the end of all

17    of the conversations if there were any

18    other issues with the SEC that were

19    unresolved.

20         Q.      Whom did you ask that of?

21         A.      KPMG.

22         Q.      Did you receive an answer?

23         A.      I received a negative answer.

24         Q.      What was the answer you

25    received?

                    CHAMBERLAIN
1
2        A.    No, there were no other issues.
3        Q.    Whom did you receive that
4   answer from?
5        A.    KPMG.
6        Q.    Do you remember whether it was
7   Bob from KPMG U.S. or Stephan from KPMG
8   Belgium?
9        A.    No.
10       Q.    Was there any time during that
11  conversation on March 22, 2000, when Bob
12  from KPMG U.S. disagreed with anything
13  that Stephan from KPMG Belgium said?
14       A.    No, there were no
15  disagreements.
16       Q.    Was there any time during that
17  conversation on March 22, 2000, that
18  Stephan from Belgium disagreed with
19  anything that Bob from KPMG U.S. said?
20       A.    No, there were no
21  disagreements.
22       Q.    Why did you ask whether there
23  were any open issues with the SEC?
24            MR. CARROLL:  Object to form,
25  mischaracterizes the testimony about what

1                    CHAMBERLAIN

2    was asked.

3        Q.    Why did you ask the question

4    you asked with respect to other issues as

5    to which you just testified you got a

6    negative answer?

7        A.    Because it would be an

8    important fact if a company had been asked

9    for more information by the SEC and it is

10   something I would want to probe.

11       Q.    Why would you want to probe it?

12       A.    Because it could tell me things

13   that were wrong with the financials or the

14   accounting policies or procedures,

15   something that they had alerted the SEC.

16       Q.    Had you not received a negative

17   answer to the question you posed with

18   respect to the SEC, had you not gotten

19   that, had you gotten a yes, how, if at

20   all, would that have affected your

21   behavior thereafter?

22            MR. CARROLL:  Objection,

23   leading and speculative.

24       Q.    Do you understand the question?

25       A.    Yes.

309

1                    CHAMBERLAIN

2        Q.    Is the question clear to you?

3        A.    Until --

4        Q.    Is the question clear to you?

5        A.    Yes, the question is clear.

6        Q.    Please answer.

7        A.    Until I understood the nature

8    of the issue and had a chance to delve

9    into it, at minimum we would not have been

10   signing an agreement the last day of March

11   or five days later, whatever it was, we

12   would have taken other procedures to make

13   sure we understood that issue.

14       Q.    What if you had not been able

15   to get an understanding of the issues that

16   the SEC was focusing on?

17       A.    There could have been two

18   passes here; one would be for me to revert

19   the current seat back from stock to cash

20   because there is no qualms about what

21   financials look like when someone hands

22   you cash, that would be one avenue.

23            The second would be that there

24   would be something written in the purchase

25   agreement that allowed for, before the

310

1                CHAMBERLAIN

2  deal closed, for us to be comfortable with

3  whatever issue it was that was being

4  brought up.

5        Q.    As you sit here today, was

6  there any question in your mind whether

7  Dragon would have signed a merger

8  agreement for stock five days afte the

9  March 22, 2000, conference call had you

10 known there were open issues with the SEC?

11            MR. CARROLL:  Same objection.

12       A.    We would not have signed an

13 agreement five days later.

14       Q.    By the way, at the time you

15 were negotiating the acquisition with

16 Lernout & Hauspie in March, were there any

17 channel issues remaining at Dragon?

18       A.    No, I already stated that I

19 restated all the financials to be on a

20 sales out methodology, not a sales in.

21       Q.    Thank you, I have no further

22 questions.

23            MR. CARROLL:  Is it back to me?

24  BY MR. CARROLL:

25       Q.    Let me follow up on your

311

1                    CHAMBERLAIN

2   counsel's questions.

3            Do I understand correctly that

4   the question related to other issues with

5   the SEC is a question you are sure you

6   asked even though it is nowhere written

7   down on Exhibit 6?

8        A.    That's correct.

9            MR. JOSEPH:  Let me object to

10  form, but you can answer.

11       Q.    Is this a question that you in

12  your -- how many years of experience was

13  it; in your experience with 15 or 16

14  transactions, I think you said, while you

15  were at Seagate, acquisition transactions,

16  is that right?

17       A.    Yes.

18       Q.    Is this a standard question

19  that it was your custom to ask from your

20  experience over the years?

