EXHIBIT D

1

1

2 UNITED STATES DISTRICT COURT

3 FOR THE DISTRICT OF MASSACHUSETTS

4 Civil Action No. 02-CV-11589-PBS

5 ------------------------------------x

6 IN RE LERNOUT & HAUSPIE SECURITIES

7 LITIGATION,

8

9 THIS DOCUMENT RELATES TO ALL ACTIONS

10

11 ------------------------------------x

12 January 21, 2004

13 9:30 a.m.

14

15

16 Deposition of ELLEN

17 CHAMBERLAIN, pursuant to Notice, held at

18 the offices of Davis Polk & Wardwell, 450

19 Lexington Avenue, New York, New York,

20 before Jineen Pavesi, a Registered

21 Professional Reporter, Registered Merit

22 Reporter, Certified Realtime Reporter and

23 Notary Public of the State of New York.

24

25

2

1

A P P E A R A N C E S :

2

GREGORY P. JOSEPH LAW OFFICES LLC

3    805 Third Avenue
New York, New York 10022

4         Attorneys for Filler Plaintiffs and
          Witness

5    BY:    GREGORY P. JOSEPH, ESQ.

6

7    REED SMITH LLP
2500 One Liberty Place

8    1650 Market Street
Philadelphia, Pennsylvania 19103

9         Attorneys for Baker Plaintiffs
BY:    ALAN K. COTLER, ESQ.

10

11

BOIES SCHILLER & FLEXNER, LLP

12   255 S. Orange Avenue
Orlando, Florida 32801

13        Attorneys for Baker Plaintiffs
BY:    KAREN DYER, ESQ.

14

15

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

16   1285 Avenue of the Americas
New York, New York 10019

17        Attorneys for Stonington Plaintiffs
BY:    JAVIER BLEICHMAR, ESQ.

18        ERIK SANDSTEDT, ESQ.

19

20   WILLCOX, PIROZZOLO & McCARTHY, P.C.
50 Federal Street

21   Boston, Massachusetts 02110
          Attorneys for Bamberg Plaintiffs

22   BY:    JAMES J. NICKLAUS, ESQ.

23

24

25

3

1

A P P E A R A N C E S   (Continued):

2

DAVIS POLK & WARDWELL

3    450 Lexington Avenue

New York, New York 10017

4         Attorneys for KPMG LLP

BY:    SEAN KNOWLES, ESQ.

5

6

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

7    Four Times Square

New York, New York 10036-6522

8         Attorneys for S.G. Cowen

BY:    GEORGE A. ZIMMERMAN, ESQ.

9         MARK LEBOVITCH, ESQ.

10

GOODWIN PROCTER LLP

11    Exchange Place

Boston, Massachusetts 02109

12         Attorneys for Jozef Lernout

BY:    IRAIDA J. ALVAREZ, ESQ.

13

14

MORRISON COHEN SINGER & WEINSTEIN, LLP

15    750 Lexington Avenue

New York, New York 10022

16         Attorneys for Pol Hauspie and Nico

Wilbert

17    BY:    KRISTIN T. ROY, ESQ.

18

ALSO PRESENT:

19         COHEN & FIERMAN, ESQ.

20         4 Faneuil Hall Marketplace

21         Boston, Massachusetts 02109

22         BY:    THOMAS W. EVANS, ESQ.

23         (On behalf of Mercator)

24

25         KEVIN GALLAGHER, Videographer

4

1

2                    S T I P U L A T I O N S

3

4            IT IS HEREBY STIPULATED AND AGREED

5    by and between the Attorneys for the

6    respective parties hereto that filing and

7    sealing be and the same are hereby waived.

8            IT IS FURTHER STIPULATED AND

9    AGREED that all objections except as to

10   the form of the question, shall be

11   reserved to the time of the trial.

12           IT IS FURTHER STIPULATED AND

13   AGREED that the within examination may be

14   signed and sworn to before any notary

15   public with the same force and effect as

16   though signed and sworn to before this

17   Court.

18

19

20

21

22

23

24

25

5

1

2             THE VIDEO TECHNICIAN:  We are

3   now going on the record at approximately

4   8:04 a.m.

5             This is the videotaped

6   deposition of nonparty witness Ellen

7   Chamberlain taken in the U.S. District

8   Court for the District of Massachusetts,

9   Case No. 02-CV-11589-PBS, In re Lernout &

10  Hauspie Securities Litigation.

11            The deposition is being held

12  today, January 21, 2004, at the offices of

13  Davis Polk & Wardwell.

14            I am the videographer, Kevin

15  Gallagher, the court reporter is Jineen

16  Pavesi, both from the independent firm of

17  Veritext Court Reporting Services.

18            Counsel will now identify

19  themselves for the record.

20            MR. JOSEPH:  Gregory Joseph for

21  the witness and the Filler plaintiffs.

22            MS. DYER:  Karen Dyer, Boies

23  Schiller & Flexner for the Baker

24  plaintiffs.

25            MS. ROY:  Kristin Roy, Morrison

6

1

2    Cohen Singer & Weinstein for defendants

3    Pol Hauspie and Nico Wilbert.

4            MR. NICKLAUS:  Jim Nicklaus,

5    Willcox, Pirozzolo & McCarthy for the

6    Bamberg plaintiffs.

7            MR. KNOWLES:  Sean Knowles from

8    Davis Polk for KPMG.

9            MS. ALVAREZ:  Iraida Alvarez

10   from Goodwin Procter for Jozef Lernout.

11           MR. EVANS:  Thomas Evans from

12   Cohen & Fierman representing Mercator.

13           MR. BLEICHMAR:  Javier

14   Bleichmar from Bernstein Litowitz Berger &

15   Grossmann for Stonington Partners, Inc.

16           MR. LEBOVITCH: Mark Lebovitch

17   from Skadden, Arps for SG Cowen.

18           MR. ZIMMERMAN:   George

19   Zimmerman from Skadden, Arps representing

20   SG Cowen Securities Corporation.

21   E L L E N    C H A M B E R L A I N,

22   having first been duly sworn by a Notary

23   Public of the State of New York, was

24   examined and testified as follows:

25   EXAMINATION BY

7

1                    CHAMBERLAIN

2  MR. ZIMMERMAN:

3       Q.    Good morning.

4       A.    Good morning.

5       Q.    If from time to time I repeat a

6  question from yesterday, I apologize in

7  advance, but I just want to try to

8  establish some background.

9             During your experience in

10 Seagate, did you have experience doing

11 mergers and acquisition transactions?

12      A.    I did.

13      Q.    Roughly how many?

14      A.    Ten to 15.

15      Q.    Was your experience both on the

16 buy side and the sell side?

17      A.    Only one, on the sell side.

18      Q.    Was it typical in those M&A

19 transactions for Seagate to hire financial

20 advisers?

21      A.    It was.

22      Q.    In any of the prior deals that

23 you were involved in at Seagate, did

24 Seagate hire Goldman, Sachs as financial

25 advisor?

8

1                    CHAMBERLAIN

2        A.      Not on the software side, I

3   can't recollect.

4                I did some for the tech side,

5   I'm not sure if Goldman, Sachs was the

6   advisor, I would have to go back and look

7   at it.

8        Q.      In those M&A transactions with

9   Seagate, was it also typical for Seagate

10  to have accounting advisers separate and

11  apart from financial advisers?

12       A.      Correct.

13       Q.      Did Seagate in any of the deals

14  you were involved in ever use Arthur

15  Andersen as their accountant advisers?

16       A.      Did not.

17       Q.      In your experience at Seagate

18  in M&A transactions, just generically,

19  could you just explain the difference

20  between the roles that a financial advisor

21  would play, investment banking type, as

22  opposed to the accounting advisor.

23       A.      The financial advisor would

24  help in negotiating the purchase price of

25  the company, help with the deal structure,

9

CHAMBERLAIN

1

2      by that I mean the price, if there were

3      earn-outs, I'm sure this is familiar

4      language, as opposed to the accounting

5      firm, the roles that I use them for would

6      be to value the assets that develop, it

7      can negotiate in process R&D, they would

8      help me do the due diligence on the

9      financials of the company that we were

10     purchasing.

11         Q.    Is it fair to say the typical

12     M&A transaction that you were involved in

13     at Seagate, the investment banker advisor

14     would not get involved in due diligence of

15     the financials, that would be left

16     primarily to the accounting advisers?

