79

CHAMBERLAIN

2  October or November.

3      Q.    The first page, 8340, is to all

4  participants in the Dragon-facilitated

5  session.

6              Were you one of those

7  participants?

8      A.    I was there for parts of it, I

9  don't think I was there for the whole

10 session.

11     Q.    Did that session take place on

12 November 4th and 5th?

13     A.    It looks like it.

14     Q.     In the parts of the meeting

15 that you attended, were you there for both

16 days?

17     A.    I don't recollect.

18     Q.    Do you recollect this document

19 being distributed either in advance of the

20 meeting or at the meeting?

21     A.    Yes, I recollect that.

22     Q.    Was it in advance of the

23 meeting?

24     A.    I don't remember.

25     Q.    Did you go through this

80

1                        CHAMBERLAIN

2    document or portions of it at the meeting?

3          A.    I am sure I did.

4          Q.    008348, "8 Burning Platforms

5    Were Identified Through Interviews," all I

6    really want to ask you, to try to shorten

7    this, if you would take a look at this

8    page and tell me whether you remember

9    these topics and these comments being

10   discussed at any of the part of the

11   meeting that you were at.

12         A.    I don't have a specific

13   recollection.

14         Q.    Do you remember seeing this or

15   reading this type of information?

16         A.    I don't have specific

17   recollection of seeing it.

18         Q.    Did you understand E&Y had in

19   preparation for this meeting met with or

20   talked to people at Dragon?

21         A.    Yes.

22         Q.    As of this point in time, about

23   November of '99, is there anything on this

24   page that you disagreed with?

25               MR. JOSEPH:  I object to that

81

1                    CHAMBERLAIN

2    as to form and as to breadth.

3              MR. ZIMMERMAN:    I can do it

4    one-by-one, I was trying to save time.

5              MR. JOSEPH:  We ought to do it

6    one-by-one, if she has an opinion that she

7    recalls in '99.

8         Q.    By November of '99 you would

9    have become CFO, correct?

10        A.    Correct.

11        Q.    "Dragon lacks a clear strategic

12   direction and vision of where it wants to

13   be in the future," do you share that view?

14        A.    Let me make sure I understand;

15   these interviews were taken from people

16   within the company and what you are asking

17   me to do is ask if that was what I felt

18   like at that time also?

19        Q.    Correct.

20        A.    Okay.

21              Unclear strategic direction,

22   yes.

23        Q.    "Resources spread too thin"?

24        A.    Yes.

25        Q.    "No matrix in place for

82

1                    CHAMBERLAIN
2    determining which products to pursue"?
3         A.    I don't really know what that
4    means, matrix.
5         Q.    "Concrete strategically sound
6    operating plan is not in place"?
7         A.    Correct.
8         Q.    "Dragon needs to understand
9    market conditions and develop a business
10   model accordingly"?
11        A.    I think I could understand the
12   comment "shift from technology to market
13   focus," I don't understand the "market
14   conditions, develop a business model"; I
15   understand shift from technology, I
16   understand the bullet point on the left.
17        Q.    What do you understand that to
18   mean?
19        A.    Companies are driven, a lot of
20   companies, before they get out into the
21   sales and have a sales model or a product
22   they can sell or technology, they don't
23   have sales, they are developing a product
24   and they drive their company that way,
25   they spend their money in R&D.

83

1                    CHAMBERLAIN

2              Those that have market focus

3    start to ask what does the company, the

4    consumer, the companies want, and they

5    change that.

6         Q.    Did you believe it was now time

7    for Dragon to make that shift?

8         A.    Yes.

9         Q.    "Company is focused on

10   declining PC speech retail market which

11   currently accounts for majority of

12   revenues"; do you agree with that?

13        A.    Correct.

14        Q.    "There are no formal

15   established methods for making decisions,

16   coordination throughout the organization

17   on a functional basis is inefficient."

18             Do you agree with that?

19        A.    I can't say that that's a

20   uniform thing across the company.

21             There are some departments

22   probably that were running efficiently.

23        Q.    And some not?

24        A.    That would be correct.

25        Q.    "Dragon has poor track record

84

CHAMBERLAIN

2  at implementing alliances which appear to

3  be a key success factor for future

4  growth"?

5        A.    I would agree.

6        Q.    What specific alliances do you

7  have in mind when it says they have a poor

8  track record on implementing it?

9        A.    I don't have a specific

10 recollection.

11       Q.    When you say you agree that

12 alliances appear to be a key success

13 factor for future growth, what types of

14 alliances do you have in mind?

15       A.    I would -- I thought a

16 business model for them would be to go out

17 and find companies that would put their

18 technology within whatever it might be.

19            It could be a stereo, it could

20 be Microsoft, it could be somebody who

21 embeds their technology, so an OEM

22 relationship.

23       Q.    "Employees are frustrated and

24 concerned, risk of increasingly higher

25 turnover rates."

85

1                    CHAMBERLAIN

2              Did you share in that view?

3         A.    Yes.

4         Q.    Did you understand that the

5    board of directors of Dragon also shared

6    that view?

7         A.    I don't know what they -- what

8    view they shared.

9         Q.    Were there ever any discussions

10   at board meetings about a risk of

11   increasingly higher turnover rates?

12        A.    I would have to look at the

13   minutes to recollect my memory of whether

14   it was discussed at a board meeting.

15        Q.    Turn to page 008351, on the

16   left-hand side, "burning platform unclear

17   year 2000 operating plan, reasons, no plan

18   is currently set and year 2000 is two

19   months away," was that accurate?

20        A.    I am not sure if this is an R&D

21   operating plan, whether this is a

22   financial operating plan from this

23   language.

24        Q.    As of this time was there an

25   R&D operating plan in place?

86

1                    CHAMBERLAIN

2        A.    I don't know.

3        Q.    How about a financial operating

4   plan?

5        A.    There was the beginning of a

6   process to put together a plan.

7        Q.    Were you part of that process?

8        A.    Yes.

9        Q.    In your view, was it late in

10  the day to start beginning that process

11  for a 2000 plan?

12       A.    No.

13       Q.    If you look at 008353, on the

14  right side, "Dragon Challenges,"

15  "diversify the product portfolio before

16  the PC speech market diminishes," do you

17  agree with that?

18            MR. JOSEPH:  Agree in November

19  of '99?

20            MR. ZIMMERMAN:    Yes.

21       A.    What was the question.

22       Q.    Do you agree that Dragon had to

23  diversify the product portfolio before the

24  PC speech market diminishes?

25       A.    Yes, not necessarily -- yes,

87

CHAMBERLAIN

1

2 the product portfolio, yes.

3      Q.      Page 003855, we already

4 discussed some of this, but just a couple

5 of questions.

6           On the left-hand side, "sample

7 responses," it says "we need to partner to

8 effectively compete."

9           Did you agree with that as of

10 November '99?

11      A.      I don't know what that means by

12 partner.

13      Q.      "Cannot maintain business

14 relationships," do you know what that

15 refers to?

16      A.      I don't know what that means

17 either.

18      Q.      Was Dragon having difficulty at

19 the time maintaining customers or

20 alliances or anything like that?

21           MR. JOSEPH:  Objection, form,

22 you may answer.

23      A.      I have previous notes from

24 individuals that I talked to that

25 indicated that, yes.

88

1                    CHAMBERLAIN

2          Q.      What do you recall being said

3    about that?

4          A.      I don't remember specific

5    items.

6          Q.      On the right-hand side,

7    "Dragon Challenges," it says "selecting

8    partners and finalizing agreements in a

9    timely manner to insure speed to market."

10              Did you agree with that?

11         A.      Yes.

12         Q.      When you had that view, how

13   would you define in your mind what a

14   timely manner was, what kind of period

15   were we talking about, what were you

16   thinking about?

17         A.      I can't say that, each

18   agreement that gets done is different.

