155

1                     CHAMBERLAIN

2      together an overview of the sales force,

3      they could have done the organization

4      chart, they could have done a lot of this

5      and provided it.

6           Q.     What's a capitalization table?

7           A.     Who owns the stock of the

8      company.

9           Q.     If they put that together, that

10     would be a collection of information

11     that's out there as opposed to them

12     preparing?

13          A.     That's splitting words that I

14     am not sure I can say.

15          Q.     When you say they could have,

16     do you know whether in fact they put this

17     stuff together or whether it came from

18     L&H?

19          A.     No.

20          Q.     I believe I asked this, but

21     forgive me, I just want to make sure.

22               Do you recall any discussion

23     you ever had with anybody at SG Cowen

24     about L&H's Korean operations?

25          A.     And I answered I did not have a

156

CHAMBERLAIN

1

2 specific recollection.

3      Q.     Only because it makes me

4 nervous when you say specific

5 recollection; your lawyer, too, because he

6 is good.

7           Do you ever remember that topic

8 being discussed with anybody at SG Cowen?

9      A.     I don't have a specific memory.

10      Q.     Do you have a general memory?

11      A.     I know that it was part of the

12 budget process, there were things in there

13 for Korea, and I know that we were getting

14 detail behind a lot of the things in the

15 budget.

16      Q.     From specifically detail about

17 Korea you were getting from SG Cowen or

18 from L&H?

19      A.     I don't know who the request

20 would have been, I don't know.

21      Q.     This information, what kind of

22 information about Korea, what business

23 they were doing?

24      A.     It was what was to be

25 supporting the budget roll-ups for the

157

1                    CHAMBERLAIN

2   year.

3        Q.    Did you get that information?

4        A.    I would need to go and check.

5              I know we got bits and pieces

6   of what we asked for for the budget.

7        Q.    Did you discuss those bits and

8   pieces with anybody at SG Cowen?

9        A.    I have no specific memory.

10             MR. ZIMMERMAN:    Let me mark

11   as Exhibit 11 for identification Bates

12   Nos. BAKE 026289 through 91.

13             (Cowen Exhibit 11, Bates Nos. BAKE

14   026289 through 91, was marked for

15   identification, as of this date.)

16             (Witness perusing document.)

17        Q.    Again, I don't know if this is

18   one document or not, but I am going to

19   focus you on the second page, the meeting

20   agenda for December 7, 1999.

21             MR. JOSEPH:   We actually looked

22   at a later iteration of this yesterday,

23   this is an earlier version.

24             MR. ZIMMERMAN:    Then this

25   should be quick.

158

CHAMBERLAIN

1

2     Q.    This indicates a Monday and
3  Tuesday, December 13th and 14th, meeting
4  at the offices of L&H and you attended
5  those meetings, correct?
6     A.    Those weren't the dates that it
7  happened, I did go to Belgium during that
8  time period, yes.
9     Q.    If you look at the item agenda,
10  "review of LIGHT restructured financials,"
11  and it indicates "call Hauspie and Allan
12  Forsey," forgetting for a moment the date
13  of the meeting, do you remember Hauspie
14  and Allan Forsey discussing at this
15  meeting a review of LIGHT's restructured
16  financials?
17     A.    Do I remember Hauspie and
18  Forsey discussing --
19           MR. JOSEPH:  Let me say the
20  later iteration, Chamberlain 11, indicates
21  that Dammekens and Forsey did it.
22     Q.    Let me show you what was marked
23  yesterday as Exhibit 11 for
24  identification.
25           Again, without caring about the

CHAMBERLAIN

1
2  actual date of the meeting, this is now I
3  am being told an undated version of the
4  agenda.
5          If you look at item 1,
6  "overview of Flanders Language Valley,
7  Jozef Lernout, Pol Hauspie," do you
8  remember Lernout and Hauspie giving an
9  overview of FLV?
10     A.    I have general recollection of
11 being in Belgium and being in this
12 meeting.
13          Specific speakers or what was
14 discussed, no.
15     Q.    My only question is it
16 indicates "Ben Howe present detail letter
17 of intent."
18          Do you remember him doing that?
19     A.    I don't think he had it
20 completed by that date.
21     Q.    Do you remember him making any
22 presentation at this meeting or anybody
23 else at SG Cowen?
24     A.    I don't have a specific memory.
25          MR. ZIMMERMAN:    Mark as

160

1              CHAMBERLAIN

2   Exhibit 12 for identification Bates No.

3   BAKE 022255.

4            (Cowen Exhibit 12, Bates No. BAKE

5   022255, was marked for identification, as

6   of this date.)

7        Q.      Have you ever seen what has

8   been marked as Exhibit 12 for

9   identification.

10            (Witness perusing document.)

11       A.      I don't have a specific

12   recollection.

13       Q.      It indicates it was forwarded

14   to you and my only question is -- not my

15   only question --  whether you received it

16   or not, reading the paragraph, the two

17   paragraphs in the body of the e-mail, do

18   you remember learning this information?

19       A.      I do not.

20       Q.      Did you remember hearing at any

21   time in December of '99 or any time prior

22   to the signing of the merger that any

23   analyst, whether Lehman Brothers analyst

24   or anybody else, had cut his fourth

25   quarter earnings estimates for L&H?

161

                        CHAMBERLAIN

1

2       A.     I don't recollect any.

3              MR. ZIMMERMAN:      Mark as 13

4    BAKE 011565 through 66.

5              (Cowen Exhibit 13, Bates Nos. BAKE

6    011565 through 66, was marked for

7    identification, as of this date.)

8       Q.     Exhibit 13 for identification

9    is the board minutes for the December 17,

10   1999, meeting of Dragon Systems, which

11   indicates that you attended.

12             Do you remember attending that

13   meeting?

14      A.     I don't specifically remember

15   this board meeting from others.

16      Q.     Do you remember a board meeting

17   where Janet Baker reported that a

18   potential acquirer of the company commonly

19   referred to as Herald had determined not

20   to make an acquisition proposal?

21      A.     I don't recollect that was

22   reported at a board meeting.

23      Q.     Do you know who Herald is?

24      A.     I believe it is Psion.

25      Q.     If this was asked I apologize,

162

CHAMBERLAIN

1

2    but do you know why or was it reported to

3    the board why Psion had determined not to

4    make an acquisition?

5         A.    I don't recollect the exact

6    reason why.

7         Q.    Psion had done due diligence?

8         A.    Psion did do due diligence.

9         Q.    It indicates Dr. Baker reported

10   to the board the status of discussions

11   with Alabama and LIGHT, who we have

12   established are Visteon and L&H, and it

13   indicates that there was a discussion

14   about the benefits and drawbacks of each

15   of the two proposals.

16        What do you remember about the

17   drawbacks, if any, of the L&H proposal

18   that were discussed at the meeting?

19        A.    I don't have a specific

20   recollection.

21        Q.    It indicates "most of the board

22   members expressed a strong preference for

23   the Alabama proposal," which is Visteon.

24        Do you remember what was the

25   basis of the board members' strong

163

                    CHAMBERLAIN

1
2    preference to the Visteon proposal as
3    opposed to the other proposal?
4         A.    I don't have a specific memory
5    of the board members' preferences.
6         Q.    Do you remember anything
7    anybody said comparing the two or as to
8    why one would be preferable to the other
9    at this point or any other?
10        A.    I know from one fact that the
11   cash proposal from the Visteon facts was
12   quite appealing.
13        Q.    What was the amount?
14        A.    There were several amounts from
15   Visteon, ranges were 525 to 590, 580.
16        Q.    As of this point in time do you
17   know whether the L&H proposal was a cash,
18   stock, or combination?
19        A.    It was --  I don't know, it
20   changed from cash to cash and stock to
21   stock, so I am not sure how this goes in.
22        Q.    Was the Visteon proposal at all
23   times a cash?
24        A.    Yes.
25            MR. JOSEPH:  At all times

164

1                    CHAMBERLAIN

2    through December 17th or until the end?

