EXHIBIT F

DONALD L. WAITE

Page 1

1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3

       _____
4                                       )

       IN RE LERNOUT & HAUSPIE          )   No. 00-CV-11589-PBS
5      SECURITIES LITIGATION            )
                                        )
6      _____ )

7

8

              VIDEOTAPE DEPOSITION OF DONALD L. WAITE
9

10     ----------------------------------------------------------

11                        March 12, 2004

12

13

14

15      Reported by Darlene S. Traficante, RPR, CSR No. 12774

16                 LegaLink Job No. 2001-346001

17

18

19

20

21

22

23

24

25

DONALD L. WAITE

Page 2

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3

   _____

4                                   )

   IN RE LERNOUT & HAUSPIE          )   No. 00-CV-11589-PBS

5  SECURITIES LITIGATION            )

                                    )

6  _____)

7

8

9

10                          --oOo--

11         BE IT REMEMBERED that, pursuant to Notice, and on

12  Friday, March 12, 2004, commencing at the hour of 9:07

13  a.m., at McDermott Will and Emery, 3150 Porter Drive, Palo

14  Alto, California, before me, DARLENE S. TRAFICANTE, a

15  Certified Shorthand Reporter, License No. 12774, State of

16  California, personally appeared

17                       DONALD L. WAITE

18  called as a witness, having been first duly sworn, was

19  examined and testified as follows:

20

21

22

23

24

25

DONALD L. WAITE

Page 3

```
 1    Appearances:
 2            For the Plaintiffs, Filler & Perlman as Trustees
                   of TRA Rights Trust:
 3
                   GREGORY P. JOSEPH LAW OFFICES LLC
 4                 By:  Gregory P. Joseph, Esq.
                   805 Third Avenue, 31st Floor
 5                 New York, NY 10022
                   212-407-1210
 6
              For the SG Cowen:
 7
                   SKADDEN ARPS SLATE MEAGHER & FLOM LLP
 8                 By:  Jonathan Frank, Esq.
                   Four Times Square
 9                 New York, NY 10036
                   212-735-3000
10
              For James & Janet Baker:
11
                   REED SMITH
12                 By:  Alan Cotler, Esq.
                   One Liberty Place
13                 Philadelphia, PA 19103
                   215-241-7905
14
              For KPMG, LLP:
15
                   DAVID POLK & WARDWELL
16                 By:  Sean Knowles, Esq.
                   450 Lexington Avenue
17                 New York, NY 10017
                   212-450-4000
18
      Appearance Via Telephone:
19
              For SG Cowen:
20
                   SKADDEN ARPS SLATE MEAGHER & FLOM LLP
21                 By:  Mark Lebovitch, Esq.
                   Four Times Square
22                 New York, NY 10036
                   212-735-3000
23
24
25
```

DONALD L. WAITE

Page 4

```
 1    Appearances Via Telephone (Continued):
 2           For Bamberg Roth:
 3                  WILLCOX PIROZZOLO and McCARTHY
                    By:  James Nicklaus, Esq.
 4                  50 Federal Street
                    Boston, Massachusetts 02110
 5                  617-482-5470
 6           For Gaston Bastiaens:
 7                  CRAIG and MACAULEY
                    By:  Daniel C. Reiser, Esq.
 8                  Federal Reserve Plaza
                    600 Atlantic Ave.
 9                  Boston, Massachusetts 02210
                    617-367-9500
10
             For Pol Hauspie, Nico Willaert:
11
                    MORRISON COHEN SINGER & WEINSTEIN, LLP
12                  By:  Jay R. Speyer, Esq.
                    750 Lexington Avenue
13                  New York, NY 10022
                    212-735-8600
14
             For Jozef Lernout:
15
                    GOODWIN PROCTER LLP
16                  Irada J. Alvarez, Esq.
                    Exchange Place
17                  Boston, Massachusetts 02109
                    617-570-1000
18
19
             Also Present:
20
                    Ted Hoppe, Videographer
21
22
23
24
25
```

DONALD L. WAITE

Page 5

```
 1                        I N D E X
 2   WITNESS:  DONALD WAITE
 3   EXAMINATION                                      PAGE
 4   By Mr. Frank                                       7
     By Mr. Knowles                                   104
 5   By Mr. Joseph                                    135
     By Mr. Cotler                                    147
 6   By Ms. Alvarez                                   151
 7
              EXHIBITS MARKED FOR IDENTIFICATION
 8
     EXHIBIT                                         MARKED
 9
     Exhibit 1     TRA 11131 - TRA 11141               20
10
     Exhibit 2     10/5/99 Board Meeting of
11                 Dragon Systems, Inc.                27
12   Exhibit 3     GS 002726 - GS 002733              44
13   Exhibit 4     TRA 13210 - TRA 13212              52
14   Exhibit 5     TRA 12874 - TRA 12875              59
15   Exhibit 6     Project Dictator Evaluation Book   63
16   Exhibit 7     BEVe 36437, BRN 50980, and
                   Misc. e-mail from Ben Howe, 3/13/00  70
17
     Exhibit 8     DNV-008532                          71
18
     Exhibit 9     E-mail and attachments from Chris
19                 Zook, 3/7/00                        77
20   Exhibit 10    Dragon Systems, Inc.'s Board of
                   Directors Meeting, 3/27/00          85
21
     Exhibit 11    Notice of Dismissal                123
22
     Exhibit 12    TRA 10715 and TRA 10714            125
23
     Exhibit 13    TRA 10231 - TRA 10232              128
24
25
                        *    *    *
```

DONALD L. WAITE

Page 6

1    PALO ALTO, CALIFORNIA; FRIDAY, MARCH 12, 2004; 9:07 A.M.

2

3              THE VIDEOGRAPHER:  Here begins videotape

4    number one in the deposition of Donald Waite in the

5    matter -- in regards to Lernout and Hauspie Securities

6    Litigation in the US District Court, District of

7    Massachusetts.  Case No. 00-CV-11589-PBS.

8              Today's date is March 12, 2004.  The time on

9    the video monitor is 9:07.  The video operator today is

10   Ted Hoppe, a notary public, contracted by LegaLink Video

11   Solutions, San Francisco, California.

12             This deposition is taking place at 3150

13   Porter Drive, Palo Alto, California.

14             Counsel, could you please voice identify

15   yourselves and state who you represent.

16             MR. JOSEPH:  Gregory Joseph on behalf of the

17   witness, and the Filler plaintiffs.

18             And Ted, before we get started, I want to

19   see the monitor just to see what the shot is.

20             THE VIDEOGRAPHER:  Okay.

21             MR. FRANK:  Jonathan Frank from Skadden Arps

22   representing SG Cowen.

23             MR. KNOWLES:  Sean Knowles from Davis Polk &

24   Wardwell representing KPMG LLP.

25             MR. COTLER:  Alan Cotler from Reed Smith,

DONALD L. WAITE

 1   representing plaintiffs, James and Janet Baker.

 2               MR. JOSEPH:  And the telephone appearances?

 3               MR. LEBOVITCH:  Marc Lebovitch of Skadden

 4   Arps.

 5               MR. SPEYER:  Jay Speyer, Morrison Cohen

 6   Singer & Weinstein on behalf of Pol Hauspie and Nico

 7   Willaert.

 8               MR. REISER:  Daniel Reiser, Craig and

 9   Macauley, Professional Corporation, in Boston on behalf of

10   Gaston Bastiaens.

11               MR. NICKLAUS:  James Nicklaus, Willcox

12   Pirozzolo and McCarthy, Boston, Massachusetts, on behalf

13   of the Bamberg Roth plaintiffs.

14               THE VIDEOGRAPHER:  The court reporter today

15   is Darlene Traficante of LegaLink.  Darlene, could you

16   please swear the witness in.

17   ------------------------------------------------------------

18                     DONALD L. WAITE,

19                  being first duly sworn,

20            was examined and testified as follows:

21

22                     EXAMINATION

23   BY MR. FRANK:

24        Q     Good morning, Mr. Waite.  I'm Jonathan

25   Frank.  Have you been deposed before, sir?

DONALD L. WAITE

Page 8

1     A     Yes, I have.

2     Q     Briefly, I'm going to ask you questions, the

3  subject matter I'm sure you're familiar with generally.

4  And I will understand -- I will take it that you

5  understand my question fully if you've given an answer to

6  it.  And if you don't understand it please feel free to

7  ask me to explain or rephrase it, however.

8          MR. FRANK:  I would also note on the record

9  that one objection by any attorney shall count as an

10  objection for all.  That all objections are reserved to

11  trial except those as to form and privilege.

12          And I think that covers the ground rules.

13  BY MR. FRANK:

14     Q     Are you presently working, sir?

15     A     I am.

16     Q     Where?

17     A     Seagate Technology.

18     Q     What is your position there?

19     A     I'm executive vice president and chief

20  administrative officer.

21     Q     How long have you held that position at

22  Seagate?

23     A     Approximately seven years.

24     Q     Can you just briefly give me some background

25  on your education, college and/or graduate degrees.

DONALD L. WAITE

Page 9

1        A        I have an undergraduate degree from

2   Creighton University in Omaha, Nebraska.   And a law degree

3   from Georgetown University in Washington, D.C.

4        Q        After you completed law school where did you

5   go to be employed?

6        A        I went to work at Arthur Andersen in Kansas

7   City, Missouri.

8        Q        In what position?

9        A        I started as an auditor on their audit

10  staff.

11       Q        Did you have a CPA at that time?

12                MR. JOSEPH:  At the time he started?

13                MR. FRANK:  At the time he started.

14                THE WITNESS:  I believe I did.

15  BY MR. FRANK:

16       Q        How long did you work there?

17       A        Seven years.  Approximately seven years.

18       Q        Approximately from when to when, sir?

19       A        From roughly September 1959 to December of

20  1965.

21       Q        What did you do after that, professionally?

22       A        I went to work at Bell & Howell Company in

23  Chicago, Illinois.

24       Q        For how long?

25       A        I worked for Bell & Howell for approximately

DONALD L. WAITE

Page 10

```
 1   12 years.
 2          Q       And what was your last position there?
 3          A       I believe I was the vice president for
 4   international operations.
 5          Q       And following that?
 6          A       I went to work for Fedders Corporation in
 7   Edison, New Jersey.
 8          Q       The air conditioner people?
 9          A       The air conditioning people.
10          Q       And what was your position there?
11          A       I was the chief financial officer.
12          Q       For how long did you hold that position?
13          A       Approximately 14 months.
14          Q       And then where did you go?
15          A       I was self-employed for the next, roughly,
16   ten months.
17          Q       And following that?
18          A       I went to work at Memorex Corporation in
19   Santa Clara, California.
20          Q       What position did you hold at Memorex?
21          A       Chief financial officer.
22          Q       Following your tenure at Memorex?
23          A       I went to Measurex Corporation in Cupertino,
24   California.
25          Q       And the position there?
```

DONALD L. WAITE

Page 11

1        A        Chief financial officer.

2        Q        And after that?

3        A        I went to work at Osborn Computers here in

4    California, I forget the town, Hayward, I believe.

5        Q        Your position?

6        A        Chief financial officer.

7        Q        And after that?

8        A        I joined Seagate Technology.

9        Q        And what was your starting position there?

10       A        I was the vice president and chief financial

11   officer.

12       Q        Did there come a time when -- well, when was

13   it that you moved from chief financial officer to chief

14   administrative officer?

15       A        Approximately 1996 or '97.

16       Q        Now, obviously you've had a background in

17   finance.  Have you had a background in technology?

18       A        The companies that I work for certainly

19   involved in technology.  I do not have, by training, a

20   background in technology.

21       Q        Did you have any experience in mergers and

22   acquisitions through your career?

23       A        Yes.

24       Q        Can you just briefly describe approximately

25   how many transactions in mergers or acquisitions have you

DONALD L. WAITE

Page 12

1    been involved?

2         A       Probably 30 or 40.  Something in that range.

3         Q       Have any or all of those been involved --

4    been -- involved public companies?

5         A       I'm not quite sure what you mean by involve

6    public companies.

7         Q       In any of those transactions were you

8    working on behalf of a public company?  Or a company that

9    was public and their shares were traded publicly at the

10   time?

11        A       Some of the acquisitions certainly involved

12   public companies.

13        Q       Can you just give me, approximately of the

14   30 or so, roughly half?  A third?

15        A       I would be guessing at the number.

16        Q       At least several?

17        A       Several.

18        Q       Now, how did you first become familiar with

19   Dragon Systems, Inc.?

20        A       I was introduced to the Dragon Systems name

21   when Seagate looked at making an investment in them

22   somewhere in the mid '90s.

23        Q       What, if any, role did you have in that

24   decision making process?

25        A       I don't recall exactly what my role was.

DONALD L. WAITE

Page 13

1    But our management would discuss those investments, and as

2    chief financial officer I would have been involved in

3    those discussions.

4            Q       And I take it there came a time when Seagate

5    made an investment in Dragon Systems?

6            A       Yes.

7            Q       Do you recall the nature of that investment,

8    its initial investment?

9            A       I believe it was a monetary investment of

10   several million dollars.

11           Q       Did there come a time -- between the time

12   that Seagate made its first investment and the Summer of

13   1999, did you have any specific involvement with Dragon

14   Systems and Seagate's investment in Dragon Systems?

15           A       Yes.

16           Q       What was that?

17           A       I would occasionally visit Dragon Systems,

18   review what, you know, how they were performing

19   financially.

20           Q       Did you have any other role other than

21   monitoring or reviewing their financial condition?

22           A       Not that I recall.

23           Q       Between 19 -- did that role start in around

24   1996?

25           A       I don't recall the exact time that began.

DONALD L. WAITE

Page 14

1        Q       But you were familiar with, in that role or

2  in that position you were familiar with Dragon's ongoing

3  financial condition?

4        A       Yes.

5        Q       In the beginning, in the Summer of 1999 can

6  you just briefly state your recollection of Dragon's

7  financial condition?

8        A       I don't recall specifically what their

9  financial condition was.  My best recollection is that

10  they were looking at various opportunities to raise

11  additional cash through either an IPO or a further

12  investment by Seagate.

13       Q       Now, did there come a time when Dragon

14  Systems, to your knowledge, attempted or undertook the

15  process of engaging a banker for an IPO?

16       A       My best recollection is -- well, let me back

17  up.

18       Q       Sure.

19       A       What time frame?

20       Q       I believe it would be in the Winter of 1998

21  going in to the Spring of '99.

22       A       The best of my recollection they did do so.

23       Q       And did you follow that process at all?

24       A       I followed it peripherally.

25       Q       Did you become aware of a time when that

DONALD L. WAITE

Page 15

1   process was halted by Dragon Systems?

2        A     Yes.

3        Q     Did you have an understanding as to the

4   reasons why it was stopped?

5        A     I believe at the time that I understood the

6   reasons why it was stopped.  I don't recall today what

7   that reason was.

8        Q     Do you recall at or around that time that

9   Dragon was not hitting its financial performance targets?

10       A     I believe that to be correct.

11       Q     And do you recall that they were losing

12  money?

13       A     When you say losing money, could you

14  define --

15       Q     Sure.  They were -- their cash flow was

16  negative?

17             MR. JOSEPH:  And is this, just so I have it

18  my mind, are we talking in early 1999?

19             MR. FRANK:  Correct, still in the same time

20  period.  At or around the time the IPO --

21             MR. JOSEPH:  Well, you also mentioned late

22  1998, that may be a difference between the two.  I want to

23  make sure he's focused on the right time.

24             THE WITNESS:  Could you repeat the question,

25  please?

DONALD L. WAITE

Page 16

1              MR. FRANK:  Yes.

2    BY MR. FRANK:

3         Q      Did you become aware in the Spring of 1999

4    at or around the time that the IPO was tabled or halted,

5    that Dragon's cash flow was negative?

6         A      That is my recollection.

7         Q      And was it your understanding that that was

8    a reason that the IPO process was stopped?

9         A      That is what I believe to be the case.

10        Q      Were you involved at all in that decision

11   making process?

12        A      No, I was not.

13        Q      Did there come a time in the Summer of 1999

14   that you were asked to, or you undertook to, examine

15   Dragon's financial condition and its management and

16   operations more closely on behalf of Seagate?

17        A      I don't recall being asked to do so in that

18   time frame, but I may have been.

19        Q      Do you recall undertaking to examine the

20   management operations and financial operations of Dragon?

21        A      In --

22        Q      In or about the summer or Fall of 1999?

23        A      Yes.

24        Q      What prompted you to do that?

25        A      I was requested by the management of Seagate

DONALD L. WAITE

Page 17

```
1    to visit with the Dragon management to understand what we

2    might do in the way of, the way of a further investment.

3         Q      Was there --

4              MR. JOSEPH:  I think we just lost the

5    conference call.  Keep going.  I'll just dial it in

6    because I don't want to stop the deposition for guys that

7    didn't bother to show up.

8    BY MR. FRANK:

9         Q      Were you led to believe why it was that

10   Seagate's management wanted this done?  Were you given an

11   understanding?

12        A      There was -- at some point in that time

13   frame there had been input that the Dragon, some members

14   of Dragon management were not happy.  And in fact, were

15   thinking of leaving.

16              (There was a discussion off the record.)

17              MR. JOSEPH:  We are reconnected.  Please

18   listen and don't talk.

19   BY MR. FRANK:

20        Q      Did Dragon's financial condition also play a

21   role in, to your understanding in Seagate management's

22   decision to more closely examine Dragon Systems?

23        A      I don't recall that being a reason.

24        Q      When you say you don't recall, do you mean

25   you don't remember whether it was, or it was not?
```

DONALD L. WAITE

Page 18

1        A        Yes, I don't remember whether it was or was

2    not.

3        Q        What precisely, or to the best of your

4    recollection, did you do with respect to this task?

5        A        My recollection is that I went to Newton and

6    visited with a number of the key management of the

7    company.

8        Q        Newton, was that Dragon's headquarters?

9        A        Yes, it was.

10        Q        And did you go with anyone?

11        A        I don't recall whether Ellen Chamberlain was

12    there at the time, accompanied me at that time, or came

13    later.

14        Q        And just who is Ms. Chamberlain?

15        A        Ellen Chamberlain was the vice president

16    finance for our software operations.  I don't know if she

17    was in that position at this particular time, but that's

18    what she had been was -- had come out of the Seagate

19    financial organization.

20        Q        Did she report to you?

21        A        I don't believe she reported to me at this

22    point in time.

23        Q        What did you do in terms of interviewing

24    Dragon personnel?

25        A        I sat and discussed with them their

DONALD L. WAITE

Page 19

1  concerns, both professionally and about the business.

2       Q       Was that -- did you have one meeting with

3  several people?  Or did you have individual meetings?

4       A       To the best of my recollection I had

5  individual meetings with various people.

6       Q       And to your recollection what did you find

7  out?

8       A       There was unhappiness amongst some of the

9  people over the management style of the then CEO.

10      Q       And who was that, the manager's style they

11 were unhappy with?

12      A       That was Janet Baker.

13      Q       Had you known Ms. Baker at that time?  Did

14 you know her?

15      A       Yes, I did.

16      Q       And had you interacted with her concerning

17 her business?

18              MR. JOSEPH:  Just so we have a point in

19 time, prior to his --

20              MR. FRANK:  Prior to that, yes, sorry.

21              MR. JOSEPH:  Prior to his coming on board to

22 look --

23              MR. FRANK:  Exactly.

24              THE WITNESS:  Yes, I had meetings with

25 Mrs. Baker prior to that time.

DONALD L. WAITE

Page 20

1                    MR. FRANK:  Ask that this be marked as

2      Exhibit 1.

3                    (Deposition Exhibit 1 marked for

4      identification.)

5      BY MR. FRANK:

6           Q      Exhibit 1, cover page is entitled,

7      Interviews During Weeks of 8/29 and 9/5/99.  The Bates

8      stamp number at the bottom of the first page is TRA11131

9      and it continues through TRA11141.

10                   Have you had a chance just to briefly look

11     at this?

12          A      Not yet.

13          Q      Okay.

14                   MR. JOSEPH:  I believe this was previously

15     marked, with one additional page, as Chamberlain Exhibit

16     18.

17     BY MR. FRANK:

18          Q      Have you had a chance to look through that?

19          A      I have.

20          Q      Have you seen this document before?

21          A      I don't recall having seen this document, I

22     may have seen it.

23          Q      Did you participate in interviews during the

24     weeks of August 29 and September 5, 1999 with personnel

25     from Dragon Systems?

DONALD L. WAITE

Page 21

1         A        I may have, I don't remember the dates that

2    I participated in interviews.

3         Q        I'd like to direct your attention to the

4    second page of the document.  Did you know Tamah Rosker

5    who was the VP of human resources and employee benefits?

6         A        I had not known her before visiting Dragon

7    at about this period of time.

8         Q        Did you meet her?

9         A        I did.

10        Q        And do you recall being made aware by her

11   that she felt an issue was, the question of whether Janet

12   Baker was qualified to run the company?

13                 MR. JOSEPH:  I'm not going to prevent him

14   from answering, but I do object to your interrogating him

15   about a document which isn't his, he's never seen before.

16   You're entitled to ask the question you asked, but I

17   believe Ms. Chamberlain has already said these were her

18   notes and she authenticated everything that was in it.

19                 That having been said, I'm not going to stop

20   you.  We'll be here until 2:00 o'clock if we need to be.

21   But go ahead, Mr. Waite.

22   BY MR. FRANK:

23        Q        Do you recall being made aware of that

24   perception of Ms. Rosker's?

25        A        I believe so.

DONALD L. WAITE

1      Q      Do you also recall being made aware through

2  these interviews that there was a problem with employee

3  morale at Dragon Systems?

4              MR. JOSEPH:  I have to object to the form.

5  He hasn't indicated he was aware of these interviews.

6              MR. FRANK:  I'll rephrase it, but in

7  fairness he said he participated in interviews.

8              MR. JOSEPH:  Not these, or maybe not these.

9  But anyway, I don't want to quibble, the record is what

10  the record is.

11  BY MR. FRANK:

12      Q      As a result of the interviews you conducted,

13  and those conducted by Ms. Chamberlain, did you become

14  aware of concerns of employee morale at Dragon Systems?

15      A      I did.

16      Q      And what were those concerns?

17      A      They spread over a fairly wide range of

18  concerns.  They ranged from concern about leadership of

19  the company.  The direction that the company was taking.

20  The fact that decisions would be made and then reversed.

21  Just a variety of different issues depending upon who you

22  were talking to at the time.

23      Q      I believe you mentioned leadership of the

24  company.  What concerns were you made aware of regarding

25  the leadership of the company?

DONALD L. WAITE

Page 23

1        A        At least one, if not more, of the people
2   felt that Janet was not capable of being the CEO of the
3   company.
4        Q        Were the people who were interviewed, were
5   these senior managers within Dragon Systems?
6        A        If you define senior manager as being people
7   who were direct reports to either Janet or to John
8   Shagoury, I would say that these would be people that were
9   senior managers of the company.
10       Q        What was Mr. Shagoury's position at that
11  time?
12       A        I believe he held the title of president and
13  chief operating officer.
14       Q        So with that definition, the one that you
15  just described, you would say that the people you spoke to
16  or were made aware of interviews with were senior
17  managers?
18       A        Yes.
19       Q        And you also -- in addition to leadership
20  you mentioned decision making problems.  What were you
21  informed of concerning those?
22       A        I was told a great deal similar to what is
23  outlined in Ellen's notes here, that the -- in some cases
24  it was lack of resources, in other cases it was lack of
25  delegation of authority.  It was matters pertaining to the

DONALD L. WAITE

Page 24

1   day-to-day operation of the business.

2       Q       Was the business of Dragon Systems to your

3   understanding at that time having problems with cash flow?

4               MR. JOSEPH:  Just object to form.  You may

5   answer the question.

6               THE WITNESS:  I believe that they were

7   running negative cash flow at that time.

8   BY MR. FRANK:

9       Q       And was it your understanding -- withdrawn.

10              Was that financial condition, being a

11  negative cash flow, having an effect on the employee

12  morale and the operations of the company?

13      A       I think that it certainly played some part

14  in their concerns, that it wasn't really the principal

15  concern of the people that I recall talking to.

16      Q       Did the managers that you spoke to have any

17  recommendations that they made to you concerning what

18  ought to be done?

19      A       My best recollection is is that at least one

20  if not more of them felt that there needed to be a new CEO

21  brought in to the company.

22      Q       Were there employees or concerns of

23  employees leaving the company at that time?  The company I

24  mean Dragon Systems.

25      A       Could you restate that?

DONALD L. WAITE

Page 25

1          Q      Yes.  At the time you conducted those

2    interviews were there significant numbers of employees, or

3    significant employees who had left Dragon Systems?

4               MR. JOSEPH:  Form objection.  You may

5    answer.

6               THE WITNESS:  I don't recall whether a

7    significant number of people had left Dragon.  Certainly

8    there had been some turnover.

9    BY MR. FRANK:

10         Q      Was that a concern -- the people who were

11   leaving -- withdrawn.

12              Was the -- were the people who were leaving

13   considered important by the people you were interviewing?

14              MR. JOSEPH:  Objection to form.  You may

15   answer.

16              THE WITNESS:  I don't know.  I mean, clearly

17   the people there were a very close knit group of people.

18   And, therefore, when any one person left it was, they did

19   not feel good about that.  Whether they considered the

20   people important or not, I'm not able to answer here

21   today.

22   BY MR. FRANK:

23         Q      On the basis of your interviews and

24   Ms. Chamberlain's, did you reach any conclusions?

25         A      The conclusion that I reached was that Janet

DONALD L. WAITE

Page 26

1    needed to be replaced as the CEO.

2        Q       What was the basis of your conclusion?

3        A       It was the result of my discussions with the

4    senior management of Dragon, and discussions with Jim

5    Baker.

6        Q       What discussions did you have with Jim

7    Baker?

8        A       I had at least telephonic discussions, and I

9    believe a personal meeting, but I'm not absolutely sure of

10   that, about the direction of the company and what needed

11   to be done about the leadership.

