# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GARY B. FILLER and LAWRENCE PERLMAN, Trustees of the TRA Rights Trust,<br><br>    Plaintiffs,<br><br>      v.<br><br>DEXIA, S.A. and DEXIA BANKS BELGIUM (Formerly known as ARTESIA BANKING CORP., SA),<br><br>    Defendants. | Action No.: 04-CV-10477 (PBS) |
| JANET BAKER and JAMES BAKER, JKBAKER LLC and JMBAKER LLC, et al.,<br><br>    Plaintiffs,<br><br>      v.<br><br>DEXIA, S.A. and DEXIA BANKS BELGIUM (Formerly known as ARTESIA BANKING CORP., SA),<br><br>    Defendants. | Action No.: 04-CV-10501 (PBS) |

## DECLARATION OF THOMAS TEIGE CARROLL

I, Thomas Teige Carroll, declare and state as follows:

1.     I am an attorney associated with Clifford Chance US LLP and admitted *pro hac vice* to practice before this Court.  I submit this declaration in support of Dexia Bank Belgium's Opposition to the Motion for a Protective Order by Non-Parties Stephen Luczo, Ellen Chamberlain and Donald Waite.

2.      Attached hereto as Exhibit A is a true and correct copy of a Letter from Thomas Teige Carroll to Avi Josefson, dated March 29, 2006.

3.   Attached hereto as Exhibit B is a true and correct copy of Attilio Po's Deposition Transcript dated April 4, 2006 taken in *In re Lernout and Hauspie Sec. Litig.*, No. 00-CV-11566 (PBS), (D. Mass. April 4, 2006).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       April 28, 2006

_____
Thomas Teige Carroll

2

# Exhibit A

# C L I F F O R D
# C H A N C E

CLIFFORD CHANCE US LLP

31 WEST 52ND STREET
NEW YORK NY 10019

TEL +1 212 878 8000
FAX +1 212 878 8375
www.cliffordchance.com

| TO | Avi Josefson | COMPANY | Bernstein Litowitz Berger & Grossman LLP |
|---|---|---|---|
| FAX NO | 212 554 1444 | PHONE NO | 212 554 1466 |
| CC | Patrick T. Egan | COMPANY | Berman DeValerio Pease Tabacco Burt & Pucillo |
| FAX NO | 617 542 1194 | PHONE NO | 617 542 8300 |
| CC | Patrick L. Rocco | COMPANY | Shalov, Stone & Bonner LLP |
| FAX NO | 212 239 4310 | PHONE NO | 212 239 4340 |
| CC | Susan M. Davies | COMPANY | Gregory P. Joseph Law Offices LLC |
| FAX NO | 212 407 1274 | PHONE NO | 212 407 1200 |
| CC | Karen C. Dyer | COMPANY | Boies, Schiller & Flexner LLP |
| FAX NO | 407 425 7047 | PHONE NO | 407 425 7118 |
| CC | Alan K. Cotler | PHONE NO | Reed Smith LLP |
| FAX NO | 215 851 1420 | COMPANY | 215 851 8100 |
| CC | Peter M. Saparoff | COMPANY | Mintz, Levin, Cohn, Ferris, Glovsky And Popeo P.C. |
| FAX NO | 617 542 2241 | PHONE NO | 617 542 6000 |

| FROM | Thomas Teige Carroll | DATE | March 29, 2006 |
|---|---|---|---|
| SENDER PHONE | +1 212 878 8231 | PAGES (INCL COVER) | 3 |

Please see the attached.

FOR FAX TRANSMISSION PROBLEMS, CALL +1 212 878 8374 THIS FACSIMILE TRANSMISSION IS INTENDED SOLELY FOR THE USE OF THE PERSON OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. ANY REVIEW, DISSEMINATION, DISTRIBUTION, COPYING OR OTHER USE OF, OR THE TAKING OF ANY ACTION IN RELIANCE UPON, THIS TRANSMISSION OR ITS CONTENTS BY PERSONS OTHER THAN THE ADDRESSEE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, OR ARE UNCERTAIN ABOUT ITS PROPER HANDLING, PLEASE CALL US IMMEDIATELY (COLLECT AT +1 212 878 8374) AND RETURN THE ORIGINAL TRANSMISSION TO US BY MAIL.

**C L I F F O R D**

**C H A N C E**

CLIFFORD CHANCE US LLP

31 WEST 52ND STREET
NEW YORK NY 10019 6131

TEL +1 212 878 8000
FAX +1 212 878 8375
www.cliffordchance.com

Thomas Teige Carroll
Associate

DIRECT TEL +1 212 878 8231
thomas.carroll@cliffordchance.com

March 29, 2006

VIA FACSIMILE

Avi Josefson, Esq.
Bernstein Litowitz Berger & Grossman LLP
1285 Avenue of the Americas
New York, NY 10019

Re:     Quaak v. Dexia Bank Belgium
        Stonington v. Dexia Bank Belgium
        Filler v. Dexia Bank Belgium
        Baker v. Dexia Bank Belgium

Dear Mr. Josefson:

This letter responds to yours of March 27, 2006 concerning the depositions of Messrs. Shaw and Fitzgibbons. As regards the dates you propose, we agree to June 8 for Mr. Fitzgibbons, but propose June 6 for Mr. Shaw. Please let me know if you agree and I will prepare amended notices.

Concerning your contentions regarding the previous depositions of Messrs. Shaw and Fitzgibbons, we do not believe that Judge Saris "held" that "any further depositions taken by Dexia should be 'cleanup depositions.'" It is plain from the transcript you cite that Judge Saris' passing remarks in no way limited Dexia's right to obtain deposition testimony or other discovery in these actions relevant to Dexia's defense. No briefing or argument on this question was advanced at that hearing, which was convened to discuss the question of whether or not to stay plaintiffs' previous actions against L&H and its principals pending the Belgian criminal proceedings, and Dexia certainly had no opportunity to be heard at any length at all on the question at that time. Further, Dexia did not attend or conduct examination in any of the depositions you mention. For these reasons at a minimum, as well as for many others, it is beyond any question that Dexia is entitled to discover any and all facts it deems necessary to defend itself in the present actions.

Nonetheless, Dexia will make reasonable efforts to avoid repetition of discovery already obtained in prior litigation, provided that all plaintiffs in the above-captioned actions stipulate that transcripts of

NYB 1525629.1

**C L I F F O R D**
**C H A N C E**

CLIFFORD CHANCE US LLP

Avi Josefson, Esq.                                                    Page 2
March 29, 2006

depositions taken in the prior L&H-related matters may be used by Dexia as though obtained in the present actions.  Please confirm your agreement to this condition and I will prepare an appropriate stipulation.

Sincerely yours,

Thomas Teige Carroll

cc        Distribution

Exhibit B

1

1

2                UNITED STATES DISTRICT COURT

3                DISTRICT OF MASSACHUSETTS

4

5   HANS A. QUAAK, ATTILIO PO  )

    and KARL LEIBINGER, on     )

6   behalf of themselves and   )

    those similarly situated,  )

7                              )

                 Plaintiffs,   )

8                              )

         vs.                   )   No. 03-CIV-11566

9                              )        (PBS)

    DEXIA BANK BELGIUM         )

10  (formerly known as         )

    ARTESIA BANKING CORP.,     )

11  SA),                       )

                               )

12               Defendant.    )

    ------------------------------)

13

14

15

16

17                    April 4, 2006

18                    9:09 a.m.

19

20        Deposition of ATTILIO PO, held at the

21   offices of Clifford Chance, 31 West 52nd

22   Street, New York, New York, before Laurie A.

23   Collins, a Registered Professional Reporter

24   and Notary Public of the State of New York.

25

**2**

1
2  A P P E A R A N C E S :
3
4     CAULEY BOWMAN CARNEY & WILLIAMS, PLLC
5     Attorneys for Plaintiffs
6        11311 Arcade Drive, Suite 200
7        Little Rock, Arkansas 72221-5438
8     BY:  J. ALLEN CARNEY, ESQ.
9        T. BRENT WALKER, ESQ.
10        - and -
11    BERMAN DeVALERIO PEASE TABACCO
12    BURT & PUCILLO
13       One Liberty Square
14       Boston Massachusetts
15    BY:  PATRICK T. EGAN, ESQ.
16
17    CLIFFORD CHANCE LLP
18    Attorneys for Defendant
19       31 West 52nd Street
20       New York, New York 10019-6131
21    BY:  JEFFREY E. BUTLER, ESQ.
22       MARYANA KODNER, ESQ.
23
24  ALSO PRESENT:
25    ROBERT McDONALD, Legal Video Specialist

**3**

1
2       THE VIDEOGRAPHER:  My name is Robert
3  McDonald, member of the National Legal Video
4  Association, for Veritext, New York.  Today is
5  April 4, 2006, and on the record at
6  approximately 9:09 a.m.
7       We're here in the matter of Quaak, et
8  al., versus Dexia Bank Belgium.  The witness
9  is Attilio Po.  And we are at the offices of
10  Clifford Chance, 31 West 52nd Street, New
11  York, New York.
12       Will counsel introduce themselves for
13  the record, please.
14       MR. BUTLER:  Jeff Butler from Clifford
15  Chance representing Dexia Bank Belgium.
16       MS. KODNER:  Maryana Kodner from
17  Clifford Chance, also representing Dexia Bank
18  Belgium.
19       MR. WALKER:  Brent Walker, counsel for
20  plaintiff, Cauley Bowman.
21       MR. EGAN:  Patrick Egan, counsel for
22  plaintiffs from Berman DeValerio Pease Tabacco
23  Burt & Pucillo.
24       MR. CARNEY:  And Allen Carney, from
25  Cauley Bowman on behalf of the plaintiffs.

**4**

1
2       THE VIDEOGRAPHER:  Will the court
3  reporter please swear in the witness.
4  A T T I L I O  P O,
5  called as a witness, having been duly sworn
6  by the Notary Public, was examined and
7  testified as follows:
8       MR. BUTLER:  Let me just say before we
9  begin that I have asked counsel for Mr. Po to
10  stipulate that Mr. Po's prior deposition
11  testimony may be used by Dexia as though it
12  was taken in this action.
13       MR. CARNEY:  Are you done?  I didn't
14  mean to interrupt you there.
15       MR. BUTLER:  Yes.  That is correct.
16       MR. CARNEY:  That's fine.  Of course,
17  pursuant to that stipulation, we would want to
18  be using it as well.  We're not foregoing our
19  right to use it in any future briefing.
20       MR. BUTLER:  I understand that.
21  EXAMINATION BY
22  MR. BUTLER:
23    Q.   Now we can begin.  Good morning,
24  Mr. Po.
25    A.   Good morning.

**5**

1                    Po
2    Q.   Can you tell me, where do you currently
3  reside?
4    A.   Can --
5    Q.   What is your current address?
6    A.   Aha.  In Italy.  I live in -- close to
7  Modena.  The name of the city is Carpi, Italy,
8  northern Italy.  The address, specific address, is
9  Via Cesalpino, the number is 2, the number 41012.
10  And -- yeah, in Italy, of course.
11    Q.   You are one of the named plaintiffs in
12  this action against Dexia; correct?
13    A.   Yes.
14    Q.   And is it correct to say that you are
15  seeking to represent a class of shareholders in
16  this litigation?
17    A.   Yes.
18    Q.   Now, you are also one of the named
19  plaintiffs in an action called In Re Lernout &
20  Hauspie Speech Products securities litigation;
21  correct?
22    A.   Yes.
23    Q.   Just for clarity purposes, I'm going to
24  refer to that prior action as the L&H securities
25  litigation.

2 (Pages 2 to 5)

6

Po

1
2     A.    I see.
3     Q.    So when I use that phrase, that's what
4  I'll be referring to.
5          MR. CARNEY:  Let him finish his
6  question.  Don't try and anticipate what he's
7  going to ask.
8          THE WITNESS:  Yes, sorry.
9     Q.    Is it correct you are also seeking to
10  serve or did serve as a class representative in
11  that earlier L&H securities litigation?
12     A.    I'm not sure about the meaning of your
13  question.  Can you repeat?
14     Q.    Were you representing a class of
15  shareholders in the earlier L&H securities
16  litigation?
17     A.    Yes.
18     Q.    And have you sought to represent any
19  other class of shareholders in any litigation in
20  the U.S.?
21     A.    No.
22     Q.    Did you attend any of the court
23  hearings in the L&H litigation?
24     A.    No.
25     Q.    How about in this action against Dexia,

7

Po

1
2  have you attended any of the course hearings?
3     A.    No.
4     Q.    Have you attended any court hearings of
5  any kind, whether inside the United States or
6  outside of the United States, relating to
7  Lernout & Hauspie?
8     A.    No.
9     Q.    Are you currently employed, Mr. Po?
10     A.    Yes.
11     Q.    What is your job?
12     A.    I'm -- right now I'm one of the
13  administrative -- the manager of a company owned
14  by me and my brother, and also I'm the general
15  manager of a company owned by my -- my brother and
16  sister in Italy.  And we have -- we have -- I used
17  to have a restaurant in United States.  I used to,
18  because I'm not longer the owner.  I already sold.
19  So now I'm just involved in Italian business.
20     Q.    I see.  So you described for me two
21  businesses in Italy --
22     A.    Yes.
23     Q.    -- that you're involved in; is that
24  correct?
25     A.    Yes.

8

Po

1
2     Q.    One that is owned by you and your
3  brother and another that is owned by you, your
4  brother and sister; is that correct?
5     A.    Yes, yes.
6     Q.    Just so the record is clear, the
7  company that you own with your brother, what's the
8  name of that company?
9     A.    It's Steel, S-T-E-E-L, Cooking
10  Technology.
11     Q.    And the other company, the one you own
12  with your brother and sister, what's the name of
13  that company?
14     A.    Noveimmobilire, N-O-V-E-I-M-M-O-B-I-
15  L-I-R-E.
16     Q.    And just briefly, what does that
17  company do?
18     A.    The steel company produces gas
19  appliances, like stoves.
20     Q.    Okay.  How about the second company?
21     A.    The second company is -- basically is a
22  company who just own land and building.
23     Q.    What do you do as general manager of
24  that company?  What are your responsibilities?
25     A.    I'm -- I'm in charge for the marketing

9

Po

1
2  department for developing the sales in Italy and
3  abroad.  I'm the marketing manager and sales
4  manager.
5     Q.    And you say that you used to be
6  involved in a restaurant in the United States.  Is
7  that the restaurant in the San Diego area that you
8  described --
9     A.    Yes.
10     Q.    -- at your previous deposition?
11     A.    It is.
12     Q.    When did you sell that restaurant?
13     A.    I sold it in December -- December 6th,
14  2005.
15     Q.    And why did you sell the restaurant?
16     A.    Because I was too much involved in this
17  restaurant, and I had to take care of my main
18  business, which is the one in Italy.
19     Q.    Did your work in connection with that
20  restaurant require you to travel to the United
21  States?
22     A.    Yes.
23     Q.    How often did you travel to the United
24  States for that restaurant?
25     A.    Quite often.  We can say at least five

3 (Pages 6 to 9)

10

```
1                    Po
2   or six time per year.
3       Q.   Five to six times per year?
4       A.   Yes.
5       Q.   Are you married, Mr. Po?
6       A.   Yes, I am.
7       Q.   And do you have any children?
8       A.   I have two daughters.
9       Q.   Apart from the two jobs that we've
10  talked about in Italy, do you have any other job
11  or employment of any kind?
12      A.   I don't.
13      Q.   Have you ever been a customer of
14  Artesia Banking Corporation?
15      A.   I've never been a customer.
16      Q.   Have you ever done any business of any
17  kind with Artesia Banking Corporation?
18      A.   Never.
19      Q.   When did you first learn that there was
20  a company called Artesia Banking Corporation?
21      A.   I think around -- late 2003.
22      Q.   And how did you learn about this
23  company?
24      A.   I was told by my lawyer --
25           MR. CARNEY:  Let me caution you here
```

11

```
1                    Po
2   not to talk about specific discussions that
3   you had; general discussion is fine but not
4   specifically what we talked about.
5       Q.   Let me just withdraw that question and
6   rephrase it.
7           Did you -- can you tell me "yes" or
8   "no" did you learn about Artesia Banking
9   Corporation for the first time from your lawyers?
10      A.   Yes.
11      Q.   Prior to this time in late 2003, were
12  you aware that Artesia Banking Corporation was a
13  banker for Lernout & Hauspie Speech Products?
14           MR. CARNEY:  Object to form.
15      A.   I was not.
16      Q.   When did you first become aware of a
17  company called Dexia Bank Belgium?
18      A.   I think about 2004.
19      Q.   And again let me ask you "yes" or "no,"
20  did you learn about this company, Dexia Bank
21  Belgium, from your lawyers.
22      A.   Yes.
23      Q.   I take it you've never been a customer
24  of Dexia Bank Belgium?
25      A.   Never.
```

12

```
1                    Po
2       Q.   You've never done any business of any
3   kind with Dexia Bank Belgium?
4       A.   Never.
5       Q.   Did you meet with your lawyers to
6   prepare for this deposition today?
7       A.   Yes.
8       Q.   How many times did you meet with them
9   specifically to prepare for this deposition?
10      A.   Three, four time.
11      Q.   Did you meet with them here in the
12  United States or in Italy?
13      A.   In the United States.
14      Q.   How much total time did you spend
15  meeting with your lawyers in these three or four
16  meetings that you had?
17      A.   Let's say six, six hour.
18      Q.   Were those meetings here in New York or
19  someplace else in the United States?
20      A.   In New York.
21      Q.   And who did you meet with for purposes
22  of this preparation?
23      A.   I meet Mr. Allen, Mr. Pat and Brent,
24  and Mr. Rocco.
25      Q.   Prior to these meetings to prepare for
```

13

```
1                    Po
2   this deposition, had you met Mr. Egan before?
3           MR. CARNEY:  Object to form.
4       A.   Do you mean personally?
5       Q.   That's a good question.  I mean have
6   you met with him face-to-face prior to these
7   meetings.
8       A.   Maybe -- maybe -- oh, many years ago.
9   I really don't remember.
10      Q.   What about Mr. Rocco, had you met
11  Mr. Rocco personally before the recent meetings to
12  prepare for this deposition?
13           MR. CARNEY:  Object to form.
14      A.   My answer is the same.  I think I met
15  face-to-face Mr. Rocco many years ago.
16      Q.   Did you review the transcript from your
17  prior deposition in preparation for this
18  deposition?
19      A.   Can you explain better the question,
20  because --
21      Q.   You recall having your deposition taken
22  in the Lernout & Hauspie securities litigation;
23  correct?
24      A.   Yes.
25      Q.   Are you aware there was a transcript
```

4 (Pages 10 to 13)

14

```
1              Po
2   prepared of your testimony?
3       A.   Yes.
4       Q.   Did you review that transcript in
5   preparation for your deposition today?
6       A.   Yes.
7       Q.   Is there anything inaccurate about your
8   prior testimony that you would like to correct on
9   the record today?
10          MR. CARNEY:  Object to form.
11      A.   No.
12      Q.   You testified in your prior deposition
13  about a meeting that you had with the other lead
14  plaintiffs in this case, Dr. Quaak and
15  Mr. Leibinger, in Zurich on January 11th, 2001.
16  Do you recall testimony about that?
17      A.   Yes.
18      Q.   How was Zurich chosen as the site for
19  that meeting?
20      A.   Excuse me, can you repeat?
21      Q.   How was the city of Zurich chosen for
22  the site of that meeting?
23      A.   I really don't know.  I just guess,
24  because it was the closest city among the city
25  where I'm living, Mr. Quaak lives and Mr. -- the
```

15

```
1              Po
2   other plaintiff lives.
3       Q.   I may have mispronounced his name, and
4   that may have confused you.  Is it Leibinger?
5       A.   Leibinger, Leibinger, yes, I remember.
6       Q.   Do you remember where in the city of
7   Zurich you met?
8       A.   Actually not.
9       Q.   And apart from Mr. Leibinger and
10  Dr. Quaak, who else was present at that meeting?
11      A.   Some lawyers.
12      Q.   Do you remember any of the lawyers who
13  were present?
14      A.   I don't remember personally, because it
15  was many years ago.  I remember there were at
16  least the three firms that right now are -- I'm
17  working with.  But I don't remember exactly the
18  person, the people, that I met at that time.
19      Q.   Was there only one meeting in Zurich or
20  might there have been more than one meeting?
21          MR. CARNEY:  Object to form.
22      A.   I think it was just one meeting.
23      Q.   Was any part of that meeting conducted
24  outside of the presence of the lawyers?
25      A.   No, I don't -- I don't think so.
```

16

```
1              Po
2       Q.   How long did the meeting last?
3       A.   It's very hard to remember.  I remember
4   some hour of -- let's say two, three hours.
5       Q.   Have you had other face-to-face
6   meetings with Dr. Quaak and Mr. Leibinger since
7   that meeting?
8       A.   No, never.
9       Q.   Have you ever called Dr. Quaak on the
10  telephone to discuss -- to discuss this
11  litigation?
12      A.   I didn't call Mr. Quaak, no.
13      Q.   Have you ever called Mr. Leibinger on
14  the telephone to discuss this litigation?
15          MR. CARNEY:  Object to form.
16      A.   Never.
17      Q.   Do you have a telephone number for
18  Dr. Quaak?
19      A.   I don't think so.  No, I don't.
20      Q.   Do you have a telephone number for
21  Mr. Leibinger?
22      A.   I don't have.
23      Q.   Do you have their e-mail addresses?
24      A.   Yes, I have.
25      Q.   In your prior deposition you discussed
```

