# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HANS A. QUAAK, ATTILIO PO and KARL LEIBINGER, on behalf of themselves and those similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA),<br><br>      Defendants. | No.: 03-CV-11566 (PBS) |
| STONINGTON PARTNERS, INC., a Delaware Corporation, STONINGTON CAPITAL APPRECIATION 1994 FUND L.P., a Delaware Partnership and STONINGTON HOLDINGS, L.L.C., a Delaware limited liability company,<br><br>      Plaintiffs,<br><br>      v.<br><br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA),<br><br>      Defendants. | No.: 04-CV-10411 (PBS) |
| GARY B. FILLER and LAWRENCE PERLMAN, Trustees of the TRA Rights Trust,<br><br>      Plaintiffs,<br><br>      v.<br><br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA),<br><br>      Defendants. | No.: 04-CV-10477 (PBS) |

JANET BAKER and JAMES BAKER, JKBAKER LLC
and JMBAKER LLC,

       Plaintiffs,

      v.

DEXIA, S.A. and DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING
CORP., SA),

       Defendants.

No.:  04-CV-10501 (PBS)

**REPLY DECLARATION OF SUSAN M. DAVIES IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL DEPOSITIONS OF DEFENDANT DEXIA BANK
BELGIUM THROUGH JEAN-PAUL CLOES, CATHERINE DECOUTERE,
IVAN DE COEN, JORIS VAN HELLEPUTTE, AND NADIA VAN HOVE**

SUSAN M. DAVIES, declares pursuant to 28 U.S.C. § 1746 that:

1.     I am a member of the Gregory P. Joseph Law Offices LLC, which represents

Plaintiffs Gary B. Filler and Lawrence Perlman, Trustees of the TRA Rights Trust ("Filler

Plaintiffs").  On June 13, 2005, the Court granted leave for me to appear *pro hac vice* in the

above-captioned action *Filler v. Dexia, S.A.*, No.:  04-CV-10477 (PBS).  Unless otherwise

indicated, I have personal knowledge of the matters addressed in this declaration.  I am over the

age of 18 and am fully competent to testify.

2.     With the consent of the Court, I will submit this reply declaration in further

support of the motion by plaintiffs in the above-captioned actions ("Plaintiffs") for an order

compelling defendant Dexia Bank Belgium ("Dexia") to produce its current managing agents

Jean-Paul Cloes, Catherine Decoutere, Ivan de Coen, Joris van Helleputte, and Nadia van Hove

for deposition by Plaintiffs pursuant to Rule 30 in Brussels, Belgium.

**Deposition Testimony of Dexia's Senior Executives Confirms that**
**<u>Cloes, Decoutere, De Coen, and Van Helleputte Are Dexia's Managing Agents</u>**

      3.      Dexia asserts that "Plaintiffs have not obtained *any* testimony from [depositions of Dexia's senior executives] indicating that the five individuals that are the subject of this motion are or were managing agents of Dexia."  (Dexia Opp. Mem. at 2) (emphasis in original).  This is false.  The deposition testimony of senior Dexia executives confirms that **Jean-Paul Cloes**, **Catherine Decoutere**, **Ivan de Coen**, and **Joris van Helleputte** were not -- as Dexia contends -- "'inferior[s]'" acting under "'close supervision or direction'" (*id.* at 3) but employees who exercised significant discretion and responsibility over matters at issue in this litigation.

      4.      **<u>Jean-Paul Cloes and Catherine Decoutere.</u>**  The testimony of Dexia executive Alain Probst flatly contradicts Dexia's unsupported assertion that the audit reports prepared by **Mr. Cloes** and **Ms. Decoutere** "merely represent recommendations given to more senior executives, who were the real decision-makers within the Bank."  (Dexia Opp. Mem. at 4.)  According to Mr. Probst:  "the conclusions and recommendations of an [internal] audit <u>are not debatable, they are applied</u>."  (**Exhibit LL** (excerpts from Probst Tr. 03/14/06) 109 line 25 – 110 line 1 (emphasis added).)  Indeed, that much is evident from the audit reports themselves (*see* Exhibits K, L, U and V to the *Declaration of Susan M. Davies in Support of Plaintiffs' Motion to Compel Depositions of Defendant Dexia Bank Belgium Through Jean-Paul Cloes, Catherine Decoutere, Ivan de Coen, Joris van Helleputte, and Nadia van Hove* executed on May 3, 2006 ("Davies Decl.")) which not only contain findings and conclusions, but direct that specific follow-up actions be taken by various departments within the bank and by senior executives such as Alain Probst and Patrick van Tiggel.  (*See especially* Davies Decl. Exhibit L at DBB037643 and Exhibit V.)  Thus, contrary to Dexia's argument, it was not Dexia's executives but the auditors themselves who were the ultimate decision-makers with respect to internal audits:  Dexia's executives did not "debat[e]" but merely "applied" the auditors' conclusions and recommendations.

5.      This conclusion is further supported by the fact that the Audit Department was not part of the bank's management hierarchy.  According to Dexia executive Claude Piret, the head of the Audit Department, Auditor General Eric De Gyns, reported directly to the CEO/President of Artesia Bank, Dirk Bruneel.  (**Exhibit KK** (excerpts from Piret Tr. 03/16/06) at 85 lines 6-8, 156 lines 15-22.)  Without such independence, **Mr. Cloes** would not have been able to conclude (as he did) that senior Dexia executives, including Mr. Piret and François Saverys, had acted in excess of their authority in deciding not to mention the Credit Default Swaps with Messrs. Lernout, Hauspie and Willaert in the credit letters for the Radial and LIC loans.  *See* below at ¶ 13.

6.      **Ivan de Coen**.  The deposition testimony of Dexia executive Jacques Janssens confirms that the Management Committee of Paribas Bank based its decision to grant a loan to Dictation on information prepared by **Ivan De Coen**.  (**Exhibit MM** (Janssens Tr. 04/20/06) at 85 line 2 – 86 line 15 (specifically referencing Davies Decl. Exh. R), 88 line 18 – 89 line 11 (specifically referencing Davies Decl. Exh. S); *cf.* Davies Decl. Exhibit B at 7.)

7.      **Joris van Helleputte.**  According to the deposition testimony of Dexia executive Philippe Steverlynck, when he worked in the Credit Secretariat of Paribas Bank during 1996-97, **Mr. Van Helleputte** was responsible for advising the bank concerning the credit risks presented by particular credit proposals, including the credit proposal for the loan to Dictation. (**Exhibit NN** (excerpts from Steverlynck Tr. 04/27/06) at 12 line 6 – 14 line 23, 34 line 23 – 36 line 19, 81 lines 3-25.)  Mr. Steverlynck's testimony indicates that during this period he – as director of the Credit Secretariat – did not closely supervise the work of **Mr. Van Helleputte** – to whom he refers as a "colleague" – and that **Mr. Van Helleputte** acted on his own initiative in preparing memoranda for other senior Dexia executives such as Mr. Janssens.  (*Id.* at 11 lines 1-6, 34 line 23 – 36 line 19.)  Mr. Steverlynck contrasts **Mr. Van Helleputte's** responsibilities with the more administrative functions (such as registration of long-term loans) performed by other employees under Mr. Steverlynck's supervision in 1996.  (*Id.* at 14 lines 6-17.)

**Depositions of Dexia's Senior Executives Have Confirmed That They Do Not Possess**
**the Information Sought from Cloes, Decoutere, De Coen, Van Helleputte, and Van Hove**

8.      Dexia argues that this Court should deny the instant motion because Plaintiffs have had the opportunity to question Dexia executive Jacques Janssens "extensively" concerning the Dictation and BTG loans, and to question several Dexia "decision-makers" who received copies of **Mr. Cloes'** and **Ms. Decoutere's** audit reports.  (Dexia Opp. Mem. at 4, 6, 7 n.10.) Dexia ignores the fact that – as Plaintiffs previously predicted – Dexia's senior executives lack personal knowledge of much of the information Plaintiffs seek.  (Davies Decl. Exh. B at 5-6.)

9.      **Dictation Loan.**  Mr. Janssens' deposition testimony concerning the Dictation loan is replete with non-responsive answers,[1] and claims of lack of knowledge[2] and lack of recollection.[3]  For example, Mr. Janssens claims to lack any knowledge concerning additional compensation and/or an "equity kicker" to be provided to Paribas Bank by L&H in connection with the Dictation loan,[4] and concerning the fact that in June 1997 Dictation sought an emergency bridge loan of $4.5 million in order to pay fees to L&H that L&H could recognize as revenue in the quarter ended June 30, 1997 and thereby avoid a negative impact on the price of L&H stock.[5]  Both of these matters are discussed in memoranda authored by **Mr. De Coen.**[6] Both of these matters are highly relevant to Dexia's scienter, particularly in light of Dexia's knowledge – testified to by Mr. Janssens – "that [L&H] could not be involved directly or indirectly in the financing provided to Dictation Consortium in order for [L&H] to recognize revenue on the monies it received from Dictation."  (**Exhibit MM** (Janssens Tr. 04/20/06) at 65

---

[1]  **Exhibit MM** (Janssens Tr. 04/20/06) at 62 line 25 – 64 line 14, 88 lines 7-17.

[2]  *Id.* at 78 lines 1-6, 78 lines 7-13, 84 lines 11-15, 86 line 22 – 87 line 6, 87 line 21 – 88 line 6, 95 lines 6-14, 96 lines 19-25

[3]  *Id.* at 55 lines 6-9, 56 lines 14-17, 58 line 23 – 59 line 2, 59 lines 3-9, 58 lines 17-22, 69 line 13-20, 78 line 24 – 79 line 4, 87 lines 8-20, 98 lines 7-13, 98 lines 14-16.

[4]  *Id.* at 78 lines 1-6, 78 lines 7-13, 78 line 24 – 79 line 4, 84 lines 11-15, 86 line 22 – 87 line 6, 87 line 21 – 88 line 6.

[5]  *Id.* at 94 line 9 – 98 line 16.

[6]  *Id.* at 85 line 2 – 88 line 17 (discussing Davies Decl. Exh. R, esp. at DBB075012), 94 line 9 – 98 line 16 (discussing Davies Decl. Exh. S, esp. at DBB074686.)

line 3 – 66 line 6.)  **Mr. De Coen** knew about these highly relevant matters when he prepared his memoranda to the Management Committee and, notwithstanding Dexia's unsupported assertion that he is unlikely to remember anything about them nine years later (Dexia Opp. Mem. at 6), Plaintiffs are entitled to test **Mr. De Coen's** recollection at a deposition.  *See Travelers Rental Co. v. Ford Motor Co.*, 116 F.R.D. 140, 143 (D. Mass. 1987) ("The plaintiff is entitled to 'test' the claim of lack of knowledge or lack of recollection by deposing the witness.")

    10.    **BTG Loan.**  Mr. Janssens is the <u>only</u> Dexia executive Plaintiffs have been permitted to depose who had <u>any</u> knowledge or recollection whatsoever about Paribas Bank's loan to BTG,[7] and Mr. Janssens' knowledge and recall were sketchy, at best.  In particular, Mr. Janssens was unable to provide information concerning the bank's knowledge of the borrower, the purpose for the loan, L&H's role in connection with the financing, the bank's reasons for violating its own procedures for authorizing draw downs on the approved credit, and the bank's consideration of a Credit Default Swap with Messrs. Lernout, Hauspie and Willaert as a means of securing the loan.[8]  Among other documents, Mr. Janssens testified that he had never seen a June 29, 1998 memorandum concerning BTG authored by **Mr. De Coen** and Patrick Faict.  (**Exhibit MM** (Janssens Tr. 04/20/06) at 118 lines 15-24.)  Plaintiffs are entitled to depose **Mr. De Coen** and **Mr. Van Helleputte** concerning their numerous memoranda about BTG.

    11.    **Artesia Securities' Analysts' Reports**.  None of the Dexia executives whom Plaintiffs have been permitted to depose has provided any information concerning the Artesia Securities' analysts' reports about L&H that were "coordinat[ed]" by **Ms. Van Hove**, the Manager of Corporate Research for Artesia Bank.[9]  (Davies Decl. Exh. W at ¶ 178.)  The

---

[7]    *See* **Exhibit OO** (excerpts from Mommens Tr. 04/19/06) at 143 line 10 – 144 line 15, 158 lines 3-15; **Exhibit KK** (excerpts from Piret Tr. 03/16/06) at 83 lines 13-15; **Exhibit PP** (excerpts from Saverys Tr. 04/26/06) at 169 line 25 – 186 line 15, 198 lines 9-17; **Exhibit NN** (excerpts from Steverlynck Tr. 04/27/06) at 99 line 6 – 100 line 21, 101 line 5 – 104 line 9; **Exhibit QQ** (excerpts from Van Riet Tr. 04/24/06) at 86 line 6 – 87 line 22.

[8]    **Exhibit MM** (Janssens Tr. 04/20/06) at 101 lines 19-24, 102 lines 7-9, 102 lines 19-24, 103 lines 4-10, 103 lines 11-22, 106 lines 12-24, 113 line 19 – 114 line 3, 115 lines 10-18, 116 lines 1-3, 116 lines 17-25, 117 lines 1-12, 117 line 22 – 118 line 2, 118 lines 3-6, 118 lines 7-10, 120 lines 17-21, 121 line 24 – 122 line 12.

[9]    **Exhibit RR** (excerpts from Janssens Tr. 04/21/06) at 255 line 19 – 259 line 19; **Exhibit OO** (excerpts from Mommens Tr. 04/19/06) at 310 line 1 – 311 line 18, 340 line 6 – 341 line 22; **Exhibit PP** (excerpts from Saverys Tr. 04/26/06) at 31 lines 12-21; **Exhibit SS** (excerpts from Steverlynck 04/28/06) at 134 line 11 – 135 line 11.

deposition testimony of Dexia executives indicates that, other than **Ms. Van Hove**, the persons likely to be most knowledgeable about the Artesia Securities' analysts' reports are Rene Avonts,[10] and Stefane Decraene.[11]  Mr. Avonts, who resides in Belgium (beyond the subpoena power of this Court), is no longer employed by Dexia.  (Davies Decl. Exh. G at 4, 18.)  It is Dexia's current position that Mr. Decraene is too senior an executive to be made available for deposition by Plaintiffs absent some special showing of need for his testimony.  (*See* letter dated May 19, 2006 from Jeff E. Butler, Esq., Clifford Chance US LLP, to Patrick L. Rocco, Esq. annexed as **Exhibit TT** hereto.)

      12.    **Internal Audit Reports.**  Contrary to Dexia's assertion, Plaintiffs' examination of Dexia executives Claude Piret and François Saverys concerning the internal audit reports prepared by **Mr. Cloes** and **Ms. Decoutere** has not provided the information that Plaintiffs seek from the auditors themselves.  (*Contra* Dexia Opp. Mem. at 4.)  Mr. Piret testified at his deposition that he had no involvement in the internal audit function of the bank, and had never been involved in an internal audit of a credit within his department.[12]  Mr. Saverys testified that he does not know how an internal audit is organized,[13] and could not recall discussions with anyone in the Audit Department about **Mr. Cloes'** and **Ms. Decoutere's** reports.[14]  As regards the audit reports themselves, Mr. Saverys was unable to provide any insight into their meaning.[15]  Indeed, his testimony amounted to little more than reading what was written in the reports.[16]

---

[10]  **Exhibit RR** (excerpts from Janssens Tr. 04/21/06) at 258 lines 2-16.  *See also* Davies Decl. Exh. P.

[11]  **Exhibit SS** (excerpts from Steverlynck Tr. 04/28/06) at 133 lines 1-19.  See also Davies Decl. Exh. P.

[12]  **Exhibit KK** (excerpts from Piret Tr. 03/16/06) at 155 line 24 – 156 line 14.

[13]  **Exhibit PP** (excerpts from Saverys Tr. 04/26/06) at 20 lines 7-11.

[14]  **Exhibit UU** (excerpts from Saverys Tr. 4/25/06) at 95 lines 13-25 (referring to Davies Decl. Exh. K); **Exhibit PP** (excerpts from Saverys Tr. 4/26/06) at 74 lines 4-7 (referring to Davies Decl. Exh. V), 81 line 20 – 82 line 3 (referring to Davies Decl. Exh. U).

[15]  *E.g.*, **Exhibit UU** (excerpts from Saverys Tr. 4/25/06) at 98 line 20 – 99 line 6; **Exhibit PP** (excerpts from Saverys Tr. 4/26/06) at 19 line 25 – 20 line 11, 71 lines 18-20, 81 lines 6-13.

[16]  **Exhibit UU** (excerpts from Saverys Tr. 4/25/06) at 91 line 19 – 92 line 8, 92 line 22 – 94 line 11, 94 line 18 – 94 line 12, 96 line 5 – 99 line 6; **Exhibit PP** (excerpts from Saverys Tr. 4/26/06) at  68 line 11 – 77 line 4.

13.      Moreover, it is simply not the case that Messrs. Piret and Saverys were the "real decision-makers" to whom **Mr. Cloes** and **Ms. Decoutere** made "mere[ ] recommendations." (*Contra* Dexia Opp. Mem. at 4.)  In fact, **Mr. Cloes'** January 20, 2000 report expressly concludes that Messrs. Piret and Saverys, as well as other members of the bank's Credit Committee 1, acted contrary to the unanimous advice of Dexia's lawyers – and in excess of their authority – in deciding not to mention the Credit Default Swaps with Messrs. Lernout, Hauspie and Willaert in the credit letters for the Radial and LIC loans.[17]  Needless to say, at their depositions both Mr. Saverys and Mr. Piret expressed disagreement with **Mr. Cloes'** conclusion on this subject,[18] further necessitating the opportunity for Plaintiffs to examine **Mr. Cloes** concerning the basis for his conclusion.

14.      In summary Plaintiffs respectfully submit that the information they have been able to obtain from depositions of senior Dexia executives has not satisfied their need to conduct further depositions of Dexia's knowledgeable managing agents, within the limit of 25 depositions to which Dexia has agreed.  Any remaining doubt this Court may have concerning whether **Cloes**, **Decoutere**, **De Coen**, **Van Helleputte**, and **Van Hove** are properly characterized as Dexia's managing agents "should be resolved in favor of [Plaintiffs] because the ultimate determination – that [Dexia] is or is not bound by the testimony of [these individuals] – 'is to be made by the trial court.'"  *U.S. v. The Dorothy McAllister*, 24 F.R.D. 316, 318 (S.D.N.Y. 1959).

## Certification Under D. Mass. Local Rules 7.1(a)(2) and 37.1(b)

15.      Pursuant to Local Rules 7.1(a)(2), I hereby certify that on May 24, 2006, I conferred by telephone with James B. Weidner, Esq. of Clifford Chance US LLP, counsel for Dexia, concerning the filing of the instant motion.  Mr. Weidner indicated that Dexia would not consent to Plaintiffs' application for leave to file the Reply Declaration.

---

[17]  **Exhibit UU** (excerpts from Saverys Tr. 04/25/06) at 91 line 19 – 92 line 8; **Exhibit VV** (excerpts from Piret Tr. 03/17/06) at 71 line 7 – 74 line 9.  *See also* Davies Decl. Exh. K at DBB083285, DBB083286.

[18]  **Exhibit UU** (excerpts from Saverys Tr. 04/25/06) at 92 lines 6-8; **Exhibit VV** (excerpts from Piret Tr. 03/17/06) at 72 line 18 – 73 line 6.

WHEREFORE, and for the reasons set forth above, and in Plaintiffs' initial moving papers, Plaintiffs respectfully request that this Court enter an order:

(1)    compelling defendant Dexia Bank Belgium to produce Jean-Paul Cloes, Catherine Decoutere, Ivan de Coen, Joris Van Helleputte, and Nadia Van Hove for deposition by Plaintiffs in the above-captioned actions, and

(2)    for such other and further relief as the Court deems just and proper.


I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York this 24th day of May 2006.


SUSAN M. DAVIES
N.Y. Attorney Registration #2413508




## CERTIFICATE OF SERVICE

I hereby certify that this document will be filed through the ECF system, which filing will constitute service of the document upon all registered ECF users as identified on the Notice of Electronic Filing (NEF). A paper copy of this document has been mailed in accordance with FED. R. CIV. P. 5(b) to all those case participants not identified on the NEF as electronic recipients.

/s/ Susan M. Davies
N.Y. Attorney Registration # 2413508

# EXHIBIT KK

Excerpts From The
March 16, 2006
Deposition of
Claude Piret

83

13     Q.   Did Paribas to your knowledge provide

14  financing for the Brussels Translation Group?

15     A.   I don't remember any more, it's possible.

85

6        A.    Mr Bruneel became the CEO President of the

7    Management Board and Mr Romagnoli became I think the

8    Chairman.

155

24    MR ROCCO:    Sir what involvement, if any, do

25    you have with the Internal Audit function of the Bank?

156

1        A.    None.

2        Q.    Do you get involved when the Internal Audit

3    takes a look at a credit within your Department?

4        A.    It can be, but not automatically.

5        Q.    What are the instances where you would be

6    involved in the Internal Audit of a credit within your

7    Department, can you give me an example?

8        A.    None.

9        Q.    There's none?

10       A.    None.

11       Q.    I misunderstood you, I thought you said there

12    could be instances where you would be involved?

13       A.    No, to the best of my knowledge there were

14    none.

156

15    Q.    Do you know when the merged entity, now I am

16    speaking of Artesia, to whom the Internal Audit

17    function reported?

18    A.    I think it was to the CEO.

19    Q.    Directly to the CEO?

20    A.    Directly to the CEO but you can deduce that

21    from the document with the number 17 that you showed me

22    today.    Normally it should be there.

# Exhibit LL

Excerpts From The
March 14, 2006
Deposition of
Alain Probst

109

25      A.    And the conclusions and recommendations of an

110

1   audit are not debateable, they are applied.

EXHIBIT MM

April 20, 2006
Deposition of
Jacques Janssens

1

```
 1
 2
                     THE UNITED STATES DISTRICT COURT
 3                   FOR THE DISTRICT OF MASSACHUSETTS
 4  ----------------------------------
    HANS A QUAAK, ATTILIO PO AND KARL )
 5  LEIBINGER, on behalf of           )
    themselves and those similarly    )
 6  situated                          )
                                      )
 7              Plaintiffs            )No:
                                      )03-CV-11566(PBS)
 8          v                         )
                                      )
 9  DEXIA, S.A. and DEXIA BANK        )
    BELGIUM (formerly known as        )
10  ARTESIA BANKING CORP S.A.         )
                                      )
11              Defendants            )
    ----------------------------------
12  STONINGTON PARTNERS, INC.,        )
    a Delaware Corporation,           )
13  STONINGTON CAPITAL APPRECIATION   )
    1994 FUND LP, a Delaware          )
14  Partnership and STONINGTON        )
    HOLDINGS LLC., a Delaware         )
15  Limited Liability Company         )
                                      )
16                                    )04-CV-10411(PBS)
                Plaintiffs            )
17                                    )
            v                         )
18                                    )
    DEXIA SA and DEXIA BANK BELGIUM   )
19  (Formerly known as ARTESIA        )
    BANKING CORP., SA                 )
20                                    )
                Defendants            )
21  ----------------------------------
22
23
24
25
```

2

```
 1    ----------------------------------
 2    GARY B FILLER and LAWRENCE         )
      PELMAN, trustees of the TRA        )
 3    Rights Trust                       )
                                         )
 4                   Plaintiffs          )
                                         )
 5           v                           )
                                         )
 6    DEXIA, S.A. and DEXIA BANK         )
      BELGIUM (formerly known as         )
 7    ARTESIA BANKING CORP S.A.          )
                                         )
 8                   Defendants          )
      ----------------------------------
 9    JANET BAKER and JAMES BAKER        )
      JK BAKER LLC and JM BAKER LLC      )
10                                       )
                                         )
11                   Plaintiffs          )
                                         )
12           v                           )
                                         )
13    DEXIA SA and DEXIA BANK BELGIUM    )
      (Formerly known as ARTESIA         )
14    BANKING CORP., SA                  )
                                         )
15                   Defendants          )
      ----------------------------------
16
17
                        Deposition of:
18
                      JACQUES JANSSENS
19
                  taken at the offices of
20
                        Dal & Veldekens
21          Rue de l'Aurore/Dageraadstraat 18
                          Brussels
22
                on Thursday, 20th April 2006
23
                           DAY 1
24              ---------------------
25          Reported by:  Paul Brincau, MBIVR ACR
```

```
                                                    3
 1
 2                    A P P E A R A N C E S
 3    Appearing on behalf of the Plaintiffs (Stonington):
 4           STEPHEN FOYTLIN ESQ
 5           Bernstein Litowitz Berger & Grossman LLP
 6           1285 Avenue of the Americas
             New York NY 10019
 7           --------------------
 8    For class plaintiffs Dr. Quaak
 9    and Messrs Po and Leibinger:
10           PATRICK ROCCO ESQ
11           Shalov Stone & Bonner LLP
             485 Seventh Avenue, Suite 1000
12           New York, NY 10018
13           ---------------------
14    Appearing on behalf Janet Baker and James Baker:
15           GEORGE R. COE ESQ
16           Boies Schiller & Flexner LLP
             255 South Orange Avenue, Suite 905
17           Orlando, Florida 32801-3456
18           --------------------
19    For the defendants:
20           JEFF E. BUTLER ESQ
             MARYANA M. KODNER ESQ
21           Clifford Chance US LLP
22           31 West 52nd Street
             New York, NY 10019 6131
23
             ---------------------
24
25
```

