<u>EXHIBIT B-1</u>

EXHIBIT B-1

## CROSS-EXAMINATION OF RENÉ AVONTS
## BY DEXIA BANK BELGIUM

### Knowledge of U.S. Accounting Principles

337.    Do you have any formal training in accounting?

    a.    If yes, please describe your training.

    b.    Did your training include United States accounting principles?

338.    Have you ever worked as an accountant?

339.    Do you have any knowledge of United States Generally Accepted Accounting Principles
("US GAAP")?

    a.    If yes, how did you acquire that knowledge?

    b.    Do you have any knowledge of the US GAAP applicable to related party
transactions?  If yes, please describe your knowledge.

    c.    Do you have knowledge of the US GAAP applicable to revenue recognition?  If
yes, please describe your knowledge.

340.    Do you have any knowledge of United States Securities & Exchange Commission
("US SEC") regulations?  If yes, how did you acquire that knowledge?  Please describe
your knowledge.

341.    During the course of your work at Artesia, were you ever asked to provide accounting
advice?  If so, please describe that advice.

### L&H Relationship with Artesia

342.    During the course of your work at Artesia, did you ever have input into the accounting
decisions made by L&H?  If so, please describe that input.

1

343. During the time you were employed by Artesia, did you ever review L&H's filings with the US SEC?

    a.     If so, what filings did you review?

    b.     For what purpose did you review those filings?

**Dictation Consortium**

344. At the time of the Dictation Consortium transaction, did you believe that L&H would use this transaction to violate US GAAP?

345. At the time of the Dictation Consortium transaction, did you believe that L&H would use this transaction to recognize revenue improperly?

346. At the time of the Dictation Consortium transaction, did you believe that L&H would use this transaction to mislead investors in L&H securities?

*Please turn your attention to Exhibit 2. The following questions are based on that document:*

347. At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

348. At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

*Please turn your attention to Exhibit 3. The following questions are based on that document:*

349. Did you review this document at the time of the Dictation Consortium transaction? If so, how much time did you spend reviewing it?

350. Did Paribas provide this document to the Flemish government?

351. Do you know whether this document accurately characterizes US GAAP?

352. At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

NYB 1536251.1

353.   At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

*Please turn your attention to Exhibit 4. The following questions are based on that document:*

354.   At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

355.   At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

*Please turn your attention to Exhibit 5. The following questions are based on that document:*

356.   In Question 31, you were asked whether the Dictation Consortium transaction would "artificially inflate L&H's reported revenue." What do you understand the phrase "artificially inflate" to mean?

357.   At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

358.   At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

*Please turn your attention to Exhibit 6. The following questions are based on that document:*

359.   Do you recall receiving this document written in English?

360.   Is this in fact an English translation of a document you received? If so, do you know who prepared the translation?

361.   This document appears to have been written by Louis Verbeke.

   a.      Have you ever met Mr. Verbeke?

   b.      Do you know whether Mr. Verbeke has any background in accounting?

c.     Was Mr. Verbeke acting for Paribas or Bacob at the time he wrote this memorandum?

d.     If not, who was he acting for?

362.    At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

363.    At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

**Brussels Translation Group**

364.    At the time of the BTG transaction, did you believe that L&H would use this transaction to violate US GAAP?

365.    At the time of the BTG transaction, did you believe that L&H would use this transaction to recognize revenue improperly?

366.    At the time of the BTG transaction, did you believe that L&H would use this transaction to mislead investors in L&H securities?

*Please turn your attention to Exhibit 7. The following questions are based on that document:*

367.    Page DBB 004080 indicates that the purpose of the BTG project was to develop machine translation software. Was that your understanding of the purpose of the project? If not, what was your understanding?

368.    Page DBB 004081 indicates that "US GAAP rules have to be applied in a very stringent way." At the time of the BTG transaction, did you believe that L&H wanted to comply with US GAAP rules?

369.    In this document, does "L&H" refer to the company Lernout & Hauspie Speech Products?

NYB 1536251.1

370.  As used in this document, does "L&H" refer to Jo Lernout, Pol Hauspie or Nico Willaert?

371.  With respect to this document and others, you have been asked whether the document was created in the "regular course of business." What is your understanding, if any, of this phrase?

372.  With respect to this document and others, you have been asked whether the document was created as part of the "regular business practice at Artesia." What is your understanding, if any, of this phrase?

*Please turn your attention to Exhibit 8. The following questions are based on that document:*

373.  At the time of the BTG transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

374.  At the time of the BTG transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

*Please turn your attention to Exhibit 9. The following questions are based on that document:*

375.  At the time of the BTG transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

376.  At the time of the BTG transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

*Please turn your attention to Exhibit 10. The following questions are based on that document:*

377.  At the time of the BTG transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

378.  At the time of the BTG transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

NYB 1536251.1

**Radial**

379.    Who created Radial?

380.    Was Artesia involved in the creation of Radial?

381.    Who created the three LDCs funded by Radial?

382.    Was Artesia involved in the creation of those LDCs?

383.    At the time of the Radial loan, did you believe that the LDCs funded by Radial were going to develop translation software?

