# EXHIBIT C

1  a sensitive issue, as I explained in my previous
2  answer, so it decided not to having its exchanges
3  about the Radial file put into writing, our goal
4  with the regularisation of this file, and the
5  committee then wanted to be able to handle it
6  adequately as usual, and this is the purpose of
7  exhibit Probst 19.
8           Q.  Is it true that even the
9  repayment, the ultimate repayment, of the Radial
10 loan was not in accordance with the bank normal
11 procedures?
12          A.  It is that the procedure of
13 repayment subject to collection was not respected.
14          Q.  Is it true that one of the
15 reasons why the bank did not create a written
16 record regarding the problems with the Radial loan
17 were because the repayment procedures were contrary
18 to the banks internal regulations?
19          A.  This is untrue, and it is easy
20 to explain why.  We have a regularisation here
21 under our eyes and the repayment occurred
22 afterwards.
23          Q.  Was the repayment properly
24 documented?
25          A.  Yes, we received the necessary

ANGLO-AMERICAN COURT REPORTERS LTD
LONDON, ENGLAND

Tel: (011 44) 20 7264 2088          Fax: (011 44) 20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com


ANGLO-AMERICAN
COURT REPORTERS

# EXHIBIT D

| | |
|---|---|
| **FEDERAL POLICE**<br>**Judicial Service District of Ypres**<br><br>**YPRES**<br><br>Police | COURT OF APPEAL – GHENT<br><br>JUNE 3, 2004 |
| | Indicator no.: 476/03 |
| D'Hondtstraat 23 - YPRES | **PRO JUSTITIA** |
| Tel.: 057/21-73-21   Fax: 057/21-67-60<br>Dept.: LH<br>Report no. **543/04**<br>Date: **05/28/04**   Exam   Appendix: | Not. no.: **IE.71.98.000464/2000** |
| On the account of/regarding:<br>- LERNOUT & HAUSPIE SPEECH PRODUCTS NV<br>  FLANDERS LANGUAGE VALLEY 50<br>  YPRES (SINT-JAN)<br>- LERNOUT JOZEF (04/27/48)<br>  SCHACHTEWEIDESTRAAT 17<br>  YPRES (ZILLEBEKE)<br>(et al.) | **SUBSEQUENT OFFICIAL REPORT**<br><br>By virtue of the order from:<br>Chamber President-Examining Magistrate Henri HEIMANS in Ghent |
| | Date: 06/05/03   file no.: |
| By virtue of the complaint of/Prejudiced person: | Sent to:<br>Chamber President – Examining Magistrate Henri HEIMANS in YPRES. *06/02/04*<br><br>The Judicial director<br>[signature] |
| Subject:<br>hearing (Geert DAUWE (20M $ transaction) | Excerpt(s): |
| | |
| Fact(s):<br>-Infringement of the legislation regarding corporations and trading companies | |

CONFIDENTIAL                                              DBB 036129

| Federal Police |
|---|
|  |
| Central service for the prevention of Economic and Financial Delinquency |
| Investigation Cell LERNOUT & HAUSPIE |

*543*            *IIG1D*

**Report no.: /2004**

On Friday, May 28, two thousand and four, at 10 AM.

We, **DE RAEDT Danny**,
Chief Inspector, Officer of the Judicial Police, Assistant-Officer of the Prosecutor, of the Central Office for the Prevention of Economic and Financial Delinquency (CDGEFID) in Brussels, are interrogating in the offices of the CDGEFID in Brussels, Notelaarsstraat 111, supported by the commissioner VAN DAELE Karen:

**D A U W E Geert**,

further identified earlier,

who declares the following:

"I take note of the fact that:
- I can request, for all questions I'm asked and all answers I give, to be recorded in the used wordings;
- I can request that a certain investigation is conducted or a certain cross-examination is held;
- I can use all documents in my possession and can possibly add it to the file;
- my statements can be used as evidence in a court of law.

**Question**: With regard to the 20 million dollar loan of the type "roll over" to Pol HAUSPIE, Jo LERNOUT and Nico WILLAERT dd. 06.25.99 with expiration date of 10.10.99, the investigation shows that this loan was not paid back on the expiration date and was then converted to a loan of the type "straight loan" with the new expiration date of 12.31.99.
Can you confirm this?
**Answer**: I noticed this when reviewing and reading the official reports of the interrogation and investigation pursuant to the insight I was granted.
**Question**: Who made the decision to replace the roll over credit, which had expired without being refunded, by a straight loan?
**Answer**: It definitely was not me. I do not know who made that decision.

