# EXHIBIT H

62

1  I have an economics background, I am not a legal
2  specialist so that is not my domain of competence.
3      Q.   You were responsible for supervising the
4  individuals who prepared loan documentation within your
5  group working in the Specialised Loan Department?
6          MS KODNER:   Objection to form.
7      A.   Can you repeat?
8          MR JOSEFSON:   I was asking whether you were
9  responsible for supervising individuals such as
10 Mr Cordonnier, for example, who were responsible for
11 preparing loan documentation within your group for the
12 Specialised Loan Department?
13     A.   I was responsible for the Department as a
14 whole.  I didn't have specific operational controls to
15 make of individual loans or documentation documents,
16 no.
17     Q.   Was there someone else you relied upon who
18 had experience in loan documentation?
19     A.   No, as I said there Piet Cordonnier was the
20 legal specialist in our department, so I had no legal
21 expertise to control him, so.
22     Q.   Did you rely therefore on Mr Cordonnier and
23 his legal experience to accurately and appropriately
24 prepare the loan documentation?
25     A.   Yes.



63

1   Q.   Were there other resources available to
2  answer questions or resolve specific issues relating
3  loan documentation within your group?
4   A.   Within the group I think that Piet Cordonnier
5  was the only legal specialist but there was also the
6  general Legal Department who was accessible for
7  specific issues and issues related to loans and loan
8  documentation, so if Piet Cordonnier had questions
9  relating to documentation or law in general he could
10 always get in touch with the Legal Department.
11  Q.   And he did not need to involve you in the
12 event that he contacted the Legal Department for an
13 opinion or advice in connection with loan documentation
14 or other issues?
15  A.   There was part of his operational activity as
16 a member of the Loan Department.
17  Q.   Did Mr Rabaey have any responsibility for
18 loan documentation?
19  A.   I would say that he as an analyst, as every
20 analyst has to ensure that the credit decision which is
21 taken by the Credit Committee is put into the credit
22 confirmation, so it is team work between the legal
23 specialist and the credit analyst because in a credit
24 confirmation you can also have financial issues to be
25 taken into the documentation, so it is team work so.

ANGLO-AMERICAN COURT REPORTERS LTD
LONDON, ENGLAND

Tel: (011 44) 20 7264 2088                    Fax: (011 44) 20 7265 1703
Website: www.a-acr.com                        E-mail: info@a-acr.com



64

1    Q.   So was it Mr Rabaey's responsibility to
2  verify that loan documentation by Mr Cordonnier
3  accurately reflected the decision of the Credit
4  Committee in the proposed terms of the credit?
5       MS KODNER:   Objection to form.
6    A.   I would say it is a shared responsibility of
7  the legal, of the legal specialist and the analyst to
8  ensure that the decision is put into a contract.
9       MR JOSEFSON:   Did Mr Rabaey have any legal
10 training that you are aware of?
11   A.   I don't know, I have no idea.
12   Q.   Are you aware of any issue relating to the
13 loan documentation for the Radial or LIC loans?
14      MS KODNER:   Objection to form.
15   A.   As I said before I was never involved
16 practically or operationally in the loan approval or
17 documentation process.  The only information I have is
18 from mails I have here before me and at that time it
19 was very sporadic and fragmented as well.
20      MR JOSEFSON:   Were you aware that Mr Rabaey
21 sought an opinion from the Legal Department at Dexia or
22 the Bank relating the LIC and Radial loans, the
23 documentation?
24   A.   Am I aware?
25      MS KODNER:   Objection.



# EXHIBIT I

112

1  loans, but this is, in this context I cannot say if it
2  was accurate to say it like that but if I read the word
3  unfortunate I don't think it was the intention to
4  formulate it like that, but I just have to interpret
5  what it says.
6          MR JOSEFSON:   We need to change the tape.
7          THE VIDEOGRAPHER:   Off-the-record at 12.50.
8
9                (Off-the-record).
10
11
12          THE VIDEOGRAPHER:   Starting roll three in
13  the deposition of Patrick Van Tiggel.   Back on the
14  record at 12.52 pm.
15          MR JOSEFSON:   Before we broke briefly we
16  were looking at the document marked Van Tiggel Exhibit
17  6, and I am trying to put on the record what while we
18  were on the break the Interpreter in the room clarified
19  that the passage we are discussing says "extremely
20  unfortunate" or "very unfortunate", we were focusing on
21  the word "unfortunate" initially in the next paragraph,
22  given the sensitivity surrounding this file am I
23  correct there?
24          THE INTERPRETER:   That is correct, yes.
25          MR JOSEFSON:   Do you have an understanding

