# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
HANS A. QUAAK, ATILLIO PO and )
KARL LEIBINGER, on behalf of  )
themselves and those similarly )
situated,                     )
                              )
            Plaintiffs,       )
                              )
            v.                )  CIVIL ACTION NO. 03-11566-PBS
                              )
DEXIA, S.A. and DEXIA BANK    )
BELGIUM (formerly known as    )
ARTESIA BANKING CORP., S.A.), )
                              )
            Defendants.       )
_____)
```

**MEMORANDUM AND ORDER**

August 8, 2006

Saris, U.S.D.J.

## I.  INTRODUCTION

Class plaintiffs bring claims for securities fraud against Dexia Bank Belgium ("Dexia"), the successor to Artesia Banking Corp., S.A. ("Artesia Banking"), the former chief commercial banker for Lernout & Hauspie Speech Products N.V. ("L&H"). Defendant Dexia moves to dismiss Plaintiffs' Third Amended Complaint ("TAC") on grounds that the amendments to the complaint are time-barred and fail to state claims under the securities laws.  After hearing and review of the briefs, the motion is **DENIED**.

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  Procedural Posture

This action is the latest episode in the long-running serial of the alleged fraud at Lernout & Hauspie Speech Products N.V. ("L&H").[1]  This securities fraud class action, brought against the former chief commercial banker for L&H, was filed on August 19, 2003.  Defendant moved to dismiss, and this Court denied that motion on February 9, 2005.  See generally Quaak v. Dexia, S.A., 357 F. Supp. 2d 330 (D. Mass. 2005).  The legal issues involved, particularly the question of scheme liability under the securities laws, were, however, quite cutting edge, and this Court was persuaded to certify several questions to the First Circuit.  (Docket No. 79.)  The First Circuit accepted the interlocutory appeal and scheduled arguments for this spring.

After the parties briefed the appellate issues, but before the oral argument, Plaintiffs moved to file the Third Amended Complaint, which makes new factual allegations and alleges two new causes of action.  After extensive briefing by both sides,

---

[1]  This Court has written several extensive opinions concerning the alleged fraudulent scheme at L&H.  Familiarity with the facts set out in those opinions is assumed.  See, e.g., In re Lernout & Hauspie Sec. Litig., 208 F. Supp. 2d 74 (D. Mass. June 19, 2002); In re Lernout & Hauspie Sec. Litig., 230 F. Supp. 2d 152 (D. Mass. Aug. 19, 2002); In re Lernout & Hauspie Sec. Litig., 286 B.R. 33 (D. Mass. Nov. 18, 2002); Bamberg v. SG Cowen, 236 F. Supp. 2d 79 (D. Mass. Dec. 9, 2002); In re Lernout & Hauspie Sec. Litig., 236 F. Supp. 2d 161 (D. Mass. Jan. 13, 2003); Baena v. KPMG, LLP, 389 F. Supp. 2d 112 (D. Mass. 2005), aff'd 2006 U.S. App. LEXIS 15577 (1st Cir. June 22, 2006).

the Court allowed the motion to amend, and Plaintiffs filed the
TAC on March 14, 2006.  Shortly thereafter, on March 29, 2006,
the First Circuit vacated its order granting leave to appeal,
leaving this Court to decide whether to recertify any or all of
the questions to the First Circuit.  (Docket No. 204.)  Defendant
now moves to dismiss the TAC and to recertify the questions
previously accepted by the First Circuit for interlocutory
appeal.

**B.   Taking a Different TAC**

The Court fully detailed the factual background of the
Second Amended Complaint ("SAC") in its Order denying Defendant's
motion to dismiss.  <u>Quaak</u>, 357 F. Supp. 2d at 332-34.  I assume
familiarity with those facts.  In brief, Plaintiffs allege that
L&H could not have committed its wide ranging fraud without the
intimate involvement of Defendant (formerly known as Artesia
Banking) as architect of the fraudulent scheme.[2]  Central to
these allegations was the claim that Defendant made numerous
fraudulent loans to L&H in an effort to bolster L&H's stock
price, something Defendant had a powerful incentive to do because
it would result in more business from L&H.  (TAC ¶ 13.)

---

[2] Indeed, the key question certified for interlocutory
appeal was whether Defendant could be liable under the securities
laws for its involvement in the fraudulent scheme, even though it
was not the entity that made the fraudulent misrepresentation,
notwithstanding the Supreme Court's decision in <u>Central Bank of
Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S.
164 (1994).

The TAC, however, adds significant factual allegations and two causes of action based on what the Plaintiffs term "recently-produced documents" (TAC ¶ 15).  To begin, the TAC alleges that Artesia Banking directly benefitted from the increase in the price of L&H stock by selling hundreds of thousands of shares itself.  Artesia Banking made over $10 million in profit from sales of L&H stock in sales from 1996 through September 26, 2000. (TAC ¶ 14.)

Additionally, beginning in March 1999, Artesia Banking exercised absolute control over the operations of a wholly-owned subsidiary called Artesia Securities.[3]  (TAC ¶¶ 15, 173-185.) The complaint alleges that Artesia Banking caused its agent Artesia Securities to issue glowing recommendations for L&H stock.  (TAC ¶¶ 15, 149.)  In other words, Artesia Banking caused Artesia Securities, in particular an analyst named Paul Verelst, to issue reports encouraging readers to buy L&H stock and to reprint false financial data.  (TAC ¶¶ 151-172.)  Artesia Securities had knowledge that its representations concerning L&H stock were false, and shared its parent's motivation to increase the stock price.  (TAC ¶¶ 252-253.)

The fraudulent scheme perpetrated by L&H and, collectively, the Artesia Entities either inflated the value of L&H stock or

---

[3] The Court will detail more fully the facts Plaintiffs have alleged to establish Artesia Banking's control of and/or entanglement with Artesia Securities later in this opinion.

artificially maintained its value given the sad reality of L&H's poor financial condition. (TAC ¶¶ 224, 226.) When the truth came out, the stock dropped precipitously and became worthless, causing damages to the class members. (TAC ¶ 228.)

Along with these new facts, the TAC asserts two new causes of action against Defendant. The SAC contained one claim (Count I) against Defendant for violating § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. The TAC adds a claim (Count II) for violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on grounds that Artesia Banking (now owned by Defendant) was a "controlling person" with respect to Artesia Securities, and that Artesia Securities issued materially false and misleading analyst reports concerning L&H in violation of § 10(b). (TAC ¶¶ 278-284.) The TAC also adds a third claim for insider trading (Count III) in violation of § 20A of the Exchange Act, 15 U.S.C. § 78t-1(a), on grounds that Artesia Banking sold millions of dollars worth of L&H stock while in possession of material non-public information. (TAC ¶¶ 285-295.)

Defendant moves to dismiss the new claims on a variety of grounds and argues for recertification of the questions previously accepted by the First Circuit on interlocutory appeal.

## III. DISCUSSION

### A.  Standard of Review

For purposes of this motion, the Court takes as true "the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor."  Coyne v. City of Somerville, 972 F.2d 440, 442-43 (1st Cir. 1992) (citing Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51 (1st Cir. 1990)).  A complaint should not be dismissed under Fed. R. Civ. P. 12(b)(6) unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  Although the Private Securities Litigation Reform Act ("PSLRA") imposes a heightened pleading requirement upon the plaintiffs with respect to some of their allegations, the First Circuit has cautioned in this regard that "even under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences in the plaintiff's favor."  Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002).

