# Exhibit D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

STONINGTON PARTNERS, INC.,    )
ET AL.,                        )   C.A. No. 04-10411-PBS

            PLAINTIFFS         )   Courtroom No. 19
VS.                            )

DEXIA, S.A., ET AL.,           )   1 Courthouse Way

            DEFENDANTS         )   Boston, MA  02210

GARY B. FILLER, ET AL.,        )   C.A. No. 04-10477-PBS

            PLAINTIFFS         )

VS.                            )

DEXIA, S.A., ET AL.,           )

            DEFENDANTS

JANET BAKER, ET AL.,           )   C.A. No. 04-10501-PBS

            PLAINTIFFS         )

VS.                            )

DEXIA, S.A., ET AL.,           )

            DEFENDANTS

MOTION HEARING

JULY 28, 2006

2:55 p.m.

BEFORE THE HONORABLE PATTI B. SARIS

UNITED STATES DISTRICT COURT JUDGE


VALERIE A. O'HARA

OFFICIAL COURT REPORTER

 1   A P P E A R A N C E S:

 2       Bernstein, Litowitz, Berger & Grossman, LLP, by
     STEVEN B. SINGER, ESQ., 1285 Avenue of the Americas,
 3   New York, New York  10019, for the Plaintiffs;

 4       Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., by
     PETER M. SAPAROFF, ESQ., One Financial Center, Boston,
 5   Massachusetts  02111, for the Defendant Dexia Bank Belgium;

 6       Clifford Chance, by JAMES B. WEIDNER, ESQ. and THOMAS
     TEIGE CARROLL, ESQ., 31 West 52nd Street, New York, New York
 7   10019-6131, for Defendant Dexia Bank Belgium;

 8       Gregory, P. Joseph Law Offices, LLC, by SUSAN M.
     DAVIES, ATTORNEY, 805 Third Avenue, 31st Floor, New York,
 9   New York  10022, for Gary Filler & Larry Perlman, TRA Rights
     Trust;
10
         Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, by
11   PATRICK T. EGAN, ESQ., One Liberty Square, Boston,
     Massachusetts  02109, for Class Plaintiffs.
12
         Boies, Schiller & Flexner, LLP, by KAREN C. DYER,
13   ATTORNEY, 255 South Orange Avenue, Suite 905, Orlando,
     Florida  32801, for JKBaker, LLC, JMBaker, LLC, James Baker
14   and Janet Baker.

15

16

17

18

19

20

21

22

23

24

25

1                      PROCEEDINGS

2          THE CLERK:  All rise.  United States District

3  Court for the District of Massachusetts is in session.

4  Please be seated.   Case of Stonington Partners,

5  Incorporated, et al vs. Dexia S.A., Civil Action 04-10411

6  and Civil Action Nos. 04-10477 and 04-10501 will now be

7  heard before this court.  Would counsel please identify

8  themselves for the record.

9          MS. DYER:  Karen Dyer, counsel for the Bakers.

10         MR. SINGER:  Good afternoon, Steven Singer, Boston

11  counsel for the Stonington plaintiffs.

12         MS. DAVIES:  Susan Davies of the firm of

13  Gregory.

14         THE COURT:  You made it.

15         MS. DAVIES:  Yes, just a moment ago representing

16  trustees of the TRA Rights Trust.

17         MR. SAPAROFF:  Your Honor, Peter Saparoff from

18  Mintz, Levin representing Dexia Bank Belgium.

19         MR. WEIDNER:  James Weidner, Clifford Chance for

20  Dexia.

21         MR. CARROLL:  Thomas Carroll also for Clifford

22  Chance, Dexia.

23         MR. EGAN:  Patrick Egan, class plaintiffs, just

24  observing.

25         THE COURT:  You love this case so much.

1          MR. EGAN:  That's right.

2          THE COURT:  You want to be here.  We have a

3   motion for judgment on the pleadings, and I've read

4   Judge Cederbaum's opinion.  She's the judge in the Southern

5   District who ruled on a different case.  I don't believe

6   collateral estoppel or res adjudicta are in mind, but

7   obviously what her view of what New York law is is relevant

8   and I think correct so I guess we should go from there.

9          MR. WEIDNER:  Thank you, Judge.  We think passing

10  collateral estoppel that the complaint should be dismissed

11  under the fraud count and aiding and abetting and going to

12  the conspiracy count.  Going first to the fraud count, which

13  is only in the Baker complaint, as it was in the Hamdan

14  case, and here, as there, there were no misrepresentations

15  made by Dexia or Artesia, et al. to the Dragon owners, there

16  just wasn't, there couldn't have been any misrepresentation

17  because there was no representation.

18          They argued, well, you can have fraud by actions

19  of will, but in those circumstances, you need some duty to

20  disclose, and typically a fiduciary duty or some special

21  relationship, and there was none as between Dexia and

22  Dragon.  There just wasn't any relationship at all, so as in

23  Hamdan, Judge, we believe that the fraud common law

24  complaint should be dismissed.  Then as to aiding and

25  abetting, again, as in Hamdan, we believe it should be

1    dismissed.