21       A.    It was in representations like

22  it is in that Dragon agreement like it is

23  now, reps about receipts from SEC,

24  et cetera.

25       Q.    You're referring to the merger

312

CHAMBERLAIN

1

2      agreement, Exhibit 2?

3          A.      Right.

4          Q.      Your typical experience was to

5      handle these things with written

6      representations in the merger agreement?

7          A.      No, excuse me; there were two,

8      that the followup was that it was in rep

9      letters or in the agreement, also.

10         Q.      In the written agreement?

11         A.      Correct, because you can have a

12     conversation one day and the next day it

13     comes.

14         Q.      Things can change from

15     day-to-day is what you are saying?

16         A.      I guess things change

17     day-to-day.

18         Q.      If I understand you correctly,

19     your experience from your years at Seagate

20     with 15 or 16 transactions was that you

21     wouldn't rely just on an oral

22     conversation, you would also handle it in

23     the written document with a written

24     representation, correct?

25         A.      As well as I went to those

313

1                    CHAMBERLAIN

2    auditors' offices and reviewed their

3    workpapers and had conversations with them

4    as I reviewed their workpapers.

5                    I was unable to do that with

6    Lernout & Hauspie's KPMG auditors.

7        Q.    I want to take each thing in

8    turn, I will do the review workpapers in

9    just a moment.

10                   I am focusing on understanding

11   what you are saying with respect to

12   written representations.

13                   If I am understanding

14   correctly, your practice, based on some 15

15   or 16 transactions at Seagate, was that in

16   addition to any discussions that you had,

17   you also got it as a written

18   representation in the signed agreement,

19   correct?

20       A.    I would say that was without a

21   doubt standard language in most of the

22   agreements.

23       Q.    You didn't do that in the

24   Lernout & Hauspie agreement?

25       A.    I think you've asked that

314

1                    CHAMBERLAIN

2   before.

3        Q.    I am just confirming your

4   answer; you did not do that here, correct?

5        A.    It was not in that agreement, I

6   wasn't the buyer.

7        Q.    With respect to your practice

8   about reviewing workpapers that you just

9   referenced, I promised I would come back

10  to that --

11             MR. JOSEPH:  Don't think we are

12  holding you to it.

13        Q.    -- I just want to confirm the

14  fact that here you did not undertake to

15  review any KPMG workpapers?

16        A.    I asked to, I was not allowed

17  to.

18        Q.    You went forward with the

19  transaction even though you were told you

20  couldn't review the workpapers?

21        A.    Based upon my conversation that

22  I had with the KPMG auditors and what they

23  told me the open issues were, that is a

24  correct statement.

25        Q.    How much time was spent putting

315

CHAMBERLAIN

2    together the typed portion of Exhibit 6,

3    with the written subject matters you were

4    going to cover, how much time was spent

5    putting these together?

6         A.    I can't guess.

7         Q.    Do you remember the day before

8    the conversation on March 22nd you spent

9    an hour with your own accounting firm,

10   Arthur Andersen, preparing the questions

11   you were going to ask KPMG on March 22nd?

12        A.    Probably getting their input,

13   yes.

14        Q.    In addition to their input from

15   Arthur Andersen, you also got input from

16   your colleague's name, Brad Desmarais,

17   correct?

18        A.    Yes.

19        Q.    And from others on your team,

20   as well, your banker, Goldman, Sachs?

21        A.    There is nothing in there from

22   my banker.

23        Q.    And you had days, weeks,

24   months, to prepare for this conversation,

25   did you not?

316

1                    CHAMBERLAIN

2        A.      I probably had my whole

3   lifetime if you want to stretch it that

4   way.

5                I can't -- how long?

6        Q.      What I mean is do you remember

7   I showed you earlier a due diligence list

8   from back in December of 1999 and an open

9   item you had listed was to have a

10  conversation --

11       A.      Yes.

12       Q.      With KPMG?

13       A.      Correct.

14       Q.      So this was something that you

15  were going to do for months in connection

16  with this transaction?

17       A.      That's correct.

18       Q.      And your testimony is it never

19  occurred to you in all that work with your

20  accountants and all your advisers to

21  prepare in the written questions that you

22  were going to cover at this meeting the

23  question you are now saying you remember

24  asking about whether there were any other

25  issues with the SEC, is that correct?

317

1                    CHAMBERLAIN

2        A.    I didn't think of all the

3    questions that were written on this page

4    that I asked.