17         A.    Not as it pertained to future

18     financials.

19         Q.    Could you explain what you mean

20     by that.

21         A.    Past financials, I would use

22     the auditing firm to go in and review the

23     workpapers, review whatever the latest

24     interim financial that they had, as

25     opposed to the bankers I would use to

10

CHAMBERLAIN

1

2    punch holes, to really work to understand

3    the projections that the company had for

4    the future, looking at the product

5    roll-ups, whether it made sense, the

6    technologies they thought they were going

7    to introduce, so they helped with future

8    and not with past.

9        Q.    Did Seagate do both stock and

10   cash acquisitions or was it primarily one

11   or the other?

12       A.    Most of the transactions I

13   worked on were cash.

14       Q.    Did you work in any stock

15   acquisitions?

16       A.    Yes.

17       Q.    In the stock acquisition

18   context, when you used the investment

19   bankers to, as you say, understand the

20   company's projections, that would be, is

21   it fair to say, that would be the

22   projections of the target that you were

23   seeking to acquire, correct?

24       A.    Correct.

25       Q.    Your investment banker didn't

11

CHAMBERLAIN

1
2     do extensive due diligence of Seagate, did

3     it?

4          A.     The investment banker knew

5     Seagate's history, the history that I had

6     with Seagate, it was the same individuals

7     who were the bankers throughout my

8     acquisition time.

9          Q.     What bankers were those?

10         A.     Morgan Stanley.

11         Q.     In connection with the L&H

12    acquisition of Dragon, you were involved

13    in that process, correct, on behalf of

14    Dragon?

15         A.     Yes.

16         Q.     And you dealt with both

17    Goldman, Sachs and Arthur Andersen?

18         A.     Correct.

19         Q.     From your perspective, were the

20    respective roles and Goldman, Sachs and

21    Arthur Andersen in the L&H deal similar to

22    the division of labor you've just

23    testified to, generically?

24         A.     Generically that was my

25    expectations.

12

1                      CHAMBERLAIN

2        Q.      And is that in fact how it

3   worked out?

4        A.      Not to the degree of how I was

5   used to Morgan Stanley doing a due

6   diligence, but it was a different banking

7   firm with different individuals.

8                So it was the same expectations

9   I had.

10       Q.      Other than the individuals who

11  were obviously different, how did the

12  Goldman, Sachs work on L&H differ from

13  your experience with Morgan Stanley work

14  on behalf of Seagate?

15       A.      I was less than thrilled with

16  their work.

17       Q.      Did you become less than

18  thrilled with their work during the

19  process or after the fact when you found

20  out what happened?

21       A.      No, during the process.

22       Q.      What was the nature of your

23  concerns?

24       A.      It was more that I was used to

25  them being the workers, again, the one who

13

1                    CHAMBERLAIN

2    would ask the questions, drive the

3    process, help with the projections, it was

4    more that in this role they wanted me to

5    do most everything.

6          Q.      Did you discuss this issue with

7    Goldman, Sachs during the time this was

8    going on?

9          A.      Yes.

10         Q.      Could you tell me what those

11   discussions were, what you said, what they

12   said.

13         A.      Not specifically; in

14   generalities, we did voice our

15   disappointment to the highest level person

16   that was on the job and we did get an

17   additional person to come and be part of

18   the team after that point.

19               But I don't know if the

20   communication also got to the Goldman,

21   Sachs office on the West Coast, too,

22   because Goldman, Sachs has done work for

23   Seagate.

24               But I voiced that concern with

25   the banker and I know I also wrote e-mails

14

CHAMBERLAIN

1

2  to the banker letting him know what I

3  expected him to be doing.

4      Q.    Do you remember the date that

5  L&H and Dragon signed the merger

6  agreement?

7      A.    I would have to look.

8      Q.    I think it is March 28th --

9          MR. JOSEPH:  27th.

10      Q.    March 27, 2000, so we have a

11  time frame.

12          When in connection with March

13  27, 2000, did you have these conversations

14  with Goldman, Sachs, how long before?

15      A.    I can only generally say

16  January and February.

17      Q.    When you indicated you had this

18  conversation or e-mail with the top or

19  senior person at Goldman, Sachs, who was

20  that person, what was his or her name?

21      A.    Rich Wayner.

22      Q.    What was his position?

23      A.    I don't know title.

24      Q.    Was he a partner, managing

25  director, or an associate?

15

                    CHAMBERLAIN

1

2    A.    Sorry, I can't tell you that

3    either.

4             MR. JOSEPH:  I believe the

5    documents reflect he was a V.P..

6    Q.    I won't hold you to the date;

7    assuming these conversations happened in

8    January or February, after the

9    conversations, to your mind, was there any

10   change in the level of performance?

11   A.    No.

12   Q.    As of March 28th, were you

13   still dissatisfied or uncomfortable,

14   whatever word is more appropriate, with

15   the investment bankers in this deal?

16   A.    I probably had become attuned

17   to the fact that something wasn't going to

18   change.

19   Q.    As a result of this, did you or

20   your people at Dragon do more due

21   diligence than you had expected going into

22   this situation?

23   A.    I think that would be a fair

24   statement.

25   Q.    Whether from Goldman, Sachs or

16

CHAMBERLAIN

1

2   Dragon, as of March 28th, were you

3   personally satisfied with the total due

4   diligence, no matter who did it, that had

5   occurred on behalf of Dragon of L&H?

6           MR. JOSEPH:  Objection, form.

7           You may answer.

8       A.    Are we asking with Goldman,

9   Sachs, with the whole team, with my

10  comfort at that point; is this a Goldman,

11  Sachs question?

12      Q.    No, it is a Dragon question and

13  thank you for the clarification.

14          No matter who ended up doing

15  more due diligence than you would have

16  expected, the total package as of March

17  28th, whether it is Dragon, Goldman,

18  Sachs, and however it was split between

19  the two, were you satisfied with the level

20  of due diligence that had been done on

21  behalf of Dragon with respect to L&H?

22      A.    I was comfortable to move

23  forward to signing.

24      Q.    Do you know whether Goldman,

25  Sachs was comfortable with respect to the

17

                    CHAMBERLAIN

1

2   due diligence as of March 28th to go

3   forward with the signing?

4        A.    I don't know what their opinion

5   was.

6        Q.    Did they ever express to you

7   one way or the other at any point during

8   the due diligence process their comfort

9   level with the due diligence?

10       A.    I can't answer without saying

11  that I saw a document that would tell me

12  they weren't comfortable.

13             I wouldn't have had

14  recollection.

15       Q.    When did you see this document?

16       A.    On Monday.

17             MR. JOSEPH:  So there is no

18  mystery, I believe it is a February 29

19  letter from Rick Wayner --

20             MR. ZIMMERMAN:   I am well

21  familiar.

22       Q.    Was that in connection with

23  preparing for the deposition?

24       A.    Yes.

25       Q.    Had you seen that document

18

1                    CHAMBERLAIN

2    before?

3         A.    Yes.

4         Q.    Had you seen it at the time it

5    was sent to Dragon?

6         A.    Yes.

7         Q.    In your ten or 15 M&A deals at

8    Seagate, do you ever remember receiving a

9    similar type of letter from your

10   investment bankers?

11        A.    Never.

12        Q.    Had you had any conversations

13   with Goldman, Sachs about their comfort

14   level with the due diligence prior to the

15   time you got this February 29th letter?

16        A.    I don't remember specific

17   conversations.

18        MR. ZIMMERMAN:    Let me show

19   you what has been marked as Cowen Exhibit

20   1 for identification.

21        It is Bates Nos. bake 026485

22   through 026508, an October 1, 1999, weekly

23   executive summary.

24        (Cowen Exhibit 1, Bates Nos. BAKE

25   026485 through 026508, was marked for

19

1                    CHAMBERLAIN

2    identification, as of this date.)

3              (Witness perusing document.)

4       Q.    Before I get to Cowen 1, let me

5    go back for a second.

6              You took me through before in a

7    generic way the division of labor in your

8    typical M&A experience before this deal

9    between the investment banker and the

10   accountants; do you recall generically

11   that testimony?

12      A.    Yes.

13      Q.    In connection with the

14   Dragon/L&H deal, you were involved in due

15   diligence, correct, you personally?