19         Q.      Are you talking a period of

20   months or years?

21         A.      Whether I think timely is a

22   couple of months?

23         Q.      Yes.

24         A.      Timely can be as short as one

25   week if it is a small partner, so I can't

89

CHAMBERLAIN

1

2  answer that.

3         Q.      "Overcome stigma of being

4  difficult to work with."

5              Do you know what that refers

6  to?

7         A.      I don't know what their

8  specific meaning is.

9         Q.      Did you have any either

10  understanding or hear anything about

11  Dragon being --  either Dragon or Dragon

12  management --  being difficult to work

13  with?

14         A.      Yes, in a general sense.

15         Q.      What was your understanding on

16  that?

17         A.      That Janet often was difficult

18  to work with.

19         Q.      When you say Janet was

20  difficult to work with, what do you mean

21  by that?

22         A.      I can't give you specific

23  items.

24              Again, I would point to the

25  notes yesterday of all my write-ups of

90

CHAMBERLAIN

1

2    people that had interactions with Janet

3    and their comments about her.

4        Q.    That's the source of your

5    knowledge on this?

6        A.    I obviously worked with her for

7    a period of time, too.

8        Q.    Did you share those comments

9    based on your own experience with Janet,

10    that she was difficult to work with?

11        A.    Yes, she was difficult to work

12    with.

13        Q.    In what way?

14        A.    She didn't share information.

15        Q.    What type of information?

16        A.    Any type of information,

17    whether it be conversations she had or --

18    she wasn't forthcoming, she wasn't a good

19    communicator.

20        Q.    Did you have that same problem

21    with Janet during the due diligence

22    process of the L&H deal?

23        A.    Yes.

24        Q.    How did you come to learn that

25    in connection with the L&H deal she wasn't

91

                              CHAMBERLAIN

1

2    communicating information?

3        A.    There would be times that she

4    would indicate not in a timely manner that

5    she had conversations with somebody that

6    we were awaiting a response from.

7        Q.    Do you recall any specific

8    instances?

9        A.    She had several --  no.

10       Q.    You were about to say she had

11   several.

12       A.    What's the question?

13       Q.    The question is do you recall

14   any specific instances and you started to

15   say --

16       A.    I don't recall any specific

17   instances.

18       Q.    Do you recall generically any

19   types of information, anybody in

20   particular who was awaiting a response

21   that you didn't find out about?

22       A.    She had several calls with

23   Mr. Lernout and Mr. Hauspie, she had calls

24   with Roel Pieper, she sometimes had calls

25   with the bankers.

92

CHAMBERLAIN

1

2      Q.    SG Cowen?

3      A.    Yes, she would have

4  conversations with Ben Howe.

5      Q.    And she would not report that

6  in a timely manner?

7      A.    Correct.

8      Q.    Do you recall any specific

9  conversation, other than Ben Howe, any

10  conversations with anybody at SG Cowen

11  that she didn't report in a timely

12  fashion?

13      A.    I don't have any specific

14  memory.

15      Q.    It was one or more than one

16  conversation with Ben Howe?

17      A.    Several.

18      Q.    What do you recall about those

19  conversations?

20      A.    I don't have a specific memory.

21      Q.    How did you find out, did she

22  tell you in a late manner or did Ben Howe

23  tell you?

24      A.    It would come up in

25  conversation later.

93

1                     CHAMBERLAIN

2          Q.     And you don't recall the topic?

3          A.     No.

4          Q.     Did you have any qualms about

5     Janet Baker's honesty or veracity?

6                 MS. DYER:  Object to form.

7          A.     I don't know what the latter

8     word means.

9          Q.     How about honesty, forget

10    veracity.

11                MS. DYER:  Same objection.

12         A.     No, I think Janet was an honest

13    person, it is the degree of how you share

14    information.

15         Q.     When you became CFO, did you

16    also become a director?

17         A.     No.

18         Q.     Did you ever have any

19    conversations with any Dragon directors

20    where they indicated to you that they had

21    similar difficulties with Janet Baker?

22         A.     I have no specific memories.

23         Q.     Do you know whether specific or

24    not any board director indicated to you

25    that for whatever reason they felt Janet

94

1                     CHAMBERLAIN

2   Baker was not communicating in a timely or

3   effective manner with them?

4             MS. DYER:    Objection to form.

5       A.    I have no specific memory.

6             I think you can look at the

7   board minutes and see that they agreed to

8   accept her resignation.

9       Q.    I know that, I am just trying

10  to figure out if this is one of the

11  reasons.

12      A.    I have no specific memories.

13      Q.    Page 008412, "Selling to Large

14  Companies Will Pose New Challenges for

15  Dragon," and it says "large companies

16  doubt that smaller firms can meet their

17  needs, big companies expect large support

18  teams, concerns that small companies do

19  not have financial stability or resources

20  to upgrade products."

21            Did you share that view?

22            MR. JOSEPH:    There seem to be

23  at least three views here, but if you had

24  a view in November '99 as to any of them,

25  you may answer.

95

CHAMBERLAIN

1

2    A.    I don't know that I had a view

3  as it pertained to Dragon, that is a

4  generality that is known in business.

5    Q.    As of November of '99, do you

6  know whether Dragon had any ideas about

7  how to deal with that situation, with that

8  particular problem?

9          MS. DYER:  Objection to form.

10   A.    I don't think I understand the

11  question.

12   Q.    Was there a view at Dragon as

13  to how to deal with this challenge about

14  the doubts expressed here, that large

15  companies have with dealing with smaller

16  companies such as Dragon?

17   A.    No.

18          MS. DYER:  Same objection.

19   Q.    If you would turn to page

20  008414, did you understand at the time

21  that Dragon had lost seven of the last 11

22  corporate account bids?

23   A.    No.

24   Q.    Do you remember learning that

25  as a result of either this meeting or this

96

                    CHAMBERLAIN

 1

 2    document?

 3         A.     I have no specific memory.

 4              MR. ZIMMERMAN:     I need a

 5    quick break.

 6              THE VIDEO TECHNICIAN:   We are

 7    now going off the record at approximately

 8    10:03 a.m..

 9              (Recess taken.)

10              THE VIDEO TECHNICIAN:   We are

11    now going back on the record at

12    approximately 10:14 a.m., beginning of

13    Tape No. 2

14    BY MR. ZIMMERMAN:

15         Q.     Let me ask you to look at the

16    next exhibit, which is Exhibit 6 for

17    identification, Bates Nos. SGC 012120

18    through 12135, which are minutes of the

19    October 5, 1999, Dragon board meeting.

20              (Cowen Exhibit 6, Bates Nos. SGC

21    012120 through 12135, was marked for

22    identification, as of this date.)

23              (Witness perusing document.)

24         Q.     Have you ever seen these

25    minutes before?

97

CHAMBERLAIN

1

2    A.    I saw them yesterday.

3    Q.    Was that the first time?

4    A.    I couldn't say a specific

5  recollection of seeing them before then.

6    Q.    You attended the October 5,

7  1999, meeting?

8    A.    That's what it says.

9    Q.    Actually, it doesn't, but your

10  name appears as making comments.

11    A.    Okay.

12    Q.    And you stayed basically for

13  the entire meeting?

14    A.    I can't say definitively.

15    Q.    If you look at the last page,

16  it indicates at the top that you did make

17  a comment and then shortly after the

18  meeting adjourned.

19        Were you there for a good

20  portion of it?

21    A.    It looks that way.

22    Q.    If you turn to page SGC 012127,

23  the next-to-last paragraph on the bottom

24  has John; is John John Shagoury, is that

25  how you pronounce his name?

98

CHAMBERLAIN

1

2       A.      Yes.

3       Q.      Who was John Shagoury?

4       A.      He was the president at Dragon.

5       Q.      He indicates "the senior staff

6   meeting had a discussion, entire senior

7   staff feels right thing to do is to seek

8   an acquisition partner, greater

9   probability of success, everyone concurs."