3         Q.    Until the end.

4         A.    My recollection is it was all

5    cash.

6         Q.    Was there a sentiment expressed

7    at this meeting that all cash from Visteon

8    was preferable to a stock deal from L&H?

9         A.    I don't know if it was

10   discussed that way in the meeting.

11        Q.    Was there ever any meeting

12   where there was a discussion that cash

13   would be preferable to stock?

14        A.    Certainly.

15        Q.    And the discussion was, I take

16   it, that certainly cash was preferable to

17   stock, right?

18        A.    To stock, yes.

19        Q.    The last page of the minutes

20   has a resolution that the management of

21   the company was authorized to and directed

22   to aggressively pursue discussions with

23   Alabama, which is Visteon.

24             Those discussions occurred,

25   correct?

165

1                    CHAMBERLAIN

2          A.     Yes.

3          Q.     What was decided at this

4    meeting about what would be told to L&H,

5    if anything?

6          A.     I don't recollect.

7          Q.     Do you know what was reported

8    to L&H after this meeting?

9          A.     I do not.

10         Q.     As of February, when the

11   Visteon discussions terminated, was Dragon

12   still in discussions with L&H or did those

13   stop for the time being?

14         A.     We started up discussions with

15   L&H after the exclusivity from Visteon

16   expired.

17         Q.     So the discussions with L&H had

18   stopped and then they picked up again

19   after exclusivity terminated?

20         A.     Correct.

21         Q.     How were the discussions

22   restarted, who approached who?

23         A.     I don't have a specific

24   recollection on how they restarted.

25         Q.     Do you remember whether there

166

CHAMBERLAIN

1

2  was any board meeting at or around the

3  time the Visteon deal terminated where

4  they discussed approaching or

5  reinstituting discussions with L&H?

6      A.    I don't have a recollection

7  without looking at minutes.

8          MR. ZIMMERMAN:    Mark as

9  Exhibit 14 for identification Bates Nos.

10  BAKE 011576 through 77.

11          (Cowen Exhibit 14, Bates Nos. BAKE

12  011576 through 77, was marked for

13  identification, as of this date.)

14          MR. JOSEPH:  This was marked

15  yesterday and was discussed.

16          (Witness perusing document.)

17          MR. JOSEPH:  I may be wrong,

18  but I am seeing other minutes in here.

19      Q.    These are minutes of the

20  December 20th, 1999, Dragon board of

21  directors meeting, which indicate that you

22  participated by telephone.

23          Do you remember that?

24      A.    I don't see where it says I

25  participated by telephone.

167

CHAMBERLAIN

1

2      Q.      The first full paragraph, three

3   lines from the bottom, "Ms. Rosker and

4   Ms. Chamberlain participated by

5   telephone."

6      A.      Okay.

7             Again, I need to state I cannot

8   differentiate between the various

9   meetings, attending dates.

10      Q.      Do you recall without specifics

11   that some meetings you attended by phone

12   as opposed to in person?

13      A.      No, I have no specific

14   recollection.

15      Q.      You don't have any reason to

16   doubt that you participated by phone in

17   this meeting, do you?

18      A.      I have no reason to doubt that.

19      Q.      Six lines from the bottom it

20   indicates Dr. Baker discussed the LIGHT

21   proposal, discussed price, financing

22   contingency and a bunch of other things,

23   and the board discussed the advantages and

24   disadvantages of each proposal, both LIGHT

25   and Alabama.

168

1              CHAMBERLAIN

2              Same question as before; do you

3    remember any discussion about either the

4    relative advantages or disadvantages of

5    the L&H proposal, other than what you have

6    talked about?

7         A.    I have no specific recollection

8    of what was said in this meeting on

9    advantages or disadvantages.

10        Q.    The minutes indicate that Chris

11   Fine and Alex Berzofsky of Goldman, Sachs

12   participated by telephone.

13             Do you remember them saying

14   anything about anything at this meeting?

15        A.    I have no specific

16   recollection.

17        Q.    Do you remember the company

18   resolved, as reflected on page 2, and

19   directed to enter into the letter of

20   intent presented by Visteon?

21        A.    Do I remember that the board

22   asked us to do that, yes.

23        Q.    When the letter of intent was

24   entered into, was there any discussion

25   with L&H as to your decision to enter into

169

1                     CHAMBERLAIN

2    a letter of intent with Visteon?

3          A.     I thought we just went over

4    that; I don't recollect who had the

5    conversation with L&H.

6          Q.     Do you recollect, forgetting

7    who had it, what was said?

8          A.     I don't recollect what was

9    said.

10               MR. ZIMMERMAN:     Mark as

11   Exhibit 15 Bates Nos. BAKE 023115 through

12   117.

13               (Cowen Exhibit 15, Bates Nos. BAKE

14   023115 through 117, was marked for

15   identification, as of this date.)

16               (Witness perusing document.)

17         Q.     If you look at the first page,

18   towards the bottom under "original

19   message," it indicates an e-mail that you

20   sent to Alex Berzofsky, do you see that,

21   "subject due diligence on LIGHT."

22         A.     I see that.

23         Q.     If you look at the next two

24   pages, the substance of an e-mail that you

25   sent to Alex reflecting some of your

170

CHAMBERLAIN

2  thoughts on due diligence, do you remember

3  this?

4      A.    I don't remember this

5  specifically, I would have to read it.

6      Q.    Why don't you take a minute and

7  read it, if you would.

8          (Witness perusing document.)

9      A.    The summary of this is what I

10  am expecting Goldman, Sachs to go out and

11  do.

12      Q.    If you look at 023116, second

13  page, four bullets from the bottom, "2000

14  plan at $122 million for new acquisition

15  that was done in Q-4. What is the

16  performance in Q-4 for Korea?"

17          What was that referring to?

18      A.    I don't know the specific

19  acquisition.

20      Q.    The 122 million, is that what

21  L&H paid for the acquisition or is that --

22      A.    That's a projection, an attempt

23  to try to get what Q-4 was for comparison.

24      Q.    Do you know whether that was

25  the acquisition of Bumil?

171

1                    CHAMBERLAIN

2       A.    I do not know that.

3       Q.    Did you get this information at

4  any point prior to the signing of the

5  agreement?

6       A.    I don't recollect that one way

7  or the other.

8       Q.    This was a projection for

9  2000, correct?

10       A.    Yes.

11       Q.    Did that amount of projection

12  either surprise you, cause you any

13  concern, or raise any questions in your

14  mind?

15       A.    It was just one of the many

16  questions that were still trying to be

17  understood.

18       Q.    As of the time of the closing,

19  did you in fact understand that issue,

20  whatever information you got on it?

21       A.    I think I said I don't

22  recollect one way or another whether I got

23  information.

24       Q.    Is this an area of information

25  that you pushed to get or is it just one

172

CHAMBERLAIN

1

2    of the pieces of information you asked for

3    and don't remember if you ultimately got

4    it?

5              MR. JOSEPH:  Objection to form.

6              You may answer.

7         A.    I don't think I pushed any

8    differently on any one of the items that

9    are on here.

10        Q.    Did you ever receive any

11   information prior to the signing of the

12   merger agreement about the identity of any

13   of L&H's customers in Korea?

14        A.    We had financial roll-ups and

15   customers in some of the packets they gave

16   us.

17        Q.    What is a financial roll-up?

18        A.    I'm sorry; whatever supports

19   the revenue for that or we ask what's the

20   25 largest customers.

21             There were a lot of those

22   questions asked in diligence.

23        Q.    When you got information about

24   the top customers in Korea, from whom did

25   you get that information?