12       Q       And what did he inform you?

13       A       He believed that it would, that Dragon would

14   be better served if Janet served in a different role than

15   CEO.

16       Q       Now, at or about that same time period, in

17   the Fall of 1999, did anybody express concern to you about

18   Dragon Systems' ability to meet its payroll?

19       A       Excuse me, just go back in the time frame.

20       Q       At or around the same time, so let's say

21   September through November of '99.

22               MR. JOSEPH:  Well, you know, at some point

23   he becomes CEO in that time frame, so is it before or

24   after?

25               MR. FRANK:  Fair point.

DONALD L. WAITE

Page 27

1    BY MR. FRANK:

2        Q        Prior to October 5, 1999, did you become

3    aware of concerns at Dragon about its ability to meet

4    payroll?

5        A        Sitting here today I don't specifically

6    recall whether that was a concern expressed to me.

7        Q        Do you recall a concern being expressed to

8    you about Dragon's ability to continue its operations,

9    again prior to October 5?

10       A        Well, there was certainly a general concern

11   expressed by different people about the future of Dragon,

12   not necessarily stated in terms of being able to continue

13   its operations.

14       Q        Prior to October 5 had, to your knowledge,

15   Dragon attempted to obtain outside financial investment,

16   in addition to the IPO we discussed?

17               MR. JOSEPH:  So the question is had it

18   sought it and been rebuffed?

19               MR. FRANK:  To his knowledge, had it sought

20   it, or was it seeking it?

21               THE WITNESS:  I don't recall the time frame

22   in which it began to seek outside investments.  Certainly

23   at a point in time it did seek that.

24               MR. FRANK:  Ask that this be marked Exhibit

25   2.

DONALD L. WAITE

Page 28

1               (Deposition Exhibit 2 marked for

2    identification.)

3               MR. JOSEPH:  John, this may be intentional

4    but these are non consecutive Bates numbers.  We have

5    board meeting minutes and then we've got non consecutive

6    numbers, so the consecutive numbers are SGC 12120 through

7    135.

8               MR. FRANK:  That's correct.

9               MR. JOSEPH:  And then the next set begins

10   after that, 12987 to 993.

11              MR. FRANK:  That is correct.  The second

12   section is Written Action of the Dragon Systems Directors

13   taken on the same date, October 5, 1999 and comprises the

14   second portion of the exhibit.

15              MR. JOSEPH:  The first part of it without

16   the written action was previously marked as Cowen Exhibit

17   6 on January 21.  Not including the addendum.

18              Somebody has a very bizarre auto correct, it

19   keeps putting Don Waite's name in there, it's either

20   wouldn't or want --

21              MR. FRANK:  I actually think it varies.  It

22   could be both.

23              MR. JOSEPH:  There must be a few

24   combinations.  Makes you very popular, Don, as a verb.

25              You would think Loktel (phonetic) was taking

Page 29

1    these minutes they go on so long.  Most minutes are a page

2    and a half long.

3                    MR. FRANK:  When you feel you've had

4    significant time to review up through SGC135, let me know.

5                    THE WITNESS:  Okay.

6                    Okay.  I'm through SGC012135.

7    BY MR. FRANK:

8         Q      Thank you.

9                This document on the cover of it states

10   October 5, 1999, Board Meeting, Dragon Systems, Inc.  Do

11   you recall attending that meeting?

12        A      I do recall attending a board meeting such

13   as this.  I presume the October 5 date is correct.

14        Q      Was the meeting -- well, did there come a

15   time at a board meeting at which you were appointed

16   interim CEO of Dragon Systems?

17        A      Yes.

18        Q      And is that reflected in these minutes?

19        A      Yes.

20        Q      Had you attended any Dragon Systems board

21   meetings prior to that date?

22        A      I don't recall if I was telephonically

23   involved in board meetings prior to that date or not.  I

24   simply don't recall.

25        Q      Had you had discussions with members of the

DONALD L. WAITE

Page 30

1    board of Dragon Systems prior to the October 5 meeting --

2    October 5, 1999 meeting concerning the agenda for that

3    meeting?

4            A       Can you restate that?

5            Q       Yes.  Before this meeting reflected in the

6    document, the exhibit that I gave you, did you have

7    discussions with any of the board members concerning the

8    agenda, what was going to be discussed at the board

9    meeting?

10           A       Yes.

11           Q       What do you recall of those discussions?

12           A       My recollection is that I talked with Steve

13   Luczo about the need to replace Janet as the CEO.  And

14   that that should be discussed at the board meeting.

15           Q       What did Mr. Luczo say to you during those

16   discussions?

17           A       I don't recall specifically his comments,

18   but I believe that it was to the effect that it should be

19   discussed at the board meeting.

20           Q       Did he -- did you have an understanding as

21   to what his position was with respect to that, whether she

22   should be removed or not?  Prior to the board meeting.

23           A       I don't recall for certain what his position

24   was.

25           Q       Did you discuss with him the financial

DONALD L. WAITE

Page 31

1    condition of Dragon Systems prior to that board meeting?

2        A       I'm certain that we would have had

3    discussions about the financial position of Dragon.

4        Q       What was your understanding of Dragon's

5    financial position as of October 5, 1999?  The board

6    meeting that is reflected in these minutes.

7        A       Can you restate that?

8        Q       Yes.  Was Dragon, to your understanding,

9    meeting its financial performance targets?

10       A       No.

11       Q       In what aspects of its financial performance

12   targets was it failing to meet?  What aspects of it was it

13   failing to meet, that you recall?

14       A       My recollection is that they were

15   continually missing their sales projections, and

16   therefore, their bottom line projections.

17       Q       Was this a concern that was discussed at the

18   board meeting of October 5?

19       A       There was certainly a discussion about the

20   financial performance of the company.

21       Q       Did the company's financial performance, was

22   it having an effect on its cash flow -- on its cash flow?

23               MR. JOSEPH:  I believe that he's already

24   answered that, but he can answer it again.

25               THE WITNESS:  Could you restate that again?

DONALD L. WAITE

Page 32

1    Sorry.

2    BY MR. FRANK:

3         Q     Yes.  Was the company's financial

4    performance having an effect as of this date on its cash

5    flow?

6              MR. JOSEPH:  I think that's almost

7    tautologic, but you can answer the question.

8              THE WITNESS:  Yes.

9    BY MR. FRANK:

10        Q     Was that having -- had that left the company

11   with the need to seek additional financing at that time?

12        A     My recollection is that the company was

13   looking at what its cash needs would be, but that I don't

14   recall specifically that it would look for additional

15   financing at that time.

16        Q     Was the company at that time considering

17   various possible investment options for outside partners

18   or acquirors to invest in it?

19        A     Yes.

20        Q     What ones do you recall?

21        A     I don't know if the Intel discussions had

22   ended by that time or not.  There were discussions ongoing

23   with Sony.  And there were the discussions with Visteon.

24   There were discussions with a European company, I don't

25   recall specifically whether that was Scion, or not.

DONALD L. WAITE

Page 33

```
 1        Q       Had you been involved in any of those

 2   discussions up to the point of this board meeting?

 3        A       I had been involved in some of the

 4   discussions with Visteon.  I don't -- I may have been

 5   involved in the discussions with the European company.  I

 6   don't recall having been involved with the others.

 7        Q       Now, you mentioned Intel, Scion, Sony and

 8   Visteon.  Are those specific entities you recall being

 9   discussed as potential financial or other type of partner

10   with Dragon?

11                MR. JOSEPH:  At one point in time?

12                MR. FRANK:  Yes.

13                MR. JOSEPH:  He mentioned on Intel, at that

14   point he wasn't sure if that already failed.

15                MR. FRANK:  Fair point.  Let me break it

16   down then.

17   BY MR. FRANK:

18        Q       With respect to Intel, did anything come to

19   fruition with respect to those discussions with Intel, to

20   your knowledge?

21        A       Not to the best of my knowledge and

22   recollection.

23        Q       And with respect to Scion?

24        A       Nothing to the best of my knowledge.

25        Q       And with respect to Sony?
```

DONALD L. WAITE

Page 34

1        A        To the best of my recollection there was,

2    nothing came on the investment side.  I believe that there

3    was an agreement negotiated for the purchase of product

4    that may have involved a prepayment.  I'm not certain

5    about that.

6        Q        But do you recall whether any investment

7    activity was finalized with Sony?

8        A        I do not believe any investment activity was

9    ever finalized for Sony.

10        Q        Were there any other companies that Dragon

11    Systems engaged in discussions with concerning a financial

12    investment that you recall, at that time?

13        A        When you say at that time let me understand

14    the time.

15        Q        Okay.  At the time you were appointed

16    interim CEO --

17        A        Right.

18        Q        -- with what companies were there ongoing

19    discussions concerning financing?

20        A        I think that it involved Visteon, Sony, the

21    European company that may have been Scion.  And as I said

22    before, I don't know when the Intel negotiations ceased.

23        Q        But at some point in time either before you

24    became CEO or thereafter they did; is that correct?

25        A        With Intel.

DONALD L. WAITE

Page 35

1          Q       Yes.

2          A       Yes.

3          Q       And what about the discussions with Visteon?

4          A       They continued for some considerable period

5     of time.  I don't recall when they finally terminated.

6          Q       Let's go back to the board minutes of

7     October 5.  If you would turn to page SGC012122.  If you

8     look at the bottom there appears to be a report by

9     Ms. Chamberlain concerning the cash flow situation as of

10    today, barring no bar from Seagate, negative 2 million

11    deficit at the end of the year, need to borrow money the

12    first week in November.

13             Do you have a recollection concerning Dragon

14    Systems' need to borrow money the first week in November?

15         A       Without the help of these minutes I wouldn't

16    have recalled that.

17         Q       Having looked at these minutes does that

18    refresh your recollection?

19         A       I don't remember a specific need to borrow.

20    What I do recall is that we had discussions about

21    Seagate's willingness to lend additional monies to Dragon.

22         Q       What do you recall of those discussions?

23         A       Almost nothing here today.

24         Q       Do you recall whether Dragon attempted to

25    obtain financing from Fleet Bank?

DONALD L. WAITE

Page 36

1          A       Yes.

2          Q       Do you recall whether they were required to

3     obtain a guarantee from Seagate in order to receive that

4     financing?

5          A       I believe that that was a part of the

6     discussions with Fleet Bank.  I don't recall the specific

7     nature today of what their requirements were.

8          Q       Do you recall whether Seagate, in fact,

9     acted as guarantor with respect to that loan?

10         A       I don't recall.

11                 MR. JOSEPH:  We've been going over an hour,

12    could we take five?

13                 MR. FRANK:  Sure.

14                 MR. JOSEPH:  Thanks.

15                 THE VIDEOGRAPHER:  The time now is 10:15 and

16    we're going off videotape record.

17      (There was a recess in the proceedings at which time

18       Ms. Alvarez joined the deposition via teleconference.)

19                 THE VIDEOGRAPHER:  The time now is 10:26 and

20    we're back on the videotape record.  Please proceed.

21    BY MR. FRANK:

22         Q       Mr. Waite, as reflected in the minutes on

23    October 5, 1999 you were appointed interim CEO of Dragon

24    Systems; is that correct?

25         A       Yes.

Page 37

1        Q        And Ms. Chamberlain was appointed to what

2  position at that time?

3        A        I don't know if she was appointed as the

4  interim CFO at that time or not, essentially that's what

5  she became.

6        Q        At about that time?

7        A        I believe it was about this time.

8        Q        And did you obtain a seat on the board of

9  directors of Dragon Systems at that time?

10        A        According to these minutes it appears that I

11  did.

12        Q        Do you recall obtaining a seat as a member

13  of the board of directors of Dragon Systems?

14        A        Without these minutes I'm not sure I would

15  have recalled that.

16        Q        Having looked at these minutes do you recall

17  that now?

18        A        Yes.

19        Q        At the time you became CEO of Dragon Systems

20  did you engage in efforts to obtain a financial partner or

21  acquirer for Dragon Systems?

22        A        Let me explain how we tried to separate

23  activities during this period.

24        Q        Sure.

25        A        It was agreed that Janet would be the

DONALD L. WAITE

Page 38

```
 1    contact person with respect to potential investments, and
 2    I would run the day-to-day operations of the business.
 3    And then we, you know, would be involved, I'd get involved
 4    at the appropriate time with any discussions regarding the
 5    financing of the business.
 6           Q       What role, if any, did you play with respect
 7    to discussions with potential financial investors?
 8           A       It varied depending upon the prospective
 9    investor.
10           Q       Let's narrow it down, because I think we've
11    gotten to the point where, and correct me if I'm mistaken
12    or inaccurate, but there was Visteon that was still a
13    potential finance partner?
14           A       Very much so.
15           Q       And at or around the time after you became
16    CEO did L&H become a potential financial partner?
17           A       Some time after of became the interim CEO.
18           Q       Yes.  Okay.  Were there any other companies
19    that you were engaged in, or Dragon Systems was engaged
20    with -- withdrawn.
21                   Aside from Intel, Scion and Sony, which we
22    already discussed --
23                   MR. JOSEPH:  And Visteon and an unnamed
24    European company that may or may not be Scion.
25                   MR. FRANK:  Well, Visteon I'm putting aside
```

DONALD L. WAITE

Page 39

1    because we're still in the process of discussing.

2    BY MR. FRANK:

3            Q       Aside from the unnamed European company

4    which might be Scion, Intel and Sony, Visteon and L&H, so

5    that's five, were there any other financial partners with

6    whom Dragon held discussions?

7            A       And excluding Seagate?

8            Q       Excluding Seagate, correct.

9            A       Not that I recall.

10           Q       Now, just to clarify for the record, that

11   European company which may have been Scion, was Scion a

12   European company?

13           A       I believe they were.

14           Q       Okay.  Was there a company from Europe in

15   addition to Scion to which you're referring?

16           A       I don't recall.  I just don't recall it

17   being, Scion specifically as being the European company

18   that we were involved with.

19           Q       Okay.  And I think we already covered it,

20   but the Scion talks never came to fruition; is that

21   correct?

22           A       As far as I know they never came to

23   fruition.

24           Q       And from your recollection, the European

25   company, whether it was Scion or not, those talks did not

DONALD L. WAITE

Page 40

1    come to fruition; is that correct?

2         A       That is my recollection.

3         Q       Okay.  So at the point, at some point in

4    time after you become CEO we're left with Visteon and L&H;

5    is that correct?

6         A       We are left with -- at the time I -- excuse

7    me.

8         Q       Sure.  Go ahead.  I'm sorry.

9         A       At the time I became CEO, Visteon was the --

10   we were actively involved with Visteon.  I believe there

11   were still ongoing discussions with Sony.  There were

12   ongoing discussions with the European company.  I've

13   already stated I don't know when the Intel discussions

14   ended.  And at that time there was not, in my mind, any

15   discussions ongoing with L&H.

16        Q       Did there come a point in time where the

17   only two companies with which Dragon Systems was having

18   discussions concerning financing were Visteon and L&H?

19        A       I don't think I'm able to testify to that.

20   I would frequently not be advised by Janet as to what

21   discussions she might be having.

22        Q       Can we go back to the exhibit of the board

23   minutes?

24                MR. JOSEPH:  This is Exhibit 2?

25                MR. FRANK:  Correct.

DONALD L. WAITE

Page 41

1    BY MR. FRANK:

2        Q       If you go to page 012132, if you go to the

3    top quarter or third of the page there there is a line

4    item attributed to Kim.  I presume that would be Mr. Kim

5    Edwards?

6        A       Yes, I believe that's who that refers to.

7        Q       And in it it's recorded as him stating, I am

8    concerned with taking Janet out of the loop because of the

9    continuity.  On the other hand, I support the need for

10   someone coming in and taking control and managing the

11   acquisition process.  I think there is benefit to keeping

12   Janet involved in the process; however, the other person,

13   regardless of title, must have full authority to lead the

14   acquisition discussions and run the business in the

15   interim time frame.

16       A       Okay.

17       Q       Do you recall that discussion at the board

18   meeting?

19       A       Without the benefit of these minutes I

20   wouldn't have recalled that.

21       Q       Having read it do you recall it?

22       A       No.

23       Q       Do you recall Mr. Edwards expressing the

24   view that he wanted the person, the interim person who I

25   presume became you at this board meeting, to have full

DONALD L. WAITE

Page 42

1    authority to lead the acquisition discussions?

2        A        No.

3        Q        If you would go further down to Mr. Luczo on

4    that same page it says, we have bankers to assist us with

5    anything to do with acquisitions.  Kim and I are not

6    saying that you -- which refers to Ms. Baker -- can't help

7    drive the discussions.  It's up to the management of the

8    company with the board's involvement and direction.  It's

9    essential that you be involved in a proactive way.  We

10   want you to understood, sic, I assume that's understand,

11   that the interim CEO has full discretion on managing

12   day-to-day as well as leading acquisition discussions even

13   if that means you play a leadership role in some

14   discussions.

15               Do you recall Mr. Luczo making that

16   statement at the board meeting?

17       A        No.

18       Q        Do you recall the members of the board

19   expressing that the interim CEO should take the lead in

20   the acquisition discussions?

21       A        No.

22       Q        Did you have a role in the acquisition

23   discussions with either Visteon or L&H?

24       A        Did I have a role?

25       Q        Correct.

DONALD L. WAITE

Page 43

1          A       Yes.

2          Q       I'll separate them out.  With respect to

3     Visteon what was your involvement?

4          A       I generally attended most all of the

5     meetings with Visteon in Newton.  There were other

6     meetings that I became aware of with Visteon that I was

7     not involved in.

8          Q       Did there come a time in December of 1999

9     where the board of Dragon considered proposals from, of

10    letters of intent from both Visteon and L&H?

11         A       Post the October 5 meeting?

12         Q       Correct.

13         A       I don't recall what discussions, what the

14    board's involvement were with proposals from Visteon.

15    They certainly were involved with, in discussions about

16    the proposal that eventually came from L&H.

17         Q       Let's backtrack for one second.  Did there

18    come a time on or about December 1, 1999 that Dragon

19    Systems retained an investment banker to assist it in the

20    acquisition process?

21         A       We did at some point retain investment

22    bankers to assist us in the process.

23         Q       And what investment banker?

24         A       I believe that we retained Goldman Sachs.

25         Q       And in your career you had described that

DONALD L. WAITE

Page 44

1   you had worked on several M&A transactions.  Had you ever

2   used Goldman Sachs as an investment banker before?

3        A     I don't recall specifically whether I ever

4   was involved in a merger and acquisitions transaction

5   where we were represented, the company I was with, was

6   represented by Goldman Sachs.

7        Q     Were they retained by Dragon to act as their

8   exclusive investment bank with respect to the

9   acquisitions, or potential acquisitions?

10       A     I believe that they were retained on an

11  exclusive basis, but I could be wrong on that.

12             MR. JOSEPH:  I think that --

13             MR. FRANK:  It has been previously marked?

14             MR. JOSEPH:  I think she already talked

15  about it, but I can tell you what the number is, just wait

16  a sec, I'll make sure.

17         (There was a discussion off the record.)

18             (Deposition Exhibit 3 marked for

19  identification.)

20             MR. JOSEPH:  Yeah, it was Cowen Exhibit 8 on

21  January 21.

22             However, there were different Bates numbers,

23  these Bates numbers are GS 2726 to 2733.  George used the

24  Baker version, but it's the same letter.

25             MR. FRANK:  Okay.

DONALD L. WAITE

Page 45

1           MR. JOSEPH:  You know, there is a note here

2   that a Ms. Alvarez was put on hold and hasn't been picked

3   up again.  Is anybody else on the line right now?

4           We must be disconnected again.  That's odd.

5           Well, just keep talking, we'll figure this

6   out.  I just want to reflect that as a matter of record

7   Skadden set up the conference call.

8           You know, this thing won't go off.  This

9   thing is broken.

10          MR. FRANK:  I'd like the record to reflect

11  that this is not our hardware that has been disconnecting

12  everyone.

13      (There was a discussion off the record.)

14  BY MR. FRANK:

15      Q    I just want to direct your attention to the

16  first paragraph.  It indicates, we are pleased to confirm

17  the arrangements under which Goldman Sachs & Company is

18  exclusively engaged by Dragon Systems, Inc.

19          MR. JOSEPH:  I think I have your marks on

20  this one.

21          MR. FRANK:  Thank you.  Sorry.

22  BY MR. FRANK:

23      Q    -- by Dragon Systems, Inc., parenthetical,

24  the company, as financial advisor in connection with the

25  possible sale.

DONALD L. WAITE

Page 46

1                MR. JOSEPH:  On behalf of Seagate we
2    certainly stipulate to that fact.
3                MR. FRANK:  That's all.
4    BY MR. FRANK:
5         Q    Does this refresh your recollection that
6    Goldman Sachs was the exclusive financial advisor?
7         A    Yes.
8         Q    Did Dragon retain an accounting firm to
9    assist in its diligence or in its decisions as to an
10   acquisition partner?
11        A    I believe that we engaged our audit firm to
12   assist us.
13        Q    Who was that?
14        A    I believe it was Arthur Andersen.
15        Q    Now, did there come a time, if you recall,
16   that the Dragon Systems board determined that they
17   preferred the proposal of Visteon to a proposal that had
18   been issued by L&H?
19        A    I don't recall that.
20        Q    Did negotiations with Visteon continue
21   through the December and January, December '98, January
22   '99 time period?
23        A    I believe that's the wrong years.
24        Q    Excuse me.  '99 and 2000, you are correct.
25   And I stand corrected.

DONALD L. WAITE

Page 47

1          A       I don't recall when the negotiations with

2   Visteon terminated.

3          Q       But you know that they did terminate?

4          A       I believe that once we signed an agreement

5   with, with L&H that they had terminated.  But I'm not --

6   I'm not certain how that termination might have occurred.

7          Q       You have no recollection of why the

8   negotiations with Visteon were terminated?

9          A       I only have one point of reference.

10         Q       And that is what?

11         A       I was advised, and I don't recall by whom,

12  that what had caused those negotiations to cease was L&H

13  had approached Visteon and advised them that they would

14  acquire Dragon and then strike a deal with Visteon that

15  would be more favorable than a transaction directly

16  between Visteon and Dragon.  Whether that is a true

17  statement I don't have any specific knowledge.

18         Q       So you do recall that there came a time when

19  the discussions with Visteon ended?

20         A       I believe that my recollection is that

21  discussions with Visteon did cease.

22         Q       And after that, those discussions ceased,

23  other than L&H was there any other financial partner that

24  Dragon Systems was still engaged in discussions with?

25         A       I don't recall whether there were any active

DONALD L. WAITE

Page 48

1   discussions other than with L&H during the period

2   preceding the signing of the agreement with L&H.

3          Q       With respect to the negotiations with L&H,

4   in discussions with L&H, what was your role?

5          A       I generally attended all of the all-hands

6   meetings.  I certainly was involved internally in the

7   discussions regarding the negotiations.  I had at least

8   one meeting with Bastiaens and Janet and Jim Baker.  The

9   four of us had a luncheon meeting where Bastiaens simply

10  was describing how he envisioned the two companies coming

11  to together and working as a combined unit.  So I would

12  say that I was kept apprised and involved in all of the

13  contractual negotiations.

14         Q       You described what you called I think as

15  all-hands meetings?

16         A       Yes.

17         Q       Approximately how many of those do you

18  recall attending?

19         A       I'd be guessing at how many.  There were

20  several.

21         Q       Less than ten?

22         A       I don't recall.

23         Q       Excuse me.

24                 Did Goldman Sachs, or members of Goldman

25  Sachs, attend those meetings with you?

DONALD L. WAITE

Page 49

1          A          To the best of my recollection, they did.

2          Q          And were they -- they were there obviously,

3     I assume, to act as your financial advisors in that

4     capacity at those meetings?

5          A          Yes.

6          Q          At those meetings were any personnel from SG

7     Cowen present?

8          A          My recollection is that generally there

9     would be a number of people from SG Cowen at these

10    meetings.

11         Q          Do you have any specific recollection of

12    statements or representations made by SG Cowen at any of

13    these meetings, or its personnel?

14                    MR. COTLER:  Object to the form.

15    BY MR. FRANK:

16         Q          You may answer.

17         A          Could you restate the question?

18         Q          Sure.

19                    With respect to any of these meetings, do

20    you have a recollection of a specific conversation or

21    statement made by personnel from SG Cowen?

22         A          I believe that the representatives from SG

23    Cowen participated in the presentations.  I don't recall

24    what those presentations might have been.

25         Q          Do you have any recollection of any specific

DONALD L. WAITE

Page 50

1   presentation that SG Cowen gave?

2          A       No, I have no recollection sitting here

3   today.

4          Q       Do you have any recollection of any

5   conversation that you had, specific conversation that you

6   had with personnel of SG Cowen, relating to the L&H

7   transaction?

8          A       I don't recall specific conversations that I

9   had.  I had conversations, but I don't recall the

10  specifics of those conversations.

11         Q       Who was involved on the Dragon side in

12  performing the due diligence on L&H with respect to that

13  transaction?

14         A       Principally Janet Baker and Ellen

15  Chamberlain.  There are other people involved in the due

16  diligence, but I would say that, that those two people

17  were the two principals.

18         Q       Did they -- were you involved personally at

19  all in the due diligence efforts?

20         A       I don't recall what my involvement was in

21  the due diligence process.  I was probably kept aware by

22  Ellen, who was very good at communicating, and what was

23  progressing.

24         Q       And was the board of Dragon apprised at its

25  meetings of the due diligence efforts that were undertaken

DONALD L. WAITE

Page 51

1    on behalf of Dragon?

2         A       I would only presume that they were, but I

3    don't have a specific recollection.

4         Q       Who was it, whether it was outside or inside

5    Dragon, who was it who was charged with doing due

6    diligence on L&H's financial statements?

7         A       I believe Ellen Chamberlain was the primary

8    person.