17

```
1              Po
2   a number of telephone conferences that you had
3   participated in with Dr. Quaak, Mr. Leibinger and
4   your lawyers.  Do you recall that testimony?
5       A.   Yes.
6       Q.   Have you had telephone conferences with
7   Dr. Quaak and Mr. Leibinger to discuss this
8   lawsuit against Dexia?
9       A.   Yes, but we were not -- I mean, it was
10  not a conference call, just among me, Mr. Quaak
11  and Mr. Leibinger.
12      Q.   I understand.  Just to clarify the
13  record, have you ever had a telephone conference
14  where it was only you, Dr. Quaak and Mr. Leibinger
15  on the phone?
16      A.   Never.
17      Q.   So back to my earlier question,
18  including Dr. Quaak, Mr. Leibinger and one or more
19  of your lawyers, how many telephone conferences
20  have you had to discuss this lawsuit against
21  Dexia?
22      A.   I have to think about it.  I could say
23  for sure more than a dozen, but I cannot be more
24  specific.
25      Q.   I'm sorry, did you say more than a
```

5 (Pages 14 to 17)

18

1           Po
2 dozen?
3      A.   Yeah.
4      Q.   How many telephone conferences have you
5 had in the past year regarding this lawsuit
6 against Dexia?
7      A.   I think two, three.
8      Q.   Do you remember when the last telephone
9 conference was?
10     A.   I don't.
11     Q.   Was it more than a month ago?
12     A.   Yes.
13     Q.   Can you give me any sense of how long
14 it was in months?
15     A.   Let me think about it. I could say six
16 months ago, maybe, maybe more.
17     Q.   You mentioned that you have the e-mail
18 addresses for Dr. Quaak and Mr. Leibinger. Have
19 you ever e-mailed them directly in connection with
20 this lawsuit?
21     A.   Yes.
22     Q.   And were those e-mails copied to your
23 lawyers?
24     A.   Basically, yes. I'm not sure 100
25 percent because sometimes e-mail we talk about

19

1           Po
2 something not related exactly to our lawyers, you
3 know. We can talk about everything, even about
4 vacation or something like that, private issue.
5      Q.   I understand. I'm not interested in
6 those kind of communications you may have had.
7 But in terms of e-mails about this litigation,
8 have you ever sent an e-mail about this litigation
9 to Dr. Quaak or Mr. Leibinger without copying your
10 lawyers?
11     A.   No, I don't think -- I don't think so.
12     Q.   Have you ever received an e-mail from
13 Dr. Quaak or Mr. Leibinger concerning this
14 litigation that did not copy your lawyers?
15     A.   Yes, yes, I received.
16     Q.   Did you receive the e-mail from
17 Dr. Quaak or Mr. Leibinger?
18     A.   Both.
19     Q.   Roughly how many such e-mails have you
20 received?
21     A.   Just few, I think one or two maximum.
22     Q.   And that related specifically to this
23 lawsuit against Dexia?
24     A.   Not against Dexia, no.
25     Q.   Did it relate to the prior Lernout &

20

1           Po
2 Hauspie securities litigation?
3      A.   Exactly.
4      Q.   You mentioned there have been a dozen
5 or more telephone conferences among the lead
6 plaintiffs, or among the named plaintiffs, to
7 discuss the case against Dexia. On those calls
8 was the L&H securities litigation also discussed?
9           MR. CARNEY:  Object to form.
10     A.   I don't remember.
11     Q.   I guess what I'm really asking, Mr. Po,
12 did you -- was there a distinction made between
13 telephone conferences that were for purposes of
14 discussing the L&H securities litigation and
15 telephone conferences for the purpose of
16 discussing the lawsuit against Dexia.
17     A.   I'm sorry, can you repeat the question?
18     Q.   Yes. My question is did you -- was
19 there any distinction made between telephone
20 conferences for the purpose of discussing the
21 earlier L&H securities litigation and telephone
22 conferences for the purpose of discussing this
23 lawsuit against Dexia?
24     A.   Oh, yes, there is a big difference
25 because Dexia -- the conference call regarding

21

1           Po
2 Dexia, Dexia are the -- just the last conference
3 call are regarding Dexia. It's quite recent
4 involvement to Dexia, to me.
5      Q.   Is it fair to say the two or three
6 calls that you've had in the past year were
7 exclusively for the purpose of discussing Dexia?
8      A.   Is not correct, is not correct, because
9 we didn't talk about just Dexia.
10     Q.   Did you also then talk about the
11 Lernout & Hauspie securities litigation?
12     A.   Yes.
13     Q.   Can you recall any conference calls
14 that you've had with the other two named
15 plaintiffs and the lawyers where only the lawsuit
16 against Dexia was discussed?
17     A.   No, I don't.
18     Q.   Are you aware that Dexia has also been
19 sued by Stonington Partners?
20     A.   I'm not.
21     Q.   Have you ever had any contacts at all
22 from anyone at Stonington Partners?
23     A.   No.
24     Q.   Are you aware that Dexia has also been
25 sued by Gary Filler and Lawrence Perlman?

6 (Pages 18 to 21)

22

```
                        Po
 1
 2      A.   I don't know.
 3      Q.   Have you ever had any contacts at all
 4  with those individuals?
 5      A.   Never.
 6      Q.   How about Jim or Janet Baker, have you
 7  ever had any contact with those individuals?
 8      A.   No, I don't know them.
 9      Q.   Have you ever had any contact with Guy
10  Warlop?  Last name is W-A-R-L-O-P.
11      A.   No, I never heard about him.
12      Q.   I have some even more difficult-to-
13  spell names for you.  Have you had any contacts
14  with Luc Vanganskeke?  That last name is
15  V-A-N-G-A-N-S-B-E-K-E.
16      A.   It sounds to be Flemish or -- no, I
17  never heard.
18      Q.   Last one, Reginald Pauwels, last name
19  is P-A-U-W-E-L-S.  Have you ever had any contacts
20  with that individual?
21      A.   Never.
22      Q.   Mr. Po, who represents you in this
23  lawsuit?
24      A.   The firm that you can find on the
25  complaint.
```

23

```
                        Po
 1
 2      Q.   When you communicate with your lawyers
 3  about this case, is there a particular person with
 4  whom you usually communicate?
 5      A.   There is a person that I communicate
 6  more often.
 7      Q.   Who is that person?
 8      A.   It is Brent Walker.
 9      Q.   Is there anyone else at the Cauley
10  Bowman firm with whom you communicate directly
11  about this case?
12      A.   Not recently.
13      Q.   So is it fair to say in the past year,
14  for example, your principal contact at the Cauley
15  Bowman firm has been Mr. Walker?
16      A.   Yes.
17      Q.   Do you have any direct contacts with
18  the -- strike that.
19          Who is your principal contact at the
20  Berman DeValerio firm?
21      A.   I'm not good at remembering the name.
22  I think Jeff Block.  I remember Jeff Block.
23      Q.   In the past year have you had any
24  communications with Mr. Block about this lawsuit?
25          MR. CARNEY:  Object to form.
```

24

```
                        Po
 1
 2      A.   I don't think so.
 3      Q.   In the time since the lawsuit against
 4  Dexia started, have you had any direct
 5  communications with Mr. Block about this lawsuit?
 6          MR. CARNEY:  Object to form.  I don't
 7      want to interfere with your deposition --
 8          MR. BUTLER:  Sure.
 9          MR. CARNEY:  -- but can you define the
10      term "communication."  We talked about being
11      person to person earlier today.  If you just
12      set up the question that way, it might be --
13      Q.   When I use the term "communication," I
14  mean a telephone call or an e-mail or a letter or
15  a fax or any of those types of things.
16      A.   I think, yes, once, once conference
17  call.
18      Q.   Have you had any communication with
19  anyone else at the Berman DeValerio firm about
20  this lawsuit against Dexia?
21      A.   I don't think so, or -- I don't
22  remember.
23      Q.   Have you had any communications with
24  anyone at the Shalov Stone & Bonner firm about
25  this lawsuit against Dexia?
```

25

```
                        Po
 1
 2          MR. CARNEY:  Object to form.
 3      A.   Yes, Mr. Rocco.
 4      Q.   So you've had direct communications
 5  with Mr. Rocco concerning this lawsuit?
 6      A.   I participated in a conference call
 7  where Mr. Rocco was present.
 8      Q.   I see.  Have you ever sent Mr. Rocco an
 9  e-mail?
10      A.   No.
11      Q.   Have you ever called him on the
12  telephone?
13      A.   No.
14      Q.   At your prior deposition in January of
15  2004, you testified that you never heard of the
16  Shalov Stone & Bonner firm.  Do you recall that?
17          MR. CARNEY:  Object to form.
18      A.   I don't remember.
19      Q.   You don't remember testifying to that
20  effect?
21      A.   I don't remember that answer or
22  question.
23      Q.   I take it you have now heard of the
24  Shalov Stone & Bonner firm; is that correct?
25      A.   Yes.
```

7 (Pages 22 to 25)

26

Po

1
2    Q.    Have you had any contacts with anyone
3    other than Mr. Rocco at the Shalov Stone & Bonner
4    firm?
5    A.    Never.
6    Q.    Have you ever communicated with James
7    Bonner?
8    A.    No, I don't remember this name.
9    Q.    How many face-to-face meetings have you
10   had with your lawyers to discuss the lawsuit
11   against Dexia?
12   A.    Few, just this day in New York to
13   prepare this deposition.
14   Q.    Apart from the meetings you had to
15   prepare for this deposition specifically, how many
16   face-to-face meetings have you had with your
17   lawyers regarding the lawsuit against Dexia?
18   MR. CARNEY: Object to form.
19   A.    None.
20   Q.    We talked earlier about conference
21   calls that you had with Dr. Quaak and
22   Mr. Leibinger and your lawyers in connection with
23   this lawsuit. Have you had any other telephone
24   conferences with your lawyers to discuss this
25   lawsuit that did not include Dr. Quaak or

27

Po

1
2    Mr. Leibinger?
3    A.    Do you mean conference call regarding
4    Dexia or regarding Lernout & Hauspie litigation?
5    Q.    Let's talk about specifically relating
6    to Dexia. Have you participated in any conference
7    calls with your lawyers --
8    A.    No.
9    Q.    -- apart from those that you described
10   before?
11   A.    No.
12   Q.    If we include both Dexia and L&H
13   securities litigation, apart from what you've
14   already told me about, are there any other
15   conference calls that you've had with your
16   lawyers?
17   MR. CARNEY: Object to form.
18   A.    Can you repeat? Including?
19   Q.    I believe you previously testified that
20   you had participated in a dozen or more conference
21   calls since the lawsuit against Dexia began; is
22   that correct?
23   A.    No, it's not correct. Maybe I made a
24   mistake -- misunderstanding. Those conference
25   call I relate -- I'm relating to this conference

28

Po

1
2    call for the whole Lernout & Hauspie litigation,
3    not for Dexia.
4    Q.    I see. So my question is are there any
5    other conference calls that relate to the
6    Lernout & Hauspie securities litigation or Dexia
7    apart from the ones you told me about?
8    A.    No.
9    Q.    Mr. Po, I'd like to hand you an exhibit
10   that was previously marked at your prior
11   deposition as Po Exhibit 7.
12   MR. BUTLER: And I'll just use the same
13   exhibits from the previous deposition if it's
14   okay with you.
15   MR. CARNEY: Sure.
16   MR. BUTLER: There's no need to mark
17   new ones.
18   Let me just say for the record Po
19   Exhibit 7 is a document titled "certification
20   of named plaintiff pursuant to federal
21   securities laws," and it's dated September
22   27th, 2000.
23   Q.    Mr. Po, is that your signature at the
24   bottom of this document?
25   A.    Yes, it is.

29

Po

1
2    Q.    Do you recall signing this document on
3    September 27th, 2000?
4    A.    Yes.
5    Q.    This document lists all of the
6    Lernout & Hauspie shares that you purchased during
7    the class period in the L&H securities litigation;
8    correct?
9    A.    Yes, it is.
10   Q.    Have you ever signed any other
11   certification that lists your share purchases in
12   connection with this litigation?
13   A.    I don't remember any other
14   certification I signed.
15   Q.    In the first paragraph of this document
16   it says, "Plaintiff has reviewed the complaint
17   alleging securities fraud against Lernout &
18   Hauspie and authorized its filing."
19   Do you see that?
20   A.    Yes.
21   Q.    What complaint are you referring to
22   here?
23   A.    It was about the -- specifically I
24   don't know if I well understand what you mean, but
25   anyway, my complaint was regarding the collapse of

8 (Pages 26 to 29)

30

Po

1
2  the quotes of the shares, the Lernout & Hauspie
3  shares, and that's why I signed the certification
4  that we are talking about.
5      Q.   Do you know what a complaint is?
6          MR. CARNEY: Object to form.
7      A.   Actually I think -- I think -- I think
8  complaint -- I understand what you said, but I
9  understand also could be -- could have a general
10  meaning. So if you can be more specific, I can be
11  more good in my answer.
12     Q.   What is your understanding of what a
13  complaint is?
14     A.   The complaint is when you have -- when
15  you feel that something is not going in the -- not
16  going in the -- under the law and you want to
17  declare, you want to be that -- you want to let
18  the people know that there is something not --
19  something was done, broken the rules or broken the
20  law, and this to me is basically the meaning of
21  the complaint.
22     Q.   It says here that you reviewed the
23  complaint. What did you review?
24     A.   All the document regarding what
25  Lernout & Hauspie had done year 2000 and basically

31

Po

1
2  the reason -- the reasons that I found to make
3  this -- this complaint.
4      Q.   Is there any particular document that
5  you recall reviewing that you referred to as the
6  complaint?
7      A.   I should have a look to the document
8  because it's too long, it's too -- it's a long
9  time ago, and I'm not able to remember
10  specifically what kind of document.
11     Q.   Let me show you another document that
12  was previously marked as Po Exhibit 8. Have you
13  seen this document before?
14     A.   I don't remember.
15     Q.   Well, Mr. Po, that's what you said at
16  your last deposition, which is why I meant
17  to show you this other document, which is Po
18  Exhibit 9.
19     A.   Okay.
20         MR. CARNEY: Is there a question
21  pending?
22         MR. BUTLER: Not yet.
23         MR. CARNEY: Okay.
24     Q.   Do you recall seeing Po Exhibit 9?
25         (Pause.)

32

Po

1
2      Q.   So my question is have you seen this
3  document before.
4      A.   Yes.
5      Q.   This is a document titled "complaint
6  for violations of the Securities Exchange Act of
7  1934," and it appears to be brought on your
8  behalf. You see you're listed as a plaintiff?
9      A.   Yes.
10     Q.   And the document is dated April 27,
11  2001, at the end. Do you see that?
12     A.   Yes.
13     Q.   Is this the complaint that was filed on
14  your behalf on April 27th, 2001?
15     A.   Yes.
16     Q.   Is this the complaint that you reviewed
17  at the time you signed your certification on
18  September 27th, 2000?
19     A.   I don't remember.
20     Q.   Is it possible that this is the
21  complaint that you reviewed?
22     A.   It is.
23     Q.   You'll see towards the end of the
24  complaint after the date there are various
25  certifications attached to the complaint, one of

33

Po

1
2  which is your certification. Do you see that?
3      A.   Yes.
4      Q.   Do you agree, then -- strike that.
5          Based on the fact that this
6  certification is attached to this document called
7  a complaint, would you agree that this appears to
8  be the complaint that you reviewed?
9          MR. CARNEY: Object to form.
10     A.   Yes.
11     Q.   Do you have any reason to think, as you
12  sit here today, that you might have reviewed any
13  other complaint at the time you signed your
14  certification?
15     A.   I don't remember.
16     Q.   And seeing this complaint that was
17  filed on your behalf, does that refresh your
18  memory that a complaint is a formal document that
19  is filed in a U.S. lawsuit?
20     A.   Yes.
21     Q.   So when you used the word "complaint"
22  in your certification, were you referring to a
23  formal document that is filed in a U.S. lawsuit?
24     A.   Yes.
25     Q.   Assuming that this is the complaint

9 (Pages 30 to 33)

34

Po
1
2  that you reviewed on or about September 27th,
3  2000, do you have any idea why you waited until
4  April 27th, 2001, to file the complaint?
5        MR. CARNEY:  Object to form.
6     A.  I have no idea.
7     Q.  Do you have any memory of waiting a
8  long time, after you first saw the complaint,
9  before filing it?
10       MR. CARNEY:  Object to form.
11    A.  No, I really don't remember.  It's a
12  long time ago.
13    Q.  Is it possible that this complaint is
14  not the document that you reviewed on September
15  27th, 2000?
16    A.  I'm trying to remember, and as I
17  couldn't remember the previous exhibit, I -- I
18  just guess this is my -- this is the complaint,
19  the only document about the complaint for
20  violation of the securities exchange.
21    Q.  I'd like you to turn to page 4 of this
22  complaint and take a look at paragraph 12.  The
23  second sentence of paragraph 12 says, "Defendant
24  Lernout resigned from his position as managing
25  director on October 9, 2000."

35

Po
1
2        Do you see that?
3     A.  Yes.
4     Q.  On September 27th, 2000, you could not
5  have known that; correct?
6        MR. CARNEY:  Object to form.
7     A.  I'm not able to give you an answer for
8  sure.
9     Q.  Well, is November 9, 2000, after
10  September 27, 2000?
11    A.  Yes, of course.
12    Q.  So on September 27th, 2000, you could
13  not have known that Defendant Lernout resigned on
14  November 9th; correct?
15    A.  Of course.
16    Q.  So this couldn't have been the document
17  that you reviewed on September 27th, 2000;
18  correct?
19    A.  Yes.
20    Q.  At the time you signed your
21  certification on September 27th, did you believe
22  that you had been defrauded by Lernout & Hauspie?
23       MR. CARNEY:  Object to form.
24    A.  Yes.
25    Q.  When did you first reach that

36

Po
1
2  conclusion?
3     A.  Immediately after the first -- the
4  first communication from the CE -- CE -- SEC on
5  NASDAQ directly on Internet, I felt there was
6  something wrong.
7     Q.  Did you believe at that time that you'd
8  been defrauded?
9        MR. CARNEY:  Objection, asked and
10  answered.
11    A.  Yes.
12    Q.  And that was the time that you saw the
13  announcement of the SEC investigation; correct?
14    A.  Yes.
15    Q.  Why didn't you sell your Lernout &
16  Hauspie shares at that time?
17    A.  I -- I wanted to -- before taking any
18  action, I wanted to be informed in a more complete
19  way about Lernout & Hauspie.  So I waited --
20  actually I still have the shares.
21    Q.  If you had sold the shares at the time
22  you concluded you had been defrauded by Lernout &
23  Hauspie, wouldn't your losses be less than they
24  turned out to be?
25       MR. CARNEY:  Object to form.

37

Po
1
2     A.  I never -- I never sold any shares of
3  Lernout & Hauspie, just by -- just booked.
4     Q.  I understand.  But there did come a
5  point in time where you concluded you had been
6  defrauded by Lernout & Hauspie.
7     A.  Yes.
8     Q.  And if you had sold your shares at the
9  time you reached that conclusion, your losses
10  would be less than they are now; correct?
11    A.  Yes, that's correct.
12    Q.  Let me turn your attention back to the
13  document that's been marked Po Exhibit 7, the
14  certification with your share purchases.  And the
15  writing is a little bit difficult to read, but it
16  looks like you had four purchases of shares; is
17  that correct?
18    A.  Correct.
19    Q.  One for 3,000 shares, one for 720
20  shares, one for 800 shares, and one for 980
21  shares; is that correct?
22    A.  It is.
23    Q.  And is it your understanding the total
24  number of shares that you purchased prior to the
25  split was 5,500 shares?

10 (Pages 34 to 37)

38

Po

1
2     A.    Correct.
3     Q.    And then there came a point where there
4  was a split, so you currently hold 11,000 shares;
5  is that right?
6     A.    That's right.
7     Q.    Do you remember when the split was?
8     A.    I don't remember exactly.  I -- no, I
9  don't remember.
10    Q.    After this certification there are
11 certain documents that appear to be confirmations
12 from banks associated with your share purchases.
13 The Bates numbers at the bottom are CP0004 through
14 007.
15         Is my understanding correct that these
16 are the confirmations of your share purchases?
17    A.    Yes.
18    Q.    And if you turn to the page that's
19 marked at the bottom CP0007, which appears to be a
20 confirmation from an entity called Credito
21 Italiano; is that correct?
22    A.    Yes, that's correct.
23    Q.    When you purchased 3,000 shares of
24 Lernout & Hauspie, did you buy those shares from
25 Credito Italiano?

39

Po

1
2     A.    That's correct.
3     Q.    The other confirmations that are part
4  of this exhibit is an entity called Rolo
5  Banca; is that correct?
6     A.    Yes.
7     Q.    Were your other purchases of Lernout &
8  Hauspie shares from Rolo Banca?
9     A.    Yes.
10    Q.    The last page of this exhibit is a
11 letter from Credito Italiano dated November 7th,
12 2000, stating the shares you purchased from
13 Credito Italiano were purchased on the NASDAQ
14 market; is that correct?
15    A.    Yes.
16         MR. CARNEY:  Object to form.
17    A.    Yes.
18    Q.    You testified previously that you don't
19 recall why you requested this letter; is that
20 correct?
21         MR. CARNEY:  Object to form.
22    A.    Actually, yes, that's correct.
23    Q.    I assume sitting here today you don't
24 have any more memory as to why you requested this
25 particular letter?