4

```
 1
 2    In attendance for Clifford Chance:
 3         Eline Tritsmans
 4         Benoit Allemeersch
 5    Court Reporter and Videographer:
 6         Paul Brincau
 7         Pat Kirk
 8         Anglo American Court Reporters
 9         150 The Minories
10         London EC3N 1LS
11          England
12    ------------------------
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

1
2
                    E X H I B I T S
3
            Number                    Page
4
            1            -            75
5           2                         79
            3                         85
6           4                         98
            5                         100
7           6                         103
            7                         105
8           8                         111
            9                         118
9           10                        143
            11                        195
10          12                        205
            13                        208
11          14                        219
            15           -            220
12          16                        221
            17                        224
13          18                        236
            19                        236
14          20                        236
            21                        236
15          22                        236
            23                        236
16          24                        245
            25                        246
17          26                        248
            27                        249
18          28                        256
      -------------------------------------
19
      (All documents and exhibits were retained by
20    counsel. Consequently the accuracy of the spelling
      of some [Belgian/Dutch/French] names and of some of
21    the content of quotations could not be verified)
22
23
24
25

6

1

2

3          (The deposition commenced at 09.05)

4     Interpreter sworn.

5     BERNARD Mr. Janssens, sworn.

6     Examined by MR. ROCCO.

7                    Q.   Just for the record, the oath is

8     being administered to both the interpreter and the

9     witness pursuant to our written stipulation that

10    the court reporter may administer such oath here in

11    Belgium, correct?

12                   MR. BUTLER: That is correct.

13                   Q.   Mr. Janssens, good morning.   My

14    name as you have heard is Pat Rocco and I represent

15    the class plaintiffs in this litigation.   You

16    understand, sir, that you are under oath?

17                   A.   Yes.

18                   Q.   That means you have an

19    obligation to tell the truth, do you understand

20    that?

21                   A.   Yes.

22                   Q.   Have you ever been deposed

23    before in an American proceeding?

24                   A.   No.

25                   Q.   Have you ever given testimony in

1    court before?

2                    A.   No.

3                    Q.   Have you had a chance to discuss

4    the nature of today's proceedings with your

5    attorneys?

6                    MR. BUTLER: Let me just caution the

7    witness that that is a 'yes' or 'no' question.

8                    A.   Yes.

9                    MR. ROCCO: And so you understand the

10   nature of today's proceedings, is that correct?

11                   A.   That's right.

12                   Q.   There will be a transcript made

13   of today's proceedings of everything that I say,

14   that you say and the lawyers around the table say,

15   do you understand that?

16                   A.   Yes.

17                   Q.   If for some reason you do not

18   understand a question that I ask please ask me to

19   rephrase it and I will be happy to try and make it

20   more understandable, okay?

21                   A.   Yes.

22                   Q.   If for some reason you do not

23   ask me to do that or rephrase a question, I am

24   going to assume you understand my question,

25   understood?

8

1          A.   Okay.

2          Q.   I understand that you are not

3  comfortable proceeding today in English, is that

4  correct?

5          A.   Yes, yes, that's right.

6          Q.   And we have a French interpreter

7  here for your convenience.

8          A.   Thank you.

9          Q.   I will be discussing often today

10 Artesia Bank.  I may use the term Artesia Bank and

11 when I do that I mean to refer to Artesia Bank

12 Incorporation and I mean to also include its

13 predecessor bank, Bacob Bank and Bank Paribas, is

14 that understood?

15         A.   Yes.

16         Q.   So if I use the term 'Artesia

17 Bank' or 'bank', I am referring to Artesia Bank and

18 its predecessor, is that understood?

19         A.   Yes.

20         Q.   And if I want to be more

21 specific as a to a particular predecessor I will

22 specify, understood?

23         A.   Okay.

24         Q.   I will also be referring to

25 Lernout and Hauspie Speech Products NV, a former

9

1    client of Artesia Bank, and when I do that I may

2    refer to them as 'L&H' or 'Lernout and Hauspie', is

3    that understood?

4              A.  Yes.

5              Q.  Mr. Janssens, did you prepare

6    for your deposition for today?

7              A.  Yes.

8              Q.  How did you do that?

9              MR. BUTLER: Let me just caution the

10   witness that you can explain who you met with and

11   when we met but you should not talk about the

12   substance of any of our conversations.

13             A.  I met with our two lawyers who

14   are here today yesterday for about four hours.

15             MR. ROCCO: Was that the only time

16   you met with attorneys to prepare for your

17   deposition?

18             A.  Yes.

19             Q.  Did you review any document in

20   preparation for your deposition?

21             MR. BUTLER: Once again, that is a

22   'yes' or 'no' question?

23             A.  Yes.

24             MR. ROCCO: When did you do that?

25             A.  Yesterday.

1               Q.   Was there any other time you

2    reviewed document to prepare for this deposition?

3               A.   No.

4               Q.   Do the documents that you

5    reviewed yesterday help you to recall any of the

6    facts that are in issue in this law suit?

7               A.   Yes.

8               Q.   Can you generally describe for

9    me which documents helped you to recall facts?

10              A.   Reviewed the document from - I

11   reviewed the documents coming from the hearing by

12   the Belgian federal police as well as internal bank

13   documents that were used as part of the

14   decision-making process for the credits.

15              Q.   Did you attempt to review

16   documents for all of the loans on which you had

17   some involvement that related to Lernout and

18   Hauspie?

19              MR. BUTLER: I object to the form of

20   the question, but the witness can answer.

21              A.   The answer is no.

22              MR. ROCCO: Why not?

23              A.   I did not think it was

24   necessary.

25              Q.   Why didn't you think it was

11

1   necessary?

2                       A.   My personal opinion.

3                       Q.   What was the basis for your

4   personal opinion?

5                       A.   I just repeat that it is

6   personal opinion.

7                       Q.   Did you believe it was important

8   to be versed in the facts that are alleged in

9   complaint in this matter?

10                      MR. BUTLER: Can I just ask for

11   clarification - do you mean for the purpose of this

12   deposition?

13                      MR. ROCCO: Yes.

14                      MR. BUTLER: Did he have a personal

15   opinion about how he should prepare, is that the

16   question?

17                      MR. ROCCO: No.  My question is my

18   question, Jeff.

19                      MR. BUTLER: (To the interpreter) Why

20   don't you interpret that.

21                      INTERPRETER: Can you repeat exactly

22   the clarification you requested just in the same

23   terms.

24                      MR. ROCCO: Can you ask the question

25   as well.

12

1                    (Record read)

2                    MR. BUTLER: Let me just object for

3      the record to the form of the question, but the

4      witness can answer if he can.

5                    A.  I don't understand the question.

6                    MR. ROCCO: Are you aware of

7      allegations that have been made against the bank in

8      this case?

9                    A.  Yes, I think so.

10                   Q.  Do you feel any obligation to

11     familiarise yourself with the facts that are at

12     issue in this law suit in order to give complete

13     testimony here today?

14                   MR. BUTLER: Objection to form.

15                   MR. ROCCO: You can answer.

16                   A.  I do not wish to answer.

17                   Q.  There is not a basis on which

18     you can refuse to answer that question, so I am

19     going to have to insist that you do answer.

20                   MR. BUTLER:  Can I hear the original

21     question again please.

22                    (Record read)

23                   MR. BUTLER: Mr. Janssens, if you

24     have an opinion about that, you can feel free to

25     answer.

13

```
 1              MR. ROCCO: I haven't asked for an
 2   opinion, I asked him if he had an obligation.
 3              MR. BUTLER: I am to trying help you
 4   Pat because he did not understand the question.
 5              MR. ROCCO: He did not tell me he did
 6   not understand my question, Jeff.  If you are going
 7   to coach the witness, this is going to be a very
 8   short deposition before we go to the magistrate.
 9              MR. BUTLER: Let me just say, he did
10   say he did not understand your question.  I am just
11   trying to help.  I can lodge my objections if you
12   don't want me to try to help.  If this man
13   understands your question, then I won't do that.
14              MR. ROCCO: He has not said he did
15   not understand my question.  Now that you have
16   coached him, perhaps he will.
17              MR. BUTLER: I am not trying to coach
18   the witness.
19              MR. ROCCO: You obviously are, Jeff,
20   and it's intolerable.
21              MR. BUTLER: Once again I state my
22   objection for the record and you can answer the
23   question, you can have it repeated.
24                   (Record read)
25              A.  I left the bank over six months
```

14

1    ago, but my answer to that question would be 'yes',

2    but I would like to nuance this by saying that I

3    have no contact with the bank, so my possibilities

4    of being perfectly aware of everything are more

5    restricted than in the past.

6                    Q.    Do you currently receive any

7    compensation from Dexia Bank?

8                    A.    No.

9                    Q.    Do you have any consulting

10   arrangement with the bank?

11                   A.    No.

12                   Q.    Have you been offered any pay

13   for appearing for your deposition or preparing for

14   the same?

15                   A.    No.

16                   Q.    Do you know who is paying for

17   your attorneys who are representing you here today?

18                   A.    Dexia Bank.

19                   Q.    Have you retired from the bank,

20   sir?

21                   A.    Yes.

22                   Q.    During your tenure with Artesia

23   Bank can you tell me what the official language, if

24   any, there was for the bank?

25                   A.    I spent more than ten years in

15

1    the bank but there are two official languages -

2    French and Dutch.

3              Q.  And did you converse in both

4    languages when you would prepare or communicate in

5    documents with your co-workers at the bank?

6              MR. BUTLER: Objection to form.

7              MR. ROCCO: You can answer.

8              A.  The answer is yes, and it was a

9    mix of both languages.

10             Q.  So, sir, are you comfortable

11   reading and understanding Dutch documents?

12             A.  Yes.

13             Q.  And you are of course

14   comfortable in French as well, is that correct?

15             A.  Yes.

16             Q.  Do you read and comprehend

17   English?

18             A.  Yes.

19             Q.  Did you have occasion to

20   communicate in English at any time while you worked

21   for Artesia Bank?

22             A.  Is this question relating to

23   Lernout and Hauspie or is it more general?

24             Q.  It is general, sir.

25             A.  The answer is 'yes', but quite

16

1    rarely.

2                   Q.    Yesterday when you prepared with

3    your for attorneys from Clifford Chance what

4    language did you use?

5                   A.    English.

6                   Q.    And did you meet with only the

7    two lawyers from Clifford Chance that are seated

8    here today from the New York office?

9                   A.    Yes.

10                  Q.    I would like to find out a

11   little bit about your job history with the bank. If

12   you could tell me when you first became employed by

13   either Artesia Bank or any of its predecessors?

14                  A.    I started employment with

15   Paribas in 1972, and for several years I was in

16   sales functions up until about 1989 when I became

17   head of credit for Paribas again. Then in 1998 with

18   the merger of Bacob and Paribas, I became head of

19   credit at Artesia up until the end of 1999.

20                  Q.    After 1999 did you maintain a

21   position with Dexia Bank?

22                  A.    Yes.

23                  Q.    What positions did you hold with

24   Dexia Bank?

25                  A.    Between 2000 and 2002 I was risk

1    advisor in corporate banking and between 2002 and

2    2005 I was delegated director for a subsidiary

3    which is called Parfibank up until my retirement.

4                  Q.  When exactly was your

5    retirement, sir?

6                  A.  September 2005.

7                  Q.  Did you retire with a pension

8    from the company?

9                  A.  Yes.

10                  Q.  I would like to go back to your

11    position as the head or director of credit of

12    Paribas Bank from 1989 up to the merger between

13    Bacob and Paribas.  Can you please describe your

14    duties and responsibilities in the position as the

15    head of credit at Paribas Bank?

16                  A.  It had to do with managing

17    credit risk for companies and individuals although

18    this was a small part of the business at Paribas

19    Bank; also the counter party risk for banks, so on

20    the one hand I had to - I was in charge of

21    supervising the preparation of the documents to be

22    submitted to the loan committee that was the

23    decision-making body, the loan committee was the

24    one granting new credits.  I was in charge of

25    personally surveying the files, the documents, and

1    then of presenting them to the committee, and in

2    the majority of cases of suggesting a decision to

3    the committee.  On the other hand I was also

4    responsible for supervising the execution of

5    decisions, that is the drafting and the

6    implementation of credit contracts.  I also

7    supervised the evolution of the credits throughout

8    the lifetime of the credit.

9    Q.  I am not sure I understood which

10    part of your practice at Paribas was a small part

11    of the bank practice.  Could you please explain

12    that?

13    A.  I just wanted to say that there

14    were few credits for individuals in our bank.

15    Q.  So Paribas was more concerned

16    with corporate clients, is that correct?

17    A.  That's right.

18    Q.  Did you sit on any Credit

19    Committee during your time at Paribas?

20    A.  Yes, I think I said it in my

21    previous answer.

22    Q.  Could you tell me which Credit

23    Committee you sat on?

24    A.  Several, of course.  I was in

25    the management committee, which is the one dealing

1   with the biggest credit, the biggest in terms of

2   the month. I was also in the committee just below

3   this management committee, that is the lower

4   committee, the second tier committee.  Both

5   management committee and this lower committee had

6   one weekly session.  And I also had a third

7   committee that is below the second tier committee,

8   and there were twice weekly sessions.

9               Q.  Do you recall the money amount

10  for the loan at each level of the three committees?

11              A.  These amounts have varied over

12  time, but talking about between 95 and 98 roughly.

13  The third tier committee, so the lowest committee,

14  was 100 million Belgian Francs, the second one was

15  up to 300 million Belgian Francs, and the

16  management committee was anything over 300 million

17  Belgian Francs.

18              Q.  In your function as the head of

19  credits at Paribas Bank, did you both present

20  proposals to the Credit Committee and approve them

21  as a member of the Credit Committee?

22              MR. BUTLER: Objection to form.

23              A.  I can answer to this question.

24  So for committees 2 and 3 I am involved in the vote

25  but I am not the one who presents the case, and for

1    the management committee I am the one presenting

2    the case but I do not vote.

3                Q.  Directing your attention to the

4    last year of Paribas prior to the merger with

5    Bacob, can you tell me who worked for you in your

6    role as director of credits?

7                A.  I am not too sure about the

8    number of people, but there must have been between

9    60 and 70 different people.

10               Q.  Generally what were the titles

11   of those 60 or 70 people?

12               MR. BUTLER: Objection to form of the

13   question.

14               A.  There are several levels of

15   responsibility and of know how.  There were

16   director assistants, I think there were about five

17   of them called heads of credit secretariat, and

18   they had people working for them.  There are two

19   categories of people working for them - the credit

20   analysts.  They were the ones who prepared the

21   files and who looked at the risk analysis; I think

22   I talked earlier about the supervision part of my

23   job. And the other category of people were the file

24   managers, they were the ones in charge of the

25   material preparation of the credit files before and

21

1    after the decision of credit was made.

2                    MR. ROCCO: Do you recall in the

3    period 1997 to 98 who the credit secretariats were

4    at Paribas?

5                    A.  Some of them, yes.

6                    Q.  Could you tell me the ones you

7    remember?

8                    A.  Van der Vei, Lequarre, Nossent,

9    Steverlynck, and for the other names I don't recall

10   them right now.

11                   Q.  And all these credits

12   secretariats reported to you, is that correct?

13                   A.  Yes.

14                   Q.  Could you tell us what the

15   responsibilities were of the credit secretariat

16   during this time period of 97 to 98?

17                   A.  So each one for the portfolio

18   that the person manages has the responsibility on

19   the one hand of studying applications and of

20   preparing files for the decision of the committee,

21   and on the other hand to carry out the decisions of

22   the committee, that is to implement the credits

23   that were granted and to manage the same credits

24   through their lifetime.

25                   Q.  And did the credit analysts

1    report to the credit secretariats?

2                      A.   Yes.

3                      Q.   In the years 1997 to 98 to whom

4    did you report at Paribas?

5                      A.   In 97/98 I think it was Phillip

6    Romagnoly.

7                      Q.   And after Mr. Romagnoly to whom

8    did you report?

9                      A.   We are talking after 98 and we

10   are talking about Artesia?

11                     Q.   That is correct.

12                     A.   It was Mr. Piret.

13                     Q.   Did you begin reporting to Mr.

14   Piret as soon as the Bacob Paribas merger was

15   agreed to - withdraw that question. Did you begin

16   reporting to Mr. Piret after the merger between

17   Bacob and Paribas?

18                     A.   Yes, but it is little bit

19   complicated, because the acquisition of Paribas

20   Bacob occurred in 1997 but the merger did not come

21   until 1998, and between acquisition and the merger

22   I still reported to Mr. Romagnoly, and after the

23   merger in 1998 I reported to Mr. Piret.

24                     Q.   Did you report to anyone else

25   after the merger was completed?

1          A.  The answer is 'no' as the head

2    of global credit risk, but when I changed position

3    to become risk advisor of corporate banking, the

4    answer is 'yes', I reported to Geert Dauwe.

5          Q.  Did your responsibilities change

6    as the director of credits once the Paribas Bacob

7    merger was completed?

8          A.  Yes.  In addition to my existing

9    responsibilities I was also in charge of managing

10   the Bacob credit risk, that is the credit risk of

11   the portfolio of Bacob, which became a part of the

12   Artesia portfolio, and I was also managing the

13   credit risk of Bacob subsidiaries.

14         Q.  What were the Bacob

15   subsidiaries?

16         A.  There was a US subsidiary but I

17   cannot find the name right now (in Seattle) that

18   dealt mostly with the real estate loans.  There was

19   one in Belgium that worked in leasing.  There was

20   also factoring subsidiary, and at the time of the

21   merger we bought two subsidiaries, one in France

22   and one in the Netherlands.

23         Q.  After the merger between Bacob

24   and Paribas, did the position of the credit

25   secretariat remain?

24

1              A.  Yes.

2              Q.  Did the responsibilities of the

3    credit secretariat remain the same as you described

4    them for Paribas?

5              A.  Yes.

6              Q.  In your role as director of

7    credit of Artesia Bank, did you have any regular

8    contact with customers of the bank?

9              A.  I didn't have any regular

10   contact with customers, but I could occasionally

11   have contact with the customer.

12             Q.  How about the credit

13   secretariat, would they be in regular contact with

14   the bank's customers?

15             A.  They were in contact with

16   customers but I would not say in regular contact,

17   because the contacts were not really frequent.

18             Q.  Could you tell me how frequently

19   the contacts were between the credit secretariat

20   and clients?

21             A.  It is difficult to answer this

22   question. I would say it was really on a case by

23   case basis.  I would say that the general criterion

24   for having more contacts was when the risk evolved,

25   became more sensitive or more difficult than has

1   been planned.

2                   Q.   Would it be unusual for a credit

3   secretariats to be in contact every month with a

4   customer?

5                   MR. BUTLER: Objection to form.

6                   MR. ROCCO: You can answer.

7                   MR. ROCCO: I will rephrase; I

8   withdraw the question.  Can you tell me as a matter

9   of weeks or days or months how frequently credit

10  secretariats would be in contact with the customers

11  of the bank under normal circumstances.

12                  MR. BUTLER: Objection to form.

13                  MR. ROCCO: You can answer.

14                  A.   I would like to have a precision

15  to really understand what you mean by 'normal

16  circumstances'.  We are talking about a credit that

17  goes along as planned with no difficulty

18  whatsoever.

19                  Q.   Let's do it both ways, sir.

20  First tell me when a credit goes along normally as

21  planned, and then tell me when it does not go along

22  as planned, how frequently the contact would be

23  between a credit secretariat and the customer?

24                  A.   There is no problem at all.  I

25  would say two to three times a year, and otherwise

26

1    I would say once a month.

2                    Q.   Does the contact with the

3    customer depend on what type of loan was issued by

4    the bank?

5                    A.   No, not really.

6                    Q.   So it's clear, if there was a

7    straight loan versus a revolving minor credit or

8    bridge loan, would it make any difference in terms

9    of the level of contact with the customer?

10                   MR. BUTLER: Objection to form.

11                   MR. ROCCO: You can answer.

12                   A.   It seems to me that for a

13   straight loan or revolving loan there should not be

14   any differences in terms of contacts. But for

15   bridge loan, it is a short term loan, so it seems

16   normal that there should be more contact,

17   especially if the maturity date is coming up.

18                   Q.   Did the credit risk analysts

19   have contact with customers of the bank?

20                   A.   The character of credit risk

21   analysts is usually such that they do not really

22   like having contacts with customers.  However, I

23   encourage them to have a few contacts so that they

24   can have a vision of risk, not just a theoretical

25   law based on accounting.  So the answer here is

27

1    'yes', but the contacts were very few and

2    infrequent.

3                    Q.  I want to go back a moment to

4    one of the subsidiaries that you mentioned for

5    Bacob. What was the name of the factoring

6    subsidiary?

7                    A.  Artesia Factors.

8                    Q.  And can you tell me what the

9    business of Artesia Factors was?

10                   A.  It is a form of credit based on

11   the portfolio of invoices issued by a customer.

12   The technique is the financing of this portfolio of

13   invoices until they are paid by the debtor.  So, as

14   I said, this includes the financing part, but also

15   the management of the accounts payables, and often

16   there is also an insolvency insurance in case the

17   debtor does not pay.

18                   Q.  I want to switch gears again

19   back to your job history. Were you ever a member of

20   the board of directors for Artesia bank or its

21   predecessors?

22                   A.  No.

23                   Q.  Was your position as the

24   director of credits one as an officer of the bank?

25                   A.  Yes.

28

1                    Q.   In the course of preparing loan

2    proposals would you obtain confidential information

3    from clients of the bank?

4                    A.   Is it a question that is

5    concerning me directly, or are you asking me if the

6    bank received confidential information?

7                    Q.   I will start with whether the

8    bank received confidential information.

9                    A.   It could happen, but I do not

10   think it was too frequent.

11                   Q. Would the financial data that

12   would be provided by corporate clients of the bank

13   be sensitive data that was confidential?

14                   A.   I cannot see the relationship

15   with the previous question.

16                   Q.   Is it true that during the

17   course of the banks processing of loans, they would

18   obtain sensitive financial data from commercial

19   clients?

20                   A.   We are talking about accounting

21   data?

22                   Q.   It could be accounting; any kind

23   of financial data.

24                   A.   I think I answered a question

25   that was quite close to this one. I said that it

29

1    could happen, yes, that the bank received

2    information from its customer that the customer

3    would consider confidential.  It's information that

4    the customer would not want the competition to know

5    about because it would give some idea or some

6    indication of the state of business, or that type

7    of information.

8                    Q.  And under those circumstances

9    did the bank take measures to make sure that that

10   information from the clients remained confidential?

11                   A.  First of all the information

12   that was labelled as confidential was not broadcast

13   throughout the bank, it was just told to a limited

14   number of people. Then the confidentiality of this

15   information was underlined to these people who were

16   given the information, and finally the general

17   rules of conduct of the bank is to preserve

18   confidentiality.

19                   Q.  So the bank recognised that it

20   had a responsibility to preserve the

21   confidentiality of the information that was

22   provided by customers of the bank, is that true?

23                   A.  Yes.

24                   Q.  As the director of credit at

25   Paribas Bank during this period 1997 to 98, were

1    you familiar with the loan procedures that were

2    used by the bank?

3                    A.  I think so.

4                    Q.  Did credits that were in excess

5    of a hundred million Belgian Francs require the

6    approval of the highest level Credit Committee 1?

7                    A.  The answer is 'yes'.

8                    Q.  Was there any exception by which

9    a loan could be approved in excess of 300 million

10   Belgian Francs, for instance, without the initial

11   consent of the highest Credit Committee?

12                   A.  Yes, there was one emergency

13   procedure.  The decision could be made by two

14   members of the management committee or by the

15   president of the bank and myself, and this decision

16   was then to be ratified the following session of

17   the Credit Committee.

18                   Q.  Who was the president of the

19   bank during this time period 97 to 98?

20                   A.  Mr. Romagnoly.

21                   Q.  What would constitute an

22   emergency to justify the use of the emergency loan

23   procedures?

24                   A.  I could  give several examples,

25   but the one that comes to mind is the need to give

1   an answer, because the customer has already

2   received an answer from another bank and cannot

3   wait for our answer.

4               Q.  Was Mr. Geert Dauwe a member of

5   the management committee of Paribas during the time

6   period 97 to 98?

7               A.  I think so, yes.

8               Q.  So as a member of the management

9   committee his signature alone wouldn't be

10  sufficient under the emergency procedures to

11  approve a loan of more than 300 million Belgian

12  Francs, correct?

13              A.  That's right.

14              Q.  What if the amount were just

15  under 300 million Belgian Francs, what was the

16  procedure under those circumstances in an

17  emergency?

18              A.  I am not sure I remember, but I

19  think the approval of two people, one of which was

20  from the management committee and the other being

21  myself, was needed.

22              Q.  I want show you what has been

23  mark as Probst exhibit 1 and ask you if you can

24  identify that document (Handed).

25              A.  (Perused document) Yes.

1                          Q.   Do you recognise this document,

2      sir?

3                          A.   Yes.

4                          Q.   Can you tell me what it is?

5                          A.   This document describes two

6      procedures, one which is the emergency procedure we

7      just talked about and the other one which is a

8      procedure for overspanning; so when the amount of

9      the line of credit has been overpassed.

10                         Q.   This document is dated March 4,

11     1999.  My question is whether the same or similar

12     procedures applied to emergency situations prior to

13     this date?

14                         MR. BUTLER: Objection to form.

15                         MR. ROCCO: I withdraw the question.

16     Are these the same procedures, sir, that applied at

17     Paribas Bank during the time period 1997 to 1998?

18                         A.   Yes, they are similar

19     procedures.  Actually the procedure described here

20     in this document was inspired by the Paribas

21     procedures.  So generally speaking they are similar

22     but the amounts have evolved in this document, they

23     are higher, but I could not remember the previous

24     amounts, and I would have to look at this document

25     in more detail.

1                    Q.   Can you take a look at the at

2    amounts and see if they are the same as they were

3    in 1998 with Paribas Bank?

4                    A.   For emergency?

5                    Q.   Yes, correct, please.

6                    A.   (Perused document) It works in

7    the same way, but of course the amounts here in

8    this document are much higher, which is

9    understandable because from the merger the volume

10   of credits was increased twofold and even more.

11                   Q.   When a credit ran past its

12   expiration date and had not been paid, what were

13   the procedures for extending the terms of that

14   credit - and I am talking about the time period

15   from, first, 97 to 98?

16                   A.   Under normal procedures, before

17   an expiration date, there would be an exchange of

18   information with the customer, and the customer

19   would let us know that he cannot comply with the

20   date, the expiration date.  Then they would

21   negotiate a new repayment plan that would be

22   presented to the relevant committee before the

23   expiration date; that is the normal procedure.

24   Another situation would be if the impossibility to

25   comply with the expiration date has not been

1    identified early enough, it could be because the

2    client has not said anything about it or because

3    the people from the bank have not been attentive to

4    this.  So technically it will be considered as an

5    overspanning, but for the whole amount.

6    Overspanning is usually when you have gone over the

7    credit by a few per cent, so for instance you have

8    100 per cent of the credit and you have maybe 5 per

9    cent, and the five per cent are the overspanning;

10   but here it would apply to the whole amount of the

11   loan. So in this situation we have a special team

12   from the bank assigned to the case, it is an

13   administrative team, which informs the relevant

14   committee, and the committee then has to make a

15   decision. The decision can be to negotiate with the

16   customer, and the committee gives instructions for

17   the negotiations, or it can also be not to

18   negotiate at all but no impose repayment plan to

19   the customer.  If this repayment plan is refused,

20   then we arrive at a case of default from the loan.

21   And if it comes to this, the bank take conservation

22   measures and start the procedures.

23                Q.  Were these procedures you just

24   described the same that were used by Artesia Bank

25   after the merger?

1          A.   Yes.

2               Q.   You mentioned an administrative

3     team. Who was on the administrative team at Paribas

4     Bank in the year prior to the merger?

5               A.   I forget the names; it was a

6     team with three people but I am sorry I forgot the

7     names.

8               Q.   Do you recall the name of those

9     administrative team members after the merger?

10              A.   No, because it was partly the

11    same people whose name I forgot.

12              Q.   Were you a member of that team?

13              A.   No.

14              Q.   In situations where the loan

15    expired without adequate notice to the bank and the

16    loan was not repaid, would the Credit Committee

17    that initially approved the loan have to also

18    approve the extended terms of the loan?

19              A.   Not necessarily; it is on a case

20    by case basis. The answer is 'yes' if the amount of

21    the expired credit is similar to the amount of the

22    loan that was granted originally, but if there has

23    been partial repayment of the loan, the amount

24    could be lower and hence the decision would belong

25    to a lower level of the committee.

1                    Q.   In the case where an amount was

2     the same as the initial loan, would the Credit

3     Committee that approved that loan have to also

4     approve the extension of the terms of the loan

5     after it expired?

6                    A.   Generally yes, but there is one

7     exception.  If it is a very short term extension,

8     in order not to overburden the Credit Committee

9     with very minor requests, we would use the

10    procedure to allow overspanning.

11                   Q.   What would constitute a very

12    short extension?

13                   A.   Between one week and two to

14    three months max.

15                   Q.   And in those circumstances where

16    there was such very short extension, who would have

17    to approve that extension?

18                   A.   It depends on the amount.  If it

19    is a significant amount... (Telephone

20    interruption) - if it was a significant amount, it

21    would be me.

22                   MR. ROCCO: Do you want to finish

23    this and we can take a break.

24                   MR. BUTLER: Fine.

25                   A.   So to start again. It depends on

1   the amount.  If it is a significant amount, it

2   would be me, but if we are talking about one

3   million of Belgian Francs, it could be an analyst

4   or head of secretariat.

5           MR. ROCCO: Now it's a good point to

6   take a break. We have to change the tape anyway.

7           (Break 10.49 - 11.02)

8           MR. ROCCO: Mr. Janssens, in a case

9   of a short term extension of an expired loan that

10  involved an amount in excess of hundred million

11  Belgian Francs, would such an extension require

12  your signature?

13          A.  Yes.

14          Q.  And if the extension for such a

15  loan of a hundred million Belgian Francs were for

16  more than 3 months, would it require the consent of

17  the Credit Committee that initially approved the

18  loan?

19          A.  Yes.

20          Q.  And would consent of that Credit

21  Committee have to be given initially before any

22  extension was granted?

23          A.  Would you repeat.

24          MR. ROCCO: In such a case where a

25  Credit Committee approval would be required for an

1    extension, would that extension - withdraw. In such

2    a case where a Credit Committee approval was

3    necessary to extend the loan, would that Credit

4    Committee have to rule on the extension before the

5    bank would actually extend the loan?

6              A.  Yes, it seeming obvious.

7              Q.  What determines when a loan will

8    be treated as a loan in default as opposed to one

9    that the bank is willing to extend?

10             A.  It is the financial soundness of

11   the client and the perception the bank has of this

12   financial soundness.

13             Q.  And who at the bank will make

14   the determination as to whether to place a loan in

15   default?

16             A.  Still talking about 97/98?

17             Q.  Actually I would like to know as

18   to Artesia Bank?

19             A.  In the majority of cases it

20   would be the Credit Committees, but I think this is

21   something I mentioned in a previous question, when

22   we are talking about credits that had not been paid

23   back by the expiration date and I said that the

24   committee could decide to start the default

25   procedure.  So for big amounts for which the

39

1    initial grant was awarded by the central Credit

2    Committee, so the three level committees, they

3    would be the ones making the decision for default,

4    and for smaller amounts it would be the credit

5    secretariats.  But at the time there was no

6    systematic mechanical procedure to put a loan in

7    default.

8                    Q.  Do you recognise the name Peter

9    Rabaey?

10                   A.  Yes.

11                   Q.  Did Mr. Rabaey work in your

12   department?

13                   A.  Yes.

14                   Q.  Did you supervise his

15   activities?

16                   A.  Not directly; he was a credit

17   analyst, he was supervised by his director head,

18   but he was under my responsibility.

19                   Q.  Do you know who Mr. Rabaey's

20   direct supervisor was in Artesia Bank?

21                   A.  I think it was Mr. Steverlynck,

22   but I am not sure hundred per cent.

23                   Q.  Was Mr. Rabaey previously

24   employed by the Paribas prior to the merger?

25                   A.  Yes.

1           Q.   Do you know whether he reported

2    to Mr. Steverlynck during that time period.

3                MR. BUTLER: Objection to form.

4           A.   I cannot recall exactly when Mr.

5    Steverlynck became in charge of what we call

6    specialised credits, I am not sure if it was right

7    before or right after merger.

8           Q.   I take it you are familiar with

9    a company called Lernout and Hauspie Speech

10   Products NV, correct?

11          A.   Yes.

12          Q.   During your tenure with Paribas

13   Bank did you deal with any loan involving Lernout

14   and Hauspie?

15          A.   Yes, as head of credit.

16          Q.   Can you tell me when the first

17   time you became involved in a transaction that

18   involved Lernout and Hauspie?

19          A.   I was involved in the start of

20   the relationship between Paribas about Lernout and

21   Hauspie. I am not sure, it might have been in 1992.

22          Q.   Do you know how the relationship

23   between Paribas and L&H started?

24          A.   No, not really.

25          Q.   What is the first matter

41

1   involving L&H that you were involved with in

2   Paribas Bank?

3                   A.   The first loan we made to L&H?

4                   Q.   When was that.

5                   A.   I just answered that.   I think

6   it was in 1992, but I am not sure.

7                   Q.   Do you know how it was that L&H

8   came to Paribas Bank for a loan in or about 1992?

9                   A.   No, not really.

10                  Q.   Do you know who introduced L&H

11  as a customer of the bank?

12                  A.   I would like precision here. The

13  question 'who', does it have to do with someone

14  from a bank or someone outside the bank?

15                  Q.   Either.

16                  A.   In the bank I do not know, I

17  forget.   Outside the bank I remember, that Mr.

18  Willaert was not yet with L&H.   He was the

19  financial manager of a company that was an old

20  customer of the bank and which we had a big

21  customer relationship, and he was one of the people

22  who introduced us to L&H.   Maybe he was not the

23  only one, but he is the only one I know.

24                  Q.   Is that Nico Willaert that you

25  are referring to?

42

1                    A.   Yes.

2                    Q.   Do you recall what the nature of

3      the first loan was that Paribas extended to L&H?

4                    A.   It was a short term line of

5      credit, and it was this time to use as working

6      capital, I think the goodwill was pledged, but of

7      course this was 14 years ago.  I think we had a

8      pledge on invoices as well, and I believe the

9      amount to have been about 50 million Belgian Francs

10     max.

11                   Q.   Over the course of the

12     relationship between bank Paribas and Lernout and

13     Hauspie, did you have any occasion to speak to Nico

14     Willaert?

15                   A.   Yes, once.

16                   Q.   When was that?

17                   A.   Ten years ago.

18                   Q.   What do you speak about with Mr.

19     Willaert in that one conversation, to the extent

20     that you can recall?

21                   A.   I don't remember very well.  It

22     was apparently - it had to do with line of credit,

23     but I cannot really remember which.

24                   Q.   Apart from the your tenure with

25     Paribas Bank, did you have any other occasion to

43

1    speak with Mr. Willaert?

2                    A.  No.

3                    Q.  Did you have occasion to speak

4    at any time with Mr. Jo Lernout?

5                    A.  Never one to one.

6                    Q.  Were there instances when you

7    spoke to him in a group?

8                    A.  Yes, as part of a conference or

9    something like that.

10                   Q.  What type of conferences would

11   you attend that Mr. Lernout would be present at?

12                   A.  Conference in voice technology.

13                   Q.  How frequently would you attend

14   such conferences?

15                   A.  Two or three times over a ten

16   year period.

17                   Q.  Apart from those conferences,

18   were there any other times when you had occasion to

19   speak with Mr. Joe Lernout.

20                   MR. BUTLER: Objection to form; you

21   can answer.

22                   A.  No.

23                   MR. ROCCO: Did you ever discuss any

24   of the loans extended or granted by the bank with

25   Joe Lernout?

44

1               A.  No.

2               Q.  Have you ever had a conversation

3      with Pol Hauspie?

4               A.  Not yet.

5               Q.  Do you expect to speak to him at

6      any time soon?

7               A.  No.

8               Q.  During the course of your duties

9      at Artesia Bank, did you have any occasion to

10     communicate what anyone else at Lernout and

11     Hauspie?

12              A.  No.

13              Q.  Was there a person at Artesia

14     Bank who was primarily responsible for

15     communicating with Lernout and Hauspie?

16              A.  Yes Geert Dauwe.

17              Q.  Was there anyone else who was

18     similarly responsible?

19              A.  No.

20              Q.  Was Mr. Dauwe also the principal

21     point of contact with L&H at Paribas Bank?

22              A.  Right before the merger, yes.

23              Q.  How about prior to Mr. Dauwe,

24     was there anyone else at Paribas Bank who was the

25     principal person or point of contact with L&H?

45

1                    A.  We are talking about 92 to

2    94/95, there was Mr. Wollecamp who was the

3    president of the bank, and he knew them, from the

4    same region as Lernout and Hauspie.

5                    Q.  Was there anyone else between

6    Mr. Wollecamp and Mr. Dauwe who had the principal

7    responsibility for dealing with L&H at Paribas

8    Bank?

9                    A.  No.

10                    Q.  Do you know prior to the merger

11    who at Bacob Bank was the person principally

12    responsible for communicating with L&H?

13                    A.  No, I do not know precisely.  I

14    know that Mr. Bruneel knew them, but I do not know

15    if he was responsible for the relationship at

16    Bacob.

17                    Q.  Do you know how Mr. Dauwe became

18    the relationship manager for the Lernout and

19    Hauspie account at the bank?

20                    A.  Yes.  He was head of our branch

21    at Courtrai, which is the region L&H is from.

22                    Q.  Do you know whether Mr. Dauwe

23    had any personal friendship or relationship with

24    any of the principals of Lernout and Hauspie?

25                    A.  I cannot really answer this

46

1    question, but what I can say is that he knew them

2    very well.

3                    Q.   Was there one person in

4    particular at Lernout and Hauspie that he knew very

5    well?

6                    A.   I think he knew them well both.

7                    Q.   Meaning both Mr. Lernout and Mr.

8    Hauspie?

9                    A.   Mr. Lernout and Mr. Hauspie.

10                   Q.   Are you familiar with a loan

11   that was extended by - withdraw, I had better not

12   use the 'extension' word; I think  that's

13   troublesome. Are you familiar with a loan that was

14   granted by Artesia Bank to an entity called

15   Dictation Consortium?

16                   A.   Yes, I know there was a loan.

17                   Q.   Were you a member of the Credit

18   Committee that approved the Dictation Consortium

19   loan?

20                   A.   I think so.  It is difficult to

21   answer these questions because there are so many

22   matters and so many committees that it is hard to

23   tell when I was there and was not there.  But in

24   the way the bank worked, I was there 80 per cent of

25   committees.

47