384.    At the time of the Radial loan, did you understand that the LDCs funded by Radial needed a license from L&H before doing any development work?

385.    At the time of the Radial loan, did you believe that L&H would use this transaction to violate US GAAP?

386.    At the time of the Radial loan, did you believe that L&H would use this transaction to recognize revenue improperly?

387.    At the time of the Radial loan, did you believe that L&H would use this transaction to mislead investors in L&H securities?

**Language Investment Company**

388.    Who created Radial?

389.    Was Artesia involved in the creation of Radial?

390.    Who created the three LDCs funded by Radial?

391.    Was Artesia involved in the creation of those LDCs?

392.    At the time of the LIC loan, did you believe that the LDCs funded by LIC were going to develop translation software?

NYB 1536251.1

393.   At the time of the LIC loan, did you understand that the LDCs funded by LIC needed a license from L&H before doing any development work?

394.   At the time of the LIC loan, did you believe that L&H would use this transaction to violate US GAAP?

395.   At the time of the LIC loan, did you believe that L&H would use this transaction to recognize revenue improperly?

396.   At the time of the LIC loan, did you believe that L&H would use this transaction to mislead investors in L&H securities?

**Credit Default Swaps**

397.   Can a credit default swap be used to reduce the bank's risk with respect to a loan?

398.   To the best of your knowledge, is there anything wrong with entering a credit default swap with a private individual?

**$20 Million Loan to Lernout, Hauspie and Willaert**

399.   At the time of this loan, did you believe that L&H would use this transaction to violate US GAAP?

400.   At the time of this loan, did you believe that L&H would use this transaction to recognize revenue improperly?

401.   At the time of this loan, did you believe that L&H would use this transaction to mislead investors in L&H securities?

**Artesia Securities**

402.   In this lawsuit, the Plaintiffs are alleging that Artesia Bank controlled the content of Artesia Securities analyst reports concerning L&H, and that therefore Dexia should be

NYB 1536251.1

held responsible for any misleading statements in those analyst reports.  What is your

reaction to that allegation?

*Please turn your attention to Exhibit 10.  The following questions are based on that document:*

403.  In Question 212, you were asked whether this chart presents a fair representation of the

"organization and control" between Artesia Bank and Artesia Securities.

    a.  Are you aware that "control" is a term of art under the securities laws of the

       United States?

    c.  Do you have any understanding of what "control" means in the context of United

       States securities law?

*Please turn your attention to Exhibit 20.  The following questions are based on that document:*

404.  To the best of you knowledge, was anyone from Artesia Securities involved in drafting

this report?

*Please turn your attention to Exhibit 21.  The following questions are based on that document:*

405.  To the best of you knowledge, was anyone from Artesia Securities involved in drafting

this report?

*Please turn your attention to Exhibit 22.  The following questions are based on that document:*

406.  What was Cordius Asset Management?

407.  What was the relationship between Artesia Bank and Cordius in February 2000?

*Please turn your attention to Exhibit 23.  The following questions are based on that document:*

408.  In Question 276(l), you were asked whether you reviewed this report before it was

"disseminated to the public."

    a.  Do you know whether this report disseminated to the public?

NYB 1536251.1

    b.      Did Artesia Securities distribute this document to anyone other than its institutional clients?  If so, who?

    c.      Did Artesia Securities distribute this document to the press?  If so, which publications?

*Please turn your attention to Exhibit 26.  The following questions are based on that document:*

409.    Was this analyst report prepared by Paribas London Branch?

410.    Was Artesia the successor to that entity?

*Please turn your attention to Exhibit 44.  The following questions are based on that document:*

411.    Does this exhibit consist of more than one document?  How many documents are included in this exhibit?

412.    With reference to the document marked DBB 109698-701, do you recognize this document?  What is it?

*Please turn your attention to Exhibit 46.  The following questions are based on that document:*

413.    Do you recall reviewing this document written in English?

414.    Is this in fact an English translation of a document you reviewed?  If so, do you know who prepared the translation?

NYB 1536251.1

EXHIBIT C-1

EXHIBIT C-1

## CROSS-EXAMINATION OF GEERT DAUWE
### BY DEXIA BANK BELGIUM

**Knowledge of U.S. Accounting Principles**

534.    Do you have any formal training in accounting?

    a.     If yes, please describe your training.

    b.     Did your training include United States accounting principles?

535.    Have you ever worked as an accountant?

536.    Do you have any knowledge of United States Generally Accepted Accounting Principles ("US GAAP")?

    a.     If yes, how did you acquire that knowledge?

    b.     Do you have any knowledge of the US GAAP applicable to related party transactions?  If yes, please describe your knowledge.

    c.     Do you have knowledge of the US GAAP applicable to revenue recognition?  If yes, please describe your knowledge.