Page 1

CONFIDENTIAL            DBB 036130

| | |
|---|---|
| Federal Police  | Report no.: /2004 |
| Central service for the prevention of Economic and Financial Delinquency | |
| Investigation Cell LERNOUT & HAUSPIE | |

**Question**: Mr. JANSSENS Jacques brings up the following matter in his statement (official report 527/03 dd. 05.26.03): *"I'm not completely sure about that. I don't remember but I think that the decision was made by DAUWE and myself. In my mind, it was an administrative decision which came down to changing the expiration date."*
Is it correct to say that you made that decision together with Mr. JANSSENS?

**Answer**: I do not remember if JANSSENS contacted me in this regard. If JANSSENS did discuss this me, he would definitely, as he always did, recorded the fact that this change was allowed after discussing it with me. This mention of approval for the conversion from roll-over to straight loan should have been listed on the booking documents or on another document.

**Question**: Since the modalities in the '*new*' "straight loan" as regards redemptions, expiration date have been changed compared to the roll-over loan, didn't the credit board have to make a decision in this matter?

**Answer**: Normally, this needed to be formally decided by a credit board. As answer to your question why this didn't happen, I refer to the statement of JANSSENS on the hand in which he says that the conversion in his mind only implied an administrative matter which came down to moving the expiration date. On the other hand, I refer in this respect to the statement of Mr. SAVEREYS (official report 513/03) in which he claims that *"the cause can also be found with the credit secretariat given the fact that the ratification is a pure administrative matter which is not always regarded as a top priority in daily practice in the banks."* I want to demonstrate that it is my assumption, given that this conversion was seen as an administrative conversion, that the ratification never took place afterwards and, in other words, no formal decision was made by the credit board.

**Question**: In this regard, Mr. Jacques JANSSENS states the following (official report 527/03 dd. 05.26.03): *"I think there was no formal decision made in the credit board, but the latter was verbally informed about the changed situation and the promised reimbursements. I believe that the credit board was informed about this change and the reimbursement promises by Geert DAUWE. I'm not sure who informed Geert*

Page 2

| | |
|---|---|
| Federal Police  | 543                          IIG1D |
| Central service for the prevention of Economic and Financial Delinquency | **Report no.: /2004** |
| Investigation Cell LERNOUT & HAUSPIE | |

*DAUWE that the reimbursement would take place. It was the client without a doubt but I'm not sure which one of the three."*

Did you notify the credit board regarding this new situation?

**Answer**: I did not inform the credit board because I was not aware of the change.

I want to clearly state that this would have been taken down if would have done that.

My assumption is that the party in charge of commercial affairs, being STEVERLINCK and LUST or Bart FERRAND, determined that the roll-over credit expired, then contacted the credit department whether in writing or not with the question what to do and/or formulated the proposal to extend the roll-over to 12.31.99. It is then up to the credit department to create a proposal and present it to the credit board. It is possible that the people in the credit department judged that it was essentially an administrative conversion and no formal decision was made on it.

**Question**: Despite the fact that it was perhaps perceived as an administrative extension, it still remains a fact that the expiration date of the roll-over was not observed and the questions remains for the bank whether the refund of the straight loan should be observed on the expiration date. Who provided the information about how and when the client would pay back?

**Answer**: I suspect that this information could have come from the commercial office in Kortrijk or that this info went directly from the client to the KGA. I don't remember getting information from the client regarding this matter, nor that I forwarded this information to the KGA.

I want to clearly state that the declaration of JANSSENS regarding my role with respect to the conversion from roll-over to straight loan is very vague and evasive and that I was neither the client, nor the party performing these actions.

CONFIDENTIAL                        DBB 036132

| | |
|---|---|
| Federal Police  Central service for the prevention of Economic and Financial Delinquency  Investigation Cell LERNOUT & HAUSPIE | *543*   *IIG1D* **Report no.: /2004** |

**Question**: The investigation showed that the credits of Radial NV, LIC NV and the personal loan of Pol HAUSPIE, Jo LERNOUT, Nico WILLAERT were paid back on 12.30.99 "under normal preservation". Did you make the decision to do the credit entries as early as 12.30.99?

**Answer**: No.

**Question**: Mr. JANSSENS stated the following in this regard: *"The credits in the account have been authorized by me given the fact that the authorization by a member of the Board of Directors or by myself was necessary for these amounts. In principle, the decision to reimburse these three loans "subject to collection" was made by DAUWE and myself."*
Did you principally approved these credit entries yes or no? On what basis did you make this principal decision?