ANGLO-AMERICAN COURT REPORTERS LTD
LONDON, ENGLAND

Tel: (011 44) 20 7264 2088        Fax: (011 44) 20 7265 1703
Website: www.a-acr.com            E-mail: info@a-acr.com



113

1  of what is meant by the sensitivity surrounding the
2  file in this e-mail?
3       A.   I don't know, I would have to guess.  I
4  don't know.
5       Q.   Do you have any idea what is meant by the
6  reference to sensitivity surrounding the file?
7       A.   The only thing I could say is that it perhaps
8  could refer to the paragraph before that the Bank only
9  had the opportunity to make an appeal on the Credit
10 Default Swop on the specific and the day after it
11 legally couldn't do it any more, so I could feel that
12 this is the sensitivity of the file which is referred
13 to.  I really don't know.
14      Q.   Are you aware of other loans on which you
15 have had experience and in which the Bank had only a
16 single day to enforce its right under a surety
17 connected to the loan?
18      A.   No.
19           MR JOSEFSON:  If you want to break now for
20 lunch that's fine.
21           THE VIDEOGRAPHER:  Off-the-record at 12.54
22 pm.
23
24           (The Luncheon Adjournment)
25

ANGLO-AMERICAN COURT REPORTERS LTD
LONDON, ENGLAND

Tel: (011 44) 20 7264 2088         Fax: (011 44) 20 7265 1703
Website: www.a-acr.com             E-mail: info@a-acr.com



# EXHIBIT J

122

1  of the repayment of the Radial or LIC loans?
2       A.   No.
3       Q.   Do you know why those loans were being paid
4  back by an account in Singapore?
5       A.   I have no idea.
6       Q.   Do you recall any discussions concerning the
7  involvement of a Singapore bank or any Singapore
8  entities in the Radial or LIC loans?
9       A.   No, totally not.
10      Q.   Do you know whether Lernout & Hauspie Speech
11 Products had any activities or involvement in
12 Singapore?
13      A.   My knowledge of the file at that time and
14 even now didn't permit me to have an opinion on this.
15 I really cannot say what is the contents and the
16 meaning of this mail.
17      Q.   This is an e-mail from Mr Cordonnier to
18 yourself and others and he opens by saying that he
19 received a telephone call from Mr Willaert.  Then the
20 remainder of the e-mail reports on that conversation?
21      A.   Yes.
22      Q.   At this point was Mr Cordonnier handling
23 himself discussions with Mr Willaert concerning
24 repayment of the LIC and Radial loans?
25      A.   I don't know, I cannot answer, but it was a

ANGLO-AMERICAN COURT REPORTERS LTD
LONDON, ENGLAND

Tel: (011 44) 20 7264 2088         Fax: (011 44) 20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com


ANGLO-AMERICAN
COURT REPORTERS

123

1  loan as I understand it in the phase of reimbursements
2  of repayment, so it is not unusual that somebody of the
3  Loan Department tries to find out or get in contact
4  with the commercial relationship manager or client to
5  find out about repayment.  So for me it is not strange
6  or unusual seeing this.
7      Q.  You earlier described Mr Cordonnier's role as
8  primarily involved with loan documentation, is it
9  unusual you would be handling issues of repayment of a
10 loan past its due by date?
11      MS KODNER:  Objection to form.
12     A.  He was a member of the Loan Department and he
13 took care of everything which is -- legal issues of
14 loans.  As I understand it there was a link with some
15 legal issues and the repayment of this loan, so I can
16 imagine that Piet Cordonnier at that time was involved
17 in the discussions, the repayment with Geert Dauwe.
18     Q.  So his activity was more expansive than
19 preparing or assisting with loan documentation; is that
20 correct?
21     A.  He was a legal specialist active in Loan
22 Departments, his main function was loan, everything to
23 do with the legal framework of loans.  So this type of
24 activities don't seem extraordinary to me, no.
25     Q.  If we can mark as the next Exhibit Van Tiggel

ANGLO-AMERICAN COURT REPORTERS LTD
LONDON, ENGLAND

Tel: (011 44) 20 7264 2088     Fax: (011 44) 20 7265 1703
Website: www.a-acr.com         E-mail: info@a-acr.com