### B.  Timeliness

Defendant moves to dismiss the new counts on the ground that they are time-barred.  With respect to the claim arising from the allegedly fraudulent analyst reports, the Court has already determined that the lengthened statute of limitations for fraud

6

in the Sarbanes-Oxley Act of 2002 applies to this litigation, 28
U.S.C. § 1658(a).  Quaak, 357 F. Supp. 2d at 336.  As such, in
this case, the statute of limitations will have run five years
after the alleged fraud occurred.  28 U.S.C. § 1658(a)(2).
Artesia Securities issued its last allegedly fraudulent analyst
report concerning L&H on January 10, 2000, more than five years
before the March 14, 2006 filing of the TAC.  With respect to the
new insider trading claim, a five-year statute of limitations
also applies.  15 U.S.C. § 78t-1(b)(4).  The last allegedly
illegal sale of L&H stock by Artesia Banking occurred on
September 26, 2000, also more than five years prior to the filing
of the TAC.  All parties agree, therefore, that the new
allegations in the TAC are time-barred unless they "relate back"
to the earlier complaint.

Federal Rule of Civil Procedure 15(c) governs whether new
allegations in an amended complaint which would otherwise be
time-barred may proceed on grounds that they relate back to an
earlier timely pleading.  In pertinent part, the rule states, "An
amendment of a pleading relates back to the date of the original
pleading when . . . (2) the claim or defense asserted in the
amended pleading arose out of the conduct, transaction, or
occurrence set forth in the original pleading."  Fed. R. Civ. P.
15(c).  In applying this test, the critical inquiry is "'whether
adequate notice of the matters raised in the amended pleading has
been given to the opposing party within the statute of

7

limitations' by the general fact situation alleged in the original pleading." <u>Stevelman v. Alias Research, Inc.</u>, 174 F.3d 79, 87 (2d Cir. 1999) (citation omitted); <u>Lind v. Vanguard Offset Printers, Inc.</u>, 857 F. Supp. 1060, 1068 (S.D.N.Y. 1994) ("The relation back doctrine is designed to ensure that an opposing party has been given adequate notice, for statute of limitations purposes, of the claim arising out of the transaction or occurrence which spawned the litigation.").

The rule is generally construed liberally so long as the defendant has not been prejudiced by the amendment. <u>See</u> <u>In re Campbell Soup Co. Sec. Litig.</u>, 145 F. Supp. 2d 574, 602 (D.N.J. 2001); <u>Pucci v. Litwin</u>, 828 F. Supp. 1285, 1296 (N.D. Ill. 1993). <u>See also</u> 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 1471 (2d ed. 1990) (noting that the flexibility of Rule 15 serves the overall purposes of the flexible pleading requirements of the federal rules: encouraging decisions on the merits rather than procedural technicalities, and moving away from fact-pleading toward notice-pleading). However,

> if the alteration of the original statement is so substantial that it cannot be said that defendant was given adequate notice of the conduct, transaction, or occurrence that forms the basis of the claim or defense, then the amendment will not relate back and will be time barred if the limitations period has expired.

6A Wright, Miller & Kane, <u>supra</u>, at § 1497; <u>see also</u> <u>O'Loughlin v. Nat'l R.R. Passenger Corp.</u>, 928 F.2d 24, 26 (1st Cir. 1991)

8

(quoting Wright, Miller & Kane).  The addition of new claims to
an amended pleading does not alone defeat relation back; the
question instead is whether the initial pleading provided a
defendant with adequate notice of the potential new claims.  <u>See,
e.g.</u>, <u>Lind</u>, 145 F. Supp. 2d at 602.

Although the rule is elementary to even first-semester law
students, it is vexingly difficult to apply and usually requires
a fact-intensive inquiry.  <u>See Bond Opportunity Fund v.
Heffernan</u>, 340 F. Supp. 2d 146, 155 (D.R.I. 2004) (citing <u>Wells
v. HBO & Co.</u>, 813 F. Supp. 1561, 1565 (N.D. Ga. 1992)).

This case is particularly close.  Defendant argues that the
allegations in the prior complaints focused entirely on Artesia
Banking's alleged misconduct related to the loan transactions
with L&H, therefore making the allegations of insider trading and
fraudulent analyst reports by Artesia Securities entirely new and
unforeseeable.  To be sure, neither of the two new counts nor
their specific factual bases were present in Plaintiffs' prior
pleadings.  With respect to the fraudulent analyst reports, there
were no allegations of Artesia Securities' existence, much less
of any public touting of L&H stock.  And, with respect to the
insider trading claim against Artesia Banking, there was no
allegation that Defendant even owned L&H stock, much less sold it
for a profit based on inside information.  Rather, Plaintiffs'
prior pleadings asserted only that Defendant had a motive to
inflate L&H's stock price to secure future banking business and

to ensure repayment of its fraudulent loans.  (<u>See, e.g.</u>, SAC
¶ 173.)  Acknowledging this, Plaintiffs contend that they allege
only new evidence of the same scheme to defraud investors and
inflate the price of L&H stock.  The Court must decide whether
these new claims merely put flesh on the plaintiffs' pre-existing
skeleton, or whether they are new animals altogether.

In light of the caselaw construing this rule liberally and
the lack of any showing of prejudice, the Court concludes that
both new claims relate back to the prior complaints.  Although
the specific factual allegations for the new claims were not in
prior pleadings, Defendant was on notice that it was under attack
for the full range of its conduct with respect to its scheme to
inflate the price of L&H stock.  As Plaintiffs learned new
information concerning that scheme through discovery, they added
those findings to an amended complaint, a common practice in
securities litigation.  <u>See</u> <u>Campbell Soup</u>, 145 F. Supp. 2d at
602-03 (noting that "Plaintiffs' clarification and recasting of
some of their claims upon further investigation is par for the
course," and that "exact identity of new claims to old . . . is
not what Rule 15(c) requires"); <u>see also</u> <u>Tiller v. Atl. Coast</u>
<u>Line R.R. Co.</u>, 323 U.S. 574, 581 (1945) (allowing relation back
for new allegations of negligence "related to the same general
conduct" leading to the originally alleged injury).  Although the
focus of the earlier pleadings was on the alleged loan
transactions, these new allegations do not come from out of the

10

blue.  Plaintiffs alleged a multifaceted scheme by Defendant to fraudulently increase the value of L&H stock.  The fraudulent analyst reports provide only another facet of that scheme, and the insider trading allegations are another way in which Defendant profited from the scheme.

Moreover, Plaintiffs persuasively cite several cases establishing the proposition that when the original complaint alleges a wide ranging fraudulent scheme, amended complaints relate back when they assert newly discovered aspects of that scheme.  See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombadier Inc., 2005 U.S. Dist. LEXIS 19506, at *49-50 (S.D.N.Y. Sept. 6, 2005) (allowing amendment to add new claims based on additional classes of securities because Defendant was on notice that they were under attack for fraudulent underwriting scheme); In re The Loewen Group Inc. Sec. Litig., 2004 U.S. Dist. LEXIS 16601, at *46-47 (E.D. Pa. Aug. 18, 2004) (finding relation back of additional fraudulent misrepresentations concerning different transactions because they were "part of the same basic scheme described in the original complaint"); Pucci, 828 F. Supp. at 1296 (allowing new allegations to relate back because they "involved the alleged inducement of investors into a fraudulent investment scheme" alleged in the original complaint); In re Chaus Sec. Litig, 801 F. Supp. 1257, 1264 (S.D.N.Y. 1992) (allowing new allegations of a different fraudulent accounting practice because it was a "'natural offshoot' of the same 'basic

11

scheme' to defraud investors by misrepresenting the company's
earnings and profitability"). These cases stand for the
proposition that when discovery unearths new evidence of a
defendant's scheme to commit securities fraud, the defendants are
deemed to be on notice, and the claims relate back to prior
pleadings. See <u>Sokolski v. Trans Union Corp.</u>, 178 F.R.D. 393,
397 (E.D.N.Y. 1998) ("The existence 'of an underlying common
scheme or course of conduct which is the basis of the original
action and links otherwise distinct transactions' provides
grounds for relation back under Rule 15(c)") (citing <u>In re Austin
Driveway Servs.</u>, 179 B.R. 390, 397 (Bankr. D. Conn. 1995)).