2            THE COURT:  Do you know what, I didn't find the

3    Hamdan comparison that persuasive simply because I know this

4    case so well and there are such different factual

5    situations.  I mean, I've read all the e-mails involving

6    Hamdan and as well the e-mails involving Dexia, and it's

7    just a different situation because Dexia was involved in the

8    financing for the two companies.

9            MR. WEIDNER:  Of the LDCs?

10           THE COURT:   Yes, yes.

11           MR. WEIDNER:  Don't let me forget --

12           THE COURT:  And also knew about some of the

13   financings for the acquisition of Dragon and Dexia.

14           MR. WEIDNER:  Let me turn to that.

15           THE COURT:  I'm not saying the law isn't relevant,

16   but maybe the thought process, but --

17           MR. WEIDNER:  Very good, Judge.  I will not

18   mention Hamdan again.

19           THE COURT:  No, no, that's fine.  I understand why

20   you brought that opinion to my attention, it's just

21   factually distinguishable, so let's just focus on this.

22           MR. WEIDNER:  Fair enough.  Fair enough.  Aiding

23   and abetting requires actual knowledge of the scheme or the

24   misrepresentations, and there is none here as to Dexia.  As

25   to the Dragon transaction, well, let me first step back and

1   say that certainly at the time that Artesia did the loans to

2   the LDCs, 1998 or even earlier, in 1997, they couldn't have

3   had actual knowledge because even LNH didn't know about the

4   transactions, but then if you bring it forward to the time

5   of the transaction themselves in terms of Dragon, Dexia

6   had -- Artesia had no involvement at all in the transaction.

7           And, in fact, the plaintiffs say in their

8   complaint that, well, it was publicized so they must have

9   known it, and they were bankers to LNH, but that doesn't

10  prove that we had any knowledge of what was going in the

11  transaction itself.  We had zero connection with it.

12          THE COURT:  I thought you helped finance it?

13          MR. WEIDNER:  No, not the Dragon transaction,

14  Judge.

15          THE COURT:  This is where I need this oral

16  argument.  I don't necessarily remember the distinctions

17  between Dragon and Dexia, so you're starting off with

18  Dragon?

19          MR. WEIDNER:  Right.  That's the Baker and Filler

20  cases.

21          THE COURT:  All right.

22          MR. WEIDNER:  In which they don't allege, in fact,

23  because it's true, Artesia had no involvement at all.  Now,

24  as to Dictaphone, which is Stonington.

25          THE COURT:  Don't allege they had involvement in

1    financing the acquisition?

2           MR. WEIDNER:  No involvement of any sort including

3    financing.

4           THE COURT:   Okay.  Now, that's different from

5    Dictaphone, right?

6           MR. WEIDNER:  Dictaphone is different.  In terms

7    of knowledge at the time of the Artesia LDC transactions,

8    it's the same.  Obviously they had no actual knowledge, but

9    now turning to the time of the merger transaction between

10   Stonington, or, I'm sorry, Dictaphone and Artesia LNH, in

11   fact, it is true that Artesia participated in a syndicated

12   financing of $400 million or more, in effect, took out the

13   debt that Dictaphone had and allowed LNH effectively to

14   assume it, but, anyway, it extended, it was part of that

15   loan syndicate and extended I believe $50 million of the 400

16   million or so, but we don't see that that does anything more

17   than show that they knew the transaction was going on, but

18   they weren't part of the negotiations or the due diligence

19   or anything in terms of the merger transaction, they were

20   indeed providing debt financing for the transaction, but in

21   our view, rather than showing that, therefore, Artesia was

22   part of some kind of a scheme here, we believe it shows the

23   contrary because if in fact it were the case that Artesia

24   knew this was a house of cards that was about to fall apart,

25   which in fact it did, why on earth would it be providing

0930aa66-6ba2-498e-ab43-1285eeda47bc

1    $50 million in financing, so to the extent --

2            THE COURT:  That's beyond what I'll do in a motion

3    to dismiss.

4            MR. WEIDNER:  I agree, Judge, but they're trying

5    to argue for an inference the other way, and what I'm saying

6    is you can deeply infer that it's just being the contrary.

7    In any event, the point being for the motion to dismiss, the

8    complaint itself simply refers to the loan, and in our view

9    that does not give rise to a sufficient allegation, actual

10   knowledge of what misrepresentations, if any, were being

11   made during the negotiations or the scope of the due

12   diligence; and, secondly, now passing from actual knowledge

13   in terms of reasonable foreseeability, as in any tort case,

14   you need to have reasonable, foreseeable harm, and that's

15   true for aiding and abetting as well.

16           And in this case we don't believe that the

17   complaints allege sufficient reasonable foreseeability.