5              This is an agenda to elicit

6    conversations from the public accountants.

7              I could not have thought of

8    everything feasible that I would ask in

9    that conversation and put it down on a

10   piece of paper like you couldn't today.

11       Q.    But the question about --

12       A.    May I take a break?

13       Q.    I prefer not, unless there is

14   some exigent reason.

15             MR. JOSEPH:  Since it is about

16   85 degrees, she wants a break, it is a

17   quarter to 5, we have been here since

18   9:30, it is reasonable.

19             MR. CARROLL:  I am powerless to

20   prevent it.

21             THE VIDEO TECHNICIAN:  Going

22   off the record at 4:45 p.m..

23             (Recess taken.)

24             THE VIDEO TECHNICIAN:  Back on

25   the record at approximately 4:49 p.m..

318

CHAMBERLAIN

1

2  BY MR. CARROLL:

3      Q.    Are you ready to continue?

4      A.    Yes.

5      Q.    I am going to continue right

6  where we were when you took the break.

7            Do you still have Exhibit 7?

8            (Witness perusing document.)

9      Q.    You previously identified

10  Exhibit 7 as two pages of handwritten

11  notes of Brad Desmarais that he had put

12  together in advance of the March 22 phone

13  call with KPMG, correct?

14      A.    It looks like his collection of

15  notes to write-ups for the e-mail agenda,

16  yes.

17      Q.    These notes were used to

18  prepare what became the written set of

19  questions that's contained in Exhibit 6,

20  correct?

21      A.    Along with my notes, wherever

22  they were.

23      Q.    If you would turn to the second

24  page of Exhibit 7, please, do you see near

25  the bottom of the page Mr. Desmarais has

319

CHAMBERLAIN

1

2    some questions related to the SEC and the

3    restatement, do you see that?

4            A.      I see it.

5                    MR. JOSEPH:   Let me note

6    generally my objection to her testifying

7    about documents she didn't prepare and

8    hadn't seen before.

9                    You may answer.

10            Q.      You worked with Mr. Desmarais,

11    yes?

12            A.      He worked for me, yes.

13            Q.      For how many years?

14            A.      At this time, three or four

15    months.

16            Q.      Do you recognize his

17    handwriting?

18            A.      I recognize his handwriting.

19            Q.      If I am reading his notes

20    correctly, they say, "As of what date was

21    restatement made, what were questions,

22    what were hot buttons in SEC review, have

23    all R&D WOs been reviewed?"

24                    Have I read it correctly?

25            A.      That's the way I would

320

CHAMBERLAIN

1

2  interpret it also.

3      Q.    There is no reference here to a

4  question about are there any other SEC

5  investigations or SEC open issues, is

6  there?

7           MR. JOSEPH:  Document speaks

8  for itself.

9           You can answer.

10     A.    Yes.

11     Q.    Yes, meaning correct?

12     A.    Correct.

13     Q.    In fact, the reference in

14  Mr. Desmarais' notes is to "have all R&D

15  WOs" -- what does WO stand for?

16     A.    Write-offs.

17     Q.    "Have all R&D write-offs been

18  reviewed," do you see that?

19     A.    I do.

20     Q.    Do you remember that was the

21  question that you asked on March 22nd?

22     A.    It was one of the many

23  questions I asked on March 22nd, yes.

24     Q.    You did not ask on March 22nd

25  whether, apart from the restatement and

321

CHAMBERLAIN

1

2    the R&D write-offs in connection with in

3    process R&D, was there anything else going

4    on with the SEC, did you?

5        A.    That's not what I just said.

6        Q.    Would it be fair to say that

7    all of the questions you asked relating to

8    the SEC were in the context of this

9    discussion of restatement and in process

10   R&D?

11           MR. JOSEPH:  Objection to form.

12           You may answer.

13       A.    With the exception that there

14   was the summation at the end, were there

15   any other issues.

16       Q.    But that summation came after a

17   discussion about the restatement and the

18   SEC review related to 1997 and 1998

19   financials, am I correct?

20       A.    Yes, it would have.

21       Q.    What were the exact words you

22   used again, are you able to remember your

23   exact words four years later?

24           MR. JOSEPH:  I believe you

25   asked that exact question before.

322

1              CHAMBERLAIN

2              You may give your answer again.

3    A.      Were there any other issues.

4    Q.      Exactly like that or is that

5    the substance of what you intended to ask?

6    A.      That's the substance; I

7    couldn't say if those were the exact words

8    that came out of my mouth today, that was

9    the substance.