16      A.    Yes.

17      Q.    Did you have contacts in that

18   due diligence process with SG Cowen?

19      A.    Had I ever worked with them

20   before?

21      Q.    No, I'm sorry; in connection

22   with the L&H deal, did you have occasion

23   to deal with SG Cowen?

24      A.    Yes.

25      Q.    Did you have occasion to deal

20

1                    CHAMBERLAIN

2    with KPMG?

3        A.    No, outside of a phone call

4    that I had with them; that's the only work

5    I did with them.

6        Q.    Who on behalf of Dragon was

7    dealing with KPMG?

8        A.    It would be me.

9        Q.    Other than the one phone call

10   you participated with KPMG, do you know

11   whether Arthur Andersen was dealing with

12   KPMG?

13       A.    KPMG asked to come see our

14   workpapers from our audit, so they would

15   have dealt with KPMG when they reviewed

16   Dragon's workpapers for the financial

17   year.

18       Q.    "They" being Arthur Andersen?

19       A.    "They" being Arthur Andersen.

20       Q.    What about in connection with

21   Dragon's due diligence of L&H, was

22   anybody --  let me go back to make sure I

23   am clear.

24            In connection with Dragon's due

25   diligence of L&H, you personally only had

21

                    CHAMBERLAIN

1

2   the one telephone conference call with

3   KPMG, that was the extent of your dealings

4   with KPMG?

5        A.    Yes.

6        Q.    Do you know whether anybody

7   else at Dragon during the Dragon due

8   diligence of L&H had any contacts or

9   communications with KPMG?

10       A.    I am not aware of any.

11       Q.    Do you know whether Arthur

12  Andersen had communications with KPMG

13  regarding Dragon's due diligence of L&H?

14       A.    They were a participant of the

15  telephone call that I referred to.

16       Q.    Do you know if they had any

17  other dealings with KPMG?

18       A.    I repeat the same thing; they

19  did in --

20            MR. JOSEPH:  You don't have to

21  repeat.

22            He is talking about the

23  affirmative review of L&H.

24       A.    Please ask the question.

25            MR. ZIMMERMAN:    Can you

22

1                    CHAMBERLAIN

2    repeat it.

3                    (Record read.)

4         Q.    Let me rephrase it.

5              Do you know if Arthur Andersen

6    had any other dealings with KPMG in

7    respect of Dragon's due diligence of L&H?

8         A.    No.

9         Q.    To your knowledge, they did not

10   or you just don't know either way?

11        A.    Outside of that phone call, I

12   am not aware of any other ones.

13        Q.    During Dragon's due diligence

14   of L&H, did there come any point in time

15   when any accounting issues arose?

16             MR. JOSEPH:  I have to object

17   to form.

18             I think this is pretty much

19   what we spent yesterday on, but you can

20   answer generically, as best you can.

21        A.    I have to understand which way

22   this is; was there any issues in L&H

23   reviewing Dragon's financials or were

24   there any issues with Dragon reviewing --

25   what's the question?

23

CHAMBERLAIN

1

2      Q.      The latter; any accounting

3  issues with respect to Dragon's due

4  diligence of L&H.

5      A.      There were a lot of questions

6  that were asked about L&H's accounting

7  issues.

8              We discussed prior SEC filings

9  that they had yesterday, we talked about

10  my telephone call that I had, and the one

11  we are specifically referring to again,

12  the March 22nd call.

13      Q.      Other than the March 22nd

14  telephone conference call, was there any

15  other occasion when questions arose

16  regarding accounting issues in Dragon's

17  due diligence of L&H?

18              MR. JOSEPH:  Objection to form.

19              You may answer.

20      A.      In your mind, is accounting

21  financial forecast?

22      Q.      Let's break that up.

23              Let's take financial forecasts

24  first.

25      A.      We spent a long time trying to

24

CHAMBERLAIN

1
2      become comfortable with the financial
3      forecasts.
4          Q.      In doing that with whom did you
5      interact or deal?
6          A.      The projections were given to
7      us by Allan Forsey.
8          Q.      And who is he?
9          A.      Exact title I couldn't tell
10     you, he represented himself as a V.P. of
11     finance in charge of investor relations.
12         Q.      He was an L&H guy?
13         A.      Yes.
14         Q.      Who else with respect to
15     forecasts, other than Allan Forsey, did
16     you interaction with?
17         A.      All the folks that attended the
18     due diligences would have seen those
19     financial forecasts.
20             As to the questions that we
21     asked, it goes to understanding the
22     product development, when the products are
23     going to be released so that you can
24     understand that, so there were people from
25     the Dragon team that asked questions of

25

CHAMBERLAIN

1

2  the L&H team on product releases and new

3  products, so we could understand that, and

4  that occurred over numerous meetings that

5  we had as per the due diligence process.

6       Q.    Other than product releases and

7  new products, what other types of issues,

8  if any, came up with respect to your

9  attempt to understand L&H's forecasts?

10      A.    We had discussions about how

11  much the roll-up forecast allowed for

12  internal cushion, if I can explain that

13  better, what the street expectation was

14  and what L&H was driving the company to do

15  so that I could become comfortable that

16  there wasn't going to be a surprise to the

17  street, so they had adequate buffer in

18  their financial roll-up so there wouldn't

19  be a disappointment to the street.

20      Q.    Let me stop you there for a

21  second.

22            On that topic, who did you

23  interact with?

24      A.    Allan Forsey and I also had

25  assurances from Gastion, whatever,

26

1                    CHAMBERLAIN

2    Bastion, that they were going to hit their

3    Q-1 and Q-2 numbers.

4         Q.     Other than him and Allan

5    Forsey, did you discuss that issue with

6    anybody else?

7         A.     Again, I must say we had a

8    whole room of people when the financial

9    forecasts were there, there were bankers

10   on both sides, Dragon personnel, we were

11   all looking at them together.

12              I don't remember specific

13   questions.

14        Q.     Other than the roll-up and

15   product release development, what other

16   issues with respect to L&H's forecast do

17   you remember being discussed?

18        A.     We had discussions about how

19   they were accounting for their sales into

20   the distribution channels.

21              We looked at the types of

22   customers that they were expecting to sell

23   to, they had a list of their top customers

24   and we went through those and talked about

25   whether or not there was going to be sales

27

                        CHAMBERLAIN

1

2    from those customers, et cetera.

3        Q.      When you discussed the top

4    customers, did you have a list or was that

5    just orally told to you?

6        A.      There was a list of customers

7    provided in the due diligence package.

8        Q.      Do you know whether any of

9    those customers were from the Far East or

10   Korea?

11       A.      I couldn't say without looking

12   at the list.

13       Q.      Do you remember discussing,

14   when you were discussing these types of

15   customers, do you remember whether any of

16   the customers you discussed were Korean?

17       A.      I don't recollect whether they

18   were Korean.

19       Q.      What other issues, if any,

20   arose in connection with these discussions

21   of L&H's forecasts, other than what you've

22   told me?

23       A.      I asked questions about certain

24   expenses from a top level on how they were

25   going to get to those expense levels, and

28

                    CHAMBERLAIN

1
2  other than that, I can't remember.

3       Q.    You mentioned that you remember

4  these discussions in a due diligence

5  meeting; was this one meeting or over a

6  series of meetings?

7       A.    Yes.

8       Q.    And these would be personal

9  face-to-face meetings?

10      A.    They would be.

11      Q.    In all of these meetings on all

12 of these subjects relating to forecasts

13 that you attended, do you recall whether

14 Janet Baker attended all or some of these

15 meetings, as well?

16      A.    She attended some of the

17 meetings, I couldn't say all of the

18 meetings.

19      Q.    Do you remember anything with

20 respect to any of these topics that we

21 have categorized as forecasts of L&H, do

22 you remember anything either you

23 specifically asked of SG Cowen or anything

24 SG Cowen specifically said on any of these

25 topics that you've talked about with

29

```
                          CHAMBERLAIN
 1
 2    respect to L&H's forecasts?
 3          A.      In specific, I can't
 4    recollection anything.
 5          Q.      Generically, do you remember
 6    anything about what SG Cowen may have
 7    said?
 8          A.      In a general; no, not in a set
 9    sense.
10                  In my experience, the bankers
11    only hand projections that they were
12    comfortable with and so my assumption is
13    that they would have gone through the
14    forecasts to make sure they were
15    comfortable with what was being given to
16    the company.
17          Q.      Did you ask them whether they
18    were in fact comfortable?
19          A.      I did not, I don't recollect
20    specifically asking that question.
21          Q.      Do you recollect them saying
22    that they were comfortable with the
23    projections?
24          A.      No.
25          Q.      When L&H was doing due
```

30

CHAMBERLAIN

1

2  diligence of Dragon, did Dragon give

3  forecasts to L&H?