10          Were you part of the senior

11  staff at that time?

12      A.      No.

13      Q.      Were you at that meeting?

14      A.      I have no specific

15  recollection.

16      Q.      Do you remember Mr. Shagoury

17  making this statement or something like it

18  at the meeting?

19      A.      No.

20      Q.      Did anyone at the meeting

21  disagree that the right thing to do was to

22  seek an acquisition partner at that time?

23      A.      Did anyone disagree?

24      Q.      Disagree, voice disagreement at

25  the meeting.

99

CHAMBERLAIN

1

2     A.     I don't recollect anybody

3  voicing disagreement.

4            I can't say that they voiced

5  agreement, either.

6     Q.     Did you have a view as of

7  October '99 whether that was the best

8  thing to do for Dragon?

9     A.     Yes, I had an opinion.

10    Q.     What was it?

11    A.     That it was best for them to

12  find a partner.

13    Q.     Why was that?

14    A.     Not necessarily an acquisition,

15  but a partner.

16    Q.     Other than acquisition, what

17  kind of partner would you be thinking of?

18    A.     Someone who would make a

19  strategic investment in them.

20    Q.     Why were you of that view that

21  that was the best thing to do at that

22  time?

23    A.     It would enable them to

24  probably grow their market channels, be

25  able to get their product out more, have

100

CHAMBERLAIN

1

2  somebody have the customer base already to

3  sell the product to; for all the reasons

4  that someone finds a joint venture.

5       Q.   As of this time had Dragon been

6  engaged in any discussions with anybody

7  concerning either an acquisition or a

8  strategic partnership?

9       A.   Prior to this time?

10      Q.   Yes.

11      A.   Yes.

12      Q.   Who?

13      A.   I can't tell you exactly if it

14  was before October 5th meeting or not, but

15  they had been talking to Sony, had been

16  talking to Visteon, had been talking to

17  Psion, had been talking I think there was

18  discussion for a while with Intel.

19           They had quite a number of

20  people they were working with.

21      Q.   Any discussions with AOL?

22      A.   AOL was already a partner in

23  the sense the product was bundled.

24           I don't know if there was more

25  discussed.

101

1                          CHAMBERLAIN

2          Q.      These discussions with Sony,

3    Visteon, Psion and Intel and AOL, did they

4    continue beyond October 5th of 1999?

5                  MR. JOSEPH:  We did go into

6    this pretty much yesterday, except AOL,

7    that one we didn't.

8          Q.      Just answer yes or no.

9          A.      I don't know if AOL was even a

10   partner, so I can't tell you if it went

11   on.

12                 Time frame for Sony, I believe

13   it was in October, it could have ended

14   earlier.

15         Q.      To try to save time, I

16   understand you did testify yesterday about

17   the status of Sony and Psion, so I will

18   skip that.

19                 What type of transaction was

20   being discussed with Intel?

21         A.      I didn't know we said

22   transaction, I thought we said partnering,

23   and I believe Intel was --  I think they

24   were going to make a capital infusion of

25   some type.

102

1                    CHAMBERLAIN

2            I wasn't involved in it, I

3    can't tell you what it was.

4        Q.    Do you know whatever happened

5    with that?

6        A.    No; it obviously didn't come to

7    be.

8        Q.    What kind of partnering or

9    transaction discussions were had with

10   Psion?

11       A.    Are we talking about prior to

12   October 4th or are we talking about --

13   what is the time frame, please?

14       Q.    We are talking about as of

15   October 5, 1999.

16       A.    I can't remember exact dates,

17   but there was a discussion and it was

18   talked about yesterday about Psion and a

19   potential acquisition.

20       Q.    At some point I think you

21   testified Psion retreated, correct?

22       A.    Yes.

23       Q.    Do you know why?

24       A.    I don't recollect the exact

25   reason, I believe there is a letter.

103

CHAMBERLAIN

1

2      Q.      Who was Steve Luczo?

3      A.      Today he is the CEO of Seagate

4  Technology.

5      Q.      What was he back in October of

6  '99?

7      A.      You would have to check.

8      Q.      Was he a director of Dragon?

9      A.      Yes, he was.

10      Q.      If you would turn to page

11  012129, and before I ask specifics, there

12  are a number of pages that reflect board

13  discussion of issues concerning employee

14  morale, financial performance, strategic

15  direction.

16          Do you remember those topics

17  being discussed during this meeting?

18      A.      Specific memories, no; in

19  generalities, yes.

20      Q.      Let me try to take you through

21  some of this stuff.

22          You testified earlier that you

23  had been asked at some point in time in

24  '99 by Seagate to try to review Dragon and

25  report back to Seagate, do you remember

104

CHAMBERLAIN

1

2    that?

3        A.    Yes.

4        Q.    Was Steve the person who asked

5    you to do that?

6        A.    No.

7        Q.    Who asked you?

8        A.    Don Waite.

9        Q.    Was Steve involved in that

10    process with you?

11        A.    What process?

12        Q.    Of going and looking at Dragon

13    and reporting back to Seagate.

14        A.    No.

15        Q.    When you looked at Dragon, did

16    you report back to Don Waite?

17        A.    Yes, I did.

18        MR. JOSEPH:   We went through

19    yesterday that Waite was the one that sent

20    her, she reported back, we have documents

21    including Exhibit 18.

22        MR. ZIMMERMAN:    I know.

23        Q.    Did you have any discussions

24    with Steve Luczo, as well?

25        A.    I'm sure I did.

105

CHAMBERLAIN

1

2    Q.    The minutes on page 012129

3    indicates that Steve reported that there

4    were concerns on multiple dimensions,

5    financial performance, employee morale,

6    definition of strategic direction, ability

7    to close a transaction and ability to

8    execute tactical product strategy,

9    leadership questions, all the way to CEO

10   level and maybe to overall organizational

11   structure and senior management structure.

12        My only question on that is did

13   any director voice any disagreement with

14   anything Steve was saying.

15        MS. DYER:    I object to form.

16   A.    I couldn't tell you.

17   Q.    Did you receive copies of board

18   minutes when you were CFO of Dragon?

19   A.    Did I look at prior board

20   minutes?

21   Q.    Yes.

22   A.    As CFO, I can't recollect

23   whether I asked for the board minutes or

24   not to review them.

25   Q.    When you became CFO, did you

106

                    CHAMBERLAIN

1

2    regularly attend board meetings?

3        A.    I was asked to attend some of

4    the board meetings, yes.

5        Q.    Do you know whether minutes of

6    board meetings were prepared for board

7    meetings at which --

8        A.    I have seen minutes of board

9    meetings.

10        Q.    Who takes the minutes, do you

11    know?

12            MR. JOSEPH:  What point in

13    time?

14        Q.    During the time you were CFO,

15    do you know who was taking them?

16        A.    They were taken by a variety of

17    different people.

18        Q.    When you received board

19    minutes, did you review them?

20        A.    If I received board minutes, I

21    reviewed them.

22        Q.    Was it your general experience

23    that the board minutes accurately

24    reflected what happened at the board

25    meetings that you attended?

107

1                   CHAMBERLAIN

2              MS. DYER:  Objection to form.

3         A.   For the most part.

4         Q.   The next statement is

5    attributed on that page to Bob, expressing

6    concern about morale, quite a few people

7    have left in the last few months, product

8    managers, financial folks.

9              Who was Bob, do you remember --

10        A.   Where are you?

11        Q.   012129.

12        A.   Bob is one of the board

13   directors.

14        Q.   That's Bob Roth?

15        A.   Yes.

16        Q.   Next page, John again, John

17   Shagoury.

18             "Your assessment about employee

19   morale and frustrations is true.  The

20   employee base is frustrated, unsettled,

21   and major change at the top.  Two key

22   resignations this week, our top sales guy

23   on the retail side and David Parmenter,

24   lead Nat Speak development effort."