173

1                        CHAMBERLAIN

2          A.      Top customers, not necessarily

3    from Korea.

4          Q.      Thank you.

5                  Did you get information about

6    L&H's customers or top customers

7    specifically in Korea?

8          A.      Never asked for them

9    specifically in Korea.

10         Q.      Whether you asked for them or

11   not, do you know whether you ever received

12   information identifying either some Korean

13   customers or the types of business they

14   did?

15         A.      Sorry, I would not have known

16   the nationality of the customers that were

17   being given to me as the customers.

18         Q.      So I am clear, forgetting

19   nationality, operating in Korea, I was

20   talking geographically.

21         A.      I don't recollect anything

22   specifically.

23         Q.      Look at the last page of this

24   exhibit, the last paragraph refers to "I

25   will get a copy of the book they gave

174

CHAMBERLAIN

Janet and I in Belgium to Pol and John."

Q.    What book are you referring to?

A.    They must have done a presentation of some type, I can't tell you specifically.

Q.    Who is the "they"?

A.    "They" are the Lernout & Hauspie folks.

Q.    Forgetting the contents for the moment --

A.    I take that back, sorry, I don't know who "they" is.

Q.    Whatever the book was, you don't know who gave it to you?

A.    I don't have a specific recollection of what this book is or who gave it to us.

MR. ZIMMERMAN:    Mark as Exhibit 16 for identification Bates Nos. BAKE 009891 through 94.

(Cowen Exhibit 16, Bates Nos. BAKE 009891 through 94, was marked for identification, as of this date.)

(Witness perusing document.)

175

CHAMBERLAIN

1

2      Q.      Have you ever seen this

3  document before?

4      A.      I believe I saw it yesterday.

5      Q.      For the first time?

6      A.      We sent out numerous requests

7  for due diligence.

8      Q.      So this is due diligence that

9  you would have requested regarding L&H?

10     A.      Yes.

11     Q.      Look at the second page, last

12  entry, "review key license agreements,

13  royalty arrangements."

14              Was that information provided?

15              (Witness perusing document.)

16     A.      Without going back and looking

17  at my due diligence items, I can't tell

18  you that.

19     Q.      There is handwriting next to it

20  that looks like "cust lists," which I

21  assume is customer lists.

22              Is that your handwriting?

23     A.      None of this is my handwriting.

24              MR. ZIMMERMAN:      Let me mark

25  as Exhibit 17 a one-page document GS

176

1                    CHAMBERLAIN

2      002233.

3              (Cowen Exhibit 17, Bates No. GS

4      002233, was marked for identification, as

5      of this date.)

6              MR. JOSEPH:  We saw this

7      yesterday and it is a separate page that's

8      part of another document.

9              MR. ZIMMERMAN:    Now it is a

10     separate document.

11          Q.    Have you seen this before, and

12     I don't mean yesterday, I mean during the

13     due diligence process.

14              (Witness perusing document.)

15          A.    It is one of the things --  no

16     specific memory of seeing one piece of

17     paper from the next piece of paper.

18          Q.    This indicates "top revenue

19     customers in T and S including projects,"

20     T and S, is that technology and software?

21          A.    Text and speech.

22          Q.    You understood this was

23     information about L&H, correct?

24          A.    Yes.

25          Q.    It indicates several Korean

177

1                    CHAMBERLAIN

2    customers, High Worldwide as the top

3    revenue customer, Neo Telecom, EPC and

4    then IBC and it has numbers next to it.

5               Did you ever discuss this

6    information with anybody at Goldman,

7    Sachs?

8         A.    I don't recollect doing so.

9         Q.    With L&H?

10        A.    I don't recollect doing so.

11        Q.    With SG Cowen?

12        A.    No.

13        Q.    When you saw this, did you or

14   anybody at Dragon follow up to confirm who

15   these customers were, whether in fact

16   these are real revenues, or anything like

17   that?

18        A.    We wouldn't have done that for

19   Q-4 '99, we relied on audited financial

20   statements.

21        Q.    Is it fair to say that given

22   the fact that this information was in

23   audited financials, you didn't see any

24   reason to go behind these numbers,

25   correct?

178

1                    CHAMBERLAIN

2              MR. JOSEPH:   Objection, form,

3    misleading.

4              You may answer it.

5         A.    This is past history, there was

6    outside people working on verifying the

7    revenues, so there was no reason for us to

8    go about verifying revenues.

9         Q.    The outside people verifying

10   revenues being the certified accountants.

11              (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

179

1                    CHAMBERLAIN

2        A.       Correct.

3               MR. KNOWLES:  I have a form

4    objection to that last question.

5               MR. ZIMMERMAN:    Let's take a

6    lunch break.

7               THE VIDEO TECHNICIAN:  Going

8    off the record at approximately 12:18

9    p.m., the end of Tape No. 2.

10              (Lunch recess: 12:18 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

180

1

2              A F T E R N O O N      S E S S I O N

3                     12:57 p.m.

4              THE VIDEO TECHNICIAN:  Going on

5  the record at approximately 12:57 p.m., of

6  the Chamberlain deposition.

7  E L L E N    C H A M B E R L A I N,

8  resumed.

9  CONTINUED EXAMINATION

10 BY MR. ZIMMERMAN:

11             MR. ZIMMERMAN:    Mark as

12 Exhibit 18 Bates Nos. GS 004388 through

13 89.

14             (Cowen Exhibit 18, Bates Nos. GS

15 004388 through 89, was marked for

16 identification, as of this date.)

17      Q.      Exhibit 18 is a February 29,

18 2000, memorandum from Goldman, Sachs to

19 Dragon Systems, carbon copying Hale &

20 Dorr, re, Lernout & Hauspie due diligence

21 and accounting issues.

22             Do you remember receiving this

23 document?

24      A.      Not specifically.

25      Q.      Was it brought to your

181

1                    CHAMBERLAIN
2    attention at some point in time?
3         A.    Yes.
4         Q.    On or about February 29, 2000?
5         A.    I couldn't say the date.
6         Q.    Who brought it to your
7    attention?
8         A.    I can't tell you the specific
9    individual.
10        Q.    Was it somebody at Dragon?
11        A.    It would have been.
12        Q.    How were you made aware of
13   this?
14        A.    I don't remember the specific
15   time.
16        Q.    Were you shown a copy of this
17   or was the substance of the letter related
18   to you?
19        A.    I saw this memo.
20        Q.    Do you know whether prior to
21   this memo Dragon had received any kind of
22   written correspondence or memoranda from
23   Goldman, Sachs?
24        A.    I think you've shown me lots of
25   items that have come from Goldman, Sachs.

182

                    CHAMBERLAIN

1

2        Q.      Other than due diligence,

3    either correspondence about the deal, not

4    books that it put together, analyses, but

5    substantive discussions about anything.

6        A.      I couldn't answer for Dragon as

7    a whole.

8        Q.      Did you personally?

9        A.      No.

10       Q.      Did you read this when it was

11   given to you by whomever gave it to you?

12       A.      Would you like me to read it

13   now?

14              MR. JOSEPH:  Why don't you do

15   that.

16              (Witness perusing document.)

17       A.      I am familiar with the memo.

18       Q.      If you notice, the memo is not

19   from any individual member of Goldman,

20   Sachs, it is from the Goldman, Sachs firm.

21              Did that at the time you

22   reviewed this have any particular

23   relevance to you?

24       A.      No.

25       Q.      Does it now?

183

CHAMBERLAIN

1

2     A.     No.

3     Q.     Do you know why it was from the

4  firm as opposed to any particular member

5  of the team?

6     A.     I don't know why it or Dragon

7  doesn't cull out a person either.

8     Q.     Do you know who it was sent to

9  at Dragon?