9         Q       And was, were either of the parties that you

10   retained active in assisting her in this?

11        A       When you say either of the parties --

12        Q       Goldman or Arthur Andersen?

13               MR. JOSEPH:  Objection, foundation.  You can

14   answer to the extent you know.

15               MR. FRANK:  I believe he testified that --

16               MR. JOSEPH:  I'm not saying he didn't.  I

17   think he's already testified that Ellen was in charge.  So

18   what he knows, he knows.

19               MR. FRANK:  That's why I asked did anybody

20   assist.

21   BY MR. FRANK:

22        Q       Was Goldman Sachs involved in assisting

23   Ellen Chamberlain in the due diligence, if you know?

24        A       I don't know if they were involved in

25   assisting her in the due diligence.

DONALD L. WAITE

Page 52

1          Q       Arthur Andersen?  Do you know if they were?

2          A       I don't know if they were involved in the

3    due diligence process.

4          Q       So you relied on Ellen primarily to report

5    to you on the nature and the process and progress of the

6    due diligence; is that correct?

7          A       Excuse me for interrupting you.

8          Q       No.  Go ahead.

9          A       I relied primarily on Ellen, but I also

10   relied on Janet Baker.

11         Q       Now, during the process of negotiations with

12   L&H did you become aware of any accounting-related issues

13   concerning L&H?

14         A       I don't recall whether I became aware of

15   those or not.

16                 I should correct myself and say, of any, not

17   of those.

18                 MR. FRANK:  What number are we up to?

19                 THE COURT REPORTER:  4.

20                 MR. JOSEPH:  4.

21                 (Deposition Exhibit 4 marked for

22   identification.)

23                 MR. JOSEPH:  This was previously marked as

24   Chamberlain 14.

25                 Which is why I guess it has a Chamberlain 14

DONALD L. WAITE

Page 53

1    sticker on it.

2                    MR. FRANK:  We believe in recycling.

3                    THE VIDEOGRAPHER:  Would this be a good time

4    for a tape change?

5                    The time now is 10:59 and we're going off

6    the videotape record.  This also is the conclusion of

7    videotape one.

8             (There was a recess in the proceedings.)

9                    THE VIDEOGRAPHER:  The time now is 11:02

10   we're back on the videotape record, this also marks the

11   beginning of tape two in the deposition of Donald Waite.

12                    Please continue.

13   BY MR. FRANK:

14        Q       Exhibit 4, which had previously been marked

15   as Chamberlain 14, appears to be an e-mail.  And at the

16   top the addressee is Don_Waite@notes.seagate.com, 11/21.

17   Do you recognize that as your e-mail address at that time?

18        A       It was my e-mail address at that time, yes.

19        Q       And do you recall receiving this e-mail at

20   around that time?

21        A       I don't specifically recall receiving this

22   e-mail, but it's not totally familiar to me either.

23        Q       I want to point specifically, if you go to,

24   go to the second page, and the section headed R&D.  And it

25   says, R&D, L&H currently operates at 11 percent.  Do you

DONALD L. WAITE

Page 54

1    know what that's referring to?

2         A      I presume that's referring to their earned

3    expense being 11 percent of net sales.

4         Q      And it further states, I believe it is this

5    low because of the research company that they do not

6    account for in R&D.  Do you know what that is referring

7    to?

8         A      Yes.  They had an off balance sheet company

9    that performed the research and development effort for

10   them to some degree.  I don't recall specifically how they

11   split in-house versus outside.

12        Q      Would that have an effect, that practice

13   have an effect on L&H's reported revenues?

14        A      It -- I would not think it would have an

15   effect on their reported revenues, but it could have.  It

16   depends upon how they may have accounted for.

17        Q      How about reported income?

18               MR. JOSEPH:  It's really an interim

19   hypothetical.  If you want him to answer you can.

20   BY MR. FRANK:

21        Q      Go ahead.

22        A      I'm sorry, ask again.

23        Q      Would that, or could that have had a

24   reported effect on their reported income?

25        A      On their reported income?  If you mean if

DONALD L. WAITE

Page 55

1    their bottom line operating income --

2          Q       Correct.

3          A       It certainly could have.

4          Q       And as part of Dragon's due diligence would

5    that be an area in which you would be interested in

6    knowing?

7                  MR. JOSEPH:  Obviously they knew it, it was

8    in here.

9                  MR. FRANK:  No, that's not --

10   BY MR. FRANK:

11         Q       Was that an area with which you would have

12   been interested in finding out more information?

13         A       In all probability, yes.

14         Q       And who would you have expected to have

15   performed that due diligence for Dragon, or on Dragon's

16   behalf?

17         A       I think that there would have been a

18   combined effort between Ellen Chamberlain, possibly our

19   accountants, maybe the Goldman Sachs people.  But not

20   necessarily.  Then some of the technical people.

21         Q       Okay.  You drew a distinction between

22   Goldman Sachs and Arthur Andersen.  Why did you draw that

23   distinction?

24         A       Because I wouldn't normally look at my

25   investment bankers as being people to advise me on

DONALD L. WAITE

Page 56

1    accounting matters.

2         Q        And specifically with respect to the L&H due

3    diligence, did Dragon rely -- or did you rely on Arthur

4    Andersen together with Ms. Chamberlain for diligence on

5    the accounting activities of L&H?

6         A        I don't recall the reliance on Arthur

7    Andersen.

8         Q        So that would leave Ms. Chamberlain is

9    who --

10        A        Who I would have looked to.

11        Q        Now, did you become aware prior to the time

12   that the board approved the agreement with L&H, which I'll

13   represent occurred on March 27, 2000, did you become aware

14   that L&H's reported revenues for their operations in the

15   Pacific Rim area had increased greatly in the first

16   quarter of 2000?

17        A        I believe I did, yes.

18        Q        Was that an area which you sought further

19   information on?

20        A        I believe that there were, there was further

21   discussions about their revenues from the Far East region.

22        Q        With whom did you have those discussions?

23        A        I'm sorry, I misstated.  I misunderstood

24   your question, misstated my answer.

25                 That my response was I believe that there

Page 57

1    was on the part of Dragon, you know, further discussions

2    on that matter.  Not that I was personally involved in

3    those discussions.

4           Q      Whom did you understand held those

5    discussions at Dragon?

6           A      I don't recall who might have been involved

7    in those.  But clearly I would have expected that both

8    Ellen and Janet would have been, you know, involved in

9    those discussions, among other people.

10          Q      Do you recall Ellen reporting anything

11   specific to you concerning the Pacific Rim revenues of L&H

12   in the process of the due diligence?

13          A      No, I don't.

14          Q      Do you recall Janet Baker reporting anything

15   specific to you concerning the revenues of L&H in the

16   Pacific Rim?

17          A      No, I don't.

18          Q      Did you become aware of, in the process of

19   the due diligence, and again prior to the time that the

20   board voted to approve the agreement with L&H on March 27,

21   did you become aware of a prior SEC investigation in to

22   revenue recording actions of L&H?

23          A      Not that I recall.

24          Q      Were there any other accounting activities

25   or revenue recognition activities of L&H that you recalled

DONALD L. WAITE

Page 58

1    being aware of prior to the March 27 board resolution?

2            A       Not that I recall.

3                    (There was a discussion off the record.)

4    BY MR. FRANK:

5            Q       Do you recall prior to March 27, 2000, ever

6    receiving a report from Arthur Andersen concerning their

7    examination of the books of L&H, or financial statements

8    of L&H?

9                    MR. JOSEPH:  Just so we're clear, I don't

10   know that it matters in the answer, are you talking about

11   a written report?

12                   MR. FRANK:  Correct.  That's correct.

13                   THE WITNESS:  I don't recall.

14   BY MR. FRANK:

15           Q       Do you recall ever requesting such a report

16   be made?

17           A       No, I don't recall.

18           Q       Do you recall ever -- I'm sorry.

19           A       Excuse me.

20           Q       Do you recall ever receiving an oral report

21   from Arthur Andersen concerning their inspection of the

22   financial statements and books of L&H?

23           A       No, I don't recall.

24           Q       Do you recall requesting any such report?

25           A       No.

DONALD L. WAITE

Page 59

1              MR. FRANK:  Yes.  Here is -- we're on to 5?

2              (Deposition Exhibit 5 marked for

3    identification.)

4              MR. JOSEPH:  Yeah, it was Cowen 18.

5    BY MR. FRANK:

6         Q    Have you had a chance to look at that?

7         A    I have.

8         Q    Have you seen that document before?

9         A    Yes.

10        Q    When?

11        A    Yesterday.

12        Q    Other than yesterday do you recall having

13   seen it before?

14        A    No, I don't recall having seen it.  I'd be

15   surprised if it hadn't been made available to me.

16        Q    And why would that surprise you?

17        A    Because the nature of the letter and the

18   rather strange relationship that it developed with Goldman

19   Sachs, that Ellen certainly would have apprised me of

20   this.  I believe Janet would also have done so.

21        Q    Do you have any recollection of them having

22   done so, either of them?

23        A    No, I don't.

24        Q    Do you have any recollection of discussing

25   with -- we'll start with Ellen -- Goldman Sachs' request

DONALD L. WAITE

Page 60

1    listed in this memorandum that Dragon certified public

2    accountants perform comprehensive due diligence on L&H

3    side by side with management, Hale & Dorr and Goldman

4    Sachs?

5         A    No, I don't recall those discussions.

6         Q    Had you had such discussions do you think

7    they would have been of the type that you would recall?

8              MR. JOSEPH:  Speculation.  You can answer.

9              THE WITNESS:  I'm not sure if I would or

10   not.

11   BY MR. FRANK:

12        Q    In your career in mergers and acquisitions,

13   had you received previously a letter of a similar type

14   where your banker was recommending that your accountant

15   perform comprehensive due diligence?

16        A    Could you restate that?

17        Q    Yes.  In your experience, in your 30 or so

18   prior mergers and acquisition transactions, do you recall

19   having received a letter from an investment banker or

20   investment bank house, Goldman Sachs in this case,

21   requesting specifically that the company's certified

22   public accountants perform comprehensive due diligence on

23   the proposed acquirer or acquiree?

24        A    I don't recall ever having experienced that.

25        Q    Do you recall any discussions with either

Page 61

1    Ellen or Janet Baker -- I think I asked you specifically

2    with Ellen Chamberlain, so let me go to Janet Baker -- do

3    you recall ever having discussed with her the substance of

4    the request made by Goldman Sachs in this memorandum?

5         A    I don't recall any such discussions.

6         Q    Do you recall being informed that Goldman

7    Sachs had made a request that additional due diligence be

8    performed by Dragon's certified public accountants?

9              MR. JOSEPH:  Just object to the

10   characterization of this document as a request.

11             MR. FRANK:  Recommendation.

12             MR. JOSEPH:  Well, it uses that word.  He

13   can certainly answer the question.

14             MR. FRANK:  I will substitute the word

15   request and -- substitute the word recommendation for the

16   word request.

17   BY MR. FRANK:

18        Q    With that change, were you ever informed

19   that Goldman Sachs recommended that Dragon's certified

20   public accountants perform comprehensive due diligence on

21   L&H?

22        A    I don't recall.

23        Q    And as interim CEO of Dragon, would that

24   have been something you would have wanted to be informed

25   of?

DONALD L. WAITE

Page 62

1          A          Yes.

2          Q          And had you been so informed of this would

3     it have been your practice to seek such an examination by

4     your certified public accountants?

5                     MR. JOSEPH:  Objection.  This is very

6     speculative at this point.  You may answer the question.

7                     THE WITNESS:  It depends.

8                     MR. FRANK:  Are you okay?

9                     MR. JOSEPH:  Fine.  If I don't keel over I'm

10    fine.

11                    MR. FRANK:  Well hopefully we won't have to

12    deal with that.

13    BY MR. FRANK:

14         Q          Do you recall any discussions you had with

15    Janet Baker about Dragon's, any issues Dragon had with

16    Goldman Sachs and their performance as financial advisor?

17         A          Did I have discussions with Janet Baker?

18         Q          Correct.

19         A          I don't recall if I had discussions with her

20    concerning any concerns that we had with the performance

21    by Goldman Sachs.

22         Q          And the same question with respect to

23    Ms. Chamberlain?

24         A          And I don't recall the discussions.  I do

25    know that Ellen and I had discussed her concerns with

DONALD L. WAITE

Page 63

1    their level of performance.

2         Q      What do you recall of those discussions?

3         A      And just that we had discussions about

4    concerns she had.  I don't remember the specifics.

5         Q      Do you recall making any recommendations to

6    her about what ought to be done?

7         A      No, I don't recall what I might have

8    recommended to her.

9         Q      Did you consider getting a different

10   investment bank?

11        A      I don't recall considering that.  And I

12   don't recall making any recommendation to her along those

13   lines.

14        Q      Do you recall any issues being brought to

15   your attention concerning Arthur Andersen and its

16   performance?

17        A      No, I don't recall any concerns there.

18        Q      Excuse me.

19               (Deposition Exhibit 6 marked for

20   identification.)

21   BY MR. FRANK:

22        Q      Exhibit 6 is a packet of information

23   labeled, Draft, Goldman Sachs, Project Dictator, as of

24   March 3, 2000.  Bates number GS 000460 through 000552.

25               I'm going to have some specific questions

DONALD L. WAITE

Page 64

1    about some specific pages.  If you want to briefly look

2    through it, but I don't want to waste our time with you

3    having you look through it in detail.  I can point you to

4    the pages.

5            MR. JOSEPH:  I take it this is the way it

6    was produced, Jon, because the first page has a March 6

7    date and the other ones have a February 29 date.

8            MR. FRANK:  Let me see what you have because

9    I may have a different document.

10           MR. JOSEPH:  Just the top.  Not every page

11   but there are a lot of different dates mixed in here,

12   February 28, March 5, February 29.

13           MR. FRANK:  This is how I had it.

14           MR. JOSEPH:  And this is the only version we

15   got from them?

16           MR. FRANK:  This is the only version I know

17   of, so I can't speak of --

18           MR. JOSEPH:  Then that's fine.

19           And it says as of March 3 on the cover and

20   we have some that are several pages that are later than

21   March 3, including as late as March 13.

22           MR. FRANK:  Well, I think there was a later

23   3/17 version that was supplied to the board of directors,

24   which we may get to or not.  But I just had some specific

25   questions generally about --

DONALD L. WAITE

Page 65

1            MR. JOSEPH:  Okay.

2            THE WITNESS:  Okay.

3    BY MR. FRANK:

4       Q       If you could turn to the page label GS

5    000468.

6            Do you have that page?

7       A       Yes, I do.

8       Q       And at the top it's entitled, Transaction

9    Issues, Open Items.  And there seem to be three columns,

10    dictator's perspective, LIGHT's perspective and general

11    issues.  Do you see that?

12       A       Yes, I do.

13       Q       Just for clarification it refers to

14    Dictator's perspective, was it your understanding that

15    Dictator referred to Dragon?

16       A       I don't recall the Dictator name, but I

17    would gather that that referred to Dragon.

18       Q       And LIGHT, would that be a reference and

19    L&H?

20       A       That is what I presume.

21       Q       Did you ever -- do you recall having seen a

22    project Dictator evaluation book such as this exhibit

23    during the course of the due diligence?

24       A       I don't recall specifically seeing this

25    document, but this would not be unusual to be furnished

DONALD L. WAITE

Page 66

1    this type of document in connection with this transaction.

2                    MR. JOSEPH:  Although this one does happen

3    to say draft.

4                    MR. FRANK:  That's why I'm --

5    BY MR. FRANK:

6            Q       Okay.  If you look under Dictator's

7    perspective on that page?

8            A       Yes.

9            Q       There is a bullet point saying, due

10   diligence.  Were you apprised some time -- or were you

11   ever apprised during March of 2000 prior to the board

12   resolution in favor of the transaction with L&H, that

13   Goldman Sachs believed that additional due diligence on

14   L&H was required?

15           A       I don't recall specifically their

16   recommending that.

17           Q       Okay.  And if you go to the last bullet

18   point, organic versus acquisition related growth and

19   profits.  Do you remember any discussion of that topic

20   with respect to L&H?

21           A       Only as referred to in the prior exhibit

22   that we looked at.  I didn't have an independent

23   recollection of that.

24           Q       Based on the exhibits that you have seen, do

25   you have a recollection of any discussions on that topic?

DONALD L. WAITE

Page 67

1        A       I don't recall what discussions we had on

2   the topic.  I do recall vaguely that there was discussions

3   about the need to look at, you know, organic versus

4   acquisition related growth.

5        Q       What was your understanding of that issue?

6        A       I don't really have any recollection of it.

7        Q       If you go to the following page entitled, GS

8   Research Comments, and you look at the column on the

9   right-hand side, potential issues, it's a bullet that

10  says, LIGHT has little to no organic growth.

11               Do you recall that issue being raised and

12  discussed?

13       A       No.

14       Q       If you go under it there is two sub points,

15  hard to understand acquisitions, accounting and financial

16  notes.  Do you recall that issue being brought to your

17  attention during the due diligence?

18       A       No.

19       Q       So I take it you recall no discussions of

20  those at that time?

21       A       I recall no discussion at that time.

22       Q       And the final sub bullet there, surge in

23  profits may be related more to translation versus

24  software.  Do you have any recollection of that topic

25  being raised?

DONALD L. WAITE

Page 68

1        A        Very vaguely about the two parts of their

2    business, their translation business being a fairly

3    significant part of their business.  Beyond that I don't

4    recall what, you know, what discussions we had or what, if

5    any, concerns we had over that.

6        Q        From your understanding were -- withdrawn.

7                 Did you have -- and I do believe you talked

8    about one meeting that you recall having with Gaston

9    Bastiaens -- do you recall prior, in the month of March

10   prior to the resolution coming to the board, having a

11   meeting between several of the senior managers of Dragon

12   and several of the senior managers of L&H?

13       A        Prior to the March 27 --

14       Q        That is correct.

15       A        -- board meeting?  I don't recall when that

16   meeting was held, whether -- there was a large meeting

17   held at the L&H headquarters in Burlington, Massachusetts,

18   attended by several of the senior officers from both L&H

19   and Dragon, where there were presentations made by L&H

20   senior management.  And I don't recall if Dragon made any

21   presentations at that meeting or not.  But I don't recall

22   the timing of that meeting.

23       Q        Do you recall the topics that were

24   discussed, the presentations made?

25       A        I believe that there were presentations by

DONALD L. WAITE

Page 69

1    the L&H personnel on the status of some of their products.

2    But I don't really specifically recall the nature of those

3    presentations today.

4         Q    At that time do you recall -- do you recall

5    any discussion at that meeting of the marked rise in

6    revenues from the Pacific Rim reported by L&H in the first

7    quarter of 2000?

8         A    It seems to me they had an individual from

9    their Pacific Rim organization -- I don't recall even

10   where he was located -- who made a presentation at that

11   meeting, or at least held a discussion at that meeting.

12   But I don't recall anything more than that about the topic

13   that might have been discussed, or the discussions that

14   might have been held about revenues from the Pacific Rim

15   region.

16        Q    And that discussion, that meeting was

17   strictly between managers from L&H and managers of Dragon

18   Systems?

19        A    When you say strictly between managers from

20   the two companies, are you asking if there were

21   representatives from any of the advisory organizations?

22        Q    Correct, to the best of your recollection.

23        A    Right.  I don't recall that there were,

24   whether or not there were members of the advisors or not

25   present at that meeting.

DONALD L. WAITE

Page 70

1                    (Deposition Exhibit 7 marked for

2    identification.)

3                    MR. JOSEPH:  This is now 7, Darlene?

4                    MR. FRANK:  Correct.

5                    THE COURT REPORTER:  Yes.

6    BY MR. FRANK:

7        Q      Exhibit 7, Bates stamped BEVe 36437, and

8    then a separate Bates stamp BRN 50980, and then a third

9    item that does not appear to have a Bates stamp at all on

10   it.

11                   MR. JOSEPH:  You're just making up these

12   exhibits?

13                   MR. FRANK:  Absolutely.

14                   MR. JOSEPH:  But that is, the last one just

15   for the record is a March 13 e-mail from Ben Howe to Joe

16   Lernout concerning project NEON.

17                   MR. FRANK:  Correct.

18                   MR. JOSEPH:  Which looks to be exactly the

19   same as the very first page.

20                   MR. FRANK:  Correct, it seems to be just

21   passed along.

22   BY MR. FRANK:

23       Q      Do you recall having such a dinner as

24   contemplated in this e-mail dated March 13 where the teams

25   from both sides got together?

DONALD L. WAITE

Page 71

```
 1        A       No, I don't recall our having a, our having

 2    the dinner that's mentioned here.

 3        Q       So this would not be the meeting you were

 4    referring to in the testimony that we just took?

 5        A       No, I don't believe this refers at all to

 6    the meeting that I just testified to.

 7        Q       Okay.  The meeting -- withdrawn.

 8                Just to clarify, the person who gave the

 9    presentation on the Korean revenues was from L&H, correct?

10                MR. JOSEPH:  I think he said Far East.

11    BY MR. FRANK:

12        Q       Far East, yes, stand corrected -- on the Far

13    East revenues was from L&H?

14        A       Yes, that's my recollection.

15        Q       And following that presentation to your

16    knowledge did anybody at Dragon seek follow up due

17    diligence on that matter?  Or on those issues?

18                MR. JOSEPH:  I believe he's already

19    disqualified himself from answering that, but he may

20    answer again.

21                THE WITNESS:  I don't recall what, if any,

22    action might have been taken.

23                MR. FRANK:  Okay.

24                (Deposition Exhibit 8 marked for

25    identification.)
```

DONALD L. WAITE

Page 72

1    BY MR. FRANK:

2         Q    Exhibit 8 is a one-page memo on SG Cowen

3    letterhead.  Subject, Project NEON, dated March 7, 2000,

4    from Ben Howe and the LIGHT team, attention Janet Baker

5    and Don Waite.  And the Bates stamp is DNV-008532.

6              MR. JOSEPH:  This was previously marked as

7    Chamberlain Exhibit 13 with a different Bates number.

8    BY MR. FRANK:

9         Q    Do you recall seeing this document before?

10        A    I don't have a specific recollection of the

11   document, but I do have a general recollection of seeing

12   something like this.

13        Q    Do you recall at or about this time being

14   advised, either through receipt of this or some other way,

15   of certain concerns that L&H was raising concerning Dragon

16   Systems and its due diligence of Dragon?

17             MR. JOSEPH:  Object to the characterization,

18   concerns.  But you may answer the question.

19             THE WITNESS:  I do have a recollection of

20   their wanting to renegotiate the price from time to time.

21   BY MR. FRANK:

22        Q    What do you recall of that?

23        A    My recollection is that they had come back

24   with a proposal to change the terms of the acquisition in

25   terms of the consideration that would be provided.  And I

DONALD L. WAITE

Page 73

1    believe also the amount of consideration to be provided.

2         Q       What do you recall of those discussions?

3         A       I don't recall each of the discussions

4    surrounding this, but I believe that, that the discussions

5    involved going from a part cash/part stock to an all stock

6    deal.  And that the -- that they would drop the

7    consideration by some amount which, you know, I don't

8    recall the amount by which they wanted to reduce the

9    estimated value of the transaction.

10        Q       What difference did it make to you whether

11   the consideration to be paid was stock and cash versus all

12   stock?  And by you I mean in your position as CEO of

13   Dragon and a board member.

14        A       Well, obviously having, you know, some

15   significant amount of cash was at least an aspect that I

16   would find generally favorable.  On the other hand, given

17   what was happening with the L&H stock at that period of

18   time, the, you know, the attractiveness of their stock was

19   a consideration as well.

20               But, you know, beyond that I, I don't -- you

21   know, there is certainly a concern at a point in time

22   about liquidity for some of the stock held, primarily by

23   the employees of Dragon, so that they would realize some

24   value out of the, some immediate value out of the

25   transaction.

DONALD L. WAITE

Page 74

1      Q     And was Dragon's position during these
2  discussions that they wanted to retain some cash element
3  of consideration?

4      A     I don't recall that we took that as a
5  position.

6      Q     Internally was that -- in those discussions
7  was that the preference of the participants in the
8  discussion that you recall?

9      A     I don't have a specific recollection, so I
10  would be speculating about what those discussions involved
11  along those lines.

12      Q     Was it your preference to retain some cash
13  element?

14      A     I don't really recall whether I had a
15  preference.

16      Q     Now, if you look at the memo, the exhibit,
17  you go to the third paragraph --

18      MR. JOSEPH:  Which just coincidentally
19  happens to be marked.  May I assume that that marketing
20  was not on the original?

21      MR. FRANK:  I think you can assume it and it
22  was probably mine and a mark from which the copies were
23  made.

24      MR. JOSEPH:  That can be redacted before
25  trial.  That's fine.

DONALD L. WAITE

Page 75

1    BY MR. FRANK:

2         Q       If you go to the middle of that paragraph it

3    states, we have discovered that ten of your patents have

4    also expired.  Do you know what that refers to?

5         A       I presume it refers to the fact that ten of

6    their patents had run their course of valid -- not

7    validity, but of the patent life.

8         Q       Protection?

9         A       Right.

10        Q       And there is some discussion above that of

11   the financial operations of Dragon Systems.  What do you

12   recall about the financial operations of Dragon at that

13   time?

14        A       Well, I believe that as stated here, that

15   there was a decline in revenues of Dragon in 1999.  But

16   that we were projecting, you know, growth and

17   profitability going in to the calendar year 2000.

18        Q       Do you know what -- do you recall what the

19   results were for the first quarter of 2000?

20        A       I don't recall what the actual results were.

21        Q       Do you recall whether you made the forecast?

22        A       I don't recall that.

23        Q       If you go further down in that paragraph it

24   said, along these lines we would like a chance to discuss

25   how soon the golden eggs can be delivered and what

DONALD L. WAITE

Page 76

1    additional resources it will take to develop them.

2                Do you know what the reference to the golden

3    eggs is?