40

Po

1
2     A.    Actually I thought about it, and I
3  think I asked -- I asked the bank Credito Italiano
4  for confirmation that the stock I bought was
5  bought from NASDAQ, and they confirmed that.
6     Q.    So you recall making that request; is
7  that right?
8     A.    Yes, yes.
9     Q.    Do you remember why you made that
10 request?
11    A.    Because this litigation is regarding
12 the shares and the action taken by Lernout &
13 Hauspie on the American market, NASDAQ.
14    Q.    Did you make a similar request to Rolo
15 Banca?
16    A.    I don't think so.
17    Q.    You testified previously that you don't
18 know whether the shares you purchased through Rolo
19 Banca were purchased on the EASDAQ or NASDAQ
20 market.  Do you recall that?
21    A.    Yes.
22    Q.    Do you have any greater understanding
23 today whether those shares were purchased on
24 EASDAQ or NASDAQ?
25    A.    Not very much -- not exactly, because

41

Po

1
2  both the bank operated on EASDAQ or NASDAQ.  And
3  I'm not sure -- 100 percent sure that Credito
4  Italiano hold the 3,000 share bought from NASDAQ
5  were just bought through Credito Italiano.
6  Maybe -- maybe also Rolo Banca could buy some
7  share from NASDAQ.  I'm not sure, 100 percent
8  sure, about it.
9     Q.    But you have no memory of making a
10 request to Rolo Banca to tell you one way or the
11 other whether they were purchased on NASDAQ; is
12 that correct?
13    A.    Yes.
14    Q.    Can you think of any reason why you
15 would have made the request to Credito Italiano
16 and not to Rolo Banca?
17    A.    I'm not sure.  I don't remember.
18    Q.    Is it possible that you requested this
19 information from Rolo Banca and it turned out that
20 these shares were purchased on EASDAQ?
21         MR. CARNEY:  Object to form.
22    A.    It's possible.
23    Q.    You were questioned pretty extensively
24 about this point at your last deposition.  After
25 that deposition did you do anything to investigate

11 (Pages 38 to 41)

42

1          Po
2 whether these shares purchased through Rolo Banca
3 were purchased on EASDAQ or NASDAQ?
4      A.   No, I didn't do any research.
5      Q.   Let me show you another exhibit that
6 was marked at your previous deposition. Po
7 Exhibit 1 is a document entitled "declaration of
8 Attilio Po." It appears to be dated December 5,
9 2000.
10        Do you recall signing this document on
11 December 5, 2000, Mr. Po?
12     A.   Can I have a look before I answer?
13     Q.   Of course.
14        (Pause.)
15     A.   Yes, I recall.
16     Q.   What was the purpose of this
17 declaration?
18        MR. CARNEY: Object to form.
19     A.   It's a declaration, so I think the
20 purpose you can find reading the declaration.
21     Q.   But do you remember, as you sit here
22 today, why you signed this particular declaration?
23     A.   Yes. To define what is my role in
24 this -- in this class action.
25     Q.   Did you understand when you signed this

43

1          Po
2 that this document was going to be submitted to
3 the court in the L&H securities litigation?
4      A.   I don't remember if at that time I was
5 aware about what you just said. I guess yes, but
6 it's a long time ago.
7      Q.   Were you aware at the time you signed
8 this that this was going to be submitted to the
9 court in connection with your application to be a
10 lead plaintiff in the Lernout & Hauspie securities
11 litigation?
12     A.   Okay.
13     Q.   Was that your understanding at the
14 time?
15     A.   Yes.
16     Q.   If you would turn to the second page of
17 this document. Paragraph 7 states, "I purchased
18 6,000 shares of Lernout & Hauspie common stock on
19 NASDAQ. To date I have suffered losses of 538,530
20 on my Lernout & Hauspie common stock."
21        Do you see that?
22     A.   Yes.
23     Q.   Now, the certification that we looked
24 at a short time ago indicates that you purchased
25 5,500 shares of Lernout & Hauspie stock; is that

44

1          Po
2 correct?
3      A.   Yes.
4      Q.   So this figure of 6,000 shares is
5 incorrect, is it not?
6      A.   Yes, I think it's incorrect.
7      Q.   Why did you say 6,000 shares if you
8 only purchased 5500?
9        MR. CARNEY: Object to form.
10     A.   I really don't know. I think is my
11 guess -- I think there was -- the split was
12 already done and among the 5,500 shares probably
13 3,000 were identified as shares bought from
14 NASDAQ. And then with the split they doubled.
15 That's why I think -- I mean, 6,000 includes
16 probably the split.
17     Q.   Take a look back at Po Exhibit 7 where
18 your share purchases are listed. It indicates
19 that you purchased 3,000 shares and the price was
20 $96 and about 24 cents a share; is that correct?
21     A.   Yes.
22     Q.   So just to make our math simpler, let's
23 say you purchased at $100 a share. That implies
24 you spent about $300,000 on those 3,000 shares;
25 correct?

45

1          Po
2      A.   Yes.
3      Q.   And then those were split into 6,000
4 shares; correct?
5      A.   Yes.
6      Q.   But you still only paid $300,000 for
7 them; correct?
8      A.   Yes.
9      Q.   If you turn to Po Exhibit 1, in
10 paragraph 7 you refer to those 6,000 shares
11 purchased on NASDAQ, and then you say you suffered
12 losses of over $500,000 on your Lernout & Hauspie
13 common stock; is that correct?
14     A.   Yes, yes.
15     Q.   But that doesn't refer to the 6,000
16 shares, does it?
17        MR. CARNEY: Object to form.
18     A.   It refers to the total losses I got
19 from Lernout & Hauspie common stock.
20     Q.   Which are more than the losses that you
21 suffered on the 6,000 shares that you reference in
22 the immediate --
23     A.   Yes.
24     Q.   -- preceding sentence?
25        MR. CARNEY: Objection to form.

12 (Pages 42 to 45)

46

Po

1
2    A.    Yes.
3    Q.    You would agree with the statement that
4  your losses on the 6,000 shares that you refer to
5  here could not have exceeded $300,000; correct?
6         MR. CARNEY:  Object to form.
7    A.    It's correct.
8         MR. BUTLER:  I think this is a good
9  time for a short break.
10         MR. CARNEY:  Sounds great.
11         THE VIDEOGRAPHER:  Off the record,
12  10:17 a.m.
13         (Recess taken from 10:17 to 10:30.)
14         THE VIDEOGRAPHER:  Back on the record
15  at 10:30 a.m.
16    Q.    Let me show you another exhibit that
17  was shown to you at your previous deposition.  Po
18  Exhibit 6 is a memorandum and order entered by the
19  court in the Lernout & Hauspie securities
20  litigation on February 26, 2001.  Do you recall
21  seeing this document at your deposition?
22    A.    Can I have a look?
23    Q.    Please do.
24    A.    Okay, I recall.
25    Q.    Do you have any memory of seeing this

47

Po

1
2  document around the time that it was entered by
3  the court in February of 2001?
4    A.    I don't remember.
5    Q.    Do you understand that this is the
6  order issued by the court appointing you as one of
7  the lead plaintiffs in the L&H securities
8  litigation?
9    A.    Yes.
10    Q.    Could you turn to page 11 of this
11  document.  Around the middle of the carryover
12  paragraph on this page, there's a sentence that
13  says, "Indeed, their meeting in Zurich,
14  Switzerland, on January 11, 2001, spawned a
15  relatively detailed litigation strategy which the
16  Quaak group has filed with this court in camera."
17         Do you see that?
18    A.    Yes.
19    Q.    Did your meeting in Zurich in fact
20  result in a detailed litigation strategy for the
21  L&H securities litigation?
22         MR. CARNEY:  I'm going to caution you
23    to answer that question "yes"/"no" but not
24    give him the details of that litigation
25    strategy.

48

Po

1
2    A.    Yes.
3    Q.    Has any similar strategy been created
4  for the lawsuit against Dexia?
5         MR. CARNEY:  Object to form.
6    A.    Yes.
7    Q.    Does that take the form of a document?
8         MR. CARNEY:  Object to form.
9    A.    Yes.
10    Q.    Just to be clear, the litigation
11  strategy that the court refers to here for the L&H
12  securities litigation, that was captured on a
13  document; is that correct?
14         MR. CARNEY:  Object to form.
15    A.    Yes.
16    Q.    Your testimony today is that a
17  separate, similar document has been created for
18  the lawsuit against Dexia; correct?
19         MR. CARNEY:  Object to form.
20    A.    Yes.
21    Q.    Can you tell me when that document was
22  created?
23    A.    Late 2003.
24    Q.    Was it the result of a particular
25  meeting that you had with Dr. Quaak and

49

Po

1
2  Mr. Leibinger?
3    A.    I should say conference call and
4  communication, that --
5         MR. CARNEY:  Not the details.
6    Q.    I don't want to know the substance of
7  the communications, but do you remember did that
8  document result from a particular conference call
9  that you had with the other named plaintiffs?
10    A.    Yes.
11    Q.    Do you remember approximately when that
12  conference call took place?
13    A.    No, I don't remember.
14    Q.    In the time since that litigation
15  strategy document was created, has it been amended
16  at all, to the best of your knowledge?
17         MR. CARNEY:  Object to form.
18    A.    I don't remember.
19    Q.    Have you and your lawyers followed the
20  litigation strategy that is outlined in this
21  document?
22 DI      MR. CARNEY:  Object to form.
23         And I'm going to instruct you not to
24    answer that question.
25    A.    I --

13 (Pages 46 to 49)



50

1              Po
2        MR. CARNEY: You don't have to say a
3   word.
4        Q.    Turning back to Po Exhibit 6 on page
5   11, at the bottom of that paragraph we were just
6   discussing it says, "They have also agreed to
7   regular conference calls every two weeks."
8        Do you see that?
9        A.    Yes.
10       Q.    Did you in fact agree to participate in
11  regular conference calls every two weeks?
12       A.    Yes.
13       Q.    In the L&H securities litigation, you
14  agreed to certain settlements; is that correct?
15       A.    Yes.
16       Q.    I believe there was a $115 million
17  settlement with certain KPMG entities; is that
18  correct?
19       A.    Yes.
20       Q.    And there was also a settlement in the
21  amount of $5.27 million with certain directors of
22  L&H; is that correct?
23       A.    Yes.
24       Q.    And then one more settlement for
25  $250,000 with the FLV Fund; is that correct?

51

1              Po
2        A.    Yes.
3        Q.    So the total settlements to date in the
4   L&H securities litigation are a little over $120
5   million; correct?
6        A.    Correct.
7        Q.    How much have you personally received
8   in connection with those settlements?
9        A.    From the settlement, nothing.
10       Q.    So to date you have not received
11  anything from the settlement itself, from any of
12  the settlements themselves?
13       MR. CARNEY: Object to form.
14       A.    No.
15       Q.    Have you received any calculation from
16  the settlement administrator of how much you might
17  receive?
18       A.    No.
19       Q.    Do you have any idea, as you sit here
20  today, when you might receive some portion of the
21  amount of those settlements?
22       A.    No.
23       Q.    What is the current status of the L&H
24  securities litigation?
25       MR. CARNEY: Object to form.

52

1              Po
2        A.    I'm not able to answer you. Once we
3   reach a settlement, after that to me is --
4   everything is -- I don't -- I don't have any news
5   about how it's going on. To me we are still at
6   the same point where we were when we reached the
7   settlement with KPMG. There is no news.
8        Q.    Well, there are other defendants in the
9   Lernout & Hauspie securities litigation other than
10  those with whom you've settled; correct?
11       MR. CARNEY: Object to form.
12       A.    Yes.
13       Q.    For example, Mr. Lernout and
14  Mr. Hauspie, the two founders of Lernout &
15  Hauspie, they're still defendants in the Lernout &
16  Hauspie securities litigation; correct?
17       A.    Yes.
18       Q.    And are you aware that your lawsuit
19  against them has been stayed?
20       A.    I actually -- I don't know. Maybe --
21  can you repeat the question?
22       Q.    Are you aware that the case that you
23  filed against the two founders of Lernout &
24  Hauspie has been stayed, at the request of
25  plaintiffs?

53

1              Po
2        MR. CARNEY: Object to form.
3        A.    I don't know the meaning of "stayed"
4   when you say "has been stayed." Can you use
5   another word to explain me better?
6        Q.    Well, are you aware that a trial of
7   your claims against Mr. Lernout and Mr. Hauspie
8   had been scheduled for I believe March of 2005?
9        A.    I'm not.
10       MR. CARNEY: Objection.
11       A.    I'm not.
12       Q.    You were not aware of that?
13       A.    (Shakes head.)
14       Q.    Are you aware that your lawyers made a
15  request of the judge in that lawsuit to postpone
16  the trial indefinitely?
17       MR. CARNEY: Objection.
18       A.    I'm not.
19       Q.    And I take it that you're not aware of
20  any of the reasons for postponing the trial of the
21  two founders of Lernout & Hauspie; is that
22  correct?
23       MR. CARNEY: Object to form.
24       A.    That's correct.
25       Q.    Were you involved in any discussions of

14 (Pages 50 to 53)

54

Po

1
2 whether to postpone the trial against those
3 individuals?
4    A.   No.
5    MR. BUTLER:  I'd like to ask the court
6 reporter to mark what will be a new exhibit,
7 and if we could, could we mark this Po Exhibit
8 14.
9    (Po Exhibit 14, supplemental
10 declaration of Po, marked for identification,
11 as of this date.)
12    Q.   Po Exhibit 14 is a document titled
13 "supplemental declaration of lead plaintiff
14 Attilio Po," and it is dated January 18, 2005.
15    Do you recall signing this document on
16 January 18, 2005?
17    A.   Yes.
18    Q.   On the first page of this document in
19 paragraph 4, the second sentence indicates that
20 your compensation rate is approximately $130 per
21 hour.  Do you see that?
22    A.   Yes.
23    Q.   How did you calculate that rate?
24    A.   Based on the rate I am paid -- I was
25 paid by my -- for my time in developing the

55

Po

1
2 business of my company.
3    Q.   Which company are you referring to?
4    A.   Steel Company.
5    Q.   Is $130 per hour, then, the rate at
6 which you're compensated in your work for the
7 steel company?
8    A.   Yes.
9    Q.   Do you work on an hourly basis for that
10 company?
11    A.   I used to.
12    Q.   At what point in time did you work on
13 an hourly basis for them?
14    MR. CARNEY:  Object to form.
15    A.   Repeat?
16    Q.   You said that you used to work on an
17 hourly basis for Steel Company.  My question is
18 when.
19    A.   Till the end of 2005.
20    Q.   And what happened at the end of 2005
21 that changed the situation?
22    A.   I changed my role, and so I decided to
23 change also the way how to be paid.
24    Q.   How are you compensated today for your
25 work for Steel Company?

56

Po

1
2    A.   By commission.
3    Q.   The last page of this document appears
4 to be an itemization of your time spent on the L&H
5 securities litigation; is that correct?
6    A.   Yes.
7    Q.   Does this chart include any of the time
8 that you spent working on the lawsuit against
9 Dexia?
10    MR. CARNEY:  Objection.  The document
11 speaks for itself.
12    A.   No.
13    Q.   For example, one of the items that you
14 list is "numerous e-mail communication with
15 attorneys from 2000 to 2004."
16    And it indicates that you spent 32
17 hours on that.  Do you see that?
18    A.   Yes.
19    Q.   Did any of those e-mails involve or
20 relate to the lawsuit against Dexia?
21    MR. CARNEY:  Objection, asked and
22 answered.
23    You can answer.
24    A.   No.
25    Q.   For purposes of preparing this

57

Po

1
2 document, did you actually go through your e-mail
3 and see if any of them related to Dexia?
4    A.   No, this is related to KPMG.
5    Q.   Just below that it indicates that you
6 spent 26 hours on, "numerous conference calls with
7 counsel and other lead plaintiffs from 2000 to
8 2004."
9    Did any of those conference calls
10 involve discussions about the lawsuit against
11 Dexia?
12    MR. CARNEY:  Objection, asked and
13 answered.
14    A.   No.
15    Q.   I thought you testified earlier today
16 that that all of your calls relating to the
17 lawsuit against Dexia also involved at least some
18 discussion of the L&H securities litigation;
19 correct?
20    MR. CARNEY:  Objection to form,
21 misstates his prior testimony.
22    A.   Yes, but the name Dexia, it appears to
23 me the first time the late -- I think late 2004 --
24 2005, I think.  So 2004 I don't remember there was
25 Dexia involved.

15 (Pages 54 to 57)

**VERITEXT/SPHERION DEPOSITION SERVICES**
**(212) 490-3430**

58

Po
1
2     Q.     Would you give the same answer for
3   Artesia Bank?
4         MR. CARNEY:  Same objection.
5     A.     Artesia Bank is different because the
6   first name came up -- that came up was Artesia.
7     Q.     And you testified earlier that you
8   first had discussions concerning Artesia Bank in
9   late 2003; correct?
10     A.     Yes.
11     Q.     So are any of those discussions
12   included in the hours that you included on that
13   chart?
14         MR. CARNEY:  Objection, asked and
15     answered.
16     A.     Yes.
17     Q.     So when you list 26 hours for
18   conference calls here, at least some of the time
19   on those conference calls was spent discussing the
20   lawsuit against Artesia; is that correct?
21     A.     Yes.
22     Q.     And is the same true for the e-mail
23   communications that you list here, 32 hours, at
24   least some of those e-mail communications related
25   to your claims against Artesia; correct?

59

Po
1
2         MR. CARNEY:  Objection.
3     A.     Yes, I think so.
4     Q.     Did you review any complaints against
5   Dexia prior to 2005?
6         MR. CARNEY:  Object to form.
7     A.     I don't remember.
8     Q.     I think you said earlier that you don't
9   remember hearing about Dexia until sometime in
10   2005; is that correct?
11     A.     Yes.
12     Q.     Prior to that time you only heard about
13   Artesia?
14     A.     Yes.
15     Q.     Do you think you would remember if you
16   had reviewed a complaint against Dexia from
17   sometime before 2005?
18         MR. CARNEY:  Object to form.
19     A.     I don't remember the time when I saw
20   the first -- the first complaint including the
21   name Dexia.
22     Q.     You have at some point, I take it,
23   reviewed a complaint that is directed at Dexia;
24   correct?
25     A.     Yes.

60

Po
1
2     Q.     But you don't remember when you
3   reviewed that for the first time; correct?
4     A.     Exactly.
5     Q.     Have you ever reviewed a complaint
6   against Artesia?
7     A.     Yes.
8     Q.     Do you remember when you reviewed that
9   complaint?
10     A.     Late 2003.
11     Q.     Just going back to this chart, Mr. Po,
12   during 2004 did you do anything to keep track of
13   the amount of time that you spent on the L&H
14   securities litigation as opposed to the lawsuit
15   against Artesia?
16     A.     No.
17     Q.     The second item that's listed on this
18   document relates to travel to Belgium for
19   deposition with the Belgian prosecutor on March
20   17, 2004.  Do you see that?
21     A.     Yes.
22     Q.     Can you tell me what this refers to?
23     A.     It was a deposition close to Brussels.
24     Q.     Who was being deposed?
25     A.     I don't remember.  Lernout & Hauspie.

61

Po
1
2     Q.     You think it was one of the
3   individuals, Mr. Lernout or Mr. Hauspie?
4     A.     No, I remember it was concerning
5   Lernout & Hauspie Speech Products, the company.
6     Q.     This indicates that this was for a
7   deposition with the Belgian prosecutor; correct?
8     A.     Yes.
9     Q.     Was the Belgian prosecutor asking
10   somebody questions during this deposition?
11     A.     Yes.
12     Q.     Who was being asked questions?
13     A.     Lernout & Hauspie company.  That's all,
14   the company.
15     Q.     The company was being asked questions?
16     A.     The prosecutor asked me some question
17   about the company.
18     Q.     I'm sorry, I may be the source of
19   confusion.
20     A.     Excuse me.
21     Q.     So the record is clear, you were being
22   asked questions about the Belgian prosecutor;
23   correct?
24     A.     Yes, yes.
25     Q.     I didn't understand that from the

16 (Pages 58 to 61)

62

Po

1    description. So you traveled to Belgium so that
2    the Belgian prosecutor could ask you questions?
3    A.    Yes.
4    Q.    Why did the Belgian prosecutor want to
5    ask you questions?
6        MR. CARNEY:  Object to form.
7    A.    I don't know.
8    Q.    Well, how did it happen that you
9    traveled to Belgium to participate in this
10   deposition?
11   A.    I was contacted by my lawyer in order
12   to make a deposition in Belgium. And so I went
13   there, and I made my deposition.
14   Q.    Do you have any understanding of why
15   the Belgian prosecutor wanted to ask you
16   questions?
17       MR. CARNEY:  Object to form.
18   A.    Yes, I have.
19   Q.    What is that understanding?
20   A.    In Belgium the prosecutor was
21   investigating about -- investigating Lernout &
22   Hauspie company, and he wanted to know something
23   about my experience, and that's it, as
24   shareholder.
25

63

Po

1    Q.    Well, what do you remember the Belgian
2    prosecutor asking you about your experiences as a
3    shareholder?
4    A.    He asked me when I bought the share,
5    why I bought the share, and my impression about
6    the case.
7    Q.    Do you recall the name of the Belgian
8    prosecutor who was asking you questions?
9    A.    I'm sorry, I don't.
10   Q.    Was any record made of this conference?
11   A.    I don't remember.
12   Q.    Were you asked to sign a report that
13   summarized what took place during this deposition
14   or interview?
15   A.    I really don't remember.
16   Q.    Have you personally had any other
17   communications with Belgian government prosecutors
18   investigating Lernout & Hauspie?
19   A.    No.
20   Q.    During this deposition or interview,
21   were you asked about your claims against Artesia?
22   A.    I don't remember.
23   Q.    Were you asked about your claims
24   against Dexia?
25

64

Po

1    A.    The same, I don't remember.
2    Q.    Are you saying you don't remember one
3    way or the other or you don't remember any
4    questions like that?
5    A.    I don't remember if they asked me
6    something about Artesia or Dexia. I remember the
7    question about Lernout & Hauspie.
8    Q.    Is it your understanding that the
9    Belgian prosecutor wished to interview you because
10   of your status as a lead plaintiff in the L&H
11   securities litigation?
12       MR. CARNEY:  Object to form.
13   A.    I think yes, yes.
14   Q.    To the best of your knowledge, is there
15   any other reason why the Belgian government
16   investigators would have wanted to talk to you?
17       MR. CARNEY:  Object to form.
18   A.    No, I think that could be the main
19   reason. I don't see any other reason.
20   Q.    Is it correct to say you didn't have
21   any interaction with Lernout & Hauspie other than
22   as a shareholder; is that correct?
23   A.    Yes.
24       MR. BUTLER:  Let me just make a request
25

65

Po

1    on the record. To the extent there has been
2    any record made of the interview with the
3    Belgian government prosecutors, we would
4    request a copy of that. We haven't seen
5    anything like that in the production to date.
6        MR. CARNEY:  Consistent with -- I'm
7    sure you read the transcript from the last
8    deposition. Would you write me a letter,
9    because the time I ride the elevator down, I
10   will have forgotten your request. If you send
11   me a letter, I will respond.
12       MR. BUTLER:  We will do that.
13       MR. EGAN:  I have not seen any copy,
14   though.
15       MR. BUTLER:  Okay.
16   Q.    There's another entry on this chart in
17   Po Exhibit 14. It's the third entry from the
18   bottom. It refers to reviewing articles and
19   pleadings from 2000 to 2004. Do you see that?
20   A.    Yes.
21   Q.    What kinds of articles did you review
22   in connection with the L&H securities litigation?
23   A.    They were articles concerning Lernout &
24   Hauspie, the financial rep of everything I found
25

17 (Pages 62 to 65)

66

Po
2  on the Internet.
3      Q.    Do you recall reviewing any particular
4  publications in connection with that litigation?
5      A.    I remember an article edited by Wall
6  Street Journal, which was, I think, one of the
7  first concerning Lernout & Hauspie problems.
8      Q.    Do you recall reviewing articles from
9  any other publications?
10     A.    Yes. I remember the article I read on
11 the NASDAQ -- NASDAQ Web site, but I don't
12 remember who wrote this article or where they were
13 published.
14     Q.    The last item on this chart is
15 communications with Italian counsel. Do you see
16 that?
17     A.    Yes.
18     Q.    Do you have Italian counsel?
19     A.    Yes.
20     Q.    What is the name of your Italian
21 counsel?
22     A.    Elena Po.
23     Q.    Could you spell that for the court
24 reporter?
25     A.    Yes. E-L-E-N-A, Po.