```
 1                      Q.  Do you have a recollection of
 2      serving on the committee that approved the
 3      Dictation loan?
 4                      A.  Yes I think so, and I think it
 5      was studied several times by the committee.
 6                      Q.  Are you familiar with a loan
 7      that Artesia Bank granted to an entity called
 8      Brussels Translation Group?
 9                      A.  Yes.
10                      Q.  Were you a member of the Credit
11      Committee at the bank that granted or approved the
12      loan to Brussels Translation Group?
13                      A.  I think so.  I would like to
14      make the same comment I made for the previous
15      loan:  that is that it was presented several times
16      to the committee and I am not 100 per cent sure I
17      was there for each presentation.
18                      Q.  Are you familiar with a loan
19      that Artesia Bank granted to an entity known as
20      Radial Belgium NV?
21                      A.  Yes.
22                      Q.  Were you a member of the bank
23      Credit Committee that approved that loan?
24                      MR. BUTLER: Objection to form.
25                      A.  No.
```

48

1                    MR. ROCCO: You were not a member of

2      the Credit Committee that approved the loan to

3      Radial?

4                    MR. BUTLER: Objection to form.

5                    MR. ROCCO: What is the objection.

6                    MR. BUTLER: Because the real loan,

7      the original loan, was not approved by the credit

8      committee, so the question is confusing.  Perhaps

9      you can ask about extension.

10                    MR. ROCCO: That is a fair point.  I

11     will withdraw that initial question.

12                    A.  I couldn't be a member of a

13     non-existent committee.

14                    Q.  Were you a member of the Credit

15     Committee that at some point considered the loan

16     that was granted to Radial Belgium NV?

17                    A.  Yes.

18                    Q.  Are you familiar with a loan

19     that Artesia Bank granted to an entity called

20     Language Investment Company NV?

21                    A.  Yes.

22                    Q.  Were you a member of the banks

23     Credit Committee that approved the loan to Language

24     Investment Company NV?

25                    A.  Yes.

49

1                    Q.   Are you familiar with a loan

2    that Artesia Bank granted to Gaston Bastiens for

3    approximately 25 million US dollars?

4                    A.   Yes.

5                    Q.   Were you a member of the bank

6    Credit Committee?

7                    A.   Yes.

8                    Q.   Were you member of the bank

9    Credit Committee that approved the loan to Gaston

10   Bastiens?

11                   A.   No.

12                   Q.   Did a Credit Committee at the

13   bank ever approve a loan to Gaston Bastiens?

14                   A.   Yes I think so.

15                   Q.   And you were not a member of

16   that committee, is that correct?

17                   A.   That's right.

18                   Q.   Do you know which committee at

19   the bank approved the loan to Gaston Bastiens?

20                   A.   If I am not mistaken, it's the

21   management committee.

22                   Q.   Were you ever a member of the

23   management committee?

24                   A.   Yes and no. I already answered

25   this question, but I also explained that at the

50

1    management committee I was presenting new matters

2    but I did not vote.  But I was on vacation the day

3    the Bastiens loan was decided.

4                    Q.  Were you responsible for

5    presenting to the loan committee the Bastiens loan?

6                    A.  It is difficult to be

7    responsible for a presentation when you are not

8    there.

9                    Q.  But the presentation would

10   involve assembling the document that would formally

11   be given to the committee, would it not?

12                   A.  Yes, if that is what you mean by

13   my presentation. But let me remind you I was on

14   vacation, so I didn't see Mr. Bastiens' file before

15   it was presented to the management committee.

16                   Q.  How long before the presentation

17   to the management committee did you go on vacation?

18                   A.  My diaries are in the archives

19   of the bank, and so here I can say that I believe

20   that the Bastiens' file was presented in the first

21   week after I went on vacation.

22                   Q.  Prior to going on vacation did

23   you work on preparing information for consideration

24   by the Credit Committee regarding the Bastiens

25   loan?

51

1                      A.  I should say no, I haven't

2       worked on it like you said, but this Bastiens loan

3       was presented to the level 2 committee before I

4       went on vacation.

5                      Q.  Did you work on preparing the

6       presentation to the level 2 Credit Committee for

7       the Bastiens loan?

8                      A.  No, I did not work on the

9       presentation, but studied the file that was

10      presented to the level 2 committee.

11                     Q.  In your absence, who was

12      responsible for presenting the Bastiens loan to the

13      higher level Credit Committee - and I mean the

14      management committee when I say 'higher level'?

15                     A.  The person I reported to, that

16      is Mr. Piret.

17                     Q.  Did anyone from your department

18      who served under you assist Mr. Piret in that

19      presentation?

20                     A.  I do not really know.

21                     Q.  Are you familiar with a loan

22      that Artesia Bank granted to Mr. Lernout, Mr.

23      Hauspie and Mr. Willaert for approximately 20

24      million dollars in 1999?

25                     A.  Yes.

1              Q.  Were you involved in presenting

2    that loan for consideration to the management

3    committee?

4              A.  I think so, yes.

5              Q.  And is it true, because you

6    presented that loan to the management committee,

7    you did not partake in the decisions of that loan -

8    of granting that loan?

9              A.  Yes, that's right, in as much as

10   it was dealt with by the management committee, it

11   was the normal way of handling matters, and it was

12   done in that way.

13             Q.  During your tenure at both

14   Paribas Bank and Artesia Bank, did you estimate on

15   how many loans you were involved that were granted

16   to Lernout and Hauspie?

17             A.  It is not an easy question, it

18   is complicated to give a precise answer.  I

19   remember about ten matters.

20             Q.  Would that approximate number

21   include syndicated loans as well in which the bank

22   participated?

23             A.  Yes.

24             Q.  Could you estimate in rough

25   figures the total amount of money that was granted

53

1    in those loans to Lernout and Hauspie?

2                    A.   I never made a precise

3    calculation of this figure.  It might sound

4    surprising, but loans evolve, one loan is granted

5    and then reimbursed, and then there is another

6    loan, and there is always, in terms of global

7    exposure on this, a figure that would vary from

8    year to year. So I cannot give you a very precise

9    estimate, but I would say maybe five billion

10   Belgian Francs.

11                   Q.   Are you aware of what role

12   Paribas Bank played in the initial public offering

13   of Lernout and Hauspie securities?

14                   A.   This was not my responsibility,

15   and it goes back several years, so it is rather

16   imprecise. I know that we were involved, but I do

17   not know what our role really was. There are other

18   several financial partners; I do not really know.

19                   Q.   Do you recall that the L&H IPO

20   (Initial Public Offering) occurred sometime in

21   1995?

22                   A.   If you had asked me the question

23   differently, if you had asked which year the IPO

24   occurred, I would not have been able to answer

25   precisely.

1                        Q.    So you are not certain as to the

2    year, is that correct?

3                        A.    Not 100 per cent.

4                        Q.    Do you know who at Paribas Bank

5    worked on the initial public offering for Lernout

6    and Hauspie?

7                        A.    There are probably several

8    people, but there is only one name that comes to my

9    mind, Rene' Avonts.

10                       Q.    From what division of Paribas

11   Bank did Mr. Avonts worked?

12                       A.    Financial markets.

13                       Q.    Do you know whether Paribas Bank

14   had a role in any other subsequent public offerings

15   of the securities of Lernout and Hauspie?

16                       A.    I am not aware of this.

17                       Q.    It is fair to say that you

18   personally did not have any role in any public

19   offerings of Lernout and Hauspie securities, is

20   that correct?

21                       A.    That's right.

22                       Q.    Mr. Janssens, I am going to show

23   you what was marked previously as Mommens exhibit 2

24   (Handed).  For the record, that is a document

25   bearing Bates numbers 074667 through 074672, a memo

55

1     from B. Mommens to P. Faict dated May 14, 1997.

2     Just take a moment, sir, to review Mommens exhibit

3     2 and tell me whether you have seen this document

4     before.

5                    A.   (Perused document).

6                    Q.   Do you recognise this document,

7     sir?

8                    A.   I think I read it at the time.

9     I am not quite certain, but I think so.

10                    Q.   Did Mr. Faict work in your

11     department?

12                    A.   No.

13                    Q.   Did you have any contact with

14     Mr. Faict with respect to the Dictation Consortium

15     file?

16                    A.   He probably told me about it.

17                    Q.   Do you know what Mr. Faict's

18     role was with respect to the Dictation Consortium

19     loan?

20                    A.   He was in charge of the

21     commercial relationship with the Dictation

22     Consortium.

23                    Q.   So he worked for Mr. Dauwe, is

24     that correct?

25                    A.   That is correct.

56

1               Q.  Did you have any role in

2    requesting the legal opinion that is set forth in

3    Mommens exhibit 2?

4               A.  The synthesis of legal opinion

5    was part of the criteria the committee considered

6    in making its decision.

7               Q.  So Mommens 2 was part of the

8    information that was presented to the Credit

9    Committee in order for it to make a decision on the

10   Dictation Consortium loan, is that correct?

11              A.  I think the synthesis of this

12   was one of the things that helped make the

13   decision.

14              Q.  Who would be responsible for

15   synthesising the information set forth in Mommens

16   2?

17              A.  I don't remember.

18              Q.  As part of your department's

19   preparation of a loan file for presentation to the

20   Credit Committee, would you typically receive

21   information from the commercial division of the

22   bank?

23              A.  Is it a question of me

24   specifically?

25              Q.  Yes.

1                          A.   It could happen, but it was not

2          frequent.

3                          Q.   How about for your division as a

4          whole as opposed to you personally?

5                          A.   Could you repeat the question,

6          please.

7                          Q.   Sure.  As part of your

8          department's responsibility for preparing a loan

9          file for presentation to the Credit Committee,

10         would people in your department rely on information

11         provided by people from the bank's commercial

12         department?

13                         A.   Maybe I can explain what was in

14         the files for a loan. It was part of it that was

15         assembled by the commercial division and another

16         part that was assembled by the credit division. The

17         credit division did the accounts analysis, the

18         commercial division provided the description of the

19         credit application, the justification for the

20         credit.  And sometimes the credit risk analysts had

21         objections to the loan, and the commercial division

22         could give first answers to the these objections.

23                         Q.   Was it the responsibility of

24         your department to synthesise the information from

25         both the commercial department as well as your own

58

1    department for presentation to the Credit

2    Committee?

3                    A.  There are two parts of the

4    document presented to the committee, and I would

5    say that the synthesis was the opinion given by the

6    credit division, but it was just an opinion, and

7    the role of the game was to be as objective as

8    possible.  And we can say that in a file there was

9    a DA and there was also the defence attorney.

10                   Q.  What was your understanding of

11   the nature of the business of Dictation Consortium?

12                   A.  Dictation Consortium was a new

13   company that had been created to develop voice

14   technology - I don't remember which exactly - based

15   on the licence that was sold by Lernout and

16   Hauspie.

17                   Q.  Is it true at the time that the

18   bank extended the loan to Dictation Consortium,

19   that it was a company without any customers?

20                   A.  I am not sure there weren't any

21   customers, but if there were customers there were

22   very few.

23                   Q.  Were you aware that Mr. Mommens

24   had concluded that Dictation Consortium actually

25   had no commercial activity at all?

1                    A.   I don't remember, but I am not

2       going to challenge this.

3                    Q.   Did your department perform a

4       financial analysis of Dictation Consortium for

5       presentation to the Credit Committee?

6                    A.   I do not really know. I guess we

7       were shown the budget for Dictation Consortium and

8       we based our opinion on this, but I do not really

9       remember.

10                   Q.   Can you tell me generally what

11      type of - withdraw. You mentioned that your

12      department, the credit division, would do an

13      accounting analysis of potential customers of the

14      bank for loans. Can you tell me what that analysis

15      would involve generally?

16                   A.   We work on the last three

17      balance sheets that had been published, so the

18      earlier balance sheets, we work on the assets and

19      liabilities, and we also look at the operating

20      statement. We look at each item of the operating

21      statement and the balance sheet, and review each

22      item; and anything surprising can figure extra

23      questions asked to the customer at our inquiry.

24      That is the first part.  Then we also consult

25      different ratios and we compare them to the

1    standard ratios, and here again this might lead to

2    additional questions if things - if some elements

3    are strange compared with the business sector of

4    the company.

5              MR. BUTLER: I need to take a short

6    break.

7              MR. ROCCO: Yes.

8              (Break 12.15 - 12.23)

9    (Mr. Butler withdrew and Miss Kodner took over as

10   leading counsel for Dexia).

11             MR. ROCCO: Mr. Janssens, in addition

12   to performing an accounting analysis of customers

13   for the purposes of deciding whether to extend a

14   loan to them, did your department also monitor the

15   financial condition of existing clients of the

16   bank?

17             A.  Yes.

18             Q.  Would that involve reviewing the

19   quarterly and year end financial statements of such

20   a client?

21             A.  We have at least a yearly review

22   of the files, and for the files where the quality

23   has decreased, there is a system of quarterly

24   review. Theoretically it is based on quarterly

25   statements.  I have to say that in Europe we don't

1    have a very strong habit with quarterly financial

2    statements, so in about 50 per cent of the cases we

3    did this quarterly review without having the latest

4    quarterly statement.  And to be very comprehensive

5    here, I would like to say that these files that we

6    reviewed on a quarterly basis (we call them

7    'blinking files'), they represented 3 of 4 per

8    cent of the loans.

9              Q.  Did your division - withdrawn.

10    The bank review the quarterly financial statements

11    of Lernout and Hauspie because it was a significant

12    customer of the bank?

13              A.  Yes, because it was a big

14    customer in terms of using lines of credit.

15              Q.  I want to return for a moment to

16    the Dictation Consortium loan.  Is it true that

17    Dictation Consortium on its own did not have

18    sufficient financial resources to support the

19    credit that it was seeking from the bank in 1997?

20              A.  Indeed, it was new company.

21              Q.  So the bank was only going to

22    extend a loan to Dictation Consortium if some other

23    source would provide security, am I right?

24              A.  Yes, that is correct.  And you

25    can see this in the decision process that, from the

62

1    beginning, we looked for outside security.

2                      Q.   And the bank was also aware that

3    the money that it was going to lend to Dictation

4    Consortium was going to be paid almost immediately

5    to Lernout and Hauspie as fees, correct?

6                      A.   Yes, I think I remember that.

7    But I have to say that, from what I remember, was

8    the payment was planned but it was linked to the

9    provision of service; so we couldn't really say it

10   was going to be immediate.

11                     Q.   But, in any event, the bank

12   understood that the money that it was going to loan

13   to Dictation Consortium would go ultimately to

14   Lernout and Hauspie, correct?

15                     A.   Yes, it was obvious there was

16   customer/supplier relationship between the two. It

17   was quite logical for us to see there was going to

18   be a financial flow between the two.

19                     Q.   Was it Lernout and Hauspie that

20   presented the opportunity for the Dictation loan to

21   the bank?

22                     A.   Yes, I am convinced that it was

23   one of the members of the Lernout and Hauspie team

24   that presented the matter, but I do not know who.

25                     Q.   The bank was also aware that the

1    Dictation transaction was structured in such a way

2    so that Lernout and Hauspie would recognise the

3    money received from Dictation Consortium as revenue

4    on its financial statement, is that correct?

5              A.   The bank was aware, I just told

6    you, the bank noticed that there was a

7    client/supplier relationship, and that there was

8    going to be a financial flow in return for service

9    provision.

10             Q.   I understand your answer, but my

11   question is a little different.

12             A.   If you can repeat the questioned

13             (Record read)

14             A.   Our job was to lend money to

15   companies which presented a good project needed to

16   finance.  In this specific case the project was

17   presented by people we knew well, with whom we he

18   had developed a relationship that was working well

19   so far, and when we made our decision we were

20   careful about our own interests.  That is what we

21   do, we do not deal with our customers interests, we

22   defend our own interests, that is our

23   responsibility, and the customer has to look at his

24   own interest and his own responsibility.  So here

25   the question was, is it a good project, believable

1    project?  And what we try to do is to assess the

2    reimbursement capacity, and when it is not enough,

3    we seek outside guarantees or securities, and that

4    is what we did in this case.  Our goal in this

5    situation was not to help Lernout and Hauspie

6    obtain revenue recognition.  So your question, were

7    we aware of this, we just were not thinking about

8    this. I would also like to add that at that time we

9    were not experts in US accounting, so this was not

10   something that was really put forward.

11              MR. ROCCO: I would move to strike

12   that answer as non-responsive.  With all due

13   respect, sir, I do not think you answered my

14   question.  I am going to pose it one more time.

15              MISS KODNER: Pat, I think the

16   witness is trying to answer your question as best

17   he could.

18              MR. ROCCO: I do not think he has

19   answered it.  Isn't it true, sir, that the bank was

20   notified by the accountants and the lawyers in

21   written communications from Lernout and Hauspie

22   that the purpose for the structure of the Dictation

23   loan was so that Lernout and Hauspie could

24   recognise revenue on the proceed that it received

25   from Dictation Consortium?

65

1                    A.   Yes, the bank received these

2    documents.

3                    Q.   And isn't it true that the bank

4    was informed that in order for Lernout and Hauspie

5    to recognise revenue from the Dictation Consortium

6    transaction, it was necessary that Lernout and

7    Hauspie remain totally independent from Dictation

8    Consortium?

9                    A.   Yes, we were told about that.

10                   Q.   And isn't it also true that the

11   bank was informed that Lernout and Hauspie could

12   not be involved directly or indirectly in the

13   financing provided to Dictation Consortium in order

14   for Lernout and Hauspie to recognize revenue on the

15   monies it received from Dictation?

16                   A.   Not only was the bank informed

17   about this, but the bank accepted that the loan

18   that was going to be for Lernout and Hauspie be

19   transferred to Dictation Consortium.   And here I

20   would like to go back to my previous answer.   I was

21   saying that we looked at the viability of the

22   Dictation Consortium project, and found that we

23   needed outside security for this.   And we then

24   found out in the negotiations that it was not

25   possible to have a security given by Lernout and

66

1    Hauspie because of financial marketing regulations,

2    and also because Lernout and Hauspie wanted to be

3    able to recognise the revenue coming from the

4    service provision to Dictation Consortium under US

5    standards, and this is why we had to find another

6    guarantee than one by Lernout and Hauspie.

7              Q.   Is it true that the bank would

8    not have lent to Dictation Consortium if they

9    couldn't find some other guarantee?

10             A.   Yes, I think so, indeed.

11             Q.   And nonetheless the bank wanted

12   to extend the loan because it was going to be

13   profitable to the bank, correct?

14             A.   Yes, generally all loans that

15   are made by the bank have to be profitable, so it

16   was also the case for this one.

17             Q.   Do you recall what security was

18   ultimately obtained by the bank for the Dictation

19   Consortium loan?

20             A.   I think that ultimately the

21   personal guarantees were obtained.

22             Q.   From whom were they obtained?

23             A.   Lernout, Hauspie, Willaert I

24   think.

25             Q.   Is it true that those personal

67

1    guarantees were not documented in the letter of

2    credit to Dictation Consortium at the request of

3    Messrs Lernout, Hauspie and Willaert?

4                    A.  Yes; for the Dictation

5    Consortium?

6                    Q.  Yes.

7                    A.  Because there is so many files,

8    but if you are telling me that the personal

9    guarantees are not in the credit documentation on a

10   separate document, it is probably at the request of

11   the personal guarantors.

12                   Q.  The bank was notified by Lernout

13   and Hauspie auditors KPMG that Lernout and Hauspie

14   could never be held responsible, directly or

15   indirectly or via a security, for the repayment of

16   the financing that would be granted to Dictation

17   Consortium NV, do you recall that?

18                   A.  Yes.

19                   Q.  And you - withdraw. And the bank

20   was aware that Mr. Lernout, Mr. Hauspie and Mr.

21   Willaert were senior managers of Lernout and

22   Hauspie, correct?

23                   A.  Yes.

24                   Q.  And the bank was aware that Mr.

25   Willaert, Mr. Hauspie and Mr. Lernout were also

68

1     principal shareholders of Lernout and Hauspie,

2     correct?

3                    A.   Yes.

4                    Q.   Isn't it logical that the

5     prohibition that Lernout and Hauspie could not be

6     held responsible, even indirectly for the security

7     on the Dictation Consortium loan, would apply to

8     guarantees offered by the senior management and

9     principal shareholders of the company?

10                    A.   No, I do not think so; I think

11     it is not applicable. The personal guarantee has to

12     do with personal belongings of the person giving

13     the guarantee and not with the holdings he may have

14     in a company.  The fact that in this case the

15     personal belongings were made up by shares in a

16     company has never seemed to be a link for us, we

17     always felt that there were really two separate

18     parts - the private part and the company part.

19                    Q.   Was the bank concerned when

20     Lernout and Hauspie did not want the outside world

21     to know that Mr. Lernout, Mr. Hauspie and Mr.

22     Willaert were in fact providing the guarantees on

23     the Dictation loan, that it was because they

24     believed it would constitute an indirect

25     involvement by their company (Lernout and Hauspie)

69

1      in the financing of Dictation Consortium?

2                     MR. BUTLER: Objection to form?

3                     A.   The bank wondered why the

4      request for separate document for personal

5      guarantees was being made. We talked it over at

6      length, but we concluded, as I said in my previous

7      answer, that we felt there was no link; but that is

8      only a question of judgment.  We reached the

9      conclusion that their request was unfounded, but

10     maybe, that maybe there was caution there when it

11     was not really required.  But we thought accepting

12     this request would do no harm.

13                     Q.   In fact the bank was informed by

14     Lernout and Hauspie that the reason why they did

15     not want to reveal that Mr. Lernout, Mr. Hauspie

16     and Mr. Willaert were providing personal guarantees

17     on the Dictation loan was because they would have a

18     problem with the US Securities and Exchange

19     Commission, isn't that correct?

20                     A.   I don't remember this.

21                     Q.   We will look at some documents

22     hopefully today that will remind you of this.  Let

23     me move on for a moment.  There were many times

24     that Mr. Lernout, Mr. Hauspie or Mr. Willaert asked

25     the bank to omit from the letters of credit the

70

1    fact that they were providing some form of security

2    for the loans that were extended by the bank, is

3    that true?

4                    MISS KODNER: Objection to form.

5                    MR. ROCCO: You can answer.

6                    A.   I don't understand question.

7                    MR. ROCCO: Sir, on the Dictation

8    loan, Mr. Lernout and Mr. Hauspie and Mr. Willaert

9    refused to sign the personal guarantee unless it

10   was done in a side letter and not disclosed in the

11   letter of credit, correct?

12                   A.   Correct, yes.

13                   Q.   And the same for Brussels

14   Translation Group, again Mr. Lernout, Mr. Hauspie

15   and Mr. Willaert refused to sign personal

16   guarantees unless it was done in a side letter and

17   not documented in a letter or credit for that loan,

18   correct?

19                   A.   Yes, probably for Dictation.

20                   Q.   Again, sir, with the Radial

21   loan, when it came to offering a credit default

22   swap, Mr. Lernout and Mr. Hauspie and Mr. Willaert

23   refused to sign such a credit default swap

24   agreement unless it was not referenced in the

25   letter of credit, correct?

1            A.  That is correct.

2            Q.  And once again with the Language

3  Investment Company, Mr. Lernout, Mr. Hauspie and

4  Mr. Willaert refused to sign a credit default swap

5  providing a guarantee for that loan unless it was -

6  unless a reference to that credit default swap was

7  omitted from the letter of credit for that loan,

8  correct?

9            A.  That is correct.

10           Q.  And is it your testimony that at

11 no point during these times when Lernout and

12 Hauspie insisted on secrecy of their guaranteeing

13 loans by the bank, did you believe that they might

14 be trying to circumvent the prohibition that the

15 company (Lernout and Hauspie) could not even

16 indirectly be involved in the security for the

17 transactions that were at issue?

18           MR. BUTLER: Objection to form.

19           MR. ROCCO: You can answer.

20           A.  Before you give the answer, I

21 need to change the tape.

22       (Off the record 13.03 - 13.05)

23           A.  You have to remember that this

24 occurred over several years actually, over a two

25 year period I think, and during this time we went

1    from using a personal guarantee to using credit

2    default swap, because with time we wondered whether

3    we were right about this indirect link.  For the

4    first credits we had assessed that there was no

5    link, not even indirect, but over time we became

6    better informed and we understood that it was a

7    more sensitive topic than we first thought, and

8    this is why we arrived at the credit default swap

9    technique and how we examined it, and the idea was

10    that it was not an external security, it was more

11    like an insurance policy.  And it was weaker at the

12    beginning of the two years and this two year

13    period.  We corrected because we no longer used the

14    personal guarantee.

15              MR. BUTLER: I think he said 'weaker

16    in our argument'?

17              A.  He said what was weaker two

18    years before; so probably in their assessment.

19              MR. ROCCO: Okay.  We will take a

20    lunch break

21              (Lunch break 13.06- 14.28)

22    (Mr. Butler resumed conduct of the case on behalf

23    of Dexia)

24              MR. BUTLER: Just for the record, I

25    state that, for the defence, Eline Tritsmans has

1    left and Benoit Allemeersch for Clifford Chance is

2    here; and I am Jeff Butler and I'm back.

3               MR. ROCCO: We will proceed. Mr.

4    Janssens, can I place before you three exhibits

5    that were marked previously at Mr. Mommens

6    deposition.  They are Mr. Mommens exhibit 4,

7    Mommens exhibit 9 and Mommens exhibit 7 (Handed).

8    For the record, I will begin with Mommens 4 which

9    is a letter from KPMG dated June 13, 1997 Bates

10   numbered 775003 to 775005.  My question to you is

11   do you recognise Mommens exhibit 4?

12               A.  (Perused document) No, I don't

13   recall seeing it.

14               Q.  (Perused document) Can I direct

15   your attention to the second page of Mommens

16   exhibit 4.  The numbered paragraphs at the bottom

17   of the page, there is a reference that says "It

18   seems to us that according to the applicable

19   regulation in the US this transaction should at

20   least have the following characteristics. (1)

21   Lernout and Hauspie Speech Products NV is not at

22   all involved directly or indirectly with the

23   financing of Dictation Consortium NV; and (2)

24   Lernout and Hauspie Speech Products NV can never be

25   held responsible directly or indirectly, or be a

74

1    security, for the repayment of the financing that

2    would be granted to Dictation Consortium NV" - do

3    you see that?

4                    A.  Yes.

5                    Q.  Do you recall receiving that

6    advice during the processing of the Dictation loan?

7                    A.  I don't recall seeing this

8    document, but I remember having been told of its

9    content.

10                    Q.  Do you know if this document was

11    provided to the management committee for

12    consideration in deciding whether to grant that

13    loan to Dictation Consortium?

14                    A.  The content of the documents

15    were provided to the Credit Committee.

16                    Q.  That would be the contents of

17    Mommens exhibit 4, is that correct?

18                    A.  Yes, mainly the paragraphs that

19    we have just read.

20                    Q.  Sir, if I can direct your

21    attention next to Mommens exhibit 9 which, for the

22    record, is a memorandum from Brown Rudnick and to

23    Paribas Bank dated June 5, 1997, bearing Bates

24    numbers 775001 and 775002, and tell me if you

25    recognise that document?

1                          A.   (Perused document) I have not

2       seen this document, but I remember its content

3       being mentioned.

4                          Q.   Were the contents of this

5       document mentioned to the management committee for

6       consideration in deciding whether or not to extend

7       the loan to Dictation Consortium?

8                          A.   I think so.

9                          Q.   If I can next direct your

10      attention to Mommens exhibit 7 which, for the

11      record, is a document beginning with a fax page "To

12      Paribas", to the attention of Patrick Faict from

13      Carl Demikins, and bearing Bates numbers 6796

14      through 67803.  I am sorry, I actually read the

15      wrong Bates numbers - it is to page 6801 - do you

16      recognise that document, sir?

17                         A.   No.

18                         Q.   You can set that aside.  Mr.

19      Janssens, I show you what has been marked as

20      Janssens exhibit 1, which is a memo from Patrick

21      Faict to the management committee dated August 12,

22      1996.  It is also dated August 5, 1996, bearing

23      Bates number 34548 through 34553. Do you recognise

24      this document, sir?

25                         A.   Yes.

76

1                        Q.   Is this a document you received

2    as a member of the management committee of the

3    bank.

4                        MR. BUTLER: Objection to form.

5                        A.   It is a document that was sent

6    to the management committee at the bank.

7                        MR. ROCCO: As a member of that

8    committee, did you receive a copy of that

9    document?

10                       MR. BUTLER: Objection to form.

11                       A.   Yes.

12                       MR. ROCCO: Is it true that the

13   initial loan proposal regarding Dictation

14   Consortium was one where the bank was to lend money

15   to Lernout and Hauspie directly?

16                       A.   Yes, that's right, I said it in

17   a previous answer.

18                       Q.   And the reason why it was

19   ultimately not granted to Lernout and Hauspie was

20   because of the prohibitions that would prevent

21   Lernout and Hauspie from recognising revenue on the

22   Dictation transaction, is that correct?

23                       A.   No; two reasons to this.  The

24   first one was the US financial market regulations,

25   and the second one was the constraints imposed by

77

1   the US GAP which would not have allowed the

2   recognition of payment for the services provided to

3   Dictation Consortium.  This is something I said in

4   a previous answer.

5               Q.  In Janssens exhibit 1, sir,

6   there is a reference to an equity kicker.  Do you

7   understand what that term means?

8               A.  It is part of the remuneration

9   of the bank for the loan granted.

10              Q.  And would that remuneration take

11  the form of some granting of stock by the company?

12              A.  Yes.

13              Q.  If you look at the fourth page

14  of exhibit Janssens 1, it says "There would be an

15  equity kicker to be negotiated with L&HSP and

16  Bacob"  - do you see that?

17              A.  I cannot find it.

18              Q.  If you look at page 34551 under

19  4.3?

20              A.  Yes, I see, yes.

21              Q.  Do you see that?  Does that mean

22  that Lernout and Hauspie would offer some stock as

23  compensation for the proposed loan?

24              A.  Yes, in remuneration of the

25  loan.

78