537.    Do you have any knowledge of United States Securities & Exchange Commission ("US SEC") regulations?  If yes, how did you acquire that knowledge?  Please describe your knowledge.

538.    During the course of your work at Artesia, were you ever asked to provide accounting advice?  If so, please describe that advice.

**L&H Relationship with Artesia**

539.    During the course of your work at Artesia, did you ever have input into the accounting decisions made by L&H?  If so, please describe that input.

1

NYB 1536250.1

540.   In Question 31, you were asked to identify loans to "any entity and individual related to L&H or whose credit came within the L&H risk."

    a.   What is your understanding of the phrase "any entity or person related to L&H"?

    b.   What is your understanding of the phrase "whose credit came within the L&H risk"?

541.   During the time you were employed by Artesia, did you ever review L&H's filings with the US SEC?

    a.   If so, what filings did you review?

    b.   For what purpose did you review those filings?

**Dictation Consortium**

542.   At the time of the Dictation Consortium transaction, did you believe that L&H would use this transaction to violate US GAAP?

543.   At the time of the Dictation Consortium transaction, did you believe that L&H would use this transaction to recognize revenue improperly?

544.   At the time of the Dictation Consortium transaction, did you believe that L&H would use this transaction to mislead investors in L&H securities?

*Please turn your attention to Exhibit 1. The following questions are based on that document:*

545.   Did you review this document at the time of the Dictation Consortium transaction? If so, how much time did you spend reviewing it?

546.   With respect to this document and others, you have been asked whether the document was created in the "regular course of business." What is your understanding, if any, of this phrase?

2

547. With respect to this document and others, you have been asked whether the document was created as part of the "regular business practice at Artesia." What is your understanding, if any, of this phrase?

*Please turn your attention to Exhibit 2. The following questions are based on that document:*

548. Did you review this document at the time of the Dictation Consortium transaction? If so, how much time did you spend reviewing it?

549. In this document, what does "L&H" refer to?

550. As used in this document, does "L&H" refer to Jo Lernout, Pol Hauspie or Nico Willaert?

551. This document appears to have been written by Philip Flink of the Brown Rudnick law firm.

    a.    Have you ever met Mr. Flink?

    b.    Do you know whether Mr. Flink has any background in accounting?

    c.    Were Mr. Flink and his law firm acting for Paribas or Bacob at the time he wrote this memorandum?

    d.    If not, who were they acting for?

552. Why was this memorandum provided to Paribas and Bacob?

553. Did Paribas provide this document to the Flemish government?

554. Do you know whether this document accurately characterizes US GAAP?

555. At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

556. At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

3

*Please turn your attention to Exhibit 3. The following questions are based on that document:*

557.  Did you review this document at the time of the Dictation Consortium transaction? If so, how much time did you spend reviewing it?

558.  Did Paribas provide this document to the Flemish government?

559.  Do you know whether this document accurately characterizes US GAAP?

560.  At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

561.  At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

*Please turn your attention to Exhibit 4. The following questions are based on that document:*

562.  Did you review this document at the time of the Dictation Consortium transaction? If so, how much time did you spend reviewing it?

563.  Did Paribas provide this document to the Flemish government?

*Please turn your attention to Exhibit 5. The following questions are based on that document:*

564.  Page DBB 006647 indicates that the purpose of the Dictation Consortium project was to develop speech-to-text dictation software. Was that your understanding of the purpose of the project? If not, what was your understanding?

*Please turn your attention to Exhibit 6. The following questions are based on that document:*

565.  Did you review this document at the time of the Dictation Consortium transaction? If so, how much time did you spend reviewing it?

566.  At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

NYB 1536250.1

567.　At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

568.　On page DBB 074685, there is reference to documenting the personal guarantees in a "side letter."

    a.　What is a side letter?

    b.　Is it unusual to document a personal guarantee in a separate letter?

    c.　To the best of your knowledge, is there anything wrong with documenting a personal guarantee in a separate letter?

569.　On page DBB 074686, there is mention of the reason for the bridge loan.  What was your understanding of the reason for this bridge loan?

570.　Did you understand that L&H wanted to be paid for the work it had already done for Dictation Consortium?

571.　Did you think there was anything wrong with L&H being paid for its work?

**Brussels Translation Group**

572.　At the time of the BTG transaction, did you believe that L&H would use this transaction to violate US GAAP?

573.　At the time of the BTG transaction, did you believe that L&H would use this transaction to recognize revenue improperly?

574.　At the time of the BTG transaction, did you believe that L&H would use this transaction to mislead investors in L&H securities?

NYB 1536250.1

*Please turn your attention to Exhibit 7. The following questions are based on that document:*

575.    Page DBB 004080 indicates that the purpose of the BTG project was to develop machine

translation software.  Was that your understanding of the purpose of the project?  If not,

what was your understanding?