**Answer**: I want to say that JANSSENS adds the following in his statement *"I don't remember anymore whether there was a direct consultation with DAUWE or by an intermediary of MINJAUW."* Besides, I don't know who MINJAUW is. Again I state that if JANSSENS and I had discussed this, he would have mentioned it on the booking document.

**Question**: I present you again with the following: Swift report, dd. 12.30.99, created by SEAH Amelia (DBS Bank) to your attention, which just confirms that the DBS Bank will receive the amount of 36 million USD on 1.4.00 at the expense of Velstra Pte.
You still believe that you did not see this report?

**Answer**: Yes, that's what I believe. I was always asked about a mailing report in earlier interrogations always where it is now a SWIFT-report.

**Question**: Statements of for instance Karel VAN RIET (official report 512/03 dd. 05.09.03) and Jacques JANSSENS bring up the fact that this must have been the report on the basis of which the bank principally approved the credit entries of the accounts Radial/LIC/Pol HAUSPIE  Jo LERNOUT  Nico WILLAERT. However, they do say that this report is solely a confirmation of an incoming payment of 36 million USD at the DBS Bank at the expense of

CONFIDENTIAL    DBB 036133

Report no.: /2004

| |
|---|
| Federal Police |
|  |
| Central service for the prevention of Economic and Financial Delinquency |
| Investigation Cell LERNOUT & HAUSPIE |

Velstra Pte and that this report does not give any indication at all that Velstra Pte will transfer this money to the Artesia Banking Corporation and that it must serve as payment of the three aforementioned loans. They both refer to you as being the person who has the background information in this regard, given the fact that this report was put to your attention. Jacques JANSSENS states the following:

> *"It is the first time that I see this document (...)*
> *I did not know the last story about this transfer at all, nor the details or the reasons for which Velstra Pte will receive these funds.*
> ***Question****: How did you know that Velstra Pte was going to transfer $31 million to Artesia Banking Corporation? For what reason?*
> ***Answer****: I don't know.*
> *(...) Given the fact that the message of the DBS Bank was addressed to Mr. DAUWE, I assume that this is the person who has the answers to these questions. In any event, Mr. DAUWE has not given me any information on this subject."*

I request that you urgently state who told you that the money would go the account of Velstra Pte at the DBS Bank, would be transferred by Velstra Pte to the Artesia Banking Corporation and would be used for the refunding of the three said loans, whereby I would like to draw your attention once more to the fact that you were the recipient of this swift-report and the investigation and various statements demonstrate that you were the only person within the Artesia Banking Corporation who had this information.
**Answer**: I know Velstra Pte but not her business manager, Tony SNAUWAERT. I found this all out from reading the dossier. Persuasive documents show that the KGA was very much aware of the refunding of these credits. There was even contact with Nico WILLAERT in this regard. This is evident from various emails in the persuasive documents.
I also quote the email of Piet CORDONNIER dd. 12.15.99 in which I was not one of the recipients and which clearly shows that the KGA was informed about an announced refund of the credits.

Page 5

CONFIDENTIAL                                    DBB 036134

Case 1:04-cv-10477-PBS    Document 176-3    Filed 08/04/2006    Page 10 of 19

| Federal Police |
|---|
|  |
| Central service for the prevention of Economic and Financial Delinquency |
| Investigation Cell LERNOUT & HAUSPIE |

Report no.: /2004

I also refer to the email of CORDONNIER dd. 12.27.99 which shows again that the KGA received information directly from the client about the refund.

The email dd. 12.9.99 of Tom DEWISPELAERE to various people but not to me, mentions at the bottom "the PAI-problem, possibly, Geert DAUWE would need to be informed". I don't know myself what a PAI-problem is. If this would have been an essential problem for the interests of the bank, I would have solved the problem. That was my role.

**Question**: If you maintain that it was the KGA that actually had all relevant information with regard to the refund, how do you explain that an employee of the Singapore DBS-Bank knows your name and puts this SWIFT-REPORT to your attention.

**Answer**: I have already racked my brains over this. I assume that, upon reading all interrogations and by getting to know the person of Nico WILLAERT better, that he probably gave a show to the bank in order to obtain this SWIFT-report at 5.29 PM, supposing that it was very important for him to obtain this report and that he said "send it to DAUWE".

**Question**: Given the fact that Nico WILLAERT maintained primarily contact with the office of Kortrijk and the headquarters, why he wouldn't address the SWIFT-report to for instance CORDONNIER or RABAEY, but actually did to you?

**Answer**: I presume that he announced my name because my name as member of the Board could immediately be verified by the DBS bank, which was not the case for the other names.