Defendant relies primarily on a 2002 case from this district
which refused to allow new claims in an amended securities fraud
complaint to relate back, <u>In re Xchange Inc. Sec. Litig.</u>, 2002
U.S. Dist. LEXIS 15909, at *12-14 (D. Mass. Aug. 26, 2002).[4]
However, that case is distinguishable. In <u>Xchange</u>, the original
complaint focused on misstatements by officers of the defendant
corporation which took place in 2000. The amended complaint
asserted new claims based on misstatements related to the
defendant's 1998 IPO and 1999 additional securities offering.

---

[4] Defendant also purports to rely on <u>Mayle v. Felix</u>, 125 S.
Ct. 2562 (2005), in which the Supreme Court discussed the
relation back doctrine in the context of habeas corpus petitions.
That case is inapposite however, as the Court made clear that its
analysis was in the context of Congress's "'finality' and
'federalism' concerns" in enacting the Antiterrorism and
Effective Death Penalty Act of 1996. <u>Mayle</u>, 125 S. Ct. at 2574.

The court dismissed the amendments as time-barred because "defendants could not have anticipated that this action would reach as far back in time as the IPO and the Second Offering." Id. at *13.

In determining whether claims in an amended complaint relate back, courts consider as a significant factor whether the new claims arise out of acts occurring at the same time as the fraudulent acts in the initial complaint. See Wells, 813 F. Supp. at 1565. Cases are legion which refuse to allow relation back when the new allegations go beyond the time-frame of the original complaint. See In re Alcatel Sec. Litig., 382 F. Supp. 2d 513, 529 (S.D.N.Y. 2005) (refusing to allow relation back when original complaint centered around an IPO and amended complaint concerned behavior prior to the IPO); In re Bausch & Lomb Sec. Litig., 941 F. Supp. 1352, 1366 (W.D.N.Y. 1996) (refusing to allow relation back for an amendment concerning a press release prior to the initial class period). In this case, however, the new allegations are firmly within the time period for which Defendant was already on notice.

Defendant argues that Plaintiffs made some statements in answers to interrogatories and in briefing before the First Circuit which indicated that alleged misrepresentations were not part of this case, arguing that the Plaintiffs' new allegations should be estopped. Judicial estoppel should only be employed when a litigant is "'playing fast and loose with the courts,' and

13

when 'intentional self-contradiction is being used as a means of
obtaining unfair advantage in a forum provided for suitors
seeking justice.'" <u>SEC v. Happ</u>, 392 F.3d 12, 20 (1st Cir. 2004)
(citing <u>Patriot Cinemas, Inc. v. Gen. Cinemas Corp.</u>, 834 F.2d
208, 212 (1st Cir. 1987)).  "[T]he party to be estopped must be
shown to have succeeded previously with a position directly
inconsistent with the one [it] currently espouses." <u>Fleet Nat'l
Bank v. Gray</u>, 375 F.3d 51, 60 (1st Cir. 2004).  Defendants point
to no cases in which new documents found during discovery leading
to an amended complaint require an application of judicial
estoppel.

In sum, while it is a close question, the Court concludes
that Plaintiffs' allegations of the wide ranging scheme Defendant
perpetrated to fraudulently inflate the value of L&H stock placed
Defendant on sufficient notice to allow the new claims and
allegations in the TAC to relate back to the initial complaint.
The new claims are therefore not time-barred.

## C.  <u>Claims Based on Analyst Reports</u>

Defendant moves to dismiss both Count I, in part, and Count
II of the TAC, which allege that Defendant is liable for
violations of § 10(b) of the Exchange Act based on materially
false and misleading analyst reports issued by Artesia Securities
concerning L&H under theories of agency, entanglement, and
control person liability.  (TAC ¶¶ 278-284.)  Defendant argues

14

that Plaintiffs have not sufficiently pleaded an underlying
§ 10(b) violation by either Artesia Securities or Artesia
Banking.  Moreover, Defendant argues that, even if Plaintiffs
have alleged a § 10(b) violation by Artesia Securities, that
Artesia Banking is not liable for that violation under any
theory.

    **1.**   **§ 10(b) Violation**

To begin, in order for liability to attach to Defendant,
there must be an underlying § 10(b) violation.  "The usual
elements of a section 10(b) claim are that the defendant (i) made
a material misrepresentation, (ii) with scienter, (iii) in
connection with the purchase or sale of a security, (iv) on which
the plaintiff relied, (v) to his detriment.  <u>In re Credit Suisse
First Boston Corp. Analyst Reports Sec. Litig.</u>, 431 F.3d 36, 45
(1st Cir. 2005) (citing <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S.
336, 341-42 (2005)).  However, the Court is aware that it must
"make an individualized assessment that sweeps before it the
totality of the facts in a given case" because "'there is no one-
size -fits-all template' for analyzing securities cases."  <u>Credit
Suisse</u>, 431 F.3d at 46 (quoting <u>In re Cabletron Sys., Inc.</u>, 311
F.3d 11, 32 (1st Cir. 2002)).

Defendant argues that Plaintiffs have failed to plead a
§ 10(b) violation on four grounds: (1) the TAC fails to allege
the subjective falsity of the opinions in the analyst reports;

15

(2) the TAC fails to allege materiality, reliance, or scienter
with respect to the financial data reprinted in the analyst
reports; (3) the TAC fails to allege that the analyst reports
were available to the public; and, (4) the TAC fails to allege a
reasonable theory of loss causation.  The Court will address each
contention in turn.

    **a.  <u>Subjective Falsity</u>**

    Defendant argues that to survive dismissal, the § 10(b)
claim must contain an allegation that the Artesia Securities
analyst who issued the L&H reports, Verelst, did not believe the
opinions in the reports at the times they were issued.  Because
there is no allegation Verelst subjectively believed its reports,
it contends, the § 10(b) claim must be dismissed.  Plaintiffs
respond that they accuse Artesia Banking of violating § 10(b),
not analyst Verelst.  Because *Artesia Banking and Artesia
Securities* allegedly knew that the L&H financial data was false,
those entities also subjectively knew that the "buy"
recommendations were false.  From Plaintiffs' perspective,
Verelst's subjective opinion is not dispositive because Artesia
Banking and/or Artesia Securities acted with the requisite
scienter to establish a § 10(b) violation.

    Defendant contends that the First Circuit's opinion in <u>In re
Credit Suisse First Boston Corp. Analyst Reports Sec. Litig.</u>, 431
F.3d 36 (1st Cir. 2005), compels dismissal because that case

16

stands for the proposition that only the state of mind of the
analyst issuing the opinion matters.  Rather, Credit Suisse
stands for the unremarkable proposition that in a § 10(b) action
based on false or misleading analyst opinions, a plaintiff must
plead with sufficient particularity that the defendant's opinions
were subjectively false when made.  431 F.3d at 48.  Plaintiffs'
allegations, however, are sufficiently distinct to dodge the
Credit Suisse missile.