18   Now, they do say that in terms of the public market that it

19   would be reasonably foreseeable that if LNH were going to

20   hook up its financials, that would have an effect on the

21   public market, but it's another thing it seems to us anyway

22   for them to say that it was reasonably foreseeable at the

23   time of these transactions in 1998 that two years later

24   they, being LNH, would acquire a company, not only acquire

25   it but acquire it for stock, takes it too far.

0930aa66-6ba2-498e-ab43-1285eeda47bc

1          The way Stonington argues the standard for

2    reasonable foreseeability here is that it includes general

3    harm suffered by all LNH investors.  We say that's too broad

4    because it's not reasonable foreseeable in our view that

5    this transaction would occur two years earlier, but more

6    than that, if we really take that broad a definition, it

7    would mean, I suppose, more than suppose that, assume that

8    LNH took out a huge mortgage or other loan, which it

9    collateralized, secured with its stock and indeed the note

10   loan wasn't paid, the lender becomes an investor in LNH,

11   does that mean that Artesia is now liable to that creditor

12   or somehow LNH stock was involved in a derivative

13   transaction in which the nominal value of the transaction

14   was LNH stock which means the counter-party now has a claim,

15   does that mean that Artesia is liable to that person, or

16   taken to its logical extreme, let's say there's a large

17   supplier of technology equipment, says, well, I depended on

18   the --

19          THE COURT:  What if you looked at it this way

20   with respect to Stonington that essentially Artesia was

21   financing a transaction knowing that LNH must have been

22   making misrepresentations about its balance sheet because

23   everyone is going to look at a balance sheet and say they

24   aided and abetted by financing it?

25          MR. WEIDNER:  I'm not sure that they would know

1   what the other side would find in the due diligence.

2           THE COURT:   So why wouldn't it be reasonably

3   foreseeable that the revenue from the fraudulent entities

4   would be relied upon by what are they, the Dictaphone

5   people, in this acquisition?

6           MR. WEIDNER:   But the reasonable foreseeability it

7   seems to me applies back at the time that Dexia did the

8   alleged bad transactions.

9           THE COURT:   Yes, but that would be a stronger

10  argument for Dragon.

11          MR. WEIDNER:   Yes, I agree.

12          THE COURT:   So, Dragon, I can understand your

13  claim, and I'll decide, which is you do a fraud way back

14  when and you know it will be a fraud on the market

15  perhaps.

16          MR. WEIDNER:   Right.

17          THE COURT:   But you don't necessarily foresee

18  five down years the road -- how many years down the road?

19          MR. WEIDNER:   Two.

20          THE COURT:   Two years down the road an

21  acquisition.  Doesn't the fraud get renewed when you

22  participate in a financing?

23          MR. WEIDNER:   Well, I'm not sure that

24  participating -- we're putting --

25          THE COURT:   Aiding and abetting a financing where

0930aa66-6ba2-498e-ab43-1285eeda47bc

1    you know the misrepresentation is being made.

2         MR. WEIDNER:  I understand, but we are putting

3    $50 million, we, the bank is putting $50 million into this

4    transaction, putting itself at risk where it didn't have to,

5    and I'm not sure I make the connection with aiding and

6    abetting a fraud because why would they --

7         THE COURT:  Could you make the reasonable

8    inference that you know that that revenue is being relied

9    upon by the Dictaphone folks?

10        MR. WEIDNER:  I'm not so sure, Judge.  This is now

11   2000, and they're looking at revenue really at the time.

12   This gets too much into facts, but it bears on what you're

13   saying, what they're really looking at is '99 revenue.

14   You'll remember that the LDC transactions, the liquor and

15   radio ones were in '98, and so it was the '98 financials, if

16   any, were affected, they were affected.

17        THE COURT:  Why wouldn't it be the '99

18   financials?

19        MR. WEIDNER:  Because the transactions occurred,

20   the revenue was taken in 1998, not 1999.

21        THE COURT:  Why?

22        MR. WEIDNER:  Because the transactions occurred in

23   1998, and that's when the revenue was taken in.

24        THE COURT:  I think they were ongoing entities.

25        MR. WEIDNER:  But the revenue was a one-time

0930aa66-6ba2-498e-ab43-1285eeda47bc

Page 12

1    thing, it wasn't recurring.

2         THE COURT:   I actually didn't -- I thought it was

3    a continuing licensing stream, no?

4         MR. WEIDNER:  There was a one-time payment.  The

5    licensing agreement was continuing, yes.

6         THE COURT:   Yours was a one-time payment to set

7    them up, but there continued to be a revenue stream.

8         MR. WEIDNER:  No.

9         THE COURT:   There's no other loan from Artesia to

10   the LDC?

11        MR. WEIDNER:  I don't believe, Judge, there were

12   any other payments made or the LDCs made any other payments

13   other than the initial ones.