10   Q.      The truth is you don't remember

11   four years later with no record in your

12   notes what words you used to ask this

13   question you now remember, correct?

14   A.      I remember generalities; we

15   just said I don't remember the exact

16   words, I remember the subject.

17   Q.      Do you agree that the exact

18   words you used can be very important in a

19   multi-million dollar transaction like

20   this?

21   A.      And I believe the words that

22   are told back to me are very important in

23   a multi-million dollar transaction like

24   this, yes, words are very important.

25   Q.      So important you didn't write

323

                    CHAMBERLAIN

1

2    them down in your notes during that phone

3    conversation, correct?

4        A.    We have already established

5    that if things were not issues, I didn't

6    write them down necessarily in the notes.

7        Q.    This is Chamberlain Exhibit 20.

8            (Chamberlain Exhibit 20, Bates

9    Nos. TRA 00003 through 06, was marked for

10   identification, as of this date.)

11           MR. CARROLL:  This is

12   multipage, Bates Nos. TRA 00003 through

13   06.

14           The first page is an e-mail,

15   the following pages are a LIGHT due

16   diligence question list.

17           Do you recognize this document,

18   this exhibit, Ms. Chamberlain.

19           (Witness perusing document.)

20       A.    They are disjointed exhibits,

21   the front sheet doesn't have anything to

22   do with the back sheet.

23       Q.    That's one of my questions;

24   this is the way it was produced to us, you

25   will see it is in Bates order, TRA 0003

324

CHAMBERLAIN

1

2    and it is consecutive up to 6.

3                Is it your recollection that

4    the second, third, and fourth pages of the

5    exhibit do not go with the first page?

6        A.    That's correct.

7        Q.    The first page there is a

8    handwritten reference to 72 minutes, do

9    you recognize that handwriting?

10       A.    It is mine.

11       Q.    And the first page is an e-mail

12   from Brad Desmarais to a list of people,

13   and you are cc'd on the e-mail, correct?

14       A.    Correct.

15       Q.    This is an e-mail that was sent

16   on March 21st in preparation for the March

17   22nd phone call?

18       A.    Correct.

19       Q.    Is 72 minutes, as you wrote

20   down on here, the length of the phone

21   call?

22       A.    That would be my presumption.

23       Q.    Can you tell us whether this is

24   the length of your call on the 21st in

25   preparation for the 22nd or whether this

325

```
1                    CHAMBERLAIN
2    is the length of the call on the 22nd?
3         A.    This is the length of the call
4    on the 22nd.
5              MR. CARROLL:  Counsel, we have
6    to change tape.
7              Going off the record at
8    approximately 4:57, end of Tape No. 3.
9              (Pause. )
10             THE VIDEO TECHNICIAN:  Going
11   back on the record at approximately 4:57
12   p.m., beginning of tape 4.
13   BY MR. CARROLL:
14        Q.    If you still have your
15   calendar, don't get rid of Exhibit 20, but
16   if you will also put in front of you your
17   calendar.
18             MR. JOSEPH:  She has it.
19        Q.    And if you will turn to March
20   2000, do you see there is an entry for
21   March 21, 11 a.m. to 12 p.m., "AA," that's
22   Arthur Andersen, isn't it?
23        A.    Yes.
24        Q.    "Call DD questions," due
25   diligence questions "for KPMG," do you see
```

326

CHAMBERLAIN

1

2   that?

3       A.    Yes.

4       Q.    That reflects the fact that you

5   had an hour phone call with Arthur

6   Andersen the day before the March 22 call

7   to prepare your questions in advance,

8   correct?

9       A.    I had a discussion with them to

10  ask what their issues were, yes.

11      Q.    The e-mail that goes out on

12  March 21, Exhibit 20, is sent to a

13  collection of people that includes

14  Mr. Dammekens, Mr. Forsey, Mr. Fraga,

15  Ms. Moi, and then a cc to yourself and Mr.

16  Waite, correct?

17      A.    Correct.

18      Q.    No one from KPMG was included

19  on this e-mail distribution, correct?

20      A.    That is correct.

21            This e-mail date is after the

22  conversation also with the AA firm the day

23  before or that same day.