4      A.    We did.

5      Q.    Were there due diligence

6  meetings where L&H tried to test the

7  forecasts the same way you would test

8  L&H's forecasts?

9      A.    I can't tell you exactly what

10  they did with the information that we gave

11  to them.

12      Q.    You attended due diligence

13  meetings with L&H, did you not?

14      A.    They definitely asked questions

15  about product development, but I can't

16  answer whether they were asking about our

17  top customers or that sort of thing.

18      Q.    When you had due diligence

19  sessions with L&H, with Dragon's forecasts

20  discussed, was Goldman, Sachs there?

21      A.    Goldman, Sachs came to 90

22  percent of the meetings, I couldn't tell

23  you; again, there were lots of different

24  questions over different meetings whether

25  or not they were there.

31

CHAMBERLAIN

1

2    Q.    When you say "there were lots

3    of different questions over different

4    meetings whether or not they were there,"

5    I am not understanding, what do you mean

6    by that?

7        A.    The financial due diligence

8    process did not get done in one meeting,

9    there were always questions that were

10   asked on different meetings that we had;

11   whether or not Goldman, Sachs was at each

12   and every meeting, I can't say.

13       Q.    Thank you for the

14   clarification.

15            What steps did Goldman, Sachs

16   take to become comfortable with Dragon's

17   forecasts?

18       A.    I think --  I thought I said I

19   don't know what they did.

20       Q.    I don't think I asked this, let

21   me make sure I got it right.

22            Do you know whether in fact

23   Goldman took any steps to become

24   comfortable with Dragon's projections and

25   forecasts?

32

CHAMBERLAIN

1

2        A.      I do not, no.

3        Q.      I take it they never tested

4    your projections with you?

5        A.      I said I don't know.

6        Q.      Did anybody in your due

7    diligence team ever report to you that

8    they had discussed Dragon's forecasts with

9    Goldman, Sachs?

10       A.      Not that I recollect.

11       Q.      In your experience doing M&A

12   at Seagate, was it your experience that

13   Seagate's investment bankers would do due

14   diligence on Seagate's projections?

15       A.      I think I want to split that

16   into two answers; there is Seagate

17   Technology and there is Seagate Software.

18            On Seagate Software's side,

19   they never looked at the financial

20   projections that I put together and in

21   most of the acquisitions I was the buyer.

22            On the Seagate Technology side,

23   I can't say for certain whether they did;

24   again, they had a long-time relationship

25   with Seagate and I'm sure they were aware

33

CHAMBERLAIN

1

2  of what the expectations were on the

3  company for profit, they were the bankers.

4          So I am not going to answer

5  definitively on the Seagate Technology

6  side, I will just say on the Seagate

7  Software side, I have no recollection of

8  the bankers testing my future projections.

9          Q.    Why would they test it on one

10  side and not the other?

11          A.    Why test one side and not the

12  other, can you explain that.

13          Q.    You said that your bankers

14  would have tested either the Technology or

15  the Software projections, but not the

16  other one; I am trying to understand

17  why --

18          A.    I don't recollect all the deals

19  within Technology to know whether or not

20  they did the testing.

21          Again, what I said is that on

22  the Technology side, there was a long

23  relationship with Technology, they worked

24  very closely with them, I'm sure they saw

25  projections over time, I'm sure they knew

34

CHAMBERLAIN

1

2  what the forecasts were for Seagate, they

3  had a lot of history.

4          I can't say on every

5  transaction whether or not they delved

6  into budgets and forecasts.

7      Q.    Is it fair to say that Goldman,

8  Sachs didn't have that long history with

9  Dragon in connection with the L&H deal?

10     A.    That's a correct statement.

11     Q.    Take a look at what has been

12  marked as Exhibit 1 for identification.

13          (Witness perusing document.)

14     Q.    My first question is have you

15  ever seen this document before?

16     A.    I have seen documents that have

17  been similar to this.

18          I don't know if I saw this

19  particular one.

20     Q.    Generically, what type of

21  information is in this document?

22     A.    Giving an idea of what sales

23  are for the quarter; it is a cumulative

24  sales report.

25     Q.    Who is Amy Heinan, do you know

35

CHAMBERLAIN

1

2    who she is?

3        A.    She was a financial analyst

4    within Dragon.

5        Q.    Was she normally the one who

6    prepared these weekly executive summaries?

7        A.    Either her or other members of

8    the financial analysis team at Dragon.

9        Q.    There is some handwriting at

10   the top right-hand of the cover sheet; is

11   that your handwriting?

12       A.    No.

13       Q.    It indicates that you were a

14   recipient, it says to Janet Baker and

15   Ellen Chamberlain.

16            As of October '99, were you

17   regularly receiving these types of weekly

18   executive summaries?

19       A.    I couldn't tell you whether I

20   was regularly receiving this report.

21       Q.    Do you remember receiving

22   reports of this nature?

23       A.    Yes.

24       Q.    Would you review them when you

25   got them?

36

CHAMBERLAIN

1

2      A.      Yes.

3      Q.      If you would look at the second

4  page, 026486, the top chart, could you

5  just generically, without the numbers,

6  just tell me what information is being

7  conveyed in that.

8      A.      It looks like this is where we

9  are showing our sales for the quarter

10  ended September 30th against what the

11  forecast was for September 30th and what

12  was required to meet that forecast by

13  product line.

14      Q.      What was the forecast for third

15  quarter '99 as per this document?

16          MR. JOSEPH:   Dollars, units?

17          MR. ZIMMERMAN:     Dollars;

18  total net product.

19          That's a fair point.

20      Q.      Are these dollars or units; net

21  sales would be dollars, correct, because

22  it says units?

23      A.      It is.

24      Q.      What's the dollar net sale

25  forecast for the third quarter as per this

37

                    CHAMBERLAIN

1    page?

2          A.      17,517,433 million.

3          Q.      And the actual?

4          A.      10,539,784.

5          Q.      If you look at the bottom

6    columns, it says worldwide head count;

7    what do those numbers represent?

8          A.      Worldwide head count.

9          Q.      Number of employees?

10         A.      Yes.

11         Q.      If you look at Q-2 second

12   quarter plan, was that the budget?

13         A.      I couldn't tell you the

14   nomenclature, whether that was budget,

15   forecast, I am not sure.

16         Q.      And the actual is the number of

17   employees, correct, the actual number?

18         A.      Correct.

19         Q.      And both for Q-2 and Q-3, the

20   actual number was below the plan number,

21   correct?

22         A.      Yes.

23         Q.      During this period of time in

24   1999, was there a high turn over of

38

1                    CHAMBERLAIN

2    employees?

3         A.    Yes.

4         Q.    Was that because employees were

5    leaving, being fired, or both?

6         A.    They were leaving,

7    predominantly leaving.

8         Q.    Why?

9         A.    You would have to ask those

10   employees.

11        Q.    Was it --

12        A.    Generally?

13        Q.    Let me ask you this; is it fair

14   to say more employees were leaving than

15   had been expected?

16        A.    That's a fair statement.

17        Q.    Was that a source of concern?

18        A.    Yes.

19        Q.    Did you take steps to try to

20   determine why this was happening?

21        A.    Yes.

22        Q.    What did you learn with respect

23   when you took these steps as to why these

24   employees were leaving?

25        A.    Is there a specific time period

39

CHAMBERLAIN

1

2  we can narrow this down to?

3      Q.    Let's say 1999.

4      A.    1999, there is an exhibit that

5  I was shown yesterday, which is a write-up

6  of what I observed in my first two weeks

7  out at Dragon.

8            MR. JOSEPH:  The witness is

9  referring to Chamberlain Exhibit 18 from

10  the deposition of January 20th.

11      A.    And it talks a lot about what

12  the employees' concerns were.