25             What was the Nat Speak

108

1              CHAMBERLAIN
2  development effort?
3      A.    I don't know what particular
4  development effort John is talking about.
5      Q.    "People think there are many
6  resignations to follow, employees are
7  looking for strategic direction, real
8  strategy that will work, management team
9  in place that can execute strategy."
10             Again, did any director at this
11  meeting voice any disagreement with
12  anything John said here?
13      A.    I don't have specific
14  recollection.
15      Q.    A couple of paragraphs down
16  next to "Luczo," "if we don't make the
17  change of CEO now, it will have a morale
18  impact, company is very fragile, have
19  heard from development and HR."
20             Do you know what he meant by
21  that, when he says "company is very
22  fragile"?
23      A.    No.
24      Q.    If you look at the next page,
25  012131, the third paragraph down next to

1                  CHAMBERLAIN

2    Waite, is that Don Waite?

3         A.     Yes.

4         Q.     He says, next-to-last sentence,

5    "It is extremely fragile, will see

6    departures of critical people."

7                That's fragile again; do you

8    know what he meant by that?

9         A.     I believe it is all the issues

10   that are being discussed here.

11        Q.     In all these issues that are

12   being discussed that we have talked about

13   so far, you don't recall any director

14   voicing any disagreement whatsoever with

15   what was being said, correct?

16        A.     Janet could have had an

17   objection, I have to look to see if she is

18   a board of director.

19                I don't have specific

20   knowledge.

21        Q.     She was at the meeting.

22        A.     Well, I don't know if she is a

23   director, I assume she is.

24        Q.     If you turn to 012133, four

25   paragraphs from the bottom, John is

110

1                        CHAMBERLAIN

2    talking again.

3                In the middle of that he says,

4    "If at end of year there is no sale, the

5    major restructuring surgery must be well

6    in the beginning of the year."

7         A.    I don't see that paragraph, who

8    is saying it?

9                MR. JOSEPH:    What page are you

10   on?

11        Q.    It is 012133, it is the second

12   paragraph of what John is saying.

13        A.    Okay.

14              (Witness perusing document.)

15        Q.    Starting "my belief."

16              It is the middle of the third

17   sentence, take a look at it, if you would.

18              (Witness perusing document.)

19        A.    Okay.

20        Q.    Do you know what major

21   restructuring surgery he was referring to?

22        A.    I have no idea.

23        Q.    Other than the sale process,

24   were you aware of whether there was any

25   major restructuring underway at Dragon?

111

1                    CHAMBERLAIN

2              MR. JOSEPH:  Objection to form.

3              You can answer the question.

4       A.    What is major restructuring,

5  will you define that for me?

6       Q.    I would if I could.

7       A.    I can't answer what he is

8  talking about.

9       Q.    Do you remember him saying

10 that?

11      A.    I have no specific memory of

12 him saying that.

13      Q.    Next paragraph down he says,

14 "will have to have layoffs if can't find a

15 suitable partner.  I'm concerned about the

16 fragility of key people in the next 90

17 days."

18              Do you remember him saying

19 that?

20      A.    I do not have a specific memory

21 that he said that.

22      Q.    Were you concerned that if

23 something didn't happen over the next 90

24 days, that Dragon might lose key people?

25      A.    I can't say about a time frame.

112

1                    CHAMBERLAIN

2        Q.      Were you concerned if Dragon

3   didn't find a suitable partner within

4   whatever time frame, that key people would

5   be leaving?

6                MR. JOSEPH:  Objection to form.

7                You can answer.

8        A.      That would be one of several

9   things that needed to change, it wasn't

10  the only reason employees would leave.

11       Q.      What other things had to be

12  changed?

13       A.      I think there is a list of

14  recommendations that we have talked about

15  before of things that were wrong with the

16  company.

17               I am suggesting there are a lot

18  of reasons why employees leave a company.

19       Q.      Other than the topics or issues

20  we have talked about today and focusing on

21  why employees would leave Dragon as

22  opposed to other companies, are there any

23  other reasons that you believed at the

24  time you would have for a significant

25  departure of employees?

113

CHAMBERLAIN

1

2    A.    I can't think of any other

3    reasons than the ones that we have gone

4    through over the last day-and-a-half.

5    Q.    Do you remember when the

6    discussions with Visteon terminated, what

7    month, I am not going to hold you to the

8    exact date?

9    MR. JOSEPH:  Object only that

10   there was extensive discussion of this

11   yesterday, but you may answer the

12   question.

13   A.    I believe it was late January,

14   early February.

15   Q.    Were you involved in

16   discussions with Visteon, you personally,

17   in that process?

18   A.    I had numerous discussions with

19   people at Visteon.

20   Q.    Did you ever have, after that

21   deal terminated, after discussions

22   terminated, did you have any discussions

23   with anybody at Visteon as to why they

24   terminated?

25   A.    I don't have a specific memory

114

                    CHAMBERLAIN

1

2    of having a discussion.

3         Q.    Do you have any understanding,

4    based on whatever source of information,

5    as to why Visteon did not go forward with

6    the deal?

7         A.    I do not.

8               May I clarify?

9         Q.    Yes.

10        A.    We did not renew the letter of

11   exclusivity, so to make a statement that

12   it was Visteon that decided, I couldn't

13   make that statement.

14              We decided at that point that

15   we were going to listen to other people.

16        Q.    In February when the

17   exclusivity ended, whatever date it was,

18   had Visteon conducted due diligence with

19   Dragon?

20        A.    Yes.

21        Q.    Was it your understanding that

22   Visteon was still actively interested in

23   acquiring Dragon and that Dragons the one

24   who pushed Visteon away?

25              MR. JOSEPH:   Are you talking

115

1                    CHAMBERLAIN

2    about a hundred percent acquisition?

3              MR. ZIMMERMAN:    Whatever

4    acquisition type transaction, whether a

5    hundred percent or significant acquisition

6    or investment.

7         Q.    Was it your understanding that

8    Dragon's refusal to extend the exclusivity

9    was the reason that Visteon went away?

10        A.    No.

11        Q.    What was your understanding as

12   to why it went away?

13        A.    I said I don't recollect the

14   exact reason why it went away.

15        Q.    Do you understand that the

16   impetus of them going away came from

17   Visteon as opposed to Dragon pushing them

18   away?

19        A.    You're telling me that.

20        Q.    I am asking.

21        A.    "Do you understand"; no, I said

22   I don't have a recollection of how the

23   relationship ended.

24        Q.    Let's mark for identification

25   as Exhibit 7 a document Bates Nos. BAKE

116

1                         CHAMBERLAIN

2    009895 through 9907.

3              (Cowen Exhibit 7, Bates Nos. BAKE

4    009895 through 9907, was marked for

5    identification, as of this date.)

6                    (Witness perusing document.)

7         Q.      Have you ever seen this

8    document before, these pages before; I

9    don't know if it is all one document or

10   not, this is how it appears?

11        A.      I have recollection of this

12   document.

13        Q.      Is it one document?

14        A.      I couldn't tell you that for

15   sure.

16        Q.      What is this?

17        A.      I believe that this is a

18   document to meet with individuals at

19   Dragon to tell them that we were pursuing

20   a relationship or a merger with Lernout &

21   Hauspie.

22        Q.      Did these meetings go forward,

23   did they happen?

24        A.      Yes.

25        Q.      Were you involved?

117

CHAMBERLAIN

1

2          A.      I attended them.

3          Q.        Who prepared, if you look at

4     the first document, which is a

5     communication strategy, and then look at

6     9898, there is a draft script, do you know

7     who prepared these documents?

8          A.      I don't.

9          Q.      Did you have any input into

10    that?

11         A.      I need to look at all the

12    things and whether there was anything

13    asked in here as to whether maybe I had

14    input.