10    A.     I don't know who received it.

11    Q.     Do you know of any other

12  correspondence or materials Dragon had

13  received from Goldman, Sachs that was

14  similar in that it was from Goldman, Sachs

15  as opposed to a specific person?

16    A.     Again, the due diligence items

17  are from a team of people at the bankers,

18  it is not a specific person.

19    Q.     It is from a team and it is

20  addressed to a team at Dragon, correct?

21    A.     Correct --  no, not necessarily

22  a team at Dragon, it is whoever asked for

23  it.

24    Q.     But this is Goldman, Sachs to

25  Dragon Systems; is this the only type of

184

1                           CHAMBERLAIN

2    correspondence you recall seeing that had

3    that same characteristic?

4          A.     At this time that's all I

5    recall.

6          Q.     Who is Hale & Dorr?

7          A.     They are the outside counsel

8    for Dragon.

9          Q.     Had you seen any other material

10   sent by Goldman, Sachs that indicated it

11   was also being sent to Dragon's outside

12   counsel?

13         A.     They sent them due diligence

14   items, yes.

15         Q.     Anything else?

16         A.     I don't know if they sent them

17   anything else.

18         Q.     It starts off, "As mentioned on

19   our call with you today, there are several

20   years where we feel greater insight and

21   clarity needs to be gained with respect to

22   both due diligence and accounting."

23                Were you a party to that call

24   that's referred to here?

25         A.     I don't recollect this call

185

CHAMBERLAIN

1

2  from any other call.

3      Q.    Do you ever recollect any call

4  with Goldman, Sachs either prior to

5  February 29th or after where they had

6  indicated to you that they believed

7  greater insight and clarity needs to be

8  gained with respect to due diligence or

9  accounting?

10     A.    I don't understand the

11  difference between the question I already

12  answered.

13           I don't remember this specific

14  call and I don't remember before or after,

15  if it is a different date than February

16  29th.

17     Q.    Whether --

18     A.    I understand the substance of

19  the memo.

20     Q.    Whether you were on this call

21  or not, did anybody at Dragon either

22  before or after this memo was received

23  talk to you about what call this refers

24  to?

25     A.    Nothing I can recollection.

186

CHAMBERLAIN

1

2      Q.     It says, "Based on our meeting

3  last week and our work to date, we would

4  like to reiterate our point of view that

5  additional due diligence led by accounting

6  professionals on both sides is important

7  to gain greater comfort with respect to

8  some of the issues indicated below."

9              Do you know, when it refers to

10  a meeting last week, which would have been

11  the week of the 22nd, were you a party to

12  part of that meeting?

13      A.     I don't know what meeting it

14  is, so I don't have a recollection.

15      Q.     Did you discuss the contents of

16  this memo with anybody at Dragon after you

17  received it?

18      A.     Sure.

19      Q.     Who did you talk to?

20      A.     Don Waite.

21      Q.     Who else?

22      A.     I don't know any other

23  particular people.

24      Q.     Do you remember ever discussing

25  the contents of this memo with Janet

187

                        CHAMBERLAIN

1
2    Baker?

3         A.     I don't remember; we showed

4    Janet as a protocol all correspondence

5    that came, so she probably had a copy.

6         Q.     Do you remember specifically

7    showing her this or that was just the

8    protocol?

9         A.     That was the protocol.

10        Q.     What was your discussion with

11   Don Waite on this memo?

12        A.     I found it rather ironic that

13   this memo was written after I wrote a memo

14   to Goldman, Sachs telling them what my

15   expectations were from a banker and pretty

16   much they cut and pasted it back and made

17   it the expectations of not them.

18        Q.     This is what you told Don?

19        A.     Yes.

20        Q.     What did he say?

21        A.     I can make a general

22   assumption, I can't tell you a specific.

23             I had no direction to do

24   anything different from the way I was

25   proceeding after that meeting.

188

CHAMBERLAIN

1

2      Q.    Do you remember anything that

3   Don said either in response to what you

4   just told him or in this conversation

5   about this letter?

6      A.    It appeared that Goldman was

7   covering their behinds.

8      Q.    Was that a source of concern to

9   you?

10      A.    No.

11      Q.    Was it a source of concern to

12   Don?

13      A.    It is what we were expecting to

14   do at that point in time.

15            They had not been doing what

16   their jobs were normally as a banker.

17      Q.    Was there any discussion at any

18   board meeting you attended where this memo

19   or its contents was discussed?

20      A.    I don't know if there was a

21   board meeting where it was discussed.

22      Q.    Whether or not it was at a

23   board meeting, do you know whether any

24   directors of Dragon other than Don Waite

25   was made aware of this document or its

189

                        CHAMBERLAIN

1

2    contents?

3        A.    I don't know if any of the

4    recipients made the board members aware.

5        Q.    Was there ever a written

6    response to this?

7        A.    Not that I am aware of.

8        Q.    Did you ever talk to Goldman,

9    Sachs about this after receiving this,

10   after seeing this?

11       A.    I'm sure there was a

12   conversation.

13       Q.    Why would you be sure of that?

14       A.    Because I happened to work with

15   them from then on until the signing of the

16   close.

17       Q.    What was the conversation?

18       A.    I don't recollect specifics.

19       Q.    Do you recall generally?

20       A.    I don't recall generally.

21       Q.    Who were the conversations

22   with?

23       A.    I can't tell you who it was

24   with.

25       Q.    Subsequent to this memo and

190

                    CHAMBERLAIN
1

2  these conversations with Goldman, did the

3  nature of their work change from what it

4  had been prior to this memo?

5          MR. JOSEPH:  Objection, form.

6          You may answer.

7          MR. ZIMMERMAN:    That's

8  actually a fair objection, the only one

9  you made today.

10          Let me rephrase the question.

11      Q.    Did you perceive any either

12  more or less Goldman, Sachs activity in

13  due diligence after this memo and after

14  your discussion with them?

15      A.    I can't definitively say.

16      Q.    As of the time of the deal

17  signing on March 27th, did you have any

18  further discussions with Goldman, Sachs

19  where they informed you that they had

20  changed their view and now were

21  comfortable with the due diligence?

22      A.    I don't recollect a

23  conversation.

24      Q.    Prior to the signing of the

25  merger agreement, did you or anyone at

191

1                    CHAMBERLAIN

2    Dragon, to your knowledge, ask Goldman,

3    Sachs in effect, before we sign this

4    agreement, are you guys now comfortable

5    with the level of due diligence?

6         A.    I can't remember a specific;

7    before we sign a deal we make sure

8    everybody is satisfied to sign an

9    agreement.

10        Q.    Would that everybody include

11   Goldman, Sachs?

12        A.    It would be the team members,

13   yes.

14        Q.    Whatever your common practice

15   is, do you specifically know or recall

16   that in fact that discussion with Goldman,

17   Sachs was had and that they said yes, we

18   are now satisfied?

19        A.    I did not.

20        Q.    One of the items that they list

21   here, paragraph 4, "review of

22   related-party transactions," and they

23   identify some, "especially where LIGHT

24   buys or sells goods or services from

25   companies or affiliates of shareholders or

192

CHAMBERLAIN

1

2    directors."

3            You testified earlier about

4    your walk-through meeting with Joe

5    Lernout, I don't want to go through that

6    again.

7            Other than that discussion with

8    him, what steps, to your knowledge, were

9    taken either by Dragon, Goldman, Sachs, or

10   your accountants, if any, to further do

11   due diligence and review of these

12   related-party transactions?

13       A.    I couldn't answer that

14   definitively.

15           We asked for a list of

16   related-party transactions.

17       Q.    You had testified earlier about

18   either a letter or some kind of memo that

19   you wrote to Goldman, Sachs.

20       A.    Yes.

21       Q.    What is your recollection of

22   what that memo or letter was, what did it

23   say?