4         A      Those were -- that is a reference to some of

5    the new products that were in development, if I recall

6    correctly.

7         Q      And do you recall any question being raised

8    or any discussion -- withdrawn.

9                Do you recall any discussion with either

10   representatives or personnel from L&H concerning the

11   development and delivery of the golden eggs?

12        A      No, I don't have recollection of those

13   discussions.

14        Q      Were you involved in any way?

15        A      In the discussion of --

16        Q      Golden eggs specifically and their delivery.

17        A      Not that I recall.

18        Q      Do you recall whether Janet Baker was

19   involved at all in those discussions?

20        A      I don't recall, but I'm not sure who else

21   would have discussed that if Janet didn't.

22        Q      Okay.  Do you know that a person by the

23   name, or have you learned of a person by the name of Rob

24   Stone of SG Cowen?

25        A      Yes.

DONALD L. WAITE

Page 77

1          Q       And what did you learn about Mr. Stone, or
2     what do you know?

3          A       That I believe he was the analyst who rode
4     on L&H among other companies for SG Cowen.

5          Q       To your knowledge do you know of his
6     involvement, if any, in the due diligence conducted by SG
7     Cowen of Dragon Systems?

8          A       My recollection is that the, Dragon did not
9     want Rob Stone to be involved in the early discussions
10    with L&H.  But later on there was a discussion of -- I've
11    got to think about this for just a minute.

12                 My recollection is he was considered to be
13    quite knowledgeable in the speech area.  And would be able
14    to evaluate, I believe it was the golden eggs, to the
15    extent that Dragon would disclose this to him.  But I
16    can't remember beyond that.

17                 MR. FRANK:  Let me mark this as 8?  9,
18    excuse me.

19                 (Deposition Exhibit 9 marked for
20    identification.)

21    BY MR. FRANK:

22         Q       I'd note Exhibit 9 does not have a Bates
23    number, I believe it was produced in the e-mails and has
24    not yet been Bates stamped.  It is a document with the
25    name Chris Zook at the top.  Chris Zook at sgcowen.com

DONALD L. WAITE

Page 78

1    dated 3/7/00.  And it is a one, two, three, four, five,

2    six-page document.

3                    MR. JOSEPH:  And basically it's a one-page

4    e-mail and those are the two attachments to it?

5                    MR. FRANK:  That is correct.

6                    MR. JOSEPH:  And this has been produced?

7                    MR. FRANK:  Yes.

8    BY MR. FRANK:

9        Q      Specifically when you've had a chance --

10                   MR. JOSEPH:  Let's let him take a look at

11   it.

12                   MR. FRANK:  I'm not going to disturb him.

13   I'm going to focus on the section entitled golden eggs

14   discussion, just so you know in advance.

15                   MR. JOSEPH:  It doesn't say on its face that

16   this was sent to this witness.

17                   MR. FRANK:  I understand that.  I'm just

18   going to see if it helps him recall specifically the

19   discussion and Mr. Stone's role in the due diligence.

20                   THE WITNESS:  Okay.

21   BY MR. FRANK:

22       Q      Directing your attention to the second page

23   at the bottom there is a heading, Golden Eggs Discussion,

24   and at the side it says Rob Stone.  And then it continues,

25   Rob Stone has reviewed with Janet the technology, golden

DONALD L. WAITE

Page 79

1    eggs, of NEON.

2              Was that the contact that you were referring

3    to previously?

4         A    Yes, I believe that is the contact that I

5    previously testified to.

6         Q    Are you aware of any other role that Rob

7    Stone played in the due diligence process of Dragon or

8    L&H?

9         A    None that I recall here today.  As I said,

10   the Bakers were quite concerned about his getting involved

11   and the possible leak of information.  And so they were

12   somewhat reticent in terms of his involvement and wanting

13   to limit his involvement.

14        Q    So they wanted to limit his involvement

15   specifically?

16        A    That's my recollection.

17        Q    And your recollection is he was brought in

18   as an aid to L&H's understanding of Dragon's golden eggs?

19        A    Yes.

20        Q    And you have no understanding of him having

21   any other role in the due diligence?

22        A    I don't have any other recollection of his

23   having other roles.

24        Q    Do you have any recollection of Janet Baker

25   ever telling you, or saying to you -- withdrawn.

DONALD L. WAITE

Page 80

1                    Now, if you go back to the exhibit we were

2      looking at earlier, the one just prior to that.

3                    MR. JOSEPH:  7?

4                    MR. FRANK:  7.  The March 7, 2000 --

5                    MR. KNOWLES:  That's 8.

6                    MR. FRANK:  That's 8, I apologize.

7      BY MR. FRANK:

8           Q      From Ben Howe and the LIGHT team and that

9      paragraph that we were just talking about previously?

10          A      Yes.

11          Q      Following the discussion about the golden

12     eggs it says, this due diligence may have to take place

13     post signing.

14                   Do you have an understanding based on your

15     experience in M&As what that referred to?

16                   And I mean specifically, post signing due

17     diligence.

18          A      I'm not quite sure I understand the nature

19     of your question.

20          Q      Do you have an understanding as to what post

21     signing due diligence would be?

22          A      Yes.

23          Q      And what would that be?

24          A      That they would, you know, continue the due

25     diligence process post signing pre closing to satisfy

DONALD L. WAITE

Page 81

1    themselves relative to different aspects of the

2    transaction.

3            Q       And is that a common feature in many

4    negotiated transactions to retain the right, for one party

5    or another to retain the right to conduct post signing due

6    diligence?

7            A       It has been my experience that that is

8    generally the right that the parties reserve.

9            Q       And as a consequence of that right do

10   parties often negotiate the right to terminate the

11   transaction if the due diligence uncovers certain items?

12           A       I believe that to be generally the case.

13           Q       Now, with respect to the L&H transaction,

14   were you made aware that at the time the resolution was

15   brought before the board that L&H had not produced audited

16   financial statements for 1999?

17           A       I do recall that.

18           Q       Was that a concern?

19           MR. JOSEPH:  Of his?

20   BY MR. FRANK:

21           Q       I'll start with of yours.

22           A       I'm sure that the lack of audited statements

23   was of some concern, the fact that it was taking them some

24   time to get their books closed.

25           Q       And do you recall whether that was a topic

DONALD L. WAITE

Page 82

1    that was discussed by the board of Dragon?

2         A    I don't specifically recall whether that was

3    a topic of discussion at the board.  I would think it

4    probably was an item that was raised at the board, but I

5    don't know that specifically.

6         Q    Do you recall if any efforts were --

7    withdrawn.

8              Do you recall if there was any provision in

9    the agreement for post signing due diligence with respect

10   to L&H's financial statements?

11        A    I don't recall whether there is a specific

12   reservations along those lines.  I would be somewhat

13   surprised if there weren't.

14        Q    Why would you be surprised if there were

15   not?

16        A    Simply because we were still, you know,

17   having discussions, reviews, in negotiations.

18        Q    And this was an issue that had been raised?

19             MR. JOSEPH:  What is the "this"?

20   BY MR. FRANK:

21        Q    The fact that there had not been audited

22   financial statements provided by L&H at the time that the

23   board adopted the resolution in support of the merger?

24        A    Can I just understand the question again?

25        Q    Sure.  Yes.

DONALD L. WAITE

Page 83

1                You indicated that you would be surprised if

2  there was no such provision in the agreement between the

3  parties, L&H and Dragon.  And that provision being a

4  reservation to conduct post signing due diligence with

5  respect to the as-yet unaudited financials.

6        A      I wouldn't limit it to, with respect to the

7  unaudited financials.

8        Q      Okay.  What would you include?

9        A      I would include that there would be ongoing

10  due diligence.

11        Q      With respect specifically to the financial

12  statements of L&H, are you aware of whether there was a

13  reservation of rights to do post signing due diligence?

14                MR. JOSEPH:  Well, I'm going to object.  The

15  document speaks for itself.  You can answer as best you

16  can.

17                If you want to give him the document, you

18  want him to read the document, he can read the document.

19                MR. FRANK:  I'm just asking for his best

20  recollection.

21                MR. JOSEPH:  It's been four years.

22                MR. FRANK:  Okay.  He can still answer the

23  question.  I know how long it's been.

24                MR. JOSEPH:  Go ahead.

25                THE WITNESS:  I don't recall whether there

DONALD L. WAITE

Page 84

1    is a specific reservation.

2    BY MR. FRANK:

3         Q    Would you be surprised if there were not a

4    reservation of that nature, that specific item?

5              MR. JOSEPH:  Just like your other question,

6    that's highly misleading suggesting there was not.  But

7    you may answer the question.

8              MR. FRANK:  I'm not suggesting there was or

9    wasn't.  I'm asking whether he would be surprised.

10             And you can simply say objection.

11             THE WITNESS:  Given the nature of the

12   discussions that were being held with them about their not

13   having audited financial statements, and I don't recall

14   what their statements were, I believe they had told us

15   that they had six months following their year end under

16   Belgium law to file financial statements.  And that

17   because of their transaction with whatever company they

18   acquired a few weeks before --

19   BY MR. FRANK:

20        Q    Dictaphone?

21        A    Yeah, Dictaphone, that they were, you know,

22   were citing reasons why their financials were being

23   delayed.

24             Given all of that, and since I don't recall

25   specifically all of the discussions, I don't know if I'd

DONALD L. WAITE

Page 85

1    be surprised that there was no reservation.

2                    MR. FRANK:  Okay.  10?

3                    (Deposition Exhibit 10 marked for

4    identification.)

5                    MR. JOSEPH:  These were previously marked as

6    Chamberlain Exhibit 8.  And then marked again as Cowen

7    Exhibit 20.

8                    THE WITNESS:  Okay.

9    BY MR. FRANK:

10        Q      This exhibit reflects the minutes of the

11   Dragon Systems, Inc. Meeting of the Board of Directors,

12   March 27, 2000.  Were you present for that meeting?

13        A      I believe I was.

14        Q      And I want you to turn to the second page --

15   first I want to ask you, do you recall at this meeting a

16   discussion being held among the board of the potential

17   transaction between L&H and Dragon Systems?

18        A      I recall that at a board meeting, presumably

19   this one, that we had such a discussion, yes.

20        Q      What do you recall of the discussions at

21   that meeting.  And I'll put it separately.

22                Do you have any independent recollection

23   aside from your review of this document of the meeting at

24   which the Dragon board voted to recommend the transaction

25   between L&H and Dragon Systems?

DONALD L. WAITE

Page 86

1          A          I have an independent recollection that

2     there was a meeting of the board to discuss the L&H

3     transaction.  I don't have an independent recollection of

4     the specifics of that meeting -- of that meeting.

5          Q          Now, if you would turn to the second page

6     and go to the second full paragraph.

7                    Which begins, Ms. Baker asked the

8     representatives of Goldman Sachs to comment on the

9     transaction.  And continues, Mr. Wayner described the

10    corporation's previous efforts to engage in a merger or

11    other business combination with another company, code

12    named Alabama, with which it had engaged in preliminary

13    acquisition discussions.  Mr. Wayner also discussed the

14    transaction with Lernout.  While the Goldman Sachs

15    representatives emphasized that they were not expressing

16    the opinion of Goldman Sachs, they noted that the

17    combination of the corporation and Lernout would create a

18    significant critical mass of technology leadership.

19                    Specifically with respect to the sentence

20    that reads, while the Goldman Sachs representatives

21    emphasized that they were not expressing the opinion of

22    Goldman Sachs, do you have any recollection of the

23    representatives of Goldman Sachs who gave a presentation

24    at that meeting indicating that Goldman Sachs itself was

25    not offering an opinion on the transaction?

DONALD L. WAITE

1        A        I have a recollection that if we were going

2   to get a fairness opinion from Goldman Sachs regarding the

3   transaction, that that would be a separately negotiated

4   agreement.   That it was not a part of the original

5   agreement with Goldman Sachs.   That's my recollection.

6        Q        Is there a -- did you ask for a fairness

7   opinion with respect to the transaction from Goldman

8   Sachs?

9        A        Not that I recall.

10        Q        Was there a reason that none was requested?

11        A        I believe that we felt after a discussion

12   amongst the board that the offer that we had from L&H was

13   a, you know, what we had initially set as a targeted

14   valuation of the company, and felt comfortable without

15   receiving an independent valuation.

16        Q        Now, we have discussed, and I don't want to

17   itemize them individually, but we discussed, I'll give you

18   just a couple of examples.   The Pacific revenues of L&H

19   and questions that may have arisen regarding their first

20   quarter boost in revenues in 2000.   Was that issue, to

21   your recollection, discussed at this board meeting?

22        A        I don't recall if that was a specific

23   discussion there or not.

24        Q        Had that been discussed -- did you discuss

25   that item with Janet Baker at any time prior to this

DONALD L. WAITE

Page 88

1    meeting?

2         A       Certainly there were internal discussions of

3    that issue in the company.  I don't recall a specific

4    discussion between Janet Baker and I regarding that topic.

5         Q       Do you have any recollection of any specific

6    discussions that you had with anybody in the company with

7    respect to that topic?

8         A       I don't recall specific discussions of that

9    topic.

10        Q       Did Ms. Baker ever inform you that she had

11   obtained comfort with respect to that issue from anything

12   stated by SG Cowen or a member of SG Cowen?

13                MR. COTLER:  Object to form.

14   BY MR. FRANK:

15        Q       You can answer.

16        A       I don't -- would you go back and restate the

17   question so I answer properly?

18        Q       Sure.  Do you recall ever being told by

19   Ms. Baker that she had obtained comfort with respect to

20   that increase in revenues in the first quarter of 2000 in

21   the Pacific of L&H by virtue of a discussion or a

22   representation made by somebody at SG Cowen?

23                MR. COTLER:  Object to form.

24                THE WITNESS:  No, I have no recollection of

25   any such comments by her.

DONALD L. WAITE

1    BY MR. FRANK:

2           Q        Did you obtain any comfort with respect to

3    the increased revenues in Korea in Q1 2000 of L&H on the

4    basis of any discussion or representation or statement

5    made by somebody affiliated -- withdrawn -- somebody from

6    SG Cowen?

7                    MR. COTLER:  Object to form.

8                    THE WITNESS:  Not that I recall.

9    BY MR. FRANK:

10          Q        Did anybody at Dragon Systems make you aware

11   that they had obtained some type of comfort with respect

12   to that issue by virtue of either a discussion, a

13   statement or a representation made by somebody at SG

14   Cowen?

15                   MR. COTLER:  Object to form.

16                   THE WITNESS:  Not that I recall.

17   BY MR. FRANK:

18          Q        Moving to the question of the unaudited

19   financials which we've talked about for 1999, and the

20   reasons why, did Ms. Baker ever inform you, or the board,

21   at any time that she had obtained comfort with respect to

22   the financial statements of L&H by virtue of a

23   conversation or a statement or a representation of any

24   type made by somebody from SG Cowen?

25                   MR. COTLER:  Object to form.

DONALD L. WAITE

Page 90

```
 1                 THE WITNESS:  Not that I recall.
 2   BY MR. FRANK:
 3        Q      Did you obtain any type of comfort with
 4   respect to the fact that the financials from 1999 were as
 5   yet unaudited at the time the board considered this
 6   agreement from any statement, representation,
 7   communication with anybody from SG Cowen?
 8                 MR. COTLER:  Object to form.
 9                 THE WITNESS:  Not that I recall.
10   BY MR. FRANK:
11        Q      And did any board member bring to your
12   attention at any time that they had obtained comfort with
13   respect to the unaudited financials by virtue of a
14   representation, statement or communication of SG Cowen?
15                 MR. COTLER:  Object to form.
16                 THE WITNESS:  That is any Dragon board
17   member?
18                 MR. FRANK:  That's correct.
19                 THE WITNESS:  Not that I recall.
20   BY MR. FRANK:
21        Q      With respect to any -- withdrawn.
22               With respect to your decision to vote to
23   approve the agreement proposed between L&H and Dragon
24   Systems, did you rely on any statement, communication or
25   representation made by somebody from SG Cowen?
```

DONALD L. WAITE

Page 91

1              MR. COTLER:  Object to form.

2              THE WITNESS:  Not that I recall.

3    BY MR. FRANK:

4         Q     Did Ms. Baker ever inform you that she had

5    relied on a representation, communication or statement

6    made by SG Cowen in deciding to vote to approve the

7    transaction at that time?

8              MR. COTLER:  Object to form.

9              THE WITNESS:  Not that I recall.

10   BY MR. FRANK:

11        Q     Did any other board member indicate to you

12   that they were relying or obtaining comfort from a

13   representation or statement made by somebody from SG

14   Cowen?

15             MR. COTLER:  Object to form.

16             THE WITNESS:  Not that I recall.

17   BY MR. FRANK:

18        Q     Do you recall any discussion of any

19   representation, statement or communication made, or

20   purported to have been made by SG Cowen or a person of SG

21   Cowen, at the discussion in advance of the vote to approve

22   the transaction between L&H and Dragon Systems?

23             MR. COTLER:  Object to form.

24   BY MR. FRANK:

25        Q     At that specific board meeting.

DONALD L. WAITE

Page 92

1                    MR. COTLER:  Object to form.

2                    THE WITNESS:  Can you just restate it?

3    BY MR. FRANK:

4         Q     Sure.  At the board meeting at which the

5    resolution was passed approving, or recommending the

6    transaction between L&H and Dragon, do you recall any

7    discussion of a representation, statement or communication

8    made by personnel of SG Cowen?

9                    MR. COTLER:  Object to form.

10                   THE WITNESS:  Not that I recall.

11   BY MR. FRANK:

12        Q     Now, did Seagate as a shareholder in Dragon

13   consider, or have a process at its board or among its

14   directors, by which they voted to approve the transaction?

15        A     I don't recall whether they had a process

16   for the board to approve the Dragon transaction or not.

17   Generally speaking, a transaction of this magnitude would

18   have to be taken before the Seagate board for approval.  I

19   don't recall if that, in fact, were done.

20        Q     Do you recall any presentation, whether or

21   not there was, in fact, an approval made, do you recall

22   any presentations made to the Seagate board with respect

23   to this transaction?

24        A     Not that I can recall.

25        Q     Do you recall whether Seagate conducted any

DONALD L. WAITE

Page 93

1    independent due diligence of L&H prior to the approval of

2    this transaction?

3                    MR. JOSEPH:   That I have to object to

4    because when you say independent --

5                    MR. FRANK:   Fair point.   Fair point.

6    BY MR. FRANK:

7         Q     Was all of Seagate's due diligence performed

8    in conjunction with Dragon Systems with respect to this

9    transaction?

10        A     Say that again, please?

11        Q     Yes.   Was all of the due diligence that

12   Seagate performed with respect to the L&H/Dragon

13   transaction, done in conjunction with or as part of and

14   party to the due diligence performed by Dragon?

15                    MR. JOSEPH:   Do you understand the question?

16                    THE WITNESS:   Yeah, I don't know that I have

17   all the knowledge to answer that.

18   BY MR. FRANK:

19        Q     To your knowledge?

20        A     I do not know of independent due diligence

21   conducted by Seagate, but that isn't to say they didn't

22   conduct independent due diligence.

23        Q     As the CEO of Dragon Systems did you ever

24   report to the Seagate board concerning the due diligence

25   performed on L&H?

DONALD L. WAITE

Page 94

1          A       I don't recall whether I made any such

2    reports or not.

3          Q       Between the time of March 27 when the board

4    approved the transaction and the closing date of the

5    transaction -- do you recall the closing date,

6    approximately?

7          A       Roughly June 1.

8          Q       Okay.

9                  MR. JOSEPH:  It's actually the 7th.

10                 MR. FRANK:  The 7th, but --

11                 MR. JOSEPH:  Within a week after four years

12   that's good enough.

13   BY MR. FRANK:

14         Q       And I'm also not looking to pigeonhole you

15   on the date, I'm looking for the block of time between the

16   acceptance of the agreement and the closing.

17                 Do you recall any further due diligence that

18   was conducted with respect to L&H's financial statements?

19         A       Between March 27 and June 7?

20         Q       Correct.  And by due diligence, I mean by

21   Dragon of L&H?

22         A       Specifically by Dragon personnel?

23         Q       Or its representatives.

24         A       Or its representatives.

25                 I don't recall what additional due diligence

Page 95

1    was conducted.

2          Q      On any topic?

3          A      On any topic.

4          Q      Do you recall any issue being raised

5    concerning any additional due diligence that was conducted

6    by Dragon or its representatives between the time of the

7    27th and the closing of the transaction?

8                 MR. JOSEPH:  May I have that question back,

9    please?

10                MR. FRANK:  Yeah, it's actually a bit

11   garbled so let me be a little more precise.

12   BY MR. FRANK:

13         Q      Do you recall any issue being raised to the

14   Dragon board or to you personally concerning due diligence

15   materials that had been uncovered following March 27 and

16   prior to the closing?

17         A      I can't place this within that time frame.

18   There was an issue that had arisen and I don't recall

19   the -- I don't recall the specific issue.

20                And I was advised by someone that I should

21   contact a partner of KPMG located in Dallas, Texas.  They

22   gave me the individual's name, but I don't independently

23   recall his name now.  And his telephone contact.  And told

24   me that they would contact him and advise him to expect my

25   telephone call.

DONALD L. WAITE

Page 96

1                    I followed that up with a telephone call to

2      the individual, and discussed whatever the topic was.  And

3      the -- and I don't want to say received satisfaction

4      because I don't remember the issue, and I don't want to

5      say, therefore, that I got satisfaction on whatever the

6      topic was.

7                    That's the only, the only situation that I

8      can recall where -- and a matter might have been brought

9      to my attention that may have been an issue in connection

10     with the transaction.

11          Q       With respect to that issue, were you advised

12     to call anybody from SG Cowen?

13          A       Not that I recall.

14          Q       Did you speak to anybody from SG Cowen, that

15     you recall?

16          A       At what time?

17          Q       With respect to that issue?

18          A       There were so many discussions involving SG

19     Cowen people that I can't testify that with respect to

20     this issue that I don't recall the nature of it, that I

21     had conversations at that time with SG Cowen.

22          Q       Do you recall whether this was an accounting

23     or financial statement issue?

24          A       I have no recollection of what the issue

25     was.

DONALD L. WAITE

Page 97

1      Q      And you recall -- I just want to try and pin

2  down to some degree when this conversation took place.

3             Do you recall this being after the signing

4  of the agreement between L&H and Dragon Systems?

5      A      Excuse me.

6             I've already said I can't place it in the

7  context of pre signing or post signing.

8      Q      I just wasn't sure and I just wanted to

9  clarify that.

10             Do you recall --

11             MR. JOSEPH:  We've been going almost an hour

12  and a half, can we take a couple minutes?

13             MR. FRANK:  Absolutely.

14             MR. JOSEPH:  Do you have any tape left?

15             THE VIDEOGRAPHER:  The time now is 12:27, we

16  are going off videotape record.  This also is the

17  conclusion of tape number two in the deposition of Donald

18  Waite.

19        (There was a recess in the proceedings.)

20             THE VIDEOGRAPHER:  The time now is 12:44,

21  we're back on the videotape record.  This also marks the

22  beginning of tape three in the deposition of Donald Waite.

23             Please continue.

24             MR. JOSEPH:  Don't encourage him.

25  BY MR. FRANK:

DONALD L. WAITE

Page 98

1          Q      Mr. Waite, I had asked you a series of
2    questions before about certain issues that had arisen
3    concerning L&H in advance of the board's recommendation
4    and vote on the transaction and vote to approve.

5                 And one of the issues that I don't recall
6    whether I raised or not, and I just wanted to touch on,
7    was whether you had become aware of certain concerns
8    regarding L&H's, what I would call related party
9    transactions and accounting for those related party
10   transactions during the due diligence.  Do you recall that
11   topic?

12         A      Yes.

13         Q      What do you recall about it?

14         A      What do I recall about it back at that time?
15   Or in the testimony this morning?

16         Q      No, what do you recall about it back at that
17   time?

18                MR. JOSEPH:  Are we talking about what he
19   recalls about the issue?  Or the discussion of the issue?
20   BY MR. FRANK:

21         Q      No, just the existence of the issue.

22         A      That they had this off balance sheet
23   development operation.

24         Q      And did you direct that any specific due
25   diligence be conducted by either Dragon's personnel or

DONALD L. WAITE

Page 99

1    your retained accountants or financial advisor on this

2    issue?

3          A     I don't recall if I directed any due

4    diligence or any specific effort be conducted.  But I do

5    know that that was one of the items that was discussed and

6    looked at.

7          Q     With respect to that item, did you obtain

8    any comfort on that issue from any representation or

9    statement or communication made by somebody, some

10   personnel of SG Cowen?

11         A     Not that I recall.

12         Q     Do you recall being informed by Ms. Baker

13   that she had received any comfort with respect to that

14   related party issue from any personnel or person of SG

15   Cowen?

16               MR. COTLER:  Object to form.

17               THE WITNESS:  Not that I recall.

18   BY MR. FRANK:

19         Q     And with respect to any board member of

20   Dragon Systems, do you recall any board member indicating

21   that they obtained comfort on that issue either by

22   communication or representation or statement made by

23   somebody from SG Cowen?

24               MR. COTLER:  Object to the form.

25               THE WITNESS:  Not that I recall.

DONALD L. WAITE

1    BY MR. FRANK:

2         Q       I asked you a series of questions with

3    respect to various issues and comfort obtained concerning

4    Janet Baker and yourself and board members.  And I just

5    want to ask you, were you ever informed that Jim Baker had

6    obtained any comfort on any of those issues we discussed,

7    the Pacific revenues, the related party transactions, the

8    unaudited financials, any matter regarding the financial

9    statements or health of L&H from a representation,

10   communication or statement of personnel of SG Cowen?