67

Po
2      Q.    Why do you have Italian counsel?
3      MR. CARNEY: Object to form.
4      A.    Because I want to take the right step
5  to communicate with my American lawyers.
6      Q.    Are your Italian lawyers generally
7  involved in conference calls with your American
8  lawyers?
9      A.    No.
10     Q.    Are there instances in which you've
11 asked your Italian lawyers to communicate directly
12 with your American lawyers?
13     A.    Excuse me, I lost the first part.
14     Q.    Are there instances or times when you
15 have asked your Italian lawyers to communicate
16 with your American lawyers on your behalf?
17     A.    Yes.
18     Q.    Without getting into the substance of
19 any of those communications, why do you use
20 Italian lawyers as opposed to just contacting your
21 American lawyers yourself?
22     A.    Because I don't understand. My Italian
23 lawyer is a lawyer. He understands English, he
24 speaks English, and she knows something about
25 American law so he can assist me -- she can assist

68

Po
2  me.
3      Q.    Is your lawyer a relative of yours?
4      A.    Actually, yes.
5      Q.    What is the relation between you and
6  Elena Po?
7      A.    She's my sister.
8      Q.    Is she affiliated with any particular
9  law firm in Italy?
10     A.    No.
11     Q.    How long has she been a lawyer?
12     A.    I'm not sure, about four years.
13     Q.    Has she had any training in U.S. law?
14     A.    Yes. They had three-month training.
15     Q.    Was that in the United States or was
16 that a course taken in Italy?
17     A.    It was a United States, and also she
18 practiced in an American company in Italy.
19     Q.    Which company was that?
20     A.    I don't remember.
21     Q.    Is your sister compensated for the time
22 she spends advising you on this case?
23     A.    Yes. I -- I pay her for the time.
24     Q.    You pay her personally?
25     A.    Yes.

69

Po
2      Q.    How much do you pay her?
3      A.    It's written on the acts. It's on
4  the -- I don't remember exactly. I have the
5  receipt somewhere. I think they are on the acts.
6  I can say about 8 to 9 thousand euros.
7      Q.    That's the total amount that you have
8  paid your sister who serves as your Italian
9  counsel --
10     A.    Yes.
11     Q.    -- in connection with the L&H
12 securities litigation?
13     A.    Yes.
14     Q.    Have you also communicated with your
15 sister in connection with the lawsuit against
16 Dexia?
17     A.    Not yet.
18     Q.    Have you been reimbursed in any way for
19 the 8 to 9 thousand euros that you paid your
20 sister to consult on this case?
21     A.    Yes.
22     Q.    Who reimbursed you for those funds?
23     A.    Physically I don't know. I got a
24 check.
25     Q.    Who sent you a check?

**VERITEXT/SPHERION DEPOSITION SERVICES**
**(212) 490-3430**

70

Po

1
2     A.    My lawyers.
3     Q.    Which of your lawyers?
4     A.    I don't remember which.
5     Q.    Have you paid money to any of your
6  other relatives in connection with the L&H
7  securities litigation?
8           MR. CARNEY:  Object to form.
9     A.    No.
10    Q.    Have you paid money to anybody else in
11  Italy in connection with the L&H securities
12  litigation?
13          MR. CARNEY:  Objection.
14    A.    No.
15    Q.    Have you paid any money to anyone in
16  Italy in connection with the lawsuit against
17  Dexia?
18    A.    No.
19    Q.    How many brothers and sisters do you
20  have?
21    A.    A lot.  I have six sisters and four
22  brothers, me included.  Big family.
23    Q.    So to put it another way, your parents
24  have six daughters and four sons; correct?
25    A.    Yes.

71

Po

1
2     Q.    And Elena Po, is she also involved in
3  either of the companies that you currently work
4  for?
5     A.    Yes.
6           MR. CARNEY:  Objection.
7     A.    Yes.
8     Q.    Which one?
9     A.    Both.
10    Q.    Apart from the amounts that you paid
11  your sister for consultation in this litigation,
12  have you been reimbursed for any other
13  expenditures that you've incurred in connection
14  with this litigation?
15          MR. CARNEY:  Objection, object to form.
16    A.    I got reimbursement for part of the
17  amount I request.
18    Q.    Well, I'm going to speak in a moment or
19  ask you some questions in a moment about the
20  court's order on reimbursing your expenses, but my
21  question is different.  Setting aside what the
22  court has done, have you been reimbursed by your
23  lawyers for any other expenditures that you have
24  incurred in connection with this litigation?
25          MR. CARNEY:  Object to form.

72

Po

1
2     A.    Yes, of course.
3     Q.    Can you tell me what those expenditures
4  are?
5     A.    Whenever I had to come here to
6  participate to meet with my lawyers.
7     Q.    So when you traveled for purposes of
8  the litigation, is it fair to say that your travel
9  expenses were reimbursed by your lawyers?
10    A.    Yes.
11    Q.    Were you also reimbursed for the time
12  that you spent on those trips?
13          MR. CARNEY:  Object to form.
14    A.    No.
15    Q.    Were you reimbursed for the full amount
16  of your travel expenses?
17          MR. CARNEY:  Object to form.
18    A.    Not for the full amount, just for the
19  amount related to my -- to my purpose of the
20  travel, of the trip.
21    Q.    Do you know how much in total those
22  reimbursements have amounted to?
23    A.    I don't know.
24    Q.    Based on this calculation -- or I
25  should say this itemization of your time, you

73

Po

1
2  requested reimbursement from the court in the
3  amount of $40,300; correct?
4           MR. CARNEY:  Objection.  The document
5     speaks for itself.
6     A.    Yes, that's correct.
7     Q.    And I think you testified earlier that
8  you remember the judge reduced that amount
9  somewhat; is that correct?
10    A.    Yes.
11    Q.    I can show you the document if you need
12  it, but do you recall that you reduced the amount
13  to around $32,000?
14          MR. CARNEY:  Objection.
15    A.    Yeah, 30 and something how dollars.
16    Q.    Have you actually received those funds?
17    A.    Yes.
18    Q.    Did you receive those funds through
19  your attorneys?
20    A.    Yes.
21    Q.    Apart from the reimbursement of
22  expenses that you incurred and the amount that you
23  received through this award from the court, have
24  you received any other money in connection with
25  this litigation?

**VERITEXT/SPHERION DEPOSITION SERVICES**
**(212) 490-3430**

74

Po

1
2  A.  No.
3      MR. BUTLER:  We need to take a short
4  break to change the tape.
5      MR. CARNEY:  Sure.
6      THE VIDEOGRAPHER:  This completes
7  Videotape 1.  Off the record at 11:18 a.m.
8      (Recess taken from 11:18 to 11:29.)
9      THE VIDEOGRAPHER:  This is Videotape
10  Number 2, back on the record at 11:29 a.m.
11  Q.  Mr. Po, your sister Elena Po we spoke
12  about before, how old is she?
13  A.  She is 32 years old.
14  Q.  In her capacity as a lawyer in Italy,
15  does she represent any other clients beside
16  yourself?
17      MR. CARNEY:  Object to form.
18  A.  Yes, of course.
19  Q.  Can you just give me a sense of what
20  kinds of -- what her legal practice consists of?
21      MR. CARNEY:  Objection.
22  A.  I really don't know.
23  Q.  Do you know whether she generally
24  represents individuals or companies?
25  A.  Both, both of them.

75

Po

1
2  Q.  Does she do any work for the companies
3  that you own?
4  A.  Yes.
5  Q.  What kind of legal work does she do for
6  those companies?
7  A.  Like assistant for editing for the
8  documents, the legal documents of my company.  I
9  don't know exactly the name, the translation, in
10  English.  Anyway...
11  Q.  Let me show you another exhibit that
12  was previously marked at your deposition as Po
13  Exhibit 10.  This document is the first
14  consolidated and amended class action complaint in
15  the L&H securities litigation.  Do you see that?
16  A.  Yes.
17  Q.  So is this one of the complaints that
18  was filed on your behalf in that lawsuit?
19      MR. CARNEY:  Without looking through
20      every page, we can stipulate that this is the
21      original copy -- or not the original but a
22      copy of the complaint filed with the court, I
23      trust.
24  A.  Yes.
25  Q.  The date of this document, Mr. Po, is

76

Po

1
2  September 21, 2001.  Do you have any recollection
3  of reviewing this document around the time that it
4  was filed?
5  A.  I don't remember.
6  Q.  Well, this is a pretty hefty document.
7  It's pretty big with a lot of pages.  Do you
8  remember receiving a document like this from your
9  lawyers?
10  A.  Yes.
11  Q.  Would you turn to page 9 of this
12  document.  There's a description on this page of
13  various defendants in the L&H securities
14  litigation.  Do you see that?
15  A.  Yes.
16  Q.  The first section beginning on Section
17  9 and carrying over to page 10 lists a number of
18  defendants who are called the L&H senior officer
19  defendants.  Do you see that?
20  A.  Yes.
21  Q.  And among those are Mr. Lernout and
22  Mr. Hauspie; correct?
23  A.  Yes.
24  Q.  Did you believe that the conduct of
25  these individuals caused the losses that you

77

Po

1
2  suffered in your L&H investment?
3      MR. CARNEY:  Object to form.
4  A.  Yes, I believe.
5  Q.  Beginning on page 10 with paragraph 31,
6  there are some defendants listed who
7  are called the L&H director defendants.  Do you
8  see that?
9  A.  Yes.
10  Q.  And it looks like there are 11 persons
11  and entities listed on pages 10, 11 and 12.  Do
12  you see that?
13  A.  I count 13.
14  Q.  Perhaps I missed a couple of them.
15      Do you believe that these individuals
16  also caused the losses that you suffered in your
17  L&H investment?
18      MR. CARNEY:  Object to form.
19  A.  Yes.
20  Q.  Beginning on page 12 and carrying over
21  to page 13, there's a description of some other
22  defendants affiliated with KPMG.  Do you see that?
23  A.  Yes.
24  Q.  It looks like there are three entities
25  here:  KPMG Belgium, KPMG U.K., and KPMG U.S.; is

20 (Pages 74 to 77)

78
```
1              Po
2  that correct?
3     A.   Yes.
4     Q.   Do you believe that those three
5  entities caused the losses that you suffered in
6  L&H shares?
7        MR. CARNEY:  Object to form.
8     A.   Yes.
9     Q.   And there's also reference to Mr. Paul
10 Behets in paragraph 47 on page 13.  Do you believe
11 that Mr. Behets also caused the losses that you
12 suffered?
13       MR. CARNEY:  Object to form.
14    A.   Yes.
15    Q.   There's some more defendants listed
16 beginning in paragraph 48: FLV Fund, S.A.I.L.
17 Trust, LHIC, Mercator, Louis Verbeke,
18 V-E-R-B-E-K-E, and Microsoft.
19       Do you believe that those persons and
20 entities also caused the losses that you suffered?
21       MR. CARNEY:  Object to form.
22    A.   I don't remember all the name that I'm
23 looking at now.
24    Q.   You see that they are named as
25 defendants in this lawsuit, though?
```

79
```
1              Po
2     A.   Yes.
3     Q.   Would you have named anyone as a
4  defendant if you did not believe that they at
5  least in part were responsible for your losses?
6        MR. CARNEY:  Object to form.
7     A.   I believe what is written in this
8  complaint, so I believe they also -- they also
9  were part of -- they also caused this fraud.
10    Q.   Is it fair to say that at a minimum
11 each of these entities contributed to the losses
12 that you suffered?
13       MR. CARNEY:  Object to form.
14    A.   That's correct.
15    Q.   If I could direct your attention back
16 to page 8, and paragraph 22 describes the company
17 Lernout & Hauspie.  And the fourth paragraph of
18 this sentence states that L&H -- this isn't a
19 direct quote, but it states that L&H is not named
20 as a defendant in this action because it filed a
21 voluntary bankruptcy petition.
22       Do you see that?
23    A.   Yes.
24    Q.   Do you believe that L&H the company
25 also caused the losses that you suffered?
```

80
```
1              Po
2        MR. CARNEY:  Object to form.
3     A.   Yes, I believe so.
4     Q.   Is it fair to say that had they not
5  been in bankruptcy proceedings that you would have
6  wanted to name them as a defendant in this action?
7        MR. CARNEY:  Object to form.
8     A.   Yes.
9     Q.   If I could draw your attention back to
10 page 14, paragraph 52 indicates that Louis Verbeke
11 is a defendant in this action.  And it says that
12 he was a named partner at the law firm Loeffclaeys
13 Verbeke.  That's L-O-E-F-F-C-L-A-E-Y S, Verbeke,
14 V-E-R-B-E-K-E.
15       Do you see that, Mr. Po?
16    A.   Yes.
17    Q.   Do you believe that the law firm
18 Loeffclaeys Verbeke also caused or contributed to
19 the losses you suffered?
20       MR. CARNEY:  Object to form.
21    A.   Yes.
22    Q.   Can you turn now to page 41 of your
23 complaint?
24       MR. CARNEY:  I don't have a 41 on my --
25 in my copy.  Can you tell me what paragraph it
```

81
```
1              Po
2  is?  I'll look over his shoulder.  Actually, I
3  don't think we have a page 41 in the main
4  exhibit.
5        MR. BUTLER:  I apologize.  The copy we
6  have -- I don't know if it was a copy on your
7  end or our end -- of this exhibit I notice
8  didn't have those pages, but we have a full
9  copy of the complaint here, I believe.  So I
10 apologize.  I should have realized that.
11       Let me mark as the next exhibit this
12 other version.
13       (Po Exhibit 15, first consolidated and
14 amended class action complaint, marked for
15 identification, as of this date.)
16       MR. BUTLER:  So for clarity of the
17 record, Po Exhibit 15 is what I believe is a
18 complete copy of the first consolidated and
19 amended class action complaint filed on
20 September 21.  Is that clear?
21    A.   Yes.
22    Q.   Turning to page 41, there's a heading
23 that says, "the massive overstatement of publicly
24 reported revenues and earnings."  Do you see that
25 heading?
```

21 (Pages 78 to 81)

**VERITEXT/SPHERION DEPOSITION SERVICES**
**(212) 490-3430**

82

Po

1
2    A.    Yes.
3    Q.    And underneath it it says, "Throughout
4  the class period L&H engaged in numerous schemes
5  that were intended to and did artificially inflate
6  the company's revenues, earnings and the value of
7  L&H's common stock."
8          Do you see that?
9    A.    Yes.
10   Q.    In this section there's a description
11 of a number of transactions, and we'll talk about
12 some of them.  But is generally what follows after
13 this a description of what -- of the schemes or
14 transactions that allowed L&H to inflate its
15 revenues?
16         MR. CARNEY:  Objection.  The document
17 speaks for itself.
18   A.    Yes.
19   Q.    If you look down the page on page 41,
20 there's a reference to a company called Capital
21 Union.  It says -- there's a reference to "booking
22 a large loan from Capital Union as revenue."
23         Do you see that?
24         MR. CARNEY:  (Indicating.)
25   A.    Yes, I see it.

83

Po

1
2    Q.    If you turn to page 53, there appears
3  to be a more detailed discussion of this loan from
4  Capital Union, on page 53 and carrying over to
5  page 54.  Do you see that?
6    A.    Yes.
7    Q.    Do you believe that Capital Union
8  caused or contributed to the losses you suffered?
9          MR. CARNEY:  Object to form.
10   A.    Yes.
11   Q.    Let's go back to page 42, and at the
12 bottom of the page in paragraph 109, there's a
13 description of a transaction with a company called
14 Xybernaut, X-Y-B-E-R-N-A-U-T.  Do you see that?
15   A.    Excuse me, which page are you --
16   Q.    Page 42?
17         MR. CARNEY:  Forty-two.
18   Q.    Do you see a description of the
19 transaction with Xybernaut?
20   A.    Xybernaut, yes.
21   Q.    Do you believe that Xybernaut caused or
22 contributed to the losses that you incurred?
23         MR. CARNEY:  Object to form.
24   A.    Yes.
25   Q.    If you turn the page, in paragraph 110

84

Po

1
2  there's -- there are a number of transactions
3  described in subparts of paragraph 110.  Do you
4  see that?
5    A.    Yes.
6    Q.    There are transactions described with a
7  company called Kortean, K-O-R-T-E-A-N, Sequoia
8  Software Corporation, Speech Machines, Nine Rivers
9  Technology, Interpra Medical Imaging Network,
10 Eduka NV -- that's E-D-U-K-A -- and on the next
11 page, Applied Voice Recognition.
12         Do you see that?
13   A.    Yes.
14   Q.    Do you believe that each of these
15 companies also caused or contributed to the losses
16 you suffered in L&H shares?
17         MR. CARNEY:  Object to form.
18   A.    I don't remember these names, but I
19 believe everything that's written on this
20 document.  I believe on this document.
21   Q.    So you believe that L&H engaged in
22 transactions with these companies that enabled it
23 to inflate its revenues; is that correct?
24         MR. CARNEY:  Object to form.
25   A.    Whatever is written here I believe.

85

Po

1
2    Q.    Would you agree that what is written
3  here in your complaint, Mr. Po, is that each of
4  these companies engaged in transactions with
5  Lernout & Hauspie that enabled it to -- enabled
6  Lernout & Hauspie to overstate its revenue?
7          MR. CARNEY:  Object to form.  The
8  document speaks for itself.
9    A.    Yes.
10   Q.    And would you agree, therefore, that
11 each of these companies caused or contributed to
12 the losses that you suffered in L&H shares?
13         MR. CARNEY:  Object to form.
14   A.    Yes.
15   Q.    If you turn to page 46, there's another
16 set of paragraphs describing transactions
17 involving various companies, and the companies are
18 Digital Voice, Inc. -- this is paragraph 113,
19 subpart A -- I-Medical in the next subpart.
20 There's an identified customer in the next
21 subpart, C.  There's a company referred to as an
22 Armenian LDC customer in subpart D.  In subpart E
23 there's reference to a company called TIB.  In
24 subpart F there's reference to a company called
25 I-Travel.  And in subpart G there's a reference to

**VERITEXT/SPHERION DEPOSITION SERVICES**
**(212) 490-3430**

86

Po

1
2  a company called European Language Center.
3         Do you see the references to these
4  companies?
5     A.    Yes.
6     Q.    Do you believe that each of these
7  companies also caused or contributed to the losses
8  that you suffered?
9         MR. CARNEY:  Object to form.
10    A.    As I said before, I cannot remember all
11  the names of the people or company involved in
12  this litigation.  But I believe everything that's
13  written in this complaint is the truth, is what I
14  believe.
15    Q.    And this complaint says that L&H
16  entered transactions with each of these companies
17  that enabled L&H to inflate its reported revenue;
18  correct?
19    A.    Yes.
20         MR. CARNEY:  Object to form.
21    Q.    And the losses that you suffered
22  resulted from the fact that L&H inflated its
23  reported revenue; correct?
24         MR. CARNEY:  Object to form.
25    A.    Yes.