```
 1                    Q.  And do you know when the loan
 2  was changed to be one that was granted to Dictation
 3  Consortium, whether Lernout and Hauspie continued
 4  to offer an equity kicker as compensation to the
 5  bank for extending the loan to Dictation?
 6                    A.  I do not know.
 7                    Q.  Did Lernout and Hauspie agree to
 8  give the bank no cost warrants worth approximately
 9  500 thousand dollars as compensation for granting
10  the Dictation loan?
11                    A.  I have no idea; it was not in
12  charge of negotiating the equity kicker.  I was in
13  charge of the quality of credit.
14                    Q.  Do you know who was in charge of
15  negotiating equity kickers?
16                    A.  I think I remember it was Greet
17  Dauwe.
18                    Q.  Would the level of compensation
19  offered on a particular loan be of concern to you
20  in your function as a director of credit for
21  presenting the loan to the Credit Committee?
22                    A.  It was part of my concern for
23  all files of the bank.
24                    Q.  But you have no recollection as
25  to whether, as to the loan that was ultimately
```

1    given to Dictation Consortium, there was any equity

2    kicker provided by Lernout and Hauspie, is that

3    correct?

4                    A.  That is correct.

5                    Q.  You can set that exhibit aside,

6    please.  Sir, I set before you what has been marked

7    as Janssens exhibit 2.  It is a document from P.H.

8    Steverlynck and J. Van Helleputt to J. Janssens

9    dated 6.13.97 bearing Bates number 6813 through

10   6817. Do you recognise this document, sir?

11                   A.  Yes.

12                   Q.  Is this a document that you

13   received in or about June of 1997?

14                   A.  I think so.

15                   Q.  Is this a format that was

16   typically used at the time?

17                   A.  I do not really understand the

18   purpose of the question.

19                   Q.  I rephrase it. What was the

20   purpose of this memo?

21                   A.  I think that is a working

22   document that was drafted as the file for the loan

23   application was being built, and this document

24   added a D class on the complex operation.

25                   Q.  And this document related to the

1    loan with Dictation Consortium, correct?

2                    A.  Yes.

3                    Q.  Do you recognise the signatures

4    on the last page of the document?

5                    A.  There are no signatures on the

6    document.

7                    A.  I am sorry.  I have a signature

8    here.  You do not have a signature on your copy?

9                    A.  (Demonstrated document to

10   counsel).

11                   Q.  Let me see that (Handed) This is

12   not the right copy.

13                   MR. BUTLER: Can you just clarify for

14   the record what the witness has said.

15                   MR. ROCCO: Yes.  I think I presented

16   the witness with a document that appears to be what

17   is in effect a rough translation of the document I

18   meant to hand him by mistake.  So he does not have

19   the correct document the look at. So I will keep

20   this marked, but I am going to mark as 2A the

21   original version of the document, which bears the

22   same Bates numbers that I have already identified

23   on the document. (To the witness) Sir, please take

24   an opportunity to review this memo.  I would like

25   to know whether the answers you gave with respect

81

1    to exhibit 2 will be the same for exhibit 2A.

2    Please take your time to review it and let me know.

3                    A.   Okay.

4                    Q.   Have you had a chance to review

5    exhibit 2A?

6                    A.   Yes.

7                    Q.   Does that appear to be the

8    original version of the document that I showed you

9    as exhibit 2?

10                   A.   (Perused document).

11                   MR. BUTLER: Objection to form.

12                   MR. ROCCO: When I say 'the

13   original', I mean a copy of the original.  Is that

14   the nature of your objection?

15                   MR. BUTLER: No.  I just think it's

16   confusing, because the first thing you showed him

17   was a rough translation, it is not the document.

18   For clarity you may just have to re-ask the

19   questions again with the proper document.

20                   MR. ROCCO: Sir, is exhibit 2A,

21   Janssens exhibit 2A, a letter you received in or

22   about June 1997?

23                   A.   Yes.

24                   Q.   And it relates to Dictation

25   Consortium, correct?

82

1              A.  Yes.

2              Q.  And it provides, exhibit 2A

3    provides the factual detail regarding the proposed

4    loan with Dictation Consortium, is that correct?

5              A.  Yes.

6              Q.  And did you use the information

7    contained in exhibit 2A for the purpose of

8    preparing the proposal for the Dictation Consortium

9    loan to Credit Committee?

10              A.  Yes.

11              Q.  If you turn to the last page of

12    the exhibit 2A, do you recognise any signatures on

13    that page?

14              A.  There is only one signature on

15    the document, and I believe it is Van Helleputt's

16    signature; I am not too sure.

17              Q.  Did Mr. Van Helleputt work under

18    your direction during this time period, June 1997?

19              A.  Yes.

20              Q.  Do you recall that it was Mr.

21    Mommens' view that the construction of the

22    Dictation Consortium transaction was artificial?

23              A.  It says so on page 2.

24              Q.  If I can direct your attention

25    to the last page of exhibit 2A, under the number

83

1    paragraph 6, there is a statement that says that

2    "Dictation software project is booked technically

3    and commercially a project of L&H" - do you see

4    that?

5              A.  Yes.

6              Q.  What did you understand that to

7    mean?

8              A.  That the Dictation project

9    relied technically and commercially on L&H.

10             Q.  Did the bank considered, when it

11   funded the Dictation Consortium loan, that it was

12   in effect financing an L&H project?

13             A.  No.

14             Q.  Did the bank count the Dictation

15   Consortium loan as part of the total risk extended

16   to Lernout and Hauspie?

17             A.  The language integrated the risk

18   of Dictation Consortium in its global exposure to

19   voice technology.

20             Q.  Were there any clients of the

21   bank in global exposure to voice technology that

22   were not related to Lernout and Hauspie?

23             A.  I have to say if you are talking

24   about direct link or indirect link?

25             Q.  I am talking about any link.

84

1              A.   In this case all voice

2     technology files have some kind of link between

3     them.

4              Q.   And are all those files in some

5     ways linked to Lernout and Hauspie?

6              A.   One way or the other, yes.

7              Q.   Do you see in the last page of

8     exhibit 2A there is a reference to verbal

9     commitment of P. Hauspie - the last line?

10             A.   Yes.

11             Q.   Did Pol Hauspie make a verbal

12    commitment to provide compensation on behalf of

13    Lernout and Hauspie for the granting of the

14    Dictation Consortium loan?

15             A.   I do not know.

16             Q.   Do you know what the reference

17    to a 'verbal commitment' by Pol Hauspie is

18    referring to in Janssens 2A?

19             A.   I do not clearly remember, but

20    it was something included in my statement with the

21    federal police when I said that I thought it was a

22    moral commitment on the part of Hauspie, Lernout

23    and Willaert, to make sure that the Dictation

24    Consortium credit would go smoothly for the bank,

25    and that L&H would comply with its contractual

1    obligation regarding Dictation Consortium.

2                    Q.  Mr. Janssens, I place before you

3    what has been marked as Janssens exhibit 3, a

4    document from Ivan De Coen to the management

5    committee dated June 16, 1997 bearing Bates numbers

6    75006 through 75015.

7                    A.  (Perused document).

8                    Q.  Do you recognise this document?

9                    A.  Yes.

10                   Q.  Is this a document you received

11   in or about June of 1997 as a member of the

12   management committee at the bank?

13                   A.  Yes.

14                   Q.  What role did Ivan De Coen play

15   in the Dictation Consortium loan?

16                   A.  He was one of the commercial

17   negotiators, because he was working in the

18   commercial department along with Mr. Faict.

19                   Q.  And both Mr. De Coen and Mr.

20   Faict worked under Mr. Dauwe, correct?

21                   A.  Yes.

22                   Q.  And what is the purpose of this

23   memo that is reflected in Janssens exhibit 3?

24                   A.  (Perused document) it is a

25   document that is to be handed to the management

86

1    committee in support for the application for a line

2    of credit.

3                    Q.    Would the management committee

4    rely on this document as a basis for making its

5    decision on whether to grant the Dictation loan?

6                    A.    This document is part of what

7    was given to the management committee to make its

8    decision.

9                    Q.    If you could turn to page 7 of

10   the document, which is also Bates number 75012.   Do

11   you recognise the signature on that page?

12                   A.    Yes.

13                   Q.    Is that the signature of Mr. De

14   Coen?

15                   A.    Yes.

16                   Q.    Did Mr. Hauspie make a verbal

17   promise to provide - withdraw. Did Mr. Hauspie make

18   a verbal promise that L&H would provide additional

19   compensation to the bank for extending the

20   Dictation Consortium loan?

21                   A.    When reading this document, yes.

22                   Q.    Do you know whether L&H provided

23   the additional compensation that is referenced in

24   Janssens exhibit 3 with the granting of the

25   Dictation Consortium loan?

87

1              A.  I have no certainty on this, I

2    do not really know.

3              Q.  Is it that you do not recall

4    whether or not that happened?

5              A.  No, I think I never knew it

6    happened.

7              Q.  Was there a discussion -

8    withdrawn. Did you ever participate in a discussion

9    as to whether Lernout and Hauspie providing

10   compensation for the Dictation loan would violate

11   the requirement that Lernout and Hauspie not be

12   directly or indirectly involved in financing of

13   Dictation Consortium?

14              MR. BUTLER: Objection to form.

15              MR. ROCCO: You can answer.

16              A.  Would you repeat the question,

17   please.

18         (Interpreter repeated question)

19              A.  I don't remember talks about

20   this topic.

21              Q.  To your knowledge did the bank

22   consider whether the fact that Lernout and Hauspie

23   would provide compensation for the granting of the

24   Dictation loan would violate the requirement that

25   Lernout and Hauspie not be directly or indirectly

88

1    involved in Dictation Consortium financing?

2                    MR. BUTLER: Objection to form.

3                    MR. ROCCO: You can answer.

4                    A.   I cannot speak for the whole

5    bank, but from what I know I have never heard that

6    we acknowledged this participation.

7                    Q.   Doesn't the fact that Lernout

8    and Hauspie would provide compensation on the

9    Dictation loan constitute a direct or indirect

10   involvement by Lernout and Hauspie in the Dictation

11   financing?

12                   A.   I don't have a personal opinion

13   on this, I am not a lawyer and, as I said, I was

14   not involved in talks on this topic at the time.

15                   Q.   So you are unable to answer my

16   question?

17                   A.   That is correct.

18                   Q.   I will show you next, Mr.

19   Janssens, what was marked as Mommens exhibit 6, and

20   ask you to take look at that please (Handed).  For

21   the record, Mommens 6 is a document which cover

22   page is dated 7.3.97, a memo from Ivan De Coen to

23   the members of the management committee, Bates

24   range 74681 to 74686.  My first question to you,

25   sir, when you have reviewed the document, is

1    whether you recognise it?

2                    A.   Yes.

3                    Q.   Is this a document that you

4    received in or about July of 1997 as a member of

5    the bank's management committee?

6                    A.   Yes.

7                    Q.   Was the information contained in

8    Mommens 6 a part of the information that was

9    considered by the management committee in approving

10   the Dictation Consortium loan?

11                   A.   (Perused document) Yes.

12                   Q.   Does your handwriting appear

13   anywhere on the document, sir?

14                   A.   Yes, on page 1.

15                   Q.   Anywhere else?

16                   A.   No.

17                   Q.   There is handwriting on the

18   second to last page.  Is that a handwriting you

19   recognise?

20                   A.   No, it is not mine.

21                   Q.   I direct your attention to the

22   first page.  Can you tell me what handwriting on

23   that page belongs to you?

24                   A.   In the square here (Indicated).

25                   Q.   In the middle of the page, is

90

1    that correct?

2                    A.  Yes.

3                    Q.  It is very difficult to read

4    this copy.  Are you able to make out any of the

5    handwriting there?

6                    A.  "Agreement as presented here,

7    except for the - except regarding the licence

8    agreement which will have to be pledged, and the

9    condition that the legal design be approved by Mr.

10   Mommens".

11                   Q.  And are you able to read the

12   entire portion of your handwritten comments there,

13   or was any illegible?

14                   A.  I just read it, so it was

15   readable.

16                   Q.  I was unclear whether you read

17   the entire thing; that was the nature of my

18   question.

19                   A.  Thank you.

20                   Q.  I understand that you were able

21   to read the entire passage, correct?

22                   A.  Yes indeed.

23                   Q.  There is a credit rating on this

24   first page of Mommens 6 that says '4', do you see

25   that?

1                    A.  Rating 4, yes.

2                    Q.  What does that mean?

3                    A.  It is the rating given by the

4     credit department to a file.

5                    Q.  And what is the scale, numeric

6     scale, that was used for that purpose?

7                    A.  It goes from 1 the 7, 1 being

8     the best risk and 7 being default.

9                    Q.  And does the numeric rating

10    that's assigned to a loan consider all the security

11    that is pledged for that loan?

12                    A.  Yes, in 1997, yes.

13                    Q.  Did that change subsequently?

14                    A.  Several times.

15                    Q.  If you can look to the second

16    page of Mommens 6, under point 2 there is the -

17    there is a notation that a bridge loan for

18    Dictation Consortium was approved, do you see that?

19                    A.  Yes.

20                    Q.  And is that the loan that is

21    proposed in appendix 2 of this document, Mommens 6?

22                    A.  Yes.

23                    Q.  I direct your attention to the

24    first page of appendix 2 of Mommens 6, there is a

25    reference that the memo was originally written to

92

1   you, Jacques Janssens, and then it's crossed out

2   and it says 'management committee' dated 6.24.97,

3   do you see that?

4              A.  Yes.

5              Q.  Does that signify that this

6   proposal was ultimately made to the entire

7   management committee?

8              A.  Yes.

9              Q.  Do you see, going back to the

10  second page of Mommens 6 and back to exhibit - I am

11  sorry, point 2.0 at the top, very top of the page,

12  point 2, there is a reference in that - in that

13  point to an 'RO credit', do you see that?

14             A.  Yes.

15             Q.  Can you explain what 'RO credit'

16  means?

17             A.  Roll-over credit; it is a

18  roll-over credit.

19             Q.  What is a roll-over credit?

20             A.  It is a credit with a fixed

21  duration, usually higher than one year, but it has

22  a floating rate which is revised, depending,

23  monthly or quarterly or yearly.

24             Q.  At this time in June of 1997,

25  was Paribas Bank participating to the extent of 50

93

1      per cent in a consortium roll-over credit for

2      Dictation Consortium?

3                    A.   (Perused document) Yes.

4                    Q.   Do you know who the other

5      participants in that consortium for the roll-over

6      credit were?

7                    A.   Yes.

8                    Q.   Can you tell me?

9                    A.   Bacob.

10                   Q.   Bacob Bank?

11                   A.   Bacob Bank. It can be

12     surprising, but you have to know that negotiations

13     for this loan started in the mid 96 and the

14     position of Paribas Bank Bacob only occurred one

15     year later.  So in 96 we were looking for a partner

16     to share our risk, and we didn't know, we thought

17     that Bacob was a good partner, and we did not know

18     we would end up sharing this risk definitely.

19                   Q.   The bridge loan to Dictation

20     Consortium that was approved in Mommens exhibit 6,

21     was guaranteed by a personal guarantee of Messrs

22     Lernout, Hauspie, Cloet and Willaert, is that

23     correct?

24                   A.   Yes.

25                   Q.   And those guarantees were

94

1    documented by means of a side letter, is that

2    correct?

3                    A.   Yes.

4                    Q.   And those guarantees were not

5    mentioned in the credit agreement which confirmed

6    the bridge loan to Dictation Consortium, correct?

7                    A.   That is what I think, because

8    there were in a side letter.

9                    Q.   The reason why Dictation

10   Consortium was seeking a bridge loan was so that it

11   could have money to pay fees to Lernout and

12   Hauspie, so that Lernout and Hauspie could

13   recognise those fees as revenue in time for their

14   quarterly reporting which ended on June 30, 1997,

15   is that correct?

16                   MR. BUTLER: Objection to form.

17                   MR. ROCCO: You can answer.

18                   A.   The object of the loan was

19   indeed so that Dictation Consortium could pay a

20   commercial debt that it had vis-a-vis Lernout and

21   Hauspie.

22                   Q.   And Lernout and Hauspie

23   expressed concern to the bank that if Dictation

24   Consortium did not receive the funds, Lernout and

25   Hauspie could not recognise revenue on the fees to

 1    be paid on Dictation Consortium, isn't that

 2    correct?

 3                    MR. BUTLER: Objection to form.

 4                    A.  I do not know if Lernout and

 5    Hauspie mentioned their concern about this.

 6                    Q.  Is it true that Lernout and

 7    Hauspie informed the bank that they had an

 8    outstanding receivable to Dictation Consortium

 9    which they needed to pay off to remove it from

10    their quarterly reports for June 30, 1997?

11                    MR. BUTLER: Objection to form.

12                    MR. ROCCO: You can answer.

13                    A.  I do not know if Lernout and

14    Hauspie mentioned this.

15                    Q.  If I can direct your attention

16    to the last page of Mommens exhibit 6 under point 2

17    where it says 'Reason of the bridge loan'.

18                    A.  Yes.

19                    Q.  If you see it says under point

20    2, middle of the paragraph "L&H hasn't claimed for

21    Dictation Consortium as a result of the delivery of

22    a mile stone for a total amount USD 4500.  The

23    short sellers in particularly pay precise attention

24    to the ratio of outstanding receivables in the

25    quarterly reporting, now as of 6.30.97 for the

1    NSDAQ.  Even a small increase will be interpreted

2    as a negative evolution of the quality of the

3    receivables portfolio and can consequently have an

4    immediate negative impact on the stock exchange

5    price. It is consequently important that the

6    outstanding receivable will be paid before 6/30/97"

7    - do you see that?

8                    A.  Yes.

9                    Q.  You understand my question?

10                   MR. BUTLER: I object.  For the

11   record, to the extent you are asking him to adopt

12   your entire translation, I object to that.  To the

13   extent you are referring him to a paragraph, I

14   understand.

15                   MR. ROCCO: You see what I am talking

16   about in this document, correct, sir?

17                   A.  I see the paragraph you are

18   talking about.

19                   Q.  Was the information I read in

20   the paragraph numbered 2.0 'Reason of the bridge

21   loan' on the last page of Mommens exhibit 6,

22   information that was provided to the bank by

23   Lernout and Hauspie?

24                   A.  Nothing in what I read here

25   allows me to answer 'yes' or 'no'.

97

1                    Q.  Do you know whether the

2    information that is referenced in the paragraph

3    number 2.0 'Reason of the bridge loan' on the last

4    page of Mommens exhibit 6 came from?

5                    A.  No.

6                    Q.  Regardless of their origin, they

7    are the reasons that were given to the management

8    committee for approving the bridge loan to

9    Dictation Consortium, correct?

10                   MR. BUTLER: Objection to form.

11                   MR. ROCCO: You can answer.

12                   A.  This point number 2 was given to

13    the management committee, but nothing tells me that

14    it was given as the reason to authorise the loan.

15                   Q.  Did the management committee

16    accept that this was a reason for authorising the

17    bridge loan as stated in the numbered paragraph 2

18    on the last page of Mommens exhibit 6.

19                   MR. BUTLER: Objection to form.

20                   MR. ROCCO: You can answer.

21                   A.  In as much as the management

22    committee gave its authorisation for this loan, it

23    means that it considered the information given in

24    the paragraph as not impeding the loan

25    authorisation.

98

1                    Q.   And do you have any reason to

2     question the accuracy of the reasons that are

3     stated under the number paragraph 2 in the last

4     page of exhibit Mommens 6 in Mr. De Coen's memo?

5                    A.   No, I have no reason to

6     challenge this information.

7                    Q.   Do you know whether anyone on

8     the management committee challenged the reasons set

9     forth under numbered paragraph 2 on the last page

10    of Mommens exhibit 6 at the time that the bridge

11    loan for Dictation Consortium was presented and

12    approved by the committee?

13                   A.   I don't remember.

14                   Q.   Do you remember anyone objecting

15    to those reasons?

16                   A.   No, I don't recall that.

17                   Q.   Mr. Janssens, I am showing you

18    what has been marked as Janssens exhibit 4, a

19    document entitled "Memo for the management

20    committee" dated July 8, 1997 and it's Bates stamp

21    numbered 78029 to 78033 (Handed).  Do you recognise

22    this document, sir?

23                   A.   (Perused document) It is a

24    document I have never seen.

25                   Q.   Do you know whether this

1    document was sent to the management committee in or

2    about July 1997?

3            A.   That is Bacob document.  It is a

4    document for the management committee of Bacob.  In

5    97 Bacob had already bought Paribas, but as I said

6    earlier the merger only occurred in 1988, so at

7    this time in 97 Paribas was a subsidiary of Bacob,

8    which means that there were two banks and two

9    different management committees.  And this document

10    apparently has to do with Bacob's involvement with

11    L&H and Dictation, I think.

12            Q.  How can you tell it is a Bacob

13    document?

14            A.  Because the person who wrote the

15    document was someone who was at Bacob in 97.

16            Q.  Are you referring to Pierre

17    Cordonnier?

18            A.  Yes.

19            Q.  Did at some point in time Mr.

20    Cordonnier work under your direction?

21            A.  That's right.

22            Q.  What position did he hold under

23    your direction?

24            A.  He was credit analyst in the

25    specialised credit department.

100

1                      Q.   When did he begin reporting to

2    you in that respect?

3                      A.   From mid 98.

4                      MR. ROCCO: This might be a good spot

5    to take a five minute break.

6                      (Break 15.45 - 16.02)

7                      MR. ROCCO: Mr. Janssens, I am going

8    to place before you what has been marked as

9    Janssens exhibit number 5 (Handed).  For the record

10   it is two page document bearing Bates numbers 85202

11   to 203 from Pierre Cordonnier to Claude Piret dated

12   August 5, 1997.  My questions is, do you recognise

13   this document, sir?

14                     A.   No.

15                     Q.   Does this appear to be a Bacob

16   Bank document?

17                     A.   It is indeed a Bacob document.

18                     Q.   How can you tell that?

19                     A.   The author of the document is

20   from Bacob, the person it was sent to and the CC'd

21   person are both Bacob.

22                     Q.   And was August 5, 1997 a time

23   before the integration of Bacob and Paribas?

24                     A.   Yes.

25                     Q.   You can set that aside.  Mr.

1    Janssens, is there any bank secrecy rules that

2    apply in Belgium?

3                    A.   In Belgium there are rules that

4    can be called bank discretion rules, but they are

5    non-banking secrecy rules, so to speak.

6                    Q.   Do any of those rules require

7    that the bank keep confidential the information it

8    receivers from clients?

9                    A.   It depends which type of

10   information we are talking about.  These rules

11   apply when the client requests confidentiality,

12   when he gives information.

13                   Q.   I would like to switch gear for

14   a moment to discuss BTG, the Brussels Translation

15   Group.

16                   Q.   You mentioned earlier that you

17   recall that loan, correct?

18                   A.   Yes.

19                   Q.   What type of company was

20   Brussels Translation Group?

21                   A.   I am not sure whether they

22   bought this company; I think so.  I think they

23   bought this company, they did not create it, but it

24   has been ten years.

25                   Q.   We know you say 'they', to whom

102

1    are you referring?

2                    A.   The shareholders.

3                    Q.   Are you speaking of the

4    shareholders of Lernout and Hauspie?

5                    A.   No; the shareholders of Brussels

6    Translation Group.

7                    Q.   Do you know what their

8    shareholders were?

9                    A.   I forgot.

10                   Q.   Was the structure of the

11   Brussels Translation Group transaction with Lernout

12   and Hauspie similar to the structure of the

13   Dictation Consortium transaction with Lernout and

14   Hauspie?

15                   MR. BUTLER: Objection to form.

16                   MR. ROCCO: You can answer.

17                   A.   No, I do not think so.  There

18   was no licence purchased.

19                   Q.   Were there any other

20   differences?

21                   A.   It is difficult to answer

22   because I do not really remember what the business

23   of Brussels Translation Group was.  It is a little

24   difficult to answer that question.

25                   Q.   Wasn't the Brussels Translation

1    Group formed to develop software that it obtained

2    from Lernout and Hauspie?

3                    A.  It is possible, yes.

4                    Q.  Wasn't the purpose of the banks

5    loan to the Brussels Translation Group to pay fees