576.    Page DBB 004081 indicates that "US GAAP rules have to be applied in a very stringent

way."  At the time of the BTG transaction, did you believe that L&H wanted to comply

with US GAAP rules?

577.    As used in this document, does "L&H" refer to the company, Lernout & Hauspie Speech

Products?

578.    As used in this document, does "L&H" refer to Jo Lernout, Pol Hauspie or Nico

Willaert?

**Radial**

579.    Who created Radial?

580.    Was Artesia involved in the creation of Radial?  If so, what was Artesia's involvement?

581.    Who created the three LDCs funded by Radial?

582.    Was Artesia involved in the creation of those LDCs?  If so, what was Artesia's

involvement?

583.    At the time of the Radial loan, did you believe that the LDCs funded by Radial were

going to develop translation software?

584.    At the time of the Radial loan, did you understand that the LDCs funded by Radial

needed a license from L&H before doing any development work?

585.    At the time of the Radial loan, did you believe that L&H would use this transaction to

violate US GAAP?

586. At the time of the Radial loan, did you believe that L&H would use this transaction to recognize revenue improperly?

587. At the time of the Radial loan, did you believe that L&H would use this transaction to mislead investors in L&H securities?

*Please turn your attention to Exhibit 10. The following questions are based on that document:*

588. On page DBB 002546 there is reference to a personal guarantee from Messrs. Lernout, Hauspie and Willaert, and underneath there is a handwritten note that says "separate letter at the request of G. Dauwe."

   a.    Do you know who wrote that note? If so, who?

   b.    Did you in fact request that the guarantee be in a separate letter?

   c.    In your view, is there anything wrong with documenting a personal guarantee in a separate letter?

*Please turn your attention to Exhibit 15. The following questions are based on that document:*

589. Is this the credit letter for the initial Radial loan?

590. It appears that you signed this document along with Jan Van der Ven. Did both you and Mr. Van der Ven approve the Radial loan?

591. This credit letter does not indicate the rate of interest to be applied to this loan. Did the bank charge any interest in connection with this loan? What was the interest rate?

592. On page DBB 037433, this document references a joint and several security of three private individuals, and provides a reference number for the security, correct?

593. Would the reference number provided allow Belgian regulators to identify the three private individuals involved?

NYB 1536250.1

**Language Investment Company**

594.  Who created LIC?

595.  Was Artesia involved in the creation of LIC?  If so, what was Artesia's involvement?

596.  Who created the three LDCs funded by LIC?

597.  Was Artesia involved in the creation of those LDCs?  If so, what was Artesia's involvement?

598.  At the time of the LIC loan, did you believe that the LDCs funded by LIC were going to develop translation software?

599.  At the time of the LIC loan, did you understand that the LDCs funded by LIC needed a license from L&H before doing any development work?

600.  At the time of the LIC loan, did you believe that L&H would use this transaction to violate US GAAP?

601.  At the time of the LIC loan, did you believe that L&H would use this transaction to recognize revenue improperly?

602.  At the time of the LIC loan, did you believe that L&H would use this transaction to mislead investors in L&H securities?

**Credit Default Swaps**

603.  Can a credit default swap be used to reduce the bank's risk with respect to a loan?

604.  To the best of your knowledge, is there anything wrong with entering a credit default swap with a private individual?

**$20 Million Loan to Lernout, Hauspie and Willaert**

605.  At the time of this loan, did you believe that L&H would use this transaction to violate US GAAP?

NYB 1536250.1

606.   At the time of this loan, did you believe that L&H would use this transaction to recognize

revenue improperly?

607.   At the time of this loan, did you believe that L&H would use this transaction to mislead

investors in L&H securities?

NYB 1536250.1

<u>EXHIBIT D-1</u>

EXHIBIT D-1

CROSS-EXAMINATION OF ERIC DE GYNS
BY DEXIA BANK BELGIUM

**Knowledge of U.S. Accounting Principles**

101.  Do you have any formal training in accounting?

  a.    If yes, please describe your training.

  b.    Did your training include United States accounting principles?

102.  Do you have any knowledge of United States Generally Accepted Accounting Principles

  ("US GAAP")?

  a.    If yes, how did you acquire that knowledge?

  b.    Do you have any knowledge of the US GAAP applicable to related party

        transactions?  If yes, please describe your knowledge.

  c.    Do you have any knowledge of the US GAAP applicable to revenue recognition?

        If yes, please describe your knowledge.

103.  Do you have any knowledge of United States Securities & Exchange Commission

  ("US SEC") regulations?  If yes, how did you acquire that knowledge?  Please describe

  your knowledge.

104.  During the course of your work at Artesia, did you ever have input into the accounting

  decisions made by L&H?  If so, please describe that input.

**Internal Audit and Compliance**

105.  Was there a separate compliance department or group within Artesia?  If yes, who was in

  that department or group?