**Question**: When JANSSENS was asked whether he made the decision back then to pay back the loans "under regular reservation" without knowing the background, being the intervention of Velstra Pte and the commitment of Velstra Pte to transfer 36 million USD to Artesia Banking Corporation to redeem the three loans, he answers the following:

> "*Response: I believe that during the consultation with Mr. DAUWE I was told that the funds for the reimbursement of the three credits were announced in favor of Artesia Banking*

Page 6

CONFIDENTIAL    DBB 036135

Report no.: /2004

| Federal Police |
|---|
|  |
| Central service for the prevention of Economic and Financial Delinquency |
| Investigation Cell LERNOUT & HAUSPIE |

*Corporation by DBS. In other words, this information was different from the content of the SWIFT-report."*

Doesn't this point to the fact that you actually knew the background and intervention of Velstra Pte and knew in advance what Velstra Pte was going to do with the money?
**Answer**: I maintain that me and JANSSENS had no discussion in this regard and that I did not tell him that the funds were coming.
**Question**: With regard to the question why the bank did not wait to pay back the three loans "under normal reservation" until 01.05.00 when the funds were in fact available within the Artesia Banking Corporation, JANSSENS supposes that it was the client who asked to execute the refund before 12.31.99 and he suspects that you can clarify this.
Was it indeed a question of the client to pay back the loans before the year's end? Who did the question come from?
**Answer**: I cannot give any clarification on this topic. I assume that KGA, particularly Mr. CORDONNIER, can provide that information. I want to clearly state my role with regard to the refund.

> I refer to the email dd. 12.14.99 of CORDONNIER to Geert DAUWE (cc. Rabaey and Van Tiggel): *"Given the very "unfortunate" formulation in the confirmation of the CDS, the gentlemen HAUSPIE, WILLAERT and LERNOUT need to be spoken to <u>TOMORROW</u> (!) and tomorrow only in order to protect our rights. Given the sensitivity that surrounds this dossier, we would like to propose to you to notify the gentlemen by phone about the Credit Event Notices.*
> *Hence, the telephone conversation will be the only proof of announcement of a credit event notice."*

I want to show with this email that I contacted the client upon explicit request of KGA and to protect the interests of the bank, given the possible problems due to the unfortunate confirmation of the CDS. I called Pol HAUSPIE and told him that the credit event notices would follow and that the credits

Page 7

Case 1:04-cv-10477-PBS  Document 176-3  Filed 08/04/2006  Page 12 of 19

| | |
|---|---|
| Federal Police  | **Report no.: /2004** |

Central service for the prevention of Economic and Financial Delinquency

Investigation Cell
LERNOUT & HAUSPIE

had to be paid back on the expiration date. Pol HAUSPIE asked me to reassure VAN DEUN by telling him that his credit (credit Radial) would be refunded.

It is evident from the interrogations that the gentlemen had gathered enough money to pay back the loan (Harout KHATCHADOURIAN and 100 million USD from Koreans). This is probably the reason why there was no pressure on the bank to pay back the loans before 12.31.99.

I take note of the fact that I can receive a free copy of the official report of my interrogation. I answer positively to this and find out from you that, pursuant to a decision of the examining magistrate, the issuance thereof is postponed by three months. I take note that I can request a copy of the current official report of the interrogation after this period of time."

The interrogation was terminated on 05.28.2004 at 12.30 PM.
Read, approved and signed.
[signature]

**Whereof deed.**
[signature]

Page 8

CONFIDENTIAL                    DBB 036137

Official report no.: 543/2004 dd. 05/28/04

French sections on page 2:
... Mr. JANSSENS Jacques brings up the following matter in his statement: « I'm not completely sure about that. I don't remember but I think that the decision was made by DAUWE and myself. In my mind, it was an administrative decision which came down to changing the expiration date.»

End of the page:
.../... « I think there was no formal decision made in the credit board, but the latter was verbally informed about the changed situation and the promised reimbursements. I believe that the credit board was informed about this change and the reimbursement promises by Geert DAUWE. I'm not sure who informed Geert DAUWE about it that... »

Page 3:

.../... the reimbursement would take place. It was the client without a doubt but I'm not sure which one of the three »

Page 4:
... Mr. JANSSENS: « The credits in the account have been authorized by me given the fact that the authorization by a member of the Board of Directors or by myself was necessary for these amounts. In principle, the decision to reimburse these three loans "subject to collection" was made by DAUWE and myself. »

...adds that: « I don't remember anymore whether there was a direct consultation with DAUWE or by an intermediary of MINJAUW »

Page 5:

Jacques JANSSENS states the following: « It is the first time that I see this document (...)
I did not know the last story about this transfer at all, nor the details or the reasons for which Velstra Pte will receive these funds.
**Question**: *How did you know that Velstra Pte was going to transfer $31 million to Artesia Banking Corporation? For what reason?*
**Answer:** I don't know.
(...) Given the fact that the message of the DBS Bank was addressed to Mr. DAUWE, I assume that this is the person who has the answers to these questions. In any event, Mr. DAUWE has not given me any information on this subject. »

End of page 6 and beginning of page 7:
« **Answer**: I believe that during the consultation with Mr. DAUWE I was told that the funds for the reimbursement of the three credits were announced in favor of Artesia Banking Corporation by DBS. In other words, this information was different from the content of the SWIFT-report. »

<div style="text-align: right;">
For certified translation
Ghislain DEWEERDT
Certified Translator & Interpreter
[signature]
</div>

CONFIDENTIAL                    DBB 036138

# EXHIBIT E

Piet CORDONNIER
12/14/99 6:13:16 pm

To:      Geert DAUWE/NPBB@NPBB
Cc:      Patrick VAN TIGGEL/NPBB@NPBB, Peter RABAEY/NPBB@NPBB
Subject: LIC/Radial

Dear Mr. Dauwe,

Letters must be sent to both debtors on the one side, and to Messrs. Hauspie, Lernout and Willaert on the other, which respectively
-it is established that the loan was not repaid on 12/15/99 (verified early in the morning) and the immediate and complete repayment of all outstanding amounts is demanded; and
-the intervention based on the credit default swap is obligatory.

"Due to an extremely "unfortunate" formulation in the confirmation of the credit default swap, Messrs. Hauspie, Lernout and Willaert must address this tomorrow (!) and only tomorrow in order not to lose our rights under this swap; accordingly we cannot wait until the expected repayment date (12/24/99)."

Given the sensitivity surrounding this dossier, may we suggest that you inform the gentlemen by telephone of the Credit Event Notice which they will receive over the course of the day. No fax number is recorded in the confirmation and we may assume that these gentlemen will not (be able to) personally sign for receipt. The telephone conversation can therefore be the only proof of the Credit Event Notice communication...

Legal financial markets has been informed of the situation.
Global Credit Risk has been asked to draw up the letters.

Awaiting further information.

Piet CORDONNIER

CONFIDENTIAL     DBB     050204

# EXHIBIT F

Piet CORDONNIER
December 15, 1999, 5:09:20 PM

To: Philippe STEVERLYNCK/NPBB@NPBB, Bart FERRAND, Patrick FAICT/NPBB@NPBB, Krist LUST/NPBB@NPBB, Antoon BAERT/NPBB@NPBB
cc: Peter RABAEY/NPBB@NPBB
Subject: LIC/Radial Credit Default Swap

Dear Colleagues,

1) In order to safeguard our legal rights, the Credit Event Notices under the Credit Default Swaps were faxed today to Mr. Lernout, Mr. Hauspie and Mr. Willaert.
The necessary informal contacts were/are laid via Mr. Dauwe with these gentlemen.
2) Registered letters (by which nonpayment at the expiration date of December 15, 1999 is enacted) are being sent yet today to Radial and LIC.
Can we count on the fact that the commercial people will inform their clients of the registered letter they should be expecting?

As you probably already know, it was orally confirmed that the credits will be repaid on December 24, 1999.


Greetings,

Piet CORDONNIER

**CONFIDENTIAL**          DBB          003712

# EXHIBIT G

Piet CORDONNIER

12/27/1999

| | |
|---|---|
| To: | Geert DAUWE/NPBB@NPBB, Bart FERRAND/NPBB@NPBB, Patrick FAICT/NPBB@NPBB, Krist LUST/NPBB@NPBB, Antoon BAERT/NPBB@NPBB |
| cc: | Francois SAVERYS/NPBB@NPBB, Jacques JANSSENS/NPBB@NPBB, Peter RABAEY /NPBB@NPBB, Patrick VAN TIGGEL/NPBB@NPBB |
| Subject: | Radial & LIC |

Gentlemen,

I received a telephone call from Nico Willaert. On Wednesday, December 29, 1999, an (adequate) amount of USD should become available in an account at a bank in Singapore to repay the loans for L1C and Radial. He will still forward to me the coordinates for the person to be contacted there.

Could the commercial contact persons let me know the correct payment instructions?

As for the private credit, he still needs more time ("just a few weeks") to repay the loan by means of selling shares.

I will keep you informed.

Piet CORDONNIER

CONFIDENTIAL        DBB        038067