       In Credit Suisse, the plaintiffs asserted that analysts from
Credit Suisse-First Boston gave subjectively false "buy"
recommendations about a company in order to secure more of that
company's investment banking business.  431 F.3d at 42.  The
plaintiffs alleged, based on internal emails and other evidence
of an overarching general scheme to issue positive
recommendations about companies to aid the firm's investment
banking business, that the opinions were subjectively false, or,
in other words, that the analysts did not believe them at the
time when they were made.  Id. at 46.  The court noted that
"ratings are unlike the statements sued upon in an archetypical
section 10(b) action because they rest upon outsiders' views
about a corporation rather than a corporate insider's factual
assertions about his or her own corporation.  Most ratings are
therefore best understood as statements of opinion, not as
unadulterated statements of objective fact."  Id. at 47.
However, such opinions may be actionable under the securities

17

laws because "a statement of opinion may be considered factual in at least two respects: as a statement that the speaker actually holds the opinion expressed and as a statement about the subject matter underlying the opinion." Id.  The plaintiffs in Credit Suisse failed because they did not succeed in pleading with enough particularity facts that would prove the opinions were made with the subjective knowledge of the speaker that they were false.  Id. at 48.  The court stated, "If a complaint does not successfully plead subjective falsity, it fails to pass muster under the PSLRA." Id. at n.4.  The court further held that merely pleading a generally corrupt environment or conflict of interest was not enough to overcome the requirement of subjective falsity under the PSLRA.  Id. at 49-50.  Unfortunately for the Credit Suisse plaintiffs, their allegations amounted to only "gauzy generalities" not linked to specific statements, and the First Circuit affirmed the district court's dismissal.  Id. at 50.

Although the language in Credit Suisse gives me pause, the allegations in this case are quite different.  In Credit Suisse, the entire case revolved around the alleged subjective falsity of the opinions; the plaintiffs' whole claim was that the analysts disbelieved the reports but issued them anyway to curry favor with the company.  The case at bar is very different; indeed, Plaintiffs do not even bother alleging that the Artesia Securities analyst Verelst did not believe his opinions.  Rather,

18

Plaintiffs allege that Artesia Banking, as part of a multifaceted scheme to inflate the value of L&H stock for its own benefit, caused Artesia Securities to make false and misleading statements about L&H.  Verelst himself is not alleged to be at fault, nor is he a defendant; rather, he is more like an unwitting pawn in the overall chess game.  Furthermore, unlike <u>Credit Suisse</u>, Plaintiffs do not ask the Court to infer that the analyst disbelieved his opinions because of a general conflict of interest or practice of analysts being rewarded for wooing clients through puffed up reports.  Instead, Plaintiffs here allege that the Artesia Entities, as part of a very specific scheme executed with L&H, knowingly published false L&H financial data and therefore published false "buy" recommendations.  (TAC ¶¶ 152-172)  Verelst was working from fraudulent financial data Defendant helped create; if he was kept in the dark, that should not shield Defendant from challenge.  As such, Defendant's reliance on <u>Credit Suisse</u> is misplaced.

**b.   <u>Financial Data</u>**

Defendant argues that the analyst reports fail the elements of materiality and reliance because they included reprinted data already issued by L&H.  In essence, Defendant's argument on both counts is that the analyst reports could not have affected the market because they repeated and were based on data that was already released to the public.  Plaintiffs do not contest that

the financial information had already been reported.  Rather,
they suggest that the reprinted financial information was still
misleading, based on what Defendant knew about the true state of
L&H's economic condition, and that, when coupled with "buy"
recommendations, they were materially misleading.  In essence,
while Defendant asks the Court to disaggregate the financial data
from the analyst reports, Plaintiffs suggest a more holistic
appraisal of the effect of the analyst reports as a whole.  The
Court will first address materiality and then reliance.

### i.  <u>Materiality</u>

To begin, Plaintiffs have sufficiently pleaded materiality.
A misstatement is material if "a reasonable investor would have
viewed the misrepresentation or omission as 'having significantly
altered the total mix of information made available.'" <u>Basic,
Inc. v. Levinson</u>, 485 U.S. 224, 232 (1988).  The First Circuit
has stated, "In most circumstances, disputes over the materiality
of allegedly false or misleading statements must be reserved for
the trier of fact." <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194,
1217 (1st Cir. 1996) (citing <u>Basic</u>, 485 U.S. at 236); <u>Swack v.
Credit Suisse First Boston</u>, 383 F. Supp. 2d 223, 239 (D. Mass.
2004) (materiality is "a fact-specific question that is rarely
and appropriate basis for dismissal").  Plaintiffs both suggest
that the analyst's "buy" recommendation altered the total mix of
available information and that given Defendant's knowledge about

20

L&H, its failure to disclose the truth was a material omission.

The financial data cannot be assessed without the "buy" recommendation joined with it. The data and the recommendation were both part of the same analyst reports; to divorce the two would rob them of the context necessary to evaluate the statements. Plaintiffs allege that the "buy" recommendations themselves were material and inflated, or at least artificially maintained the price of L&H stock. (TAC ¶ 260.) Courts have acknowledged that analyst recommendations may be material. See, e.g., Swack, 383 F. Supp. 2d at 238; In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 299 (S.D.N.Y. 2003) (noting that it "comports with both common sense and probability" to acknowledge the impact of analyst recommendations). Furthermore, it is sensible to assume that the "buy" recommendation, coupled with the financial data, to a reasonable investor, would have altered the total mix of information available. See DeMarco v. Robertson Stephens, 318 F. Supp. 2d 110, 118 (S.D.N.Y. 2004) (finding "it is entirely reasonable that investors would consider analyst recommendations as part of the 'total mix' of information available when making purchases"); see also Hevesi v. Citigroup, Inc., 366 F.3d 70, 79 n.6 (2d Cir. 2004) ("On motions to dismiss, of course, courts are required to assume the truth of well-pleaded allegations, including allegations that an analyst's misrepresentations affected the market price of securities."). The omission was no doubt material, based on the fact that once

21

the truth was known about L&H the stock crashed and the company
went into bankruptcy.  (TAC ¶ 241.)

### ii.  **Reliance**

Defendant argues that Plaintiffs are not entitled to the
fraud-on-the-market presumption of reliance because the financial
data had already been released.  It relies upon <u>Greenberg v.
Crossroads Systems, Inc.</u> to support its argument that merely
confirmatory information negates the fraud-on-the-market
presumption.  364 F.3d 657 (5th Cir. 2004).  <u>Greenberg</u>, however,
simply stands for the proposition that, at summary judgment, a
plaintiff must prove "that a stock's price was actually affected
by an allegedly false statement."  <u>Id.</u> at 663.  The decision in
<u>Greenberg</u> was based on a lack of an evidentiary showing regarding
the relative price of the stock at issue after the misstatements
were corrected.  <u>Id.</u> at 664.  Such an analysis is inappropriate
at the motion to dismiss phase.  Having found, however, that
Plaintiffs have successfully pleaded materiality with respect to
the "buy" recommendations, the Court finds Defendant's argument
unpersuasive  because the recommendation itself altered the total
mix of information available.