14        THE COURT:  I just don't remember.

15        MR. WEIDNER:  Well, I think --

16        THE COURT:  You think they're not alleged that

17   way, okay, thank you.  It's a pretty simple issue, one way

18   or another.

19        MR. WEIDNER:  When you get to the conspiracy, it's

20   essentially the same.

21        THE COURT:   I agree with that.

22        MS. DYER:  Your Honor, on behalf of both the Baker

23   and Filler plaintiffs, I'd like to address Dragon.  They

24   were very aware of the Dragon transaction, Dexia was,

25   because they contemplated financing it, they didn't finance

1  it, but they contemplated financing it.  They actually had

2  documents with the Dragon pro forma when they were looking

3  at the --

4          THE COURT:  Suppose that's true, I'll assume it's

5  true, they didn't do anything with respect to it, so how did

6  they aid and abet that fraud?

7          MS. DYER:  Well, the fraud is overstating the

8  financial statements, and what they did is they continued to

9  participate in the fraud.  We allege they've continued to

10  participate in this fraud by doing things such as making the

11  LDC, or, I'm sorry, making the Radio LIC/LDF loans look like

12  they were paid off at the end of '99.

13          In November of 2000, we've alleged that they

14  concealed the fraud so that they took affirmative steps as

15  part of the ponte scheme after they well knew about the

16  Dragon transaction, and so, no, they didn't actually finance

17  it.  They talked about it.  They didn't actually finance it.

18  They were still involved in the fraud.  There's no case out

19  there that says that foreseeability means that by the time I

20  take the first act in a fraud, I have to know that the Baker

21  plaintiffs are --

22          THE COURT:  So let's just play this through, if

23  the only fraud were back in 1998 and then it ended, you'd

24  have a hard case?

25          MS. DYER:  If they didn't continue with the

1    fraud.

2            THE COURT:    If all it was was that initial loan,

3    you'd have a problem?

4            MS. DYER:    It would be a different case.    I

5    haven't analyzed that so I can't say yes or no.

6            THE COURT:    What you're saying, they continued to

7    do things to aid and abet that fraudulent acquisition?

8            MS. DYER:    After they knew we existed.

9            THE COURT:    What?

10            MS. DYER:    That we were taking stock and that we

11    were taking the risk of the volatility of the stock.

12            THE COURT:    What did they do while they knew

13    about it that you would have relied on?

14            MS. DYER:    They --

15            THE COURT:    My pronouns are terrible.    What did

16    Artesia do after Artesia knew about your client's, the

17    Dictaphone people, discussing the possibility of merging in

18    a way that your people, the Dictaphone people, would have

19    been relying on it?

20            MS. DYER:    They told the auditors, we believe, and

21    this has come out in discovery that three loans, Radio LIC

22    and LDF had been paid off on December 30th, 1999, when in

23    fact they were not repaid until January of 2000 so that that

24    revenue didn't have to be reversed and so that there was no

25    question about the revenue that had been booked previously.

Page 15

1  That's alleged in the complaint, your Honor.  They also

2  continued after that.

3          THE COURT:  Do you have the paragraph that that's

4  in?

5          MS. DYER:  Yes, if you look at the complaint at

6  paragraph 85.

7          THE COURT:  It says that Artesia made an actual

8  misrepresentation to --

9          MS. DYER:  No, what we talk about is that the

10  ponte scheme was still going on January 5th, 2000.  We

11  described what is in the complaint, in the paragraphs that

12  surround that what they were doing, which was they were

13  paying off or making it look like a loan was paid off on

14  December 30th, 1999, that it was not paid off in fact until

15  January 5th.  In terms of the reasons for it, I mean, that's

16  really come out in discovery.

17          THE COURT:  Just back off because I don't know

18  the facts.  It is alleged in this complaint that there were

19  specific misrepresentations made from Artesia to Dictaphone?

20          MR. WEIDNER:  Judge, I think you mean Dragon.

21          THE COURT:  I'm sorry, Dragon.

22          MS. DYER:  That there were specific

23  misrepresentations by whom, I'm sorry?

24          THE COURT:  By Artesia to Dragon?

25          MS. DYER:  No, I mean, there's not a specific

1    misrepresentation directly from Artesia to anybody.

2                THE COURT:   That's what I wanted to know.

3                MS. DYER:  Alleged in this complaint.

4                THE COURT:   So now you're saying, no, they didn't

5    make a direct misrepresentation but they knew about the

6    transaction and were taking specific steps to cook the

7    books?

8                MS. DYER:  To cook the books.

9                THE COURT:  While the acquisition --

10               MS. DYER:  To cook the 1999 books.  This would

11   have cooked the 1999 books.  Your Honor, we don't have, I

12   want to be clear, the allegations talk about what they did.