24      Q.    I'm sorry, you're telling us, I

25  think, that Exhibit 20, the first page,

327

CHAMBERLAIN

1
2  the e-mail was sent after your call with
3  Arthur Andersen?
4        A.    Yes, it was.
5        Q.    So you have your call with
6  Arthur Andersen to talk about what
7  questions to have ready for KPMG and then
8  you send out later that day the dial-in
9  information for the conference call?
10        A.    I didn't send out the dial-in
11  information, Brad sent out the
12  information, I did not.
13        Q.    Mr. Desmarais, who worked for
14  you at the time, sent out the dial-in
15  information, correct?
16        A.    Correct.
17        Q.    And Mr. Desmarais, also based
18  on the discussion that you had with Arthur
19  Andersen on the 21st, assembled the
20  written questions for the March 22 call
21  that appear on Exhibit 6, correct?
22        A.    I did not see that handwriting
23  before today, I don't know whether he
24  assembled those when he was listening to
25  the AA call, after, I don't know when they

328

CHAMBERLAIN

1

2    got assembled.

3        Q.    I was referring to the Exhibit

4    6, the typed questions for the March 22

5    call for KPMG --

6        A.    That's not what you were

7    holding in your hand, you were holding the

8    handwritten ones.

9        Q.    Let's be clear on the record

10   and slow down.

11           Mr. Desmarais, after the

12   discussion with Arthur Andersen on the

13   21st, Mr. Desmarais puts together the

14   typed questions for the call with KPMG on

15   the 22nd, correct?

16       A.    Yes, we established that.

17       Q.    Those are our questions at this

18   time.

19           Thank you.

20           MR. JOSEPH:  I have a few.

21    BY MR. JOSEPH:

22       Q.    Exhibit 6, the conversation

23   that is noted therein, in your practice as

24   an M&A professional, did you commonly have

25   conversations in advance of an acquisition

329

CHAMBERLAIN

1

2       transaction with auditors for the party to

3       be acquired or the party doing the

4       acquisition?

5            A.    Yes.

6            Q.    As an M&A professional, had you

7       been told during the conversation of March

8       22, 2000, that there were open issues with

9       the SEC, was it your practice that that

10      was the sort of thing you would have

11      noted?

12           A.    That is --

13                 MR. CARROLL:   Object to

14      leading.

15                 Go ahead.

16           A.    Yes.

17           Q.    Let me ask it another way

18      because I don't want counsel to be

19      offended by the question.

20                 Had Arthur Andersen responded

21      affirmatively rather than negatively to

22      the question you asked with respect to

23      other issues with the SEC, is that the

24      sort of information that it was your

25      practice to note or not to note on

330

CHAMBERLAIN

1

2  documents such as Exhibit 6?

3      A.    Yes.

4          MR. CARROLL:  I think you

5  misspoke and said Arthur Andersen.

6          MR. JOSEPH:  I will sit here

7  all day to get the answer, we only want

8  the truth here, we both have the same

9  interest.

10         MR. CARROLL:  Certainly my

11  interest.

12     Q.    Had KPMG informed you on March

13  22, 2000, in the conversation that you had

14  with Bob and Stephan that there were open

15  issues with the SEC at Lernout & Hauspie,

16  is that the sort of thing that it was or

17  was not your practice as an M&A

18  professional to note?

19     A.    I would have noted it.

20     Q.    Had they given you that

21  affirmative answer, was that the sort of

22  information that it was or was not your

23  practice as an M&A professional to report

24  to the board?

25     A.    I definitely would have gone to

331

CHAMBERLAIN

1
2  see Don and reported that; whether he as

3  the CEO would ask the board to convene to

4  discuss that, I don't know, but I would

5  have reported to the CEO my particular

6  findings.

7      Q.    There were a variety of

8  questions that counsel asked you about the

9  financial situation at Dragon at the time

10  of the Lernout & Hauspie acquisition, do

11  you recall that?

12      A.    Yes.

13      Q.    I appreciate it is 5 in the

14  afternoon and we have been here since

15  9:30, but do you have that generally in

16  mind?

17      A.    Yes.

18      Q.    Were all aspects of the

19  financial condition of Dragon disclosed to

20  Lernout & Hauspie prior to the

21  acquisition, as best you know?

22              MR. CARROLL:  Beyond the scope.

23      Q.    You can answer the question.

24      A.    Lernout & Hauspie were given my

25  financial statements that I prepared by me

CHAMBERLAIN

1

2    as part of the due diligence process and

3    they were also given the audited financial

4    statements that I worked on for December

5    31st.

6                Whether Lernout & Hauspie

7    received something earlier from members of

8    Dragon, Janet, before I got there, I can't

9    say that.