13      Q.    How was this exhibit put

14  together?

15      A.    By me doing face-to-face

16  interviews with the employees.

17      Q.    So based on those face-to-face

18  interviews, you had an understanding, did

19  you not, as to why they were leaving?

20      A.    Correct.

21      Q.    What was your understanding?

22      A.    Without a specific person, in

23  general, they were not happy with the

24  direction of the company.

25      Q.    Were you CFO at this time?

40

1                     CHAMBERLAIN

2      A.     No.

3      Q.     What was your role at Dragon as

4  of that time, before you became CFO?

5      A.     I was there because Seagate

6  asked me to go out and make an assessment

7  of Dragon as to what the issues were out

8  there, and so I was asked on a temporary

9  basis to go out and poke around for a few

10 weeks.

11     Q.     What was the size at that time

12 of Seagate's investment in Dragon?

13     A.     Roughly 30 percent.

14     Q.     Was Seagate happy with Dragon's

15 direction?

16     A.     That's why they sent me out

17 there.

18     Q.     That's a no?

19     A.     Who is Seagate; is there an

20 individual?

21     Q.     Does Seagate have a management?

22     A.     Yes.

23     Q.     Were you part of that

24 management?

25     A.     Yes.

41

1                    CHAMBERLAIN

2        Q.     Do you know whether Seagate's

3    management was happy with the direction

4    and performance of Dragon at that time?

5                    MR. JOSEPH:  Objection to form.

6                    You can answer.

7        A.     I need to narrow the question;

8    what are we talking about generally, the

9    company's morale, the technology, the

10   people, what is the question?

11       Q.     Operations, were they happy

12   with the way the company --

13       A.     They were not happy with the

14   financial operations.

15       Q.     Were they happy with

16   management?

17       A.     They asked me to go assess

18   that.

19       Q.     Did you?

20       A.     Yes.

21       Q.     Did you report back to Seagate

22   management?

23       A.     Yes.

24       Q.     As a result of your reporting

25   back, do you know whether Seagate was

42

1              CHAMBERLAIN

2    happy with Dragon's management?

3         A.    I would say they were

4    discontented.

5         Q.    Did you share their discontent

6    with management?

7              MR. JOSEPH:   This is prior to

8    her becoming the CFO?

9              MR. ZIMMERMAN:    Yes.

10        A.    Yes, I shared with them what I

11   believed the issues were.

12        Q.    Were you discontent with

13   Dragon's management?

14        A.    I didn't have dealings with

15   them on a one-on-one basis, so I can't

16   say.

17             My recommendations were that

18   there be a change in the management, I

19   can't say I was discontent.

20        Q.    Were you discontent with their

21   operating performance?

22        A.    Yes.

23        Q.    Were you discontent with their

24   financial operations?

25        A.    Yes.

43

                    CHAMBERLAIN

1

2      Q.    Did there come a point in time

3   when Janet Baker resigned as CEO of

4   Dragon?

5      A.    Yes.

6      Q.    Was that at the behest of

7   Seagate?

8      A.    Yes.

9      Q.    When did you become CFO of

10  Dragon roughly?

11     A.    Same day Janet submitted her

12  resignation or her change, same board

13  meeting.

14     Q.    Did the predecessor CFO also

15  resign at the same time?

16     A.    I am not sure of the exact

17  dates of the resignation.

18     Q.    Did she resign at some point

19  prior to your becoming CFO?

20     A.    I don't know if she formally

21  resigned; was she there after I was CFO,

22  no.

23     Q.    Who was the CFO, what was her

24  name?

25     A.    Diane Hudson.

44

CHAMBERLAIN

1

2      Q.     Do you know the circumstances

3  under which she no longer was CFO?

4      A.     I know that Janet was not happy

5  with her.

6      Q.     Was Seagate's management happy

7  with her?

8      A.     I couldn't say that.

9      Q.     In your discussions with

10  Seagate management when you reported back

11  on what you had learned about the company,

12  was she discussed, her performance

13  discussed?

14      A.     I don't have a specific

15  recollection.

16          MR. ZIMMERMAN:     Could you

17  mark that as Exhibit 2.

18          (Cowen Exhibit 2, Bates Nos. BAKE

19  011034 through 011074, was marked for

20  identification, as of this date.)

21          MR. ZIMMERMAN:     Exhibit 2 for

22  identification is Bates Nos. BAKE 011034

23  through 011074.

24          It is the Arthur Andersen

25  audited financial statements of Dragon

45

1                          CHAMBERLAIN

2    Systems as of December 31, 1998 and 1999.

3                (Witness perusing document.)

4          Q.    Could you please take a look at

5    what has been marked for identification as

6    Exhibit 2 and tell me whether you have

7    ever seen this before.

8          A.    I have seen the audited

9    financials.

10         Q.    Take a look at page 2, which

11   is the consolidated balance sheet,

12   next-to-last line, total stockholders

13   equity, and it indicates 21.8 million for

14   1998, do you see that?

15         A.    Yes, I see that.

16         Q.    And a deficit of 1.137 for '99?

17         A.    Yes.

18         Q.    What do you understand a

19   deficit equity to mean, does that mean

20   that on a balance sheet basis Dragon was

21   insolvent?

22         A.    No.

23         Q.    What does it mean?

24         A.    It means that the liabilities

25   exceed the assets.

46

1                          CHAMBERLAIN

2          Q.      What's your definition of

3    insolvency, do you have an understanding?

4          A.      I don't have a definition of

5    insolvency.

6          Q.      If you look at the next page,

7    page 3, which is the consolidated

8    statement of operations -- Dragon had a

9    calendar fiscal year, correct?

10         A.      Yes.

11         Q.      For year-ended '98 and '99, do

12   you see the total net revenue lines?

13         A.      I do.

14         Q.      Gross profits, both are down in

15   '99 from '98, correct?

16         A.      Correct.

17         Q.      And it indicates that the net

18   income bottom line for 1999, Dragon lost

19   21.8 million?

20         A.      It does.

21         Q.      It indicates they made 7.2

22   million for '98, do you see that?

23         A.      I do.

24         Q.      Without exact details, is it

25   fair to say that the '99 performance net

47

1                    CHAMBERLAIN

2    income and revenues and gross profit was

3    significantly below forecast?

4          A.    I don't know what the forecast

5    was for '99 or '98.

6                MR. ZIMMERMAN:    Let me mark

7    as Cowen Exhibit 3 for identification

8    Bates Nos. BAKE 027043 through 027110.

9                (Cowen Exhibit 3, Bates Nos. BAKE

10   027043 through 027110, was marked for

11   identification, as of this date.)

12               (Witness perusing document.)

13         Q.    If you would take a look at

14   what has been marked as Exhibit 3 for

15   identification, do you recognize this

16   document?

17         A.    I don't know, there is

18   different pieces in here I recognize, I am

19   not sure what the document is used for.

20         Q.    I can't represent this is all

21   one document, this is how it was produced,

22   so let me just ask you about specific

23   pages.

24               If you would go to page 027048,

25   which is titled "Dragon Systems, Inc.,

48

CHAMBERLAIN

1

2    Original 1999 Budget Versus 1999 Actual,"

3    have you seen pages like this before?

4              MR. JOSEPH:   Relative to '99 or

5    in general.

6         Q.    In general first.

7         A.    In general, yes.

8         Q.    Specifically with respect to

9    '99?

10        A.    Yes.

11        Q.    The left side chart, 1999

12   original, do you understand that to be the

13   budget?

14        A.    I can't tell you that for sure.

15        Q.    If you look at the top it says

16   "Dragon Systems, Inc., Original 1999

17   Budget Versus '99 Actual."

18             MR. JOSEPH:   The document

19   speaks for itself, it says that.

20        A.    It says that; I need to say I

21   wasn't there all year, I am not sure if

22   this is the original.

23        Q.    Either before or after you

24   became CFO, did you have any occasion to

25   assess how the company was performing

49

CHAMBERLAIN

1 

2   compared to budget to see if they were on

3   track or changes needed to be made?

4        A.    Yes.

5        Q.    Is it fair to say that you

6   understood that in late '99, October '99,

7   the company was operating significantly

8   below budget?