15         Q.      We may or may not get to that,

16    you don't have to answer that now.

17                 Did you get this document in

18    advance of the meeting?

19         A.      I can't tell you that.

20         Q.      Was it one meeting or a series

21    of meetings with different employees?

22         A.      I can't tell you that either.

23         Q.        Having looked at this very

24    briefly, do you recall that as of this

25    date, 2/28/2000, that the Visteon deal was

118

                        CHAMBERLAIN

1

2    now terminated, was off the table?

3        A.    Correct.

4        Q.    9897, it says "prepare for

5    reactions," and fourth bullet says "some

6    will be nervous about working for the

7    'evil empire' and view it as selling out."

8              What did you understand the

9    evil empire to refer to?

10       A.    Lernout & Hauspie.

11       Q.    Had you ever heard that

12   reference to them before?

13       A.    No.

14       Q.    What was the basis for your

15   understanding that it refers to L&H?

16       A.    Because L&H was our competitor

17   and this was a meeting to discuss that L&H

18   and Dragon were going to enter into a

19   relationship.

20       Q.    Is it your understanding that

21   it is because L&H was a competitor that it

22   was referred to as the evil empire as

23   opposed to any other reason?

24       A.    Correct.

25       Q.    If you look at the next page,

119

CHAMBERLAIN

1

2      9898, which is the first page of the draft

3      script, under the "news Don Waite," second

4      paragraph says, "When we met in January we

5      told you that Dragon had signed a

6      nonbinding letter of intent to be acquired

7      by a company with the code name Alabama."

8              Was Alabama Visteon?

9      A.    Yes.

10     Q.    And then it says, "For a

11     variety of reasons we did not end up

12     signing an agreement with Alabama."

13             If you then turn to page 9904,

14     which is "First Company Meeting

15     Outline/Agenda," under "fundamental

16     questions" it says "why did the Alabama

17     deal fall through?"

18             Was this a question that

19     management was anticipating getting from

20     employees at this meeting?

21     A.    I can't tell you about the

22     outline of this agenda and where it came

23     from.

24     Q.    How did you find out there were

25     going to be these meetings with employees?

120

CHAMBERLAIN

1
2      A.      I'm sure Don, my boss, told me.

3      Q.      What did he tell you about what

4  the purpose of the meetings was going to

5  be?

6      A.      I don't remember a specific

7  conversation about the meeting.

8      Q.      I think you testified you

9  attended one or more of these meetings,

10 correct?

11     A.      That is correct.

12     Q.      During any of the meetings that

13 you attended, did anybody ask why the

14 Visteon deal fell through?

15     A.      I can't recollect that.

16     Q.      Did you have a view that from

17 an employee's perspective it would be a

18 fundamental question and issue for

19 employees as to why the Alabama deal fell

20 through?

21     A.      No more than curiosity as to

22 why.

23             Fundamental, I don't believe it

24 was a fundamental.

25     Q.      When the discussions with

121

1                    CHAMBERLAIN

2    Visteon were taking place, was it your

3    view as CFO that a potential transaction

4    with Visteon along the lines you were

5    discussing was an important development

6    for Dragon?

7              MR. JOSEPH:  Objection, form.

8              You may answer.

9        A.    For the employees?

10       Q.    For the company.

11             MR. JOSEPH:  Same objection.

12       A.    Who is the company?

13       Q.    Dragon.

14       A.    Then you need to reask the

15   question, please.

16       Q.    What type of transaction were

17   you discussing with Visteon?

18       A.    We had several different forms;

19   we started talking to Visteon early on and

20   worked with them and it changed throughout

21   the process.

22       Q.    What was the final version or

23   -- let me ask the right question.

24             What was the final evolution of

25   the type of transaction being discussed

122

1                    CHAMBERLAIN

2   with Visteon at the time discussions

3   stopped?

4       A.    I would want to look and need

5   to look at the final term sheet that we

6   had with Visteon that we agreed to.

7       Q.    Would it be fair to say that

8   from your perspective, whatever the form

9   of the transaction was, it was an

10  important transaction for Dragon, it was a

11  big deal?

12              MR. JOSEPH:  Objection to the

13  form.

14              You can answer.

15      A.    An acquisition is a big deal

16  for any company.

17      Q.    And it was specifically for

18  Dragon?

19      A.    Yes.

20      Q.    What I am trying to figure out

21  is when the deal terminated, as the CFO of

22  Dragon, didn't you want to know why it

23  terminated and if there was a problem?

24      A.    I said I don't recollect the

25  reason why it terminated.

123

CHAMBERLAIN

1

2      Q.      Do you remember making

3  inquiries as to what happened here?

4      A.      I don't have a specific

5  recollection of making inquiry, I worked

6  very closely on it, I'm sure I saw what I

7  needed to see or was told the reason.

8      Q.      As you sit here, just so I

9  understand this, you don't know whether

10  Visteon walked away because of some issue

11  they had with Dragon as opposed to Dragon

12  pushing Visteon away, you just don't know

13  why Visteon walked away?

14      A.      Push away; what I told you was

15  that we let the exclusivity letter go.

16          For them, I'm sure Visteon

17  wrote a letter explaining why they went

18  away, I'm sure there were phone calls

19  made.

20          What else is the question?

21      Q.      Were you part of those phone

22  calls?

23      A.      I don't have specific

24  recollection.

25      Q.      All I want to know is that you

124

1                    CHAMBERLAIN

2   don't have any specific recollection of

3   why at least Visteon articulated the

4   reason for walking away from this deal,

5   you just don't know, other than whatever

6   is in the letter?

7          A.     I can tell you it wasn't the

8   form of the deal that we wanted.

9          Q.     What was it?

10         A.     What was what?

11         Q.     Was it the value of Dragon that

12  they were not satisfied with, was it the

13  price?

14         A.     We were looking for a 100

15  percent partnership, not 80 percent

16  partnership.

17         Q.     And they were not comfortable

18  doing a hundred percent?

19         A.     You would have to ask them.

20         Q.     Do you know whether they were

21  willing to do an 80 percent?

22         A.     That's what the original term

23  sheet said.

24         Q.     I understand that, but they

25  walked away.

125

CHAMBERLAIN

1

2    A.    I don't know what they would
3    have come back to.
4    Q.    Look at BAKE 009899, at the top
5    is "why Lernout & Hauspie, the sell, Janet
6    Baker."
7    Do you remember Janet Baker
8    making a presentation to employees?
9    A.    I do not.
10    Q.    Under B, "understand why it is
11    a good idea now, the market has changed."
12    Let me stop there; did you at
13    the time believe that the transaction will
14    L&H was a good idea from Dragon's
15    perspective?
16    A.    Did I believe in February that
17    it was good from Dragon's perspective,
18    yes.
19    Q.    Did you continue to believe
20    that as of the date the merger agreement
21    was signed in March 27th?
22    A.    If they could execute together,
23    yes.
24    Q.    If they could execute what
25    together?

126

1                    CHAMBERLAIN

2        A.    If they could execute and make

3    their plans into the future, yes.

4        Q.    Did you have comfort that was

5    going to happen?

6        A.    No.

7        Q.    Did you express any discomfort

8    about that at the time the board voted on

9    the deal?

10       A.    No.

11       Q.    Were you at the meeting when

12   the board voted on the deal?

13       A.    I would have to look at that

14   vote date and see if I was at that

15   meeting.

16       Q.    Was there any particular reason

17   why you didn't express your concerns at

18   the board meeting?

19       A.    This is not a concern.

20             If they could execute, I think

21   it was a great marriage.

22       Q.    Did you believe they could

23   execute?

24       A.    It would remain to be seen, it

25   would depend upon what the management did

127

                    CHAMBERLAIN

1

2   in the future with that company.

3       Q.    Did you have any concern about

4   whether they could execute?