24       A.    It listed the items that I

25   wanted Goldman, Sachs to get going on.

193

CHAMBERLAIN

1

2    Q.    Is that one of the exhibits I

3    walked you through before?

4    A.    Yes.

5    Q.    That's the document you were

6    referring to?

7    A.    Yes.

8    Q.    Did you discuss this memo with

9    Janet Baker?

10    A.    I said I didn't have a specific

11    recollection of discussing it with Janet

12    Baker.

13    Q.    Was Janet Baker also involved

14    in dealing with Goldman, Sachs throughout

15    this process?

16    A.    She was part of the team that

17    was working on the merger.

18    Q.    Did she ever express to you any

19    discomfort she had with Goldman, Sachs'

20    work?

21    MS. DYER:  Object to the form.

22    A.    She was not happy with Goldman,

23    Sachs, she wasn't happy specifically with

24    Rich Wayner.

25    Q.    What did she say?

194

CHAMBERLAIN

1

2        A.    I can't say a specific

3    statement.

4        Q.    When in the process did she say

5    that?

6        A.    I can't tell you when she said

7    she was unhappy with him.

8        Q.    Was it before or after the

9    signing?

10           MR. JOSEPH:  Before March 27th?

11           MR. ZIMMERMAN:    Before March

12    27th, thank you.

13        A.    Yes, before March 27th.

14        Q.    Was there ever any discussion

15    that you participated in with regard to

16    the possibility of getting a different

17    financial advisor for this transaction?

18           MR. JOSEPH:  Are you talking

19    about different person at Goldman, Sachs

20    or different advisor altogether?

21           MR. ZIMMERMAN:    Let's start

22    with a different person at Goldman, Sachs.

23           MR. JOSEPH:  Asked and

24    answered.

25        A.    Yes, there was a different

1                    CHAMBERLAIN

2    individual that came on the team during

3    the process.

4         Q.    Yes, you did answer that.

5              Who was that individual?

6         A.    I would have to look at what

7    his name was.

8              MR. JOSEPH:   Chris Fine is the

9    testimony.

10        Q.    Was he above or below Rich?

11        A.    He was below --  I'm sorry, I

12   don't know, he was an IT specialist, he

13   was familiar with technology.

14        Q.    Don't give me an exact date

15   unless you can, which would be great;

16   about when did he come onboard?

17        A.    I can't tell you that.

18        Q.    After he came onboard, did your

19   level of satisfaction increase?

20        A.    No.

21        Q.    Was there ever any discussion

22   that you participated in about the

23   possibility of getting a different

24   financial advisor, different firm?

25        A.    After we had hired Goldman,

196

CHAMBERLAIN

1

2  Sachs?

3       Q.    Correct.

4       A.    No.

5       Q.    Did that thought ever cross

6  your mind?

7       A.    I would probably have to look

8  at the engagement letter, but I don't

9  think we could have.

10      Q.    Why is that?

11      A.    Because I think there is a

12  period of time that you have to go where

13  there might be something as there is in

14  letters of engagement, that you can't.

15      Q.    Given this letter and your

16  testimony about your concerns and Don's

17  and Janet's, was there ever any

18  consideration or thought to not signing

19  the deal as of March 27th and waiting or

20  just doing something else other than the

21  deal?

22            MR. JOSEPH:  Objection to form.

23            You can answer it.

24      A.    Did we think not to do the deal

25  because of Goldman, Sachs, no.

197

CHAMBERLAIN

1

2     Q.     Did you have any similar

3     concerns with the work that Arthur

4     Andersen was doing for Dragon in

5     connection with due diligence?

6     A.     I had no concerns with Arthur

7     Andersen.

8     Q.     In your other, whatever the

9     number was, ten or 15 M&A transactions at

10    Seagate, in instances where Seagate did

11    have investment bankers helping them, have

12    you ever received a similar type memo or

13    letter from one of your financial

14    advisers?

15            MR. JOSEPH:  Objection to form.

16            You can answer.

17    A.     I don't know if I would have

18    been privy to that information.

19            The CEO of Seagate Technology

20    was an investment banker, it is possible

21    that he received things and other

22    management people took care of things.

23            I am aware of none, but I can't

24    say definitively.

25    Q.     You testified earlier as to

198

1                    CHAMBERLAIN

2    what Arthur Andersen's role in all this

3    was.

4                    After you received this memo

5    from Goldman, Sachs suggesting more

6    accounting due diligence, did Arthur

7    Andersen's role expand?

8                    MR. JOSEPH:   I will object to

9    the characterization of what this letter

10   is.

11                   You can answer the question.

12        A.    No.

13        Q.    Did you ever have any

14   discussions with SG Cowen about your views

15   of Goldman, Sachs' work?

16        A.    No, none that I recollect.

17        Q.    I meant whether you said

18   anything to them or they said anything to

19   you about Goldman, Sachs' work.

20        A.    No recollection.

21                   MR. ZIMMERMAN:    Mark that as

22   Exhibit 19 for identification, Bates Nos.

23   TRA 00391 through 409.

24                   (Cowen Exhibit 19, Bates Nos. TRA

25   00391 through 409, was marked for

199

1                    CHAMBERLAIN

2      identification, as of this date.)

3                 (Witness perusing document.)

4         Q.    Have you ever seen Exhibit 19

5      before?

6         A.    I don't have a specific memory.

7         Q.    It indicates that on March 28th

8      Allan Forsey sent to you additional

9      marketing information in the Far East.

10                Is that something that you had

11     requested of him?

12        A.    I'm sure it must have been.

13        Q.    We had gone over before that

14     one of the questions on the due diligence

15     list for Goldman, Sachs was the $122

16     million projection for Korea and you said

17     you wanted information on that.

18                Do you know whether this

19     information was in response to the request

20     on that?

21        A.    On glancing through it, it

22     would not be the type of information that

23     I was looking for.

24                A generalization of four bullet

25     points wouldn't give me a lot of comfort.

200

CHAMBERLAIN

1

2       Q.      Do you know whether you ever

3   got whatever information on that topic it

4   was that you were looking for?

5       A.      I do not.

6       Q.      If you look at 0395, it talks

7   about explosive market growth of I&C in

8   Korea.

9               Do you know what I&C stands

10  for?

11      A.      I don't.

12      Q.      Did you have any view or

13  understanding of the Korean market in I&C

14  or what this was referring to?

15      A.      If I did at the time, I don't

16  know.

17      Q.      Go to 00408, it identifies four

18  "strategic business partners."

19              Do you know what this is?

20              (Witness perusing document.)

21      A.      I guess a listing of strategic

22  business partners.

23      Q.      Do you know whether you,

24  Dragon, or Goldman, Sachs, or anybody else

25  did any due diligence into who these

201

1                    CHAMBERLAIN

2    partners were and what the nature of their

3    relationships were with L&H?

4         A.    I would have no knowledge if

5    they did.

6         Q.    Did you see any need to do any

7    of that type of due diligence?

8              MR. JOSEPH:    I believe this was

9    asked and answered earlier, but you may

10   answer.

11        A.    On this particular slide?

12        Q.    I am going to withdraw this

13   question, which I asked before, and I am

14   getting confirmation of it, I don't need

15   to do it again.

16             If you would look at the last

17   page of this document, you have

18   "Technologies and Solution revenues" and

19   if you look at the columns, it says "total

20   2000," then it looks like "original 1999,"

21   I can't read that.

22             Do you have any understanding

23   of what this page is supposed to

24   represent?

25        A.    It is one of the lines of

202

CHAMBERLAIN

1

2  businesses that Lernout & Hauspie had

3  called Technologies and Solutions and it

4  is a projection of what appears they are

5  going to do for the year 2000 as opposed

6  to -- I can't read those numbers, as

7  opposed to something else on the right.