11                   MR. COTLER:  Object to the form.

12                   THE WITNESS:  Not that I recall.

13   BY MR. FRANK:

14        Q       At the time of the transaction with L&H were

15   there any alternative transactions that you recall Dragon

16   Systems passing up to take the one with L&H?

17        A       Other than I have testified relative to the

18   status of the Visteon transaction, I'm not aware of or

19   don't recall the existence of other transactions that were

20   pending at the time of the signing of the L&H agreement.

21        Q       Do you recall whether the negotiations with

22   Visteon had been, in fact, terminated prior to the time

23   that the transaction was voted on with L&H at the board

24   level?

25        A       Only as I had testified earlier that I

DONALD L. WAITE

Page 101

1   believe that the discussions with Visteon had ceased.

2        Q     And so at the time the transaction on March

3   27 was approved by the board, you're aware of no other

4   potential transaction that Dragon was involved in

5   negotiating?

6              MR. COTLER:  Object to form.

7              MR. JOSEPH:  And by transaction you're

8   talking about with a counterpart?

9              MR. FRANK:  Yes.

10             THE WITNESS:  Not that I recall.

11  BY MR. FRANK:

12       Q     Were any other members of the board of

13  Dragon, to your knowledge, involved in any of the due

14  diligence of L&H on Dragon's behalf?

15             MR. JOSEPH:  Other than Ms. Baker and

16  himself?

17             MR. FRANK:  Correct.

18  BY MR. FRANK:

19       Q     Aside from the team you've testified to?

20       A     I don't know whether Bob Roth or Bamberg

21  were involved in the due diligence process.  I just don't

22  recall.  They certainly were involved in several of the

23  meetings that transpired between L&H and Dragon which, you

24  know, various advisors might have been present.

25       Q     From your recollection did they have any

DONALD L. WAITE

1    specific role with respect to the due diligence, either

2    Mr. Bamberg or Mr. Roth?

3          A      I don't recall that they had a specific

4    charge other than in listening and evaluating the

5    presentations by L&H or others regarding the L&H business.

6          Q      And just before the break you had identified

7    one conversation on an issue which you did not recall with

8    a member of KPMG US.  And I know I had asked you this

9    before but I just want to, now that I'm aware of that

10   include this, include -- let me withdraw it.

11               Now that I'm aware of that conversation I

12   just want to be sure it is included with respect to your

13   answers that neither you, nor anyone to your knowledge,

14   obtained comfort on any issue that we've discussed

15   concerning L&H from personnel of SG Cowen?

16               MR. COTLER:  Object to form.

17               MR. JOSEPH:  Could I just get the question

18   back?  I'm not objecting to it --

19               MR. FRANK:  No, it's a convoluted question

20   and maybe I'll break it down easier.

21   BY MR. FRANK:

22          Q      It's my recollection that we've covered at

23   length the fact that you have no recollection of obtaining

24   comfort on any of the issues we've described from

25   personnel from SG Cowen; is that correct?

DONALD L. WAITE

Page 103

1        A       That is what I have testified.

2        Q       And you have no recollection of any of,

3    either Mr. Baker, Ms. Baker or any board member telling

4    you that they obtained comfort from a representation, a

5    statement or communication on any of these issues from

6    personnel of SG Cowen?

7                    MR. COTLER:  Object to form.

8                    THE WITNESS:  And that's what I believe I

9    have testified to.

10   BY MR. FRANK:

11       Q       And I just want to be sure that whatever the

12   issue was that you discussed with KPMG, whatever that

13   issue may have been, your testimony that you don't recall

14   obtaining comfort on any issue from SG Cowen would include

15   whatever that issue might have been?

16                   MR. JOSEPH:  Can we just stipulate to it so

17   we don't have to figure out what the question means?

18                   He doesn't recall relying on anything from

19   Cowen.  So if he doesn't remember that issue how could he

20   remember not relying with respect to the issue he can't

21   remember.

22                   MR. FRANK:  And I will still hold my

23   question.

24                   MR. COTLER:  Can I have the question back,

25   please.

DONALD L. WAITE

Page 104

1          MR. FRANK:  I'll rephrase it.

2    BY MR. FRANK:

3          Q     Was there anything from any issue that you

4    recall on which you relied on a statement, representation

5    or communication from SG Cowen with respect to the

6    L&H/Dragon transaction, and particularly the due diligence

7    of L&H?

8               MR. COTLER:  Object to form.

9               THE WITNESS:  There is -- I have no

10   recollection.

11              MR. JOSEPH:  But if you ask him an 11th or

12   12th time he may change his mind.

13              MR. FRANK:  Well, that's what I'm looking to

14   avoid happening at some later date.

15              All right, I will pass the baton.

16              MR. JOSEPH:  Who is next?  Sean?

17        (There was a discussion off the record.)

18                        EXAMINATION

19   BY MR. KNOWLES:

20        Q     Good afternoon, Mr. Waite.  My name is Sean

21   Knowles, I represent KPMG LLP which is the US KPMG entity

22   in this matter.  I just have a few questions I'd like to

23   ask you.

24              Am I correct, or is it correct that you were

25   named the interim CEO of Dragon at some point in October

DONALD L. WAITE

Page 105

1    of 1999?

2          A       Yes.

3          Q       Prior to October of 1999 am I correct that

4    you were an officer at Seagate Technologies?

5          A       Yes.

6          Q       And what specific position did you hold at

7    Seagate Technologies immediately prior to October of 1999?

8          A       I was the executive vice president and chief

9    administrative officer of the company.

10         Q       And in that position to whom did you report

11   at Seagate Technologies?

12         A       To our then CEO, Steve Luczo.

13         Q       And was Mr. Luczo also a member of the board

14   of directors of Dragon at that time?

15         A       Yes.

16         Q       And so then when you became interim CEO of

17   Dragon did you also report to Mr. Luczo?

18         A       As I retained my position at Seagate during

19   the time that I served as interim CEO of Dragon.

20         Q       Okay.

21         A       And so I continued to report to Mr. Luczo in

22   my role at Seagate.

23         Q       Okay.  And then independent of that in your

24   role as interim CEO of Dragon did you also report to

25   Mr. Luczo in the context of him being on the board of

DONALD L. WAITE

Page 106

1    directors of Dragon?

2          A      I reported to the board of directors which

3    included Mr. Luczo.

4          Q      And I think you've already answered this,

5    but when you were named interim CEO of Dragon did you

6    resign your position at Seagate Technologies?

7          A      No, I did not.

8          Q      So then from at least October of 1999 until

9    some point after the merger with Dragon and Lernout and

10   Hauspie closed, you were an officer of two distinct

11   corporations or companies; is that correct?

12         A      That's correct.

13         Q      Do you agree that an officer of a company

14   generally owes an obligation to serve the interests of

15   that company's shareholders?

16         A      I do.

17                MR. JOSEPH:  You can answer it, it's asking

18   for a legal conclusion but he's answered the question.  My

19   objection stands.

20   BY MR. KNOWLES:

21         Q      During the period of time that you served as

22   an officer of both Dragon and Seagate, whose interests did

23   you serve, Dragon's or Seagate's?

24         A      I served Dragon's interests in all matters

25   pertaining to Dragon.

DONALD L. WAITE

Page 107

1        Q       Did there ever come a time during that

2   period of time where Dragon's interests were inconsistent

3   from those of Seagate's?

4        A       I don't believe so.

5        Q       Had you considered that possibility before

6   you accepted the role as interim CEO of Dragon?

7        A       I don't recall thinking specifically of that

8   issue before accepting the interim CEO position.

9        Q       Was there somebody in particular at Seagate

10  Technologies who authorized you to become the interim CEO

11  of Dragon and still retain your position at Seagate

12  Technologies?

13       A       I certainly, you know, had the permission

14  from Mr. Luczo to do so.  I don't know what discussions

15  might have been held with the board of directors of

16  Seagate.

17       Q       And am I correct to say that your position

18  at Dragon was interim CEO; is that correct?

19       A       That is correct, according to the minutes.

20       Q       In October 1999 when you became the interim

21  CEO of Dragon was there a sense as to how long you would

22  serve as the CEO of Dragon?

23       A       There was no specified time period at the

24  time I was appointed that position.

25       Q       Did Mr. Luczo give you any goals in terms of

DONALD L. WAITE

Page 108

1    your position as interim CEO of Dragon?

2         A     No, he didn't give me any specific goals

3    other than as a board member of Dragon participating in

4    the board meetings.

5         Q     And in October 1999 when you became the

6    interim CEO of Dragon had Seagate at that point invested

7    money in Dragon?

8         A     Yes, we had.

9         Q     Do you recall approximately how much money

10   Seagate had invested at that time?

11        A     I believe it was somewhere in the 15, $18

12   million range, but I don't recall specifically.

13              In fact, I'll stand corrected.  By the time

14   I assumed the interim CEO role we had, I think, doubled

15   our investment, and also advanced them some money.

16        Q     At the time you were named interim CEO of

17   Dragon did anyone from Seagate Technologies express to you

18   a concern that Seagate would lose its investment in

19   Dragon?

20        A     I don't believe they expressed a view that

21   we would lose our investment in Dragon.  It was more in

22   how we could maximize the value of the Dragon investment.

23        Q     And who from Seagate expressed that concern

24   to you?

25        A     Certainly it would have -- if it came from

DONALD L. WAITE

Page 109

1    anybody it would have come from Mr. Luczo.

2            Q       During the time you served as interim CEO of

3    Dragon did Dragon conduct any search for a permanent CEO?

4            A       I don't believe we conducted a search for a

5    permanent CEO during my tenure as the interim CEO, given

6    the status of the negotiations that were pending.

7            Q       So because Dragon was involved in various

8    discussions with some of the potential acquirers that

9    we've discussed this morning there was no need for, or

10   there was no search conducted for a permanent CEO; is that

11   correct?

12           A       That's my recollection.

13           Q       Did you receive a salary while you served as

14   interim CEO of Dragon?

15           A       Not from Dragon.

16           Q       Did you receive any salary at all during the

17   time period that you served as interim CEO of Dragon?

18           A       I continued to be, receive my pay from

19   Seagate Technology.

20           Q       Are you familiar with someone named Diane

21   Hudson who worked for Dragon?

22           A       Yes, I am.

23           Q       Was she the CFO of Dragon immediately prior

24   to October of 1999 when you were named interim CEO of

25   Dragon?

DONALD L. WAITE

Page 110

1          A       Yes, she was.

2          Q       Was Ms. Hudson fired from her position as

3     CFO at Dragon?

4          A       I don't know whether you would classify her

5     termination as being fired.  I believe she resigned, but I

6     can't specifically state whether she resigned or was

7     otherwise terminated.

8          Q       Were you personally aware of any

9     conversations at Dragon or Seagate regarding satisfaction

10    with the performance of Ms. Hudson as CFO of Dragon?

11         A       Yes.

12         Q       Can you tell me more about that, what were

13    you aware of?

14         A       That the job was probably demanding more

15    than the capabilities she could bring to it.

16         Q       Did you personally exert any pressure on

17    Ms. Hudson to resign as CFO?

18         A       Not that I recall.

19         Q       Okay.  As I mentioned before I represent the

20    US member firm of KPMG International.  One of the things

21    I'd like to do is get a sense as to any discussions you

22    had with representatives of the US KPMG entity in

23    connection with the acquisition of Dragon by Lernout and

24    Hauspie.

25                  I believe you testified earlier this morning

DONALD L. WAITE

Page 111

1    you had a call with someone from Dallas; is that correct?

2         A       Yes, someone from KPMG's Dallas office.

3         Q       Okay, that's correct.  Now, aside from that

4    call which we can talk about in a little bit, did you

5    personally have any other communications with anyone from

6    KPMG US in connection with the acquisition of Dragon by

7    Lernout and Hauspie?

8         A       Not that I recall.

9         Q       So then I'd like to talk a little bit more

10   about this call with the person from the Dallas office, if

11   I can.

12               Can you tell me -- can you just tell me

13   everything that you recall about this call with someone

14   from Dallas?

15        A       As I testified earlier, some matter had

16   arisen and I was advised that I should call this

17   individual from the Dallas office.  And that he would be

18   apprised of my call before I called him and would be

19   expecting my call.

20               I called him.  We had a discussion, I don't

21   remember the length of the discussion.  It was more than a

22   very brief discussion, but I don't remember if it was, how

23   long the discussion ensued.

24               And as I testified earlier, I don't recall

25   the subject matter of the discussion.

DONALD L. WAITE

Page 112

1          Q       Okay.  I'd like to probe a little bit

2     further in to some of those issues.

3                  First with respect to the matter, I believe

4     you testified earlier that you couldn't say whether it was

5     an accounting matter or a financial matter; is that

6     accurate?

7          A       I said I didn't know what the matter was.

8          Q       Do you recall who it was who advised you to

9     speak to this individual from the Dallas office?

10         A       No, I don't recall.

11         Q       And I noticed when you answered previously

12    you used the pronoun him.  Are you confident that the

13    person you spoke with from the Dallas office was a male?

14         A       Yes, I am.

15         Q       You testified that it was more than a very

16    brief discussion.  I'd just like to see if I can get a

17    better sense of that.  So does that mean, was it longer

18    than a five-minute phone call?

19         A       I don't recall how long it was.

20         Q       So when you say it was more than a very

21    brief discussion, that's as specific as you can get?

22         A       Yes, it is.

23         Q       And I believe you testified earlier that you

24    couldn't say whether this call took place before signing

25    the merger agreement, before Dragon, excuse me, signed the

DONALD L. WAITE

Page 113

1   merger agreement on or about March 27, 2000 or after that

2   time period; is that correct?

3          A       That's correct.

4          Q       Do you recall where you were physically when

5   you had this call?  Where were you located?

6          A       My best recollection was that I was in my

7   office at the Dragon headquarters in Newton,

8   Massachusetts.

9          Q       And that doesn't help you to place the

10  timing of the call pre merger agreement versus post merger

11  agreement at all?

12         A       No, it does not.

13         Q       Did you take any notes of this phone call?

14         A       I don't recall whether I took notes or not.

15  I'd be surprised if I did not, but I certainly didn't have

16  any notes to produce for this deposition.

17         Q       Okay.  That was, you're anticipating my next

18  question.

19                 Did you conduct a search that would have

20  potentially captured those notes if they existed prior to

21  this deposition today?

22         A       Yes, we did conduct a search.

23         Q       And you produced all the documents that you

24  found prior to this deposition; is that correct?

25         A       To the best of my knowledge we produced all

DONALD L. WAITE

Page 114

1    the documents that were found.

2         Q       And you did not produce any documents

3    reflecting this conversation to the best of your

4    knowledge?

5         A       Not that I have seen.

6         Q       Did you have any sense as to why you were

7    being asked to contact someone from KPMG in the Dallas

8    office?

9         A       They gave me a reason as to why he was the

10   individual I should talk to, but I don't recall what that

11   reason was.

12        Q       Do you have any recollection as to why you

13   in particular were asked to make this telephone call?

14        A       No, I don't.

15        Q       Did anyone else participate in this phone

16   call aside from you and the individual from the Dallas

17   office?

18        A       I don't believe anybody else was on that

19   call.

20        Q       Did you understand this individual from the

21   Dallas office to be a partner at KPMG?

22        A       My recollection is that he was a partner at

23   KPMG, but I'm not certain of that and wouldn't testify to

24   that.

25        Q       So then under oath you can't say for sure

DONALD L. WAITE

Page 115

1    that he was actually a partner; is that correct?

2        A      That's correct.

3        Q      Is there anything that you can think of that

4    would help refresh your recollection as to the issue that

5    you discussed with this individual from the Dallas office?

6        A      Anything that would help me recall the

7    issue?

8        Q      Yes.

9        A      Well, there could be either some notes, the

10   individual from the Dallas office himself, possibly Ellen

11   Chamberlain might help me recall.  That's the only things

12   that might help me recall.

13       Q      Why do you specifically say Ellen

14   Chamberlain might help you recall?

15       A      Because she and I communicated quite closely

16   all the time that we worked together at Dragon.  And

17   the -- you know, I had no reason to be contacting KPMG to

18   the best of my recollection for matters that didn't

19   involve the ongoing discussions with various parties.

20       Q      And just so I'm clear, do you have a

21   specific recollection of notifying Ms. Chamberlain about

22   this call you had with the Dallas representative?

23       A      No, I do not.

24       Q      And to the extent you conducted a search for

25   documents prior to coming to this deposition, do you

DONALD L. WAITE

Page 116

1    believe it would have captured, or you would have been

2    able to find such notes if they existed?

3         A       Not necessarily.  I didn't have access to

4    all of the documents from my office up in Newton at the

5    Dragon office.

6         Q       Do you know what happened to those documents

7    that were up in the Dragon offices in Newton done, do you

8    know where they are today?

9         A       I do not know where they are today.

10        Q       Okay.  And then let's talk about, I guess, I

11   think you had testified earlier that you weren't able to

12   testify that you got satisfaction relating to this issue

13   because you couldn't remember the issue, is that accurate,

14   or would you like to correct that?

15        A       No, I testified that I cannot testify as to

16   whether I got satisfaction to whatever the, I hate to use

17   the term issue because I'm not sure it was even an issue,

18   but I can't recall, you know, having gotten satisfaction

19   or not getting satisfaction.

20        Q       And then aside from potentially discussing

21   this call with Ms. Chamberlain, do you recall discussing

22   this telephone call with anyone else from Dragon?

23        A       I don't recall discussing it with anyone

24   else at Dragon.  That isn't to say that I didn't discuss

25   it with others.

DONALD L. WAITE

Page 117

1          Q      But sitting here today your best

2    recollection is you don't recall having such discussions?

3          A      That's correct.

4          Q      And you don't recall any presentations you

5    made to the Dragon board that reflected the results or the

6    outcome of this phone call?

7          A      I don't recall any such discussions.

8          Q      Okay.  Just to clarify, and forgive me if

9    I've asked you this before, but aside from this telephone

10   call with someone from KPMG at the Dallas office you don't

11   recall you personally having any specific communications

12   with anyone from KPMG in the US with respect to the

13   acquisition of Dragon by Lernout and Hauspie?

14         A      I don't specifically recall having any

15   communications with Dragon -- or KPMG representatives in

16   connection with the L&H transaction.

17         Q      Okay.  You said specifically, do you recall

18   anything generally?

19         A      No, not generally.  There was a meeting in

20   the, let me call it the conference room across from my

21   office at Dragon that involved some accountants.  But I

22   don't remember whether that was just Arthur Andersen

23   accountants or other accountants.  So I can't recall that

24   I ever had discussions with anybody from KPMG.

25         Q      Okay.  Did you personally attend this

DONALD L. WAITE

Page 118

1    meeting?

2         A      Other than the one individual.

3         Q      Sorry.  Are you finished?

4         A      Yes.

5         Q      Did you personally attend this meeting with

6    the accountants in the conference room at Dragon?

7         A      If I recall this meeting correctly I

8    personally attended the meeting.

9         Q      But you can't be sure whether there were any

10   representatives from any KPMG entity at that meeting, or

11   whether it was just Arthur Andersen; is that correct?

12        A      Or what accounting firm.  I'm certain I

13   can't testify that there were any representatives from

14   KPMG.

15        Q      Do you recall the approximate date of this

16   meeting?

17        A      No, I do not.

18        Q      Do you recall whether it was pre signing the

19   merger agreement or after that period?

20        A      No, I do not.

21        Q      All right.

22               Mr. Waite, did Dragon retain Hale & Dorr to

23   provide legal advice in connection with the acquisition of

24   Dragon by Lernout and Hauspie?

25        A      We did.

DONALD L. WAITE

Page 119

1          Q          Did Hale & Dorr also serve as an outside law
2     firm to Seagate at that time?

3          A          I don't recall whether they provided
4     services to Seagate at that time.  I certainly was
5     familiar with the firm.  Whether we had utilized them in
6     connection with, you know, any other transactions, I don't
7     recall.

8          Q          I believe you testified earlier that you
9     didn't recall any specific reports to the Dragon board
10    regarding the status of the due diligence of Lernout and
11    Hauspie; is that correct?  Is that accurate?

12         A          I believe that's accurate.

13         Q          To the extent such reports did take place
14    would you expect them to occur at Dragon board meetings?

15                     MR. JOSEPH:  Object to the form.  You may
16    answer.

17                     THE WITNESS:  Let me be sure I understand
18    the question.  Would you repeat it?

19    BY MR. KNOWLES:

20         Q          Sure, let me see if I can take a look.

21                     If there had been such reports regarding the
22    due diligence of Lernout and Hauspie to the board, would
23    you have expected those to take place at the Dragon board
24    meetings?

25                     MR. JOSEPH:  Object to form.  You may

DONALD L. WAITE

Page 120

1    answer.

2                THE WITNESS:  They would not necessarily

3    have taken place at formal board meetings.  But I don't

4    recall communications with the board as a whole outside of

5    board meetings.

6    BY MR. KNOWLES:

7          Q      Okay.  If I could ask you to take out

8    Exhibit 10 which you saw earlier today, it was March 27

9    board meeting minutes?

10         A      Yes.

11         Q      I believe you looked at this earlier this

12   morning, if you want to take another look at it to refresh

13   yourself with it that's fine.

14               MR. JOSEPH:  Okay.  Is there any particular

15   part you want him to refer to?

16   BY MR. KNOWLES:

17         Q      Do you recognize this document to be minutes

18   from the March 27 board meeting at Dragon?

19         A      I'm assuming they are because that's what

20   they are stated to be.

21         Q      Okay.  And do you see your name listed as

22   present and participating throughout the meeting in the

23   second full paragraph on this --

24         A      I do.

25         Q      I think you had previously testified that

DONALD L. WAITE

Page 121

1    you were not aware of whether Seagate served as a

2    guarantor on a line of credit for Dragon with Fleet Bank;

3    is that accurate?

4         A     I think that is what I testified to.

5         Q     Okay.  If I could draw your attention to the

6    second page of this exhibit which is Bates stamped KPMG US

7    115015.  If you would look at the first full paragraph on

8    that page and the last sentence of that paragraph,

9    Mr. Waite also reported that the release of the guarantee

10   provided by Seagate Technology, Inc. of the corporation's

11   current line of credit with Fleet Bank was a condition to

12   the closing of the transaction.  Do you see that?

13        A     Yes.

14        Q     Does that refresh your recollection as to

15   whether Seagate Technology served as a guarantor to a line

16   of credit for Dragon?

17        A     I presume that accurately reflects the fact.

18   And I do know that there was, you know, a lot of

19   discussions with Fleet Bank over, over the guarantee.  And

20   I can't again remember if that was in connection with our

21   providing the initial guarantee or getting a release on

22   the guarantee.

23        Q     Okay.  As it says here, the release of this

24   guarantee provided by Seagate, to the extent that was a

25   condition of the closing of the merger with Lernout and

DONALD L. WAITE

Page 122

1    Hauspie would you characterize that as a benefit to

2    Seagate?

3                    MR. JOSEPH:  Objection to form.  You may

4    answer.

5                    THE WITNESS:  Excuse me, say that again.

6    BY MR. KNOWLES:

7         Q       Sure.  This line that I had you look at

8    refers to the release of a guarantee provided by Seagate

9    Technology, and characterizes that as a condition to the

10   closing of the transaction; do you see that?

11        A       Yes.

12        Q       To the extent that is true would you

13   characterize that as a benefit arising to Seagate from the

14   merger between Dragon and Lernout and Hauspie?

15        A       Yes.

16                    MR. JOSEPH:  I just want to put my

17   objection.  You're more than welcome to answer any

18   question he has.

19   BY MR. KNOWLES:

20        Q       Do you personally recall making any

21   presentations to the board during this March 27 meeting

22   regarding Dragon's due diligence of Lernout and Hauspie?

23        A       I don't recall making a presentation

24   relative to our due diligence.

25        Q       And based on your review of this document do

DONALD L. WAITE

Page 123

1    you see any references to such a presentation that you

2    made at this meeting?

3                    MR. JOSEPH:  The document speaks for itself.

4    We don't need to have the witness --

5    BY MR. KNOWLES:

6         Q      Do you have any independent recollection of

7    Ms. Chamberlain making a presentation to the board

8    regarding Dragon's due diligence of Lernout and Hauspie at

9    this meeting?

10        A      I don't recall whether she did or did not

11   make such a presentation.

12        Q      Do you have any independent recollection of

13   anyone from Arthur Andersen attending this March 27, 2000

14   board meeting?

15        A      I don't have an independent recollection of

16   anyone from Arthur Andersen attending.

17        Q      Okay.  Do you recall any report to the board

18   at this March 27, 2000 meeting regarding representations

19   made by KPMG US?

20        A      I don't have any recollection of any such

21   representations.

22        Q      Okay.  You can put that document away.

23                    MR. KNOWLES:  I'd like to mark this as Waite

24   Exhibit -- are we at 11?

25                    (Deposition Exhibit 11 marked for

DONALD L. WAITE

Page 124

 1   identification.)

 2   BY MR. KNOWLES:

 3        Q       If you could just take a look at that

 4   document for me, please.  Let me know when you've done so.

 5        A       Okay.

 6        Q       Mr. Waite, were you personally a party to

 7   any action in the United States Bankruptcy Court in

 8   Massachusetts called in re Gaston Bastiaens?

 9        A       Not that I recall.

10        Q       Are you familiar with an entity called

11   Stonington Holdings LLC?

12        A       Not that I recall.

13        Q       To your knowledge did Seagate Technology

14   have any investments in a company called Dictaphone?

15        A       Did Seagate Technology have any holdings in

16   Dictaphone?

17        Q       Any investment in a company called

18   Dictaphone?

19        A       There weren't any such investments by

20   Seagate to the best of my knowledge.

21        Q       Are you aware of any relationship between an

22   entity called Stonington Holdings LLC and Seagate

23   Technology?

24        A       No, I don't know of any such relationship.

25        Q       Okay.  Do you have any idea then why mail to

DONALD L. WAITE

Page 125

1   Stonington Holdings LLC would be addressed care of Seagate

2   Technology, Inc., attention Donald L. Waite?

3                   MR. JOSEPH:  I think you should ask the guy

4   on the phone from Craig and Macauley.  It says it's from

5   him.