87

Po

1
2     Q.    So do you agree that each of these
3  companies caused or contributed the losses that
4  you suffered?
5         MR. CARNEY:  Object to form.
6     A.    Yes.
7     Q.    If you look at page 47, there's the
8  beginning of a discussion called Vasco Data
9  Security.  Do you see that?  Do you believe that
10  Vasco Data Security caused or contributed to the
11  losses that you suffered?
12         MR. CARNEY:  Object to form.
13    A.    Yes.
14    Q.    Could you turn to page 50, please.
15  Paragraph 122 beginning on page 50 bears reference
16  to a number of other transactions with various
17  other customers.  The first one is with Vasco,
18  which we just talked about.  There's also
19  reference in subpart B to a company called BCB
20  Voice Systems.  Subpart C refers to a company that
21  I think we talked about previously.  Subpart D
22  refers to Excalibur Technologies.  Subpart E
23  refers to G2 Speech B.V.  And subpart F refers to
24  an unidentified customer.
25         Do you see the references to those

88

Po

1
2  companies?
3     A.    Yes.
4     Q.    Do you believe that these companies
5  also caused or contributed to the losses that you
6  suffered?
7         MR. CARNEY:  Object to form.
8     A.    I repeat, I believe any page of this
9  complaint what is written here I believe.
10    Q.    And once again, what is written here is
11  that these companies entered transactions with
12  Lernout & Hauspie that enabled Lernout & Hauspie
13  to inflate its publicly reported revenue; correct?
14         MR. CARNEY:  Object to form.
15    A.    Yes.
16    Q.    And your losses resulted from the fact
17  that L&H inflated its publicly reported revenue;
18  correct?
19         MR. CARNEY:  Object to form.
20    A.    Yes.
21    Q.    So do you agree that each of these
22  companies caused or contributed to the losses that
23  you have suffered?
24         MR. CARNEY:  Object to form.
25    A.    Contributed, yes.

89

Po

1
2     Q.    Take a look at paragraph 125 beginning
3  on page 52.  There are references to some other
4  companies.  There's one called I-Merge in subpart
5  A and one called Cegeka Healthcare Systems N.V.
6  It's spelled C-E-G-E-K-A.  In subparts C and D,
7  there are references to transactions with
8  unidentified customers.
9         Do you see those references?
10    A.    Yes, I do.
11    Q.    Once again I'll ask you, do you believe
12  these entities caused or contributed to the losses
13  that you suffered?
14         MR. CARNEY:  Object to form.
15    A.    Yes.
16    Q.    Please turn to page 55.  In paragraph
17  132 there are references to transactions involving
18  a company called DNH Distributing and with another
19  company called Computer Consulting Group.
20         Do you see those references?
21    A.    Yes.
22    Q.    Do you believe that these companies
23  also caused or contributed to the losses that you
24  have suffered?
25    A.    As I told you, I believe in everything

23 (Pages 86 to 89)

90

Po

1
2  that's written here.
3      MR. CARNEY: Objection.
4      Q.   And what's written here, Mr. Po, is
5  that these companies also entered transactions
6  with Lernout & Hauspie that enabled Lernout &
7  Hauspie to inflate it reported revenue; correct?
8      MR. CARNEY: Object to form.
9      A.   Correct.
10     Q.   So do you believe that these companies
11  caused or contributed to the losses that you
12  suffered?
13     MR. CARNEY: Object to form.
14     A.   Yes.
15     Q.   In paragraph 135 on the following page,
16  there's reference to a company called WH
17  Operations Limited. Do you see that?
18     A.   Yes, I see.
19     Q.   Do you believe that this company also
20  caused or contributed to the losses that you have
21  suffered?
22     MR. CARNEY: Object to form.
23     A.   Yes, I do.
24     Q.   And in the preceding paragraph there's
25  reference to an unidentified Belgian customer that

91

Po

1
2  was involved in a $500,000 license agreement with
3  L&H. Do you see that?
4      A.   Yes.
5      Q.   Do you believe this unidentified
6  Belgian customer is also -- also caused or
7  contributed to the losses you've suffered?
8      MR. CARNEY: Object to form.
9      A.   Yes.
10     Q.   If you turn to paragraph 50 -- pardon
11  me, page 58. There's a heading here that says
12  "the Korean fraud." Do you see that?
13     A.   Yes.
14     Q.   And in the paragraph underneath,
15  there's reference to a company called Bumil
16  Information and Communications Company. That's
17  B-U-M-I-L. Do you see that?
18     A.   Yes.
19     Q.   It seems to indicate that Lernout &
20  Hauspie acquired this company and it became L&H's
21  Korean subsidiary. Is that what it indicates
22  here?
23     A.   Yes.
24     MR. CARNEY: Object to form.
25     Q.   Is that your understanding as well?

92

Po

1
2      A.   Yes.
3      Q.   Do you believe that this company, which
4  became the L&H Korean subsidiary, caused or
5  contributed to the losses you have suffered?
6      MR. CARNEY: Object to form.
7      A.   Yes, I believe so.
8      Q.   I assume you would give the same answer
9  for the entity L&H Korea, which is separate from
10  Lernout & Hauspie Speech Products; is that
11  correct?
12     MR. CARNEY: Objection.
13     A.   Yes.
14     Q.   Turn to page 65, paragraph 158. First
15  I should say before paragraph 157 there's a
16  heading that says "factoring agreement." Do you
17  see that?
18     A.   Yes.
19     Q.   Paragraph 48 indicates L&H Korea
20  entered into a series of factoring agreements with
21  four Korean banks; is that correct?
22     A.   Yes.
23     Q.   The names of those banks are Hanvit
24  Bank, Shinhan Bank, Hana Bank, and Chohung Bank;
25  is that correct?

93

Po

1
2      A.   Yes.
3      Q.   Do you believe that each of those banks
4  caused or contributed to the losses that you have
5  suffered?
6      MR. CARNEY: Object to form.
7      A.   Yes.
8      Q.   If you turn to the next page, page 66,
9  and take a look at paragraph 161, there's another
10  series of paragraphs describing specific
11  transactions with particular companies. These are
12  all, I believe, in Korea. And there's reference
13  to the following companies: Voice Tech Korea in
14  subpart A, International Business Computers in
15  subpart B, HI Worldwide Co. Ltd in subpart C,
16  Digital Sei-Young Limited -- that's Digital
17  S-E-I - Young Limited in subpart D. Evat T&C
18  Limited -- that's E-V-A-T T&C -- in subpart E, and
19  IMP Vision Company in subpart F.
20         Do you see the references to those
21  companies?
22     A.   Yes, I do.
23     Q.   Do you believe that these -- each of
24  these entities also caused or contributed to the
25  losses that you suffered in your L&H investment?

24 (Pages 90 to 93)

**VERITEXT/SPHERION DEPOSITION SERVICES**
**(212) 490-3430**

94

Po

1
2     MR. CARNEY:  Object to form.
3     A.    Yes.
4     Q.    Please turn to page 70.  Paragraph 166
5  beginning on page 70 describes a number of
6  transactions with specific customers, and the
7  customers involved here a Midas Tech Company
8  Limited in subpart A, an unidentified customer in
9  subpart B, another unidentified customer in
10  subpart C, and a company called IMP Vision in
11  subpart D, which I think is the same as a company
12  we've already spoken about.
13         My question, Mr. Po, is do you believe
14  each of these companies also caused or contributed
15  to the losses you suffered?
16         MR. CARNEY:  Object to form.
17     A.    Yes.
18     Q.    Page 71, paragraph 168, there's
19  reference to a $6 million licensing agreement with
20  a company called Zen Entertainment.  Do you see
21  that?
22     A.    Yes.
23     Q.    Do you believe that Zen Entertainment
24  also caused or contributed to the losses that you
25  suffered?

95

Po

1
2     MR. CARNEY:  Object to form.
3     A.    Can I have a look through this
4  paragraph?
5     Q.    Of course.
6         (Pause.)
7     A.    Yes.
8     Q.    Please turn to page 74.  In paragraph
9  178 there's reference to a company called
10  Dictation Consortium N.V.  do you see that?
11     A.    Yes.
12     Q.    Do you believe that Dictation
13  Consortium caused or contributed to the losses you
14  have suffered?
15         MR. CARNEY:  Object to form.
16     A.    Yes.
17     Q.    Please turn to page 75.  Paragraph 182
18  refers to a company called Brussels Translation
19  Group N.V.
20         Do you believe that Brussels
21  Translation Group also caused or contributed to
22  the losses you have suffered?
23         MR. CARNEY:  Object to form.
24     A.    Yes.
25     Q.    Please turn to page 77.  At the top of

96

Po

1
2  the page there's a heading that says "the
3  undisclosed 30."  Do you know what "the
4  undisclosed 30" is referring to?
5     A.    I don't.
6     Q.    Paragraph 188 it refers to 30 start-up
7  companies based in Belgium and Singapore
8  purportedly to develop variance of L&H software
9  for nonmainstream languages.
10         Do you see that?
11     A.    Yes.
12     Q.    Do you understand the undisclosed 30
13  referred to here are companies in Belgium and
14  Singapore set up to develop products based on L&H
15  software?
16         MR. CARNEY:  Object to form.
17     A.    Yes.
18     Q.    Are these start-up companies sometimes
19  referred to as language development companies and
20  cross language development companies?
21         MR. CARNEY:  Object to form.
22     A.    Yes.
23     Q.    Is it your understanding the 30
24  start-up companies referred to here are various
25  language development companies and cross language

97

Po

1
2  development companies; correct?
3         MR. CARNEY:  Asked and answered, but go
4  ahead.
5     A.    Yes.
6     Q.    Do you believe that each of those 30
7  companies also contributed to or caused the losses
8  that you have suffered?
9         MR. CARNEY:  Object to form.
10     A.    Yes.
11         MR. BUTLER:  Mark this as the next
12  exhibit.
13         (Po Exhibit 16, second amended class
14  action complaint, marked for identification,
15  as of this date.)
16         MR. CARNEY:  I have this as 16.
17         THE REPORTER:  Correct.
18     Q.    We've marked as Po Exhibit 16 a
19  document titled "second amended class action
20  complaint" in the lawsuit against Dexia Bank
21  Belgium.
22         Do you see that?
23     A.    Yes.
24     Q.    And the date of this document is
25  February 25, 2004.  Do you see that at the end?

25 (Pages 94 to 97)



98
Po
1
2    A.   Yes.
3    Q.   Is this the complaint that was filed on
4  your behalf against Dexia on February 25, 2004?
5        MR. CARNEY:  Let me object.  Are you
6    representing that this is that document or do
7    you want him to look at every page and see if
8    he can recollect?
9    Q.   Take as much time as you need to look
10 at it.  I don't think there's any dispute that
11 that's what the document is.
12       MR. CARNEY:  Okay.
13   Q.   Can you agree or can your counsel agree
14 that this is in fact your second amended complaint
15 against Dexia?
16   A.   I agree.
17   Q.   The named defendants in this complaint
18 are Dexia SA and Dexia Bank Belgium; correct?
19       MR. CARNEY:  Object to form.
20   A.   Yes.
21   Q.   I take it you would agree both of those
22 entities also, in your view, caused or contributed
23 to the losses that you suffered; is that correct?
24       MR. CARNEY:  Object to form.
25   A.   Yes.

99
Po
1
2    Q.   Just to make it absolutely clear, you
3  believe that Dexia SA was at least partially
4  responsible for the losses that you suffered; is
5  that correct?
6        MR. CARNEY:  Object to form.
7    A.   Dexia SA?
8    Q.   Yes.
9    A.   Actually I don't remember Dexia SA.
10   Q.   Okay, well, turn to page 11 of this
11 complaint.  Do you see that Dexia SA is named as a
12 defendant in this complaint?
13   A.   Yes.
14   Q.   Given that they were named as a
15 defendant, did you believe at the time that this
16 was filed that they were at least partially
17 responsible for the losses that you suffered?
18       MR. CARNEY:  Object to form.
19   A.   Yes.
20   Q.   Would you turn to page 32 of this
21 complaint.  In paragraph 98 there's a company
22 called Radial Belgium N.V.  Do you see that?
23   A.   Yes.
24   Q.   Do you believe that Radial Belgium N.V.
25 caused or contributed to the losses that you

100
Po
1
2  suffered?
3        MR. CARNEY:  Object to form.
4    A.   Yes, I do believe.
5    Q.   Please turn to page 34.  Paragraph 107
6  that carries over to page 35 refers to a company
7  called Language Investment Company.  Do you see
8  that?
9    A.   Yes.
10   Q.   Do you believe that Language Investment
11 Company caused or contributed to the losses that
12 you have suffered?
13       MR. CARNEY:  Objection.
14   A.   Yes.
15   Q.   Please turn to page 40.  In paragraph
16 117 there's reference to a company called Velstra.
17 Do you see that?
18   A.   The paragraph, 117?
19   Q.   117.  There's reference to Velstra, a
20 Singapore company owned by Mercator.  Do you see
21 that in the third line of 117?
22       MR. CARNEY:  (Indicating.)
23   A.   Oh, yeah, yes.
24   Q.   Do you believe that Velstra caused or
25 contributed to the losses that you suffered?

101
Po
1
2        MR. CARNEY:  Object to form.
3    A.   Yes.
4    Q.   There's also reference in this
5  paragraph to a Lebanese-Armenian businessman named
6  Harout Katchadourian.  Do you see that?
7    A.   Yes.
8    Q.   Do you believe that Mr. Katchadourian
9  also caused or contributed to the losses that you
10 suffered?
11       MR. CARNEY:  Objection.
12   A.   Yes.
13       MR. BUTLER:  Let's take a quick break,
14 but I think we might be done.
15       MR. EGAN:  Harout is H-A-R-O-U-T, and
16 the last name is Katchadourian,
17 K-A-T-C-H-A-D-O-U-R-I-A-N.
18       THE VIDEOGRAPHER:  Off the record at
19 12:12 p.m.
20       (Recess taken from 12:12 to 12:21.)
21       THE VIDEOGRAPHER:  Back on the record,
22 12:21 p.m.
23   Q.   Mr. Po, we've talked about a lot of
24 different persons and entities who may have caused
25 or contributed to the losses that you suffered.

26 (Pages 98 to 101)



102

Po
1
2    Apart from the persons and entities we've already
3    discussed, can you think of anyone else or any
4    other company that has contributed to the losses
5    that you've suffered in your L&H investment?
6         MR. CARNEY: Object to form.
7    A.   Yes.
8    Q.   And what are you referring to?
9    A.   Dexia Bank.
10   Q.   We talked about Dexia Bank. Apart from
11   the entities we've already discussed, is there
12   anyone or any entity -- any other entity that you
13   think has contributed to the losses that you
14   suffered?
15        MR. CARNEY: Object to form.
16   A.   With the term "Dexia," I want to
17   include all the companies related to Dexia.
18   Q.   Do you believe that all the companies
19   related to Dexia have caused or contributed to the
20   losses that you've suffered?
21        MR. CARNEY: Object to form.
22   A.   All the company related to Dexia named
23   in this complaint.
24   Q.   Like, for example, Dexia SA?
25        MR. CARNEY: Object to form, misstates

103

Po
1
2    his prior testimony.
3    Q.   Is that what you're referring to,
4    Mr. Po?
5    A.   Not exactly. Dexia SA at that time,
6    yes, I believe that contributed, at that time.
7    Q.   Setting aside companies related to
8    Dexia and predecessors of Dexia, are there any
9    other companies or persons that you think are
10   responsible in some way for your losses in L&H
11   shares?
12        MR. CARNEY: Object to form.
13   A.   More than people or company named here,
14   I don't think -- I don't think there are other
15   people or company involved.
16   Q.   Let me ask you just a couple more
17   questions about Dr. Quaak and Mr. Leibinger.
18   A.   Sure.
19   Q.   What does Dr. Quaak do for a living?
20   A.   I don't know. I don't remember his
21   job.
22   Q.   Do you know whether he's married?
23   A.   I don't know.
24   Q.   Do you know if he has any children?
25   A.   I don't.

104

Po
1
2    Q.   How about Mr. Leibinger, do you know
3    what his job is?
4    A.   No.
5    Q.   Do you know whether he's married?
6    A.   No.
7    Q.   Do you know whether he has any
8    children?
9    A.   I don't.
10        MR. BUTLER: I think that's all for me.
11        MR. CARNEY: No questions.
12        MR. BUTLER: Thank you very much,
13   Mr. Po.
14        THE WITNESS: Thank you.
15        MR. EGAN: Thank you.
16        THE VIDEOGRAPHER: This completes Tape
17   2. Off the record at 12:24 p.m.
18        (Time noted: 12:24 p.m.)
19

20        _____
             ATTILIO PO
21
22   Subscribed and sworn to before me
23   this ____ day of _____ 2006.
24
25   _____

105

1
2         C E R T I F I C A T E
3    STATE OF NEW YORK    )
4                         : ss.
5    COUNTY OF NEW YORK    )
6
7         I, LAURIE A. COLLINS, a Registered
8    Professional Reporter and Notary Public
9    within and for the State of New York, do
10   hereby certify:
11        That ATTILIO PO, the witness whose
12   deposition is hereinbefore set forth, was
13   duly sworn by me and that such deposition
14   is a true record of the testimony given by
15   the witness.
16        I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage, and that I am
19   in no way interested in the outcome of this
20   matter.
21        IN WITNESS WHEREOF, I have hereunto
22   set my hand this 6th day of April 2006.
23
24        _____
25              LAURIE A. COLLINS, RPR

27 (Pages 102 to 105)

106

1
2    - - - - - - - - - I N D E X - - - - - - - - - -
3
4    WITNESS:           EXAMINATION BY:        PAGE
5    Attilio Po       Mr. Butler           4
6
7
8    - - - - - - - - - - - - - TRANSCRIPT MARKINGS - - - - - - - - - - - - -
9    DIRECTIONS:
10   MOTIONS:
11   REQUESTS:
12   RULINGS:
13   TO BE FURNISHED:
14
15   - - - - - - - - - - - - - - - - - EXHIBITS - - - - - - - - - - - - - - - - - -
16   PO NO.          DESCRIPTION        PAGE
17
18   14, supplemental declaration of Po    54
19   15, first consolidated and amended    81
20   class action complaint
21   16,  second amended class action    97
22   complaint
23
24
25

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

1

**A**

able 31:9 35:7 52:2
abroad 9:3
absolutely 99:2
acquired 91:20
Act 32:6
action 4:12 5:12,19
  5:24 6:25 36:18
  40:12 42:24 75:14
  79:20 80:6,11
  81:14,19 97:14,19
  105:18 106:20,21
acts 69:3,5
additional 77:6
address 5:5,8,8
addresses 16:23
  18:18
administrative 7:13
administrator 51:16
advising 68:22
affiliated 68:8 77:22
ago 13:8,15 15:15
  18:11,16 31:9
  34:12 43:6,24
agree 33:4,7 46:3
  50:10 85:2,10 87:2
  88:21 98:13,13,16
  98:21
agreed 50:6,14
agreement 91:2
  92:16 94:19
agreements 92:20
Aha 5:6
ahead 97:4
al 3:8
alleging 29:17
Allen 2:8 3:24 12:23
allowed 82:14
amended 49:15
  75:14 81:14,19
  97:13,19 98:14
  106:19,21
American 40:13
  67:5,7,12,16,21,25
  68:18

amount 50:21 51:21
  60:13 69:7 71:17
  72:15,18,19 73:3,8
  73:12,22
amounted 72:22
amounts 71:10
announcement
  36:13
answer 13:14 25:21
  30:11 35:7 42:12
  47:23 49:24 52:2
  56:23 58:2 92:8
answered 36:10
  56:22 57:13 58:15
  97:3
anticipate 6:6
anybody 70:10
anyway 29:25 75:10
apart 10:9 15:9
  26:14 27:9,13 28:7
  71:10 73:21 102:2
  102:10
apologize 81:5,10
appear 38:11
appears 32:7 33:7
  38:19 42:8 56:3
  57:22 83:2
appliances 8:19
application 43:9
Applied 84:11
appointing 47:6
approximately 3:6
  49:11 54:20
April 1:17 3:5 32:10
  32:14 34:4 105:22
Arcade 2:6
area 9:7
Arkansas 2:7
Armenian 85:22
Artesia 1:10 10:14
  10:17,20 11:8,12
  58:3,5,6,8,20,25
  59:13 60:6,15
  63:22 64:7
article 66:5,10,12

articles 65:19,22,24
  66:8
artificially 82:5
aside 71:21 103:7
asked 4:9 36:9 40:3
  40:3 56:21 57:12
  58:14 61:12,15,16
  61:22 63:5,13,22
  63:24 64:6 67:11
  67:15 97:3
asking 20:11 61:9
  63:3,9
assist 67:25,25
assistant 75:7
associated 38:12
Association 3:4
assume 39:23 92:8
Assuming 33:25
attached 32:25 33:6
attend 6:22
attended 7:2,4
attention 37:12
  79:15 80:9
Attilio 1:5,20 3:9
  42:8 54:14 104:20
  105:11 106:5
attorneys 2:5,18
  56:15 73:19
authorized 29:18
award 73:23
aware 11:12,16
  13:25 21:18,24
  43:5,7 52:18,22
  53:6,12,14,19
a.m 1:18 3:6 46:12
  46:15 74:7,10

**B**

B 87:19 93:15 94:9
back 17:17 37:12
  44:17 46:14 50:4
  60:11 74:10 79:15
  80:9 83:11 101:21
Baker 22:6
Banca 39:5,8 40:15
  40:19 41:6,10,16