6    to Lernout and Hauspie in exchange for receiving

7    that software?

8                    MR. BUTLER: Objection to form.

9                    A.  I can only answer as I answered

10   the previous question.  I don't recall exactly.

11                   MR. ROCCO: Wasn't the purpose of the

12   structure of the Brussels Translation Group

13   transaction so that Lernout and Hauspie could

14   recognise revenue on the fees it received from the

15   Brussels Translation Group?

16                   MR. BUTLER: Objection to form.

17                   A.  Show me the structure so that I

18   can answer the question.

19                   MR. ROCCO: Without looking at a

20   document, are you able to answer the question?

21                   A.  I just asked you for a document,

22   so obviously the answer is 'no'.

23                   Q.  Mr. Janssens, I have placed

24   before you what has been marked as Janssens exhibit

25   6, which is a multipage document bearing Bates

1    numbers 075028 to 075038, and it is also a memo P.

2    Faict to the management committee dated 9.29.97

3    (Handed).  I should also note for the record that

4    when I have been reading Bates numbers both

5    yesterday and today, all the documents that have

6    been marked are with the prefix DBB, noting that

7    they were produced by Dexia Bank Belgium.  Do you

8    recognise Janssens exhibit 6, sir?

9                    A.  It's a document I saw at the

10   time.

11                   Q.  Is this a document that you

12   received in or about September of 97 as a member of

13   the bank's management committee?

14                   MR. BUTLER: Objection to form.

15                   A.  It is a document that was

16   presented to the management committee, yes.

17                   MR. ROCCO: Were you a member of that

18   committee?

19                   A.  As I said before, I was present

20   in the sessions of the management committee to

21   present the files, but I did not vote.

22                   Q.  Was this a document that you

23   relied on in preparing the files to be presented to

24   the management committee for the approval of a loan

25   to Brussels Translation Group?

1              A.  Yes, I think so.

2              Q.  Does reviewing this document

3    help you to recall what the business of Brussels

4    Translation Group was?

5              A.  Yes.

6              Q.  Is it true that Lernout and

7    Hauspie granted to Brussels Translation Group a

8    software licence to develop software for Lernout

9    and Hauspie?

10             A.  That is indeed what I can read

11   in this memo.

12             Q.  Is it true that the financing

13   that was to be provided by the bank was going to be

14   used to pay Lernout and Hauspie those licensing

15   fees by Brussels Translation Group?

16             A.  (Perused document) Yes, that is

17   correct.

18             Q.  You can set that document aside.

19   Mr. Janssens, I show you what has been marked as

20   Janssens exhibit 7, a multipage document beginning

21   with Bates number 4078 to 4088, and the first page

22   is titled "Approval of the credit minutes" dated

23   3.30.98 and 3.31.98. If you could take a moment to

24   review that document.

25             A.  (Perused document).

106

 1                    Q.  Can you tell me what this

 2    document is, sir?

 3                    A.  (Perused document) This document

 4    was for the management committee so that it will

 5    make a final decision for the Brussels Translation

 6    Group after several presentations to the committee,

 7    in which only temporary or partial decisions had

 8    been made; so it was to make a final decision.

 9                    Q.  And does this document reflect

10    that final decision?

11                    A.  Yes indeed.

12                    Q.  Did you make the presentation of

13    this loan for Brussels Translation Group to the

14    management committee?

15                    A.  I don't remember it, but I guess

16    so because I am the one who took note of the

17    decision.

18                    Q.  Is the information that is

19    contained in the memo that is reflected in Janssens

20    exhibit 7 information you used in presenting the

21    proposal for the Brussels Translation Group loan to

22    the Credit Committee?

23                    A.  Yes, quite certainly; I don't

24    remember it, but certainly.

25                    Q.  Is that your handwriting on the

1    second page of exhibit 7?

2                    A.   Yes.

3                    Q.   And that would be on document

4    numbered 04079, correct?

5                    A.   That is correct.

6                    Q.   Can you tell, from reviewing

7    exhibit 7, what amount the Brussels Translation

8    Group loan was for?

9                    A.   14 million US dollars.

10                   Q.   Is it true that Brussels

11   Translation Group on its own did not have adequate

12   financial resources to just buy a loan to that

13   amount?

14                   A.   It is completely correct.

15                   Q.   And for that reason the bank

16   looked for guarantees outside of Brussels

17   Translation Group, correct?

18                   A.   That is correct.

19                   Q.   And is it also true that the

20   Brussels Translation Group transaction was similar

21   to the Dictation transaction, in that there were

22   limitation placed on Lernout and Hauspie's role in

23   any financing, so that Lernout and Hauspie could

24   recognise revenue on its dealings with Brussels

25   Translation Group?

1          A.   Yes, that is why, that's right,

2     there was a similarity.

3          Q.   Is it true that the bank was

4     informed that Lernout and Hauspie could not be

5     liable directly or indirectly, or by means of a

6     guarantee, with respect to the repayment of the

7     financing of the BTG loan?

8          MR. BUTLER: Objection to form

9     (record read)?

10          A.   Yes, that is correct.

11          MR. ROCCO: Is it true that the bank

12     was informed that Lernout and Hauspie would

13     recognise as revenue the monies it received from

14     Brussels Translation Group for the development of

15     the software that was being licensed?

16          A.   The question you are asking

17     close to the ones that were asked for Dictation; it

18     is true that it is quite a similar situation.  I

19     underlined in a previous answer that BTG did not

20     have the necessary resources to have access to 14

21     million dollar loan, which is why the bank looked

22     for outside guarantees.  And the number 1

23     guarantee, the biggest guarantee, came from the

24     public authority, was the Brussels region guarantee

25     which covered three fourths of the loan.  Obviously

1    without this guarantee the loan would not have been

2    feasible.  For the other quarter, we looked for

3    another outside guarantee and we turned to L&H and,

4    there was this problem with the US GAP.  It was not

5    a problem for us, but it was for them, and we tried

6    to accommodate them and asked them for counter

7    proposals, and the counter proposal was their

8    personal guarantee.  So it is quite similar to the

9    Dictation transactions we talked about earlier. Let

10   me just state that the goal of the bank was not to

11   allow Lernout and Hauspie to solve, so to speak,

12   its problem of revenue recognition, it was to

13   finance a viable project with good hopes of

14   recovering our money, and this is what guided me

15   and probably the committee in examining the

16   transaction.

17              MR. ROCCO: Tape change.

18         (Off the record 16.33 - 16.35)

19              MR. ROCCO: Mr. Janssens, is it true

20   that the personal guarantees that were provided by

21   Messrs Lernout, Hauspie and Willaert on the BTG

22   loan were documented in a side letter?

23              A.  Yes, that's right.  We talked

24   about this earlier.

25              Q.  It is for the same reasons as

1    the Dictation personal guarantee, correct?

2                        MR. BUTLER: Objection to form.

3                        A.   What were the reasons in the

4    Dictation matter?

5                        Q.   Is it true that - withdrawn.   Do

6    you know whether the government guarantee that was

7    supposed to be supplied to the Brussels Translation

8    Group in fact was provided by the Belgian

9    government?

10                       A.   I think that the government,

11   Belgian government authorised the operation, but I

12   read recently (yesterday) that BTG had not called

13   upon this agreement it had received.

14                       MR. ALLEMEERSCH: My translation

15   shows - I didn't hear it said about the

16   government.   There is probably some confusion.

17                       MR. ROCCO: You can clarify.

18                       INTERPRETER: He said "I think the

19   government authorised the operation, but I read

20   recently (actually yesterday) that BTG had not

21   called upon this agreement".

22                       Q.   When you refer to the government

23   are you referring to the Brussels regional

24   government?

25                       A.   Yes.

1                        Q.   What do you mean by the fact

2       that Brussels Translation Group did not call upon

3       the guarantee?

4                        A.   I mean that it did not call upon

5       this guarantee.  That it had the possibility, there

6       was the agreement to implement this guarantee, but

7       it did not carry out the procedure so that it would

8       happen.

9                        Q.   So as a result of the failure to

10      - withdrawn. So as a result of BTG's failure to

11      call upon the government guarantee, the bank could

12      not look to the government for surety on the BTG

13      loan, is that correct?

14                       A.   Yes, that's it; of course it

15      didn't exist.

16                       Q.   Did the bank look for additional

17      security after the BTG failed to exercise the

18      government guarantee?

19                       A.   I don't remember.

20                       Q.   You can set that document aside.

21      Mr. Janssens, I place before you a document marked

22      Janssens exhibit 8 which is a memo from Peter Faict

23      to J. Van Der Ven and G.K. Dauwe December 30, 1998,

24      bearing Bates numbers 038268 to 038270 (Handed).

25      If you can take a moment to review that document?

1              A.  (Perused document) Yes.

2              Q.  Do you recognise this document,

3    sir?

4              A.  No.

5              Q.  Have you seen it before today?

6              A.  No.

7              Q.  There is a reference -

8    withdrawn. If you look at the last page of the

9    document, do you recognise the signature of Pete

10   Faict on that page?

11             A.  Yes.

12             Q.  And looking again at the last

13   page of Janssens exhibit 8, do you recognise the

14   handwriting of Mr. Geert Dauwe on that page?

15             A.  Yes.

16             Q.  His signature also appears on

17   that page, correct?

18             A.  Yes.

19             Q.  Is it also his handwriting that

20   says "To be implemented on L&H.  Consequently the

21   global risk should not increase; besides,

22   regularise with the team of John Van Der Van, do

23   you see that.  That is Mr. Dauwe's handwriting that

24   wrote that, is that correct?

25             A.  Yes.

113

1                    Q.   Do you have any understanding to

2      what he is referring there?

3                    A.   It is a request to use 3 million

4      dollar share of Brussels Translation Group loan.

5                    Q.   Do you know whether the bank

6      took any steps, as a result of the Brussels

7      Translation Group's failure to obtain the

8      government guarantee that was contemplated at the

9      time the loan was approved?

10                   MR. BUTLER: Objection to form.

11                   MR. ROCCO: You can answer.

12                   A.   From what I know, new steps were

13     taken but, as I said, I have never seen this

14     document until today. As I said, the regional

15     guarantee was never implemented, but I have to say

16     this loan was rapidly paid back. I do not know the

17     exact schedule from the absorption of Brussels

18     Translation Group by L&H.

19                   Q.   And is it true that prior to the

20     repurchase of the Brussels Translation Group by L&H

21     the bank was informed by L&H that it would be

22     repurchasing BTG?

23                   A.   I read this information under

24     item 3 of the document presented here.

25                   Q.   Do you have any knowledge, apart

114

1    from this document, that that actually was the

2    case?

3                        A.  I don't remember.

4                        Q.  Was the loan that was granted to

5    Brussels Translation Group a roll-over loan?

6                        A.  Yes, I think so indeed.

7                        Q.  And as a roll-over credit, did

8    it acquire approvals during the course of the loan

9    for Brussels Translation Group to draw down on the

10   loan?

11                       A.  Yes in this case, because the

12   guarantee from the Brussels regional government was

13   not in place, so one of the conditions of the loan

14   was not met.  So there was need for an approval to

15   draw on the credit.

16                       Q.  Who needed to approve the

17   withdrawal on the credit under the circumstances -

18   withdrawn. In the event that one of the terms of

19   the loan was not met, who was the person who could

20   authorise a drawdown of the credit?

21                       A.  For this amount in this

22   situation, it must be the committee who initially

23   granted the loan, who is the one responsible for

24   authorising the withdrawal in this case, and in

25   this case it is the management committee.

1                    Q.  Are there individuals, apart

2      from the management committee, that could approve

3      the drawdown of a loan when one of the conditions

4      was not met under a loan of this amount?

5                    A.  It could be done in the

6      emergency procedure we talked about this morning;

7      also by two members of the management committee and

8      with a later ratification by the next session of

9      the committee.

10                    Q.  Do you know whether those

11      emergency procedures were used to approve the

12      drawdown of any of the credit extended to Brussels

13      Translation Group?

14                    A.  I do not know but, in reading

15      this document, the first steps that are mentioned

16      here are not part of this procedure.  But I do not

17      know if there have been other withdrawals than the

18      ones mentioned in this document.

19                    Q.  To understand you, is it your

20      testimony that the approvals that are noted on

21      Janssens exhibit 8 do not appear to be made

22      pursuant to the emergency procedures?

23                    A.  Those were withdrawals made

24      under emergency procedures in which the usual steps

25      were not complied with.

116

1                      Q.   Do you know why they were not

2   complied with?

3                      A.   No, I do not know.

4                      Q.   And - withdrawn.   In fact the

5   bank approved on an emergency basis the drawdown of

6   money on the BTG transaction at the end of June

7   1998, is that correct?

8                      MR. BUTLER: Objection to form.

9                      A.   Yes.   Reading paragraph 3 on the

10  first page of the document refers to a withdrawal

11  on 29 June.

12                     Q.   And that co-incides with the end

13  of the second quarter for Lernout and Hauspie for

14  financial reporting purposes, does it not?

15                     A.   29 June corresponds to the end

16  of the quarter for everyone.

17                     Q.   Was the basis for the emergency

18  approval of the drawdown of the BTG loan on June

19  29, 1998 the fact that Lernout and Hauspie needed

20  to receive the money that would be provided to

21  Brussels Translation Group as fees, so that they

22  could recognise them as revenue before the end of

23  the June 1998 quarter?

24                     A.   The information I have here does

25  not allow me to answer this question.

117

1                    Q.   Based on the fact that he

2     prepared this memo, would you believe that Patrick

3     Faict would have an answer to that question?

4                    A.   You have to ask him. I have no

5     idea.

6                    Q.   Do you know the reason why the

7     bank approved on an emergency basis a withdrawal on

8     the BTG line of credit on September 29, 1998 as

9     reflected in Janssens exhibit 8?

10                   MR. BUTLER: Objection to form.

11                   A.   No, I do not know; I cannot

12    answer this question.

13                   MR. ROCCO: Is it true that the

14    approvals, both on June 29, 1998 and September 29,

15    1998, for the withdrawal of credit on the Brussels

16    Translation Group loan, were not consistent with

17    the banks policy for emergency procedures?

18                   A.   For the transaction of the 30

19    December, I have already said that they did not

20    comply with the policies, and it is also the case

21    of the one of the 30 June.

22                   Q.   Do you know when the bank was

23    first informed by Lernout and Hauspie that it would

24    be repurchasing Brussels Translation Group?

25                   A.   No, I do not know.  It is

1    mentioned in the memo here, but I do not know if it

2    was the first mention.

3                    Q.   Do you know how Lernout and

4    Hauspie financed the repurchase of Brussels

5    Translation Group?

6                    A.   No, I do not know.

7                    Q.   Do you know if Artesia Bank

8    provided any of that financing for the repurchase

9    of Brussels Translation Group?

10                   A.   I don't remember.

11                   Q.   When I refer to Artesia Bank, I

12   mean to include both Bacob and Paribas, do you

13   understand that?

14                   A.   Yes.

15                   Q.   Mr. Janssens, I have handed you

16   what has been marked as Janssens exhibit 9, which

17   is a memo to R. Avonts and J. Van Der Van from P.

18   Faict and I. De Coen dated June 29, 1998 bearing

19   Bates numbers 027616 to 027619.  If you can take a

20   moment to review that document?

21                   A.   (Perused document).

22                   Q.   Do you recognise this document?

23                   A.   No, I think it is the first time

24   I see it.

25                   Q.   Were you involved in presenting

119

1    to the management committee a proposal regarding

2    the Brussels Translation Group in March of 1998?

3                    A.   Yes.  I have already answered

4    this question a few minutes ago.

5                    Q.   I was not sure we had

6    established it was in March of 1998.  There is a

7    reference in this document to a presentation before

8    the management committee dated March, 13 1998, do

9    you see that?

10                   A.   Yes.

11                   Q.   We looked earlier at a decision

12   that was made and presented at the end of March

13   1998 in Janssens exhibit 7. My question to you is

14   whether - my question to you is whether you were

15   involved in this earlier presentation of March 13,

16   1998?

17                   A.   I think so.

18                   Q.   Were you also involved in

19   presenting the Brussels Translation Group matter to

20   the management committee on Marcy 23, 1998?

21                   A.   For the third time, I am saying

22   yes.

23                   Q.   Sir, I ask you because they are

24   all different dates, and I need to be clear you

25   presented on each time.  Do you know what position

120

1    Mr. Avonts held at the time this memo of June 29,

2    1998?

3                A.   He is a member of the management

4    committee of the bank, and at the time I am not

5    sure, but I think he was in charge of the financial

6    markets division.

7                Q.   Do you have an understanding as

8    to why he was an addressee of a memo regarding the

9    Brussels Translation Group loan?

10                A.   No.

11                Q.   Did you deal with Mr. Avonts in

12    the course of presenting any of the proposals

13    regarding the Brussels Translation Group to the

14    management committee?

15                A.   It is possible I was involved

16    with most everybody.

17                Q.   Do you recall any discussions

18    you had with Mr. Avonts regarding the Brussels

19    Translation Group?

20                A.   No, not any discussion

21    specifically.

22                Q.   If you can please turn to the

23    last page of exhibit 9. Do you recognise the

24    signature of Patrick Faict on that page?

25                A.   Yes.

121

1                    Q.  Do you recognise the signature

2    of Ivan De Coen on that page?

3                    A.  Yes.

4                    Q.  And do you recognise the third

5    signature that appears there?

6                    A.  It is Mr. Van Der Van's

7    signature.

8                    Q.  And is the handwriting that

9    appears just above Mr. Van Der Van signature also

10   in his handwriting?

11                   A.  Yes, it is very likely.

12                   Q.  If you can direct your attention

13   to the first page of Janssens 9, do you recognise

14   the handwriting on that page?

15                   A.  Ahm, yes.

16                   Q.  Can you tell me whose

17   handwriting it is that appears after the word

18   "decision" in the middle of the first page of

19   Janssens 9?

20                   A.  Mr. Avonts.

21                   Q.  Is that also his signature that

22   appears on the first page of Janssens 9?

23                   A.  Indeed, yes.

24                   Q.  Do you know whether the bank

25   ever considered accepting a credit default swap on

122

1    the Brussels Translation Group loan?

2                    MR. BUTLER: Objection to form.

3                    A.   I cannot answer for the bank,

4    but I have - I did not receive this information

5    within the bank until today when I read it in the

6    document, the exhibit Janssens 8 at point 2.4.

7                    MR. ROCCO: So you do not recall,

8    during the course of your duties on the Brussels

9    Translation Group loan, ever hearing of the

10   possibility of using a credit default swap in

11   connection with that loan, is that correct?

12                   A.   That is correct.

13                   Q.   I want to switch gears now away

14   from the Brussels Translation Group to another

15   transaction that we briefly touched on earlier. You

16   testified you recalled a loan to Radial Belgium NV,

17   correct?

18                   A.   Ahm.

19                   Q.   I am going to refer, for

20   similarity's sake, to 'Radial Belgium' as 'Radial',

21   is that okay?

22                   A.   Ahm.

23                   Q.   Can you tell me what was the

24   business of Radial?

25                   A.   Radial was a new company that

1    had been created in order to develop a new voice

2    technology - I've forgotten which.

3                    Q.   Do you know what that language

4    development company is?

5                    A.   It was also a new company that

6    was to develop translation technology in languages

7    other than the ones Lernout and Hauspie were

8    working on.

9                    Q.   Is it is true that Radial

10   Belgium was going to use the proceeds of the loan

11   it obtained from the bank to pay to the LDCs, who

12   would in turn pay licensing fees to Lernout and

13   Hauspie?

14                   A.   Radial needed money to finance

15   its business and, taking into account the contract

16   with Lernout and Hauspie, it was obvious that it

17   had a main supplier, which was Lernout and Hauspie.

18                   Q.   And the bank was aware that

19   money it was going to provide to Radial would

20   ultimately be used to pay fees to Lernout and

21   Hauspie, is that correct?

22                   A.   The bank was aware that Radial

23   had invoices to pay to its main supplier, and it

24   had requested a loan for the working capital?

25                   A.   And its main supplier was

124

1  Lernout and Hauspie, correct?

2                    A.  Correct.

3                    Q.  And the bank also knew that

4  Lernout and Hauspie was going to recognise as

5  revenue the monies it received from the LDCs that

6  were funded by the loans provided by the bank to

7  Radial, correct?

8                    MR. BUTLER: Objection to form.

9                    A.  The bank knew it was granting a

10  loan to Radial for working capital, to pay its main

11  supplier.

12                    MR. ROCCO: Isn't it also true that

13  the bank was informed that Lernout and Hauspie

14  would be recognising revenue on the money it

15  received from the LDCs that were funded by the loan

16  to Radial?

17                    MR. BUTLER: Objection to form.

18                    A.  Can you repeat the question.

19                    (Question repeated by interpreter).

20                    A.  Since the bank has at the same

21  time loans to Lernout and Hauspie, it also analyses

22  the accounts of Lernout and Hauspie and can see

23  that, in the income, there have been invoices paid

24  by Radial.

25                    Q.  And wasn't - withdrawn.  And

1    didn't Lernout and Hauspie inform the bank that it

2    could not guarantee the loans to Radial, because to

3    do so would jeopardise the company's ability to

4    recognise revenue on monies it received from the

5    LDCs that were funded by Radial?

6                    MR. BUTLER: Objection to form.

7                    A.    I don't remember if Lernout and

8    Hauspie actually told us, but it had already been

9    mentioned in past for transactions which we have

10   said were similar. Indeed we knew that, for Lernout

11   and Hauspie, our client, that there was a problem

12   for the accounting part of the operation, that it

13   was impossible to have a direct link.

14                   Q.    And the bank also knew it was

15   impossible to have an indirect link between the

16   loan to Radial and Lernout and Hauspie in order for

17   Lernout and Hauspie to recognise revenue, correct?

18                   MR. BUTLER: Objection to form.

19                   A.    That's right.

20                   Q.    The initial loan that was

21   approved by - withdrawn. The initial loan that was

22   granted to Radial was done outside of the normal

23   procedures at the bank, is that correct?

24                   A.    That is correct.

25                   Q.    The loan was approved only by

126

1     the signature of Geert Dauwe, is that right?

2                    A.   Yes, that is the case.

3                    Q.   And Mr. Dauwe did not have an

4     authority alone to approve a loan of the size of

5     the Radial loan, is that correct?

6                    A.   That is correct.

7                    Q.   Was Mr. Dauwe ever sanctioned by

8     the bank for approving a loan outside of the

9     banking proper procedures?

10                    A.   I have not any - I don't have

11    any knowledge of sanctions, but it was not part of

12    my responsibilities to deal with sanctions of

13    members of the management committee.

14                    Q.   Do you know whether the bank

15    ever conducted an investigation regarding Mr.

16    Dauwe's initial approval of the loan to Radial?

17                    A.   I have no knowledge of an

18    investigation by anyone in the bank on this topic.

19                    Q.   Who in the bank would know

20    whether or not Mr. Dauwe was ever sanctioned for

21    approving the initial Radial loan outside of the

22    banks normal procedures?

23                    A.   Certainly the president of the

24    management committee of the bank, Mr. Bruneel, and

25    maybe the chairman of the board as well; you should

127

1    ask them.

2                    Q.  Did Mr. Dauwe continue to

3    function in his normal capacity on the Radial loan

4    after it was discovered by the bank that he had

5    approved the initial loan outside of the bank's

6    normal procedures?

7                    A.  I did not notice any change.

8                    MR. BUTLER: It's 5.30.  You should

9    be looking for a good place to break.

10                   MR. ROCCO: We can stop here, that's

11   fine, this is a good point.

12   (The deposition was adjourned at 17.31)

13         -------------------------------------

14

15

16

17

18

19

20

21

22

23

24

25

128