NYB 1536266.1

**Radial and Language Investment Company**

*Please turn your attention to Exhibit 1. The following questions are based on that document:*

106.    With respect to this document and others, you have been asked whether the document was prepared in the "in the course of your regular duties at Artesia."

    a.    What is your understanding, if any, of this phrase?

    b.    Did any of the work you did at Artesia fall outside your regular duties? If yes, please describe that work.

*Please turn your attention to Exhibit 3. The following questions are based on that document:*

107.    Does this memorandum indicate that you were consulted on the question of whether to disclose the LIC credit default swap in the letter of credit in May 1999?

*Please turn your attention to Exhibit 4. The following questions are based on that document:*

108.    With reference to pages DBB 083283-86, is this the report of a deontological audit relating to L&H?

109.    What is a deontological audit?

110.    The first page of this audit report indicates that a deontological audit was requested by the Central Credit Committee 1 on July 22, 1999, correct?

111.    Where any restrictions placed on the scope of this audit by the Central Credit Committee?

112.    The first page also indicates that the audit department initially sought to examine whether the transactions with L&H were consistent with Easdaq and Nasdaq regulations, correct?

113.    The internal audit department considered consulting an external lawyer concerning these regulations, but ultimately decided not to do that, correct?

114.    Who made the decision not to consult external lawyers concerning Easdaq and Nasdaq regulations?

NYB 1536266.1

115. The date of this audit report is January 20, 2000, correct?

116. Why did it take the audit department nearly six months to prepare this audit report?

117. With respect to this document and others, you have been asked whether the document was created in the "regular course of business." What is your understanding, if any, of this phrase?

118. With respect to this document and others, you have been asked whether the document was created as part of the "regular business practice at Artesia." What is your understanding, if any, of this phrase?

*Please turn your attention to Exhibit 6. The following questions are based on that document:*

119. On page DBB 098895, you stated: "We have clearly been the victims of manipulations, which are tantamount to fraud." Please explain what you meant by that statement.

120. On page DBB 098896, under the heading "Conclusion" you stated: "It is also necessary to add that, if we had had at our disposal audited figures correctly reflecting the financial situation of the L&H Group, things would certainly have happened differently." Please explain what you meant by that statement.

*Please turn your attention to Exhibit 10. The following questions are based on that document:*

121. What was the "ad hoc Risk Committee"?

122. How often did this ad hoc Risk Committee meet?

123. Were you a member of this ad hoc Risk Committee?

3

<u>EXHIBIT E-1</u>

EXHIBIT E-1

CROSS-EXAMINATION OF PATRICK FAICT
BY DEXIA BANK BELGIUM

**Knowledge of U.S. Accounting Principles**

65.    Do you have any formal training in accounting?

    a.    If yes, please describe your training.

    b.    Did your training include United States accounting principles?

66.    Have you ever worked as an accountant?

67.    Do you have any knowledge of United States Generally Accepted Accounting Principles

    ("US GAAP")?

    a.    If yes, how did you acquire that knowledge?

    b.    Do you have any knowledge of the US GAAP applicable to related party

        transactions?  If yes, please describe your knowledge.

    c.    Do you have knowledge of the US GAAP applicable to revenue recognition?  If

        yes, please describe your knowledge.

68.    Do you have any knowledge of United States Securities & Exchange Commission

    ("US SEC") regulations?  If yes, how did you acquire that knowledge?  Please describe

    your knowledge.

69.    During the course of your work at Artesia, were you ever asked to provide accounting

    advice?  If so, please describe that advice.

**L&H Relationship with Artesia**

70.    During the course of your work at Artesia, did you ever have input into the accounting

    decisions made by L&H?  If so, please describe that input.

1

71.  During the time you were employed by Artesia, did you ever review L&H's filings with the US SEC?

    a.  If so, what filings did you review?

    b.  For what purpose did you review those filings?

**Dictation Consortium**

72.  At the time of the Dictation Consortium transaction, did you believe that L&H would use this transaction to violate US GAAP?

73.  At the time of the Dictation Consortium transaction, did you believe that L&H would use this transaction to recognize revenue improperly?

74.  At the time of the Dictation Consortium transaction, did you believe that L&H would use this transaction to mislead investors in L&H securities?

*Please turn your attention to Exhibit 1. The following questions are based on that document:*

75.  With respect to this document and others, you have been asked whether the document was prepared "as part of your regular activities as an employee of Paribas."

    a.  What is your understanding, if any, of the phrase "regular activities as an employee of Paribas"?

    b.  Did you do any work at Paribas that was not part of your regular activities as an employee of Paribas? If so, please describe.

*Please turn your attention to Exhibit 3. The following questions are based on that document:*

76.  Did you review the Brown Rudnick memo at the time of the Dictation Consortium transaction? If so, how much time did you spend reviewing it?