### c.  **Public Availability of Analyst Reports**

Defendant argues that the Court should dismiss the TAC for
failure to allege that the analyst reports were made public, and
that without such an allegation Plaintiffs are not entitled to

the fraud-on-the-market presumption of reliance.  <u>In re</u>

<u>Polymedica Corp. Sec. Litig.</u>, 432 F.3d 1, 8 n.11 (1st Cir. 2005)

(noting that a plaintiff must prove "public misrepresentations"

to invoke fraud-on-the market).  The TAC does contain allegations

that the reports were "issued" or "published." (<u>See, e.g.</u>, TAC

¶¶ 15, 149, 150, 151, 153, 155, 163.)

          **d.  <u>Loss Causation</u>**

Defendant argues that Plaintiffs have failed to adequately

plead loss causation because they have not demonstrated a link

between the analyst reports and Plaintiffs' economic loss.

Defendant adds that the Plaintiffs failed to allege that the

analyst reports caused the price of L&H stock to go up, and point

out that the stock price sometimes actually declined on the same

day the reports were issued.

Defendants acknowledge that Plaintiffs have alleged that

Defendant's analyst reports caused them to purchase L&H stock at

inflated prices.  (TAC ¶¶ 237-238.)  Plaintiffs have also alleged

that the revelation of the truth regarding L&H led to a sharp

decline in the stock price, causing their damages.  (TAC ¶ 228.)

"A private plaintiff who claims securities fraud must prove

that the defendant's fraud caused an economic loss."  <u>Dura Pharm.</u>

<u>Inc. v. Broudo</u>, 544 U.S. 336, 338 (2005).  In <u>Dura</u>, the Court

held that a plaintiff must in the complaint "provide the

defendant with some indication of the loss and the causal

23

connection the plaintiff has in mind." Id. at 347.  In this case, Plaintiffs have adequately alleged the misrepresentations, omissions, and other activities that caused them to buy L&H stock at an inflated price, and the consequent loss they suffered when the truth was revealed.  See Brumbaugh v. Wave Sys. Corp., 416 F. Supp. 2d 239, 255-56 (D. Mass. 2006) (finding allegations of share price decreased and public disclosure of the truth to be sufficient for loss causation).

### 2.  **Defendant's Liability for Analyst Reports**

Plaintiffs assert three theories to attach liability to Defendant: (1) Artesia Securities was an agent of Artesia Banking; (2) Artesia Banking entangled itself with Artesia Securities; and (3) Artesia Banking was a "control person" with respect to Artesia Securities under § 20(a) of the Exchange Act (Count II).

With respect to all these claims, the TAC details a scheme run from the top down, with Artesia Banking essentially infiltrating Artesia Securities and causing the analyst reports to be issued.  Artesia Securities, for its part, "threw in" with its parent and willingly participated in the scheme.  Plaintiffs allege that Aretsia Banking acted with scienter,  Artesia Securities acted with scienter, and that Artesia Securities was controlled by Artesia Banking.

Plaintiffs have adequately alleged Artesia Banking's

scienter with respect to the scheme to inflate the value of L&H stock, and those allegations are present in the TAC. In an earlier proceeding, the Court found the following allegations sufficient:

> In this case, plaintiffs have alleged that Artesia (a) helped to finance the sham [entities]; (b) loaned money to the nominal owner of certain [entities] with the knowledge that [they] would use those funds to engage in transactions that would allow L&H to book fictitious revenue from "licensing fees"; (c) intentionally structured the loans artificially to inflate L&H's revenue in a manner designed to conceal the fact that those loans were guaranteed by L&H's principal officers; (d) acted with the specific purpose of hiding the guarantees provided by L&H's officers from the SEC and investors; (e) took affirmative steps to conceal its role in the L&H fraud from the company's Audit Committee investigators; and (f) extended a $20 million line of credit to L&H's principal officers with full knowledge that those funds would be utilized to record fictitious revenue supposedly generated from licensing transactions with [the sham entities].

Quaak, 357 F. Supp. 2d at 342 (internal citations omitted). Plaintiffs allege that Artesia Banking used its wholly-owned subsidiary Artesia Securities to issue fraudulent analyst reports recommending that consumers buy L&H stock as an aspect of the same fraudulent scheme.

### a.  §10(b) Violation by Artesia Banking

The two doctrinal avenues Plaintiffs use to connect the Artesia Securities analyst reports to the Artesia Banking scheme are theories of agency and entanglement.

### i.  Agency

Plaintiffs allege that Artesia Securities was acting as

Artesia Banking's agent when it issued the positive L&H analyst
reports.  Defendant contends that no agency relationship exists
because there is no evidence of an agreement between Artesia
Securities and Artesia Banking regarding publication of the
analyst reports.  Because "agent liability remains a viable
theory of liability," the question becomes whether Plaintiffs
have alleged facts sufficient to establish an agency
relationship.  In re Lernout & Hauspie Sec. Litig., 230 F. Supp.
2d 152, 172 (D. Mass. 2002); see also In re Alstom Sec. Litig.,
406 F. Supp. 2d 433, 468 (S.D.N.Y. 2005) ("Under federal
securities laws, a principal may be held liable for the acts of
its agent."); In re Centennial Techs. Litig., 52 F. Supp. 2d 178,
185-86 (D. Mass. 1999) (Keeton, J.); Gabriel Capital, L.P. v.
NatWest Fin., Inc., 122 F. Supp. 2d 402, 432-33 ("Once a court
has taken the dramatic step of abolishing the legal distinction
between a parent and its subsidiary, it is not inequitable to
conclude that the parent possessed the requisite scienter and
that the statements of its subsidiary can be attributed to it.").

Generally, for an agency relationship to exist, there must
be an agreement between two people that one will act on the
other's behalf and subject to his or her control.  Restatement
(Second) of Agency § 1 (1958).  "Whether such an agency is formed
depends on the actual interaction between the putative principal
and agent, not on any perception a third party may have of the
relationship."  Itel Containers Int'l Corp. v. Atlanttrafik

26

Express Serv. Ltd., 909 F.2d 698, 702 (2d Cir. 1990).  Although
subsidiaries do not always act as agents of the parents, in some
cases the facts establish an agency relationship.  See In re Am.
Bank Note Holographics Sec. Litig., 93 F. Supp. 2d 424, 443-44
(S.D.N.Y. 2000) (finding agency relationship based in part upon
"allegations of interlocking financial, managerial, and business
relationships" between the parent and subsidiary).

Plaintiffs allege a series of facts to establish an agency
relationship: (1) Artesia Banking owned 100% of the shares of
Artesia Securities and exercised absolute control over its
operations (TAC ¶ 173); (2) Artesia Banking maintained complete
control over Artesia Securities' day-to-day operations by placing
a member of the Bank's Executive Committee as the head of Artesia
Securities (Id. ¶ 175-176); (3) any significant actions by
Artesia Securities had to be approved by the Executive Committee
of Artesia Banking (Id.); (4) Artesia Banking and Securities were
located in the same building, used the same branding, and
operated under uniform policies (Id. ¶ 176); (5) Artesia
Banking's Management Committee dictated the investment policies
of Artesia Securities (Id.); (6) Artesia Banking bore a
significant amount of the costs of Artesia Securities (Id.); (7)
accounts of customers with Artesia Banking were commingled with
accounts of Artesia Securities customers such that Artesia
Banking maintained all accounts (Id.); and (8) Artesia Banking
and Securities shared a single integrated computer system (Id.