13   The discovery has linked up in many respects while they were

14   trying to do it and while they were trying to conceal it

15   from the auditors, but I don't think it's particularly

16   appropriate at this point to say, well, you should have

17   alleged that beforehand.  We alleged their acts in 1999 and

18   that it had an impact on the 1999 financials.  We relied on

19   the 1999 financials.  They knew about our transactions.  As

20   it turns out, discovery has revealed they knew about our

21   transaction in December of '99 before they took the acts in

22   January of 2000 alleged in paragraph 86 of the complaint.

23               THE COURT:   When was the acquisition?

24               MS. DYER:  The acquisition was June 7th, 2000.

25               THE COURT:  So it was afterwards?

1    MS. DYER:  The acquisition was afterwards, yes.

2    THE COURT:    Thank you.

3    MS. DYER:  May I address Broad briefly, your

4  Honor?  What Hamdan was was a misrepresentation case.  It

5  alleged a misrepresentation.  What the Court found was that

6  there was no misrerepresentation alleged earlier enough in

7  time on which the plaintiffs could have relied.  We do not

8  allege a misrepresentation case here.  We allege here a

9  conduct case.  A fraud by conduct or common law fraud case

10 is consistent with cases that we cited like NEMCO, which is

11 a  New York decision which says you can have fraud.

12    The defendants argued, well, that's like an

13 omission, and you have to have a special duty in order for

14 there to be an omission, and the Court said no, no, no,

15 we're talking about conduct in concealing things which goes

16 beyond any sort of straight omission case and which does not

17 require a special fiduciary duty.

18    It's in our briefs.  It's the NEMCO case.  They

19 tried to distinguish it, they filed this reply yesterday,

20 and they try to distinguish it by saying, well, all of the

21 conduct cases dealing with common law fraud are situations

22 where the defendant is actually in a transaction, directly

23 in a transaction with the plaintiff, but we recognize, they

24 say in their reply, that the one case you cited under

25 New York law isn't that situation, but at least the

Page 18

1    defendant there was engaged in similar transactions parallel

2    to the plaintiffs, but if you look at NEMCO, what you'll see

3    is the Court found the NEMCO decision, I'll give you the

4    cite, it's a New York case, the Court found that you can

5    have fraud, but the actual Chicago Board of Commodities

6    Trading could been engaged in the fraud through their

7    conduct.

8            They never made a single representation to the

9    plaintiffs, they didn't have a special fiduciary

10   relationship in any way to the plaintiffs, but the Court

11   found in that case that you could have fraud through

12   conduct, and what they said was -- and this is at page 340

13   of the decision, it's 552 F. Supp. 332, and at 340 they made

14   clear that if NEMCO means to allege that the exchange -- and

15   that's the Commodities Exchange Board -- failed to carry out

16   their duties and intended to failure to facilitate the

17   fraudulent scheme of the other defendants, that would

18   constitute fraud.  It would amount to an allegation that the

19   exchanges were participants in the fraudulent conduct.

20           This is someone, they're not a party to the

21   transaction, they're the Commodities Exchange Board out

22   there, they're alleged to have engaged in the fraud.  In the

23   conduct, they made no direct misrepresentations whatsoever

24   to the plaintiff, and the Court said under New York law you

25   can have fraud by conduct.  There was no special fiduciary

1  relationship.  Hamdan didn't consider that.  Hamdan was a

2  misrepresentation.  The allegations were a misrepresentation

3  that was repeated through someone else.  It was not a case

4  where fraudulent conduct was alleged, and the Court didn't

5  decide on these grounds.  The Court didn't consider these

6  grounds.

7            THE COURT:  Okay, thank you.

8            MR. SINGER:  Good afternoon, your Honor,

9  Steven Singer, and I really have somewhat of a different

10  position, but I really wanted to expound briefly, if I may,

11  to this point about reasonable foreseeability.  I'm not

12  going to respond to actual knowledge because your Honor has

13  already heard in the class cases that the allegations stated

14  were sufficient to actual knowledge on their part.

15            I'm not going to repeat those allegations, I think

16  they show and establish common law fraud, but it's a

17  reasonable foreseeability point.  If you look in our brief,

18  we cited documents which showed on December 8th, 1999, these

19  entities knew about both of our deals.  It's interesting to

20  me because at that time we didn't know about our deal.  They

21  knew about our deal before we did.  Learnout and Hausby

22  initially --

23            THE COURT:  Is that alleged in this complaint?

24            MR. SINGER:  No, we didn't have that fact.  We

25  didn't have this document.  I've never gotten motion for

0930aa66-6ba2-498e-ab43-1285eeeda47bc

1   judgment until after the close of document discovery.

2   Summary judgment maybe; motion for judgment on the

3   pleadings, no.

4           THE COURT:   Actually, that's a really good point.

5   When is the motion for summary judgment due so I'm not

6   playing this game of what people know in discovery and what

7   they knew in the complaint?

8           MR. SINGER:   It's due in December, your Honor, end

9   of December.

10          THE COURT:   Why?  If there's discovery done, why

11  don't we move it?