10               I never gave them anything but

11   the ones that I had done changing the

12   accounting methodologies that were

13   previously used.

14        Q.     To the best of your knowledge,

15   as you sit here today, would you tell the

16   jury whether or not the financial

17   information that you disclosed to Lernout

18   & Hauspie, to KPMG, and to SG Cowen with

19   respect to Dragon was or was not accurate?

20        A.     It was accurate.

21               MR. JOSEPH:  I don't have any

22   further questions.

23               MR. CARROLL:  I have followup

24   on that.

25    BY MR. CARROLL:

333

CHAMBERLAIN

1

2      Q.      Did you disclose to Lernout &

3   Hauspie and to KPMG that there had been a

4   channel stuffing problem at Dragon?

5      A.      We probably told them that and

6   I am sure I told them that I had changed

7   all the quarters' information to reflect

8   that.

9      Q.      Previously today do you

10  remember I asked you about that subject?

11     A.      If there was a channel

12  stuffing?

13     Q.      Do you remember I asked you

14  previously whether you could remember

15  disclosing that to anyone and you said you

16  didn't remember?

17     A.      You asked me if -- you can

18  restate your question, but I thought you

19  asked me if there was a channel stuffing,

20  would I have disclosed that to Lernout &

21  Hauspie.

22     Q.      No, ma'am.

23             We previously discussed the

24  fact that there was a channel stuffing

25  problem that had occurred at Dragon,

334

                    CHAMBERLAIN

1

2    correct?

3                    MR. JOSEPH:   Whatever the

4    record is the record is at this point.

5                    You can answer as best you can.

6         A.        Yes, that's what you said.

7         Q.        Did you disclose to Lernout &

8    Hauspie and KPMG that fact, namely that

9    there had been a channel stuffing problem

10   that in fact had occurred at Dragon, yes

11   or no?

12                   MR. JOSEPH:   Asked and answered

13   multiple times, you may answer again.

14        A.        If I was asked it, I would have

15   told them I don't recollect having the

16   specific conversation about it, it might

17   have been a due diligence question, I

18   don't know.

19        Q.        If somebody happened to ask

20   you, by the way, is there a channel

21   stuffing problem at Dragon, you would have

22   told them, but other than that, you would

23   not have volunteered that information, is

24   that your testimony?

25                   MR. JOSEPH:   Objection.

335

CHAMBERLAIN

1

2    A.    No, that's not true.

3    I have to go through -- show

4 the financial due diligence that I was

5 given by Lernout & Hauspie and the

6 questions that I had to answer.

7    You are bringing one item in

8 here, I went through a very vigorous,

9 including them reviewing my workpapers, to

10 make sure I was stating my financials

11 correctly.

12    The period you're talking about

13 is the beginning of the year of an audited

14 financial statement of which I restated

15 all four quarters to be in accordance with

16 what I thought was a conservative method

17 of accounting.

18    Q.    And you did not disclose the

19 channel stuffing problem that had occurred

20 before, did you?

21    A.    I said I don't know if I did.

22    Q.    Based on your experience both

23 as an auditor and as a financial officer

24 of a company, who generally handles

25 disclosures of investigations or

336

CHAMBERLAIN

1

2  litigations, the accountants or the

3  lawyers?

4          MR. JOSEPH:  This is way beyond

5  any scope of anything and I am --

6      A.    Generally --

7          MR. JOSEPH:  Hold on.

8          I also want to object to the

9  use of the word investigation, which has

10  by no means been defined.

11          You can continue to answer

12  these questions.

13      Q.    Please answer.

14      A.    What's the question.

15          MR. JOSEPH:  Why don't you read

16  it back.

17          MR. CARROLL:  I will restate it

18  to save time.

19      Q.    Based on your many years of

20  experience, who generally handles in

21  transactions, who generally handles

22  disclosures of litigation matters such as

23  investigations, the lawyers or the

24  accountants?

25          MR. JOSEPH:  I am going to

337

                    CHAMBERLAIN

1

2    object unless we have a context.

3              But you may answer the

4    question.

5        A.    Both of them are aware of it;

6    the moment an SEC investigation came into

7    Seagate, if there would be one, it would

8    be turned over to the auditors.

9        Q.    And the decision about whether

10   to disclose that publicly to a third party

11   would be made by the lawyers, wouldn't it?

12             MR. JOSEPH:  Objection.

13       A.    You tell me, I don't know.

14       Q.    I am asking.

15       A.    I don't know about most

16   companies; with Seagate?