9        A.    I understood that their

10  business model was not going -- didn't

11  warrant what they were going to have in

12  their revenue line and that forecasts that

13  people had put together previously were

14  not going to be hit.

15       Q.    As you read this document,

16  whether you saw it at the time or not, do

17  you understand this document to show that,

18  budgeted or forecast, total company

19  revenue was 117,415 for '99 and that the

20  actual '99 revenue was 60,803?

21            MR. JOSEPH:  Objection, the

22  document speaks for itself, we don't need

23  this witness for that.

24            MS. DYER:  I object to form,

25  also.

50

1                    CHAMBERLAIN

2              MR. ZIMMERMAN:    I take your

3    objection.

4         Q.    Do you understand that's what

5    it is saying.

6         A.    I understand that's what it is

7    saying.

8         Q.    Exhibit 2, consolidated

9    financial statements, page 011057, this

10   page indicates that for years ended

11   December 31, 1996, '97, '98, the statement

12   of operations, do you see that?

13        A.    I do.

14        Q.    Is it consistent with your

15   understanding of the company's financial

16   condition that it had losses for '96 and

17   '97 as indicated here?

18        A.    That's what the document says.

19        Q.    And that was your

20   understanding, not these specific numbers,

21   but you understood at the time that the

22   company in fact had lost money in '96 and

23   '97, correct?

24        A.    Yes.

25        Q.    If you go back to Exhibit 3 and

51

                    CHAMBERLAIN

1

2    turn to page 027052.

3              (Witness complying.)

4       Q.      Actually, start with 051.

5              If you look at 051 and 052,

6    those two pages have the Goldman, Sachs

7    little box in the left-hand corner and 051

8    says "assumptions for the 1999 original

9    plan," and 052 says "what happened in

10   1999."

11             First question is do you

12   recognize seeing this before?

13      A.      I can't say I have specific

14   memory.

15      Q.      Do you know whether Goldman,

16   Sachs was asked to prepare a document

17   analyzing, among other things, how the

18   company performed compared to what its

19   plan was?

20      A.      I have no recollection as to

21   whether they were asked to do that.

22      Q.      Whether they were asked to do

23   it or not, do you remember them doing it?

24      A.      I do not.

25      Q.      If you look at 051, the

52

CHAMBERLAIN

1

2    assumptions for the '99 original plan, do

3    you know whether in fact these were

4    assumptions for Dragon's '99 plan?

5        A.    I wasn't there to derive the

6    '99 plan, so I can't say that for sure.

7        Q.    When you became CFO -- and if

8    I asked you this before, I apologize --

9    did you review documents or assess the

10   company's actual performance compared to

11   its plan?

12       A.    I have no specific

13   recollection.

14       Q.    For purposes of company's

15   operations, was it important to understand

16   whether the company was performing as

17   planned, and if not, why not?

18       A.    Yes.

19       Q.    Did you undertake to ascertain

20   that information?

21           MR. JOSEPH:    For any particular

22   period?

23       A.    As I said before, I have no

24   specific recollection of doing that, but I

25   was responsible for doing the Q-4

53

                    CHAMBERLAIN

1

2   forecast.

3              MR. JOSEPH:  We have been going

4   about an hour, should we take a minute.

5              MR. ZIMMERMAN:    Absolutely.

6              THE VIDEO TECHNICIAN:  Going

7   off the record at approximately 9 a.m..

8              (Recess taken.)

9              THE VIDEO TECHNICIAN:  We are

10  now going back on the record at

11  approximately 9:08 a.m..

12  BY MR. ZIMMERMAN:

13     Q.    Same exhibit, if you look at

14  BAKE 027054, which is titled "Q-41999

15  Explanation," under "North America $3

16  million retail shortfall," it says

17  "aggressive competitive spending."

18             Do you know what that means?

19             MR. JOSEPH:  I'm going to

20  object to her being cross-examined about a

21  document she didn't prepare and hasn't

22  even testified she has seen.

23             If you have an understanding,

24  you can share that, but I really think

25  this witness has been kind enough to come

54

1                    CHAMBERLAIN

2   here from Oregon, it really isn't

3   appropriate that we are doing this.

4              I'm sure Goldman, Sachs can

5   tell you what it means.

6              MR. ZIMMERMAN:    They are not

7   here today.

8              MR. JOSEPH:  Well, why don't we

9   get them and let her go back to Oregon.

10       Q.    You understood the business

11  that Dragon was in, correct?

12       A.    The aggressive competitive

13  spending was by L&H.

14       Q.    "Limited dictator spending";

15  "dictator" is Dragon?

16       A.    I don't know what that phrase

17  means.

18       Q.    Do you know what "$1.1 million

19  in special deals" refers to?

20       A.    No.

21       Q.    If you look at the next page,

22  do you recognize that handwriting?

23       A.    No.

24       Q.    You testified earlier that in

25  your M&A experience at Seagate, the

55

CHAMBERLAIN

1

2 accountants would advise and do due

3 diligence on past financials and interim

4 financials and the investment bankers you

5 would look more to punching holes in

6 projections, without putting words in your

7 mouth, that's generically what you

8 testified?

9     A.    Generically, yes.

10     Q.    Did that division of labor or

11 description work any differently in the

12 L&H deal?

13         MR. JOSEPH:  Objection, asked

14 and answered.

15         MS. DYER:  Objection to form.

16         MR. ZIMMERMAN:    That's not

17 what I meant to say.

18     Q.    When Dragon was doing due

19 diligence of L&H, when it had issues or

20 questions relating to past financials or

21 interim financials, would it look to the

22 management of L&H and L&H's accountants

23 for that type of information, as well?

24     A.    Yes.

25     Q.    Did it look to SG Cowen for

56

CHAMBERLAIN

1

2    information about L&H's or questions about

3    L&H's past financials or interim

4    financials?

5         A.    The due diligence information

6    went through them, so they would have seen

7    it and passed on that information.

8              I don't recollect a specific

9    question to them.

10        Q.    But you do recollect specific

11   questions that you would ask of either

12   management or KPMG about past financials

13   or interim financials?

14        A.    Correct.

15        Q.    When L&H was conducting due

16   diligence of Dragon, and L&H made certain

17   requests for information about Dragon,

18   correct?

19        A.    Correct.

20        Q.    Who would provide that

21   information?

22        A.    Some went directly, some would

23   go to Goldman, Sachs so they could

24   distribute it to all the parties, some

25   came from our legal directly.

1                      CHAMBERLAIN

2          Q.      When information went to

3    Goldman, Sachs for distribution to other

4    parties, the information came from Dragon

5    and went to Goldman, Sachs?

6          A.      Yes.

7          Q.      What types of information?

8          A.      I can't remember specifics.

9          Q.      Would it be, for example, past

10   financials?

11         A.      It is a possibility.

12         Q.      And Goldman, Sachs would

13   distribute it?

14         A.      Yes.

15         Q.      Was it your understanding when

16   Goldman, Sachs would distribute that type

17   of information, that Goldman, Sachs was

18   vouching for the accuracy of that

19   information or were they just passing it

20   along?

21         A.      In past financials they would

22   not be vouching for that information.

23         Q.      And that would be typical of an

24   investment banker's role in that kind of

25   situation?

58

1                    CHAMBERLAIN

2        A.      Correct.

3                MS. DYER:  Objection to form.

4        Q.      Do you recall at some point in

5    time Dragon tried to do an IPO, initial

6    public offering?

7        A.      I recollect that they did.

8        Q.      What year?

9        A.       '99.

10       Q.      Did Dragon retain Morgan

11   Stanley to help them in that process?

12       A.      That's my understanding.

13       Q.      And Morgan Stanley was going to

14   be the lead underwriter?

15       A.      I can't say that for certain, I

16   am not sure.

17       Q.      Do you know when Morgan Stanley

18   was retained?

19       A.      No.

20       Q.      Do you know when Dragon's

21   management determined not to go forward

22   with the IPO?

23       A.      Do not.

24       Q.       Do you know how far along the

25   IPO process was at the time it was decided

59

                        CHAMBERLAIN

1

2    not to go forward?

3        A.    I do not.

4              At the beginning of '99 and I

5    was not there.

6        Q.    Do you know why Dragon was

7    looking to do an IPO?

8        A.    No.

9        Q.    Do you know why the IPO did not

10   go forward?

11       A.    I don't know the specific

12   reasons.