5       A.    Yes.

6       Q.    What was the concern?

7       A.    We had asked for and tried to

8   continue to get together integration plans

9   and to lay out road maps for products, to

10  lay out things that we could communicate

11  with --  not communicate with employees

12  really, hear things, so that there was a

13  committee that oversaw -- through my

14  experience, it was very important to

15  manage the people after an acquisition.

16          That's why it remained to be

17  seen whether or not they would execute.

18      Q.    When you say "we had asked for

19  and tried to continue to get" --

20      A.    A committee formed to oversee

21  the integration of the two companies.

22      Q.    "We had asked for and tried to

23  continue to get together integration plans

24  and to lay out road maps for products";

25  was that process you were trying to do

128

CHAMBERLAIN

1

2 before the merger was signed?

3     A.    Yes.

4     Q.    Did you succeed in

5 accomplishing that?

6     A.    I believe a committee was

7 named, but I don't believe the committee

8 did anything.

9     Q.    Was there any discussion at the

10 board meeting about this plan to integrate

11 products?

12     A.    I couldn't recollect if there

13 was a specific discussion.

14          It was more than just products.

15     Q.    Was any concern raised at the

16 board meeting when the L&H deal was

17 approved?

18     A.    I couldn't recollect.

19     Q.    But you don't recall raising

20 any issues, any concerns?

21     A.    Correct.

22     Q.    Forget whether the board

23 meeting or elsewhere, did you raise this

24 issue, this concern you had, with Janet

25 Baker or anybody else at Dragon?

129

CHAMBERLAIN

1

2    A.    That the companies put together

3 a formal plan to intergrate, yes, it was

4 part of the thing that we asked for and,

5 yes, I spoke to other people within

6 Dragon.

7    Q.    Why didn't that get done?

8    A.    I wasn't part of the committee,

9 I am not sure why they didn't.

10    It was my request, it wasn't

11 going to be our company on a go-forward

12 basis.

13    It was L&H's company, it was up

14 to them to make the integration work.

15    My experience was that if you

16 didn't do that up-front, you were going to

17 have an unsuccessful transition and so it

18 was more my desire to make everything

19 work.

20    Q.    Did you express to Janet Baker

21 that in your experience, if you didn't do

22 that up-front, you were going to have an

23 unsuccessful transition?

24    A.    I don't know if I did or not.

25    Q.    Did you express that to

130

1                   CHAMBERLAIN

2    anybody?

3        A.    I know that I must have

4    succeeded somewhat in putting it on a due

5    diligence, because they named a committee,

6    one of which was a Dragon member.

7        Q.    Who was the Dragon member?

8        A.    I believe it was John Shagoury.

9        Q.    Going back to 9899 in Exhibit

10   7, "understand why it is a good idea now,

11   the market has changed, cover the changes

12   in the marketplace, why the desktop is not

13   enough."

14           What does that mean?

15       A.    Don't know, it is not my

16   script, I am not sure.

17       Q.    Regardless of who wrote the

18   script, do you know what changes in the

19   marketplace were taking place at the time?

20       A.    No.

21       Q.    "Competition both new players

22   and well-funded players," what does that

23   mean?

24       A.    That there is competition --

25           MR. JOSEPH:   I object to

131

                    CHAMBERLAIN

1
2    continuing to have her interpret a
3    document she didn't write and you don't
4    even know she saw before.
5             You can answer as best you can.
6        A.    Everybody has competition;
7    there was competition to Dragon Systems
8    out there.
9        Q.    Both from new players and
10   well-funded players?
11       A.    Every day new people enter the
12   marketplace, yes.
13       Q.    How would a merger with L&H or
14   some company like that help Dragon deal
15   with that development?
16       A.    I think it was all the concerns
17   that we looked at earlier of dealing with
18   a smaller company; you get more
19   establishment as a bigger company, more
20   credibility in the customers' eyes.
21       Q.    If you look at 9900,
22   "presentation Roel Pieper," the last
23   bullet point is "what we can accomplish
24   together that we cannot accomplish alone."
25            Did you believe that an

132

1                    CHAMBERLAIN

2    acquisition by L&H would enable the

3    combined company to accomplish things that

4    Dragon on its own could not?

5              (Witness perusing document.)

6         A.    Will you restate the question.

7              (Record read.)

8         A.    If they executed well, yes.

9              MR. ZIMMERMAN:    Mark as

10   Exhibit 8 for identification this

11   document, Bates Nos. BAKE 004457 to 4464.

12             (Cowen Exhibit 8, Bates Nos. BAKE

13   004457 to 4464, was marked for

14   identification, as of this date.)

15             (Witness perusing document.)

16        Q.    Have you ever seen what's been

17   marked as Exhibit 8 for identification?

18        A.    This is the final letter, yes.

19        Q.    I just want you to tell me what

20   it is.

21        A.    It is an engagement letter.

22        Q.    Of Goldman, Sachs?

23        A.    Yes.

24        Q.    This is dated December 2, 1999.

25             Do you know whether Goldman,

133

CHAMBERLAIN

1

2  Sachs had started providing any financial

3  advisory services to Dragon prior to

4  December 2, 1999?

5      A.    They probably did prior to an

6  engagement letter.

7            I can't say I know exactly what

8  day they started doing things.

9      Q.    Do you remember what month they

10  started doing their work?

11      A.    No, I do not.

12      Q.    Were you involved, I know you

13  interviewed Goldman, Sachs before they

14  were engaged, were you involved in

15  actually negotiating the engagement

16  letter?

17      A.    Yes.

18      Q.    Were you involved in

19  negotiating the scope of the work they

20  would be doing?

21      A.    Is the scope of the work in

22  this engagement letter?

23      Q.    The ultimate, yes.

24      A.    Yes.

25      Q.    At any point in time before

134

CHAMBERLAIN

1

2  signing the engagement letter, did you

3  have any discussions with Goldman, Sachs

4  about their issuing a fairness opinion?

5        A.    I recollect the subject, yes.

6        Q.    What was discussed on that

7  subject?

8        A.    All I remember is that we were

9  discussing them giving a fairness opinion.

10       Q.    Did you on behalf of Dragon

11 want them to give a fairness opinion?

12       A.    It was my normal practice to

13 have a fairness opinion.

14       Q.    Have you ever done a merger or

15 acquisition transaction without receiving

16 a fairness opinion?

17       A.    Yes --

18             MR. JOSEPH:  Buy or sell?

19             MR. ZIMMERMAN:    Either.

20       A.    Yes.

21       Q.    On the sell side or buy side?

22       A.    Buy side.

23       Q.    When you were doing deals at

24 Seagate, what factors would determine

25 whether you would want a fairness opinion

135

                    CHAMBERLAIN

1

2    or not?

3         A.    I can't recollect, I believe I

4    worked with attorneys in coming up with

5    what we would be satisfied to do.

6         Q.    I know you discussed the topic

7    with Goldman, Sachs.

8              Did you ask for a fairness

9    opinion?

10        A.    I can't remember if we started

11   that way.

12        Q.    At some point whenever in the

13   process prior to the time of the

14   engagement letter, which is December 2nd,

15   I think, did you ask for a fairness

16   opinion?

17        A.    I will say I recollect the

18   subject generally, I don't recollect any

19   specifics further than that.

20        Q.    Just so the record is clear,

21   forgetting the date for a minute, whether

22   it is before the engagement letter or

23   after, at any time prior to March 27th,

24   when the merger agreement was signed, did

25   you or anybody on behalf of Dragon ask

136

1                    CHAMBERLAIN

2    Goldman, Sachs for a fairness opinion?

3         A.    You or anybody at Dragon;

4    possibly anybody or Dragon did.

5         Q.    Did you?

6         A.    No, I do not have specific

7    recollection.

8         Q.    Since anything is possible, do

9    you know whether in fact anybody from

10   Dragon ever asked for Goldman, Sachs

11   fairness opinion prior to the signing of

12   the deal?