8       Q.    Is this referring to business

9  in Korea or something else?

10      A.    It is referring to the whole

11 Technology and Solution is going to get

12 the revenues that would come from lots of

13 places.

14            MR. ZIMMERMAN:    Mark as

15 Exhibit 20 for identification Bates Nos.

16 BAKE 011626 through 631.

17            (Cowen Exhibit 20, Bates Nos. BAKE

18 011626 through 631, was marked for

19 identification, as of this date.)

20            MR. JOSEPH:  This was

21 Chamberlain 8 yesterday.

22      Q.    Do you recall attending the

23 March 27th meeting at which the merger

24 agreement with L&H was approved?

25      A.    I believe I answered this

203

CHAMBERLAIN

1

2    question yesterday and I have today; I

3    don't have recollection of one board

4    meeting different from the next board

5    meeting on the specifics.

6        Q.    Well, the deal was approved,

7    right, this was a significant --

8        A.    Yes, the deal was approved.

9        Q.    And whatever date it was, you

10   attended a meeting where that happened,

11   right?

12       A.    Yes.

13       Q.    If you turn to page 2 of these

14   minutes, the third paragraph, third line,

15   "Mr. Wayner discussed the transaction with

16   Lernout."

17            What did he say, or let me go

18   back for a minute.

19            How long was his presentation?

20       A.    I don't know.

21       Q.    What did he say?

22       A.    I don't have a specific

23   recollection of what Mr. Wayner talked

24   about.

25       Q.    Do you remember anything he

204

CHAMBERLAIN

1

2    said about the deal?

3        A.    I don't.

4        Q.    It indicates he emphasized --

5    that the Goldman, Sachs representatives

6    emphasized that they were not expressing

7    the opinion of Goldman, Sachs.

8            Do you remember him saying

9    that, or whoever from Goldman, Sachs

10   saying that?

11       A.    I don't expressly or

12   definitively remember that.

13       Q.    Did any directors at the

14   meeting ask the Goldman, Sachs people any

15   question?

16       A.    I don't know that either.

17       Q.    It indicates that "they," being

18   Goldman, Sachs, "noted that the currency

19   for the merger of the Lernout shares was

20   rather volatile but noted that market

21   conditions in Europe for Lernout were

22   quite favorable."

23            Other than looking at this

24   sentence, do you recall anything they said

25   about the currency being volatile?

205

CHAMBERLAIN

1

2    A.    I do not.

3    Q.    It indicates, "After further

4  discussion among the directors, they then

5  adopted the resolution."

6          How long was the discussion?

7    A.    I don't know that either.

8    Q.    Do you remember having a sense

9  that there was adequate discussion and

10  consideration of this merger at whatever

11  meeting that the merger was approved?

12    A.    I believe there was adequate

13  discussion.

14    Q.    Did Goldman, Sachs get paid its

15  agreed-upon fee after this transaction

16  closed?

17    A.    I do not believe they did.

18    Q.    Was there a discount, was there

19  a haircut, did they not get paid at all,

20  what do you know about that?

21    A.    They got paid, I can't tell you

22  the amounts they got paid.

23          My recollection is they had

24  something within the original letter that

25  wouldn't put a cap on the fees, so as the

206

1                    CHAMBERLAIN

2    stock was continuing to run, they were

3    continuing to get more and more fees.

4              I believe there was negotiation

5    after that to either put a cap or to --

6    on the fee amount.

7        Q.    Was that the reason for putting

8    the cap on the fee as opposed to any

9    dissatisfaction with what they had done?

10       A.    Well, to some degree you equate

11   the dollars that you are paying somebody

12   to the value of the services you're

13   receiving.

14             So I'm sure at some point we

15   had to go back to the table and negotiate

16   for that reason.

17       Q.    Were you a party to those

18   negotiations?

19       A.    I can't recollect whether I was

20   or not or whether I was just involved with

21   Don on the outskirt.

22       Q.    This negotiation occurred after

23   the closing?

24       A.    I don't know when it occurred.

25       Q.    When did you cease being the

207

```
                        CHAMBERLAIN
 1
 2    CFO of Dragon?
 3         A.     We need to confirm the exact
 4    date, but I believe it was May 5th of
 5    2000.
 6         Q.     After the signing, before the
 7    closing?
 8         A.     Correct.
 9         Q.     What were the circumstances,
10    did you resign?
11         A.     Yes.
12         Q.     Why?
13         A.     Because I was there for a
14    two-week assignment that ended up being
15    nine months, it was just time to go.
16              MR. ZIMMERMAN:    Let's take a
17    two-minute break.
18              THE VIDEO TECHNICIAN:  Going
19    off the record at approximately 1:32 p.m..
20              (Recess taken.)
21              THE VIDEO TECHNICIAN:  Back on
22    the record at approximately 1:38 p.m..
23    BY MR. ZIMMERMAN:
24         Q.     Let me show you what has been
25    marked as Exhibit 21 for identification,
```

1                 CHAMBERLAIN

2     TRA 10681 through 83, which is some

3     handwritten notes.

4              (Cowen Exhibit 21, Bates Nos. TRA

5     10681 through 83, was marked for

6     identification, as of this date.)

7         Q.    This is a note that John

8     Shagoury sent to you enclosing the latest

9     documents and notes on Sony, Visteon and

10    Psion.

11             Do you remember getting this?

12             (Witness perusing document.)

13        A.    I don't.

14        Q.    Do you recognize Mr. Shagoury's

15    handwriting?

16        A.    This is Mr. Shagoury's

17    handwriting, yes.

18        Q.    Second page, it says, "Visteon

19    pissed off, we keep adding new conditions

20    or back off on previously agreed terms."

21             Do you remember seeing that?

22        A.    This isn't my handwriting.

23        Q.    Do you know what this is

24    referring to, because apparently it was

25    sent to you?

209

CHAMBERLAIN

1

2      A.      It must have been a document

3 that was -- the status of the Sony,

4 Visteon and Psion talks.

5      Q.      Did you discuss this with him,

6 this concept of Visteon being pissed off

7 for these reasons?

8      A.      I don't remember what the

9 specifics were because I don't have the

10 report, so I don't know.

11      Q.      "What about Sony has brought in

12 reluctantly to 575 value but wants better

13 definition of strategic value."

14      A.      Do you understand these are not

15 my notes and they are not John Shagoury's?

16      Q.      I understand that and I

17 understand also that he sent these to you.

18      A.      Not these notes.

19      Q.      I'm sorry, let's go back to the

20 cover page, I am under a misunderstanding.

21          This cover page, "Per our

22 discussion on Friday, enclosed are the

23 latest document and notes on Sony, Visteon

24 and Psion."

25          You are saying the second page

210

1           CHAMBERLAIN

2    is not what he sent you?

3           A.    Correct.

4           Q.    So you have never seen this

5    page?

6           A.    Correct.

7           Q.    Whether you saw it or not, did

8    you ever hear or have any discussions with

9    anybody about either of the two things on

10   Visteon or Sony that I have just read?

11          A.    We had lots of discussions

12   about Visteon, Sony, Psion, and all the

13   other acquisition candidates that we had

14   targeted.

15          Q.    But specifically with respect

16   to Visteon being pissed off because we

17   keep adding new positions and back off on

18   previously agreed terms?

19          A.    Specific conversations, no.

20          Q.    And specific conversations

21   about Sony wanting better definition of

22   strategic --

23          A.    No.

24          MR. ZIMMERMAN:    Exhibit 22

25   for identification is TRA 1119 through 26.

211

CHAMBERLAIN

1

2          (Cowen Exhibit 22, Bates Nos. TRA

3    1119 through 26, was marked for

4    identification, as of this date.)