6                   THE WITNESS:  No, I don't.

7   BY MR. KNOWLES:

8         Q       Do you know, were there any officers of

9   Seagate who served on the board of directors of

10  Dictaphone?

11        A       None to the best of my knowledge.

12        Q       All right.

13                  MR. KNOWLES:  If I could I'd like to mark

14  this as Waite Exhibit 12, please.

15                  (Deposition Exhibit 12 marked for

16  identification.)

17  BY MR. KNOWLES:

18        Q       If you could take a look at this exhibit and

19  let me know when you're finished, please.

20                  MR. JOSEPH:  The two documents are in

21  inverse order, I'm not sure they're actually related.

22  BY MR. KNOWLES:

23        Q       Okay.  If you could look at the first page

24  in this exhibit which is TRA10715, please.  And let me

25  know when you've finished reviewing that.

DONALD L. WAITE

Page 126

1          A        Um-hum.

2          Q        Okay.  Do you recognize this handwriting?

3          A        Yes, I do.

4          Q        Whose handwriting is it?

5          A        It looks a good deal like mine.

6          Q        Can you tell me what this document is,

7    please?

8          A        It -- are notes that I made, but I don't, I

9    don't know whether they were notes that I made as a result

10   of a conversation that I had with Ellen Chamberlain and

11   made notes of her comments, or whether these were notes

12   that I made of my own view of matters and that it's simply

13   notes that I would have made.

14         Q        Okay.  I see up at the top the first line

15   appears to be a telephone number within the handwritten

16   comments Ritz Boston, and then a dash with Ellen; is that

17   accurate?

18         A        Yes.

19         Q        Is it your position then that Ellen there

20   might refer to Ellen Chamberlain?

21         A        That would be my first impression.

22         Q        Okay.  If you look down about the middle of

23   the page there is a handwritten comment that appears to be

24   Bob Roth; do you see that?

25         A        Yes.

DONALD L. WAITE

Page 127

1        Q       Can you just read for me the two lines that
2   are below there?  I have a hard time making that out.
3        A       It says, Janet-great, paren good, question
4   mark, paren.  Spokesperson.
5        Q       I'm sorry, and the next line below that.
6        A       And then underneath that, dash, not good for
7   day-to-day direction.
8        Q       Okay.  And I believe then you testified that
9   you're not sure whether this reflects a conversation you
10  actually had, or comments from Ellen Chamberlain; is that
11  correct?
12       A       Yeah, I testified that I'm not sure that
13  these weren't notes I made as a result of conversations I
14  had, or whether these were notes that I made from a
15  conversation I had with Ellen.
16       Q       Okay.  Thank you.
17               Do you know who Bob Roth is?
18       A       Yes, he was one of the key technical people
19  at Dragon and one of the early, if he wasn't a founder,
20  one of the early Dragon people.
21       Q       Was he also on Dragon's board of directors,
22  to your knowledge?
23       A       I believe he was on the Dragon board, I'm
24  not sure about that.  He certainly attended board
25  meetings, but I don't remember if he was a board member.

DONALD L. WAITE

Page 128

1          Q          Do you recall taking any action as a result

2     of the notes that are reflected here on this page?

3          A          I don't recall that the notes on this page

4     led to me taking any specific action.

5                    MR. KNOWLES:  Okay.  Put that document away

6     and I'd like to mark this as Waite Exhibit 13, please.

7                    (Deposition Exhibit 13 marked for

8     identification.)

9     BY MR. KNOWLES:

10         Q          If you would please, sir, just take a look

11    at this exhibit and let me know when you're finished.

12         A          Okay.

13         Q          It would appear to me this is a two-page

14    document.  And the first page of this document it looks

15    like it may have something like a Post-it note sort of on

16    the upper left-hand side with various handwritten

17    notations.  And then the second page of the document is a

18    clean copy of the document; would you agree with that

19    description?

20         A          That's what it appears to be.

21         Q          Okay.

22                    MR. JOSEPH:  I think there are two Post-it

23    notes, but --

24                    MR. KNOWLES:  Okay, two Post-it notes.

25    BY MR. KNOWLES:

DONALD L. WAITE

Page 129

1          Q      So I guess looking at the second page which

2    we could perhaps assume is a clean copy of the document,

3    do you recognize this document?

4          A      I recognize it as appearing to be my

5    handwriting.

6          Q      Okay.  But do you recognize the format of

7    this document as it says To Do as of 10/1/99, at the top

8    and then it has a list of typewritten items and some

9    handwriting as well, do you recognize that format, is that

10   familiar to you?

11         A      No.

12         Q      And you said this appears to be your

13   handwriting; is that correct?

14         A      Yes.

15         Q      If I could ask you, could you please read

16   for me to the best you can what it says there, long?

17         A      Long conversation with Janet, dash, should

18   not have been a surprise since they had discussed it over

19   and over.

20                Another dash, agreed to disagree on

21   seriousness of situation.

22                Another dash, 99.5 percent of company

23   support Tamah's position.

24                Another dash, thinks she will be voted out.

25                Last dash, Bob Roth talked to Tamah and

DONALD L. WAITE

Page 130

1    expressed his concern over naming -- something I can't

2    read -- interim CEO, looks like naming me interim CEO.

3          Q        Thank you.  Do you recall, are these notes

4    of a conversation that you had with Janet Baker?

5          A        I don't believe that this necessarily

6    reflects notes of a conversation I had with Janet Baker.

7                   The -- I don't know that that's what this

8    reflects.

9          Q        Okay.  Do you recall anything about the

10   second dashed item that you read there which I believe

11   says, agreed to disagree on seriousness of situation?  Do

12   you recall, did someone tell you that?

13         A        Well, I believe that these were notes that I

14   took in a conversation with someone, and I believe that

15   someone is most likely Tamah.

16         Q        Tamah?

17         A        Right.

18         Q        Is that Tamah Rosker?

19         A        Tamah Rosker, right.

20         Q        So do you have any idea what's being

21   referred to here when it says, agreed to disagree on

22   seriousness of situation?

23         A        My recollection is that Tamah and Janet had

24   a, you know, agreed to disagree as to, you know, how

25   serious the matter, the employee matter at Dragon was.

DONALD L. WAITE

Page 131

1          Q          And by employee matter are you talking about

2     employee morale?

3          A          Employee morale.

4          Q          The bottom dashed item here I believe you

5     said says, Bob Roth talked to Tamah and expressed his

6     concern over naming, and you thought it might be me,

7     interim CEO; do you see that?

8          A          Yes.

9          Q          Did you ever have any discussions with

10    Mr. Roth over any concerns he had with naming you interim

11    CEO?

12         A          I don't recall specific conversations with

13    him prior to my being named the interim CEO.  I did have

14    conversations with him before that happened.  But I don't

15    recall a specific conversation about his concerns.

16                     I think the board minutes that we referred

17    to earlier reference this same, this same issue.

18         Q          So were you aware then that anyone had

19    concern over naming you interim CEO?  Let me withdraw.

20                     Were you aware then that anyone on the

21    Dragon board of directors had concerns about naming you

22    interim director of Dragon?

23         A          I believe that I was aware that there was

24    some concern by the Dragon board over naming me as the

25    interim CEO before they resolved the issue and elected me

DONALD L. WAITE

Page 132

1    to that position.

2         Q        So the concern then as you understood it was

3    more with the timing of naming you the CEO; is that

4    accurate?

5         A        No, I don't believe it had to do with the

6    timing, I think that it had to do with my lack of a

7    technical background.

8         Q        All right.  Just give me one second, let me

9    take a look at my notes, I may be finished.

10                 Mr. Waite, let me just make sure I have this

11   clear on the record with respect to your awareness of

12   conversations with anyone at Dragon, between anyone at

13   Dragon and anyone at KPMG US.  You testified a little

14   earlier with me that you recalled a conversation with

15   someone from the Dallas office; is that correct?

16        A        That's correct.

17        Q        And then you also testified that there was a

18   meeting at some point in the Dragon offices that was

19   attended by what you believe to be accountants; is that

20   correct?

21        A        That is correct.

22        Q        But you couldn't say specifically from which

23   firms those accountants may or may not have been; is that

24   correct?

25        A        That's correct.

DONALD L. WAITE

Page 133

1      Q      And aside from those two instances are you

2  aware of any other communications between anyone at Dragon

3  and anyone at KPMG US relating to the acquisition of

4  Dragon by Lernout and Hauspie?

5      A      I don't recall any such communications.

6      Q      Mr. Waite, when was the last time you spoke

7  with Janet Baker?

8      A      I don't recall whether I have spoken with

9  her since I left my position there as the interim CEO at

10  Dragon.  I may have, but I don't recall.

11      Q      How about Ellen Chamberlain, when was the

12  last time you spoke with Ms. Chamberlain?

13      A      I spoke directly to her maybe, my guess is

14  six or eight months ago.  I received a phone mail message

15  from her following her deposition in New York, whenever

16  that took place.

17      Q      What was the substance of that -- did you

18  return that message from Ms. Chamberlain?

19      A      No.

20      Q      What was the substance of the message that

21  Ms. Chamberlain left you relating to her deposition?

22      A      As I recall it she said, I just wanted to

23  let you know I spent a marvelous two days in New York City

24  with a bunch of men who kept shoving papers under my nose

25  with your handwriting all over it.

DONALD L. WAITE

Page 134

1       Q      Okay.  And just so I'm clear, to the best of
2  your recollection you didn't return that message?

3       A      I haven't spoken to her since the -- we do
4  communicate but she's busy, I've been busy, and we haven't
5  talked since she left me that phone mail message.

6       Q      Mr. Waite, are you represented by counsel
7  here today?

8       A      I am.

9       Q      And is that counsel Mr. Joseph sitting next
10 to you?

11      A      It is.

12      Q      I believe you sort of mentioned yesterday
13 that you had, you had had an opportunity to meet with
14 Mr. Joseph prior to the deposition today; is that correct?

15      A      I did.

16      Q      I definitely do not want to get in to any of
17 the substance of what you and Mr. Joseph discussed during
18 that prep session, but I would just like to ask, did you
19 review any documents during that prep session?

20      A      I did.

21      Q      Did you review the transcript of
22 Ms. Chamberlain's deposition testimony in this case?

23      A      I don't believe I did.

24      Q      Did anyone else participate in this prep
25 session aside from Mr. Joseph?

DONALD L. WAITE

Page 135

1          A       No, just Mr. Joseph.  Oh, excuse me, I stand

2    corrected.  At the very start of our session we placed a

3    call to our, Bill Hudson who is general counsel for

4    Seagate.  That conversation lasted three or four minutes.

5          Q       Okay.  And I think you've captured this in

6    your answer but I just want to make sure when I ask if

7    there was anything else present, I meant both present

8    physically and present on the telephone, does that change

9    your answer at all?

10         A       No.

11                 MR. KNOWLES:  All right.  I think that's all

12   I have.  Thank you very much, Mr. Waite.

13                 MR. JOSEPH:  Mr. Waite, I'm going to ask you

14   a few questions.  This is kind of a clumsy situation but I

15   want you to talk to the jury which is the camera for

16   today.  So even though I'm on your side and you're going

17   to be tempted to look over me, tempting as that may be,

18   try and restrain yourself and answer by looking in the

19   camera.

20                 This is going to be relatively brief.

21                           EXAMINATION

22   BY MR. JOSEPH:

23         Q       And I'm going to try and recapture a little

24   bit of the ground we have covered very succinctly so we

25   have this all together, Mr. Waite.

DONALD L. WAITE

Page 136

1            You're currently the chief administrative

2      officer of Seagate Technology?

3         A      I am.

4         Q      And you've been in that position for

5      approximately seven years?

6         A      I believe that's the case.

7         Q      And for about 14 years before that you were

8      the chief financial officer at Seagate; is that right?

9         A      From October of 1983.

10        Q      Until either '96 or '97?

11        A      Yeah, I served as chief administrative

12     officer and had the chief financial officer reporting to

13     me starting in about 1997.

14        Q      And prior to coming to Seagate in 1983 you

15     had served as chief financial officer in a number of other

16     both public and non public companies?

17        A      I did.

18        Q      And you worked for several years at Arthur

19     Andersen which was at one time an international accounting

20     firm?

21        A      That's correct.

22        Q      And am I correct that you also worked

23     immediately after you got your accounting and law degrees

24     at the SEC for a short period of time?

25        A      No, I worked at the SEC while I was going to

DONALD L. WAITE

Page 137

1    law school.

2         Q      I see.  You got your law degree from
3    Georgetown University?

4         A      I did.

5         Q      And you worked at the SEC while you were in
6    law school?

7         A      I did.

8         Q      And what was your position there?

9         A      I was a financial analyst.

10        Q      Sir, I'm going to ask you to think about
11   just this one transaction, the Dragon/Lernout and Hauspie
12   transaction.

13               Are you aware, sir, that SG Cowen,
14   Mr. Frank's client, rendered a fairness opinion that the
15   consideration being paid by Lernout and Hauspie for
16   Dragon's assets was fair to the shareholders of Lernout
17   and Hauspie?

18        A      I am.

19        Q      And how much was that consideration in
20   dollars, as best you recall?

21        A      I believe that the consideration was valued
22   at the time as approximately $525 million.

23        Q      And is it fair to say that when an
24   investment banking firm gives a fairness opinion, they're
25   basically saying that the acquisition is worth what's

DONALD L. WAITE

Page 138

1  being paid for it?

2        A      Could you state that again?  I'm sorry, I --

3        Q      That's just fine.  I want you to be clear

4  with my questions.

5              That a fairness opinion that is given to the

6  buyer of a company is an opinion that the company being

7  bought is worth the amount that's being paid for it; is

8  that fair?

9        A      That's my understanding.

10       Q      All right.  You were asked some questions

11  about Exhibit No. 2 which is this set of minutes from the

12  October 5, 1999 board meeting which you reviewed earlier

13  today.  Would you please turn with me to page 012128?

14       A      012128, yes.

15       Q      Yes.  And if you see the second full

16  paragraph from the top begins with the word Luczo, is that

17  Mr. Steve Luczo?

18       A      Yes, it is.

19       Q      What's his position at Seagate Technology

20  today?

21       A      He is chairman and chief executive officer.

22       Q      And did he also serve as chief executive

23  officer of Seagate in 1999?

24       A      I believe he was then chief executive

25  officer of -- let me think about this -- I believe that as

DONALD L. WAITE

Page 139

1    of October 5, 1999 that he was chief executive officer of

2    Seagate.

3             Q       But not the chairman of Seagate at that

4    time?

5             A       I'm not sure that he was chairman at that

6    time.

7             Q       All right.  Now, Mr. Luczo you've testified

8    earlier was also a member of the board of Dragon, correct?

9             A       Yes, I did.

10            Q       And in this passage which begins, everyone

11   needs to pitch in, he says, quote, from Seagate I wouldn't

12   be interested in selling this company for less than $500

13   million.  My sense is that let's not go too low, L&H is a

14   good buyer, my basement is 500 million.

15                    Do you remember discussions as to the value

16   of Dragon at the time period that thought was being given

17   to selling the company?

18            A       I don't have specific recollections of the

19   discussion of the values at this point in time.  I do know

20   that Mr. Luczo thought very highly of the Dragon

21   technology.

22            Q       All right.  Well, your reference to the

23   Dragon technology is something I want to follow up on.  If

24   you go to page 131, three pages later on.  At the very top

25   of the page you'll see this is Mr. Luczo speaking again,

DONALD L. WAITE

Page 140

1    if you look at the bottom of the prior page.  And they're

2    discussing the departure of Ms. Baker as the chief

3    executive officer.

4              Do you see at the top of page 131 in the

5    second full sentence it says, if someone is interested in

6    this company they are looking at the technology and the

7    management team.

8              Now, is that consistent with your

9    recollection of where the value lay in Dragon in 1999?

10        A    Yes, it is.

11        Q    And can you tell me whether Mr. Luczo's

12   reference earlier to a $500 million value is consistent

13   with your recollection of the value he had in mind for

14   this company as of October 1999?

15        A    I'm sorry, could you say that again?

16        Q    Sure.  On the prior page when we were

17   looking at 128 the reference is to $500 million as the

18   value for Dragon.  Is that consistent with your

19   recollection of the range of value he had in mind for the

20   company in October of '99?

21        A    Yes.

22        Q    I'd also like to look with you for a moment

23   at Exhibit 6 which is this Goldman Sachs book that counsel

24   for SG Cowen presented to you.  And if you would go with

25   me to just two pages in here, I'm only interested in a

DONALD L. WAITE

Page 141

1    couple of pages, page 482, GS 000482, which is entitled

2    Dictator Valuation Range.  And I just want to walk through

3    the right-hand side of this so the jury will understand

4    what it means under where it says, implied consideration

5    sales -- excuse me, implied consideration range.  In the

6    middle it shows -- let me step back.

7              You see that this has something entitled,

8    Dictator Valuation Range, correct?

9         A    Yes.

10        Q    And Dictator I understand is a reference to

11   Dragon in this presentation from your earlier testimony;

12   is that correct?

13        A    Yes.  As I said I had forgotten the code

14   name for Dragon, but Dictator I believe to be the code

15   name for Dragon.

16        Q    And then in the center here where we have

17   these Dictator sales, the same numbers appear for Dragon

18   sales in each of these four different scenarios of

19   valuation, correct?

20        A    Correct.

21        Q    And I just want to look at the implied

22   consideration range in this valuation page for Dragon on

23   the right-hand side in the top block where it shows a,

24   LTM, is that last 12 months?

25        A    I believe that's meant to stand for last 12

DONALD L. WAITE

Page 142

1    months.

2         Q       And does that then, given these four

3    scenarios which are identical in this first block, show a

4    valuation range of $1.41 billion in each of the four

5    scenarios, high, mean, median and low?

6         A       Yes.

7         Q       And in the second block beneath that the

8    implied consideration range shows a range from a low of

9    379 million to a high of 1.678 billion?

10        A       Yes.

11        Q       And in the third valuation range the implied

12   consideration ranges from a low of 377 million to a high

13   of 2.886 billion?

14        A       Yes.

15        Q       And the very last one on the bottom of the

16   page it shows an implied consideration range, an LTM range

17   going from 125.6 million low to 860.2 million high?

18        A       Yes.

19        Q       And if you'll then turn with me to page --

20   well, let's stop at GS 000500 for a moment.  And you see

21   this is entitled, Equity Research Views on LIGHT.  Am I

22   correct that LIGHT is a reference to Lernout and Hauspie?

23        A       I believe that was the code name for Lernout

24   and Hauspie.

25                MR. FRANK:  Could you just give me the Bates

DONALD L. WAITE

Page 143

1    number again?

2                   MR. JOSEPH:  Sure.  500.  Let me know when

3    you're there.

4                   MR. FRANK:  I'm there.

5    BY MR. JOSEPH:

6         Q    You see this is a synopsis of an equity

7    research view from Mr. Stone of SG Cowen rating the

8    company, Lernout and Hauspie, a strong buy?

9         A    Yes.

10        Q    And do you understand a strong buy to be an

11   analyst's recommendation that the market should acquire

12   that stock because there is a significant upside?

13                  MR. FRANK:  Objection.

14                  MR. JOSEPH:  That's fine.

15                  You can answer the question.

16                  THE WITNESS:  At this time, in this time

17   frame that's what I understood it to mean.

18   BY MR. JOSEPH:

19        Q    And in fairness, that was with the date of

20   January 5, 2000?

21        A    Yes.

22        Q    And the comment says, L&H is the leading

23   player in the emerging market for natural speech

24   interfaces in computer, automotive, consumer electronics

25   and communications applications from a strong base

DONALD L. WAITE

Page 144

1    business in technology licensing.  It is rapidly expanding

2    in to higher value added applications and services.

3                   Do you see that?

4         A       I do.

5         Q       And on the next page which is another equity

6    research view on LIGHT, you see there is a broker analyst

7    report from Dresdner Kleinwort Benson?

8         A       Yes, I see that.

9         Q       And the first comment on that January 4,

10   2000 report is, we believe Lernout and Hauspie to be

11   fundamentally undervalued and set a conservative year end

12   price target of US $73?

13        A       Yes.

14        Q       I want to direct your attention next, sir,

15   to Exhibit 9.  And that was an unBates numbered exhibit

16   that counsel for Cowen presented, an e-mail from Mr. Zook

17   to Mr. Lernout and others, all of whom appear to be on the

18   Lernout and Hauspie side of the transaction.

19                   And please take a look and tell me if I'm

20   mistaken about that and you see anybody that does not

21   appear to be on the Lernout and Hauspie side of the

22   transaction?

23        A       I believe that's correct.

24        Q       If you'll turn with me to the third page,

25   Roman numeral III, it's entitled, Purchase Price

DONALD L. WAITE

1    Alternatives.

2         A    Yes.

3         Q    The second paragraph, the second sentence

4    reads, currently NEON -- and I'll represent to you that

5    that's an abbreviation for Dragon -- currently NEON

6    employees feel they are underpaid and they lack faith in

7    the direction which management is taking the company,

8    which has led to low morale.  Providing employees this

9    incentive to stay, expressing the interest we have in

10   retaining key personnel, and giving them reason to feel

11   good about their new parent is a necessary step in making

12   this acquisition work.  Do you see that?

13        A    Yes, I do.

14        Q    Was there any time that anybody at Dragon

15   attempted to cover up any kind of employee dissatisfaction

16   from anybody at Lernout and Hauspie?

17        A    Not to the best of my recollection.

18        Q    And if you'll turn with me to Exhibit 8,

19   which is another document that counsel for Cowen showed

20   you.  And I want to direct your attention to the same

21   location he directed your attention to which is the third

22   paragraph.  And particularly to the negative financial

23   performance of Dragon.  Do you see those references there?

24        A    I do.

25        Q    It says, at the same time based on our due

DONALD L. WAITE

Page 146

1    diligence findings, we have developed several concerns.

2    Obviously, the fact that revenue growth in fiscal year

3    1999 was negative is an issue right now.

4                    That means that sales went down, correct?

5        A        Correct.

6        Q        It says, based on an annual -- excuse me,

7    based on annualized projections for Q1 2000, NEON --

8    again, I'll represent to you that's Dragon -- Dragon's

9    current run rate is $70 million in revenue with a negative

10   $19 million operating loss.

11                   So at any time during the negotiations

12   between Dragon and Lernout and Hauspie, was there any

13   effort to conceal from Lernout and Hauspie, or from Cowen,

14   or from KPMG, or anybody, the negative financial

15   performance of Dragon?

16       A        Not to the best of my knowledge.

17       Q        And after giving all that information, to

18   the best of your knowledge, Cowen gave a fairness opinion

19   that a $525 million acquisition price was fair to the

20   shareholders of Lernout and Hauspie; is that right?

21       A        They gave their fairness opinion as to the,

22   as to the valuation of Dragon.

23       Q        At 525 million?

24       A        I believe it was at 525 million.

25                   MR. JOSEPH:  I don't think I have any more

DONALD L. WAITE

Page 147

1    questions for the witness.

2                    MR. COTLER:  I have a couple quick ones.

3            (There was a discussion off the record.)

4                              EXAMINATION

5    BY MR. COTLER:

6         Q      Mr. Waite, I want you to look at Exhibit 8.

7                    MR. JOSEPH:  He's got it right there.

8    BY MR. COTLER:

9         Q      This is a document -- looking at Exhibit 8

10   and this is a document that has SG in the upper left-hand

11   corner and it says SG Cowen, this is a document that came

12   from SG Cowen, do you under understand that?

13        A      I accept that.

14        Q      And SG Cowen was the investment banker for

15   Lernout and Hauspie; you understood that?

16        A      Yes.

17        Q      In a way they were sort of speaking for

18   Lernout and Hauspie, right, representing them?

19                   MR. FRANK:  Objection.

20                   THE WITNESS:  They were --

21                   MR. COTLER:  What's the grounds of the

22   objection.

23                   MR. FRANK:  Compound question.

24                   MR. COTLER:  I'll rephrase the question.

25   BY MR. COTLER:

DONALD L. WAITE

Page 148

1          Q          Did you understand that when SG Cowen spoke

2     they were speaking for L&H basically?

3          A          Well, I understood them to be advising

4     Lernout and Hauspie, and therefore, you know, representing

5     them.

6          Q          Now, this memo is dated March 7, 2000.  It's

7     one page, right?

8          A          Yes.

9          Q          And it comes from Ben Howe of SG Cowen.  And

10    it's addressed to Janet Baker and you, Don Waite, right?

11         A          Yes.

12         Q          And I just want to read the first two

13    paragraphs and ask you some questions.

14                    SG Cowen says in this letter, Dear Janet and

15    Don, in order to keep our negotiations moving forward this

16    week toward an agreement, we would like to share with you

17    some of the topics that our team discussed this weekend.

18    It is our hope that with a common understanding we can

19    resolve any issues that both sides have, and get to a

20    definitive agreement that each side is comfortable with as

21    quickly as possible.

22                    And, in fact, the definitive agreement was

23    reached shortly after this, right?

24                    MR. FRANK:  Objection.

25                    MR. COTLER:  What's the ground of the

DONALD L. WAITE

Page 149

1    objection?

2              MR. FRANK:  You characterized this as SG

3    Cowen stating this and it's issued from Ben Howe and the

4    LIGHT team.

5    BY MR. COTLER:

6         Q     Do you know who Ben Howe was?

7         A     Yes, he was, I believe he headed up M&A for

8    SG Cowen, but I'm not sure that that was, that he actually

9    headed it up.  But he was certainly with SG Cowen.

10        Q     A definitive agreement, a binding contract

11   was arrived at between Lernout and Hauspie and Dragon

12   shortly after this memo; isn't that right?

13        A     Yes.

14        Q     In the next paragraph --

15        A     Could I interrupt?

16        Q     Sure.  Go ahead.

17        A     I just want to make a comment that you

18   stated that this is a one-page memo, this appears that it

19   may be, that it may be only the first page of a multi-page

20   memo.