41:19 42:2
bank 1:9 3:8,15,17
  11:17,20,24 12:3
  40:3 41:2 58:3,5,8
  92:24,24,24,24
  97:20 98:18 102:9
  102:10
banker 11:13
Banking 1:10 10:14
  10:17,20 11:8,12
bankruptcy 79:21
  80:5
banks 38:12 92:21
  92:23 93:3
based 33:5 54:24
  72:24 96:7,14
basically 8:21 18:24
  30:20,25
basis 55:9,13,17
Bates 38:13
BCB 87:19
bears 87:15
began 27:21
beginning 76:16
  77:5,20 78:16 87:8
  87:15 89:2 94:5
behalf 1:6 3:25 32:8
  32:14 33:17 67:16
  75:18 98:4
Behets 78:10,11
Belgian 60:19 61:7
  61:9,22 62:3,5,16
  63:2,8,18 64:10,16
  65:4 90:25 91:6
Belgium 1:9 3:8,15
  3:18 11:17,21,24
  12:3 60:18 62:2,10
  62:13,21 77:25
  96:7,13 97:21
  98:18 99:22,24
believe 27:19 35:21
  36:7 50:16 53:8
  76:24 77:4,15 78:4
  78:10,19 79:4,7,8
  79:24 80:3,17 81:9

81:17 83:7,21
84:14,19,20,21,25
86:6,12,14 87:9
88:4,8,9 89:11,22
89:25 90:10,19
91:5 92:3,7 93:3
93:12,23 94:13,23
95:12,20 97:6 99:3
99:15,24 100:4,10
100:24 101:8
102:18 103:6
**Berman** 2:11 3:22
23:20 24:19
**best** 49:16 64:15
**better** 13:19 53:5
**big** 20:24 70:22 76:7
**bit** 37:15
**Block** 23:22,22,24
24:5
**blood** 105:18
**Bonner** 24:24 25:16
25:24 26:3,7
**booked** 37:3
**booking** 82:21
**Boston** 2:14
**bottom** 28:24 38:13
38:19 50:5 65:19
83:12
**bought** 40:4,5 41:4
41:5 44:13 63:5,6
**Bowman** 2:4 3:20
3:25 23:10,15
**break** 46:9 74:4
101:13
**Brent** 2:9 3:19
12:23 23:8
**briefing** 4:19
**briefly** 8:16
**broken** 30:19,19
**brother** 7:14,15 8:3
8:4,7,12
**brothers** 70:19,22
**brought** 32:7
**Brussels** 60:23
95:18,20

**building** 8:22
**Bumil** 91:15
**Burt** 2:12 3:23
**business** 7:19 9:18
10:16 12:2 55:2
93:14
**businesses** 7:21
**businessman** 101:5
**Butler** 2:21 3:14,14
4:8,15,20,22 24:8
28:12,16 31:22
46:8 54:5 64:25
65:13,16 74:3 81:5
81:16 97:11
101:13 104:10,12
106:5
**buy** 38:24 41:6
**B-U-M-I-L** 91:17
**B.V** 87:23

---

**C**

**C** 2:2 85:21 87:20
89:6 93:15 94:10
105:2,2
**calculate** 54:23
**calculation** 51:15
72:24
**call** 16:12 17:10
20:25 21:3 24:14
24:17 25:6 27:3,25
28:2 49:3,8,12
**called** 4:5 5:19
10:20 11:17 16:9
16:13 25:11 33:6
38:20 39:4 76:18
77:7 82:20 83:13
84:7 85:23,24 86:2
87:8,19 89:4,5,18
89:19 90:16 91:15
94:10,20 95:9,18
99:22 100:7,16
**calls** 20:7 21:6,13
26:21 27:7,15,21
28:5 50:7,11 57:6
57:9,16 58:18,19
67:7

**camera** 47:16
**capacity** 74:14
**Capital** 82:20,22
83:4,7
**captured** 48:12
**care** 9:17
**Carney** 2:4,8 3:24
3:24 4:13,16 6:5
10:25 11:14 13:3
13:13 14:10 15:21
16:15 20:9 23:25
24:6,9 25:2,17
26:18 27:17 28:15
30:6 31:20,23 33:9
34:5,10 35:6,23
36:9,25 39:16,21
41:21 42:18 44:9
45:17,25 46:6,10
47:22 48:5,8,14,19
49:5,17,22 50:2
51:13,25 52:11
53:2,10,17,23
55:14 56:10,21
57:12,20 58:4,14
59:2,6,18 62:7,18
64:13,18 65:7 67:3
70:8,13 71:6,15,25
72:13,17 73:4,14
74:5,17,21 75:19
77:3,18 78:7,13,21
79:6,13 80:2,7,20
80:24 82:16,24
83:9,17,23 84:17
84:24 85:7,13 86:9
86:20,24 87:5,12
88:7,14,19,24
89:14 90:3,8,13,22
91:8,24 92:6,12
93:6 94:2,16 95:2
95:15,23 96:16,21
97:3,9,16 98:5,12
98:19,24 99:6,18
100:3,13,22 101:2
101:11 102:6,15
102:21,25 103:12

104:11
**Carpi** 5:7
**carries** 100:6
**carrying** 76:17
77:20 83:4
**carryover** 47:11
**case** 14:14 20:7 23:3
23:11 52:22 63:7
68:22 69:20
**Cauley** 2:4 3:20,25
23:9,14
**caused** 76:25 77:16
78:5,11,20 79:9,25
80:18 83:8,21
84:15 85:11 86:7
87:3,10 88:5,22
89:12,23 90:11,20
91:6 92:4 93:4,24
94:14,24 95:13,21
97:7 98:22 99:25
100:11,24 101:9
101:24 102:19
**caution** 10:25 47:22
**CE** 36:4,4
**Cegeka** 89:5
**Center** 86:2
**cents** 44:20
**certain** 38:11 50:14
50:17,21
**certification** 28:19
29:11,14 30:3
32:17 33:2,6,14,22
35:21 37:14 38:10
43:23
**certifications** 32:25
**certify** 105:10,16
**Cesalpino** 5:9
**Chance** 1:21 2:17
3:10,15,17
**change** 55:23 74:4
**changed** 55:21,22
**charge** 8:25
**chart** 56:7 58:13
60:11 65:17 66:14
**check** 69:24,25

**children** 10:7
103:24 104:8
**Chohung** 92:24
**chosen** 14:18,21
**city** 5:7 14:21,24,24
15:6
**claims** 53:7 58:25
63:22,24
**clarify** 17:12
**clarity** 5:23 81:16
**class** 5:15 6:10,14
6:19 29:7 42:24
75:14 81:14,19
82:4 97:13,19
106:20,21
**clear** 8:6 48:10
61:21 81:20 99:2
**clients** 74:15
**Clifford** 1:21 2:17
3:10,14,17
**close** 5:6 60:23
**closest** 14:24
**collapse** 29:25
**Collins** 1:23 105:7
105:25
**come** 37:4 72:5
**commission** 56:2
**common** 43:18,20
45:13,19 82:7
**communicate** 23:2,4
23:5,10 67:5,11,15
**communicated** 26:6
69:14
**communication**
24:10,13,18 36:4
49:4 56:14
**communications**
19:6 23:24 24:5,23
25:4 49:7 58:23,24
63:18 66:15 67:19
91:16
**companies** 71:3
74:24 75:2,6 84:15
84:22 85:4,11,17
85:17 86:4,7,16

87:3 88:2,4,11,22
89:4,22 90:5,10
93:11,13,21 94:14
96:7,13,18,19,20
96:24,25 97:2,7
102:17,18 103:7,9
**company** 7:13,15
8:7,8,11,13,17,18
8:20,21,22,24
10:20,23 11:17,20
55:2,3,4,7,10,17
55:25 61:5,13,14
61:15,17 62:23
68:18,19 75:8
79:16,24 82:20
83:13 84:7 85:21
85:23,24 86:2,11
87:19,20 89:18,19
90:16,19 91:15,16
91:20 92:3 93:19
94:7,10,11,20 95:9
95:18 99:21 100:6
100:7,11,16,20
102:4,22 103:13
103:15
**company's** 82:6
**compensated** 55:6
55:24 68:21
**compensation** 54:20
**complaint** 22:25
29:16,21,25 30:5,8
30:13,14,21,23
31:3,6 32:5,13,16
32:21,24,25 33:7,8
33:13,16,18,21,25
34:4,8,13,18,19,22
59:16,20,23 60:5,9
75:14,22 79:8
80:23 81:9,14,19
85:3 86:13,15 88:9
97:14,20 98:3,14
98:17 99:11,12,21
102:23 106:20,22
**complaints** 59:4
75:17

**complete** 36:18
81:18
**completes** 74:6
104:16
**Computer** 89:19
**Computers** 93:14
**concerning** 19:13
25:5 58:8 61:4
65:24 66:7
**concluded** 36:22
37:5
**conclusion** 36:2
37:9
**conduct** 76:24
**conducted** 15:23
**conference** 17:10,13
18:9 20:25 21:2,13
24:16 25:6 26:20
27:3,6,15,20,24,25
28:5 49:3,8,12
50:7,11 57:6,9
58:18,19 63:11
67:7
**conferences** 17:2,6
17:19 18:4 20:5,13
20:15,20,22 26:24
**confirmation** 38:20
40:4
**confirmations** 38:11
38:16 39:3
**confirmed** 40:5
**confused** 15:4
**confusion** 61:19
**connection** 9:19
18:19 26:22 29:12
43:9 51:8 65:23
66:4 69:11,15 70:6
70:11,16 71:13,24
73:24
**Consistent** 65:7
**consists** 74:20
**consolidated** 75:14
81:13,18 106:19
**Consortium** 95:10
95:13

**consult** 69:20
**consultation** 71:11
**Consulting** 89:19
**contact** 22:7,9 23:14
23:19
**contacted** 62:12
**contacting** 67:20
**contacts** 21:21 22:3
22:13,19 23:17
26:2
**contributed** 79:11
80:18 83:8,22
84:15 85:11 86:7
87:3,10 88:5,22,25
89:12,23 90:11,20
91:7 92:5 93:4,24
94:14,24 95:13,21
97:7 98:22 99:25
100:11,25 101:9
101:25 102:4,13
102:19 103:6
**Cooking** 8:9
**copied** 18:22
**copy** 19:14 65:5,14
75:21,22 80:25
81:5,6,9,18
**copying** 19:9
**CORP** 1:10
**Corporation** 10:14
10:17,20 11:9,12
84:8
**correct** 4:15 5:12,14
5:21 6:9 7:24 8:4
13:23 14:8 21:8,8
25:24 27:22,23
29:8 35:5,14,18
36:13 37:10,11,17
37:18,21 38:2,15
38:21,22 39:2,5,14
39:20,22 41:12
44:2,20,25 45:4,7
45:13 46:5,7 48:13
48:18 50:14,18,22
50:25 51:5,6 52:10
52:16 53:22,24

4

56:5 57:19 58:9,20
58:25 59:10,24
60:3 61:7,23 64:21
64:23 70:24 73:3,6
73:9 76:22 78:2
79:14 84:23 86:18
86:23 88:13,18
90:7,9 92:11,21,25
97:2,17 98:18,23
99:5
**counsel** 3:12,19,21
4:9 57:7 66:15,18
66:21 67:2 69:9
98:13
**count** 77:13
**COUNTY** 105:5
**couple** 77:14 103:16
**course** 4:16 5:10 7:2
35:11,15 42:13
68:16 72:2 74:18
95:5
**court** 1:2 4:2 6:22
7:4 43:3,9 46:19
47:3,6,16 48:11
54:5 66:23 71:22
73:2,23 75:22
**court's** 71:20
**CP0004** 38:13
**CP0007** 38:19
**created** 48:3,17,22
49:15
**Credito** 38:20,25
39:11,13 40:3 41:3
41:5,15
**cross** 96:20,25
**current** 5:5 51:23
**currently** 5:2 7:9
38:4 71:3
**customer** 10:13,15
11:23 85:20,22
87:24 90:25 91:6
94:8,9
**customers** 87:17
89:8 94:6,7
**C-E-G-E-K-A** 89:6

**D**

**D** 85:22 87:21 89:6
93:17 94:11 106:2
**Data** 87:8,10
**date** 32:24 43:19
51:3,10 54:11 65:6
75:25 81:15 97:15
97:24
**dated** 28:21 32:10
39:11 42:8 54:14
**daughters** 10:8
70:24
**day** 26:12 104:23
105:22
**December** 9:13,13
42:8,11
**decided** 55:22
**declaration** 42:7,17
42:19,20,22 54:10
54:13 106:18
**declare** 30:17
**defendant** 1:12 2:18
34:23 35:13 79:4
79:20 80:6,11
99:12,15
**defendants** 52:8,15
76:13,18,19 77:6,7
77:22 78:15,25
98:17
**define** 24:9 42:23
**defrauded** 35:22
36:8,22 37:6
**department** 9:2
**deposed** 60:24
**deposition** 1:20 4:10
9:10 12:6,9 13:2
13:12,17,18,21
14:5,12 16:25 24:7
25:14 26:13,15
28:11,13 31:16
41:24,25 42:6
46:17,21 60:19,23
61:7,10 62:11,13
62:14 63:14,21
65:9 75:12 105:12

105:13
**described** 7:20 9:8
27:9 84:3,6
**describes** 79:16 94:5
**describing** 85:16
93:10
**description** 62:2
76:12 77:21 82:10
82:13 83:13,18
106:16
**detailed** 47:15,20
83:3
**details** 47:24 49:5
**DeVALERIO** 2:11
3:22 23:20 24:19
**develop** 96:8,14
**developing** 9:2
54:25
**development** 96:19
96:20,25 97:2
**Dexia** 1:9 3:8,15,17
4:11 5:12 6:25
11:17,20,24 12:3
17:8,21 18:6 19:23
19:24 20:7,16,23
20:25 21:2,2,3,4,7
21:9,16,18,24 24:4
24:20,25 26:11,17
27:4,6,12,21 28:3
28:6 48:4,18 56:9
56:20 57:3,11,17
57:22,25 59:5,9,16
59:21,23 63:25
64:7 69:16 70:17
97:20 98:4,15,18
98:18 99:3,7,9,11
102:9,10,16,17,19
102:22,24 103:5,8
103:8
**DI** 49:22
**Dictation** 95:10,12
**Diego** 9:7
**difference** 20:24
**different** 58:5 71:21
101:24

**difficult** 37:15
**difficult-to** 22:12
**Digital** 85:18 93:16
93:16
**direct** 23:17 24:4
25:4 79:15,19
**directed** 59:23
**DIRECTIONS**
106:9
**directly** 18:19 23:10
36:5 67:11
**director** 34:25 77:7
**directors** 50:21
**discuss** 16:10,10,14
17:7,20 20:7 26:10
26:24
**discussed** 16:25
20:8 21:16 102:3
102:11
**discussing** 20:14,16
20:20,22 21:7 50:6
58:19
**discussion** 11:3
57:18 83:3 87:8
**discussions** 11:2
53:25 57:10 58:8
58:11
**dispute** 98:10
**distinction** 20:12,19
**Distributing** 89:18
**DISTRICT** 1:2,3
**DNH** 89:18
**document** 28:19,24
29:2,5,15 30:24
31:4,7,10,11,13,17
32:3,5,10 33:6,18
33:23 34:14,19
35:16 37:13 42:7
42:10 43:2,17
46:21 47:2,11 48:7
48:13,17,21 49:8
49:15,21 54:12,15
54:18 56:3,10 57:2
60:18 73:4,11
75:13,25 76:3,6,8

5

76:12 82:16 84:20
  84:20 85:8 97:19
  97:24 98:6,11
**documents** 38:11
  75:8,8
**dollars** 73:15
**doubled** 44:14
**dozen** 17:23 18:2
  20:4 27:20
**Dr** 14:14 15:10 16:6
  16:9,18 17:3,7,14
  17:18 18:18 19:9
  19:13,17 26:21,25
  48:25 103:17,19
**draw** 80:9
**Drive** 2:6
**duly** 4:5 105:13

---

**E**

**E** 2:2,2,21 85:22
  87:22 93:18 105:2
  105:2 106:2
**earlier** 6:11,15
  17:17 20:21 24:11
  26:20 57:15 58:7
  59:8 73:7
**earnings** 81:24 82:6
**EASDAQ** 40:19,24
  41:2,20 42:3
**edited** 66:5
**editing** 75:7
**Eduka** 84:10
**effect** 25:20
**Egan** 2:15 3:21,21
  13:2 65:14 101:15
  104:15
**either** 71:3
**Elena** 66:22 68:6
  71:2 74:11
**elevator** 65:10
**employed** 7:9
**employment** 10:11
**enabled** 84:22 85:5
  85:5 86:17 88:12
  90:6
**engaged** 82:4 84:21

85:4
**English** 67:23,24
  75:10
**entered** 46:18 47:2
  86:16 88:11 90:5
  92:20
**Entertainment**
  94:20,23
**entities** 50:17 77:11
  77:24 78:5,20
  79:11 89:12 93:24
  98:22 101:24
  102:2,11
**entitled** 42:7
**entity** 38:20 39:4
  92:9 102:12,12
**entry** 65:17,18
**ESQ** 2:8,9,15,21,22
**et** 3:7
**European** 86:2
**euros** 69:6,19
**Evat** 93:17
**exactly** 15:17 19:2
  20:3 38:8 40:25
  60:4 69:4 75:9
  103:5
**EXAMINATION**
  4:21 106:4
**examined** 4:6
**example** 23:14
  52:13 56:13
  102:24
**Excalibur** 87:22
**exceeded** 46:5
**exchange** 32:6 34:20
**exclusively** 21:7
**Excuse** 14:20 61:20
  67:13 83:15
**exhibit** 28:9,11,19
  31:12,18,24 34:17
  37:13 39:4,10 42:5
  42:7 44:17 45:9
  46:16,18 50:4 54:6
  54:7,9,12 65:18
  75:11,13 81:4,7,11

81:13,17 97:12,13
  97:18
**exhibits** 28:13
  106:15
**expenditures** 71:13
  71:23 72:3
**expenses** 71:20 72:9
  72:16 73:22
**experience** 62:24
**experiences** 63:3
**explain** 13:19 53:5
**extensively** 41:23
**extent** 65:2
**E-D-U-K-A** 84:10
**E-L-E-N-A** 66:25
**e-mail** 16:23 18:17
  18:25 19:8,12,16
  24:14 25:9 56:14
  57:2 58:22,24
**e-mailed** 18:19
**e-mails** 18:22 19:7
  19:19 56:19
**E-V-A-T** 93:18

---

**F**

**F** 85:24 87:23 93:19
  105:2
**face-to-face** 13:6,15
  16:5 26:9,16
**fact** 33:5 47:19
  50:10 86:22 88:16
  98:14
**factoring** 92:16,20
**fair** 21:5 23:13 72:8
  79:10 80:4
**family** 70:22
**fax** 24:15
**February** 46:20
  47:3 97:25 98:4
**federal** 28:20
**feel** 30:15
**felt** 36:5
**figure** 44:4
**file** 34:4
**filed** 32:13 33:17,19
  33:23 47:16 52:23

75:18,22 76:4
  79:20 81:19 98:3
  99:16
**filing** 29:18 34:9
**Filler** 21:25
**financial** 65:25
**find** 22:24 42:20
**fine** 4:16 11:3
**finish** 6:5
**firm** 22:24 23:10,15
  23:20 24:19,24
  25:16,24 26:4 68:9
  80:12,17
**firms** 15:16
**first** 10:19 11:9,16
  29:15 34:8 35:25
  36:3,4 54:18 57:23
  58:6,8 59:20,20
  60:3 66:7 67:13
  75:13 76:16 81:13
  81:18 87:17 92:14
  106:19
**five** 9:25 10:3
**Flemish** 22:16
**FLV** 50:25 78:16
**followed** 49:19
**following** 90:15
  93:13
**follows** 4:7 82:12
**foregoing** 4:18
**forgotten** 65:11
**form** 11:14 13:3,13
  14:10 15:21 16:15
  20:9 23:25 24:6
  25:2,17 26:18
  27:17 30:6 33:9
  34:5,10 35:6,23
  36:25 39:16,21
  41:21 42:18 44:9
  45:17,25 46:6 48:5
  48:7,8,14,19 49:17
  49:22 51:13,25
  52:11 53:2,23
  55:14 57:20 59:6
  59:18 62:7,18

64:13,18 67:3 70:8
71:15,25 72:13,17
74:17 77:3,18 78:7
78:13,21 79:6,13
80:2,7,20 83:9,23
84:17,24 85:7,13
86:9,20,24 87:5,12
88:7,14,19,24
89:14 90:8,13,22
91:8,24 92:6 93:6
94:2,16 95:2,15,23
96:16,21 97:9
98:19,24 99:6,18
100:3 101:2 102:6
102:15,21,25
103:12
**formal** 33:18,23
**formerly** 1:10
**forth** 105:12
**Forty-two** 83:17
**found** 31:2 65:25
**founders** 52:14,23
53:21
**four** 12:10,15 37:16
68:12 70:21,24
92:21
**fourth** 79:17
**fraud** 29:17 79:9
91:12
**full** 72:15,18 81:8
**Fund** 50:25 78:16
**funds** 69:22 73:16
73:18
**FURNISHED**
106:13
**further** 105:16
**future** 4:19

**G**

**G** 85:25
**Gary** 21:25
**gas** 8:18
**general** 7:14 8:23
11:3 30:9
**generally** 67:6 74:23
82:12

**getting** 67:18
**give** 18:13 35:7
47:24 58:2 74:19
92:8
**given** 99:14 105:14
**go** 57:2 83:11 97:3
**going** 5:23 6:7 30:15
30:16 43:2,8 47:22
49:23 52:5 60:11
71:18
**good** 4:23,25 13:5
23:21 30:11 46:8
**government** 63:18
64:16 65:4
**great** 46:10
**greater** 40:22
**group** 47:16 89:19
95:19,21
**guess** 14:23 20:11
34:18 43:5 44:11
**Guy** 22:9
**G2** 87:23