```
 1
 2                              ERRATA
 3     CORRECTION                                    PAGE
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24     Signature                              Date
25
```

129

1

2                        I, Jacques Janssens, am the

3    deponent in the foregoing deposition.  I have read

4    the foregoing deposition and, having made such

5    changes and corrections as I desired, I certify

6    that the transcript is a true and accurate record

7    of my responses to the questions put to me on 20th

8    April 2006.

9

10

11

12

13

14

15

16    Signed

17

18

19

20

21

22

23    At

24

25

130

1
2
3                   CERTIFICATE OF COURT REPORTERS
4      I, Paul Brincau, Accredited Court Reporter, Member
5      of the British Institute of Verbatim Reporters, do
6      hereby certify that I took the stenotype notes of
7      the foregoing deposition, and that the transcript
8      thereof is a true and accurate record transcribed
9      to the best of my skill and ability.
10
11     I further certify that I am neither counsel for,
12     related to, nor employed by any of the parties to
13     the action in which this deposition was taken, and
14     that I am not a relative or employee of any
15     attorney or counsel employed by the parties hereto,
16     nor financially or otherwise interested in the
17     outcome of the action.
18
19
20
21
22
23                   PAUL BRINCAU
24
25

# EXHIBIT NN

Excerpts From The
April 27, 2006
Deposition of
Philippe Steverlynck

11

1         MR EGAN:    Let me try and speed this up this

2    way.  Between January 96 and June 1999 do you recall

3    being a director of credit secretary at Paribas?

4         A.    I have been in charge of that department and

5    I can imagine it is approximately in that period of

6    time, yes.

12

6     Q.   Thank you, sir.   I would like to focus now

7   for a moment on your role during the time period you

8   were working as Credit Secretary, you mentioned

9   earlier.   What were your duties at that time?

10     A.   So this was a new department that has been

11   created at the beginning of that year, January.   The

12   purpose was to centralise all the risk advices, credit

13   advices for counterparty related issues for departments

14   that were not active immediately in the different

15   regions in the distribution network, so I think about

16   risks on the banks, risks on the bank as counterparty

17   as well as export finance transactions as well as

18   structured finance transactions and so on.

19     Q.   You mentioned it was January of that year,

20   that year being 1996?

21     A.   Might be, yes.

22     Q.   You also mentioned counterparty related

23   issues, what did you mean by that?

24     A.   So we have market issues, market risk issues

25   and you have counterparty related issues, so it is

13

1   especially the counterparty related issues, risks on

2   counterparty, yes.

3          THE INTERPRETER:   Lenders -- excuse me,

4   borrowers.

5          MR EGAN:   What were your responsibilities in

6   that role?

7       A.   My responsibilities in the case are in the

8   first case was to deploy the department, it was really

9   we began from scratch and to look for people to run, to

10  help me to do what they expected from our department,

11  to give the advices.   Also to bring the whole

12  procedure.

13          THE INTERPRETER:   Start, launch.

14      A.   Also to even to write them and to begin

15  them.   That was -- the essential, let us say the

16  essential duty we had is to give an advice together

17  with the proposition to Credit Committee.

18          MR EGAN:   So were you responsible for

19  getting credit files in order?

20          MR WEIDNER:   Objection to form.

21      A.   Not really.

22          MR EGAN:   Were you responsible for preparing

23  credit memoranda related to proposed loans?

24      A.   Not really.

25      Q.   As you were head of the department, correct?

                                                    14

1       A.   I was.

2       Q.   Who did you report to?

3       A.   To Mr Janssens.

4       Q.   That's Jacque Janssens?

5       A.   Yes.

6       Q.   In 1996 who else was in the Department, who

7   reported to you?

8        A.    So I had one guy Joris Van Helleputte, then I

9   had other guys who were more an Administrative

10  department just for registration of long-term loans,

11  but it was pure administrative issue, so it was.  There

12  was still my Department but also your Joris only came

13  in the month of March, some months later, so I was

14  alone to start, at the exception of the Administrative

15  department there.   Then there was also another guy, a

16  very junior one also, that was Philippe De Culinaere.

17              THE INTERPRETER:   Philippe De Culinaere.

18              MR EGAN:   What was Mr Van Helleputte's job?

19       A.   Mr Van Helleputte's job was, he was to give

20  an advice on the credit requests, credit proposals that

21  had been made by other departments.

22       Q.   Would this be advice focused on Credit Risk?

23       A.   Yes.

34

23      Q.    I would like to mark Steverlynck Exhibit 4.

24    (Marked for identification Steverlynck Exhibit 4)

25            Steverlynck Exhibit 4 is BATES stamped DBB

35

1    00006813 through 6817 and Mr Steverlynck I ask you if

2    you have reviewed this document and ask you if you

3    recognise it?

4      A.    Yes.

5      Q.    Mr Steverlynck, do you recognise this

6    document?

7      A.    It appears to me not to be the first time,

8    but I see that document, yes.

9      Q.    Did you draft this document?

10      A.    I can't remember, what I know is the way of

11    working was mostly that in the beginning as

12    I explained, I see it is June 97, Joris Van Helleputte

13    wrote --

14            THE INTERPRETER:    It is likely that Joris

15    Van Helleputte wrote this.

16            MR EGAN:    And this is a June 13th 1997 memo

17    from Mr Van Helleputte and yourself to Mr Janssens and

18    Ivan De Coen D-E, C-O-E-N?

19      A.    That is.

20      Q.    And at that time Mr Van Helleputte reported

21    to you?

22      A.    That is.

23      Q.    And you believe Mr Van Helleputte would have

24   prepared this document?

25      A.    That is.

                                                          36

 1      Q.    Would he have prepared it at your

 2   instruction?

 3      A.    Not especially on my instruction.    They had,

 4   I suppose I see it is an advice so it was in evidence

 5   because he was the only --

 6            THE INTERPRETER:    The only member of staff.

 7      A.    He was my own colleague, so it can happen

 8   that he did it automatically on the request also of the

 9   credit proposal that has to come to Credit Committee.

10            MR EGAN:    Would you have reviewed this

11   document before it was sent to Mr Janssens and Mr De

12   Coen?

13      A.    I can't remember.

14      Q.    Would Mr Van Helleputte typically put your

15   name on documents without you seeing them?

16      A.    This can happen.

17      Q.    Do you recall it happening with this

18   document?

19      A.    I don't.

81

3      Q.   Do you recall receiving the advice at or

4  around June 1997 in connection with the Dictation

5  Consortium loan proposal that L&H cannot directly or

6  indirectly serve as guarantor for the repayment of any

7  loan granted to Dictation?

8      A.   I can't remember, what I have in mind now is

9  the advice to Van Helleputte that he advised to

10  guarantee, that's what I remind, what I have read this

11  morning.

12      Q.   So this reminds you of Mr Van Helleputte

13  providing advice regarding guarantee?

14      A.   Yes, that is what I am remind to have read

15  this morning on that document.

16      Q.   You are referring to Steverlynck Exhibit 4?

17      A.   That's it.

18      Q.   Where the reference, because of problems with

19  American law?

20      A.   No, no.  The second paragraph of number six

21  in the advice of Joris.   That's all I want to say.

22      Q.   So all you recall is the suggestion made in

23  Steverlynck 4 to consider seeking a guarantee from L&H

24  related to Dictation Consortium?

25      A.   Yes.

99

6   Mr Steverlynck, are you familiar with a company known

7   as the Brussels Translation Group?

8       A.   Familiar, yes, I know, I remember the name,

9   yes.

10      Q.   While working for Special Credits at the Bank

11  did you work on the Brussels Translation Group loan?

12      A.   The name of the Brussels Translation Group

13  seems to me I heard it.   I don't know if it was when,

14  if it was in my period when I was in Kortrijk, then it

15  was in my responsibility of the credit in Brussels.

16      Q.   Do you have any memory of actively working on

17  any BTG loan proposals?

18      A.   In my memory I can't remember any

19  negotiations on this external negotiations on that

20  transaction, so I suppose it was from my activity here

21  in the Brussels department.

22      Q.   We will mark Steverlynck Exhibit 8?

23      A.   But maybe if I see a date.

24  (Marked for identification Steverlynck Exhibit 8)

25      Q.   DBB 125390 through 125404 is a December 3rd

100

1   1998 e-mail with three attachments.  Did you receive

2   this e-mail on or about December 3rd 1998?

3       A.   I can't remember but I suppose so, yes.

4       Q.   Is that your e-mail address?

5       A.   That is.

6        Q.    And that is the address you received the

7    e-mail at around December 1998; is that correct?

8        A.    This has been addressed to me on that date.

9        Q.    It is from Mr Van Helleputte to

10   Mr Steverlynck?

11       A.    Yes.    Mr Van Helleputte -- strike that.    He

12   is sending you copies of the BTG loan proposals; is

13   that correct?

14       A.    That is correct.

15       Q.    Do you know why he was sending these to you

16   in December 1998?

17       A.    Not on the basis of this mail, no.

18       Q.    Were you involved in a request for an

19   extension or prolongment of credit related to BTG in

20   December 1998?

21       A.    I can't remember.

101

5          MR EGAN:    Mr Steverlynck, still on the

6   Steverlynck Exhibit 8 e-mail from Mr Van Helleputte to

7   you December 3rd 1998, do you believe you received the

8   attachments to this e-mail as well?

9          A.    I can't remember, but I suppose so, yes.

10          Q.    You have no reason to doubt that you received

11   those attachments?

12          A.    No.

13          Q.    I can actually represent to you that this

14   e-mail came from what's been designated by Dexia as

15   your files.    Can you turn to the second page.    If you

16   could turn to the second page of the document, the

17   first page of the first attachment.    This is an

18   October 7th 1997 memo from P Faict and Mr Van

19   Helleputte to the Management Committee for a draft of

20   that.    Do you see that document?

21          A.    I see this document here, yes.

22          Q.    Who is Mr Faict?

23          A.    Mr Faict was that moment a corporate banker

24   in the Brussels region.

25          Q.    Would it be typical for a corporate banker

102

1   and somebody from Credit Risk to prepare a joint memo

2   to a Management Committee?

3          A.    It could happen.    I see what I see, it could

4   happen, yes.

5       Q.    If you could look down to the section marked

6    2.1 heading "impossibility of having our entire risk

7    covered by L&H under US GAP", do you see that section?

8       A.    I see.

9       Q.    And the first sentence under that, does that

10   state that:

11            "We can safely say that this credit should

12   be used to finance the machine translation project

13   within L&H."

14      A.    That's what I read here.

15      Q.    From that you understand that BTG would be

16   involved in transactions with Lernout & Hauspie?

17      A.    Because of what I read here.

18      Q.    Did you understand that BTG was a customer of

19   Lernout & Hauspie's?

20      A.    That's what I am reconstructing, now they are

21   a customer, yes.

22      Q.    If you look at the first line of the second

23   paragraph under 2.1, the last section on that page?

24      A.    Yes.

25      Q.    Does this memo indicate it would be

                                                        103

1    imperative that L&H would exclude itself entirely from

2    the loan transaction so that they could book the monies

3    needed for this project as revenue?

4       A.    What is stated here is --

5            THE INTERPRETER:   For this it would seem

6   recommended, it would seem appropriate.

7        A.   That's what I read here.

8             MR EGAN:   If you can turn to the next page

9   where there is a series of bullet points.   The first

10  bullet point, does that instruct that L&H can in no way

11  directly or indirectly be involved with the financing

12  of the BTG?

13       A.   I don't know if it's, I should see if what I

14  am reading here is L&H is not involved nor directly nor

15  directly in the financing of BTG.   That's what I read

16  there.

17       Q.   Based on the preceding page that is a

18  requirement imposed by the regulations for the

19  regulations of the stock authorities?

20       A.   That is what I read here.

21       Q.   You also see there in the second bullet point

22  that it says:

23            "L&H can never be held responsible not

24  directly nor indirectly nor as securities or guarantor

25  for the repayment of any financing."

                                                      104

1        A.   That is what I read here.

2        Q.   And you received this attachment on or about

3   December 1998?

4        A.   That is the date here 3rd December 1998.

5        Q.   And you have no recollection of being

6   involved in a decision to extend or prolong credit to

7  BTG in December 1998?

8       A.    Not on the basis of what I have before me

9  now, no.   I can't really remember.

EXHIBIT OO

Excerpts From The
April 19, 2006
Deposition of
Bernard Mommens

143

10          Q.  Are you familiar with a
11 transaction known as the Brussels Translation
12 Group?
13          A.  I am not sure.
14          Q.  Mr. Mommens, I show you what has
15 been marked as Mommens exhibit 11, which is a
16 contract surety or guarantee on Paribas Bank
17 letterhead that is stamped DBB 004377 to 04378.  Do
18 you recognise this document?
19          A.  No sir.
20          Q.  Do you recognise any of the
21 handwriting on this document?
22          A.  No I do not.
23          Q.  Does seeing this document cause
24 you to recall anything about a loan that the bank
25 issued to Brussels Translation Group NV?

144

1          A.  No sir.
2          Q.  Were you ever asked to offer any
3 legal advice on a loan to Brussels Translation
4 Group NV?
5          A.  I don't remember, I was never
6 shown a document saying the opposite; so I don't
7 remember.
8          Q.  Do you recall whether anyone on
9 your staff in the legal department was ever asked

10    by the bank to offer legal advice on the Brussels

11    Translation Group loans?

12                        A.  I cannot exclude it.

13                        Q.  You don't know sitting here

14    today whether that was ever done?

15                        A.  No sir.

158

3                    Q.  Is it your testimony that you do

4    not recall anything about the Brussels Translation

5    Group?

6                    A.  Well, it is a name that has been

7    mentioned, but up to now, nor by federal police nor

8    in preparation of this deposition, I was not shown

9    any documents, so I do not know for sure if I saw

10    something about Brussels development or not.

11                    Q.  But it is fair to say you do not

12    recall having any involvement with that

13    transaction, Brussels Translation Group?

14                    A.  That is fair to say, yes.  Maybe

15    if you have documents, I can try to remember.

310

1                          Q.  Did you have any role with
2    respect to Artesia securities at any point in time
3    with the bank?
4                          A.  No sir, I did not.
5                          Q.  Did you have any role with
6    respect to Artesia securities at any positions in
7    LHSP securities?
8                          A.  No sir.
9                          Q.  Do you know who at this time,
10   1999, would be the person who dealt with those
11   issues?
12                         A.  I do not know.  I should look
13   into the organisation chart in order to answer you;
14   but I do not know.
15                         Q.  Did you in the legal department
16   ever examine whether or not, at any time while you
17   were in that department, there was any conflict
18   with the Artesia Bank trading in L&H securities for
19   its own account while Artesia securities was
20   issuing its research reports recommending advice on
21   the L&H securities?
22                         MR. BUTLER: Can I have that question
23   read back.
24                         (Record read)
25                         MR. ROCCO: You can answer.

311

1                    A.  If I as a lawyer intervened in
2      the question - no I did not.
3                    Q.  And you were never asked to
4      provide any such advice, is that correct?
5                    A.  I don't remember ever giving any
6      advice on that issue; I don't remember.
7                    Q.  Were you ever asked to give any
8      advice with respect to the bank's, Artesia Bank's,
9      relationship with Artesia securities?
10                   A.  If what respect.
11                   Q.  In any respect?
12                   A.  Any respect outside of this -
13     outside of Lernout and Hauspie?
14                   A.  Ahm.
15                   Q.  I do not really think so.
16                   Q.  You don't recall ever doing
17     that?
18                   A.  No, no.

340

6                    Q.  Were you aware that at some

7    point in time in 1999 Artesia securities was

8    providing analyst coverage of Lernout and Hauspie's

9    stock?

10                   A.  I was not - I am not aware of

11   that.

12                   Q.  Is it fair to say that you had

13   no involvement in the affairs of Artesia

14   securities?

15                   A.  That is correct.

16                   Q.  Is it also fair to say that you

17   had no involvement in the affairs of Cordius Asset

18   Management.

19                   A.  99?

20                   Q.  1999.

21                   A.  That is correct.

22                   Q.  How about 98?

23                   A.  No, no.

24                   Q.  At any time did you have a role

25   with respect to either one of those companies -

341

1    Artesia securities or Cordius Asset Management.

2                    A.  In what period of time?

3                    Q.  Any time?

4                    A.  Any time?

5                    Q.  Yes.

6                    A.   Now?

7                    Q.   Including today, yes.

8                    A.   Cordius became - but I do not

9    know how legally - became Dexia Asset Management.

10                   A.   Okay.

11                   A.   And I am a director to Dexia

12   Asset Management at this time.

13                   Q.   When was your first involvement

14   with Dexia Asset Management?

15                   A.   Two years ago I think, two/three

16   years ago.

17                   Q.   It was after the time period in

18   which the bank was dealing with Lernout and

19   Hauspie?

20                   A.   It was what?

21                   Q.   After the time period?

22                   A.   After, yes.

# Exhibit PP

Excerpt From The
April 26, 2006
Deposition of
François Saverys

19

25        Q.    Do you see that the first page indicates that

20

1    at least part of this document is an interview of

2    G Dauwe, if you look at the very first page?

3        A.    I don't know.

4        Q.    Well, look at the very first page, it is

5    written in interview of GK Dauwe, correct?

6        A.    Yes.

7        Q.    Does that indicate that this is an interview

8    and meetings, meeting notes of meetings with various

9    individuals?

10        A.    I don't know, I don't know how an audit is

11    organised.

12     Q.    Do you know if Artesia Securities traded L&H

13 stock at all?

14     A.    I don't know.

15     Q.    Do you know if Artesia Securities actually

16 prepared analyst reports with regard to L&H stock?

17     A.    I don't know.    I don't know.

18     Q.    Do you know if Paribas did?

19     A.    I don't know, they are making a lot of

20 analysts, I don't know if they made special analysts

21 for Lernout & Hauspie.

68

11      Q.    Let's focus then on the actual Audit Report

12  which begins at DBB 039481 and goes to DBB 039516.

13  This is a report that has a date of 1/19/01, do you see

14  that?

15      A.    Yes.

16      Q.    It was prepared by the Internal Audit

17  Department of Dexia; is that correct?

18      A.    That will be, yes.

19      Q.    Pardon?

20      A.    Yes.

21      Q.    And did you discuss this report with anybody

22  when you received it?

23      A.    Afterwards when we received it with the

24  auditors.

25      Q.    Who in the Audit Department did you discuss

69

1   it with?

2       A.    I don't remember.

3       Q.    What about before the Audit Report was

4   actually prepared, did you discuss the subject of the

5   report, which you will see on page one is the Bastiens

6   loan, with anyone?

7       A.    I can't remember.

8       Q.    You don't know if you were interviewed in

9   connection with the preparation of the Audit Report?

10      A.    I can't remember.

11     Q.    But you are sure that you discussed this

12  report with one or more members of the Audit Department

13  afterwards?

14     A.    Yes, yes.

15     Q.    If you look at the top of the second page of

16  the report, DBB 039482, it says the "present report",

17  at the top:

18          "The present report was prepared at the

19  request of the Bank and Finance Committee dated

20  11/29/2000."

21          Do you see that?

22     A.    Yes.

23     Q.    So the Bank Regulators actually requested

24  this audit to be conducted; is that correct?

25     A.    I read it, yes.

                                                    70

1      Q.    Did you independently understand that this

2   was requested by the Bank Regulators?

3      A.    That's what I am reading, yes.

4      Q.    It says in the next sentence:

5          "The present report covers the credits

6   directly allocated to the companies of L&H Group

7   including the role of paying agent regarding Consortium

8   credit allocated to LHSP regarding which the Bank

9   currently still has outstanding credits, in particular

10  Bastiens, L&H Speech Products, L&H Investment Company

11  and P Van Driesten.

12          Do you see that?

13     A.   Yes.

14     Q.   So this pertains to open credits or