77.  As used in the Brown Rudnick memo, does "L&H" refer to the company, Lernout & Hauspie Speech Products?

2

78.    As used in the Brown Rudnick memo, does "L&H" refer to Jo Lernout, Pol Hauspie or Nico Willaert?

79.    This Brown Rudnick memorandum appears to have been written by Philip Flink.

    a.    Have you ever met Mr. Flink?

    b.    Do you know whether Mr. Flink has any background in accounting?

    c.    Were Mr. Flink and his law firm acting for Paribas or Bacob at the time he wrote this memorandum?

    d.    If not, who were they acting for?

80.    Why was this memorandum provided to Paribas and Bacob?

81.    Do you know whether this document accurately characterizes US GAAP?

82.    At the time of the Dictation Consortium transaction, did the Brown Rudnick memo indicate to you that L&H was seeking to violate US GAAP?

83.    At the time of the Dictation Consortium transaction, did the Brown Rudnick memo indicate to you that L&H was seeking to violate US SEC regulations?

*Please turn your attention to Exhibit 4. The following questions are based on that document:*

84.    Did you review this document at the time of the Dictation Consortium transaction? If so, how much time did you spend reviewing it?

85.    Did Paribas provide this document to the Flemish government?

86.    Do you know whether this document accurately characterizes US GAAP?

87.    At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

88.    At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

3

**Brussels Translation Group**

89.    At the time of the BTG transaction, did you believe that L&H would use this transaction to violate US GAAP?

90.    At the time of the BTG transaction, did you believe that L&H would use this transaction to recognize revenue improperly?

91.    At the time of the BTG transaction, did you believe that L&H would use this transaction to mislead investors in L&H securities?

**Radial**

92.    Who created Radial?

93.    Was Artesia involved in the creation of Radial?  If so, what was Artesia's involvement?

94.    Who created the three LDCs funded by Radial?

95.    Was Artesia involved in the creation of those LDCs?  If so, what was Artesia's involvement?

96.    At the time of the Radial loan, did you believe that the LDCs funded by Radial were going to develop translation software?

97.    At the time of the Radial loan, did you understand that the LDCs funded by Radial needed a license from L&H before doing any development work?

98.    At the time of the Radial loan, did you believe that L&H would use this transaction to violate US GAAP?

99.    At the time of the Radial loan, did you believe that L&H would use this transaction to recognize revenue improperly?

100.    At the time of the Radial loan, did you believe that L&H would use this transaction to mislead investors in L&H securities?

4

NYB 1536288.1

*Please turn your attention to Exhibit 17, attached hereto, which is a one-page letter to you from Mr. Van Deun of Radial Belgium sent on July 1, 1999, numbered DBB 037458. The following questions are based on that document:*

101.    Have you seen this document before?

102.    Did you receive this from Mr. Van Deun of Radial on July 1, 1999?

103.    Did you make the handwritten notation on the upper right hand portion of this document?

104.    This letter requests that you send a copy of the CDS associated with the Radial loan to Mr. Van Deun, and notes that this is at the demand of Radial's auditors, Deloitte & Touche, correct?

105.    It appears that you forwarded the letter to Peter Rabaey with instructions to take care of this, correct?

106.    Did you have any objection to providing the CDS to Radial or its auditors? If so, what was the nature of your objection?

107.    Did anyone within Artesia raise any objection to providing the CDS to Radial or its auditors? If so, who and what was the nature of the objection?

108.    Did you expect Mr. Rabaey to send the requested documents to Radial?

109.    Do you know whether he did send the documents to Radial?

NYB 1536288.1

Exhibit 17

01-JUL-1999 09:50    RADIAL BELGIUM NV    +32 14 672489    P.01

# RADIAL BELGIUM N.V.



RESEARCH AND DEVELOPMENT
FOR INTELLIGENCE ACQUISITION.

N.V. Artesia Bank
Tav De Heer Patrick Feict

Per Fax : 02 2044181

Beste Patrick,

Naar aanleiding van de laatst ontvangen kredietbrief, zou ik het op prijs stellen, dat U mij zo spoedig mogelijk voor de volledigheid van mijn dossier, dringend een copy laat geworden van de ondertekende borgstelling dd 29 september 1998 met ref. KP/290998/01 en een copy van de credit swap transaction met nummer 001/60/PR/AV/002, en dit op vraag van mijn accountants Deloitte & Touche.

Hopende deze zaken spoedig te mogen ontvangen, verblijf ik,

Met vriendelijke groeten,

F. Van Deun
Afgevaardigd Bestuurder

Schoolstraat, 1A  B-2370  Arendonk  Tel : + 32 (0)14 679368  Fax : +32 (0)14 672489
H.R. Turnhout 84827  B.T.W.  BE 463.476.996
e-mail : info@radial.be

TOTAL P.01

CONFIDENTIAL    DBB    037458

EXHIBIT F-1

EXHIBIT F-1

CROSS-EXAMINATION OF JAN VAN BROECKHOVEN
BY DEXIA BANK BELGIUM

**Knowledge of U.S. Accounting Principles**

91.    Do you have any formal training in accounting?

    a.    If yes, please describe your training.

    b.    Did your training include United States accounting principles?