27

¶ 177).

Though the entities purported to be separated by a "Chinese Wall," the TAC alleges that in reality the two entities were well-coordinated. Plaintiffs support this allegation through a May 7, 1999 internal Artesia Securities memorandum to the Managing Director of Artesia Banking's Corporate Banking Division. The memo states the "necessity for coordinating the efforts by the analysts of ARTESIA SECURITIES with those of Investment Banking. The CD decides to invite N. VAN HOVE of Investment Banking to the weekly meetings of the analysts of ARTESIA SECURITIES." (Id. ¶ 179; attached as Ex. I to Butler Decl.) According to the TAC, Van Hove was the manager of Artesia Banking's corporate research department. (Id.)

Put together, on a motion to dismiss, these facts raise the strong inference that Artesia Securites was an agent of Artesia Banking, with the two acting together as one coordinated entity. See In re Am. Bank Note Holographics, 93 F. Supp. 2d at 444; cf. In re Lernout & Hauspie, 230 F. Supp. 2d at 173 (rejecting agency allegation when there were no facts supporting that "collaborations occurred at the behest of, on behalf of, under the direction of, or subject to the control of KPMG International"). "Whether an individual has acted as an agent is a question of fact," Foisy v. Royal Maccabees Life Ins. Co., 356 F.3d 141, 150 (1st Cir. 2004), and it is one which may be

disproved at a later stage of the proceedings, but at this point
Plaintiffs have alleged enough to proceed.

### ii. __Entanglement__

Alternatively, Plaintiffs allege that Artesia Banking is
liable for the Artesia Securities analyst reports under the
"entanglement" test adopted by the First Circuit in In re
Cabletron Sys., Inc., 311 F.3d 11, 21 (1st Cir. 2002).  In
Cabletron, the First Circuit held that in some cases a securities
fraud defendant may be liable for the statements of a third
party:

> Liability may attach to an analyst's statements where the
> defendants have expressly or impliedly adopted the
> statements, placed their imprimatur on the statements, or
> have otherwise entangled themselves with the analysts to
> a significant degree . . . .  The court will determine
> whether the complaint contains allegations which,
> favorably construed and viewed in the context of the
> entire pleading, could establish a significant and
> specific, not merely a casual or speculative,
> entanglement between the defendants and analysts with
> respect to the statements at issue.

Id. at 37-38 (quoting Schaffer v. Timberland Co., 924 F. Supp.
1298, 1310 (D.N.H. 1996)).  "Entanglement also includes
situations where company officials 'intentionally foster a
mistaken belief concerning a material fact.'"  Cabletron, 311
F.3d at 38 (quoting Elkind v. Liggett & Myers, Inc., 835 F.2d
156, 163-64 (2d Cir. 1980)).

The First Circuit adopted the entanglement test out of
concern that a more stringent rule requiring that the defendant

control the third party speaker "would give company officials too
much leeway to commit fraud on the market by using analysts as
their mouthpieces." Cabletron, 311 F.3d at 38.  In Cabletron
itself, the court cited analyst statements based on
misinformation provided directly by the defendant corporation as
examples of entanglement.  Id.  In this case, Plaintiffs argue
that they have alleged facts supporting a significant
entanglement between Artesia Banking and Artesia Securities with
respect to the L&H analyst reports.  (TAC ¶ 179.)  Defendant
argues that entanglement analysis is inappropriate here because
there are no specific allegations of direct contact between
Artesia Banking and the analyst Verelst.

These facts seem to be somewhat unique among entanglement
cases.  Defendant is correct that there are no specific
allegations of direct contact between Artesia Banking and Verelst
regarding the L&H reports.  However, Artesia Securities was no
independent third party analyst; Plaintiffs have alleged that
Artesia Securities was a wholly-owned subsidiary of Artesia
Banking, which orchestrated the scheme to pump up the value of
L&H stock.  Furthermore, Artesia Banking's insertion of one of
its own executives to coordinate activities between investment
banking and stock analysis suffices for an allegation of
entanglement between the defendants and analysts.  If anything,
Artesia Banking and Artesia Securities were more entangled than

30

the defendant and third party analysts in <u>Cabletron</u>.  The direct
involvement by Artesia Banking in the activities of the analysts
at Artesia Securities raises a strong inference that Artesia
Banking was entangled with the analyst reports.

Furthermore, this case falls within the heartland of the
conduct the First Circuit was trying to prevent when it adopted
the entanglement test, to wit, a primary violator's use of a
third party as a mouthpiece to shield itself from liability.  <u>See</u>
<u>Cabletron</u>, 311 F.3d at 38.

### b. <u>Control Person Liability</u>

Plaintiffs assert a claim under the theory of "control
person liability" under § 20(a) of the Exchange Act, 15 U.S.C.
§ 78t(a) (Count II).  Section 20 states:

> Every person who, directly or indirectly, controls any
> person liable under any provision of this title or of any
> rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such
> controlled person to any person to whom such controlled
> person is liable, unless the controlling person acted in
> good faith and did not directly or indirectly induce the
> act or acts constituting the violation or cause of
> action.

The First Circuit has stated that the "elements of § 20(a) are
generally stated to be (i) an underlying violation of the same
chapter of the securities laws by the controlled entity . . . ;
and (ii) control of the primary violator by the defendant."  <u>In</u>
<u>re Stone & Webster, Inc. Sec. Litig.</u>, 414 F.3d 187, 194 (1st Cir.
2005).

### i. __Underlying Violation__

In Count II, Plaintiffs allege Artesia Securities committed violations of § 10(b) by issuing false and misleading analyst reports concerning L&H, and that Artesia Banking controlled Artesia Securities. (TAC ¶ 283.) This claim is analytically slightly different from Count I because it does not rest on Artesia Banking's having committed a § 10(b) violation – Plaintiffs suggest they establish a control person claim by showing that Artesia Securities itself committed a § 10(b) violation and that it was controlled more generally by Artesia Banking. However, Plaintiffs plead no facts suggesting that Artesia Securities committed a § 10(b) violation without the intimate involvement of Artesia Banking. Defendant seizes upon this by arguing that Artesia Securities had no scienter, and therefore did not commit an underlying § 10(b) violation. In a sense, this argument has some merit. If Artesia Banking is the guilty party here, and it used Artesia Securities as an innocent pawn, then the § 10(b) violation would have to have been committed by Artesia Banking, and a control person claim is misplaced here. Defendant argues that this must be the case because there is no allegation of scienter on the part of the individual analyst, Verelst. Of course, even in the securities context, Plaintiffs are free to plead in the alternative, "and the plaintiff's doing so does not undermine the validity of the

32

complaint." Stone & Webster, 414 F.3d at 200 n.8.

This case brings to the fore difficult questions regarding scienter and how it must be pleaded in a § 20(a) claim, both with respect to the defendant "controller" and the "controllee" that committed the underlying violation. The First Circuit addressed these questions, although it did not finally resolve them, in Stone & Webster. The court noted a split among the circuits as to whether § 20(a) requires a plaintiff to prove "culpable participation" by the defendant controller. As it has in prior cases, the court elected to "take no position in this decision on whether 'culpable participation' is required, or on what it means." Id. at 194 n.4.