12          MR. SINGER:   Discovery is closed but for the

13  discovery ordered by the magistrate judge on the pending

14  motions.

15          THE COURT:   Let me ask you this, if this is an

16  unusual posture simply because discovery has been completed,

17  so if they're telling me things they learned during

18  discovery which they could now update and amend to add, am I

19  better off just waiting for summary judgment?

20          MR. SINGER:   I think the motion should be denied

21  on the pleadings themselves.

22          THE COURT:   You know, can I tell you something?

23          MR. SINGER:   Yes.

24          THE COURT:  This case has been a life endeavor for

25  me, it's not just that I had the big cases, but I've had

Page 21

1   your cases, which are big to you, and I've had the trustee

2   of this and this of that, and it's huge.  It's as big as

3   some of my multi-district litigation cases, so while you

4   might think I salivated the idea of writing another opinion,

5   I don't.  It takes a huge amount of time, and I'm now doing

6   the motion for the class cert., I, as a practical matter,

7   probably won't get to this for three or four motions, and,

8   oops, there's the motion for summary judgment.  So I'm sort

9   of thinking why am I looking at it through this tiny lens?

10  Why don't I just get the facts?

11          MR. WEIDNER:  Judge, it's true discovery has

12  tentatively been closed, but there's an enormous amount of

13  discovery that's still going on.  That's the fact of the

14  matter.

15          THE COURT:   This is just separate cases, right?

16          MR. SINGER:  These are the transactional cases.

17          THE COURT:  Why don't I just wait?

18          MS. DYER:  Your Honor --

19          THE COURT:  I won't get to it for three months

20  anyway.

21          MS. DYER:  Our position would be if you were

22  inclined to consider the collateral estoppel argument which

23  we believe is valid and has been weighed and all those

24  things, we would say we would want you to decide it now

25  really because it's improper.  If what you're saying is you

0930aa66-6ba2-498e-ab43-1285eeeda47bc

1  need to consider it in the context of the documents because

2  we're raising these documents to you and all you're looking

3  at is that the Hanvit Bank case is one more case

4  interpreting law.

5           THE COURT:  You're putting me in an awkward

6  position because you keep inserting facts you learned during

7  discovery, and I can't in my mind keep track of what is what

8  or even take those into account on a judgment in the

9  pleadings.

10          MS. DYER:  Which is why we think they've waived a

11  motion for summary judgment.  They've waived as well the

12  collateral estoppel.

13          THE COURT:  Collateral estoppel doesn't apply.

14  It's a different case.

15          MS. DYER:  It is somewhat awkward to be on a

16  motion for the summary judgment at the end of fact

17  discovery.  Other than what the magistrate has ordered, fact

18  discovery is closed.

19          THE COURT:  Let me ask you this, how big a deal

20  would it be for you to just simply amend your complaint and

21  then add in everything you think is relevant and I'll

22  consider it all in a motion for summary judgment?

23          MR. SINGER:  I think, your Honor, at this stage of

24  the game, I think we might as well go to summary judgment

25  and we can put in all the evidence that we have and we can

1  make the same arguments.  Who knows what we'll find out two

2  months from now when we depose whomever.  Frankly, one of

3  the key employers of Dexia who was involved in the

4  Dictaphone financing is a man named Peter Rabaey.  We tried

5  to take his deposition and couldn't.  The magistrate judge

6  just ordered him to be deposed a week ago, and we still

7  don't have a date for his deposition.

8          So, I mean, I don't think it makes sense to amend

9  at this time if we're going to kick in and we're going to

10  say let's consider all the evidence on this issue, then

11  let's move it to summary judgment.  If your Honor is

12  inclined, if your Honor takes this fact, in order for us to

13  show reasonably that this was foreseeable, we had to show

14  that they specifically knew about us and our deals and the

15  fact that they were getting stock and the fact that there

16  was --

17          THE COURT:   Without that, particularly the

18  conduct case falls apart, unless you're acting in a

19  fraudulent way knowing about a transaction, in other words,

20  I'm very sympathetic to their argument.  I mean, you do

21  something fraudulent in year 1 and then in year 6 something

22  happens you can't foresee, I'm not sure you're on the hook.

23  On the other hand, you're saying, Judge, don't go that

24  route, they knew about these transactions and continued to

25  cook the books knowing about it.  If that's not all in the

1    complaint, I have a hard place to evaluate it.

2            MR. SINGER:  Let me respond briefly to that.  It's

3    not year 1 and year 6, their fraudulent transactions were in

4    1998 and 1999 both, that's what they did.  It began in 1998.

5    I don't think it's the law that at the day they started the

6    fraud they had to know all of what.

7            THE COURT:   I was using a hypothetical.

8            MR. SINGER:  No, I know, I understand.

9            THE COURT:   If you commit a fraud on day 1 and on

10   Day 3 something happened you couldn't have anticipated

11   through an acquisition, fine, I'll use your time framework,

12   I think they've got a strong argument.  If in fact they're

13   continuing to do things while they knew about these

14   acquisitions, it's a different case.  They may win, you may

15   win; but it's a different case.