17       Q.    Would you as an accountant ever

18   make a disclosure like that unless the

19   lawyers had told you it was appropriate

20   for a disclosure?

21             MR. JOSEPH:  A disclosure to

22   the street?

23             MR. CARROLL:  A public

24   disclosure to somebody outside your

25   company.

338

CHAMBERLAIN

1

2    Q.    Would you have considered as an

3    accountant, you had the ability to make

4    that disclosure without input from the

5    lawyers?

6    A.    I am a prudent person, I would

7    have consulted with all my advisers before

8    I made my decision.

9    Q.    Including the lawyers?

10    A.    Including the lawyers.

11    Q.    And you knew in connection with

12    this transaction that your lawyers

13    representing you were handling the

14    disclosure of litigation as it related to

15    Dragon, correct?

16    A.    The SEC is not litigation.

17    Q.    That wasn't the question, was

18    it?

19    A.    I'm sorry, go ahead.

20    Q.    With respect --

21    MR. JOSEPH:  Don't try to make

22    it relevant, just listen to the question.

23    Q.    With respect to the Dragon

24    disclosures, the disclosures relating to

25    any litigation were handled by the

339

1               CHAMBERLAIN

2    lawyers, not the accountants for Dragon,

3    correct?

4        A.    That's correct.

5        Q.    And the merger agreement we

6    reviewed earlier defines litigation for

7    the Dragon disclosure as including

8    investigations, correct?

9        A.    That is correct.

10       Q.    Did you ever speak to the

11   lawyers for Lernout & Hauspie and ask them

12   whether all litigations including

13   investigations had been disclosed?

14       A.    I did not speak with the

15   lawyers.

16            MR. CARROLL:  No further

17   questions.

18   BY MR. JOSEPH:

19       Q.    Were you ever advised by any

20   lawyer for Seagate or any other company to

21   lie to a prospective seller or purchaser

22   of a business as to whether or not an SEC

23   investigation was outstanding?

24            MR. CARROLL:  Objection to the

25   form.

340

CHAMBERLAIN

1

2          A.     No.

3          Q.     Did you ever lie to a

4   prospective seller or purchaser of a

5   company as to whether or not an SEC

6   investigation you were actually aware of

7   existed?

8               MR. CARROLL:  Same objection.

9          A.     I did not.

10          Q.     Did you ever lie to a

11   prospective purchaser or seller of a

12   business as to whether there were open

13   issues with the SEC when specifically

14   aware of them?

15          A.     I have not.

16               MR. JOSEPH:  I don't have any

17   additional questions.

18   BY MR. CARROLL:

19          Q.     With respect to the

20   conversation we have been going back and

21   forth on on March 22nd related to open

22   issues with the SEC, that's not reflected

23   on Exhibit 6, were there in fact any open

24   issues relating to the SEC, SEC

25   restatement, that were open at that point

341

                    CHAMBERLAIN

1

2    in time do you know?

3         A.    I answered that; they were not,

4    they told me they restated the financials

5    and there were other questions but none

6    that required them to do reclassifications

7    or restatements.

8         Q.    As you sit here today, that is

9    a truthful statement, correct; namely that

10   there were no open issues relating to that

11   SEC restatement?

12        A.    To that SEC restatement, that

13   is a correct statement.

14             MR. CARROLL:   No further

15   questions.

16             (Continued on next page.)

17

18

19

20

21

22

23

24

25

342

1                    CHAMBERLAIN

2     BY MR. JOSEPH:

3         Q.    Was your question with respect

4     to open issues as ultimately given to KPMG

5     limited to the restatement?

6         A.    No, not the last question.

7              MR. JOSEPH:  Thank you.

8              Nothing further.

9              THE VIDEO TECHNICIAN:  Going

10    off the record at approximately 5:12 of

11    tape 4.

12              (Time noted: 5:12 p.m.)

13

14

15

16

17

18         ----------------------

19         ELLEN CHAMBERLAIN

20

21    Subscribed and sworn to before me

22    this      day of            , 2004.

23

24

25

343

1

2                    C E R T I F I C A T I O N

3

4

5

6          I, Jineen Pavesi, a Registered

7    Professional Reporter, Registered Merit

8    Reporter, Certified Realtime Reporter and

9    a Notary Public, do hereby certify that

10   the foregoing witness, ELLEN CHAMBERLAIN,

11   was duly sworn on the date indicated, and

12   that the foregoing is a true and accurate

13   transcription of my stenographic notes.