13       Q.    This is probably repetitive of

14   yesterday and I apologize, it will take

15   two minutes; what was your position at

16   Seagate?

17       A.    V.P. of finance.

18       Q.    What is Seagate's business?

19       A.    Their primary business at that

20   time was the manufacture of computer disk

21   drives.

22       Q.    Were you generally familiar

23   with the state of the market in Dragon's

24   business areas as of 1999?

25       A.    What does "state of the market"

60

                    CHAMBERLAIN

1

2   mean?

3        Q.    Were companies doing well,

4   other than Dragon?

5             MR. JOSEPH:  Are you talking

6   about market valuation, are you talking

7   about profit and loss?

8             MR. ZIMMERMAN:    Operating

9   performance, that's a fair point.

10       Q.    Operating performance.

11       A.    L&H was.

12       Q.    Other competitors?

13       A.    There weren't that many

14  competitors out there that had stand-alone

15  financials that you could read.

16       Q.    Were any IPOs going on in

17  Dragon's field in 1999, late '98 and '99?

18       A.    I couldn't say that.

19       Q.    When was Goldman, Sachs hired

20  by Dragon in connection with the L&H or

21  Visteon transaction?

22       A.    Specific date, I would have to

23  look at the letter of engagement.

24       Q.    Do you remember what month

25  roughly?

61

1                    CHAMBERLAIN

2        A.    No.

3        Q.    Were you involved in the hiring

4    process?

5        A.    Yes.

6        Q.    What was your role?

7        A.    Janet asked that we interview

8    various investment banking firms and that

9    she be part of the process in choosing the

10   banker and we did that.

11       Q.    Who else did you interview?

12       A.    I know we talked to Morgan

13   Stanley and I know I talked to another

14   firm that I can't remember right now.

15       Q.    Did you also talk to Goldman,

16   Sachs?

17       A.    Yes.

18       Q.    Did you make a recommendation

19   as between these three companies?

20       A.    It really wasn't down to three

21   companies, so I recommended Goldman, Sachs

22   along with Janet recommended Goldman,

23   Sachs.

24       Q.    What was the basis for

25   recommending Goldman, Sachs over Morgan

62

CHAMBERLAIN

1

2    Stanley or the other company whose name

3    you can't recall at the moment?

4        A.    I don't believe Janet wanted

5    Morgan Stanley because of her IPO process

6    history with that team.

7        Q.    How about the other banker that

8    you interviewed?

9        A.    I can't remember the reason,

10    any particulars about them.

11        MR. ZIMMERMAN:    Can you mark

12    as the next exhibit for identification,

13    Exhibit 4, Bates Nos. BAKE 008901 through

14    8932.

15        (Cowen Exhibit 4, Bates Nos. BAKE

16    008901 through 8932, was marked for

17    identification, as of this date.)

18        Q.    Have you ever seen what's been

19    marked as Exhibit 4 before?

20        (Witness perusing document.)

21        A.    I have a vague recollection of

22    it, yes.

23        Q.    It indicates, the first page

24    with print, the top page is redacted,

25    indicates that December 17, 1999, Alex

63

CHAMBERLAIN

1
2    Berzofsky of Goldman, Sachs circulated

3    this document to, among other people,

4    yourself.

5              Who is Alex Berzofsky?

6        A.    He works for Goldman, Sachs.

7        Q.    Was he one of the people you

8    dealt with?

9        A.    Yes, he was on the Goldman,

10   Sachs team.

11       Q.    If you would look at the next

12   page, it indicates "Project Dictator,

13   Discussion Materials for the Board of

14   Directors," and it is dated December 17th.

15             Do you understand that Dictator

16   refers to Dragon?

17       A.    Yes, it refers to a potential

18   merger, not necessarily Dragon, it is the

19   name of a project of an acquisition or

20   venture.

21       Q.    Turn to page 8906, under the

22   executive summary it says "Background:

23   Dictator is a privately-held company based

24   in Newton, Massachusetts, the founder and

25   largest equityholder is Janet Baker."

64

CHAMBERLAIN

1
2          Does that refresh your
3    recollection that Dictator is Dragon?
4          A.    Yes.
5          Q.    It says, "Last March Dictator
6    attempted an IPO with Morgan Stanley as
7    lead underwriter.  The IPO failed largely
8    because Dictator was badly missing its
9    1999 financial targets."
10          Is that explanation consistent
11    with your understanding?
12          A.    No.
13          Q.    Was this ever discussed with
14    Goldman, Sachs, this particular piece of
15    information?
16          A.    I don't know.
17          Q.    What was your understanding as
18    to why the IPO failed?
19          A.    Valuation differences.
20          Q.    Could you explain what you mean
21    by that.
22          A.    The bankers had one thought on
23    what they could raise on dollar value and
24    the management at Dragon had different
25    thoughts.

65

CHAMBERLAIN

1

2      Q.     Was management unable to

3   convince Morgan Stanley?

4      A.     I don't know that.

5      Q.     Did you ever have any

6   discussions with Morgan Stanley about the

7   IPO and why it failed?

8      A.     No.

9      Q.     If you look at the next page,

10  "Transaction Issues," left side says

11  Alabama, right side says LIGHT.

12           Do you know who Alabama is?

13     A.     I do.

14     Q.     Who is that?

15     A.     Visteon.

16     Q.     And LIGHT is L&H?

17     A.     Yes, it is.

18     Q.     As of the date of this

19  document, December 17, 1999, was Dragon in

20  discussions with both Visteon and L&H

21  about possible transactions?

22     A.     During that time period, yes.

23     Q.     Do you remember attending any

24  board meetings at which the board

25  discussed and compared Alabama, Visteon

66

1                      CHAMBERLAIN
2    and L&H potential transactions?
3         A.    We had several discussions
4    about it, I don't recollect whether it was
5    a board meeting or some other type of
6    meeting.
7         Q.    On the right-hand side under
8    LIGHT, which is L&H, it says here "general
9    issues, value of stock currency more
10   volatility."
11            Do you understand what that
12   means?
13        A.    I can make an interpretation,
14   but I don't understand what Goldman Sachs
15   was trying to say when they wrote that.
16        Q.    And you don't recall any
17   discussion of that?
18        A.    I don't recall any specific
19   discussion.
20        Q.    "Loss certainty," any
21   discussion or do you know what that means;
22   I don't want you to guess what Goldman,
23   Sachs was thinking?
24        A.    I don't know what that meant.
25        Q.    "Past accounting practice, re,

67

1                    CHAMBERLAIN

2    R&D write-offs."

3              Do you know what that refers

4    to?

5         A.    They had several inquiries into

6    the past and restatements that were

7    financial restatements.

8         Q.    What was the nature of the

9    restatements?

10        A.    I would have to look at exactly

11   all the things, but the primary thing was

12   in process R&D, their valuations, what

13   they did for companies.

14        Q.    Was it your understanding there

15   had been some promulgation by the SEC

16   about how to account for that that

17   resulted in the restatement?

18        A.    Yes.

19        Q.    Was it your understanding that

20   a number of companies restated as a result

21   of that SEC promulgation or was it just

22   L&H?

23        A.    There were other companies that

24   restated.

25        Q.    If you would turn to page 8914,

68

```
                    CHAMBERLAIN
```

 1    CHAMBERLAIN

 2    "Potential Transaction With LIGHT,

 3    Strategic Rationale and Potential Issues,"

 4    in the right-hand side under "potential

 5    issues," the last one, "less known about

 6    acquirer, European versus U.S. accounting

 7    and reporting," do you understand what

 8    that's referring to?

 9         A.    I can only assume what it is

10    referring to.

11         Q.    From your perspective, was

12    there an issue with respect to L&H

13    concerning European versus U.S. accounting

14    and reporting?

15         A.    No, it was more that --  no.

16         Q.    It was more what?

17         A.    That information --  there were

18    different requirements that a European

19    company had to do as it pertained to 10-Ks

20    and 10-Qs and the timing of that, so it

21    wasn't as easy to get information, 10-Ks

22    didn't even have to be done until May as

23    opposed to a U.S. company in 90 days.

24         Q.    Did that affect the level of

25    the due diligence you performed?

69

1                    CHAMBERLAIN

2              MR. JOSEPH:  Object to form,

3    but you may answer.