13        A.    I do not have a specific

14   recollection.

15        Q.    Do you generally recall that

16   there were discussions with Goldman, Sachs

17   about a fairness opinion?

18        A.    I think I already said that

19   generally I recall the topic.

20        Q.    Do you remember anything about

21   that topic being discussed?

22        A.    I do not.

23        Q.    Do you know whether in fact

24   Goldman, Sachs refused to give a fairness

25   opinion?

137

CHAMBERLAIN

1

2      A.     I do not know that

3  definitively.

4      Q.     When you say definitively, I

5  am not sure what that means.

6          Did you have any discussions or

7  sources of information that lead you to

8  have any understanding as to whether

9  Goldman, Sachs refused to give a fairness

10  opinion with respect to the --

11      A.     I do not have information to

12  lead me to that.

13      Q.     Do you have any information

14  that gives you any understanding as to

15  whether Goldman, Sachs internally ever

16  discussed among themselves whether to give

17  a fairness opinion?

18      A.     I don't have any information of

19  that sort.

20      Q.     Who during your due diligence

21  leading to the L&H transaction, who did

22  you personally have discussions or

23  meetings with from SG Cowen?

24      A.     Personally I sat in a room in a

25  meeting or a one-on-one?

138

                    CHAMBERLAIN

1

2      Q.    Let's start with a meeting

3   first.

4      A.    There were numerous meetings

5   with SG Cowen, I would have to consult my

6   calendar to go through those.

7          I was in -- through various

8   meetings I met Ben.

9      Q.    Ben Howe?

10     A.    Yes, Ben Howe, and I am sure I

11  met most of his team somewhere along the

12  line, I don't remember their individual

13  names.

14     Q.    How about one-on-one?

15     A.    I know I stepped into offices

16  individually with all of them during

17  certain things.

18     Q.    Did you ever have a one-on-one

19  meeting or discussion with Rob Stone?

20     A.    I think I said I never met that

21  analyst before.

22          MR. ZIMMERMAN:    Let me mark

23  Exhibit 9, BAKE 009646 to 9648.

24          (Cowen Exhibit 9, Bates Nos. BAKE

25  009646 to 9648, was marked for

139

                    C H A M B E R L A I N

1    identification, as of this date.)

2        Q.    Before I ask you about this

3    document, let me go back for a minute.

4            During the due diligence

5    process in the L&H transaction, did Janet

6    Baker ever inform you of any discussions

7    or meetings she had had with Rob Stone?

8        A.    I don't know about discussions

9    or meetings.

10           What I said previously was

11   generally Janet talked to me about him and

12   him being the industry person that people

13   looked to to understand speech

14   recognition.

15           I don't know if there was a

16   specific discussion or call.

17       Q.    Did she say anything beyond

18   that about him?

19       A.    I don't have any specific

20   memories.

21       Q.    Did she say anything about his

22   views on L&H?

23       A.    I don't have a specific memory.

24       Q.    Did you ever check him out and

140

                    CHAMBERLAIN

1
2   ask other people whether they knew

3   anything about Stone or his reputation?

4        A.    I don't have a specific memory

5   on that.

6        Q.    If you would look at Exhibit 9

7   for identification, the first page is an

8   SG Cowen fax cover sheet from Chris Zook

9   to Ellen Chamberlain.

10            Was Chris Zook at SG Cowen that

11  you either met with or had a one-on-one?

12       A.    He was in some of the meetings,

13  yes.

14       Q.    The next page says "meeting

15  agenda," and Ben Howe is setting an agenda

16  for the November 17th meeting at SG Cowen

17  Securities and it lists you as one of the

18  attendees.

19            Do you recall a meeting on

20  November 17th at the offices of SG Cowen?

21       A.    I don't remember the particular

22  date, I remember numerous meetings that we

23  had at the offices of SG Cowen.

24       Q.    Do you remember receiving this

25  agenda on or about November 16th?

141

CHAMBERLAIN

1

2      A.      I don't have a specific memory

3   of this agenda.

4      Q.      If you look at the actual

5   agenda, Wednesday, November 17th item,

6   "description and analysis of Dragon

7   financials, projected duration of four

8   hours," do you remember, whatever the

9   date, do you remember a meeting at SG

10  Cowen's offices at which there was a

11  description and analysis of Dragon

12  financials?

13     A.      I don't know if there was an

14  analysis or description, but certainly

15  through all the due diligence process

16  there were numerous things that were asked

17  on the financials.

18     Q.      Let me ask the question so I

19  can maybe save time.

20          There was more than one due

21  diligence meeting where SG Cowen people

22  were involved, correct?

23     A.      Correct.

24     Q.      Do you have specific

25  recollections of specific topics discussed

142

CHAMBERLAIN

1

2      at each meeting or is your recollection

3      just generally what was discussed over the

4      period of time?

5            A.    I don't have any specific

6      recollection to a specific meeting.

7            Q.    You indicated you had meetings

8      with SG Cowen and you had some one-on-one

9      sessions with SG Cowen.

10                 Did you have any phone calls

11     with SG Cowen on the due diligence?

12           A.    Yes.

13           Q.    With whom?

14           A.    I can't tell you specifically,

15     this is a due diligence process, there is

16     a lot of phone calls between the bankers

17     and potential candidate to be acquired.

18           Q.    Whether phone call meeting,

19     one-on-one, or anything else, during the

20     entire due diligence process, what do you

21     remember either asking SG Cowen or SG

22     Cowen saying about Dragon's historical

23     financials --  about L&H's historical

24     financials?

25                 MR. JOSEPH:  The question is

143

1                    CHAMBERLAIN

2    what do you remember SG Cowen saying about

3    L&H's historicals?

4              MR. ZIMMERMAN:     Correct.

5         A.    I don't recollect them saying

6    anything specifically, I don't have a

7    specific recollection.

8         Q.    You indicated you don't recall

9    them saying anything specifically.

10             Do you recall asking them

11   anything on the topic of historical

12   financials?

13        A.    I don't have specific memory of

14   those meetings without looking at my

15   agendas and the topics of all those and

16   what I received, I can't.

17        Q.    Does looking at this agenda do

18   anything for you?

19        A.    No.

20        Q.     Let's focus on meetings for

21   the moment as opposed to phone calls --

22             MR. JOSEPH:  We have been going

23   over an hour, I don't mind you finishing

24   this line, but maybe we should take a

25   break.

144

1              CHAMBERLAIN

2              MR. ZIMMERMAN:    Any time.

3              MR. JOSEPH:  Do you want to do

4    it now?

5              MR. ZIMMERMAN:    Sure.

6              THE VIDEO TECHNICIAN:  Off the

7    record at approximately 11:15 a.m..

8              (Recess taken.)

9              THE VIDEO TECHNICIAN:  We are

10   now going back on the record at

11   approximately 11:28 a.m..

12   BY MR. ZIMMERMAN:

13       Q.    I am going to try to exhaust

14   your recollection on this issue.

15              Going back to Exhibit 9, the

16   agenda for the November 17th meeting, at

17   the actual meeting it indicates that Ben

18   Howe, Dan Small, Matt Howson, Damani

19   Hamilton and Chris Zook attended.

20              Do you recall them being at the

21   meeting?

22       A.    I do not have a specific

23   recollection of them being there on this

24   date.