5              MR. ZIMMERMAN:    I don't know

6    if this is one document.

7              MR. JOSEPH:  I don't think this

8    was marked.

9          A.    This is a lot of conglomerates

10   of documents.

11         Q.    All I want to focus your

12   attention on is TRA 11123 and at the top

13   it lists your name, September 10, 1999, to

14   Don Waite and Steven Luczo, subject

15   recommendations, and without going through

16   this, is this a document that you

17   prepared?

18         A.    I did.

19         Q.    And you sent them to these

20   gentlemen?

21         A.    I did.

22         Q.    Thank you.

23              MR. ZIMMERMAN:    I am done.

24              MR. JOSEPH:  Do we have any

25   other questions from any other defendant?

212

```
1                    CHAMBERLAIN
2               (No response.)
3               MR. JOSEPH:  I have a few
4    questions for the witness.
5    EXAMINATION BY
6    MR. JOSEPH:
7          Q.   Ms. Chamberlain, I am going to
8    ask you a few questions, I am going to ask
9    you to direct your answers to the jury,
10   which in this case means directing them
11   down to the camera, which I know is
12   difficult, but please do your best.
13         A.    Okay.
14         Q.    I am going to show you what was
15   shown you earlier as Cowen Exhibit No. 2,
16   which is consolidated financial statements
17   signed by Arthur Andersen on the second
18   page of the document.
19              Do you recognize this document?
20              (Witness perusing document.)
21         A.    I do.
22         Q.    You yourself in a prior life
23   were a certified public accountant,
24   correct?
25         A.    That's correct.
```

213

CHAMBERLAIN

1

2      Q.      And you worked for what is now

3  Ernst & Young in one of its large

4  predecessor firms?

5      A.      That's correct.

6      Q.      Was it seven years you worked

7  as an auditor?

8      A.      Five years.

9      Q.      And seven years at the firm?

10     A.      No, five to six years for Ernst

11  & Whinney, Ernst & Young.

12     Q.      Ernst and whatever the Ernst

13  entity was in those days?

14     A.      Yes.

15     Q.      Can you tell the jury what a

16  clean or unqualified opinion from an

17  auditor is.

18     A.      To summarize, that the

19  financial statements would not be

20  misleading to a reader in material

21  aspects, that there are no issues of

22  materiality or that they couldn't get

23  comfortable with in issuing a qualified

24  opinion, that the company would go forward

25  in the future.

214

1                    CHAMBERLAIN

2       Q.    When you say the company would

3    go forward in the future, does that relate

4    to a concept known as a going concern?

5       A.    Yes.

6             A going concern is one of the

7    opinions that an auditing firm could give;

8    they could give a clean opinion, which

9    this is, a qualified opinion with their

10   exceptions, or a going concern opinion.

11      Q.    You were asked questions about

12   insolvency.

13            If an auditor believed that a

14   company like Dragon was insolvent and not

15   a going concern, could it properly issue a

16   clean opinion like the one before you in

17   Exhibit 2?

18      A.    No, they couldn't.

19      Q.    Just because a company is not

20   profitable at a given point in time, does

21   that mean it does not have value?

22      A.    Because a company is not

23   profitable does not indicate that it

24   doesn't have value.

25      Q.    Can you give an example to the

215

                    CHAMBERLAIN
1
2    jury of that.

3        A.      Amazon.com had a long history

4    of operating losses, it is an extremely

5    valuable company today.

6        Q.      You testified earlier you were

7    chief financial officer at Seagate

8    Software at one point in your career,

9    correct?

10       A.      Yes.

11       Q.      Approximately how much did

12   Seagate Software invest in acquiring other

13   software companies in round numbers?

14       A.      We put it at somewhere between

15   375 to 400 million.

16       Q.      Were all of those companies

17   profitable at the time that Seagate

18   Software acquired them?

19       A.      No.

20       Q.      Ultimately do you know what the

21   value of Seagate Software was as realized

22   in the Veritas merger with Seagate?

23       A.      That was not all of Seagate

24   Software, still portions of Seagate

25   Software remained after the Veritas

216

                    CHAMBERLAIN

1

2   transaction.

3        Q.    But just that portion of

4   Seagate Software that was reflected in the

5   Veritas merger, what was the ultimate

6   value of that in the year 2000?

7        A.    It went from approximately 1.8

8   billion when we signed to 3 billion at one

9   time, depending upon what the stock price

10  of Veritas was.

11       Q.    Is there a reason why software

12  or other tech companies are acquired,

13  apart from whether or not they are showing

14  a profit at a particular point in time?

15       A.    There is a lot of reasons

16  companies are acquired.

17            Each company is acquired for a

18  different reason, it can be their

19  technology, a certain part of their

20  product line a company needs, they might

21  even buy a company for its distribution

22  channel.

23            Each deal is different, it is

24  not based upon financials as one aspect.

25       Q.    You were earlier shown Cowen

217

CHAMBERLAIN

1

2  Exhibit No. 7, which were a series of

3  notes that included on page BAKE 009900 a

4  presentation made by Roel Pieper which

5  appeared to be on or about March 27, 2000.

6           Do you remember seeing that

7  exhibit?

8       A.    I do.

9           MR. ZIMMERMAN:    What page?

10           MR. JOSEPH:  Page BAKE 009900.

11       Q.    At the top of the page it has

12  "II, Presentation Roel Pieper 30 Minutes."

13           Do you recall Mr. Pieper was a

14  member of the board at Lernout & Hauspie?

15       A.    I do.

16       Q.    Roel states that "L&H is

17  acquiring Dragon both for our technology

18  and for our people."

19           Is that your understanding of

20  the basis of the transaction as Lernout &

21  Hauspie articulated it at that time?

22       A.    That was certainly one of the

23  reasons.

24       Q.    You were shown Cowen Exhibit 3

25  earlier, which is a compilation of a

218

1                        CHAMBERLAIN

2    variety of things and I would like to

3    direct your attention to page 027055.

4        A.    Yes.

5        Q.    You see at the top it says

6    "market data, Lehman Brothers."

7              Who is Lehman Brothers?

8        A.    At that time one of the

9    investment banking houses.

10       Q.    One of the largest investment

11   banking houses in the country, is that

12   right?

13       A.    Yes.

14       Q.    It says as a bullet point

15   "voice recognition market is in its

16   nascent stages."

17             What did you understand that to

18   mean, its nascent stages?

19       A.    Infancy.

20       Q.    "And a CAGR of 70 percent is

21   predicted for the next several years."

22             What does CAGR in professional

23   financial parlance stand for?

24       A.    Aggregate growth rate.

25       Q.    Compounded annual growth rate?

219

1              CHAMBERLAIN

2        A.      Yes, compounded annual growth

3   rate of 70 percent for the next few years.

4        Q.      This is saying that voice

5   recognition market is in its nascent

6   stages or infancy and a compounded annual

7   growth rate of 70 percent is predicted for

8   the next several years?

9        A.      Yes.

10       Q.      Was that the market that Dragon

11  was in?

12       A.      Yes.

13       Q.      Can you just explain to the

14  jury what a compounded annual growth rate

15  of 70 percent means?

16       A.      I would take that that its

17  earnings, revenue, or earnings would grow

18  by 70 percent a year compounded, obviously

19  there is a multiple of next year, it would

20  be the larger, the next several years.

21              For me that would be three to

22  five.

23       Q.      Just so the jury can

24  understand, does that mean if you have

25  revenue of $100 in one year, the predicted

220

1                      CHAMBERLAIN

2    revenue would be $170 in the next year?

3         A.      Right.

4         Q.      And then it would be $170 plus

5    70 percent of that the following year?

6         A.      Correct.

7         Q.      The next thing it says "turn

8    systems, speech recognition software

9    industry is now in approximately $250

10   million business and could climb to $1

11   billion by 2002."