21        Q     It might be.  But in terms of what the

22   lawyers for Cowen gave us this morning, they gave us just

23   one page.

24        A     Yes.

25        Q     And in the next paragraph Ben Howe of SG

DONALD L. WAITE

Page 150

1    Cowen and the LIGHT team, that would be L&H, right?

2         A    Yes.  My understanding is that LIGHT was the

3    code name for Lernout and Hauspie.

4         Q    The next paragraph they wrote, first, it is

5    important to note that throughout the course of our

6    meetings over the past few weeks we have confirmed a

7    number of positive attributes of Dragon and its potential

8    integration with Lernout and Hauspie.  Given the strong

9    technology you possess it is apparent that the combination

10   of the two organizations would result in a true market

11   leader.

12              At the time that you read this did you have

13   any reason to believe that that was not true?

14        A    No.

15        Q    In fact, isn't it true -- let me rephrase

16   the question.

17              Mr. Waite, was it your understanding that

18   what Lernout and Hauspie was paying for was for the Dragon

19   speech technology?

20        A    I believe that they, that they were

21   certainly interested in the Dragon technology which was

22   mainly its speech technology.

23        Q    Is there anything on this one page, you read

24   it earlier before, is there anything on this one page

25   where Lernout and Hauspie says, you know, we really can't

DONALD L. WAITE

Page 151

1    wait to have Janet Baker use her management skills at

2    Lernout and Hauspie, or anything about her running the

3    company, or being CFO, or CEO, or anything like that?

4         A      No, not in this one page.

5         Q      Is there anything in this memo where they

6    say, you know, we're paying all that money because we

7    really love Dragon's cash flow position, and that's why

8    they're paying the money?

9         A      No.

10        Q      Anything in this that you can see other than

11   the fact that they wanted Dragon's strong technology?

12        A      Nothing.

13               MR. COTLER:  I don't have any other

14   questions.

15               MR. JOSEPH:  If you have a couple, just a

16   couple of questions on the phone, you know, we're at 2:00

17   but we'll try and accommodate.

18                         EXAMINATION

19   BY MS. ALVAREZ:

20        Q      Mr. Waite, this is Irada Alvarez calling in

21   from Boston, I'm with Goodwin Procter and we represent

22   Mr. Jozef Lernout.

23               I have a question -- earlier today you

24   testified that you were present at a meeting in

25   Burlington, Massachusetts, where L&H management gave a

Page 152

1    series of presentations.  Do you recall who from L&H

2    management was there?

3         A      I don't recall the names of all the people

4    that were there.  I believe -- I believe the senior person

5    to the best of my recollection was Gaston Bastiaens.

6         Q      Was Mr. Jozef Lernout present at that

7    meeting?

8         A      I don't recall whether he was at that

9    meeting or not.

10         Q      Have you ever met Mr. Jozef Lernout?

11         A      I don't recall if I've met him or not.

12              MS. ALVAREZ:  Okay.  That's all I have.

13              MR. JOSEPH:  All right.  Anybody else?

14    Going -- going -- gone.  Thanks.

15           (There was a discussion off the record.)

16              MR. JOSEPH:  We'll read and sign.

17              THE VIDEOGRAPHER:  Here marks the end of

18    videotape number three in the deposition of Donald Waite.

19              The original videotapes will be retained by

20    LegaLink Video Solutions at 50 1st Street, San Francisco,

21    California.

22              Going off the record.  The time now is 2:03.

23         (The proceedings were concluded at 2:03 p.m.)

24

25

```
 1                   CERTIFICATE OF REPORTER

 2        I, DARLENE S. TRAFICANTE, Registered Professional

 3   Reporter and Certified Shorthand Reporter, hereby certify

 4   that the witness in the foregoing deposition was by me

 5   duly sworn to tell the truth, the whole truth and nothing

 6   but the truth in the within-entitled cause;

 7        That said deposition was taken down in shorthand

 8   by me, a disinterested person, at the time and place

 9   therein stated, and that the testimony of said witness was

10   thereafter reduced to typewriting, by computer, under my

11   direction and supervision;

12        That before completion of the deposition, review

13   of the transcript [X] was [ ] was not requested.  If

14   requested, any changes made by the deponent (and provided

15   to the reporter) during the period allowed are appended

16   hereto.

17        I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of this

20   cause, and that I am not related to any of the parties

21   thereto.

22              DATED:  3-24-04

23

24              Darlene S. Traficante, RPR

25              CSR No. 12774
```

**Legalink San Francisco  (415) 359-2040**

DONALD L. WAITE

Page 154

1   March 30, 2004

2

3   Donald L. Waite
    Gregory P. Joseph, Esquire
4   GREGORY P. JOSEPH LAW OFFICES LLC
    805 Third Avenue, 31st Floor
5   New York, NY 10022
6   Re:  IN RE LERNOUT & HAUSPIE SECURITIES LITIGATION
7   Dear Mr. Waite:
8   Please be advised that the original transcript of your
    deposition taken March 12, 2004, in the above-entitled
9   matter is available for reading and signing.  The original
    transcript will be held at the offices of LegaLink San
10  Francisco, 601 Van Ness Avenue, Suite 2052, San Francisco,
    California, 94102, (415) 359-2040, for thirty (30) days in
11  accordance with Federal Rule Section 30(e).
12  If you are represented by counsel in this matter, you may
    wish to ask your attorney how to proceed.  If you are not
13  represented by counsel and wish to review your transcript,
    please contact our office for a mutually convenient
14  appointment to review your deposition.
15  Thank you for your cooperation in this matter.
16  Sincerely yours,
17
18  Ronald B. Harrison,
    Vice President
19
20  cc:  Original transcript
         All counsel
21
22
23
24
25

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE LERNOUT & HAUSPIE SECURITIES LITIGATION, | |
| | CA No. 00-11589-PBS |
| THIS DOCUMENT RELATES TO ALL CASES | |

### ACKNOWLEDGEMENT AND ERRATA

STATE OF CALIFORNIA          )
                                             ss:
COUNTY OF SANTA CRUZ     )

DONALD L. WAITE being duly sworn deposes and says:

1.    I have read the transcript of testimony taken under oath in my deposition of March 12, 2004 in connection with the above-captioned litigation and related cases. Subject to the corrections set forth at Exhibit A hereto, to the best of my recollection the transcript is true, complete and correct record of what was asked, answered and said during my deposition.  I hereby certify that, subject to the corrections set forth at Exhibit A hereto, the answers on the record as given by me are true and correct.

2.    Annexed hereto as Exhibit A are my changes to the transcript of testimony, made pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, including the reason for each such change.

_____

Donald L. Waite

Subscribed and sworn to before me this
21ST day of April 2004

_____
Notary Public



GEORGIA A. BRINT
Comm. 1480002
NOTARY PUBLIC-CALIFORNIA
SANTA CRUZ COUNTY
MY COMMISSION EXPIRES APR. 9, 2006

## EXHIBIT A

### Errata Sheet to Deposition of Donald  L. Waite Taken on March 12, 2004

| Page | Line(s) | Change From | To | Reason for Correction |
|------|---------|-------------|-----|----------------------|
| 11 | 18 | for certainly | for are certainly | To correct mistranscription |
| 32 | 25 | Scion | Psion | To correct spelling |
| 33 | 7 and 23 | Scion | Psion | To correct spelling errors |
| 34 | 21 | Scion | Psion | To correct spelling error |
| 38 | 17 | of | I | To correct mistranscription |
| 38 | 21 and 24 | Scion | Psion | To correct spelling errors |
| 39 | 4, 11, 15, 17, 20, and 25 | Scion | Psion | To correct spelling errors |
| 43 | 9 | proposals from, of | proposals from, or | To correct mistranscription |
| 48 | 11 | to together and | together and | To correct mistranscription |
| 50 | 22 | and what was | about what was | To correct mistranscription |
| 53 | 22 | familiar | unfamiliar | To correct mistranscription |
| 54 | 2 | earned | R&D | To correct mistranscription |
| 74 | 19 | marketing | marking | To correct mistranscription |
| 77 | 3 | rode | wrote | To correct mistranscription |

| 79 | 2 and 4 | contact | context | To correct mistranscription |
|-----|-----|------------------------|----------------------|---------------------------------------------|
| 87 | 13 | a, you know, what | , as you know, what | To correct transcription and punctuation errors |
| 101 | 23 | Dragon which | Dragon at which | To correct mistranscription |
| 127 | 4 | paren.  Spokesperson. | paren spokesperson. | To correct punctuation error |

EXHIBIT G

# GREGORY P. JOSEPH LAW OFFICES LLC

805 THIRD AVENUE
NEW YORK, NEW YORK 10022
(212) 407-1200
WWW.JOSEPHNYC.COM

SUSAN M. DAVIES
DIRECT DIAL: (212) 407-1208
DIRECT FAX: (212) 407-1274
EMAIL: sdavies@josephnyc.com

FACSIMILE
(212) 407-1299

May 26, 2005

<u>Via Electronic Mail and First Class Mail</u>

Jeff E. Butler, Esq.
Jeff.Butler@CliffordChance.com
Clifford Chance US LLP
31 West 52nd Street
New York, New York 10019-6131

**Re:**   ***Quaak v. Dexia, S.A.*, No. 03-CV-11566-PBS**
***Stonington Partners, Inc. v. Dexia, S.A.*, No. 04-CV-10411-PBS**
***Filler v. Dexia, S.A.*, No. 04-CV-10477-PBS**
***Baker v. Dexia, S.A.*, No. 04-CV-10501-PBS**

Dear Jeff:

Pursuant to the Scheduling Order in the above-captioned actions and the Confidentiality Order in *In re Lernout & Hauspie Sec. Litig.*, 00-CV-11589-PBS and related cases, as modified by electronic order entered in *In re Lernout & Hauspie Sec. Litig.*, 00-CV-11589-PBS on May 25, 2005, and subject to *Filler Plaintiffs' Responses & Objections to Defendant Dexia Bank Belgium's First Request for Production of Documents from the Filler Plaintiff,* the following discovery materials from *In re Lernout & Hauspie Sec. Litig.* are available immediately for pick-up and copying by your vendor:

- Copies of various written discovery requests and responses Bates numbered GPJLO 02429 – GPJLO 04809

- Documents produced by KPMG LLP Bates numbered KPMGUS124237 – KPMGUS124507

- Documents produced by Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren Bates numbered KPMG-B-046895 – KPMG-B-047474

GREGORY P. JOSEPH LAW OFFICES LLC

Jeff E. Butler, Esq.
May 26, 2005
Page 2

- A CD containing TIFF images of the following
    - documents produced by PricewaterhouseCoopers LLP
      Bates numbered PWC 000001 – PWC 010196,
    - documents produced by Ellen Chamberlain Bates numbered
      EC 00001 – EC 00018,
    - documents produced by Donald L. Waite Bates numbered
      DW 00001 – DW 00062, and
    - documents produced by Stephen Luczo Bates numbered
      SL 00001 – SL 00023.
- Transcripts of depositions, and exhibits marked at depositions, of the
  following individuals (including errata and confidential designations):
    - Ellen Chamberlain – January 20-21, 2004
    - Stephen Luczo – July 29, 2004
    - Sarah Rothermel – September 10, 2004
    - Donald L. Waite – March 12, 2004

Please contact Charles Vos at 212-407-1255 (cvos@josephnyc.com) to
arrange pick up and return of the above materials.

Sincerely,

Susan M. Davies

CC:    Via e-mail only
       Amber Wessels (Amber.Wessels@CliffordChance.com)
       Peter Saparoff (psaparoff@mintz.com)
       Patrick Rocco (Procco@lawssb.com)
       Patrick Egan (pegan@bermanesq.com)
       Karen C. Dyer (kdyer@bsfllp.com)
       Javier Bleichmar (Javier@blbg.com)

EXHIBIT H

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SDNY WEB 4/99

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF _____ OREGON _____

JANET BAKER and JAMES BAKER, JKBAKER LLC
and JMBAKER LLC, et al.

**V.**

DEXIA, S.A. and DEXIA BANK BELGIUM (formerly
known as ARTESIA BANKING CORP., S.A.)

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: [1] 04-10501 (PBS)
03-11566 (PBS)
04-10411 (PBS)
04-10477 (PBS)

TO:    MS. ELLEN CHAMBERLAIN
c/o Gregory P. Joseph Law Offices LLC
805 Third Avenue, 31st Floor
New York. New York 10022

Pending in the United
States District Court for the
District of Massachusetts

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify
in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in
the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| At a location to be discussed by counsel for the Defendants and the witness. | May 11, 2006, 9:30 a.m. |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place,
date, and time specified below (list documents or objects):

See attached Schedule A.

| PLACE | DATE AND TIME |
|---|---|
| Clifford Chance US LLP<br>31 West 52nd Street, New York, NY 10019 | April 17, 2006, 9:30 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more
officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person
designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]*          Attorney for Defendant Dexia Bank Belgium | March 28, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Jeff Butler
Clifford Chance US LLP, 31 West 52nd Street, New York, NY 10019, (212) 878-8205

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SDNY WEB 4/99

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____        _____
                        DATE                                    SIGNATURE OF SERVER

                                                        _____
                                                        ADDRESS OF SERVER

### Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that,

subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

## DEFINITIONS

1.      "Artesia" means Artesia Banking Corporation, S.A, and its predecessors Paribas Bank België (a.k.a. Paribas Banque Belgique) and Bacob Bank.

2.      "Dexia" means Dexia S.A. or Dexia Bank Belgium (a.k.a. Dexia Bank België or Dexia Banque Belgique).

3.      "Dragon" means Dragon Systems, Inc.

4.      "L&H" means Lernout & Hauspie Speech Products, N.V., including any of its predecessors, successors, parents, subsidiaries, divisions or affiliates and their officers, directors, agents, attorneys, accountants, employees, partners, or other persons occupying similar positions or performing similar functions.

5.      The term "Plaintiffs" refers to any of the plaintiffs in this action or the related actions against Dexia Bank Belgium pending in the District of Massachusetts, namely Hans A. Quaak; Attilio Po; Karl Leibinger; Stonington Partners, Inc.; Stonington Capital Appreciation 1994 Fund, L.P.; Stonington Holdings, L.L.C.; Gary B. Filler and Lawrence Perlman, as trustees of the TRA Rights Trust; Janet Baker; James Baker; JKBaker LLC; and JMBaker LLC.

6.      The term "Plaintiffs' Counsel" refers to the following law firms: Berman DeValerio Pease Tabacco Burt & Pucillo; Shalov Stone & Bonner LLP; Cauley Bowman Carney & Williams; Shearman & Sterling LLP; Young Conaway Stargatt & Taylor; Looney & Grossman LLP; Bernstein Litowitz Berger & Grossman LLP; Partridge Anker & Hortsman LLP; Boies Schiller & Flexner, Reed Smith LLP; Fried, Frank, Harris, Shriver & Jacobson LLP; Gregory P. Joseph Law Offices LLC; Reece & Associates, P.C.; Kotin Crabtree & Strong, LLP; Marx Van Ranst Vermeersch & Partners; Dal & Veldekens; Van Doosselaere Advocaten; CMS DeBacker; and Keuleneer Storme Vanneste Van Varenbergh Verhelst, Advocatenassociatie.

7.    "TRA Rights Trust" shall mean the Delaware trust that is the sole successor in interest to Seagate Technologies, Inc. for and on behalf of the stockholders of Seagate Technologies, Inc. in respect to any and all claims and causes of actions possessed by Seagate Technology, Inc. arising out of, in connection with, or relating to Seagate Technologies, Inc.'s acquisition or ownership of shares of, or holdings in, L&H.

8.    The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in the Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations.  A draft or non-identical copy is a separate document within the meaning of this term.

9.    The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

10.    The term "concerning" means relating to, in relation to, referring to, describing, evidencing or constituting.

11.    "And" and "or" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

12.    The word "all" shall be deemed to include and encompass the words "each" and "any."

13.    The use of the singular form of any word includes within its meaning the plural form, and vice versa.

14.    The use of any tense of any verb includes within its meaning all other tenses of the verb.

5

## **INSTRUCTIONS**

1.    Each document request shall be responded to separately and fully, unless it is in good faith objected to, in which event the reasons for the objection shall be stated with specificity.  If an objection pertains to only a portion of the a request, or to a word, phrase, or clause contained therein, you shall state the objection to that portion only and respond to the remainder of the request.

2.    If any document responsive to these document requests is withheld under a claim of privilege, including the work-product doctrine, you shall identify with respect to each document:  (a) the date of the document, (b) the title of the document; (c) the type of the document; (d) a description of the subject matter of the document, (e) the name of each author, addressee, and copyee, and (f) the specific privilege or protection claimed.

3.    If, in responding to these document requests, you claim any ambiguity in a document request, or in a definition or instruction applicable thereto, such claim shall not be utilized as a basis for refusing to respond, but you shall set forth as part of your response the language deemed to be ambiguous and the interpretation used in responding to the document request.

4.    Each request shall be construed according to its terms and not with reference to any other request.

5.    All responsive documents, wherever located, that are in your possession, custody or control shall be produced in response to these document requests.

6.    An original or one copy of each responsive document shall be produced. Any copy of a document that varies in any way from the original or from any other copy of the document, whether by reason of handwritten or other notation, highlighting, underlining or other marks, or any omission, or a draft or successive iteration thereof and all modifications thereto

6

shall constitute a separate document and must be produced, whether or not the original of such document is within your possession, custody or control.

7.    All documents that are physically attached to each other when located for production shall be left so attached. Documents that are segregated or separated from other documents whether by use of binders, files, sub-files, or by dividers, tabs, or any other method, shall be left so segregated or separated. All labels or markings on any such binders, files, sub-files, dividers, tabs, or folders shall be produced.

8.    A request for documents shall be deemed to include a request for all transmittal sheets, cover letters, exhibits, enclosures, and attachments to the documents in addition to the document itself, without abbreviation or expurgation.

9.    The relevant time period for this request is from January 1, 1994 to the present.

### DOCUMENT REQUESTS

1.    All documents concerning Artesia or Dexia.

2.    All documents concerning L&H.

3.    All documents concerning the historical financial condition and operating results of Dragon including, but not limited to, valuations, financial statements, balance sheets, statements of income and/or operations and cash flow statements.

4.    All documents concerning Jo Lernout, Pol Hauspie, Gaston Bastiaens, Carl Dammekens, or Nico Willaert.

5.    All documents concerning any Language Development Company or Cross-Language Development Company.

6.    All documents concerning Language Investment Co. and Radial Belgium N.V.

7.    All documents concerning Vasco Data Security International.

7

8.      All documents concerning the acquisition of Dragon by L&H or the potential acquisition of Dragon by any other company, including documents related to any and all due diligence or other investigation undertaken in relation thereto.

9.      All documents concerning communications with any investment bank, accounting firm or other outside advisor concerning the acquisition of Dragon by L&H or by any other company, including communications concerning any and all due diligence or other investigation undertaken in relation thereto.

10.     All documents concerning or incorporating any communications with Plaintiffs or Plaintiffs' Counsel referring to Artesia or Dexia or the acquisition of Dragon by L&H or by any other company.

11.     All documents concerning Plaintiffs' decision to consent to the acquisition of Dragon by L&H.

12.     All documents concerning any valuation or other financial assessment of Dragon at any time in the period defined herein.

13.     All documents concerning any investigation of Artesia or Dexia conducted by Plaintiffs or you, either on your own behalf or at the request of Plaintiffs or Plaintiffs' Counsel.

14.     All documents concerning any investigation of any bank or banking institution other than Artesia or Dexia conducted by Plaintiffs or by you, either on your own behalf or at the request of Plaintiffs or Plaintiffs' Counsel.

15.     All documents related to any ownership interest in Seagate Technology, Inc., the TRA Rights Trust, or Dragon purchased, held, sold, or assigned by you or any purchaser or any of your agents, beneficiaries, or assignees.

8

EXHIBIT I

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GARY B. FILLER and LAWRENCE PERLMAN, Trustees of the TRA Rights Trust,<br><br>              Plaintiffs,<br><br>v.<br><br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., S.A.)<br><br>              Defendants. | No. 04-CV-10477-PBS |
| JANET BAKER and JAMES BAKER, JKBAKER LLC and JMBAKER LLC, *et al.*,<br><br>              Plaintiffs,<br><br>v.<br><br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., S.A.)<br><br>              Defendants. | No. 04-CV-10501-PBS |

### ELLEN CHAMBERLAIN'S WRITTEN RESPONSES AND OBJECTIONS TO DOCUMENT SUBPOENA SERVED BY DEXIA BANK BELGIUM

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, the Local Rules of the Districts of Oregon and Massachusetts, non-party Ellen Chamberlain responds and objects as follows to the document requests contained in Schedule A to the subpoena dated March 28, 2006 served by Dexia Bank Belgium on March 28, 2006 in the above-captioned actions and related actions ("the Document Requests").

### GENERAL OBJECTIONS

These General Objections are incorporated into each specific response and objection hereinafter set forth, whether generally or as to each or any specific Document Request, as if

fully set forth therein, and will not be repeated in each specific response or objection. The provision of any documents in response to a Document Request is not, and shall not be construed as, an admission of the propriety of such Document Request. Ms. Chamberlain reserves the right to amend these responses and objections. All documents produced in response to a Document Request will be subject to the objections contained herein.

1.  Ms. Chamberlain objects to the Document Requests (including Definitions and Instructions) to the extent that they purport to impose upon Ms. Chamberlain any obligations different from, or greater than, those established or required by the Federal Rules of Civil Procedure, and the Local Rules of the Districts of Oregon and Massachusetts.

2.  Ms. Chamberlain objects to the Document Requests (including Definitions and Instructions) to the extent that they purport to call for documents protected from disclosure by the attorney client privilege, the attorney work product doctrine, or Rule 26(b)(3) of the Federal Rules of Civil Procedure relating to trial preparation materials, or documents that are otherwise privileged or immune from discovery, and Ms. Chamberlain reserves the right not to produce such documents. The inadvertent production of any such privileged or protected document shall not constitute, or be deemed a waiver of, any applicable statutory, regulatory, common-law or other privilege with respect to such document (or the subject matter thereof) or with respect to any other documents or discovery now or hereafter requested or produced. Ms. Chamberlain reserves the right not to produce documents that are in part protected by any such privilege, except on a redacted basis.

3.  Ms. Chamberlain objects to the Document Requests (including Definitions and Instructions) to the extent that they purport to call for documents not within the possession, custody, or control of Ms. Chamberlain.

4.  Ms. Chamberlain objects to the Document Requests (including Definitions and Instructions) to the extent that they purport to call for documents that were produced in *In re Lernout & Hauspie Securities Litigation*, No. 00-CV-11589 and related actions, and have been made available to Dexia Bank Belgium in the above-captioned actions bearing Bates numbers TRA00001 through TRA00539 and EC00001 through EC000018.

5.  Ms. Chamberlain objects to the Document Requests (including Definitions and Instructions) to the extent that they imply the existence of facts or circumstances that do not or did not exist, and to the extent that they state or assume legal conclusions. In providing these responses and objections to the Document Requests, Ms. Chamberlain does not admit the factual or legal premise of any of the Document Requests.

6.  Ms. Chamberlain objects to the Document Requests (including Definitions and Instructions) to the extent that they are vague, ambiguous or would unreasonably require speculation as to the nature and/or scope of the documents sought thereby.

7.    Ms. Chamberlain objects to the Document Requests (including Definitions and
Instructions) to the extent that they subject Ms. Chamberlain, as a non-party, to undue
burden and/or significant expense.

8.    Ms. Chamberlain objects to the Document Requests (including Definitions and
Instructions) to the extent that they are cumulative or duplicative.

9.    Ms. Chamberlain objects to the Document Requests (including Definitions and
Instructions) to the extent that the discovery sought is obtainable from some other source
that is more convenient, less burdensome, or less expensive.

10.    Ms. Chamberlain objects to the Document Requests (including Definitions and
Instructions) to the extent that Dexia Bank Belgium has had ample opportunity by
discovery in the above-captioned actions to obtain the information sought.

11.    Ms. Chamberlain objects to the Document Requests (including Definitions and
Instructions) to the extent that the burden or expense of the proposed discovery
outweighs its likely benefit.

12.    Ms. Chamberlain objects to the Document Requests (including Definitions and
Instructions) to the extent that they call for documents that are not relevant to the subject
matter involved in the above-captioned actions or any of the related actions; and/or are
not material and necessary to the prosecution or defense of the above-captioned actions
or any of the related actions; and/or do not bear on, or could not reasonably lead to matter
that could bear on, any issue that is or may be in the above-captioned actions or any of
the related actions; and/or are not reasonably calculated to lead to the discovery of
admissible evidence.

13.    Ms. Chamberlain objects to the Document Requests (including Definitions and
Instructions) to the extent that they call for documents that are publicly available.

14.    Ms. Chamberlain objects to the "relevant time period" set forth in Instruction No. 9 of the
Document Requests as unduly burdensome and not reasonably calculated to lead to the
discovery of admissible evidence to the extent that it purports to commence on January 1,
1994.  In light of the fact that Dexia Bank Belgium has requested plaintiffs to the above-
captioned actions and related actions to produce documents dated, created, sent, or
received only after January 1, 1998, the "relevant time period" is *a fortiori* unreasonable.
Except as otherwise indicated in response to a specific Document Request,
Ms. Chamberlain objects to producing documents dated, created, sent, or received before
January 1, 1998 or after August 19, 2003.

15.    Ms. Chamberlain does not in any way waive or intend to waive, but rather intends to
preserve and is preserving her right to:  (a) object on any ground to the use of any
document produced in response to the Document Requests, or its contents, in the above-
captioned actions, including at trial, or in any other action; (b) supplement or amend these
responses and objections at any time prior to trial; (c) object on any ground to any request

3

for further documents, or any other discovery requests in, or relating to, the above-captioned actions and related actions; or (d) move at any time for an appropriate protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure.