**H**

**Hana** 92:24
**hand** 28:9 105:22
**HANS** 1:5
**Hanvit** 92:23
**happen** 62:9
**happened** 55:20
**hard** 16:3
**Harout** 101:6,15
**Hauspie** 5:20 7:7
11:13 13:22 20:2
21:11 27:4 28:2,6
29:6,18 30:2,25
35:22 36:16,19,23
37:3,6 38:24 39:8
40:13 43:10,18,20
43:25 45:12,19
46:19 52:9,14,15
52:16,24 53:7,21
60:25 61:3,5,13
62:23 63:19 64:8
64:22 65:25 66:7
76:22 79:17 85:5,6

88:12,12 90:6,7
91:20 92:10
**head** 53:13
**heading** 81:22,25
91:11 92:16 96:2
**Healthcare** 89:5
**heard** 22:11,17
25:15,23 59:12
**hearing** 59:9
**hearings** 6:23 7:2,4
**hefty** 76:6
**held** 1:20
**hereinbefore** 105:12
**hereunto** 105:21
**HI** 93:15
**hold** 38:4 41:4
**hour** 12:17 16:4
54:21 55:5
**hourly** 55:9,13,17
**hours** 16:4 56:17
57:6 58:12,17,23
**H-A-R-O-U-T**
101:15

**I**

**idea** 34:3,6 51:19
**identification** 54:10
81:15 97:14
**identified** 44:13
85:20
**Imaging** 84:9
**immediate** 45:22
**Immediately** 36:3
**IMP** 93:19 94:10
**implies** 44:23
**impression** 83:6
**inaccurate** 14:7
**include** 26:25 27:12
56:7 102:17
**included** 58:12,12
70:22
**includes** 44:15
**including** 17:18
27:18 59:20
**incorrect** 44:5,6
**incurred** 71:13,24

73:22 83:22
**indefinitely** 53:16
**indicate** 91:19
**indicates** 43:24
44:18 54:19 56:16
57:5 61:6 80:10
91:21 92:19
**Indicating** 82:24
100:22
**individual** 22:20
**individuals** 22:4,7
54:3 61:3 74:24
76:25 77:15
**inflate** 82:5,14
84:23 86:17 88:13
90:7
**inflated** 86:22 88:17
**information** 41:19
91:16
**informed** 36:18
**inside** 7:5
**instances** 67:10,14
**instruct** 49:23
**intended** 82:5
**interaction** 64:22
**interested** 19:5
105:19
**interfere** 24:7
**International** 93:14
**Internet** 36:5 66:2
**Interpra** 84:9
**interrupt** 4:14
**interview** 63:15,21
64:10 65:3
**introduce** 3:12
**investigate** 41:25
**investigating** 62:22
62:22 63:19
**investigation** 36:13
**investigators** 64:17
**investment** 77:2,17
93:25 100:7,10
102:5
**involve** 56:19 57:10
**involved** 7:19,23 9:6

9:16 53:25 57:17
57:25 67:7 71:2
86:11 91:2 94:7
103:15
**involvement** 21:4
**involving** 85:17
89:17
**issue** 19:4
**issued** 47:6
**Italian** 7:19 66:15
66:18,20 67:2,6,11
67:15,20,22 69:8
**Italiano** 38:21,25
39:11,13 40:3 41:4
41:5,15
**Italy** 5:6,7,8,10 7:16
7:21 9:2,18 10:10
12:12 68:9,16,18
70:11,16 74:14
**item** 60:17 66:14
**itemization** 56:4
72:25
**items** 56:13
**I-Medical** 85:19
**I-Merge** 89:4
**I-Travel** 85:25

_____ **J** _____
**J** 2:8
**James** 26:6
**Janet** 22:6
**January** 14:15
25:14 47:14 54:14
54:16
**Jeff** 3:14 23:22,22
**JEFFREY** 2:21
**Jim** 22:6
**job** 7:11 10:10
103:21 104:3
**jobs** 10:9
**Journal** 66:6
**judge** 53:15 73:8

_____ **K** _____
**KARL** 1:5
**Katchadourian**

101:6,8,16
**keep** 60:12
**kind** 7:5 10:11,17
12:3 19:6 31:10
75:5
**kinds** 65:22 74:20
**know** 14:23 19:3
22:2,8 29:24 30:5
30:18 40:18 44:10
49:6 52:20 53:3
62:8,23 69:23
72:21,23 74:22,23
75:9 81:6 96:3
103:20,22,23,24
104:2,5,7
**knowledge** 49:16
64:15
**known** 1:10 35:5,13
**knows** 67:24
**Kodner** 2:22 3:16
3:16
**Korea** 92:9,19 93:12
93:13
**Korean** 91:12,21
92:4,21
**Kortean** 84:7
**KPMG** 50:17 52:7
57:4 77:22,25,25
77:25
**K-A-T-C-H-A-D-...**
101:17
**K-O-R-T-E-A-N**
84:7

_____ **L** _____
**L** 4:4
**land** 8:22
**language** 86:2 96:19
96:20,25,25 100:7
100:10
**languages** 96:9
**large** 82:22
**late** 10:21 11:11
48:23 57:23,23
58:9 60:10
**Laurie** 1:22 105:7

105:25
**law** 30:16,20 67:25
68:9,13 80:12,17
**Lawrence** 21:25
**laws** 28:21
**lawsuit** 17:8,20 18:5
18:20 19:23 20:16
20:23 21:15 22:23
23:24 24:3,5,20,25
25:5 26:10,17,23
26:25 27:21 33:19
33:23 48:4,18
52:18 53:15 56:8
56:20 57:10,17
58:20 60:14 69:15
70:16 75:18 78:25
97:20
**lawyer** 10:24 62:12
67:23,23 68:3,11
74:14
**lawyers** 11:9,21
12:5,15 15:11,12
15:24 17:4,19
18:23 19:2,10,14
21:15 23:2 26:10
26:17,22,24 27:7
27:16 49:19 53:14
67:5,6,8,11,12,15
67:16,20,21 70:2,3
71:23 72:6,9 76:9
**LDC** 85:22
**lead** 14:13 20:5
43:10 47:7 54:13
57:7 64:11
**learn** 10:19,22 11:8
11:20
**Lebanese-Armeni...**
101:5
**legal** 2:25 3:3 74:20
75:5,8
**Leibinger** 1:5 14:15
15:4,5,5,9 16:6,13
16:21 17:3,7,11,14
17:18 18:18 19:9
19:13,17 26:22

27:2 49:2 103:17
104:2
**Lernout** 5:19 7:7
11:13 13:22 19:25
21:11 27:4 28:2,6
29:6,17 30:2,25
34:24 35:13,22
36:15,19,22 37:3,6
38:24 39:7 40:12
43:10,18,20,25
45:12,19 46:19
52:9,13,14,15,23
53:7,21 60:25 61:3
61:5,13 62:22
63:19 64:8,22
65:24 66:7 76:21
79:17 85:5,6 88:12
88:12 90:6,6 91:19
92:10
**letter** 24:14 39:11
39:19,25 65:9,12
**let's** 12:17 16:4 27:5
44:22 83:11
101:13
**LHIC** 78:17
**Liberty** 2:13
**license** 91:2
**licensing** 94:19
**Limited** 90:17 93:16
93:17,18 94:8
**line** 100:21
**list** 56:14 58:17,23
**listed** 32:8 44:18
60:17 77:6,11
78:15
**lists** 29:5,11 76:17
**litigation** 5:16,20,25
6:11,16,19,23
13:22 16:11,14
19:7,8,14 20:2,8
20:14,21 21:11
27:4,13 28:2,6
29:7,12 40:11 43:3
43:11 46:20 47:8
47:15,20,21,24

48:10,12 49:14,20
50:13 51:4,24 52:9
52:16 56:5 57:18
60:14 64:12 65:23
66:4 69:12 70:7,12
71:11,14,24 72:8
73:25 75:15 76:14
86:12
**little** 2:7 37:15 51:4
**live** 5:6
**lives** 14:25 15:2
**living** 14:25 103:19
**LLP** 2:17
**loan** 82:22 83:3
**Loeffclaeys** 80:12
80:18
**long** 16:2 18:13 31:8
31:8 34:8,12 43:6
68:11
**longer** 7:18
**look** 31:7 34:22
42:12 44:17 46:22
81:2 82:19 87:7
89:2 93:9 95:3
98:7,9
**looked** 43:23
**looking** 75:19 78:23
**looks** 37:16 77:10
77:24
**losses** 36:23 37:9
43:19 45:12,18,20
46:4 76:25 77:16
78:5,11,20 79:5,11
79:25 80:19 83:8
83:22 84:15 85:12
86:7,21 87:3,11
88:5,16,22 89:12
89:23 90:11,20
91:7 92:5 93:4,25
94:15,24 95:13,22
97:7 98:23 99:4,17
99:25 100:11,25
101:9,25 102:4,13
102:20 103:10
**lost** 67:13

**lot** 70:21 76:7
101:23
**Louis** 78:17 80:10
**Luc** 22:14
**L&H** 5:24 6:11,15
6:23 20:8,14,21
27:12 29:7 43:3
47:7,21 48:11
50:13,22 51:4,23
56:4 57:18 60:13
64:11 65:23 69:11
70:6,11 75:15
76:13,18 77:2,7,17
78:6 79:18,19,24
82:4,14 84:16,21
85:12 86:15,17,22
88:17 91:3 92:4,9
92:19 93:25 96:8
96:14 102:5
103:10
**L&H's** 82:7 91:20
**L-I-R-E** 8:15
**L-O-E-F-F-C-L-...**
80:13

---

# M

**Machines** 84:8
**main** 9:17 64:19
81:3
**making** 40:6 41:9
**manager** 7:13,15
8:23 9:3,4
**managing** 34:24
**March** 53:8 60:19
**mark** 28:16 54:6,7
81:11 97:11
**marked** 28:10 31:12
37:13 38:19 42:6
54:10 75:12 81:14
97:14,18
**market** 39:14 40:13
40:20
**marketing** 8:25 9:3
**MARKINGS** 106:8
**marriage** 105:18
**married** 10:5

103:22 104:5
**Maryana** 2:22 3:16
**Massachusetts** 1:3
2:14
**massive** 81:23
**math** 44:22
**matter** 3:7 105:20
**maximum** 19:21
**McDONALD** 2:25
3:3
**mean** 4:14 13:4,5
17:9 24:14 27:3
29:24 44:15
**meaning** 6:12 30:10
30:20 53:3
**meant** 31:16
**Medical** 84:9
**meet** 12:5,8,11,21
12:23 72:6
**meeting** 12:15 14:13
14:19,22 15:10,19
15:20,22,23 16:2,7
47:13,19 48:25
**meetings** 12:16,18
12:25 13:7,11 16:6
26:9,14,16
**member** 3:3
**memorandum**
46:18
**memory** 33:18 34:7
39:24 41:9 46:25
**mentioned** 18:17
20:4
**Mercator** 78:17
100:20
**met** 13:2,6,10,14
15:7,18
**Microsoft** 78:18
**Midas** 94:7
**middle** 47:11
**million** 50:16,21
51:5 94:19
**minimum** 79:10
**mispronounced**
15:3

**missed** 77:14
**misstates** 57:21
102:25
**mistake** 27:24
**misunderstanding**
27:24
**Modena** 5:7
**moment** 71:18,19
**money** 70:5,10,15
73:24
**month** 18:11
**months** 18:14,16
**morning** 4:23,25
**MOTIONS** 106:10

---

# N

N 2:2 106:2
**name** 3:2 5:7 8:8,12
15:3 22:10,14,18
23:21 26:8 57:22
58:6 59:21 63:8
66:20 75:9 78:22
80:6 101:16
**named** 5:11,18 20:6
21:14 28:20 49:9
78:24 79:3,19
80:12 98:17 99:11
99:14 101:5
102:22 103:13
**names** 22:13 84:18
86:11 92:23
**NASDAQ** 36:5
39:13 40:5,13,19
40:24 41:2,4,7,11
42:3 43:19 44:14
45:11 66:11,11
**National** 3:3
**need** 28:16 73:11
74:3 98:9
**Network** 84:9
**never** 10:15,18
11:23,25 12:2,4
16:8,16 17:16 22:5
22:11,17,21 25:15
26:5 37:2,2
**new** 1:22,22,24 2:20

2:20 3:4,10,11
12:18,20 26:12
28:17 54:6 105:3,5
105:9
**news** 52:4,7
**Nine** 84:8
**nonmainstream**
96:9
**northern** 5:8
**Notary** 1:24 4:6
105:8
**noted** 104:18
**notice** 81:7
**Noveimmobilire**
8:14
**November** 35:9,14
39:11
**number** 5:9,9 16:17
16:20 17:2 37:24
74:10 76:17 82:11
84:2 87:16 94:5
**numbers** 38:13
**numerous** 56:14
57:6 82:4
**NV** 84:10
**N-O-V-E-I-M-M-...**
8:14
**N.V** 89:5 95:10,19
99:22,24

**O**

**O** 4:4,4
**object** 11:14 13:3,13
14:10 15:21 16:15
20:9 23:25 24:6
25:2,17 26:18
27:17 30:6 33:9
34:5,10 35:6,23
36:25 39:16,21
41:21 42:18 44:9
45:17 46:6 48:5,8
48:14,19 49:17,22
51:13,25 52:11
53:2,23 55:14 59:6
59:18 62:7,18
64:13,18 67:3 70:8

71:15,25 72:13,17
74:17 77:3,18 78:7
78:13,21 79:6,13
80:2,7,20 83:9,23
84:17,24 85:7,13
86:9,20,24 87:5,12
88:7,14,19,24
89:14 90:8,13,22
91:8,24 92:6 93:6
94:2,16 95:2,15,23
96:16,21 97:9 98:5
98:19,24 99:6,18
100:3 101:2 102:6
102:15,21,25
103:12
**objection** 36:9 45:25
53:10,17 56:10,21
57:12,20 58:4,14
59:2 70:13 71:6,15
73:4,14 74:21
82:16 90:3 92:12
100:13 101:11
**October** 34:25
**officer** 76:18
**offices** 1:21 3:9
**oh** 13:8 20:24
100:23
**okay** 8:20 28:14
31:19,23 43:12
46:24 65:16 98:12
99:10
**old** 74:12,13
**once** 24:16,16 52:2
88:10 89:11
**ones** 28:7,17
**operated** 41:2
**Operations** 90:17
**opposed** 60:14
67:20
**order** 46:18 47:6
62:12 71:20
**original** 75:21,21
**outcome** 105:19
**outlined** 49:20
**outside** 7:6 15:24

**overstate** 85:6
**overstatement**
81:23
**owned** 7:13,15 8:2,3
100:20
**owner** 7:18

**P**

**P** 2:2,2 4:4
**page** 34:21 38:18
39:10 43:16 47:10
47:12 50:4 54:18
56:3 75:20 76:11
76:12,17 77:5,20
77:21 78:10 79:16
80:10,22 81:3,22
82:19,19 83:2,4,5
83:11,12,15,16,25
84:11 85:15 87:7
87:14,15 88:8 89:3
89:16 90:15 91:11
92:14 93:8,8 94:4
94:5,18 95:8,17,25
96:2 98:7 99:10,20
100:5,6,15 106:4
106:16
**pages** 76:7 77:11
81:8
**paid** 45:6 54:24,25
55:23 69:8,19 70:5
70:10,15 71:10
**paragraph** 29:15
34:22,23 43:17
45:10 47:12 50:5
54:19 77:5 78:10
78:16 79:16,17
80:10,25 83:12,25
84:3 85:18 87:15
89:2,16 90:15,24
91:10,14 92:14,15
92:19 93:9 94:4,18
95:4,8,17 96:6
99:21 100:5,15,18
101:5
**paragraphs** 85:16
93:10

**pardon** 91:10
**parents** 70:23
**part** 15:23 39:3
67:13 71:16 79:5,9
**partially** 99:3,16
**participate** 50:10
62:10 72:6
**participated** 17:3
25:6 27:6,20
**particular** 23:3 31:4
39:25 42:22 48:24
49:8 66:3 68:8
93:11
**parties** 105:17
**partner** 80:12
**Partners** 21:19,22
**Pat** 12:23
**Patrick** 2:15 3:21
**Paul** 78:9
**Pause** 31:25 42:14
95:6
**Pauwels** 22:18
**pay** 68:23,24 69:2
**PBS** 1:9
**Pease** 2:11 3:22
**pending** 31:21
**people** 15:18 30:18
86:11 103:13,15
**percent** 18:25 41:3,7
**period** 29:7 82:4
**Perlman** 21:25
**person** 15:18 23:3,5
23:7 24:11,11
**personally** 13:4,11
15:14 51:7 63:17
68:24
**persons** 77:10 78:19
101:24 102:2
103:9
**petition** 79:21
**phone** 17:15
**phrase** 6:3
**Physically** 69:23
**place** 49:12 63:14
**plaintiff** 3:20 15:2

10

28:20 29:16 32:8 43:10 54:13 64:11
**plaintiffs** 1:7 2:5 3:22,25 5:11,19 14:14 20:6,6 21:15 47:7 49:9 52:25 57:7
**pleadings** 65:20
**please** 3:13 4:3 46:23 87:14 89:16 94:4 95:8,17,25 100:5,15
**PLLC** 2:4
**Po** 1:5,20 3:9 4:9,24 5:1 6:1 7:1,9 8:1 9:1 10:1,5 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1,11 21:1 22:1,22 23:1 24:1 25:1 26:1 27:1 28:1,9,11,18 28:23 29:1 30:1 31:1,12,15,17,24 32:1 33:1 34:1 35:1 36:1 37:1,13 38:1 39:1 40:1 41:1 42:1,6,8,11 43:1 44:1,17 45:1 45:9 46:1,17 47:1 48:1 49:1 50:1,4 51:1 52:1 53:1 54:1,7,9,10,12,14 55:1 56:1 57:1 58:1 59:1 60:1,11 61:1 62:1 63:1 64:1 65:1,18 66:1 66:22,25 67:1 68:1 68:6 69:1 70:1 71:1,2 72:1 73:1 74:1,11,11 75:1,12 75:25 76:1 77:1 78:1 79:1 80:1,15 81:1,13,17 82:1 83:1 84:1 85:1,3

86:1 87:1 88:1 89:1 90:1,4 91:1 92:1 93:1 94:1,13 95:1 96:1 97:1,13 97:18 98:1 99:1 100:1 101:1,23 102:1 103:1,4 104:1,13,20 105:11 106:5,16 106:18
**point** 37:5 38:3 41:24 52:6 55:12 59:22
**portion** 51:20
**position** 34:24
**possible** 32:20 34:13 41:18,22
**postpone** 53:15 54:2
**postponing** 53:20
**Po's** 4:10
**practice** 74:20
**practiced** 68:18
**preceding** 45:24 90:24
**predecessors** 103:8
**preparation** 12:22 13:17 14:5
**prepare** 12:6,9,25 13:12 26:13,15
**prepared** 14:2
**preparing** 56:25
**presence** 15:24
**present** 2:24 15:10 15:13 25:7
**pretty** 41:23 76:6,7
**previous** 9:10 28:13 34:17 42:6 46:17
**previously** 27:19 28:10 31:12 39:18 40:17 75:12 87:21
**price** 44:19
**principal** 23:14,19
**prior** 4:10 5:24 11:11 12:25 13:6 13:17 14:8,12

16:25 19:25 25:14 28:10 37:24 57:21 59:5,12 103:2
**private** 19:4
**probably** 44:12,16
**problems** 66:7
**proceedings** 80:5
**produces** 8:18
**production** 65:6
**products** 5:20 11:13 61:5 92:10 96:14
**Professional** 1:23 105:8
**prosecutor** 60:19 61:7,9,16,22 62:3 62:5,16,21 63:3,9 64:10
**prosecutors** 63:18 65:4
**Public** 1:24 4:6 105:8
**publications** 66:4,9
**publicly** 81:23 88:13 88:17
**published** 66:13
**Pucillo** 2:12 3:23
**purchased** 29:6 37:24 38:23 39:12 39:13 40:18,19,23 41:11,20 42:2,3 43:17,24 44:8,19 44:23 45:11
**purchases** 29:11 37:14,16 38:12,16 39:7 44:18
**purportedly** 96:8
**purpose** 20:15,20,22 21:7 42:16,20 72:19
**purposes** 5:23 12:21 20:13 56:25 72:7
**pursuant** 4:17 28:20
**put** 70:23
**P-A-U-W-E-L-S** 22:19

**p.m** 101:19,22 104:17,18

## Q

**Quaak** 1:5 3:7 14:14 14:25 15:10 16:6,9 16:12,18 17:3,7,10 19:9,13,17 26:21 26:25 47:16 48:25 103:17,19
**question** 6:6,13 11:5 13:5,19 17:17 20:17,18 24:12 25:22 28:4 31:20 32:2 47:23 49:24 52:21 55:17 61:16 64:8 71:21 94:13
**questioned** 41:23
**questions** 61:10,12 61:15,22 62:3,6,17 63:9 64:5 71:19 103:17 104:11
**quick** 101:13
**quite** 9:25 21:3
**quote** 79:19
**quotes** 30:2

## R

**R** 2:2 105:2
**Radial** 99:22,24
**rate** 54:20,23,24 55:5
**reach** 35:25 52:3
**reached** 37:9 52:6
**read** 37:15 65:8 66:10
**reading** 42:20
**realized** 81:10
**really** 13:9 14:23 20:11 31:16 34:11 44:10 63:16 74:22
**reason** 31:2 33:11 41:14 64:16,20,20
**reasons** 31:2 53:20
**recall** 13:21 14:16