15 outstanding credits, correct?

16     A.   Outstanding credit risks.

17     Q.   Is that correct?

18     A.   That is what I read, yes.

19     Q.   Then the last sentence in that paragraph

20 reads:

21          "The question whether other files closed as

22 well shows outstanding needs to be submitted to an

23 audit investigation as now posed."

24          Do you see that?

25     A.   I see that, yes.

                                                      71

1      Q.   Then below that a little further halfway down

2 the page it says "score"?

3      A.   Yes.

4      Q.   It says:

5          "We conclude that the internal control within

6 the Bank functioned in an insufficient manner."

7          Do you see that?

8      A.   Yes.

9      Q.   "Because of time pressure on the file the

10 procedures came under pressure."

11          Do you see that?

12     A.   I see that.

13      Q.    "In addition if procedures were in place they
14  were applied in an insufficient or unsatisfactory
15  manner."

16            Do you see that?

17      A.    Yes.

18      Q.    That was the conclusion of Dexia's Internal
19  Audit Group with regard to the Bastiens loan?

20      A.    I don't know.

21      Q.    Well, perhaps with regard to other loans but
22  it was certainly the conclusion of this Internal Audit
23  report which covered the Bastiens, L&H Speech Products,
24  L&H Investment Company and P Van Driesten loans,
25  correct?

                                                        72

1       A.    That is what I read, yes.

2       Q.    Look at DBB 039484.    Do you see at the top
3   it says:  "L&H Group part Bastiens."

4       A.    Yes.

5       Q.    And if you were to look back at the first
6   page of the report it says that this is the part of the
7   report regarding Bastiens, do you see that, DBB 039481?

8       A.    Yes, I see that, yes.

9       Q.    So this discussion that we are looking at,
10  DBB 03389484, relates to the Bastiens loan?

11      A.    It looks like.

12      Q.    If you look at the first column there are
13  deficiency findings, correct?

14    A.    Yes.

15    Q.    If you look under, look then at DBB 039486

16  which is a couple of pages over.    It says:

17          "Credit proposal two Management Committee

18  7/4/00."

19          Do you see that?

20    A.    I see that, yes.

21    Q.    So that's actually a decision of the

22  Management Committee on 7/4/2000 regarding the Bastiens

23  loan, correct?

24    A.    I don't know.

25    Q.    Well, what does that refer to?

                                                      73

1     A.    I have to read it to give you an answer.    It

2  looks to be that.

3     Q.    So the Management Committee actually did

4  consider this loan after it was rejected on 6/28/00 by

5  Credit Committee One, correct?

6     A.    Yes, correct.

7     Q.    And it considered it on or about July 7th

8  2000, correct?

9     A.    Pardon?

10    Q.    It considered the loan on or about July 7th

11  2000, correct?

12    A.    In July 2000.

13    Q.    Or on or about July 4th 2000 is when the

14  Management Committee considered the Bastiens loan,

15    correct?

16            THE INTERPRETER:    During the course of the

17    month of July.

18            MR WEIDNER:    Are you asking him for his

19    direct knowledge or just what it says on the page

20    because it is unclear in the record?

21            MS DYER:    You can clarify it if you need to,

22    Jim.

23            Let's go to the past bullet point, 039486, it

24    says:

25            "The decision of the Management Committee

                                                        74

1    deviates from the opinion provided by the CDC, the

2    reasons hereto are not mentioned in the decision."

3        A.    I see that, yes.

4        Q.    After the report was issued which we are

5    looking at did you discuss that particular issue with

6    the Internal Audit Department members?

7        A.    I don't remember.

8        Q.    If you look at the next page, DBB 039487?

9        A.    Yes.

10       Q.    Do you see where it says:

11            "Credit proposal three Management Committee

12    7/18/00"?

13       A.    Yes.

14       Q.    So the Management Committee considers the

15    Bastiens loan a second time then; is that correct?

16     A.   I have to read it.   I see that the credit

17  note is presented to the Committee.

18     Q.   And if you look at the second paragraph under

19  that it says:

20          "At the time of the Committee meeting the

21  analyst was on holiday and says that he sent the

22  memorandum to a member of the Management Committee by

23  e-mail on 7/14/00."

24          Do you see that?

25     A.   Yes.

                                                          75

1      Q.   It says:

2           "In this e-mail it is stated the credit has

3   been approved by BAN, Bank Artesia Netherlands."

4           Do you see that?

5      A.   I see that.

6      Q.   So after it is approved by BAN then the loan

7   actually comes back to the Management Committee for

8   consideration, correct?

9      A.   I don't know.

10     Q.   Well, that's what this states?

11     A.   That is what I read there.

12     Q.   You were not a member of that Management

13  Committee?

14     A.   I was on vacations.

15     Q.   That is not my question.   You were not a

16  member of that Management Committee?

17     A.    No.

18     Q.    It says, the next paragraph says:

19          "He" and I assume that refers to the analyst

20    "does not remember very well how long he was in

21    possession of the memorandum by the analyst but he

22    suspects directly from the analyst."

23          THE INTERPRETER:    Can I correct the

24    translation, it doesn't say how long he has been in

25    possession, it says he doesn't remember very well in

                                                              76

1    what way he came into the possession of the note.

2          MS DYER:    Is that what it says, Mr Saverys?

3     A.    That is what, that is a correct translation.

4          MS DYER:    Then the next sentence says:

5          "He remembers that he spoke with Messrs

6    Piret and Saverys and in a mutual consultation it was

7    decided to present the file to the Management

8    Committee."

9          Do you see that?

10    A.    I see that, yes.

11    Q.    Do you recall having a conversation with

12    Mr Piret and anyone else to make the decision to

13    represent to the Management Committee?

14    A.    No, as I was on vacations at that moment.

15    Q.    Is it possible you had a conversation by

16    telephone?

17    A.    No, I was in Namibia and in Namibia there was

18  no telephone connection.

19       Q.   How long were you on vacation?

20       A.   One month.

21       Q.   What dates?

22       A.   The beginning of July, I don't remember the

23  date exactly, the beginning of July up to end of July.

24       Q.   Do you know why or who then decided to

25  present the file to the Management Committee on

                                                    77

1  7/18/2000?

2        A.   I don't know.

3        Q.   Did you ever ask anyone why?

4        A.   I don't know.

81

6     Q.   It says:

7          "A previously approved group file also

8    included a credit allocated in light of nursing the

9    stock exchange price."

10         Do you see that?

11    A.   I see that.

12    Q.   Do you know what that refers to?

13    A.   No.  No, I don't know.

81

20    Q.   Did you ever discuss these conclusions with

21  any members of the Audit Committee?

22    A.   As I told you before I had a discussion with

23  the auditor.

24    Q.   Did you discuss these conclusions regarding

25  the Bastiens loan?

82

1    A.   Yes, I will have discussed it.  Yes.

2    Q.   What did you discuss?

3    A.   I don't remember.

25        MS DYER:   Let me show you a document we will

                                                            170

1  mark as Saverys Exhibit 30.

2  (Marked for identification Saverys Exhibit 30)

3        DBB 038305 through 308.   I will give Exhibit

4  30 to your counsel and give him an opportunity to

5  review it, I have only one copy.   I place before you

6  Saverys Exhibit 30, it is a 3/19/1998 memo from Patrick

7  Faict and John Van Helbut to the Management Committee

8  and it is CCed to you, do you see that?

9        A.   Yes.

10       Q.   It relates to the roll over of a credit for

11 Brussels Translation Group; is that correct?

12       A.   It seems so.

13       Q.   Were you involved in the approval of the

14 initial Brussels Translation Group loan on or about

15 October 7th 1997?

16             THE INTERPRETER:   Not as far as I remember.

17             MS DYER:   You were not on the Credit

18 Committee that approved that loan that you recall?

19       A.   I can't remember that.

20       Q.   Were you involved in the approval of the

21 grant of the roll over that is referenced here on

22 Saverys Exhibit 30?

23       A.   I can't remember.

24       Q.   Do you know why you're CCed on this document?

25       A.   As being at that moment active in Corporate

171

1  Banking.

2      Q.   What is this document exactly?

3      A.   I try to see what it is as a document.   I

4  don't know exactly.   The first page anyhow is a

5  decision of the Management Committee, Management Board

6  Committee from 31st March and that is the written --

7           THE INTERPRETER:   It is the decision of the

8  Management Committee written down in writing.

9           MS DYER:   And it indicates an approval of

10 that loan extension or that loan roll over, correct?

11     A.   It is to do with that, yes.

12     Q.   Then the subsequent pages appear to be a memo

13 related to that loan BTG, correct?

14     A.   I don't know, I imagine but I don't know.  I

15 can't confirm it but I don't know.   I imagine it is

16 that.

17     Q.   If you look at DBB 038306?

18     A.   Yes.

19     Q.   Under item number two, context of the

20 operation, it refers to Brussels Translation Group?

21     A.   Yes, I see that, yes.

22     Q.   If you turn to the next page which is DBB

23 038307?

24     A.   Yes.

25     Q.   Let me just ask you first, you were CCed on

172

1   this document, have you seen this document before?

2      A.   I don't remind me the document, no.   I don't

3   remember the document.

4      Q.   Do you have any reason to believe that you

5   didn't receive it given that you are a CC on it?

6      A.   I have no reason to believe that I didn't

7   receive it.

8      Q.   Is any of the handwriting on the document

9   yours?

10     A.   No.

11     Q.   If you look at item number three, DBB 038307?

12     A.   Yes.

13     Q.   It says:

14          "US GAP restricts the possible structuring

15   of the operation."

16          Do you see that?

17     A.   I see that, yes.

18     Q.   It says:

19          "The operation has two benefits for L&H, the

20   loan for the financing of the developments cost is

21   granted to a third party, that is BTG, and will

22   consequently not affect the balance sheet of L&H."

23     A.   I see that.

24     Q.   Number two:

25          "The compensation for development costs

173

1  which BTG will pay to L&H will constitute company

2  income for L&H."

3       A.   I see that.

4       Q.   Those are two benefits, or similar benefits

5  that we looked at for the LDF loan we look at earlier?

6       A.   As far as I remember I think so, yes.

7       Q.   And Dexia was aware of those benefits in

8  structuring the loan this way?

9       A.   Was informed of that, yes.

10       Q.   Then it says:

11            "To realise these benefits it is essential

12  under US GAP that the transaction between BTG and L&H

13  be considered as a mere commercial transaction taking

14  place between independent and free parties under normal

15  economic circumstances."

16            Do you see that?

17       A.   I see that, yes.

18       Q.   "By taking the Stock Exchange quotation of

19  L&H on the NASDAQ into consideration the US GAP

20  regulations will need to be applied in a stringent

21  manner which will be monitored strictly by the American

22  Securities and Exchange Commission."

23            Do you see that?

24       A.   I see that yes.

25       Q.   And then it indicates below that the

174

1    characteristics that the transaction needs to show?

2        A.    Yes.

3              THE INTERPRETER:    Yes, I can see that.

4              MS DYER:    The first is:

5              "L&H in no manner will be involved directly

6    or indirectly in the financing of BTG."

7              Do you see that?

8        A.    I se that yes.

9        Q.    "L&H may never be held liable directly or

10    indirectly by means of the guarantee with regard to

11    repayment of the financing granted to BTG."

12              Do you see that?

13        A.    I see that, yes.

14              MS DYER:    We have to change the tape and so

15    why don't we go ahead and take a break.

16              THE VIDEOGRAPHER:    Off the record at

17    4 o'clock.

18

19                      (Short adjournment)

20

21              THE VIDEOGRAPHER:    Starting roll seven in

22    the deposition of Francois Saverys.    Going back on the

23    record at 16.11.

24              MS DYER:    Returning to Saverys Exhibit 30

25    which was the document we were talking about before the

175

1  break, Mr Saverys, if you could just look at the last

2  page of that document DBB 038308?

3     A.   Yes.

4     Q.   It says:

5          "By taking standards of US GAP into

6  consideration L&H cannot provide us any additional

7  guarantees for the period of development of the machine

8  translation software without rendering the entire

9  operation useless."

10         Do you see that?

11    A.   Yes, I see that.

12    Q.   Did you understand that at the time this

13 document was written on or around March 19th 1998?

14    A.   I don't remember the document.

15    Q.   Regardless of whether you remember the

16 document did you understand that with regard to the BTG

17 entity and the loan that the entire operation would be

18 rendered useless?

19    A.   I understand what I read there, yes.

20    Q.   Did you understand it at the time that the

21 BTG loan was extended in March 1998?

22    A.   I tell you that I don't remember the note as

23 such.

24    Q.   Let me ask you to take a look at two

25 documents, one that we will mark as Saverys Exhibit 31

176

1  and Saverys Exhibit 32.

2  (Marked for identification Saverys Exhibits 31 and 32).

3          I ask you to take a look at the documents

4  before you, Saverys Exhibit 31 is DBB 039346 and 347.

5  Saverys Exhibit 32 is DBB 039354 and 355, they are both

6  entitled deed of guarantee and I ask you to look at

7  these and tell me if you have seen these before?

8      A.    I don't remember.

9      Q.    These are guarantees that Messrs Lernout

10  Hauspie & Willaert gave in favour of Artesia Bank in

11  connection with the BTG loans; is that correct?

12      A.    I suppose so, I imagine that that was the

13  case, yes.

14      Q.    And Saverys Exhibit 31, the first one is

15  dated March 31st 1998, correct, if you look at page

16  two?

17      A.    Yes.

18      Q.    And Saverys -- sorry, go ahead.   And Saverys

19  Exhibit 32 is dated June 19th 1998, correct?

20      A.    I see the date of June 98, yes.

21      Q.    If you look at what we will mark as Saverys

22  Exhibit 33.

23  (Marked for identification Saverys Exhibit 33)

24          Saverys Exhibit 33 is DBB 027616 through 619,

25  it is from Patrick Faict and Ivan Decoen to Rene Avonts

177

1   and Jan Van Der Ven regarding the Brussels Translation

2   Group dossier, do you see that?

3        A.    I see that.

4        Q.    It indicates a decision to a second

5   withdrawal with an increase of personal guarantee of

6   Lernout Hauspie & Willaert up to US 6,600,000, correct?

7        A.    That's what I read.

8        Q.    Does that refresh your recollection that

9   there was, in fact, guarantees by Messrs Lernout &

10  Hauspie Willaert on the Brussels Translation Group loan

11  or BTG loan?

12       A.    I don't remember anything from this Brussels,

13  regarding the Brussels Translation Group.

14       Q.    You had no reason to believe that the

15  guarantees that we have seen or the memos indicating

16  that there are guarantees are inaccurate in any way, do

17  you?

18       A.    No.

19       Q.    Let me show you a document we will mark as

20  Saverys Exhibit 32 -- 34.

21  (Marked for identification Saverys Exhibit 34)

22            MS DYER:    Sorry, 34 this is a memo dated

23  September 30th 1998 from Patrick Faict to Jan Van Der

24  Ven and Geert Dauwe.    It is regarding Brussels

25  Translation Group NV, do you see that?

178

1      A.    I see that, yes.

2      Q.    Can you tell me if you have seen this

3  document before, sir?

4      A.    I cannot remember.

5      Q.    Can you tell me what this document is, if you

6  know?

7      A.    I should read it.  I have to read it.  It is

8  a request for payment I see.

9      Q.    A request for payment on the Brussels

10 Translation Group loan?

11     A.    For payment by Brussels Translation Group.

12     Q.    It is a request for payments by whom to

13 Brussels Translation Group, though?

14     A.    Payment by Brussels Translation Group.

15     Q.    To the Bank?

16     A.    I don't know to whom.

17     Q.    But it indicates --

18     A.    It is a request, no a request inside in the

19 Bank.

20     Q.    To obtain payment?

21           THE INTERPRETER:  As part of an application

22 for payment Brussels Translation Group are asking to be

23 allowed to pay an invoice.

24           MS DYER:   Okay, is that invoice -- who is

25 the invoice going to that Brussels Translation Group is

179

1  paying?

2      A.    I don't know.

3      Q.    Would that be Lernout & Hauspie?

4      A.    I don't know.

5      Q.    If you look at page two it says:

6            "In context number two BTG has Lernout &

7  Hauspie L&H development commercialised machine

8  translation software."

9            Do you see that?

10     A.    I see that, yes.

11     Q.    Then if you look down a little bit further a

12 couple of paragraphs:

13           "The development of the machine translation

14 software is divided into a number of milestones."

15           Do you see that?

16     A.    Yes, I see that, yes.

17     Q.    It says:

18           "In September 99 a complete product speech

19 technology needs to be delivered for all language

20 pairs," and it identifies those language pairs,

21 correct?

22     A.    Where is that?

23     Q.    Then --

24     A.    Where is that, the second paragraph?

25     Q.    No, the third paragraph under "context"?

1     A.   Yes.

2     Q.   Do you see that?

3     A.   Umm hmm.

4     Q.   Then if you look at the last paragraph under

5     contact:

6          "The realisation of each milestone will be

7     certified by an independent expert ST. Bodemcamp

8     appointed by BTG."

9     A.   Yes.

10    Q.   Then it says:

11         "Per certified milestone part of the

12    development fees will need to be paid."

13    A.   Umm hmm.

14    Q.   Then it says:

15         "BTG finances the development by means of

16    capital and by means of Bank credit."

17         Do you see that?

18    A.   Yes.

19    Q.   So is BTG then paying these milestone

20    payments to L&H?

21    A.   That will probably be so, yes.

22    Q.   If you look under number two:  "Coverage of

23    the total of our risk by L&H." Do you know that, what

24    that refers to, number two the heading "coverage of the

25    total of our risk by L&H", do you know what that refers

181

1  to?

2      A.    Probably referring to the transaction.

3      Q.    Referring to the BTG loan?

4      A.    To this transaction probably, I don't know.

5      Q.    Which would be the BTG loan?

6      A.    I don't know.

7      Q.    Isn't that what we are talking about, this is

8  the relationship between BTG and Artesia is that BTG is

9  a borrower and Artesia is a lender, correct?

10     A.    At that particular moment I think BTG was a

11 borrower and that Artesia was the lender, yes.

12     Q.    So talking about the coverage of Dexia's

13 total risk on the BTG loan by L&H, correct?

14     A.    That is the title of that point, yes.

15     Q.    Then if you look at 2.1 it says:

16           "Impossibility under the US GAP to cover the

17 total of our risk by L&H."

18           Do you see that?

19     A.    I see that, yes.

20     Q.    So Dexia, I take it, viewed this as a risk of

21 L&H, in other words the BTG loan was a risk of L&H

22 according to Dexia, correct?

23     A.    No, that is not what is written there.

24     Q.    Well, they are trying to cover the risk by

25 L&H, correct?

182

1    A.    Impossibility to cover the risk by L&H.

2    Q.    It says "to cover the total of our risk by

3  L&H", did they cover part of the risk by L&H?

4    A.    I can't remember.

5    Q.    If you look at the text it says:

6          "We can state that this credit serves the

7  financing of machine translation project within L&H."

8          Do you see that?

9    A.    Where is that?

10    Q.    The first sentence under 2.1?

11    A.    Yes, I see that.

12    Q.    Then it says:

13          "For reasons common to the NASDAQ ISDAQ

14  quotation of L&H the financing of the entire project

15  was transferred to the special purpose vehicle Brussels

16  Translation Group NV."

17          Do you see that?

18    A.    I see that, yes.

19    Q.    So Dexia was aware that the reason why the

20  financing of this entire project was transferred from

21  L&H to BTG was because of security considerations,

22  correct?

23    A.    No, just because what you see is following in

24  that note that it has to be seen as a transaction

25  completely independent.

183

1      Q.    And the way that was --

2      A.    As a pure commercial transaction.

3      Q.    And that's in order to avoid the restrictions

4   of the NASDAQ and ISDAQ, correct?

5      A.    That was a point to be looked at, to be very

6   careful therefore, yes.

7      Q.    And the way that the loan was structured in

8   order to make it appear as a mere commercial

9   transaction was to create the BTG special purpose

10  vehicle and finance the project through BTG rather than

11  L&H, correct?

12     A.    What do you say?

13            THE INTERPRETER:   I did not use the term to

14  make it appear like.

15            MS DYER:   But for -- well, to be considered

16  as a mere commercial transaction in order to circumvent

17  the restrictions of NASDAQ and ISDAQ Dexia was aware

18  that the financing was transferred to BTG as a special

19  purpose vehicle, correct?

20            THE INTERPRETER:   And as a result there was

21  solely a risk on the part of the special purpose

22  vehicle.

23            MS DYER:   Well, there was actually a risk

24  also we saw the guarantee of Messrs Lernout Hauspie &

25  Willaert, correct?

184