92.    Have you ever worked as an accountant?

93.    Do you have any knowledge of United States Generally Accepted Accounting Principles
("US GAAP")?

    a.    If yes, how did you acquire that knowledge?

    b.    Do you have any knowledge of the US GAAP applicable to related party
transactions?  If yes, please describe your knowledge.

    c.    Do you have knowledge of the US GAAP applicable to revenue recognition?  If
yes, please describe your knowledge.

94.    Do you have any knowledge of United States Securities & Exchange Commission
("US SEC") regulations?  If yes, how did you acquire that knowledge?  Please describe
your knowledge.

95.    During the course of your work at Paribas and Artesia, were you ever asked to provide
accounting advice?  If so, please describe that advice.

**L&H Relationship with Artesia**

96.    During the course of your work at Paribas and Artesia, did you ever have input into the
accounting decisions made by L&H?  If so, please describe that input.

1

NYA 795573.1

97.　During the time you were employed by Paribas and Artesia, did you ever review L&H's filings with the US SEC?

　　a.　If so, what filings did you review?

　　b.　For what purpose did you review those filings?

**Dictation Consortium**

98.　At the time of the Dictation Consortium transaction, did you believe that L&H would use this transaction to violate US GAAP?

99.　At the time of the Dictation Consortium transaction, did you believe that L&H would use this transaction to recognize revenue improperly?

100.　At the time of the Dictation Consortium transaction, did you believe that L&H would use this transaction to mislead investors in L&H securities?

*Please turn your attention to Exhibit 1. The following questions are based on that document:*

101.　Pages DBB 007192-93 appears to be a memo from the Brown Rudnick law firm. Did you review this document at the time of the Dictation Consortium transaction? If so, how much time did you spend reviewing it?

102.　As used in this memo, does "L&H" refer to the company, Lernout & Hauspie Speech Products?

103.　As used in this memo, does "L&H" refer to Jo Lernout, Pol Hauspie or Nico Willaert?

104.　This memo appears to have been written by Philip Flink.

　　a.　Have you ever met Mr. Flink?

　　b.　Do you know whether Mr. Flink has any background in accounting?

　　c.　Were Mr. Flink and his law firm acting for Paribas or Bacob at the time he wrote this memorandum?

2

d.      If not, who were they acting for?

105.    Why was this memorandum provided to Paribas and Bacob?

106.    Did Paribas provide this document to the Flemish government?

107.    Do you know whether this document accurately characterizes US GAAP?

108.    At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

109.    At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

*Please turn your attention to Exhibit 2.  The following questions are based on that document:*

110.    At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

111.    At the time of the Dictation Consortium transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

## Brussels Translation Group

112.    At the time of the BTG transaction, did you believe that L&H would use this transaction to violate US GAAP?

113.    At the time of the BTG transaction, did you believe that L&H would use this transaction to recognize revenue improperly?

114.    At the time of the BTG transaction, did you believe that L&H would use this transaction to mislead investors in L&H securities?

3

<u>EXHIBIT G-1</u>

EXHIBIT G-1

## CROSS-EXAMINATION OF JAN VAN DER VEN
## BY DEXIA BANK BELGIUM

**Knowledge of U.S. Accounting Principles**

146.    Do you have any formal training in accounting?

    a.    If yes, please describe your training.

    b.    Did your training include United States accounting principles?

147.    Have you ever worked as an accountant?

148.    Do you have any knowledge of United States Generally Accepted Accounting Principles ("US GAAP")?

    a.    If yes, how did you acquire that knowledge?

    b.    Do you have any knowledge of the US GAAP applicable to related party transactions?  If yes, please describe your knowledge.

    c.    Do you have knowledge of the US GAAP applicable to revenue recognition?  If yes, please describe your knowledge.

149.    Do you have any knowledge of United States Securities & Exchange Commission ("US SEC") regulations?  If yes, how did you acquire that knowledge?  Please describe your knowledge.

150.    During the course of your work at Artesia, were you ever asked to provide accounting advice?  If so, please describe that advice.

**L&H Relationship with Artesia**

151.    During the course of your work at Artesia, did you ever have input into the accounting decisions made by L&H?  If so, please describe that input.

1

152. During the time you were employed by Artesia, did you ever review L&H's filings with the US SEC?

    a.     If so, what filings did you review?

    b.     For what purpose did you review those filings?

**Radial**

153. Who created Radial?

154. Was Artesia involved in the creation of Radial?

155. Who created the three LDCs funded by Radial?

156. Was Artesia involved in the creation of those LDCs?

157. At the time of the Radial loan, did you believe that the LDCs funded by Radial were going to develop translation software?

158. At the time of the Radial loan, did you understand that the LDCs funded by Radial needed a license from L&H before doing any development work?