The court then turned to the pleading requirements under the PSLRA, noting that in actions "in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind," the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. at 195 (quoting 15 U.S.C. § 78u-4(b)(2)). The court noted that in this circuit, the statute requires "a recitation of facts supporting a 'highly likely' inference that the defendant acted with the required state of mind." Id. (quoting Aldridge, 284 F.3d at 82). The court then noted that § 20(a) does not, on its face, require any scienter on the part of the defendant controller. As such, because § 20(a) does not require proof that the "defendant acted

33

with a particular state of mind," the PSLRA's heightened pleading requirements do not apply to control person claims under the plain language of the statute.  <u>Id.</u> at 196.  Because the PSLRA's heightened pleading requirement does not, by its terms, apply to § 20(a) claims, it also does not apply to the underlying securities law violation of the controlled entity, even if that violation requires proof of scienter as an element.  <u>Id.</u> at 201. The court explains:

> We recognize that a plaintiff must show under § 20(a) that the controlled entity committed a violation of the securities laws.  If that violation was, for example, a violation of Rule 10b-5, which requires a proof of scienter, then the plaintiff under § 20(a) must prove that the controlled entity acted with "a particular state of mind."  Nonetheless, if the statute is read literally, the strong-inference requirement of the PSLRA does not apply.  The statute states that the strong-inference requirement applies only where the plaintiff's recovery depends on proof that "*the defendant* acted with a particular state of mind" (emphasis added).  The obligation to prove that the controlled corporation acted with scienter does not involve an obligation to prove "that *the defendant* acted with a particular state of mind."

<u>Id.</u> (emphasis in original).  The court indicated that there "may be policy arguments counseling for a broader reading of the PSLRA," but they were not briefed and the court declined to speculate on them.  <u>Id.</u> n.11.

To add to the confusion about the court's decision, the First Circuit published an opinion denying the defendants' motion for rehearing.  <u>In re Stone & Webster, Inc. Sec. Litig.</u>, 424 F.3d 24 (1st Cir. 2005).  The court confirmed its conclusion that "the

strong-inference requirement of the PSLRA has no application to a claim under § 20(a)." <u>Id.</u> at 26.  The court then added in a footnote,

> This ruling also was provisional.  We recognized possible policy arguments which, notwithstanding the words of the statute, might counsel against allowing prosecution of a secondary claim in circumstances where the predicate claim, standing alone, would be dismissed for failure to meet the PSLRA's strong-inference requirement.  In view of the fact that defendants had not advanced such an argument, we left its final resolution for another day.

<u>Id.</u> n.3.

At least for the time being, it is unclear whether the PSLRA's heightened pleading standard for scienter will eventually be extended to apply to an underlying § 10(b) violation in a § 20(a) control person liability claim.  Given the current ambiguity as to the proper pleading standard in this circuit, and because neither party addressed the question, the Court declines to resolve the pleading standard dilemma now.  However, following the First Circuit's provisional stance, I assume the PLSRA does not apply.

The most likely alternative pleading standard would be Federal Rule of Civil Procedure 9(b), which applies generally to fraud cases outside the securities context.  Rule 9(b) requires the circumstances of fraud to be stated with particularity, but allows that any necessary "condition of mind may be averred generally."  Fed. R. Civ. P. 9(b).  Prior to the PSLRA, in securities cases, the First Circuit read Rule 9(b) to mean that,

35

"General averments of the defendants' knowledge of material
falsity will not suffice.  Consistent with Fed. R. Civ. P. 9(b),
the complaint must set forth specific facts to make it reasonable
to believe that defendants knew that a statement was fraudulent
or misleading." Lucia v. Prospect St. High Income Portfolio, 36
F.3d 170, 174 (1st Cir. 1994).

Under Rule 9(b), Plaintiffs have alleged sufficient facts
such that it is reasonable to believe that Artesia Securities
knew that their statements regarding L&H were false and
misleading.  Id.  The aforementioned allegations of entanglement
between Artesia Banking and Securities, supra, support an
inference that Artesia Securities knew enough of the scheme to
know that the financial data and "buy" recommendations were
false.  Plaintiffs' allegations are bolstered by the presence of
an Artesia Banking executive, Van Hove, at Artesia Securities'
weekly meetings in order to coordinate the activities of the two
entities.  At this stage, under Rule 9(b), taking all inferences
in favor of the non-moving party, Plaintiffs have pleaded the
necessary scienter on the part of Artesia Securities.  Rather
than plead in "wholly conclusory terms," the TAC alleges specific
facts giving rise to a reasonable inference that Artesia
Securities knew its statements about L&H were false when made.
See Serabian v. Amoskeag Bank Shares, 24 F.3d 357, 361-62 (1st
Cir. 1994) (rejecting under 9(b) wholly conclusory allegations,
but accepting allegations when defendant had access to concrete

36

information contradicting its public misstatements).

### ii. **Control**

Plaintiffs' allegations regarding Artesia Banking's control over Artesia Securities are sufficient.  The "control" element of a control person claim requires that "the alleged controlling person must not only have the general power to control the company, but also actually exercise control over the company." Aldridge, 284 F.3d at 85 (citing Sheinkopf v. Stone, 927 F.2d 1259, 1270 (1st Cir. 1991)).  Defendant argues that Plaintiffs do not sufficiently allege that Artesia Banking exercised control over Artesia Securities with respect to the analyst reports.

"Control is a question of fact that 'will not ordinarily be resolved summarily at the pleading stage.'  The issue raises a number of complexities that should not be resolved on such an undeveloped record." Cabletron, 311 F.3d at 41 (citing 2 T.L. Hazen, Treatise on the Law of Securities Regulation § 12.24(1) (4th ed. 2002)); accord Brumbaugh, 416 F. Supp. 2d at 259. Furthermore, only "a reasonable inference in the complaint" of control is necessary to survive a motion to dismiss.  See id. The same facts which support Plaintiffs' agency claim support their claim that Artesia Banking exercised control over Artesia Securities.  The complaint alleges that Artesia Banking exercised almost complete control over Artesia Securities' day-to-day operations, even going so far as installing an executive to

37

"coordinate activities" between the two units.  At this stage, Plaintiffs have sufficiently alleged actual control.

## D.  Insider Trading

Defendant moves to dismiss Plaintiffs' new insider trading claim under 15 U.S.C. § 78t-1 on two grounds: (1) that the allegations that the named plaintiffs traded contemporaneously are insufficient; and (2) that the complaint lacks the requisite predicate violation of the securities laws to sustain an insider trading claim.

### 1.  Contemporaneous Trading

The statute creating a private right of action for insider trading supports liability "to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class."  15 U.S.C. 78t-1(a).  Defendant contends that Plaintiffs have failed to allege that any of the named class representatives traded L&H stock contemporaneously with the illegal sales of stock by Artesia Banking.  The TAC alleges that the named plaintiffs and the class purchased stock contemporaneously with the illegal transactions and were damaged, but it does not go into specifics.  (TAC ¶¶ 34, 289.)  In their brief, Plaintiffs assert that class representative Leibinger purchased L&H shares six business days after Artesia Banking's May 12, 2000 sale of L&H stock.

38

Both sides brandish cases discussing the number of days
after an illegal trade that a plaintiff's trade must take place
for it to be considered "contemporaneous."  See, e.g., In re
Cypress Semiconductor Sec. Litig., 836 F. Supp. 711, 714 (N.D.