16           MR. SINGER:  It's a different case.  Let me, what

17   they did is they helped Learned & Hausby to cook the books

18   in 1998 and 1999.  1999 financial statements are issued in

19   February of 2000, essentially a few weeks, a month before

20   our deal was announced, okay, so the impact on their fraud

21   was felt by us contemporarneously with our doing a number of

22   deals, and we clearly relied upon those financial

23   statements.  So that's one thing, the ramifications of their

24   conduct were felt at the time.

25           THE COURT:   That's alleged?

0930aa66-6ba2-498e-ab43-1285eeeda47bc

Page 25

1          MR. SINGER:  It's alleged, partially alleged, but

2     your Honor also noted in terms of -- and this is I think

3     relevant.  There's two things that are relevant, that are

4     directly relevant to your decision in the class case, one is

5     their discussion about their conduct throughout 1999, and it

6     relates to something Mr. Weidner said, your Honor said by

7     mid to late 1999, Artesia became interestingly concerned

8     that the loans to the LDC were not getting paid, the loans

9     derived from the LDC were due on June 30, 1999, the

10    $20 million personal loans to the senior officers were

11    due.

12          THE COURT:   Slow down.

13          MR. SINGER:  And they extended the loans to

14    December 15th, 1999.  What we now know from discovery,

15    Mr. Weidner said why would we loan Dictaphone and Learned &

16    Hausby's had no knowledge when we now know that was part of

17    a quid pro quo.  The reason they loaned Learned & Hausby the

18    money from Dictaphone, we think a condition of that loan was

19    that they get repaid for all these sham loans.  That was the

20    deal.  That was the condition they insisted on.  No, that's

21    not alleged in the complaint, that particular fact.  Okay.

22    That is not because we didn't know it, now we know it, we

23    have the document where it says we must get repaid on our

24    loans outstanding.

25          THE COURT:  In what sense was this a fraud you

Page 26

1    relied on?

2            MR. SINGER:  In what sense, my client relied upon

3    Learned & Hausby's financial statements in doing this deal.

4    They were involved in financing.

5            THE COURT:  I don't know it as well as you do.

6    Were the loans closed out, was that something that affected

7    the balance sheets?

8            MR. SINGER:  The loans were closed out, in other

9    words, yes, these were loans in 1998 and 1999.

10            THE COURT:  Were closed out, and that affected

11    the balance sheet, and you're saying that all happened while

12    they knew --

13            MR. SINGER:  Of our deal and while they were

14    agreeing to finance our deal.

15            THE COURT:  Is that all in the complaint?

16            MR. SINGER:  What's in our complaint is the

17    allegation with respect to them, the allegation that they

18    knew or participated in the financing of Dictaphone, as your

19    Honor noted, and that should be sufficient to defeat any

20    argument that it wasn't reasonably foreseeable at this

21    stage.  That's the fact that's alleged.

22            THE COURT:  I understand the argument.  We have a

23    choice, you can go and amend the complaint and add all this

24    stuff so that I have a real sense of where this case is

25    right now or we can all morph this into a summary judgment

1    motion.

2            MR. SINGER:  We think it makes more sense to do

3    summary judgment.

4            MS. DYER:  Your Honor, I don't want to be at the

5    mercy of whether I leave out one little fact somehow, you

6    know, I made a general allegation, I made pretty detailed

7    facts, but, oh, I left out this document on an amended

8    complaint and now we go through the process again.  In

9    summary judgment, I can bring, you know, everything in.

10            THE COURT:   But my concern is in reading the

11    briefs, it's a little hard for me sometimes to parse what

12    was in the complaint as opposed to what you learned from the

13    documents, and so it started looking more like a summary

14    judgment motion.

15            MS. DYER:  We don't have a problem, if, you know,

16    setting aside the collateral estoppel and all that, we don't

17    have a problem with that.  We do think you have to consider

18    the documents at some point probably.

19            THE COURT:   What do you all think about this?  I

20    mean, I know you've flown up here.  Maybe you think it's a

21    waste of money?

22            MS. DYER:  I came the furthest.

23            THE COURT:  Where did you come from?

24            MS. DYER:  Florida.

25            MR. WEIDNER:  Judge, the reason we made the motion

Page 28

1   is because, as you pointed out, it's a pretty simple legal

2   issue.  The stuff that they're talking about now is not in

3   the complaint, and what's happened is we make a motion for

4   judgment on the pleadings, all of a sudden we get a dump

5   load of stuff from the other side saying, well, really this

6   and that.  That's what changed.

7          THE COURT:  You waited so long for the motion for

8   judgment on the pleadings, so in a way, although not

9   intended, I'm sure by you, they've now got discovery.