14         I further certify that I am not

15   employed by nor related to any party to

16   this action.

17

18

19

20

21

22         *Jineen Pavesi RPR, RMR*

23         JINEEN PAVESI, RPR, RMR, CRR

24

25

344

E X H I B I T S

Chamberlain

EXHIBIT          DESCRIPTION                    PAGE

1, Bates Nos. BAKE 010660 through 10815

. . . . . . . . . . . . . . . . . . . . . . . . . . 24:14

2, Bates Nos. TRA 00719 through 796. . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . 36:22

3, document. . . . . . . . . . . . . . . . . . . 46:6

4, Bates Nos. 083447 through 452, KL 01649

through 424. . . . . . . . . . . . . . . . . . . 50:18

5, Bates No. EC 00011. . . . . . . . . . . . . . 66:22

6, Bates Nos. TRA 12578 and 79. . . . . . 76:6

7, Bates Nos. TRA 0001 and 2. . . . . . 160:10

8, Bates Nos. KPMG U.S. 083441, it is

numbered pages 1 through 6. . . . . . . . 165:14

9, Bates numbered KPMG U.S. 088674. . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . 199:22

10, Bates Nos. TRA 00266 through 286. . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . 202:24

11, Bates Nos. SGC 007791 through 95. . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . 212:17

12, Bates No. TRA 10175. . . . . . . . . . . 224:22

345

1

2                    E X H I B I T S (Continued):

3

4   Chamberlain

5   EXHIBIT        DESCRIPTION              PAGE

6   13, Bates Nos. SGC 008093 and 94.. 236:13

7   14, Bates Nos. TRA 13210 through 212.....

8   .................................. 240:17

9   15, audited financials for '98 and '99...

10  .................................. 243:23

11  16, Bates Nos. TRA 13119 through 125.....

12  .................................. 248:10

13  17, Bates Nos. TRA 08856 through 8866....

14  .................................. 252:13

15  18, Bates Nos. TRA 11130 through 141.....

16  .................................. 272:11

17  19, Bates Nos. EC 00001 through 10.......

18  .................................. 281:21

19  20, Bates Nos. TRA 00003 through 06......

20  .................................. 323:8

21

22

23

24

25

346

1

## LITIGATION SUPPORT INDEX

2

3

4

5    DIRECTION TO WITNESS NOT TO ANSWER

6        Page            Line            Page            Line

7  (NONE)

8

9

10

11

12

13    REQUEST FOR PRODUCTION OF DOCUMENTS

14        Page            Line            Page            Line

15  (NONE)

16

17

18

19

20    INFORMATION TO BE FURNISHED

21        Page            Line            Page            Line

22  (NONE)

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE LERNOUT & HAUSPIE SECURITIES
LITIGATION,

CA No. 00-11589-PBS

THIS DOCUMENT RELATES TO ALL CASES ·

## ACKNOWLEDGEMENT AND ERRATA

STATE OF OREGON    )
                           ) ss:
COUNTY OF LANE    )

        ELLEN CHAMBERLAIN being duly sworn deposes and says:

1.    I have read the transcript of testimony taken under oath in my deposition of January 20, 2004 in connection with the above-captioned litigation and related cases. Subject to the corrections set forth at Exhibit A hereto, to the best of my recollection the transcript is true, complete and correct record of what was asked, answered and said during my deposition. I hereby certify that, subject to the corrections set forth at Exhibit A hereto, the answers on the record as given by me are true and correct.

2.    Annexed hereto as Exhibit A are my changes to the transcript of testimony, made pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, including the reason for each such change.

_____
Ellen Chamberlain

Subscribed and sworn to before me this
_19_ day of March 2004

_____
Notary Public

OFFICIAL SEAL
CHARLENE CARTER
NOTARY PUBLIC-OREGON
COMMISSION NO. 361936
MY COMMISSION EXPIRES OCT. 27, 2006

## EXHIBIT A

### Errata Sheet to Deposition of Ellen Chamberlain Taken on January 20, 2004

| Page | Line(s) | Change From | To | Reason for Correction |
|------|---------|-------------|-----|----------------------|
| 289 | 23 | there from L&H, | there, from L&H | To correct punctuation error in transcription |
| 293 | 6 | he | either he or Pol | To more accurately reflect my current recollection. |
| 293 | 19 | with him | with he and Pol | To more accurately reflect my current recollection |