4         A.    No.

5         Q.    If you would turn to page

6    008917, it says "Equity Research Views on

7    LIGHT," and it has on the left-hand side

8    "Broker analyst Goldman, Sachs, Robert

9    Smithson."

10             Do you know who Robert Smithson

11   is?

12        A.    No.

13        Q.    Is it fair to say that you have

14   never had any discussions with him in

15   connection with your due diligence?

16        A.    That's correct.

17        Q.    During your due diligence

18   sessions and meetings and discussions with

19   Goldman, Sachs, did Goldman, Sachs ever

20   talk to you about their analysts' views on

21   L&H?

22             MR. JOSEPH:  Other than as

23   reflected on the page?

24             MR. ZIMMERMAN:   Let's have an

25   oral conversation first.

70

CHAMBERLAIN

1

2          A.     No.

3          Q.     If you look, as your attorney

4    correctly points out, if you look at the

5    discussion on this page, do you remember

6    any of this information, other than in

7    this document, being discussed or

8    presented to you by Goldman, Sachs?

9                 (Witness perusing document.)

10         A.     No.

11         Q.     Did you during your due

12   diligence make any effort to look at

13   analyst reports of analysts that followed

14   L&H?

15         A.     I did not personally.

16         Q.     Did any of your due diligence

17   team members do that?

18         A.     Janet followed Mr. Stone's

19   recommendations and his beliefs quite

20   often.

21         Q.     Did she follow anybody else's?

22         A.     I knew Mr. Stone's name, I

23   couldn't have told you anybody else

24   following the industry.

25         Q.     In your M&A experience at

71

                    CHAMBERLAIN

1

2   Seagate, did you have occasion to review

3   analyst reports of analysts that followed

4   whatever company you were either going to

5   acquire or sell?

6        A.    Yes.

7        Q.    More than one analyst?

8        A.    Yes.

9        Q.    Why?

10       A.    Seagate Software was

11  considering doing an IPO and we

12  interviewed at least eight banking firms

13  in connection with that, so most of them

14  brought their analysts there and we saw

15  the types of reports they did.

16       Q.    Other than the IPO, when

17  Seagate did either an acquisition or a

18  sale, would they typically look at analyst

19  reports of the company involved?

20       A.    I can't answer for Seagate as a

21  company, I didn't do every acquisition

22  Seagate did.

23       Q.    That's fair; how about the ten

24  or 15 that you were involved in.

25       A.    None of them were -- maybe one

72

CHAMBERLAIN

1

2       or two were public, so for the most part

3       it was a nonissue.

4             Q.     For the one or two that were

5       public?

6             A.     I was not a primary person on

7       the one that I am referring to, which was

8       Seagate's acquisition of AMC and Seagate

9       Software got part of that portfolio.

10             And the second one was a

11      company that was publicly-traded and the

12      acquisition was sometime down in 1993 and

13      I have no recollection whether or not we

14      looked at analyst reports.

15            Q.     Do you have any experience in

16      M&A transactions prior to your involvement

17      with Seagate?

18            A.     No, I worked for Seagate for 15

19      years.

20            Q.     You indicated that you

21      understood Janet Baker followed Mr. Stone.

22             Did she ever discuss Stone's

23      analyst reports with you?

24            A.     We never formally looked at any

25      analyst reports, that I can recollect, and

73

CHAMBERLAIN

1

2    go over them.

3           It was generalities of her

4    believing that he was the lead in this

5    industry.

6           Q.    Were you aware whether there

7    were other analysts in the industry other

8    than Mr. Stone?

9           A.    I had never heard anyone else's

10   name.

11          Q.    Did you see this document,

12   Exhibit 4?

13          A.    The whole document together?

14          Q.    Yes.

15          A.    I can't say if I recollection

16   each page here.

17          Q.    Do you remember looking at this

18   particular page?

19               MR. JOSEPH:   This one being 17?

20               MR. ZIMMERMAN:    Thank you,

21   yes.

22          A.    I don't have a specific

23   recollection.

24          Q.    Were you aware that Goldman,

25   Sachs had an analyst in the industry?

74

CHAMBERLAIN

1

2      A.      Probably not until this

3 meeting.

4              I had no recollection of

5 anybody else except for who Janet talked

6 about that followed the industry.

7      Q.      When you say prior to this

8 meeting, do you mean the board meeting or

9 do you mean today?

10      A.      No, probably the board meeting,

11 I was at the board meeting, if this is the

12 materials.

13      Q.      If you look at the next page,

14 8918, were you aware that Lehman Brothers

15 had an analyst following the industry?

16      A.      I answered that the only one

17 that I knew of was Mr. Stone.

18      Q.      As a result of the meeting, was

19 there any discussion of either Goldman,

20 Sachs' analyst report or Lehman Brothers'

21 analyst report?

22      A.      This isn't a report.

23      Q.      Was there any discussion about

24 the contents of these pages?

25      A.      I have no specific recollection

75

1                           CHAMBERLAIN

2    of what discussion happened on these

3    pages.

4           Q.     Do you recall whether this

5    meeting or any other meeting you ever

6    attended, there was any discussion about

7    the views of analysts who followed the

8    industry, views of L&H of analysts who

9    followed the industry, other than

10   Mr. Stone?

11          A.     I do not.

12          Q.     Do you remember at any board

13   meeting discussions of Mr. Stone?

14          A.     I have no specific recollection

15   of discussions with Mr. Stone in a board

16   meeting.

17          Q.     I wasn't asking about

18   discussions with Mr. Stone, I was asking

19   do you remember at any board meeting a

20   discussion of Mr. Stone or what he was

21   writing about the company?

22          A.     I have no specific recollection

23   of discussions about Mr. Stone in the

24   board meeting.

25          Q.     During 1999 Dragon had a line

76

1                    CHAMBERLAIN
2     of credit with Fleet Bank, correct?
3          A.    Yes.
4          Q.    Was Seagate a guarantor of
5     that?
6               MR. JOSEPH:  I object because
7     we did go into this yesterday; you can
8     testify as best you can recall.
9          A.    I believe --  now I am very
10    familiar that Seagate had a guarantee on
11    the Fleet loan.
12         Q.    When did you learn that?
13         A.    I didn't recollect the specific
14    transaction of any of the Fleet
15    information, yesterday we went over it.
16         Q.    If you were asked this
17    yesterday, I apologize, tell me to shut up
18    and I will move on.
19         A.    Watch the tape.
20         Q.    I don't have it yet.
21              Do you know whether the bank
22    insisted on the Seagate guarantee?
23         A.    I can't recollection whether
24    they did or not.
25         Q.    Would it be customary for

77

1              CHAMBERLAIN

2    Seagate to volunteer a guarantee unless it

3    was required by the bank?

4         A.    No, they wouldn't volunteer a

5    guarantee.

6         Q.    Were you aware at some point in

7    1999 Dragon asked Fleet Bank to increase

8    the line of credit?

9         A.    I repeat, I wasn't aware of

10   this until yesterday, so I am aware of

11   that topic.

12        Q.    Forgive me, I thought you

13   weren't aware of the guarantee issue.

14        A.    No.

15        Q.    You were not aware generally of

16   the line of credit.

17        A.    I have no specific recollection

18   of the Fleet guarantees.

19        Q.    Forgetting the guarantees, do

20   you have any recollection that Dragon

21   tried to increase the line of credit and

22   was turned down?

23        A.    I did not have specific

24   recollections.

25             MR. ZIMMERMAN:    Would you

78

1                    CHAMBERLAIN

2    mark as Exhibit 5 for identification Bates

3    Nos. BAKE 008339 to 8415.

4              (Cowen Exhibit 5, Bates Nos. BAKE

5    008339 to 8415, was marked for

6    identification, as of this date.)

7              (Witness perusing document.)

8         Q.    Have you seen this document

9    before?

10        A.    Yes.

11        Q.    At some point in time in '99

12   did Dragon retain Ernst & Young to perform

13   any services?

14        A.    Yes.

15        Q.    What were they hired to do?

16        A.    I believe it was to facilitize

17   a management off-site meeting, to gather

18   the managers together and try to come up

19   with a common direction.

20        Q.    When was E&Y retained to do

21   this?

22        A.    I don't remember the specific

23   date.

24        Q.    Month?

25        A.    Early into Don's process, so