25       Q.    Forgetting this meeting then,

145

```
1                    CHAMBERLAIN
2    for the entire due diligence process, can
3    you tell me anything that Ben Howe
4    specifically ever told you about L&H or
5    its financial condition?
6         A.    Not specifically.
7         Q.    Same question with respect to
8    Dan Small?
9         A.    Not specifically.
10        Q.    Matt Howson?
11        A.    I can recollect no specific.
12        Q.    Damani Hamilton?
13        A.    No specific.
14        Q.    Chris Zook?
15        A.    Can't remember a specific
16   conversation.
17        Q.    Any other person at SG Cowen
18   that you can remember a specific
19   conversation about of L&H?
20        A.    No.
21        Q.    With respect to each of these
22   individuals, whether specific or general,
23   do you remember any topic or subject
24   matter of information about L&H that any
25   of these individuals we have just gone
```

146

1                    CHAMBERLAIN
2   through told you or talked to you about?
3        A.    Subject matter about L&H, not
4   about the deal?
5        Q.    About L&H; financial or
6   substantive information about L&H.
7        A.    I don't have a specific
8   recollection.
9        Q.    When you say "about the deal,"
10  do you remember any of these individuals'
11  topics about the deal they talked to you
12  about, like structure of the deal, cash,
13  stock, merger?
14       A.    We had several conversations
15  with Ben Howe and I recollect a
16  conversation I had with Ben Howe about
17  narrowing the price range of one of the
18  letters --  it wasn't a letter of intent
19  --  a term sheet that they had sent us.
20       Q.    Any other topic relating to L&H
21  or this deal that you can remember
22  discussing or receiving information about
23  --  just discussing with any of these
24  individuals we have just gone through from
25  SG counsel?

147

                         CHAMBERLAIN
1

2        A.     No, just general.

3        Q.     Do you recall having any

4   discussions about L&H's activities in

5   Korea with anybody at SG Cowen?

6        A.     I don't have a specific

7   recollection.

8        Q.     Did you have any discussion

9   with anybody at SG Cowen about L&H's

10  related parties transactions?

11       A.     I don't have a specific

12  recollection.

13       Q.     I believe yesterday you

14  testified about a conversation you had

15  with Joe Lernout about a related party

16  transaction, do you recall that?

17       A.     Yes.

18       Q.     I am not going to go through

19  the testimony, but the bottom line was you

20  indicated to him, when you asked about it,

21  he said that had been taken care of,

22  that's no longer an issue?

23       A.     Yes, both he and Pol were in

24  the room, I was being given a tour, yes.

25       Q.     Was anybody else in the room or

148

                    CHAMBERLAIN
1
2  a party to that conversation?
3      A.    I couldn't say that.
4          Those two were giving me the
5  tour, I can't remember who all took the
6  tour.
7      Q.    When they said that, did they
8  indicate how they had taken care of it?
9      A.    That they were no longer
10 involved in those companies.
11     Q.    When they told you that, did
12 you have any reason to doubt that that was
13 true?
14     A.    I had no reason to doubt it.
15     Q.    Did you take any steps to
16 confirm to yourself that in fact that was
17 true?
18     A.    At that particular time I did
19 not.
20     Q.    At any time prior to the time
21 the merger agreement was signed, did you
22 take any steps to verify that?
23     A.    I did not have a specific
24 question, but I had a conversation with
25 the auditors and they would have told me

149

CHAMBERLAIN

1

2     there was a significant related party

3     transaction.

4          Q.     That being KPMG?

5          A.     Yes.

6          Q.     You didn't discuss that topic

7     with SG Cowen?

8          A.     I am not aware of discussing it

9     with Cowen.

10          Q.     What did KPMG tell you?

11          A.     I didn't ask a specific

12     question; I had an agenda of things that I

13     went through that were major issues that

14     were there and that was not one that came

15     out of the conversation.

16          Q.     Last question about this

17     exhibit; this agenda which talks about

18     description and analysis of Dragon

19     financials at the November 17th meeting,

20     my only question is do you recall whether

21     there was any discussion at this meeting

22     about L&H's financials as opposed to

23     Dragon's financials?

24          A.     I have no specific recollection

25     of this meeting from the other meetings.

150

CHAMBERLAIN

1

2    Q.    Do you know whether Janet

3    Baker ever had any meetings or

4    conversations with anybody from SG Cowen

5    that you were not a participant in?

6    A.    She had conversations with Rob

7    Stone, she had conversations with Ben

8    Howe.

9    Q.    Anybody else?

10    A.    I don't know, I just know those

11    two.

12    Q.    Did she report to you at any

13    point in time prior to the signing of the

14    deal in March of any conversations or

15    discussions or meetings she had had with

16    either Stone or Howe?

17    A.    Specific items I couldn't

18    remember; we certainly were working on a

19    term sheet with Ben, so I'm sure that we

20    exchanged information on a phone call.

21    Q.    That would be regarding the

22    term sheet?

23    A.    Yes.

24    Q.    Focusing on the due diligence

25    part of it, getting information about

151

1                    CHAMBERLAIN

2  L&H's financials or their activities, did

3  Janet Baker ever relay to you any

4  information or discussions she had had

5  with Howe or Stone or anybody else at SG

6  Cowen?

7          A.    About financial, no.

8          Q.    How about Korea?

9          A.    No specific conversation that I

10 recollect.

11         Q.    How about related party

12 transactions?

13         A.    No specific.

14         MR. ZIMMERMAN:    Mark as

15 Exhibit 10 for identification Bates Nos.

16 BAKE 022771-772, December 1, 1999,

17 memorandum from Ben Howe and Dan Small to

18 Goldman, Sachs.

19         (Cowen Exhibit 10, Bates Nos. BAKE

20 022771-772, was marked for identification,

21 as of this date.)

22         (Witness perusing document.)

23         Q.    Have you ever seen what has

24 been marked as Exhibit 10 for

25 identification before?

152

CHAMBERLAIN

1

2    A.    I don't specifically remember

3    this document.

4    Q.    It refers to a "1 o'clock due

5    diligence call for this Friday," which I

6    believe was December 3rd.

7    Do you remember a due diligence

8    call?

9    A.    I would be unable to

10   differentiate this phone call from any

11   other phone call that we had dealing with

12   due diligence.

13   Q.    This is information that

14   Goldman, Sachs wanted to receive about L&H

15   and they were sending this to Ben Howe and

16   Dan Small and copied you.

17   Prior to this being sent out,

18   did you have any discussions with Goldman,

19   Sachs about what types of information you

20   wanted about L&H?

21   A.    There was a complete listing of

22   due diligence items that was asked for in

23   the beginning that combined a lot of

24   different people's requests.

25   Q.    As of March 27th, when the deal

153

CHAMBERLAIN

1
2      was signed, was there any information
3      about L&H that Dragon had requested that
4      you had not received?
5           A.      Yes.
6           Q.      What was that?
7           A.      The audited 1999 financial
8      statements.
9           Q.      Anything else?
10          A.      I couldn't say definitively.
11          Q.      The audited '99 financial
12     statements, I take it, was requested of
13     KPMG, correct?
14          A.      Correct.
15          Q.      As of March 27th they had not
16     yet --
17          A.      They had not completed their
18     audit.
19          Q.      Was there any information prior
20     to March 27th that had been requested of
21     SG Cowen that you had not received?
22          A.      I don't have a definitive
23     memory of something I didn't receive.
24          Q.      These items that Goldman, Sachs
25     requested from SG Cowen, was it your

154

1                    CHAMBERLAIN

2   understanding of the process that SG Cowen

3   would collect this information from L&H

4   and distribute it to Goldman, Sachs?

5                MS. DYER:  Objection to form.

6        A.    Yes.

7              I think I said some came

8   through the companies directly, some came

9   through the bankers.

10       Q.    It was all L&H-prepared

11  documents, regardless of who actually

12  delivered it to you?

13       A.    I can't say that for certain

14  unless I look to see if I had items from

15  other folks.

16       Q.    Is there anything on this due

17  diligence items here, 1 through 18, that

18  would have been an SG Cowen-created

19  document as opposed to L&H information?

20       A.    Could be.

21       Q.    Which categories?

22       A.    They could have put together

23  capitalization table No. 1, they could

24  have put together an overview of the

25  business segments, they could have put