12              Do you see that?

13        A.      Yes.

14        Q.      It then refers to "Data Quest."

15              Do you know who Data Quest is?

16        A.      Yes.

17        Q.      Who is Data Quest?

18        A.      Data Quest Partner Group were

19   all people that determine what market

20   share are for particular industries and

21   they usually give opinions about what

22   growth rates could be.

23        Q.      It says "estimated market size

24   was derived from various data and provided

25   to Alabama for the PC speech business

221

CHAMBERLAIN

1

2   plan."

3              Is that data, if you recall,

4   that Dragon had provided to Visteon in

5   connection with a possible transaction?

6        A.    I am not sure whether the

7   Dragon folk did it or they got it

8   themselves.

9        Q.    Take a look at Exhibit 4, which

10  is another exhibit that counsel showed you

11  earlier, which I believe you testified was

12  a Goldman, Sachs-prepared document.

13       A.    Yes.

14       Q.    Just glance at page 8920.

15             (Witness perusing document.)

16       Q.    Am I correct in reading this

17  that the range of values that Goldman,

18  Sachs was indicating on this page at the

19  top of the page, if Lernout & Hauspie were

20  to acquire Dragon, ranged from between 550

21  and $650 million?

22       A.    That's correct.

23       Q.    And would you tell the jury, is

24  that a value of Dragon we are talking

25  about?

222

CHAMBERLAIN

1

2    A.    That's a value of Dragon.

3    Q.    Counsel showed you another

4 exhibit, Exhibit 5, and walked through

5 various problems that were set forth in

6 this early meeting in November 4 and 5,

7 early in your tenure, a meeting that was

8 put together by your former firm, Ernst &

9 Young.

10    A.    Yes.

11    Q.    In your view, in your tenure at

12 that company, were the problems that you

13 had identified before that date and the

14 problems identified in that report fixable

15 problems?

16    A.    Most of the problems that are

17 in here are ones that companies face, a

18 lot of companies face, and people are

19 brought in to change those, to turn the

20 company around.

21    Q.    Were any people brought in to

22 turn those and turn the company around in

23 Dragon's case?

24    A.    I would say they brought Don

25 and I in there to do that.

223

1          CHAMBERLAIN

2     Q.    Notwithstanding everything we

3 heard for the last several hours about

4 issues at Dragon, is it your understanding

5 that SG Cowen, Mr. Zimmerman's client,

6 gave a fairness opinion that the value of

7 Dragon exceeded $500 million in March of

8 2000?

9     A.    I knew they gave a fairness

10 opinion.

11     Q.    Prior to that time had you or

12 Dragon provided to SG Cowen and Lernout &

13 Hauspie all the financial information, all

14 board minutes, anything else that they

15 asked for, to the best of your ability?

16     A.    To my knowledge, we gave them

17 everything that they asked for.

18     Q.    Last question; to your

19 knowledge, did the problems at Lernout &

20 Hauspie have anything to do with the

21 failure of having an integration committee

22 set up and functioning prior to the merger

23 closing between Dragon and Lernout &

24 Hauspie?

25     A.    No.

224

1                   CHAMBERLAIN

2              MR. ZIMMERMAN:    Objection as

3    to form.

4              MR. JOSEPH:  I have nothing

5    further.

6              THE VIDEO TECHNICIAN:  Going

7    off the record at approximately 1:55 p.m..

8              This is the end of Tape No. 3.

9              (Time noted: 1:55 p.m.)

10

11

12

13

14         _____

15              ELLEN CHAMBERLAIN

16

17   Subscribed and sworn to before me

18   this       day of             , 2004.

19

20

21

22

23

24

25

225

1

2                      C E R T I F I C A T I O N

3

4

5

6          I, Jineen Pavesi, a Registered

7    Professional Reporter, Registered Merit

8    Reporter, Certified Realtime Reporter and

9    a Notary Public, do hereby certify that

10   the foregoing witness, ELLEN CHAMBERLAIN,

11   was duly sworn on the date indicated, and

12   that the foregoing is a true and accurate

13   transcription of my stenographic notes.

14          I further certify that I am not

15   employed by nor related to any party to

16   this action.

17

18

19

20

21

22          *Jineen Pavesi, RPR, RMR*

23        JINEEN PAVESI, RPR, RMR, CRR

24

25

226

1

2                            E X H I B I T S

3

4     Cowen

5     EXHIBIT          DESCRIPTION                    PAGE

6     1, Bates Nos. BAKE 026485 through 026508

7     . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18:24

8     2, Bates Nos. BAKE 011034 through 011074

9     . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44:18

10    3, Bates Nos. BAKE 027043 through 027110

11    . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47:9

12    4, Bates Nos. BAKE 008901 through 8932...

13    . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62:15

14    5, Bates Nos. BAKE 008339 to 8415... 78:4

15    6, Bates Nos. SGC 012120 through 12135...

16    . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96:20

17    7, Bates Nos. BAKE 009895 through 9907...

18    . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116:3

19    8, Bates Nos. BAKE 004457 to 4464........

20    . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132:12

21    9, Bates Nos. BAKE 009646 to 9648........

22    . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138:24

23    10, Bates Nos. BAKE 022771-772.... 151:19

24

25

227

E X H I B I T S (Continued):

Cowen

EXHIBIT        DESCRIPTION                    PAGE

11, Bates Nos. BAKE 026289 through 91....
.................................... 157:13

12, Bates No. BAKE 022255......... 160:4

13, Bates Nos. BAKE 011565 through 66....
.................................... 161:5

14, Bates Nos. BAKE 011576 through 77....
.................................... 166:11

15, Bates Nos. BAKE 023115 through 117...
.................................... 169:13

16, Bates Nos. BAKE 009891 through 94....
.................................... 174:22

17, Bates No. GS 002233........... 176:3

18, Bates Nos. GS 004388 through 89......
.................................... 180:14

19, Bates Nos. TRA 00391 through 409.....
.................................... 198:24

20, Bates Nos. BAKE 011626 through 631...
.................................... 202:17

228

1

2                    E X H I B I T S (Continued):

3

4    Cowen

5    EXHIBIT        DESCRIPTION              PAGE

6    21, Bates Nos. TRA 10681 through 83......

7    ................................... 208:4

8    22, Bates Nos. TRA 1119 through 26.......

9    ................................... 211:2

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

229

1

2                 LITIGATION SUPPORT INDEX

3

4

5        DIRECTION TO WITNESS NOT TO ANSWER

6        Page            Line            Page            Line

7    (NONE)

8

9

10

11

12

13        REQUEST FOR PRODUCTION OF DOCUMENTS

14        Page            Line            Page            Line

15    (NONE)

16

17

18

19

20            INFORMATION TO BE FURNISHED

21        Page            Line            Page            Line

22    (NONE)

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE LERNOUT & HAUSPIE SECURITIES
LITIGATION,

CA No. 00-11589-PBS

THIS DOCUMENT RELATES TO ALL CASES·

## ACKNOWLEDGEMENT AND ERRATA

STATE OF OREGON  )
        ) ss:
COUNTY OF LANE   )

ELLEN CHAMBERLAIN being duly sworn deposes and says:

I have read the transcript of testimony taken under oath in my deposition of

January 21, 2004 in connection with the above-captioned litigation and related cases.  To

the best of my recollection the transcript is true, complete and correct record of what was

asked, answered and said during my deposition.  I hereby certify that the answers on the

record as given by me are true and correct.

_____
Ellen Chamberlain

Subscribed and sworn to before me this
19 day of March 2004

_____
Notary Public

OFFICIAL SEAL
CHARLENE CARTER
NOTARY PUBLIC-OREGON
COMMISSION NO. 361936
MY COMMISSION EXPIRES OCT 27 2005