## SPECIFIC RESPONSES

**Request No. 1:  All documents concerning Artesia or Dexia.**

**Response to Request No. 1:**

Ms. Chamberlain objects to Request No. 1 on the grounds that it is overly broad, unduly burdensome, and in large extent calls for documents that: (i) are not relevant to the subject matter involved in the above-captioned actions or any of the related actions, (ii) are not material and necessary to the prosecution or defense of the above-captioned actions or any of the related actions, (iii) do not bear on, or could not reasonably lead to matter that could bear on, any issue that is or may be in the above-captioned actions or any of the related actions; and (iv) are not reasonably calculated to lead to the discovery of admissible evidence.  In responding to Request No. 1, Ms. Chamberlain will construe the request as seeking documents concerning the allegations concerning Artesia (as defined in the Document Requests) and Dexia (as defined in the Document Requests) set forth in the complaints filed in the above-captioned actions on March 9, 2004 and March 11, 2004, and in the Third Amended Complaint filed in *Quaak, et al. v. Dexia Bank Belgium*, No. 03-CIV-11566 (PBS) on March 14, 2006.  Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that there are no documents responsive to Request No. 1 in her possession, custody, or control.

**Request No. 2:  All documents concerning L&H.**

**Response to Request No. 2:**

Ms. Chamberlain objects to Request No. 2 on the grounds that it is overly broad, unduly burdensome, and in large extent calls for documents that:  (i) are not relevant to the subject matter involved in the above-captioned actions or any of the related actions, (ii) are not material and necessary to the prosecution or defense of the above-captioned actions or any of the related actions, (iii) do not bear on, or could not reasonably lead to matter that could bear on, any issue that is or may be in the above-captioned actions or any of the related actions; and (iv) are not reasonably calculated to lead to the discovery of admissible evidence.  In responding to Request No. 2, Ms. Chamberlain will construe the request as seeking documents concerning the allegations concerning L&H (as defined in the Document Requests) set forth in the complaints filed in the above-captioned actions on March 9, 2004 and March 11, 2004, and in the Third Amended Complaint filed in *Quaak, et al. v. Dexia Bank Belgium*, No. 03-CIV-11566 (PBS) on March 14, 2006.  Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that all responsive documents in her possession, custody, or control were produced in *In re Lernout & Hauspie Securities Litigation*, No. 00-CV-11589 and related actions, and have been made available to Dexia Bank Belgium in the above-captioned actions.

4

**Request No. 3**:  **All documents concerning the historical financial condition and operating results of Dragon including, but not limited to, valuations, financial statements, balance sheets, statements of income and/or operations and cash flow statements.**

**Response to Request No. 3:**

Ms. Chamberlain objects to Request No. 3 on the ground that it is unduly burdensome, and to the extent that it is cumulative and duplicative of discovery that Dexia Bank Belgium has obtained, or has had ample opportunity to obtain, from parties to the above-captioned actions and related actions.  Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that all responsive documents in her possession, custody, or control were produced in *In re Lernout & Hauspie Securities Litigation*, No. 00-CV-11589 and related actions, and have been made available to Dexia Bank Belgium in the above-captioned actions.

**Request No. 4**:  **All documents concerning Jo Lernout, Pol Hauspie, Gaston Bastiaens, Carl Dammekens, or Nico Wilaert.**

**Response to Request No. 4:**

Ms. Chamberlain objects to Request No. 4 on the ground that it is unduly burdensome, and to the extent that it is cumulative and duplicative of discovery that Dexia Bank Belgium has obtained, or has had ample opportunity to obtain, from parties to the above-captioned actions and related actions.  Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that all responsive documents in her possession, custody, or control were produced in *In re Lernout & Hauspie Securities Litigation*, No. 00-CV-11589 and related actions, and have been made available to Dexia Bank Belgium in the above-captioned actions.

**Request No. 5**:  **All documents concerning any Language Development Company or Cross-Language Development Company.**

**Response to Request No. 5:**

Ms. Chamberlain objects to Request No. 5 on the grounds that it is unduly burdensome and ambiguous in so far as the Document Requests do not define the terms "Language Development Company" or "Cross-Language Development Company".  In responding to Request No. 5, Ms. Chamberlain will construe these terms consistent with their usage in the complaints filed in the above-captioned actions on March 9, 2004 and March 11, 2004.  Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that all responsive documents in her possession, custody, or control were produced in *In re Lernout & Hauspie Securities Litigation*, No. 00-CV-11589 and related actions, and have been made available to Dexia Bank Belgium in the above-captioned actions.

**Request No. 6**:  **All documents concerning Language Investment Co. and Radial Belgium N.V.**

**Response to Request No. 6:**

Ms. Chamberlain objects to Request No. 6 on the ground that it is unduly burdensome, and to the extent that it is cumulative and duplicative of discovery that Dexia Bank Belgium has

obtained, or has had ample opportunity to obtain, from parties to the above-captioned actions and related actions. Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that there are no documents responsive to Request No. 6 in her possession, custody, or control.

**Request No. 7**:  **All documents concerning Vasco Data Security International.**

**Response to Request No. 7:**
        Ms. Chamberlain objects to Request No. 7 on the grounds that it is unduly burdensome, and in large extent calls for documents that (i) are not relevant to the subject matter involved in the above-captioned actions or any of the related actions, (ii) are not material and necessary to the prosecution or defense of the above-captioned actions or any of the related actions, (iii) do not bear on, or could not reasonably lead to matter that could bear on, any issue that is or may be in the above-captioned actions or any of the related actions, and (iv) are not reasonably calculated to lead to the discovery of admissible evidence. Ms. Chamberlain further objects to Request No. 7 to the extent that it is cumulative and duplicative of discovery that Dexia Bank Belgium has obtained, or has had ample opportunity to obtain, from parties to the above-captioned actions and related actions. In responding to Request No. 7, Ms. Chamberlain will construe the request as seeking documents concerning the relationships between Vasco Data Securities International, on the one hand, and Artesia (as defined in the Document Requests), Dexia (as defined in the Document Requests), or L&H (as defined in the Document Requests), on the other. Subject to, and without waiving, the foregoing specific and general objections, Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that there are no documents responsive to Request No. 1 in her possession, custody, or control.

**Request No. 8**:  **All documents concerning the acquisition of Dragon by L&H or the potential acquisition of Dragon by any other company, including documents related to any and all due diligence or other investigation undertaken in relation thereto.**

**Response to Request No. 8:**
        Ms. Chamberlain objects to Request No. 8 on the ground that it is unduly burdensome, and to the extent that it is cumulative and duplicative of discovery that Dexia Bank Belgium has obtained, or has had ample opportunity to obtain, from parties to the above-captioned actions and related actions. Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that all responsive documents in her possession, custody, or control were produced in *In re Lernout & Hauspie Securities Litigation*, No. 00-CV-11589 and related actions, and have been made available to Dexia Bank Belgium in the above-captioned actions.

**Request No. 9**:  **All documents concerning communications with any investment bank, accounting firm or other outside advisor concerning the acquisition of Dragon by L&H or by any other company, including communications concerning any and all due diligence or other investigation undertaken in relation thereto.**

**Response to Request No. 9**:

      Ms. Chamberlain objects to Request No. 9 on the ground that it is unduly burdensome, and to the extent that it is cumulative and duplicative of discovery that Dexia Bank Belgium has obtained, or has had ample opportunity to obtain, from parties to the above-captioned actions and related actions.  Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that all responsive documents in her possession, custody, or control were produced in *In re Lernout & Hauspie Securities Litigation*, No. 00-CV-11589 and related actions, and have been made available to Dexia Bank Belgium in the above-captioned actions.

**Request No. 10**:  **All documents concerning or incorporating any communications with Plaintiffs or Plaintiffs' Counsel referring to Artesia or Dexia or the acquisition of Dragon by L&H or by any other company.**

**Response to Request No. 10**:

      Ms. Chamberlain objects to Request No. 10 on the grounds that it is unduly burdensome and vague and ambiguous.  In responding to Request No. 10, Ms. Chamberlain will construe the request as seeking documents concerning or incorporating communications between Ms. Chamberlain, on the one hand, and Plaintiffs (as defined in the Document Requests) or Plaintiffs' Counsel (as defined in the Document Requests), on the other, referring to Artesia (as defined in the Document Requests), Dexia (as defined in the Document Requests), or the acquisition of Dragon (as defined in the Document Requests) by L&H (as defined in the Document Requests) or by any other company.  Ms. Chamberlain further objects to Request No. 10 to the extent that it purports to call for documents protected from disclosure by the attorney client privilege, the attorney work product doctrine, Rule 26(b)(3) of the Federal Rules of Civil Procedure relating to trial preparation materials, or documents that are otherwise privileged or immune from discovery, and Ms. Chamberlain reserves the right not to produce such documents.

**Request No. 11**:  **All documents concerning Plaintiffs' decision to consent to the acquisition of Dragon by L&H.**

**Response to Request No. 11**:

      Ms. Chamberlain objects to Request No. 11 as unduly burdensome and to the extent that it implies that Plaintiffs (as defined in the Document Requests) decided to consent to the acquisition of Dragon (as defined in the Document Requests) by L&H (as defined in the Document Requests).  In responding to Request No. 11, Ms. Chamberlain will construe the request as seeking documents concerning the decision of the shareholders of Dragon to consent to the acquisition of Dragon by L&H.  Ms. Chamberlain further objects to Request No. 11 to the extent that it is cumulative and duplicative of discovery that Dexia Bank Belgium has obtained, or has had ample opportunity to obtain, from parties to the above-captioned actions and related

actions.  Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that all responsive documents in her possession, custody, or control were produced in *In re Lernout & Hauspie Securities Litigation*, No. 00-CV-11589 and related actions, and have been made available to Dexia Bank Belgium in the above-captioned actions.

**Request No. 12:  All documents concerning any valuation or other financial assessment of Dragon at any time in the period defined herein.**

**Response to Request No. 12:**

      Ms. Chamberlain objects to Request No. 12 on the grounds that it is unduly burdensome and to the extent that it is cumulative and duplicative of Document Request No. 3 above, and of discovery that Dexia Bank Belgium has obtained, or has had ample opportunity to obtain, from parties to the above-captioned actions and related actions.  Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that all responsive documents in her possession, custody, or control were produced in *In re Lernout & Hauspie Securities Litigation*, No. 00-CV-11589 and related actions, and have been made available to Dexia Bank Belgium in the above-captioned actions.

**Request No. 13:  All documents concerning any investigation of Artesia or Dexia conducted by Plaintiffs or you, either on your own behalf or at the request of Plaintiffs or Plaintiffs' Counsel.**

**Response to Request No. 13:**

      Ms. Chamberlain objects to Request No. 13 on the grounds that it is overly broad, unduly burdensome, and in large extent calls for documents that (i) are not relevant to the subject matter involved in the above-captioned actions or any of the related actions, (ii) are not material and necessary to the prosecution or defense of the above-captioned actions or any of the related actions, (iii) do not bear on, or could not reasonably lead to matter that could bear on, any issue that is or may be in the above-captioned actions or any of the related actions; and (iv) are not reasonably calculated to lead to the discovery of admissible evidence.  In responding to Request No. 13, Ms. Chamberlain will construe the request as seeking documents concerning any investigation of potential legal claims by former shareholders of Dragon (as defined in the Document Request) against Artesia (as defined in the Document Request) or Dexia (as defined in the Document Request) arising out of the Dragon shareholders' acquisition of the stock of L&H (as defined in the Document Request).  Ms. Chamberlain further objects to Request No. 13 to the extent that it purports to call for documents protected from disclosure by the attorney client privilege, the attorney work product doctrine, Rule 26(b)(3) of the Federal Rules of Civil Procedure relating to trial preparation materials, or documents that are otherwise privileged or immune from discovery, and Ms. Chamberlain reserves the right not to produce such documents. Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that there are no documents responsive to Request No. 13 in her possession, custody, or control.

**Request No. 14:  All documents concerning any investigation of any bank or banking institution other than Artesia or Dexia conducted by Plaintiffs or by you, either on your own behalf or at the request of Plaintiffs or Plaintiffs' Counsel.**

**Response to Request No. 14:**

Ms. Chamberlain objects to Request No. 14 on the grounds that it is overly broad, unduly burdensome, and in large extent calls for documents that:  (i) are not relevant to the subject matter involved in the above-captioned actions or any of the related actions, (ii) are not material and necessary to the prosecution or defense of the above-captioned actions or any of the related actions, (iii) do not bear on, or could not reasonably lead to matter that could bear on, any issue that is or may be in the above-captioned actions or any of the related actions; and (iv) are not reasonably calculated to lead to the discovery of admissible evidence.  In responding to Request No. 14, Ms. Chamberlain will construe the request as seeking documents concerning any investigation of potential legal claims by former shareholders of Dragon (as defined in the Document Request) against any bank or banking institution other than Artesia (as defined in the Document Request) or Dexia (as defined in the Document Request) arising out of the Dragon shareholders' acquisition of the stock of L&H (as defined in the Document Request).  Ms. Chamberlain further objects to Request No. 14 to the extent that it purports to call for documents protected from disclosure by the attorney client privilege, the attorney work product doctrine, Rule 26(b)(3) of the Federal Rules of Civil Procedure relating to trial preparation materials, or documents that are otherwise privileged or immune from discovery, and Ms. Chamberlain reserves the right not to produce such documents.  Subject to, and without waiving, the foregoing specific and general objections, Ms. Chamberlain states that there are no documents responsive to Request No. 14 in her possession, custody, or control.

**Request No. 15:  All documents related to any ownership interest in Seagate Technology, Inc., the TRA Rights Trust, or Dragon purchased, held, sold, or assigned by you or any purchaser or any of your agents, beneficiaries, or assignees.**

**Response to Request No. 15:**

Ms. Chamberlain objects to Request No. 15 on the grounds that it is overly broad, unduly burdensome, calls for documents that (i) are not relevant to the subject matter involved in the above-captioned actions or any of the related actions, (ii) are not material and necessary to the prosecution or defense of the above-captioned actions or any of the related actions, (iii) do not bear on, or could not reasonably lead to matter that could bear on, any issue that is or may be in the above-captioned actions or any of the related actions, and (iv) are not reasonably calculated to lead to the discovery of admissible evidence.  Ms. Chamberlain further objects to Request No. 15 on the ground that it calls for confidential personal financial information of a non-party.  In responding to Request No. 15, Ms. Chamberlain will produce, subject to the protective order in the above-captioned actions and related actions, documents in her possession, custody, and control sufficient to identify the extent of her own ownership interests during the period from January 1, 1998 to the present.  Ms. Chamberlain held an ownership interest in Dragon (as defined in the Document Request) only through her shareholdings in Seagate Technology, Inc.

Dated: April 11, 2006
     New York, New York

GREGORY P. JOSEPH LAW OFFICES LLC

_____

Gregory P. Joseph, N.Y. Atty Reg. #1645852
Susan M. Davies, N.Y. Atty Reg. #2413508
(sdavies@josephnyc.com)
805 Third Avenue, 31st Floor
New York, New York  10022
Telephone:  (212) 407-1200

**OF COUNSEL**

Nicholas M. Kelley, BBO #265640
Amy C. Mainelli, BBO #657201
KOTIN, CRABTREE, AND STRONG, LLP
One Bowdoin Square
Boston, Massachusetts  02114
Telephone:  (617) 227-7031

*Attorneys for Non-Party Ellen Chamberlain*

## Certificate of Service

I hereby certify that on April 11, 2006, I caused a true and correct copy of the foregoing *Ellen Chamberlain's Written Responses and Objections to Document Subpoena Served by Dexia Bank Belgium* dated April 11, 2006 to be served by electronic mail and First Class Mail, postage prepaid, upon the following Counsel of Record at the electronic and postal addresses indicated below:

Jeff E. Butler, Esq. (Jeff.Butler@CliffordChance.com)
Clifford Chance US LLP
31 West 52nd Street
New York, NY 10019
**Counsel for Dexia Bank Belgium in *Filler v. Dexia, S.A.*, C.A. No. 04-10477-PBS; *Quaak v. Dexia, S.A.*, C.A. No. 03-11566-PBS; *Baker v. Dexia, S.A.*, C.A. No. 04-10501-PBS, *Stonington Partners, Inc v. Dexia, S.A.*, C.A. No. 04-10111-PBS**

Karen C. Dyer, Esq. (kdyer@bsfllp.com)
Boies Schiller & Flexner
225 South Orange Avenue, Suite 905
Orlando, Florida 32801
**Cousel for Plaintiffs Janet Baker, James Baker, JK Baker LLC, and JMBaker LLC in *Baker v. Dexia, S.A.*, C.A. No. 04-10501-PBS**

Steven B. Singer, Esq. (steven@blbglaw.com)
Bernstein Litowitz Berger & Grossman LLP
1285 Avenue of the Americas
New York, New York 10019
**Counsel for Plaintiffs Stonington Partners, Inc., Stonington Capital Appreciation 1994 Fund L.P., and Stonington Holdings, L.L.C. in *Stonington Partners, Inc v. Dexia, S.A.*, C.A. No. 04-10111-PBS**

Patrick Egan, Esq. (pegan@bermanesq.com)
Berman DeValerio Pease Tabacco Burt & Pucillo
One Liberty Square
Boston, MA 02109
**Co-Lead Counsel for Class Plaintiffs in *Quaak v. Dexia, S.A.*, C.A. No. 03-11566-PBS**

Susan M. Davies
N.Y. Attorney Registration # 2413508

EXHIBIT J

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SDNY WEB 4/99

## Issued by the
# UNITED STATES DISTRICT COURT

_____ NORTHERN _____    DISTRICT OF _____ CALIFORNIA _____

JANET BAKER and JAMES BAKER, JKBAKER LLC
and JMBAKER LLC,  et al.

### V.

DEXIA, S.A. and DEXIA BANK BELGIUM (formerly
known as ARTESIA BANKING CORP., S.A.)

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: [1]    04-10501 (PBS)
03-11566 (PBS)
04-10411 (PBS)
04-10477 (PBS)

Pending in the United
States District Court for the
District of Massachusetts

TO:    MR. STEPHEN LUCZO
c/o Gregory P. Joseph Law Offices LLC
805 Third Avenue, 31st Floor
New York. New York 10022

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
|  | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
| --- | --- |
| At a location to be discussed by counsel for the Defendants and the witness. | April 18, 2006, 9:30 a.m. |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See attached Schedule A.

| PLACE | DATE AND TIME |
| --- | --- |
| At a location to be discussed by counsel for the Defendants and the witness. | April 18, 2006, 9:30 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| *[signature]*    Attorney for Defendant Dexia Bank Belgium | March 28, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Jeff Butler
Clifford Chance US LLP, 31 West 52nd Street, New York, NY 10019, (212) 878-8205

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SDNY WEB 4/99

---

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
|      |       |

SERVED

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|
|                        |                   |

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|
|                        |       |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____        _____
            DATE                            SIGNATURE OF SERVER

                                            _____
                                            ADDRESS OF SERVER

                                            _____

---

### Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)   A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)   (A)   A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)   Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)   (A)   On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)   fails to allow reasonable time for compliance,

(ii)   requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that,

subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)   requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)   subjects a person to undue burden.

(B)   If a subpoena

(i)   requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)   requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)   requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)   DUTIES IN RESPONDING TO SUBPOENA.

(1)   A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)   When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

## DEFINITIONS

1.      "Artesia" means Artesia Banking Corporation, S.A, and its predecessors Paribas Bank België (a.k.a. Paribas Banque Belgique) and Bacob Bank.

2.      "Dexia" means Dexia S.A. or Dexia Bank Belgium (a.k.a. Dexia Bank België or Dexia Banque Belgique).

3.      "Dragon" means Dragon Systems, Inc.

4.      "L&H" means Lernout & Hauspie Speech Products, N.V., including any of its predecessors, successors, parents, subsidiaries, divisions or affiliates and their officers, directors, agents, attorneys, accountants, employees, partners, or other persons occupying similar positions or performing similar functions.

5.      The term "Plaintiffs" refers to any of the plaintiffs in this action or the related actions against Dexia Bank Belgium pending in the District of Massachusetts, namely Hans A. Quaak; Attilio Po; Karl Leibinger; Stonington Partners, Inc.; Stonington Capital Appreciation 1994 Fund, L.P.; Stonington Holdings, L.L.C.; Gary B. Filler and Lawrence Perlman, as trustees of the TRA Rights Trust; Janet Baker; James Baker; JKBaker LLC; and JMBaker LLC.

6.      The term "Plaintiffs' Counsel" refers to the following law firms: Berman DeValerio Pease Tabacco Burt & Pucillo; Shalov Stone & Bonner LLP; Cauley Bowman Carney & Williams; Shearman & Sterling LLP; Young Conaway Stargatt & Taylor; Looney & Grossman LLP; Bernstein Litowitz Berger & Grossman LLP; Partridge Anker & Hortsman LLP; Boies Schiller & Flexner, Reed Smith LLP; Fried, Frank, Harris, Shriver & Jacobson LLP; Gregory P. Joseph Law Offices LLC; Reece & Associates, P.C.; Kotin Crabtree & Strong, LLP; Marx Van Ranst Vermeersch & Partners; Dal & Veldekens; Van Doosselaere Advocaten; CMS DeBacker; and Keuleneer Storme Vanneste Van Varenbergh Verhelst, Advocatenassociatie.

7.    "TRA Rights Trust" shall mean the Delaware trust that is the sole successor in interest to Seagate Technologies, Inc. for and on behalf of the stockholders of Seagate Technologies, Inc. in respect to any and all claims and causes of actions possessed by Seagate Technology, Inc. arising out of, in connection with, or relating to Seagate Technologies, Inc.'s acquisition or ownership of shares of, or holdings in, L&H.

8.    The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in the Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations. A draft or non-identical copy is a separate document within the meaning of this term.

9.    The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

10.    The term "concerning" means relating to, in relation to, referring to, describing, evidencing or constituting.

11.    "And" and "or" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

12.    The word "all" shall be deemed to include and encompass the words "each" and "any."

13.    The use of the singular form of any word includes within its meaning the plural form, and vice versa.

14.    The use of any tense of any verb includes within its meaning all other tenses of the verb.

5

## INSTRUCTIONS

1.    Each document request shall be responded to separately and fully, unless it is in good faith objected to, in which event the reasons for the objection shall be stated with specificity. If an objection pertains to only a portion of the a request, or to a word, phrase, or clause contained therein, you shall state the objection to that portion only and respond to the remainder of the request.

2.    If any document responsive to these document requests is withheld under a claim of privilege, including the work-product doctrine, you shall identify with respect to each document: (a) the date of the document, (b) the title of the document; (c) the type of the document; (d) a description of the subject matter of the document, (e) the name of each author, addressee, and copyee, and (f) the specific privilege or protection claimed.

3.    If, in responding to these document requests, you claim any ambiguity in a document request, or in a definition or instruction applicable thereto, such claim shall not be utilized as a basis for refusing to respond, but you shall set forth as part of your response the language deemed to be ambiguous and the interpretation used in responding to the document request.

4.    Each request shall be construed according to its terms and not with reference to any other request.

5.    All responsive documents, wherever located, that are in your possession, custody or control shall be produced in response to these document requests.

6.    An original or one copy of each responsive document shall be produced. Any copy of a document that varies in any way from the original or from any other copy of the document, whether by reason of handwritten or other notation, highlighting, underlining or other marks, or any omission, or a draft or successive iteration thereof and all modifications thereto

6

shall constitute a separate document and must be produced, whether or not the original of such document is within your possession, custody or control.

7.    All documents that are physically attached to each other when located for production shall be left so attached. Documents that are segregated or separated from other documents whether by use of binders, files, sub-files, or by dividers, tabs, or any other method, shall be left so segregated or separated. All labels or markings on any such binders, files, sub-files, dividers, tabs, or folders shall be produced.

8.    A request for documents shall be deemed to include a request for all transmittal sheets, cover letters, exhibits, enclosures, and attachments to the documents in addition to the document itself, without abbreviation or expurgation.

9.    The relevant time period for this request is from January 1, 1994 to the present.

## DOCUMENT REQUESTS

1.    All documents concerning Artesia or Dexia.

2.    All documents concerning L&H.

3.    All documents concerning the historical financial condition and operating results of Dragon including, but not limited to, valuations, financial statements, balance sheets, statements of income and/or operations and cash flow statements.

4.    All documents concerning Jo Lernout, Pol Hauspie, Gaston Bastiaens, Carl Dammekens, or Nico Willaert.

5.    All documents concerning any Language Development Company or Cross-Language Development Company.

6.    All documents concerning Language Investment Co. and Radial Belgium N.V.

7.    All documents concerning Vasco Data Security International.

7

8.    All documents concerning the acquisition of Dragon by L&H or the potential acquisition of Dragon by any other company, including documents related to any and all due diligence or other investigation undertaken in relation thereto.

9.    All documents concerning communications with any investment bank, accounting firm or other outside advisor concerning the acquisition of Dragon by L&H or by any other company, including communications concerning any and all due diligence or other investigation undertaken in relation thereto.

10.    All documents concerning or incorporating any communications with Plaintiffs or Plaintiffs' Counsel referring to Artesia or Dexia or the acquisition of Dragon by L&H or by any other company.

11.    All documents concerning Plaintiffs' decision to consent to the acquisition of Dragon by L&H.

12.    All documents concerning any valuation or other financial assessment of Dragon at any time in the period defined herein.

13.    All documents concerning any investigation of Artesia or Dexia conducted by Plaintiffs or you, either on your own behalf or at the request of Plaintiffs or Plaintiffs' Counsel.

14.    All documents concerning any investigation of any bank or banking institution other than Artesia or Dexia conducted by Plaintiffs or by you, either on your own behalf or at the request of Plaintiffs or Plaintiffs' Counsel.

15.    All documents related to any ownership interest in Seagate Technology, Inc., the TRA Rights Trust, or Dragon purchased, held, sold, or assigned by you or any purchaser or any of your agents, beneficiaries, or assignees.

NYA 776938.1