17:4 21:13 25:16
29:2 31:5,24 39:19
40:6,20 42:10,15
46:20,24 54:15
63:8 66:3,8 73:12
**receipt** 69:5
**receive** 19:16 51:17
51:20 73:18
**received** 19:12,15
19:20 51:7,10,15
73:16,23,24
**receiving** 76:8
**Recess** 46:13 74:8
101:20
**Recognition** 84:11
**recollect** 98:8
**recollection** 76:2
**record** 3:5,13 8:6
14:9 17:13 28:18
46:11,14 61:21
63:11 65:2,3 74:7
74:10 81:17
101:18,21 104:17
105:14
**reduced** 73:8,12
**refer** 5:24 45:10,15
46:4
**reference** 45:21
78:9 82:20,21
85:23,24,25 87:15
87:19 90:16,25
91:15 93:12 94:19
95:9 100:16,19
101:4
**references** 86:3
87:25 89:3,7,9,17
89:20 93:20
**referred** 31:5 85:21
96:13,19,24
**referring** 6:4 29:21
33:22 55:3 96:4
102:8 103:3
**refers** 45:18 48:11
60:22 65:19 87:20
87:22,23,23 95:18

96:6 100:6
**refresh** 33:17
**regarding** 18:5
20:25 21:3 26:17
27:3,4 29:25 30:24
40:11
**Reginald** 22:18
**Registered** 1:23
105:7
**regular** 50:7,11
**reimbursed** 69:18
69:22 71:12,22
72:9,11,15
**reimbursement**
71:16 73:2,21
**reimbursements**
72:22
**reimbursing** 71:20
**relate** 19:25 27:25
28:5 56:20
**related** 19:2,22 57:3
57:4 58:24 72:19
102:17,19,22
103:7 105:17
**relates** 60:18
**relating** 7:6 27:5,25
57:16
**relation** 68:5
**relative** 68:3
**relatively** 47:15
**relatives** 70:6
**remember** 13:9 15:5
15:6,12,14,15,17
16:3,3 18:8 20:10
23:22 24:22 25:18
25:19,21 26:8
29:13 31:9,14
32:19 33:15 34:11
34:16,17 38:7,8,9
40:9 41:17 42:21
43:4 47:4 49:7,11
49:13,18 57:24
59:7,9,15,19 60:2
60:8,25 61:4 63:2
63:12,16,23 64:2,3

64:4,6,7 66:5,10
66:12 68:20 69:4
70:4 73:8 76:5,8
78:22 84:18 86:10
99:9 103:20
**remembering** 23:21
**rep** 65:25
**repeat** 6:13 14:20
20:17 27:18 52:21
55:15 88:8
**rephrase** 11:6
**report** 63:13
**reported** 81:24
86:17,23 88:13,17
90:7
**reporter** 1:23 4:3
54:6 66:24 97:17
105:8
**represent** 5:15 6:18
74:15
**representative** 6:10
**representing** 3:15
3:17 6:14 98:6
**represents** 22:22
74:24
**request** 40:6,10,14
41:10,15 52:24
53:15 64:25 65:5
65:11 71:17
**requested** 39:19,24
41:18 73:2
**REQUESTS** 106:11
**require** 9:20
**research** 42:4
**reside** 5:3
**resigned** 34:24
35:13
**respond** 65:12
**responsibilities** 8:24
**responsible** 79:5
99:4,17 103:10
**restaurant** 7:17 9:6
9:7,12,15,17,20,24
**result** 47:20 48:24
49:8

**resulted** 86:22 88:16
**revenue** 82:22 85:6
86:17,23 88:13,17
90:7
**revenues** 81:24 82:6
82:15 84:23
**review** 13:16 14:4
30:23 59:4 65:22
**reviewed** 29:16
30:22 32:16,21
33:8,12 34:2,14
35:17 59:16,23
60:3,5,8
**reviewing** 31:5
65:19 66:3,8 76:3
**ride** 65:10
**right** 4:19 7:12
15:16 38:5,6 40:7
67:4
**Rivers** 84:8
**Robert** 2:25 3:2
**Rocco** 12:24 13:10
13:11,15 25:3,5,7
25:8 26:3
**Rock** 2:7
**role** 42:23 55:22
**Rolo** 39:4,8 40:14
40:18 41:6,10,16
41:19 42:2
**Roughly** 19:19
**RPR** 105:25
**rules** 30:19
**RULINGS** 106:12

---

**S**

**S** 2:2 80:13
**SA** 1:11 98:18 99:3
99:7,9,11 102:24
103:5
**sales** 9:2,3
**San** 9:7
**saw** 34:8 36:12
59:19
**saying** 64:3
**says** 29:16 30:22
34:23 47:13 50:6

12

80:11 81:23 82:3
82:21 86:15 91:11
92:16 96:2
**scheduled** 53:8
**schemes** 82:4,13
**SEC** 36:4,13
**second** 8:20,21
34:23 43:16 54:19
60:17 97:13,19
98:14 106:21
**section** 76:16,16
82:10
**securities** 5:20,24
6:11,15 13:22 20:2
20:8,14,21 21:11
27:13 28:6,21 29:7
29:17 32:6 34:20
43:3,10 46:19 47:7
47:21 48:12 50:13
51:4,24 52:9,16
56:5 57:18 60:14
64:12 65:23 69:12
70:7,11 75:15
76:13
**Security** 87:9,10
**see** 6:2 7:20 25:8
28:4 29:19 32:8,11
32:23 33:2 35:2
43:21 47:17 50:8
54:21 56:17 57:3
60:20 64:20 65:20
66:15 75:15 76:14
76:19 77:8,12,22
78:24 79:22 80:15
81:24 82:8,23,25
83:5,14,18 84:4,12
86:3 87:9,25 89:9
89:20 90:17,18
91:3,12,17 92:17
93:20 94:20 95:10
96:10 97:22,25
98:7 99:11,22
100:7,17,20 101:6
**seeing** 31:24 33:16
46:21,25

**seeking** 5:15 6:9
**seen** 31:13 32:2 65:5
65:14
**Sei-Young** 93:16
**sell** 9:12,15 36:15
**send** 65:11
**senior** 76:18
**sense** 18:13 74:19
**sent** 19:8 25:8 69:25
**sentence** 34:23
45:24 47:12 54:19
79:18
**separate** 48:17 92:9
**September** 28:21
29:3 32:18 34:2,14
35:4,10,12,17,21
76:2 81:20
**Sequoia** 84:7
**series** 92:20 93:10
**serve** 6:10,10
**serves** 69:8
**set** 24:12 85:16
96:14 105:12,22
**Setting** 71:21 103:7
**settled** 52:10
**settlement** 50:17,20
50:24 51:9,11,16
52:3,7
**settlements** 50:14
51:3,8,12,21
**Shakes** 53:13
**Shalov** 24:24 25:16
25:24 26:3
**share** 29:11 37:14
38:12,16 41:4,7
44:18,20,23 63:5,6
**shareholder** 62:25
63:4 64:23
**shareholders** 5:15
6:15,19
**shares** 29:6 30:2,3
36:16,20,21 37:2,8
37:16,19,20,20,21
37:24,25 38:4,23
38:24 39:8,12

40:12,18,23 41:20
42:2 43:18,25 44:4
44:7,12,13,19,24
45:4,10,16,21 46:4
78:6 84:16 85:12
103:11
**Shinhan** 92:24
**short** 43:24 46:9
74:3
**shoulder** 81:2
**show** 31:11,17 42:5
46:16 73:11 75:11
**shown** 46:17
**sign** 63:13
**signature** 28:23
**signed** 29:10,14
30:3 32:17 33:13
35:20 42:22,25
43:7
**signing** 29:2 42:10
54:15
**similar** 40:14 48:3
48:17
**similarly** 1:6
**simpler** 44:22
**Singapore** 96:7,14
100:20
**sister** 7:16 8:4,12
68:7,21 69:8,15,20
71:11 74:11
**sisters** 70:19,21
**sit** 33:12 42:21
51:19
**site** 14:18,22 66:11
**sitting** 39:23
**situated** 1:6
**situation** 55:21
**six** 10:2,3 12:17,17
18:15 70:21,24
**software** 84:8 96:8
96:15
**sold** 7:18 9:13 36:21
37:2,8
**somebody** 61:10
**someplace** 12:19

**somewhat** 73:9
**sons** 70:24
**sorry** 6:8 17:25
20:17 61:18 63:10
**sought** 6:18
**sounds** 22:16 46:10
**source** 61:18
**spawned** 47:14
**speak** 71:18
**speaks** 56:11 67:24
73:5 82:17 85:8
**Specialist** 2:25
**specific** 5:8 11:2
17:24 30:10 93:10
94:6
**specifically** 11:4
12:9 19:22 26:15
27:5 29:23 31:10
**Speech** 5:20 11:13
61:5 84:8 87:23
92:10
**spell** 22:13 66:23
**spelled** 89:6
**spend** 12:14
**spends** 68:22
**spent** 44:24 56:4,8
56:16 57:6 58:19
60:13 72:12
**split** 37:25 38:4,7
44:11,14,16 45:3
**spoke** 74:11
**spoken** 94:12
**Square** 2:13
**ss** 105:4
**started** 24:4
**start-up** 96:6,18,24
**State** 1:24 105:3,9
**statement** 46:3
**states** 1:2 7:5,6,17
9:6,21,24 12:12,13
12:19 43:17 68:15
68:17 79:18,19
**stating** 39:12
**status** 51:23 64:11
**stayed** 52:19,24

53:3,4
steel 8:9,18 55:4,7
   55:17,25
step 67:4
stipulate 4:10 75:20
stipulation 4:17
stock 40:4 43:18,20
   43:25 45:13,19
   82:7
Stone 24:24 25:16
   25:24 26:3
Stonington 21:19,22
stoves 8:19
strategy 47:15,20,25
   48:3,11 49:15,20
Street 1:22 2:19
   3:10 66:6
strike 23:18 33:4
submitted 43:2,8
subpart 85:19,19,21
   85:22,22,24,25
   87:19,20,21,22,23
   89:4 93:14,15,15
   93:17,18,19 94:8,9
   94:10,11
subparts 84:3 89:6
Subscribed 104:22
subsidiary 91:21
   92:4
substance 49:6
   67:18
sued 21:19,25
suffered 43:19
   45:11,21 77:2,16
   78:5,12,20 79:12
   79:25 80:19 83:8
   84:16 85:12 86:8
   86:21 87:4,11 88:6
   88:23 89:13,24
   90:12,21 91:7 92:5
   93:5,25 94:15,25
   95:14,22 97:8
   98:23 99:4,17
   100:2,12,25
   101:10,25 102:5

102:14,20
Suite 2:6
summarized 63:14
supplemental 54:9
   54:13 106:18
sure 6:12 17:23
   18:24 24:8 28:15
   35:8 41:3,3,7,8,17
   65:8 68:12 74:5
   103:18
swear 4:3
Switzerland 47:14
sworn 4:5 104:22
   105:13
Systems 87:20 89:5
S-E-I 93:17
S-T-E-E-L 8:9
S.A.I.L 78:16

### T

T 2:9,15 4:4,4 105:2
   105:2
Tabacco 2:11 3:22
take 9:17 11:23
   25:23 34:22 44:17
   48:7 53:19 59:22
   67:4 74:3 89:2
   93:9 98:9,21
   101:13
taken 4:12 13:21
   40:12 46:13 68:16
   74:8 101:20
talk 11:2 18:25 19:3
   21:9,10 27:5 64:17
   82:11
talked 10:10 11:4
   24:10 26:20 87:18
   87:21 101:23
   102:10
talking 30:4
tape 74:4 104:16
Tech 93:13 94:7
Technologies 87:22
Technology 8:10
   84:9
telephone 16:10,14

16:17,20 17:2,6,13
   17:19 18:4,8 20:5
   20:13,15,19,21
   24:14 25:12 26:23
tell 5:2 11:7 41:10
   48:21 60:22 72:3
   80:25
term 24:10,13
   102:16
terms 19:7
testified 4:7 14:12
   25:15 27:19 39:18
   40:17 57:15 58:7
   73:7
testifying 25:19
testimony 4:11 14:2
   14:8,16 17:4 48:16
   57:21 103:2
   105:14
Thank 104:12,14,15
things 24:15
think 10:21 11:18
   13:14 15:22,25
   16:19 17:22 18:7
   18:15 19:11,11,21
   23:22 24:2,16,21
   30:7,7,7 33:11
   40:3,16 41:14
   42:19 44:6,10,11
   44:15 46:8 57:23
   57:24 59:3,8,15
   61:2 64:14,19 66:6
   69:5 73:7 81:3
   87:21 94:11 98:10
   101:14 102:3,13
   103:9,14,14
   104:10
third 65:18 100:21
thought 40:2 57:15
thousand 69:6,19
three 12:10,15 15:16
   16:4 18:7 21:5
   77:24 78:4
three-month 68:14
TIB 85:23

Till 55:19
time 10:2 11:9,11
   12:10,14 15:18
   24:3 31:9 32:17
   33:13 34:8,12
   35:20 36:7,12,16
   36:21 37:5,9 43:4
   43:6,7,14,24 46:9
   47:2 49:14 54:25
   55:12 56:4,7 57:23
   58:18 59:12,19
   60:3,13 65:10
   68:21,23 72:11,25
   76:3 98:9 99:15
   103:5,6 104:18
times 10:3 12:8
   67:14
titled 28:19 32:5
   54:12 97:19
today 3:4 12:6 14:5
   14:9 24:11 33:12
   39:23 40:23 42:22
   48:16 51:20 55:24
   57:15
told 10:24 27:14
   28:7 89:25
top 95:25
total 12:14 37:23
   45:18 51:3 69:7
   72:21
track 60:12
training 68:13,14
transaction 83:13
   83:19
transactions 82:11
   82:14 84:2,6,22
   85:4,16 86:16
   87:16 88:11 89:7
   89:17 90:5 93:11
   94:6
transcript 13:16,25
   14:4 65:8 106:8
translation 75:9
   95:18,21
travel 9:20,23 60:18

72:8,16,20
traveled 62:2,10
　72:7
trial 53:6,16,20 54:2
trip 72:20
trips 72:12
true 58:22 105:14
trust 75:23 78:17
truth 86:13
try 6:6
trying 34:16
turn 34:21 37:12
　38:18 43:16 45:9
　47:10 76:11 80:22
　83:2,25 85:15
　87:14 89:16 91:10
　92:14 93:8 94:4
　95:8,17,25 99:10
　99:20 100:5,15
turned 36:24 41:19
Turning 50:4 81:22
two 7:20 10:8,9 16:4
　18:7 19:21 21:5,14
　50:7,11 52:14,23
　53:21
types 24:15
T&C 93:17,18

**U**

underneath 82:3
　91:14
understand 4:20
　17:12 19:5 29:24
　30:8,9 37:4 42:25
　47:5 61:25 67:22
　96:12
understanding
　30:12 37:23 38:15
　40:22 43:13 62:15
　62:20 64:9 91:25
　96:23
understands 67:23
undisclosed 96:3,4
　96:12
unidentified 87:24
　89:8 90:25 91:5

94:8,9
Union 82:21,22 83:4
　83:7
United 1:2 7:5,6,17
　9:6,20,23 12:12,13
　12:19 68:15,17
use 4:19 6:3 24:13
　28:12 53:4 67:19
usually 23:4
U.K 77:25
U.S 6:20 33:19,23
　68:13 77:25

**V**

vacation 19:4
value 82:6
Vangansbeke 22:14
variance 96:8
various 32:24 76:13
　85:17 87:16 96:24
Vasco 87:8,10,17
Velstra 100:16,19
　100:24
Verbeke 78:17
　80:10,13,13,18
Veritext 3:4
version 81:12
versus 3:8
Video 2:25 3:3
VIDEOGRAPHER
　3:2 4:2 46:11,14
　74:6,9 101:18,21
　104:16
Videotape 74:7,9
view 98:22
violation 34:20
violations 32:6
Vision 93:19 94:10
Voice 84:11 85:18
　87:20 93:13
voluntary 79:21
vs 1:8
V-A-N-G-A-N-S-...
　22:15
V-E-R-B-E-K-E
　78:18 80:14

**W**

waited 34:3 36:19
waiting 34:7
Walker 2:9 3:19,19
　23:8,15
Wall 66:5
want 4:17 24:7
　30:16,17,17 49:6
　62:5 67:4 98:7
　102:16
wanted 36:17,18
　62:16,23 64:17
　80:6
Warlop 22:10
way 24:12 36:19
　41:10 55:23 64:4
　69:18 70:23
　103:10 105:19
Web 66:11
weeks 50:7,11
went 62:13
West 1:21 2:19 3:10
we'll 82:11
We're 3:7 4:18
we've 10:9 94:12
　97:18 101:23
　102:2,11
WH 90:16
WHEREOF 105:21
WILLIAMS 2:4
wished 64:10
withdraw 11:5
witness 3:8 4:3,5 6:8
　104:14 105:11,15
　105:21 106:4
word 33:21 50:3
　53:5
work 9:19 55:6,9,12
　55:16,25 71:3 75:2
　75:5
working 15:17 56:8
Worldwide 93:15
wouldn't 36:23
write 65:9
writing 37:15

written 69:3 79:7
　84:19,25 85:2
　86:13 88:9,10 90:2
　90:4
wrong 36:6
wrote 66:12
W-A-R-L-O-P
　22:10

**X**

X 106:2
Xybernaut 83:14,19
　83:20,21
X-Y-B-E-R-N-A-...
　83:14

**Y**

yeah 5:10 18:3
　73:15 100:23
year 10:2,3 18:5
　21:6 23:13,23
　30:25
years 13:8,15 15:15
　68:12 74:13
York 1:22,22,24
　2:20,20 3:4,11,11
　12:18,20 26:12
　105:3,5,9
Young 93:17

**Z**

Zen 94:20,23
Zurich 14:15,18,21
　15:7,19 47:13,19

**$**

$100 44:23
$115 50:16
$120 51:4
$130 54:20 55:5
$250,000 50:25
$300,000 44:24 45:6
　46:5
$32,000 73:13
$40,300 73:3
$5.27 50:21

**$500,000** 45:12 91:2
**$6** 94:19
**$96** 44:20

---

**0**

**007** 38:14
**03-CIV-11566** 1:8

---

**1**

**1** 42:7 45:9 74:7
**10** 75:13 76:17 77:5
  77:11
**10:17** 46:12,13
**10:30** 46:13,15
**100** 18:24 41:3,7
**10019-6131** 2:20
**107** 100:5
**109** 83:12
**11** 47:10,14 50:5
  77:10,11 99:10
**11th** 14:15
**11,000** 38:4
**11:18** 74:7,8
**11:29** 74:8,10
**110** 83:25 84:3
**113** 85:18
**11311** 2:6
**117** 100:16,18,19,21
**12** 34:22,23 77:11
  77:20
**12:12** 101:19,20
**12:21** 101:20,22
**12:24** 104:17,18
**122** 87:15
**125** 89:2
**13** 77:13,21 78:10
**132** 89:17
**135** 90:15
**14** 54:8,9,12 65:18
  80:10 106:18
**15** 81:13,17 106:19
**157** 92:15
**158** 92:14
**16** 97:13,16,18
  106:21
**161** 93:9

**166** 94:4
**168** 94:18
**17** 60:20
**178** 95:9
**18** 54:14,16
**182** 95:17
**188** 96:6
**1934** 32:7

---

**2**

**2** 5:9 74:10 104:17
**200** 2:6
**2000** 28:22 29:3
  30:25 32:18 34:3
  34:15,23 35:4,9,10
  35:12,17 39:12
  42:9,11 56:15 57:7
  65:20
**2001** 14:15 32:11,14
  34:4 46:20 47:3,14
  76:2
**2003** 10:21 11:11
  48:23 58:9 60:10
**2004** 11:18 25:15
  56:15 57:8,23,24
  60:12,20 65:20
  97:25 98:4
**2005** 9:14 53:8
  54:14,16 55:19,20
  57:24 59:5,10,17
**2006** 1:17 3:5
  104:23 105:22
**21** 76:2 81:20
**22** 79:16
**24** 44:20
**25** 97:25 98:4
**26** 46:20 57:6 58:17
**27** 32:10 35:10
**27th** 28:22 29:3
  32:14,18 34:2,4,15
  35:4,12,17,21

---

**3**

**3,000** 37:19 38:23
  41:4 44:13,19,24
**30** 73:15 96:3,4,6,12

**96:23** 97:6
**31** 1:21 2:19 3:10
  77:5
**32** 56:16 58:23
  74:13 99:20
**34** 100:5
**35** 100:6

---

**4**

**4** 1:17 3:5 34:21
  54:19 106:5
**40** 100:15
**41** 80:22,24 81:3,22
  82:19
**41012** 5:9
**42** 83:11,16
**46** 85:15
**47** 78:10 87:7
**48** 78:16 92:19

---

**5**

**5** 42:8,11
**5,500** 37:25 43:25
  44:12
**50** 87:14,15 91:10
**52** 80:10 89:3
**52nd** 1:21 2:19 3:10
**53** 83:2,4
**538,530** 43:19
**54** 83:5 106:18
**55** 89:16
**5500** 44:8
**58** 91:11

---

**6**

**6** 46:18 50:4
**6th** 9:13 105:22
**6,000** 43:18 44:4,7
  44:15 45:3,10,15
  45:21 46:4
**65** 92:14
**66** 93:8

---

**7**

**7** 28:11,19 37:13
  43:17 44:17 45:10

**7th** 39:11
**70** 94:4,5
**71** 94:18
**720** 37:19
**72221-5438** 2:7
**74** 95:8
**75** 95:17
**77** 95:25

---

**8**

**8** 31:12 69:6,19
  79:16
**800** 37:20
**81** 106:19

---

**9**

**9** 31:18,24 34:25
  35:9 69:6,19 76:11
  76:17
**9th** 35:14
**9:09** 1:18 3:6
**97** 106:21
**98** 99:21
**980** 37:20