```
 1       A.    As private persons.

 2       Q.    They took a risk too, correct?

 3       A.    If they are giving a guarantee they are

 4  taking a risk as private persons, yes.

 5       Q.    If you go to commercial risk?

 6       A.    The same page?

 7       Q.    No, following, DBB 038370.  It says:

 8             "The commercial risk is contractually

 9  covered."

10             Do you see that?

11       A.    I see that.

12       Q.    "In the event the commercialisation fails the

13  repayment of the credit allocated to BTG will in first

14  place be guaranteed by the minimum sales performance

15  standards which L&H needs to accomplish as of 1999."

16             Correct?

17       A.    I see that, yes.

18       Q.    So there was a relationship between the

19  repayment of the BTG loan and L&H, correct?

20       A.    I wouldn't say that, no.

21       Q.    Well?

22       A.    I don't know.

23       Q.    The next sentence says L&H guarantee to pay

24  the minimum performance of 1999 and 2000 and 2001 and

25  gives an amount?
```

185

1       A.   I read that.

2       Q.   Were you aware of that at the time?

3       A.   No.

4       Q.   Look at the solution coverage for our risk --

5  strike that.   Do you know if L&H guaranteed any part

6  of the BTG loan at any time?

7       A.   I don't know.

8       Q.   Look at 2.4, solution coverage for our risk,

9  it says:

10            "As a solution for the coverage of our risk

11  put and call options would be established by and

12  between Artesia BTG and Mr N Willaert, Mr P Hauspie and

13  Mr J Lernout."

14            Do you see that?

15      A.   I see that, yes.

16      Q.   Then it says:

17            "Meanwhile it was also considered to remove

18  the risk from our books by means of a Default Swop."

19            Do you see that?

20      A.   I read that, yes.

21      Q.   Do you know what's meant by removing the risk

22  from our books by the means of a Default Swop?

23      A.   I don't know.

24      Q.   Would that be to eliminate the disclosure of

25  any guarantee?

186

1      A.   No, I don't know.

2      Q.   Do you know if the guarantee that Messrs

3  Lernout Hauspie & Willaert that we looked at as Saverys

4  Exhibits 31 and 32 were disclosed in the Letter of

5  Credit --

6      A.   I don't know.

7      Q.   Let me finish, regarding the BTG loan?

8      A.   I don't know.

9      Q.   Do you know if -- strike that.   Why wasn't a

10  Default Swop done in connection with the BTG loan?

11      A.   I don't know.

12      Q.   Did you have any involvement in assessing the

13  possibility of the use of a default Swop in connection

14  with the BTG loan?

15      A.   Not to my knowledge.

 9          MS DYER:   Mr Saverys, do you recall being in

10  meetings of the Credit Committee where any other

11  members of the Credit Committee expressed an opinion as

12  to whether the guarantees for either BTG or Dictation

13  had to be mentioned in the Letters of Credit?

14      A.   No, I don't remember.

15      Q.   With regard to BTG do you know if you were on

16  the Credit Committee that approved that loan?

17      A.   I don't remember.

# EXHIBIT QQ

Excerpts From The
April 24, 2006
Deposition of
Karl van Riet

86

6      Q.    I show you a document we will mark as Exhibit

7    40.

8    (Marked for identification Van Riet Exhibit 40)

9         This should be a two page document 027614

10   through 027615, let me first ask you to take a look at

11   this document which is a March 24th 2004 letter from

12   the Federal Police in Ieper to you.    I take it that

13   you have seen this document before?

14        A.    Yes.

15        Q.    This relates to loans to BTG, correct?

16        A.    Yes.

17        Q.    And the Federal Police state that of the

18   documents that have been handed over the following

19   parts appear to be missing or incomplete, correct?

20        A.    Yes, I can only reiterate what is there.    It

21   states what it says there:   I have checked the

22   additional documents handed by you on 10th March 2004

23   principally intended to become aware of the composition

24   of the various Management Committees who approved the

25   granting of credits, loans to and the credit, taking up

87

1    of credits by BTG.

2         Q.    And if you look at the next page, the second

3    to last paragraph of this document that begins with

4    I-N-D-E-Z-E, do you see that?

5         A.    Yes.

6      Q.    Do you see that paragraph?

7      A.    Yes.

8      Q.    It asks about guarantees for the BTG loan?

9            THE INTERPRETER:    Mr Van Riet reads out the

10   sentence there which says:

11           "With regard to the taking up of a balance

12   and taking up of the exceedance we don't have one

13   single document or information which shows what the

14   sureties, what the guarantees were which were held by

15   Artesia with regard to these two credits being taken

16   up."

17     Q.    Do you know what sureties there were,

18   guarantees there were with regard to these two

19   installments?

20     A.    No.

21     Q.    Do you know if there were any?

22     A.    I can't remember me.

# EXHIBIT RR

Excerpts From The
April 21, 2006
Deposition of
Jacques Janssens

255

19              Q.  Did you have any dealings,

20     during your tenure with Artesia Bank, with the

21     Artesia subsidiary Artesia Securities Inc?

22              A.  I had the occasion, when I was

23     head of credit at Artesia, to look at a number of

24     Artesia Securities Inc transactions that had to do

25     with having holdings in unlisted companies that was

256

1      part of their business, and I was part of the

2      credit committee that made decisions on this type

3      of transactions, but that was all.

4              Q.  Were the Credit Committees, that

5      made those decisions, Credit Committees of Artesia

6      Bank Incorporation?

7              A.  Yes.

8              Q.  Is it true that, as director of

9      credit of Artesia Bank Incorporation, you had

10     authority to make decisions for Artesia Securities.

11              MR. BUTLER: Objection to form.

12              A.  I can say two things.  I was the

13     head of credit at Artesia group, and the decisions

14     made in the Artesia Securities files that were

15     within the scope of the Credit Committee were those

16     where there was unlisted counter party.  There were

17     different procedures to which I did not participate

18     in when this had to do with listed counter party.

19                Q.  When you say 'unlisted' you mean

20    not listed on any public exchange, is that correct?

21                A.  Correct.

22                Q.  And you refer to a position you

23    held with the Artesia group.  What do you mean when

24    you say 'Artesia group'?

25                A.  Artesia Bank and its

                                                    257

1    subsidiaries.

2                Q.  Did you hold a separate position

3    with any other subsidiary of Artesia Bank aside

4    from the bank itself - withdraw the question. You

5    were an officer of Artesia Bank, correct, sir?

6                A.  That is correct.

7                Q.  Were you an officer of any other

8    subsidiary of Artesia Bank Incorporation NV?

9                Q.  So when you made decisions on

10    the unlisted companies...

11                A.  Ahm.

12                Q. When you made decisions on the

13    unlisted companies that were presented by Artesia

14    Securities for credit analysis, you made that

15    decision as an officer of Artesia Bank

16    Incorporation NV, is that correct?

17                A.  Yes probably, but all this was

18    wrought by group protocols. The bank committee had

19    authority on decisions for the subsidiaries, but in

20    this case the committee was enlarged with people,

21    representatives, from the subsidiaries; so there

22    were these internal protocols that made sure we

23    were not in contradiction with company law.

24              Q.   Were those protocols written

25    down?

                                                    258

1              A.   Yes.

2              Q.   Who was your principal contact

3    person at Artesia Securities when you did the

4    credit analysis of the unlisted companies?

5              A.   Mr. Avonts I believe.

6              Q.   And did Mr. Avonts hold a

7    position as a member of the Artesia Bank management

8    committee at the time that he was discussing

9    Artesia Securities business with you?

10             A.   Mr. Avonts was a member of the

11   management committee but he did not discuss the

12   files with me; he discussed them with the bank

13   Credit Committee.

14             Q.   Was Mr. Avonts also an officer

15   of Artesia Securities?

16             A.   Yes.

17             Q.   As the director of credit at

18   Artesia Bank, did you have authority to reject the

19   unlisted company credits that were proposed by

20   Artesia Securities?

21          A.  Me personally no, but the Credit

22   Committee I belonged to, yes.

23          Q.  So is it true that the Credit

24   Committee of Artesia Bank had authority to reject

25   proposed credits with unlisted companies that were

                                                   259

1    proposed by Artesia Securities?

2           A.  Artesia Securities was not

3    presenting requests for loan for unlisted

4    companies, they were proposing holdings in unlisted

5    companies.

6           Q.  And did the Credit Committee of

7    Artesia Bank have the authority to reject the

8    proposal that Artesia Securities would require

9    certain unlisted companies as securities?

10          A.  Yes.

11          Q.  Were accounts of Artesia Bank

12   and Artesia Securities maintained in the same

13   place?

14          MR. BUTLER: Objection to form.

15          A.  I am not competent to answer

16   this question.  I do not know.

17          MR. ROCCO: Do you know who would

18   know the answer to that question?

19          A.  No.

# Exhibit SS

Excerpts From The
April 28, 2006
Deposition of
Philippe Steverlynck

133

1          MR EGAN:   Mr Steverlynck, you testified

2   yesterday morning that at some point in time you became

3   a director of Artesia Securities; is that correct?

4          A.   I did.

5          Q.   At what point in time was that?

6          A.   Approximately 2002 I think.

7          Q.   Prior to?

8          A.   September 2002 I think.

9          Q.   Prior to that did you have any dealings with

10  the Artesia Securities branch of the Bank?

11         A.   No before I was in charge of a Department

12  which we called Investment Banking, the CEO of Artesia

13  Securities was Mr Decraene D-E-C-R-A-E-N-E.

14         Q.   When did you report to Mr Decraene?

15         A.   From the period I left Kortrijk till I became

16  in charge of Dexia Securities.

17         Q.   How long were you in that position reporting

18  to Mr Decraene?

19         A.   I think one and a half years.

134

11      Q.    Do you have any contact with Artesia

12    Securities analysts?

13      A.    Not at all.

14      Q.    Do you have any contact with any Cordius

15    Asset Management analyst?

16      A.    Not at all.

17      Q.    Do you know where Artesia Securities was

18    based in 1999 and 2000?

19      A.    I guess I do see on a separate floor.

20      Q.    Separate floor, is that the same building

21    where Artesia Bank is located?

22      A.    Yes.

23      Q.    Do you know if customer accounts of Artesia

24    Bank and Artesia you are sureties were kept separate?

25            MR BUTLER:    Objection to form.

135

1      A.    What do you mean by?

2            MR EGAN:    Were the accounts maintained by

3    the same office?

4            MR BUTLER:    Objection to form.

5      A.    I cannot speak for the period 98 to 2000

6    because I had nothing to do with Artesia Securities.

7    I was speaking about the period I was in Kortrijk and

8    to be clear 98 to 2000 no, really.

9            MR EGAN:    In the period 98 to 2000 did you

10    have any contact with Nadia Van Hove V A N, H O V E?

11      A.    Not at all.

# EXHIBIT TT

# C L I F F O R D

# C H A N C E

**CLIFFORD CHANCE US LLP**

31 WEST 52ND STREET
NEW YORK NY 10019 6131

TEL +1 212 878 8000
FAX +1 212 878 8375
www.cliffordchance.com

**Jeff E. Butler**

DIRECT TEL 212-878-8205
DIRECT FAX 212-878-8375
jeff.butler@cliffordchance.com

May 19, 2006

VIA FACSIMILE

Patrick L. Rocco, Esq.
Shalov Stone & Bonner LLP
485 Seventh Avenue, Suite 1000
New York, NY 10018

Re:     *Quaak v. Dexia Bank Belgium*
        *Stonington v. Dexia Bank Belgium*
        *Filler v. Dexia Bank Belgium*
        *Baker v. Dexia Bank Belgium*

Dear Pat:

This responds to (1) your e-mail to me on May 12, 2006, concerning the depositions of Axel Miller and Stefaan Decraene, and (2) Steve Singer's letter to Teige Carroll dated May 17, 2006.

Mr. Miller and Mr. Decraene are the senior-most executives of Dexia S.A. and Dexia Bank Belgium, respectively. We do not believe that these individuals had any significant involvement in the transactions at issue in this litigation. Unless you can identify specific information available from these witnesses that would not be available from other witnesses (or through other forms of discovery), we believe that depositions of these executives would be unreasonable and inconsistent with Rule 26(b)(2). Accordingly, please let us know as soon as possible what specific areas of questioning you have in mind for these individuals.

Regarding Steve Singer's letter, Plaintiffs' contention that Dexia has "utterly ignored" Plaintiffs' depositions notices is incorrect. We have made our position clear that Dexia employees who are not officers, directors or managing agents of Dexia may not be noticed for depositions pursuant to Rule 30(b). Moreover, in cases were Plaintiffs have noticed the depositions of lower-level employees improperly, we have consistently taken the position that there is no obligation to seek a protective order, because such notices have no

**C L I F F O R D**
**C H A N C E**

CLIFFORD CHANCE US LLP

Patrick L. Rocco, Esq.                                                    Page 2
May 19, 2006

legal effect. Plaintiffs have not sought sanctions against Dexia for taking these positions in
the past. It is a little late to start threatening to seek them now.

Sincerely,

Jeff E. Butler

cc:     Patrick Egan, Esq.
        Susan Davis, Esq.
        Steven B. Singer, Esq.
        Karen C. Dyer, Esq.
        Alan Cotler, Esq.
        Peter M. Saparoff, Esq.

# Exhibit UU

Excerpt From The
April 25, 2006
Deposition of
François Saverys

91

19     Q.   And do you see where it discusses the Central

20  Credit Committee attended by you and Messrs Probst,

21  Piret, Janssens and Dauwe?

22     A.   Yes, I see that.

23     Q.   Do you agree that CDS two is not included in

24  the credit offer, do you see that?

25     A.   Yes.

92

1     Q.   It says:

2       "This decision was made despite a note from

3  the Specialised Activities Credit Secretariat which

4  clearly reflected the opinion of our lawyers."

5     A.   Yes.

6     Q.   So the opinion of the lawyers was to mention

7  the CDSs in the credit offers?

8     A.   That was the opinion of the audit.

92

22    Q.    Okay.    Then if you look at the next

23 sentence, the next paragraph in the audit report it

24 says:

25            "We note an amendment to the credit agreement

93

1  of 12/22/98 was established on 6/17/99 for five months

2  after execution of CDS One."

3            Do you see that?

4     A.    Second part.

5     Q.    It says:

6            "In it the Bank Artesia stipulates that a

7  credit line is henceforth accompanied by a

8  supplementary guarantee i.e., the CDS one."

9            Do you see that?

10    A.    Yes, I see that.

11    Q.    So the CDS one was actually referenced as a

12 supplementary guarantee; is that correct?

13    A.    That's what it means.

14    Q.    It says:

15            "This declaration contradicts the truth.

16 The credit line has already been guaranteed by this

17 last agreement after 1/4/99."

18            Do you see that?

19    A.    I see that.

20    Q.    So it was actually not, well if you look at

21 it it says, if you look at the next paragraph, the

22    reference to henceforth was made, if the reference to

23    henceforth was made knowingly it would involve a false

24    declaration, do you see that?

25         A.    I see that.

94

1         Q.    That's because actually the CDS was in place

2    before the term henceforth was actually used, correct

3     -- well, the credit line was not henceforth

4    accompanied by a CDS, the credit line had been

5    accompanied by the CDS for several months?

6         A.    Well as far as I read here it should start in

7    99, yes.

8         Q.    In January of 1999, not henceforth from June

9    17th 1999, correct?

10         A.    I don't know.   I just read here what you see

11    also but I can't make other conclusions on what I see.

94

18      Q.    If you look down at Radial Belgium, do you

19  see the next reference on the same page to Radial

20  Belgium slightly below that?

21      A.    Where?  Yes, I see that.

22      Q.    It says:

23            "With regard to this dossier we have the

24  same reservation for the Language Investment Company

25  dossier."

95

1             Do you see that?

2       A.    Yes, yes.

3       Q.    Then if you look over at the conclusions on

4   the next page there is a number of conclusions there,

5   do you see those bullet points?

6       A.    I see that point, yes.

7       Q.    It says:

8             "We shall finish by saying that with regard

9   to our study we have revealed significant operating

10  lapses addressed in another note."

11            Do you see that?

12      A.    Yes, I see that.

13      Q.    Who are Messrs Cloes and Dankelman?

14      A.    Auditors.

15      Q.    Did you ever speak with them about these

16  issues that are addressed in this January 20th 2000

17  memo?

18      A.    I can't remember.

19      Q.    You don't know one way or the other?

20      A.    I can't remember that I talked to him about

21  that.    I can't remember.

22      Q.    Did you speak with anyone in the Audit

23  Department about the Radial or LIC Credit Default Swops

24  or Letters of Credit?

25      A.    Probably, but I can't remember.

96

5      Q.    Look, if you would, at the January 31st 2000

6    memo which is attached as the last two pages of this

7    document.   In particular look at the last page?

8      A.    Yes.

9      Q.    DBB 083289, there is a discussion under item

10   three of CDS and 281.50 forms, do you see that?

11     A.    I see that.

12     Q.    It says:

13          "For every payment made pursuant to the CDSs

14   we refer to in this note the tax affairs office told us

15   that the 281.50 tax form should be filled out by

16   Artesia and isn't to the beneficiaries of the sums

17   paid."

18          Do you see that?

19     A.    I see that.

20     Q.    Do you know if such forms were filled out for

21   Messrs Lernout and Hauspie with regard to the Radial

22   and LIC CDSs?

23     A.    I don't know.

24     Q.    Look at the fourth paragraph and it says, do

25   you see where it says:

97

1          "After we specified that in practice."

2      A.    Yes.

3      Q.    When there is doubt as regard classifying the

4    sum to be paid as profits or miscellaneous income the

5    debtor always fills out a 281.50 form so as not to be

6    subject following an audit to a special secret

7    commission charge, do you see that?

8         A.    I see that, yes.

9         Q.    Were you ever involved in any discussions as

10   to how to treat the premiums paid to Messrs Lernout &

11   Hauspie or owed to Messrs Lernout & Hauspie on the

12   Credit Default Swops?

13        A.    Not directly, not directly, no.

14        Q.    You don't recall any?

15        A.    In fact, it is a tax issue so I am not a tax

16   expert.

17        Q.    I am not referring just to discussions with

18   Messrs Lernout & Hauspie, I am referring to any

19   discussions with anyone?

20        A.    I can't remember precisely something because

21   I am not in that tax Department.

22        Q.    With regard to this particular document the

23   January 31st 2000 audit memo beginning at the first

24   page of DBB 083288, this was also prepared by Mr Cloes,

25   the second one which is the January 31st 2001?

                                                            98

1         A.    Yes, umm hmm, I think so, yes.   He signed it

2    or his name is on the bottom.

3         Q.    Let me ask you to take a look at a document

4    which we will mark which is previously marked as Van

5    Riet Exhibit 13, so I hope your counsel has a copy.

6   We won't remark it.   It is just Van Riet Exhibit 13.

7   I ask you to first take a look at this document, DBB

8   087476 through 77, April 21st 1999 memorandum Internal

9   Audit from a Mr Gryp, G-R-Y-P, to a number of

10   individuals and tell me if you have seen this document

11   before?

12         A.   Is that the question?

13         Q.   The question is have you seen this document?

14         A.   I can't remember having seen that, no.

15         Q.   If you look back then at Saverys Exhibit 7,

16   the last page of that Exhibit which was the January

17   31st 2000 audit report, the very last a page, DBB

18   083289, are you there?

19         A.   Yes.

20         Q.   The very last sentence says:

21         "Lastly we recall that in a note of 4/21/99

22   the audit called attention to the fact that the

23   Language Investment Company CDS had not been posted on

24   the books and asked that the Radial Belgium CDS be

25   confirmed.   There is nothing whereby we can say this

                                                        99

1   was done."

2             Do you see that?

3      A.   Yes.

4      Q.   Do you know what it meant by posting on the

5   books the language Investment Company CDS?

6      A.   No, I don't know.

# EXHIBIT VV

Excerpts From The
March 17, 2006
Deposition of
Claude Piret

71

7     Q.   I am going to show you what is marked as

8     Piret Exhibit 27, which is a document entitled

9     "Internal Audit Artesia Securities" BATES numbers DBB

10    083283 through 83287.

11    (Marked for identification Piret Exhibit 27)

12         Have you seen this document before, sir?

13    A.   It can be, yes.

14    Q.   Were you aware that the Bank's Internal Audit

15    office concluded in 2000 that the CDSs should have been

16    disclosed in the Letter of Credit for LIC and Radial?

17    A.   At the bottom of the document I have to read

18    it before, but could be, yes.

19    Q.   I am asking you even without reading the

20    document are you aware that as of January 2000 an

21    Internal Audit office had determined that the CDSs

22    should have been disclosed in the Letter of Credit for

23    Radial and for LIC?

24    A.   My problem is that.

25    Q.   Let's do it a different way.  Are you aware

72

1     that ultimately at some point in time the Internal

2     Audit Department concluded that the Credit Default

3     Swaps should have been disclosed in the LIC and the

4     Radial loan Letter of Credit?

5     A.   Yes.

6     Q.   That was their ultimate finding, correct?

7     A.   That was the ultimate advice of the audit,

8    internal audit.

9        Q.    If you look at the last page of this

10    document, the second to last page of this document

11    Piret 27, where it says "conclusions", do you see that?

12        A.    Yes.

13        Q.    Do you see the statement "Bank lawyers are

14    unanimous that CDSs should have been mentioned in the

15    Letters of Understanding sent to borrowers."

16            Do you see that?

17        A.    Yes.

18        Q.    Were you aware that it was the unanimous view

19    of the Bank's lawyers that the CDSs should have been

20    disclosed in the Letter of Credit going to the

21    borrowers on Radial and LIC loans?

22        A.    Firstly, I was not aware that all the lawyers

23    of the Bank were unanimous about this point.

24    Secondly, the advice of the lawyer in the credit

25    proposal for this credit was not affirmative but

                                                              73

1    conditional.

2        Q.    What do you mean by not affirmative but

3    conditional?

4        A.    It is mentioned in the piece that you have

5    submitted today that the CDS had to be mentioned if two

6    conditions were fulfilled.

7        Q.    And one of them was if the borrower and the

8    CDS issuer were not totally foreign to each other then

9    the CDS would have to be disclosed in the Letter of

10    Credit, correct?

11        A.    Yes.

12        Q.    And that was the view of Mr Mommens, correct?

13        A.    Yes.

14        Q.    But in your view that under the circumstances

15    of the LIC and Radial loan that would not require

16    disclosure of the CDS in the Letters of Credit,

17    correct?

18        A.    To the best of my knowledge during the

19    Committee where it has been discussed, the consensus on

20    the basis of the advice of the credit proposal and the

21    conversation that has been taken outside in a margin of

22    this problem, were so that the Committee unanimously

23    decided not to mention them.

24        Q.    Do you know sitting here today whether

25    Mr Mommens shares your interpretation of his legal

                                                              74

 1    opinion?

 2        A.    I don't know.

 3        Q.    Have you spoken to him?

 4        A.    No.

 5        Q.    You never asked him what he meant when he

 6    said those conditions?

 7        A.    No.

 8        Q.    At any time you never asked him that?

 9        A.    No, to the best of my knowledge, of course.