159. At the time of the Radial loan, did you believe that L&H would use this transaction to violate US GAAP?

160. At the time of the Radial loan, did you believe that L&H would use this transaction to recognize revenue improperly?

161. At the time of the Radial loan, did you believe that L&H would use this transaction to mislead investors in L&H securities?

*Please turn your attention to Exhibit 1. The following questions are based on that document:*

162. On page DBB 002546 there is reference to a personal guarantee from Messrs. Lernout, Hauspie and Willaert, and underneath there is a handwritten note that says "separate letter at the request of G. Dauwe."

2

a.    Do you know who wrote that note?  If so, who?

b.    Do you know if Geert Dauwe in fact requested that the guarantee be in a separate
letter?

c.    In your view, is there anything wrong with documenting a guarantee in a separate
letter?

163.    With respect to this document and others, you have been asked whether the document
was created in the "regular course of business."  What is your understanding of this
phrase?

164.    With respect to this document and others, you have been asked whether the document
was created as part of the "regular business practice at Artesia."  What is your
understanding of this phrase?

*Please turn your attention to Exhibit 2.  The following questions are based on that document:*

165.    Is this the credit letter for the initial Radial loan?

166.    It appears that you signed this document along with Geert Dauwe.  Did both you and Mr.
Dauwe approve the Radial loan?

167.    This credit letter does not indicate the rate of interest to be applied to this loan.  Did the
bank charge any interest in connection with this loan?  What was the interest rate?

168.    On page DBB 037433, this document references a joint and several security of three
private individuals, and provides a reference number for the security, correct?

169.    Would the reference number provided allow Belgian regulators to identify the three
private individuals involved?

**Language Investment Company**

170.    Who created LIC?

3

171.    Was Artesia involved in the creation of LIC?

172.    Who created the four LDCs funded by LIC?

173.    Was Artesia involved in the creation of those LDCs?

174.    At the time of the LIC loan, did you believe that the LDCs funded by LIC were going to
        develop translation software?

175.    At the time of the LIC loan, did you understand that the LDCs funded by LIC needed a
        license from L&H before doing any development work?

176.    At the time of the LIC loan, did you believe that L&H would use this transaction to
        violate US GAAP?

177.    At the time of the LIC loan, did you believe that L&H would use this transaction to
        recognize revenue improperly?

178.    At the time of the LIC loan, did you believe that L&H would use this transaction to
        mislead investors in L&H securities?

**Credit Default Swaps**

179.    Can a credit default swap be used to reduce the bank's risk with respect to a loan?

180.    To the best of your knowledge, is there anything wrong with entering a credit default
        swap with a private individual?

*Please turn your attention to Exhibit 5. The following questions are based on that document:*

181.    Was this document signed at the same time the initial loan to Radial was disbursed?  If
        not, when did you sign it?

182.    Do you know when Messrs. Lernout, Hauspie and Willaert signed it?  If so, when?

NYB 1536252.1

*Please turn your attention to Exhibit 6.  The following questions are based on that document:*

183.    Was this document signed at the same time the initial loan to LIC was disbursed?  If not, when did you sign it?

184.    Do you know when Messrs. Lernout & Hauspie signed it?  If so, when?

185.    Was this document signed at the same time as the initial CDS confirmation for the Radial loan (Exhibit 5)?  If not, was this document signed before or after the CDS for the Radial loan?

## Brussels Translation Group

186.    At the time of the BTG transaction, did you believe that L&H would use this transaction to violate US GAAP?

187.    At the time of the BTG transaction, did you believe that L&H would use this transaction to recognize revenue improperly?

188.    At the time of the BTG transaction, did you believe that L&H would use this transaction to mislead investors in L&H securities?

*Please turn your attention to Exhibit 10.  The following questions are based on that document:*

189.    Does Exhibit 10 consist of one document?  If not, how many documents are contained in Exhibit 10?

190.    Page DBB 004080 indicates that the purpose of the BTG project was to develop machine translation software.  Was that your understanding of the purpose of the project?  If not, what was your understanding?

191.    Page DBB 004081 indicates that "US GAAP rules have to be applied in a very stringent way."  At the time of the BTG transaction, did you believe that L&H wanted to comply with US GAAP rules?

NYB 1536252.1

192.    In this document, what does "L&H" refer to?

193.    As used in this document, does "L&H" refer to Jo Lernout, Pol Hauspie or Nico Willaert?

*Please turn your attention to Exhibit 12. The following questions are based on that document:*

194.    At the time of the BTG transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

195.    At the time of the BTG transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

*Please turn your attention to Exhibit 13. The following questions are based on that document:*

196.    At the time of the BTG transaction, did this document indicate to you that L&H was seeking to violate US GAAP?

197.    At the time of the BTG transaction, did this document indicate to you that L&H was seeking to violate US SEC regulations?

NYB 1536252.1