Cal. 1993) (sale within five days of defendants' trades is
contemporaneous); Froid v. Berner, 649 F. Supp. 1418, 1421 n.2
(D.N.J. 1986) (blessing trade which took place nine days after
defendants' trade).  Thankfully, the Court need not engage in
this bean-counting exercise because, both in their briefs and at
oral argument, Plaintiffs assured the Court that they could amend
their pleading to add one of numerous class members who traded
L&H stock on the same day as L&H's illegal trades.  Defendant
asserts that the Court should not allow such an amendment.  The
Court disagrees; to allow Plaintiffs to add an additional class
representative at this stage of the litigation would not
prejudice Defendant.  See Trief v. Dun & Bradstreet Corp., 144
F.R.D. 193, 202 (S.D.N.Y. 1992) ("Intervention of class
representatives to ensure adequate class representation is highly
desireable [sic].").  See also Manual for Complex Litigation
(Fourth) § 21.26 (2004) (noting appropriateness of later
alteration of class representative).

**2.  Predicate Violation**

In order to plead a violation of the insider trading
statute, the complaint must allege a predicate violation of the

1934 Exchange Act or its rules and regulations.  See Jackson
Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d
Cir. 1994) (noting that the statutory language is "quite plain"
on that score); Carney, 135 F. Supp. 2d at 243 (citing Greebel v.
FTP Software, Inc., 194 F.3d 185, 207 (1st Cir. 1999)).
Defendant argues that the TAC fails to allege a predicate claim
for insider trading because Artesia Banking had no fiduciary duty
to L&H or its shareholders.  Plaintiffs counter that Defendant
either served as a temporary insider because of its close
relationship with L&H, or, alternatively, that Defendant was an
outsider liable under the "misappropriation theory."

    There are two theories under which a party can be liable for
insider trading: the classical (or traditional) theory and the
misappropriation theory.  See United States v. O'Hagan, 521 U.S.
642, 651-52 (1997).  The classical theory creates liability when
an "insider trades in the securities of his corporation on the
basis of material, nonpublic information."  Id.  "The classical
theory applies to officers, directors, and other permanent
insiders of a corporation, as well as to attorneys, accountants,
consultants and others who temporarily become fiduciaries of the
corporation."  SEC v. Kornman, 391 F. Supp. 2d 477, 483 (N.D.
Tex. 2005) (citing Dirks v. SEC, 463 U.S. 646, 655 (1983)).  The
basis of liability is that "a relationship of trust and
confidence [exists] between the shareholders of a corporation and
those insiders who have obtained confidential information by

40

reason of their position within the corporation." O'Hagan, 521 U.S. at 652.

Under the misappropriation theory, a person commits securities fraud "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." United States v. Larrabee, 240 F.3d 18, 22 (1st Cir. 2001) (quoting O'Hagan, 521 U.S. at 652-53). Unlike the classical theory, the misappropriation theory "outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information." O'Hagan, 521 U.S. at 653; see also SEC v. Sargent, 229 F.3d 68, 75 (1st Cir. 2000) (noting that under the misappropriation theory, the plaintiff "must demonstrate . . . that the alleged misappropriator breached a fiduciary duty owed to . . . the source of the nonpublic, material information").

This brief tour of insider trading law demonstrates that the defendant trader must owe a fiduciary duty to some party, whether it be the corporation's shareholders under the classical theory or the source of the nonpublic information under the misappropriation theory. Plaintiffs have alleged insider trading under both theories in this case.

Under the "classical theory," temporary insiders, like lawyers, underwriters, and accountants may be liable for trading on material nonpublic information. Dirks, 463 U.S. at 655.

41

Plaintiffs allege that Artesia Banking was a temporary insider of
L&H because it obtained extensive nonpublic financial information
while serving as L&H's principal commercial banker.  Under Dirks,
the basis for the liability of temporary insiders is "not simply
that such persons acquired nonpublic corporate information, but
rather that they have entered into a special confidential
relationship in the conduct of the business of the enterprise and
are given access to information solely for corporate purposes."
463 U.S. at 655 n.14.  Defendant responds that, traditionally, a
lender does not owe a fiduciary duty to a borrower.  This is true
in a general sense.  See Pimental v. Wachovia Mortgage Corp., 411
F. Supp. 2d 32, 39 (D. Mass. 2006); Adams Co-operative Bank v.
Greenberg, 212 B.R. 422, 428 (Bankr. D. Mass. 1997) ("The
relationship of debtor and creditor, without more, does not
establish a fiduciary relationship."); Flaherty v. Baybank
Merrimack Valley, N.A., 808 F. Supp. 55, 64 (D. Mass. 1992).
However, a "fiduciary relationship can . . . arise if a lender
both knows that a borrower is placing her trust in it and accepts
that trust."  Pimental, 411 F. Supp. 2d at 40.

As alleged, Artesia Banking was more than just an arms-
length lender to L&H, but rather acted more as a consultant in
developing the method to finance the entities at the heart of
this alleged scheme.  See SEC v. Softpoint, Inc., 958 F. Supp.
846, 863-64 (S.D.N.Y. 1997) (finding a consultant a corporate
insider who "had legitimate access to corporate secrets and thus

42

owed a fiduciary duty to shareholders"). At this stage of the litigation, when all inferences are drawn in favor of the non-moving party, a fiduciary relationship existed between Artesia Banking, a temporary insider, and L&H shareholders. See, e.g., United States v. McDermott, 245 F.3d 133, 138 (2d Cir. 2001) (affirming insider trading conviction of investment banker who passed along insider information to the "adult film star" with whom he was having an affair); SEC v. Svoboda, 409 F. Supp. 2d 331, 340 (S.D.N.Y. 2006) (finding that bank credit officer breached fiduciary duty by disclosing confidential information of bank's clients). Cf. McAdams v. Mass. Mut. Life Ins. Co., 391 F.3d 287, 303 (1st Cir. 2004) (citing Indus. Gen. Corp. Sequoia Pac. Sys. Corp., 44 F.3d 40, 44 (1st Cir. 1995) ("The question of whether, in a particular factual setting, a fiduciary relationship exists, is a question of fact.")).

For the misappropriation theory to apply, Artesia Banking must have owed a fiduciary duty to L&H as the source of confidential information, i.e. the fact that the licensing entities were a sham. "In the context of section 10(b) and Rule 10b-5 liability premised on the misappropriation theory, the existence of a fiduciary relationship turns on whether the source of the misappropriated information granted the misappropriator access to confidential information in reliance on a promise by the misappropriator that the information would be safeguarded." Sargent, 229 F.3d at 75 (citing O'Hagan, 521 U.S. at 652). The

43

Supreme Court affirmed the theory in part because it is "well tuned to an animating purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence." O'Hagan, 521 U.S. at 657. The question is how elastic the misappropriation theory is. Co-conspirators in a fraudulent scheme no doubt trust each other not to disclose nonpublic information about the scheme, but that duty of loyalty is not one recognized in the law. Under the misappropriation theory, it would be a stretch to hold that in a stock fraud scheme, one outsider schemer owed the insider schemer a fiduciary duty not to disclose confidential information it received regarding the sham entities they helped each other cook up. Moreover, even assuming a cognizable duty, "if the fiduciary discloses to the source that he plans to trade on the nonpublic information," there is no liability under the misappropriation theory. O'Hagan, 521 U.S. at 655. It was not alleged that L&H did not know that Artesia Banking would trade on the false information as repayment for its role in the scheme. At least in these circumstances, the better fit seems to be to consider Artesia Banking a temporary insider.

## ORDER

After hearing and review of the briefs, Defendant's motion to dismiss is **DENIED**. (Docket No. 223.) The motion to recertify the questions is **DENIED**. (Docket No. 211.)

**S/PATTI B. SARIS**
United States District Judge