10         MR. WEIDNER:  We don't think it makes any

11  difference frankly.  That is to say, we don't think the

12  facts make any difference.

13         THE COURT:  Let me be quite candid, this is not

14  going to be on a fast boat anywhere.  When does discovery

15  end now?

16         MS. DYER:  Fact discovery has ended, your Honor,

17  other than those depositions that the Court, that

18  Judge Collings has ordered and has potentially under

19  consideration right now.  Expert discovery I believe ends in

20  either October or November.

21         THE COURT:  And, in any event, if I knocked out

22  some of these common law counts, there's still the federal

23  counts?

24         MS. DYER:  The federal counts are still there,

25  yes.

1    MR. WEIDNER:  The 10(b)5 claim, depending what you

2    do with the 10(b)(5) claim would still be there.

3        THE COURT:   Because that covers everybody?

4        MR. WEIDNER:  Right.  We didn't make the motion.

5        THE COURT:   Not to complicate things at all, but

6    I've read the objections to Judge Collings, that's this

7    case, right?

8        MS. DYER:  Yes.

9        THE COURT:   Versus the class cases.

10       MS. DYER:  It's all cases, your Honor.

11       THE COURT:  I've read two of them.  Are there more

12   than that, the one that had to do with the inadvertent

13   disclosure and one had to do with the 30A depsotion?

14       MR. EGAN:  Yes, that's correct.

15       THE COURT:   So let me just say today or

16   yesterday, I don't know if you've seen it yet, I've

17   basically denied both sets of objections but with the

18   following understanding which could add to the discovery

19   complications.  It may well be that you're going to move for

20   a letter rogatory to that particular witness, and so you

21   should do forthwith so you don't delay that anymore.  That

22   will be the route you will have to go.

23       As far as the inadvertent disclosure, I've denied

24   the objection.  On the other hand, there are routes that you

25   can go if you think that while it's work product, in other

0930aa66-6ba2-498e-ab43-1285eeda47bc

1  words, you did it on the grounds of inadvertent disclosure,

2  that's pretty much the law around here, you know, two

3  documents, two needles in the haystack, we don't do that to

4  lawyers around here.

5        On the other hand, it may be that you feel you

6  have a substantial, how do you word it, the nonopinion, if

7  you have a substantial need of it that it overcomes it?

8        MR. WEIDNER:  Right.

9        THE COURT:  So I'm not here to preclude either

10  you from doing the letters rogatory, just get it off in a

11  reasonable way, or if you really feel you can show a

12  substantial need from me doing that?

13        MR. WEIDNER:  Understood, Judge.

14        THE COURT:  I will take this under advisement,

15  but I think realistically even if I get to it before the

16  summary judgments and if I found it wasn't enough, I would

17  allow you to amend to add this stuff, so I'm not going to

18  play that game.  It was hard for me reading the stuff and

19  preparing yesterday afternoon just figuring out how much,

20  because the complaints are always so massive, how much is in

21  the complaint and how much is in the documents and then they

22  would be fair to say you can't allege that stuff because

23  that's not in the complaint, the timing, all the timing

24  things, and yet I don't know of any judge who wouldn't then

25  say, well, grant it without prejudice through an amendment,

0930aa66-6ba2-498e-ab43-1285eeeda47bc

Page 31

1    so I don't know that that's worth the dime right now.

2          Is there any movement at all towards settlement on

3    this thing?

4          MR. WEIDNER:  Not so far, Judge.

5          THE COURT:   Could we go off the record.

6          (Discussion off the record.)

7          THE COURT:   I'll take this under advisement.

8    When my new law clerks come in September, it will be part of

9    the pile they get, but I think as a practical matter it

10   makes sense to wait for summary judgment, but if I do get to

11   it, if that gets delayed yet again because of the little

12   rogatory, maybe there can be, and I can get to this, I'll

13   get some legal guidance because if I rule against you

14   because some of the facts aren't in the complaint, I thought

15   they were critical, I'll let you amend and add them in.

16   Makes sense?  Have a nice rest of the summer.

17         (Whereupon, the hearing was suspended at

18   3:56 p.m.)

19

20

21

22

23

24

25

Page 32

1                    C E R T I F I C A T E.

2

3   UNITED STATES DISTRICT COURT )

4   DISTRICT OF MASSACHUSETTS     )

5   CITY OF BOSTON                )

6

7              I, Valerie A. O'Hara, Registered Professional

8   Reporter, do hereby certify that the foregoing transcript

9   was recorded by me stenographically at the time and place

10  aforesaid in No. 04-10411-PBS, In Re:  Stonington Partners,

11  Inc., et al. vs. Dexia, S.A., et al. and thereafter by me

12  reduced to typewriting and is a true and accurate record of

13  the proceedings.

14                    _____

15                    VALERIE A. O'HARA

16                    REGISTERED PROFESSIONAL REPORTER

17

18

19

20

21

22

23

24

25