Exhibit D

Case 1:04-cv-10477-PBS    Document 244-6    Filed 12/28/2006    Page 1 of 14

SHEET 5    PAGE 33

**33**

1 between the US and Belgium, can you describe for me the
2 interrelationship between the Board of Directors of
3 the Bank versus the Management Board of the Bank?
4    A. Well, the directors of the Bank are appointed
5 by the shareholder; in our situation, Dexia SA. The
6 directors then appoint the members of the
7 Management Board (the management) and the
8 Management Board reports to the Board of Directors of
9 the exercise of their function.
10    Q. And does the Compliance Department within
11 Dexia Bank Belgium report to the Board of Directors?
12    A. No. The Compliance function reports to the
13 Management Board.
14    Q. Right. And how about the Internal
15 Audit function?
16    A. The Internal Audit function reports to the
17 Management Board as well, knowing that the
18 Auditor General, as we call him or her, have access to
19 the Audit Committee, to present their Audit Plan, to
20 get the observations of the directors who are present
21 on the Audit Committee and submit their main findings
22 regularly over the course of the year.
23    Q. And in your tenure with Dexia Bank, did you
24 have any reason to deal regularly with the Commission
25 on Banking and Finance inside Belgium?

PAGE 34

**34**

1    A. Yes.
2    Q. And is that sometimes referred to as
3 "the CBF"?
4    A. Or CBFA.
5    Q. CBFA.
6    A. Yes. Commission Bancaire Financiere et des
7 Assurances.
8       THE COURT REPORTER: Can you say that
9 again, please?
10       THE WITNESS: I'm sorry. That is Banking and
11 Finance Commission. Banking, Finance and Insurance
12 Commission.
13 BY MR ROCCO:
14    Q. Generally speaking, does the Dexia Bank --
15 a bank in Belgium have a duty to be candid with its
16 communications with the regulatory body, the CBFA?
17    A. Well, all banks have not only a duty, but a
18 tradition of being very candid with their
19 Regulators, yes.
20    Q. And so I just want to understand the
21 relationship between Regulator and bank. It would be,
22 for instance, improper for a bank in Belgium to mislead
23 the CBFA; is that a fair statement?
24    A. Yes. You don't want to mislead the Regulators
25 in any way, shape or form.

PAGE 35

**35**

1    Q. So that would include -- you would also not
2 want to withhold from the Regulators a matter that was
3 relevant or material to their inquiry; is that fair
4 to say?
5    A. You wouldn't want to do that, no.
6    Q. And at all times during your tenure with
7 Dexia Bank, was it regulated by the CBFA?
8    A. You mean whether the Bank was at all times
9 regulated by the CBFA during my tenure?
10    Q. Yes.
11    A. Yes, it was.
12    Q. And would that be the regulatory body,
13 the CBFA, that also regulated Artesia Bank?
14    A. It was the same body that regulates all the
15 banks in Belgium, including Dexia Bank and
16 Artesia, yes.
17    Q. I want to return to your tenure, briefly,
18 with Clifford Chance. At some point while you were a
19 partner at Clifford Chance, did you have occasion to
20 work on the merger or the potential merger between
21 Artesia Bank and Dexia Bank?
22    A. Yes. I was the legal counsel of Dexia in that
23 particular transaction.
24    Q. And do you recall when was the first time
25 that you worked on the potential merger between

PAGE 36

**36**

1 Dexia Bank and Artesia Bank?
2    A. As far as I can recall, the first context
3 between me and my client on that matter, probably
4 back from the end of 2000.
5    Q. And what do you recall about that first
6 contact with the potential deal?
7    A. I'm sorry, what was the question?
8    Q. What do you recall as your first contact with
9 this potential deal between Artesia and Dexia?
10    A. Well, I don't have any specific recollection
11 of that. As far as I can remember, it was sort of stop
12 and go. A first contact, end of 2000, that Dexia took
13 was with us saying, "We have the intention of doing
14 this particular transaction", but as far as I can
15 remember, there was not heavy involvement on our part
16 at end of 2000. Things really got up to speed beginning
17 of 2001.
18    Q. And in the beginning of 2001, what became
19 your responsibility on that transaction?
20    A. Advising on the acquisition of Artesia
21 by Dexia.
22    Q. Did Artesia -- withdrawn.
23       Did Dexia Bank have a financial advisor
24 with respect to that deal?
25    A. Yes.

PAGE 37

1  Q. And who was that?
2  A. Morgan Stanley.
3  Q. And did Dexia Bank have any auditing or
4  accounting consultants on the deal?
5  A. Dexia was working with PricewaterhouseCoopers
6  for that transaction.
7  Q. Was PricewaterhouseCoopers also the auditor
8  of Dexia at that time?
9  A. Yes.
10 Q. And apart from Morgan Stanley,
11 PricewaterhouseCoopers, who I will call PwC, and
12 Clifford Chance, were there any other professionals
13 that you recall being involved in the transaction on
14 the Dexia side?
15 A. No, I don't recall of any other advisors
16 being involved in that transaction.
17 Q. Do you recall -- you believe it was not
18 until 2001 that the deal began to heat up, if you will,
19 but do you recall what the time period was that you
20 worked on the Dexia/Artesia deal?
21 A. It was a short period of time, mostly
22 concentrated on February/March 2001.
23 Q. Now, are you familiar with the
24 term "due diligence"?
25 A. Yes, I am.

PAGE 38

1  Q. Can you tell me what your understanding of
2  that term is?
3  A. Well, due diligence is essentially the
4  investigation that you carry out on behalf of your
5  client to try to ascertain what is the net asset value
6  of the other company and the type of risks involved in
7  any particular transaction, plus any elements that are
8  required to make sure that you can put a transaction
9  together making it effective.
10 Q. And did you have any role in the
11 due diligence that was performed on the
12 Dexia/Artesia merger?
13 A. Yes. I was advising Dexia on that part as
14 well.
15 Q. And do you know who actually did the
16 performance of the due diligence on the Dexia/Artesia
17 merger on the Dexia side?
18 A. On the Dexia side, the due diligence was
19 mostly carried out by PwC and we were assisting them,
20 to an extent, on the legal side.
21 Q. When you say you were "assisting them", what
22 did you do to assist them?
23 A. Well, the transaction was executed in a
24 relatively short period of time so the due diligence
25 efforts requested from PwC and from Clifford Chance at

PAGE 39

1  that time were relatively limited in scope.
2  Q. When you say "relatively limited", what
3  do you mean?
4  A. The business understanding between the
5  principals as laid out in the agreement I think they
6  signed at the time was they wanted to do it relatively
7  fast and they didn't want to embark on a long and
8  thorough due diligence process.
9  Q. And why was that?
10 A. From what I can understand, because I was not
11 a principal at that time, I was a legal advisor, it was
12 due to a number of reasons. If I had to sum them up,
13 I would say (1) the transaction was to be structured as
14 a share exchange whereby Artesia would contribute its
15 shares or ARCO, the shareholder of Artesia, would
16 contribute its shares in Artesia to Dexia SA in
17 exchange for shares of Dexia SA. So to that extent,
18 they would continue to bear part of the economic risk
19 attached to Artesia.
20    Second, at that time, ARCO was, as far as
21 I know, saying to Dexia that they were contemplating
22 alternative business combinations with other parties,
23 so it was important to get a swift agreement between
24 the parties on a business combination
25 between themselves.

PAGE 40

1     And a third reason was, Dexia being a
2  public company and Artesia being a private company, my
3  understanding is that the principals did not want to
4  embark upon a long due diligence process which would be
5  run on both companies because of the listed nature
6  of Dexia.
7     So all of these elements led to a relatively
8  quick agreement between principals on economic terms
9  and a relatively light check being performed on
10 Artesia, mostly by PwC, assisted by us on the
11 legal side.
12 Q. You mentioned ARCO. Just so we are all clear,
13 that was the parent company of Artesia Bank; is
14 that correct?
15 A. That's correct.
16 Q. And that is A-R-C-O?
17 A. A-R-C-O.
18 Q. You mentioned earlier that Dexia Bank Belgium
19 was assuming the liabilities of Artesia Bank in the
20 deal; is that correct?
21 A. No. The deal was structured in 2001 as being
22 a contribution by ARCO, the shareholder of Artesia, of
23 the shares of Artesia to Dexia SA. So as a result of
24 that step, Artesia Bank and Dexia Bank were
25 sister companies, both owned by the parent company

SHEET 6 PAGE 41

**41**

1 Dexia SA. It is only at a later stage in 2002 that the
2 legal merger between Dexia Bank and Artesia Bank was
3 consummated and that the transfer of assets and
4 liabilities took place as a result of the merger.
5    Q. Was that ultimate merger and melding of
6 liabilities anticipated at the time of the original
7 acquisition of Artesia Bank by Dexia?
8    A. I don't know what you would mean
9 by "anticipated". The way that the second step would
10 take place was not known, as far as I know, at the time
11 that the first business combination took place, but
12 I think it is fair to assume that this was one of the
13 likely results of the first step.
14    Q. Wasn't it ——
15    A. And how the transaction would have been
16 structured later on is something that has been
17 determined in the course of 2001, after the
18 contribution by ARCO of the Artesia shares to Dexia SA
19 took place.
20    Q. Did Dexia Bank Belgium conduct any
21 due diligence before the final merger of the two banks
22 wherein Dexia Bank assumed the liabilities of
23 Artesia Bank?
24    A. No. As far as I can remember, there was no
25 additional due diligence conducted at the level of

PAGE 42

**42**

1 Dexia Bank between the contribution in 2001 and the
2 legal merger in 2002.
3    Q. Did Dexia Bank ever do anything to assess
4 what its liability risks might be in acquiring
5 Artesia Bank?
6    A. Again, Dexia Bank, between the first step in
7 2001 and the legal merger in 2002, did not, to my
8 recollection, do specific work on assessing the extent
9 of the assets and liabilities of Artesia.
10    Q. And why was that?
11    A. Because the inclusion of Artesia in the
12 Dexia Group was a fact after the first step and the
13 contribution of the shares by ARCO to Dexia SA, and
14 because at the time there was no reason felt to perform
15 a particular due diligence between the two companies.
16    Q. Did Dexia Bank have any duty to its public
17 shareholders to make sure that it was not acquiring
18 a bank that had liability risks that were beyond what
19 Dexia Bank felt were appropriate for the Bank?
20    A. Well, that is a legal question. I don't know
21 if I am the best person to answer that question.
22    Q. Well, was there a concern at all ——
23    A. Dexia Bank is not a listed company.
24 Dexia Bank is a private company owned by Dexia SA.
25    Q. So ultimately the liabilities of the Bank

PAGE 43

**43**

1 would flow to the public shareholders of SA though;
2 is that correct?
3    A. Well, any liability which is within any
4 company of the Group is part of the Group, that
5 is right.
6    Q. So was there ever a concern expressed that
7 because ultimately the Bank is held publicly by the
8 SA shareholders there should be some evaluation of
9 whether or not Dexia Bank Belgium is acquiring
10 liabilities that may not be appropriate for the Bank?
11    MR WEIDNER: Object to the form. Expressed
12 by whom?
13    MR ROCCO: Anyone.
14    THE WITNESS: To try to understand your
15 question, can you please rephrase it?
16    MR ROCCO: Sure.
17 BY MR ROCCO:
18    Q. During the acquisition of Artesia Bank by
19 Dexia Bank, was it ever expressed by anyone, to your
20 knowledge, that there may be a concern, since
21 Dexia Bank is ultimately held publicly by Dexia SA
22 shareholders, that the Bank (Dexia Bank) should
23 investigate whether or not they are assuming liability
24 risks with the acquisition of Artesia Bank?
25    MR WEIDNER: Same objection.

PAGE 44

**44**

1    THE WITNESS: Dexia Bank, whether it merged
2 with Artesia or not, it didn't change anything for the
3 ultimate shareholders of the parent company.
4 BY MR ROCCO:
5    Q. Well ——
6    A. So to that extent, my answer to your question
7 is, no, there was no concern expressed at that point
8 in time.
9    Q. It is possible that Artesia Bank could have
10 had some tremendously large liability, legal liability,
11 that would be assumed by Dexia Bank; is that possible?
12    A. Everything is possible.
13    Q. So my question was, because that is a
14 possibility, was there anything done to assess whether
15 or not that was the case when Dexia Bank went to
16 acquire Artesia Bank?
17    A. Well, the reality is that once you are part
18 of a banking group like Dexia, there is solidarity
19 between the various companies which are included in
20 that group, so that question is a question that was
21 asked as a first step when Artesia was contributing to
22 Dexia SA. There was no reason, no specific reason to
23 have to ask yourself that question again in the future
24 because of the solidarity which exists between all
25 companies of the group.

PAGE 45

**45**

1  Q. But you just told me there was no inquiry --
2  unless I misunderstood. I will rephrase. If
3  I understood you correctly, you said that Artesia Bank
4  -- withdrawn.
5      If I understood you correctly, you said that
6  Dexia Bank, when it first did its due diligence of
7  Artesia Bank, did not attempt to quantify liability
8  risks that might be inherent in Artesia Bank. Did
9  I understand that correctly?
10  A. No, you are confusing me by trying to draw a
11 distinction between Dexia SA and Dexia Bank.
12  Q. Okay.
13  A. What I am trying to say is that Dexia SA did
14 conduct an inquiry before Artesia was contributed to
15 the Group. Whether after that Dexia Bank, the sister
16 company of Artesia at that point in time needed to
17 conduct a separate inquiry, that was not felt
18 necessary.
19  Q. I understand your point of clarification.
20 What did Dexia SA do prior to accepting a merged
21 Artesia Bank into the fold, if you will, to check on
22 the liabilities of Artesia Bank?
23  A. Well, as I said earlier, before entering into
24 this business combination with ARCO with respect to
25 Artesia, a due diligence was performed by

PAGE 46

**46**

1  PricewaterhouseCoopers on certain elements of Artesia,
2  which was at the time a banking company regulated by
3  the CBFA. They have been disclosing information for a
4  number of years and that is the basis on which the
5  principals at that time decided they felt comfortable
6  with the acquisition.
7   Q. Did PwC do any assessment of liability risks
8  for Artesia Bank?
9   A. Well, again at that point in time, I was
10 legal counsel to Dexia. I was not a principal at Dexia
11 so I can only tell you what I saw from my perspective.
12 My understanding is that PwC did perform an
13 investigation on Artesia upon the instructions of Dexia
14 at the time.
15  Q. So is it fair to say you don't know one way
16 or the other whether PwC actually did an assessment of
17 liability risks at Artesia Bank?
18  A. Well, I don't know exactly what was the
19 extent of the instructions that PwC received from
20 Dexia, their client, at that point in time. That
21 was not my job as a legal advisor. There were some
22 specific areas of focus that were requested from PwC.
23     As far as I can remember, the trading room
24 was one of them; the securities portfolio including
25 derivatives of Artesia was another; and certain

PAGE 47

**47**

1  particular tax issues that had been flagged were to be
2  the object of the review done by
3  PricewaterhouseCoopers. But the exact extent of the
4  instructions given to PwC, I don't know.
5   Q. Do you know whether or not Dexia Bank
6  received a legal opinion from counsel from Artesia Bank
7  as to potential legal liabilities of Artesia Bank
8  during the merger process?
9   A. I don't remember that.
10  Q. Were you ever asked, as a Clifford Chance
11 advisor to Dexia Bank, to assess the potential
12 legal liabilities for Artesia Bank?
13     MR WEIDNER: Object to that. That calls for
14 attorney/client communication and I direct you not
15 to answer.
16     MR ROCCO: Are you going to direct him not to
17 answer ----
18     MR WEIDNER: Yes.
19     MR ROCCO: ---- whether he did a legal
20 assessment of -- I'm not asking ----
21     MR WEIDNER: No, no, no. You asked him whether
22 he was asked.
23     MR ROCCO: Right. Well, let me ask it a
24 different way.
25 BY MR ROCCO:

PAGE 48

**48**

1   Q. Did you ever perform an assessment of the
2  liability, the legal liability risks inherent to
3  Artesia Bank as part of your duties for Dexia Bank in
4  the merger?
5   A. No.
6   Q. And so we don't get hung up on the entities,
7  are you aware of whether anyone at Dexia SA performed
8  such an assessment of the legal liability risks of
9  Artesia Bank in connection with the merger between
10 Artesia Bank and Dexia Bank?
11  A. No, I'm not aware of that.
12  Q. You mentioned one of the reasons why there
13 was a limited due diligence done was because Dexia was
14 a public company and Artesia was a private company, and
15 it didn't follow why that's an explanation for doing a
16 limited due diligence. Could you explain to me why, as
17 a public company, Artesia -- I mean, Dexia did not want
18 to do a full-blown due diligence on the merger?
19  A. Well, I am not here to give explanations
20 about the reason why the principals at that time
21 decided to structure the operation in a certain way.
22 I can only tell you, you know, what my knowledge is
23 as external advisor at the time.
24     One of the reasons, I think, but I would be
25 wrong on that, is that the transaction was to be

SHEET 7   PAGE 49

**49**

1 structured as a share exchange and, to that extent,
2 that ARCO would remain one of the shareholders of Dexia
3 and would continue to bear part of the economic risk,
4 if any, that would be linked with Artesia.
5   Q. I understood that part ----
6   A. But I am not in a good position to comment on
7 that because that was not my area of responsibility.
8   Q. Understood but you mentioned three reasons:
9 you said there was shared economic risk, which is the
10 one you just referred to, the fact they would assume
11 shares of the new company, the ARCO people; you said
12 that there was the competition for the deal, which
13 I understood, others may have purchased the Bank; but
14 then you gave us a third example was the fact that
15 because Dexia was a public company and Artesia was a
16 private company.
17       You offered that as an explanation for doing
18 limited due diligence and I don't understand how that
19 is an explanation, so I am asking you to clarify that
20 if you will.
21   A. Well, that might have been a point in that
22 had Dexia required to go into a very extensive, long,
23 thorough due diligence into the books of Artesia,
24 Artesia or ARCO could have said conversely, "Since I am
25 getting shares of Dexia as contribution or remuneration

PAGE 50

**50**

1 for my contribution, I want to do the same on
2 Dexia SA", which was, and still is, a listed company,
3 with all the problems associated to that being a listed
4 company and having to give private information to a
5 private party.
6   Q. Right. What are those problems you are
7 referring to?
8   A. Sorry, what is your question exactly?
9   Q. What are the problems that would entail --
10 that would prohibit a public company from doing that?
11   A. Well, under Belgian law at that point in
12 time, there were extensive debates about whether a
13 listed company was allowed to give non-public
14 information to a third party in combination with an M&A
15 transaction, thereby potentially breaching equality of
16 treatment between shareholders. So one of the
17 possibilities would be that the principals did not
18 wanted to engage into that course of action.
19   Q. But weren't there ways, through
20 confidentiality agreements and the like, that you could
21 do that without violating any public laws?
22   A. There are a number of ways you can try to
23 address those issues, yes.
24   Q. And aren't they addressed in other instances
25 where public companies acquire private companies?

PAGE 51

**51**

1   A. You are as well placed as I am to comment and
2 offer an opinion on that.
3   Q. Well, you were ----
4   A. I am not here to give testimony as an expert,
5 am I?
6   Q. You have fourteen years as an M&A lawyer in
7 Belgium. In your experience as an M&A lawyer in
8 Belgium, aren't there ways to protect a public company
9 when it seeks to acquire a private company, so that the
10 two can exchange information without violating any
11 public company requirements in Belgium?
12   A. There are a number of things that can be
13 done. Your question was why were the things done in a
14 particular way. I am offering explanation based on the
15 position I held at the time. Those are as good
16 explanations as they are.
17       If you want to know why the principals
18 structured the transaction like that at the time, you
19 should ask the people who were leading Dexia at that
20 point in time. I was not in that position. I was an
21 outside counsel. I am offering possible explanations,
22 but that is where I have to stop, I guess.
23   Q. Understood. Did you -- do you know whether,
24 as part of the due diligence on the Artesia
25 acquisition, Dexia Bank examined Artesia Bank's

PAGE 52

**52**

1 correspondence with the CBFA, the Belgian Bank
2 Regulators?
3   A. Yes, I think that was one of the things that
4 was reviewed as part of the diligence process.
5   Q. You say you think so. What makes you
6 think so?
7   A. That is the recollection that I have at this
8 point in time.
9   Q. Did you do any review of the correspondence
10 between Artesia Bank and the CBFA.
11   A. Well, if your question is if I did that
12 personally, I did not do that personally, but I think
13 that that was one of the things done by PwC and perhaps
14 some of my associates at that time.
15   Q. Do you have a recollection that some of your
16 associates would have reviewed that correspondence?
17   A. I have a recollection that they may have
18 done that.
19   Q. Could you describe for me what your personal
20 involvement was as a Clifford Chance partner in the
21 actual due diligence that was done on the
22 Artesia/Dexia merger?
23   A. My personal involvement was fairly limited.
24 I was mostly advising my client on the structure of the
25 transaction and the implementation of it and, for the

PAGE 53

1 rest, since the diligence efforts were mostly requested
2 from PwC, with some light assistance on the legal side
3 from us, my involvement in that was fairly limited.
4    Q. And do you recall anything specific about
5 what you did as part of the due diligence function on
6 the deal?
7    A. No. The main thing I recall is that from what
8 we saw at that point in time, which was very little,
9 there was no "deal breaker" that seemed to appear from
10 the investigations as were conducted. But again, they
11 were of a fairly limited nature.
12    Q. Do you know whether Dexia Bank Belgium was
13 aware that the Belgian Federal Police had executed a
14 search warrant to seize documents from Artesia Bank
15 prior to the merger between Artesia Bank and Dexia Bank
16 Belgium?
17    A. Well, if my recollection is correct, I think
18 that was mentioned in the Press at the time, so we must
19 have had that knowledge. I think that at the point in
20 time, this point was discussed directly between
21 principals but apparently to their satisfaction because
22 there was no particular follow-up on that.
23    Q. You believe that the search warrant was
24 publicized in Belgium?
25    A. That is what I think I remember, yes.

PAGE 54

1    Q. Do you know where that was publicized?
2    A. I don't, no.
3    Q. Have you seen recently any indication that
4 the search warrant was publicized?
5    A. No.
6    Q. Do you know whether Dexia Bank Belgium knew
7 -- withdrawn.
8       You say you assume because it was publicly
9 disclosed the Bank must have known. Do you have any
10 specific recollection that allows you to say whether
11 or not the Bank (Dexia Bank) knew about the
12 search warrant?
13    A. No, I don't.
14    Q. And if it were to be found out that it
15 was not publicly disclosed, would you have any basis to
16 think that Dexia Bank Belgium knew about the
17 search warrant?
18       MR WEIDNER: Objection to form.
19       THE WITNESS: No.
20 BY MR ROCCO:
21    Q. And I say that to you because we have been
22 through public disclosures and I have not seen any
23 indication that the search warrant was disclosed in the
24 public Press. So my question is: if it turns out that
25 there was no public mention of the search warrant, do

PAGE 55

1 you have any basis to believe that Dexia Bank Belgium
2 would have known about that prior to the merger with
3 Artesia Bank?
4    A. No.
5       MR WEIDNER: Object to the form.
6 BY MR ROCCO:
7    Q. Do you know what, if anything, Morgan Stanley
8 did with respect to due diligence on the
9 Artesia acquisition?
10    A. I don't remember that they performed a
11 particular due diligence, nor that they were instructed
12 by Dexia to do so.
13    Q. Did you have any communications with the
14 Morgan Stanley investment bankers on the transaction,
15 the Artesia transaction?
16    A. Yes.
17    Q. Do you recall whether any of that related to
18 any investigation of Artesia Bank by Dexia Bank?
19    A. I'm sorry, can you repeat the
20 question again?
21    Q. In your communication with Morgan Stanley, do
22 you recall any discussions about any due diligence or
23 investigation that was done by Morgan Stanley of
24 Artesia Bank?
25    A. No.

PAGE 56

1    Q. Do you know whether there were any
2 restrictions placed on Dexia Bank Belgium's access to
3 the records of Artesia Bank in the due diligence
4 process?
5    A. Well, the agreement between principals was
6 that there was no general access to each other's books
7 as part of that due diligence process. I don't know if
8 you can call that limitation to access.
9       The agreement between principals was that
10 there would be access to senior management of Artesia
11 and that certain specific items would be reviewed in
12 first line by PwC and, on the basis of that, that
13 further questions could be asked.
14    Q. What would PwC have access to, to
15 your knowledge?
16    A. I don't remember that with precision. You
17 should ask PwC.
18    Q. Do you know whether Dexia Bank Belgium had
19 access to the loan files of Artesia Bank as part of the
20 due diligence process?
21    A. They had access to the information that they
22 requested at the time. Now, to what information
23 precisely they had access to, I have no precise
24 recollection of.
25    Q. Do you know whether Dexia Bank -- any request

SHEET 8   PAGE 57

**57**

1 by Dexia Bank Belgium for information as part of the
2 due diligence process was refused by Artesia Bank?
3    A. No, I don't remember that.
4    Q. And it is your recollection that Artesia Bank
5 did give access to its correspondence files with the
6 Regulators to Dexia Bank Belgium; is that right?
7    A. I think they did give access to their
8 correspondence files with the Regulators, yes.
9    Q. And do you have a specific recollection
10 of that?
11    A. It depends what you call "specific". You
12 asked me to the best of any knowledge do I remember
13 that. I think, yes, that they had access to that. I may
14 be wrong, but my memory tells me that I think they had
15 access to that particular file.
16    Q. Do you recall any issues that arose from the
17 review of the correspondence files between Artesia Bank
18 and the CBFA?
19    A. No, I don't remember that.
20    Q. Do you know whether Dexia Bank Belgium had
21 access to the Internal Audit Reports of Artesia Bank in
22 the merger process?
23    A. I don't remember that.
24    Q. Would you expect that they would have looked
25 at the Internal Audit function and its reports of

PAGE 58

**58**

1 Artesia Bank as part of the due diligence?
2    A. I'm sorry, can you rephrase the question?
3    Q. Sure.
4    A. Would I expect? What do you mean by would
5 I expect?
6    Q. Well, in a due diligence, as you have
7 described it for the Artesia/Dexia merger, would you
8 have expected the due diligence team to have looked at
9 Internal Audit Reports from Artesia Bank?
10    A. Let's put it this way: I think if they had
11 asked to have access to the audit files of Artesia,
12 I don't think that that access would have been refused.
13 Now, I don't know if they have asked for it nor whether
14 they have had access to it or whether it was refused.
15    Q. Was there a particular person inside
16 Dexia Bank at the time that would have been the company
17 person who was principally responsible for
18 due diligence?
19    A. I'm not sure that there was a person who was
20 principally responsible for that. Generally, it was one
21 of the members of the Management Board of the Bank who
22 was entrusted with the coordination of the diligence
23 efforts or the investigation efforts, if there were
24 any, and that would normally be Martin Decamps at that
25 point in time who would have been interested with that.

PAGE 59

**59**

1    Q. If you could spell that name, please?
2    A. Martin Decamps is D-E-C-A-M-P-S.
3    Q. And besides Mr Decamps, was there anyone else
4 that you recall that would have been dealing with the
5 due diligence issue inside Dexia Bank Belgium on the
6 Artesia/Dexia merger?
7    A. No, I don't remember that.
8    Q. Do you know whether there was any attempt by
9 Dexia Bank Belgium to assess Artesia Bank's compliance
10 with banking regulations inside Belgium as part of the
11 due diligence process?
12    A. No, I don't remember that.
13    Q. Would you expect that that would have
14 been done?
15    A. I don't know.
16    Q. Do you know whether Dexia Bank Belgium asked
17 Artesia Bank to identify any open CBFA investigations
18 concerning Artesia Bank's activities as part of the
19 due diligence process?
20    A. I don't know.
21    Q. Would you expect that that would have
22 been done?
23    A. I'm sorry but I'm confused when you are
24 asking me whether I am expecting anything. I don't know
25 exactly what you refer to.

PAGE 60

**60**

1    Q. Well, you have expectations, as a person who
2 worked on some element of the due diligence on the
3 Artesia/Dexia merger, as to whether certain of these
4 things would have been performed, whether or not you
5 recall them. That is the nature of my question.
6    A. Again, I don't know that. I was not privy to
7 the business discussions between principals and what
8 extent they wanted to give to these investigations, so
9 I can't comment on that.
10    Q. And you didn't learn, after joining the Bank,
11 as to whether or not that was one of the things that
12 was required or asked of?
13    A. Do you mean in this particular transaction or
14 in general terms?
15    Q. In this particular transaction?
16    A. No, I don't know that.
17       MR WEIDNER: You want to take a break?
18       MR ROCCO: Sure.
19       THE VIDEOGRAPHER: Going off the record.
20       (Off the record at 10.33 a.m.)
21    (Miller Exhibit 1 marked for identification)
22    (Miller Exhibit 2 marked for identification)
23    (Miller Exhibit 3 marked for identification)
24       (Back on the record at 10.44 a.m.)
25       THE VIDEOGRAPHER: Going back on the record.

PAGE 61

BY MR ROCCO:
Q. Mr Miller, as part of the due diligence performed by Dexia Bank or on Dexia Bank's behalf in the Artesia merger, do you know whether Dexia Bank reviewed the publicly-available information about Artesia Bank during that process?
A. I think they did, yes.
Q. And you joined Dexia SA in May of 2001; is that correct?
A. That's correct, yes.
Q. Had the merger closed by that point between Artesia Bank and Dexia Bank?
A. I think it had. To be quite frank, I don't remember the exact date of the contribution of shares, but it must have been around that point, that period in time.
Q. During your responsibilities as the person in charge of integrating the two banks, did you become any more familiar with the exchange of information between the two banks during the merger process?
A. No, that was not the priority at the time.
Q. After assessing the publicly-available information on Artesia Bank during the merger process, do you know whether Dexia Bank had any reason to believe that Artesia Bank had committed any criminal

PAGE 62

offence in connection with the Lernout & Hauspie files?
    MR WEIDNER: Object to the form. You can answer.
    THE WITNESS: No. On the contrary, I can tell you that they were not aware of any criminal offence being done by Artesia at that point in time.
BY MR ROCCO:
Q. Nothing was revealed in the due diligence or the publicly-available information to lead them to believe that; is that correct?
A. They did not have, to my knowledge, any information about any criminal offence being done by Artesia.
Q. Well, whether or not it is criminal, let me expand my question. Did Dexia Bank -- based on the due diligence it did and the assessment of the publicly-available information, did Dexia Bank Belgium have any reason to believe that Artesia Bank had committed any wrongdoing with respect to the Lernout & Hauspie files?
A. No. I'm pretty sure that they had no such knowledge. On the contrary, had something like that appeared, I think it would have been viewed as a material element.
Q. And would you agree that at the time of the

PAGE 63

Dexia/Artesia merger, that Dexia Bank Belgium had greater access to information about Artesia Bank's dealings with Lernout & Hauspie than the general public did?
A. I'm not sure about that at all, no.
Q. Well, do you think the general public had any access to the loan files of Artesia Bank?
A. No, that's -- the public certainly did not have general access to the loan file of Artesia. Dexia and Dexia Bank had access to the loan file of Artesia and that was actually reviewed, but only with a view to seeing whether the loan that had been made to Artesia that had to be written off had been adequately provisioned. That had been reviewed in-depth by Dexia at that point in time, but that was very specifically limited to the loan book towards L&H and the provisioning that was done by Artesia ----
Q. So you agree ----
A. ---- to ascertain the net asset value of the company.
Q. So you would agree with me that at least in terms of loan files, Dexia Bank had greater access than the public did with respect to information regarding Artesia?
A. I agree with you that with respect to the

PAGE 64

loan file, Dexia Bank had more access than the general public, yes.
Q. Would you agree with me that the general public did not have access to Artesia Bank's correspondence with the Belgian Banking Regulators?
A. That's correct.
Q. And yet Dexia Bank did have that access; correct?
A. That's right.
Q. So would you agree with me that Dexia Bank had greater access to information regarding Artesia Bank's dealings or relationship with Lernout & Hauspie than the public did?
    MR WEIDNER: Object to the form.
    THE WITNESS: Well, as you put it yourself, Dexia Bank had access to the loan file which the public didn't, and had access to other information, like, for example, the correspondence with Regulators. If they asked for that information and got it, as I said earlier, I have no particular memory of that or recollection of that.
    So to that extent, yes, they have a broader access than the general public. Yes.
BY MR ROCCO:
Q. I am going to show you what has been marked

SHEET 9  PAGE 65

**65**

1 as Miller Exhibit 1. If you could please take a look at
2 that. For the record, it is a one-page report from
3 'The Financial Times', dated April 28, 2001.
4     As you review that, Mr Miller, my first
5 question to you is just have you seen this before?
6   A. I might have seen it at the time.
7   Q. There is a reference here in this
8 Press Release, Miller Exhibit 1, that says:
9     "The auditors have apparently not come across
10 any irregularities, but Dexia had Pierre Richard
11 commenting, 'We have not been informed of any
12 problems.'".
13     Do you see that?
14   A. Yes, I do.
15   Q. Were the auditors -- withdrawn.
16     Do you have an understanding of what
17 irregularities the auditors were looking for in the
18 due diligence process?
19   A. Well, as we mentioned earlier, PwC was
20 instructed by Dexia to review certain items. Included
21 in those items was the review of the loan portfolio to
22 L&H with a view to verifying whether the provisioning
23 was adequate.
24   Q. When you say "provisioning", you are talking
25 about the financial provisions that were made by

PAGE 66

**66**

1 the Bank for losses that might be incurred as a result
2 of those loans?
3   A. Yes.
4   Q. And you don't know whether there was any
5 assessment of the liability that might adhere to
6 the Bank, meaning Artesia Bank, because of the loans it
7 made to the L&H entities?
8   A. No.
9   Q. I am going to show you what has been marked
10 next as Miller Exhibit 2.
11   A. Do I give this back to you?
12   Q. You can keep it right there and just place it
13 down, that is fine.
14   A. Right.
15   Q. For the record, there is a one-page
16 "Financial Times" Press article, dated April 30, 2001.
17 My first question is: have you seen this before?
18   A. I might have at the time.
19   Q. There is reference here that says:
20     "Dexia has chosen to continue its
21 due diligence investigations into the business
22 customers of ABC [which stands for Artesia Banking
23 Corporation] following discovery in ABC's books of
24 loans to troubled Belgian company L&H."
25     Do you see that?

PAGE 67

**67**

1   A. Yes.
2   Q. Were there additional steps that were taken
3 in the due diligence process on the Artesia merger once
4 Dexia learned that, in fact, Artesia had lent money
5 to L&H?
6   A. Not that I know of. It was public knowledge
7 that Artesia was -- had given loans to L&H, and
8 everybody knew at that point in time that L&H was in
9 problems because the problems had surfaced in the
10 middle of 2000. So Dexia knew, at the time, of loans
11 being given by Artesia to L&H and wanted to verify
12 whether these loans had to be written off, which they
13 had, and whether they were adequately provisioned.
14   Q. Do you know why there was some public
15 disclosure in April 30, 2001 that Dexia had chosen to
16 continue its due diligence to look specifically into
17 these L&H files?
18   A. I'm sorry, can you rephrase the question?
19   Q. Do you know why there was this public
20 disclosure in April 30, 2001 that Dexia had chosen to
21 continue its due diligence investigations into the
22 customers of ABC following the discovery in ABC's books
23 of loans to L&H?
24   A. No, I don't know.
25   Q. Do you recall anything specific about what

PAGE 68

**68**

1 was learned in the loan files that may have led to
2 additional steps of due diligence?
3   A. No.
4   Q. Would you be in a position to have known that
5 as the outside counsel for Dexia?
6   A. I might have been in a position to know that
7 and I don't recall of any sort of two-step
8 due diligence process.
9   Q. Do you know whether the loan files that were
10 being reviewed that related to L&H were loan files
11 not only of direct loans to L&H but to
12 L&H-related entities?
13   A. I don't know that. As far as I can remember,
14 the investigation into the loan files that was done by
15 PwC might also have been done directly by people from
16 the Bank, but I don't know that for sure. This was not
17 something that was within my area of responsibility.
18 That is something that the Bank did itself with PwC.
19   Q. And who would have been the person within
20 the Bank that would have been in charge of that type
21 of review?
22   A. I don't know that.
23   Q. I am going to show you what has been marked
24 as Miller Exhibit 3. For the record, it is a one-page
25 Dexia Press Release dated July 3, 2001. My first

PAGE 69

69

1 question to you Mr Miller is: do you recognize this
2 document?
3     A. This document I recognize because I was
4 involved in the drafting of the Press Release so...
5     Q. Is this a document that you would have
6 reviewed prior to its release to the public?
7     A. It is more likely than not that I would have
8 reviewed that, yes.
9     Q. And this is because you were, at this point,
10 within Dexia Bank -- sorry, Dexia SA at this time;
11 correct?
12    A. Yes.
13    Q. And as part of your duties within Dexia SA,
14 you reviewed Press Releases that related to Dexia Bank
15 Belgium?
16    A. Yes.
17    Q. Okay. Do you see in this ----
18    A. Sorry, can I rephrase my answer?
19    Q. Sure.
20    A. It is not that my duties were to be involved
21 in Press Releases with respect to Dexia Bank, but this
22 was a transaction which was conducted and coordinated
23 at Dexia SA level. In that context it is normal,
24 especially given my prior involvement as legal counsel,
25 that I would have reviewed such a Press Release.

PAGE 70

70

1     Q. The third paragraph of this Press Release
2 says:
3         "In compliance with the provisions of the
4 agreement, a due diligence audit was conducted by
5 PricewaterhouseCoopers to review certain areas which
6 might represent potential operating (or other) risks.
7 Parties were not led to revise the price conditions
8 initially agreed upon."
9         Do you see that?
10    A. Yes, I do.
11    Q. Do you know what is referred to as the
12 "potential operating risks"?
13    A. I don't think that that meant anything in
14 particular, since at the time the agreement was
15 announced on or around March 13, it was made clear that
16 certain further investigations needed to be done. So
17 I guess it is logical that in the Press announcement
18 that we have here, there is a reference being made to
19 the due diligence that has been done and why this
20 due diligence was being done. I don't have any
21 recollection that this would refer to anything
22 in particular.
23    Q. This Press Release draws a distinction
24 between potential operating risks and other risks. What
25 is meant by "other risks" in the Press Release?

PAGE 71

71

1     A. I don't know.
2     Q. You don't recall?
3     A. No, I don't think that that would have any
4 potential specific meaning. I think it is just a sort
5 of standard phrase to say that when you perform a
6 due diligence, you try to look at whatever risks there
7 are and this is a description of the type of risks that
8 you are likely to encounter in a business combination
9 of this type.
10    Q. Do you know, apart from operating risks, what
11 other risks were assessed as part of the due diligence?
12    A. Well, as I mentioned earlier, I think that
13 certain areas had been identified of being particularly
14 relevant for the principals at that time; the trading
15 room was one, the securities portfolio, certain tax
16 issues that were in the public and Dexia knew about. So
17 those were specific items (call them risks if you want)
18 that had been looked with particular attention.
19    Q. And what were the tax issues that were
20 looked at?
21    A. There was a case called the QFIE a number of
22 years ago in Belgium where a tax system was put in
23 place by the Belgian legislator and had been used by
24 the banking sector in general terms, leading to some
25 problems with the tax authorities. That, at that point

PAGE 72

72

1 in time, was a specific risk that people wanted to know
2 more about.
3         In the meantime, these risks have gone away
4 because the courts have dismissed the tax
5 administration, but at that point in time it was a sort
6 of hot issue that might have entailed certain financial
7 or reputational risks for Artesia. So as far as I can
8 remember, that was one of the items that was the
9 specific object of attention.
10    Q. You mentioned also a trading room issue. What
11 was that?
12       THE VIDEOGRAPHER: Excuse me. We are getting
13 some mobile or BlackBerry interference so if you could
14 turn them off or move them away from the table,
15 thank you. Sorry to interrupt.
16 BY MR ROCCO:
17    Q. Sorry. Do you have my question?
18    A. No, please repeat it.
19    Q. You mentioned a trading room issue that was
20 looked at as part of the due diligence. What was that?
21    A. Well, Dexia itself had discovered a fraud in
22 its own trading room and that was in January of 2001.
23 It is fair to say that having discovered a fraud in
24 their own operations, they wanted to make sure that
25 there was no similar type of risk within the trading

SHEET 10   PAGE 73

**73**

1 room of Artesia which was, in many respects, larger
2 than the one at Dexia.
3     So call it a precautionary measure from
4 people who had been burned in one particular area and
5 wanted to make sure that there were no specific risks
6 with Artesia in the trading room.
7   Q. Could you briefly describe what the fraud was
8 within Dexia's trading room?
9   A. Well, the fraud that was uncovered in
10 January 2001 was essentially a trader buying paper
11 which had certain apparent characteristics. Further
12 investigation showed that the paper had totally
13 different characteristics, leading to more risks than
14 what was envisaged at the time. So that mismatch
15 between 'bought risk' and 'real risk' was something
16 that was really at the center of the attention of Dexia
17 management at the time. They wanted to make sure that
18 there was no similar problem with Artesia.
19   Q. Did the trading review that Dexia Bank
20 performed on Artesia Bank include Artesia Securities
21 trades?
22   A. I'm not sure they did.
23   Q. And do you know whether the due diligence
24 that was performed turned up any irregularities with
25 respect to the trading room at Artesia Bank?

PAGE 74

**74**

1   A. I don't think that it turned out any material
2 irregularities which would have, you know, posed a
3 problem, as evidenced by this Press Release by the way.
4   Q. Do you know what the finding was ultimately
5 as to whether the reserves (the financial reserves) for
6 the Lernout & Hauspie-related loans were adequate?
7   A. Well, to the extent the investigation went
8 into, you know, what is the amount of loans that were
9 given to L&H, which one of these loans were written off
10 and has there been adequate provisioning, that review
11 was concluded satisfactorily; there was adequate
12 provisioning of all loans that needed to be written
13 off.
14   Q. There was a -- there are several references
15 now we have seen to PwC performing due diligence. You
16 mentioned they performed due diligence. Did they ever
17 issue a final report to Dexia Bank or Dexia SA
18 regarding the due diligence performed by PwC?
19   A. They issued a report. Whether they issued a
20 final report, I don't know.
21   Q. Right. Are you aware of more than one report
22 that PwC issued?
23   A. No, that is why I said that in the singular
24 form. I know they issued at least one report because
25 that report had been discussed in the management

PAGE 75

**75**

1 sessions that we, that Dexia was having and to which we
2 were participating. So the findings were disclosed to
3 Dexia. Whether there was one report or more, I don't
4 know, and whether there was a final report, frankly
5 I don't know.
6   Q. And were you privy to that report, the
7 PwC report?
8   A. I'd certainly seen that report at the
9 time, yes.
10     MR ROCCO: Mark that as the next.
11   (Miller Exhibit 4 marked for identification)
12 BY MR ROCCO:
13   Q. Mr Miller, I am going to show you what has
14 been marked as Miller Exhibit 4, a multi-page document
15 from PwC stamped "DRAFT", dated May 11, 2001, bearing
16 Bates numbers DBB-085468 to 08556 and ask you to take a
17 look at this and tell me whether you have seen this
18 document before.
19   A. I think I must have seen the document
20 at the time.
21   Q. Does that mean you don't have a specific
22 recollection of seeing this actual document?
23   A. Well, I don't know if the paper that you have
24 shown me, which is 085468 and finishing by 08556, is
25 the one document I saw, but I am pretty sure that

PAGE 76

**76**

1 I reviewed whatever report PwC produced at that point
2 in time.
3   Q. Do you recall whether the report you reviewed
4 back then was stamped "DRAFT", as this one is, on
5 each page?
6   A. I don't recall that.
7   Q. Do you know whether there was a version of
8 this report that is more final than the one we are
9 looking at in Miller Exhibit 4?
10   A. I don't know.
11   Q. Would you expect that there would be a final
12 report without the stamping of "DRAFT" on it by PwC?
13   A. Well, it is customary practice to have
14 draft reports and then final reports. I just don't know
15 if, in this case, there was ever a final report. That
16 is a question you would have to address to PwC.
17   Q. But do you have any explanation as to why
18 the Bank didn't keep a final report in its files?
19   A. I don't know if the Bank did not keep a final
20 report in its files, so I can't answer that question.
21   Q. Well, I can represent to you that we
22 requested a copy of it and we have not received one,
23 so that leads me to believe that there wasn't one
24 maintained in its files.
25     My question is: do you have any explanation

PAGE 77

1 as to why a final PwC report was not maintained in
2 the Bank's files?
3    A. If that's the case, I don't have an
4 explanation why, no.
5    Q. And the same question for Dexia SA: do you
6 know why —
7       THE COURT REPORTER: Sorry, could you slow
8 down a little, please?
9       MR ROCCO: Sure.
10 BY MR ROCCO:
11   Q. Same question for Dexia SA: do you know why
12 they would not have maintained a final PwC report in
13 their files?
14   A. No. If they don't have a final report in
15 their files, I wouldn't know why.
16   Q. And you have no way of telling whether this
17 report that is marked "DRAFT" is the same as what the
18 final report would have been; is that a fair statement?
19      MR WEIDNER: Object to the form.
20      THE WITNESS: I don't know.
21 BY MR ROCCO:
22   Q. Do you recall seeing draft PwC reports during
23 your work on the due diligence of the Artesia/Dexia
24 merger?
25   A. Yes, I do.

PAGE 78

1    Q. Do you recall how many you reviewed?
2    A. I'm sorry, what was the question?
3    Q. Do you recall how many draft reports you
4 reviewed from PwC?
5    A. No, I don't.
6    Q. If you could turn to page 85502 which is
7 I guess about thirty pages in. It is 85502.
8    A. Yes.
9    Q. There is a heading 5.1 that says: "Main
10 findings further to business review carried out in
11 February/March 2001"; do you see that?
12   A. Yes.
13   Q. It says:
14      "During our business review carried out in
15 February/March 2001, we noted that DTT made severe
16 comments in their reports to the Banking and Finance
17 Commission regarding unreconciled items in internal
18 accounts and suspense accounts. We understood that
19 management has taken appropriate action, however
20 received at that moment no additional information."
21      Do you know what that refers to?
22   A. No, I don't know what that specifically
23 refers to.
24   Q. If you could turn to page 085513, which is,
25 within this Miller Exhibit 4, a letter from

PAGE 79

1 Pricewaterhouse, dated April 2, 2001.
2    A. I'm sorry, you said 85513?
3    Q. 85513.
4    A. Yes.
5    Q. Do you see that? It is an April 2, 2001
6 letter from Pricewaterhouse to Mr Rembert von Lowis?
7    A. Yes.
8    Q. This refers, in the first line, to "...a
9 second due diligence investigation of Artesia by
10 PricewaterhouseCoopers." Do you recall that there was
11 more than one due diligence?
12   A. No, I did not recall that.
13   Q. Does seeing this help you to recall that
14 there was more than one?
15   A. Well, apparently there was.
16   Q. If you could take a moment just to review
17 this letter and tell me, whether having reviewed it,
18 whether it triggers a memory as to what additional
19 due diligence was performed by Pricewaterhouse.
20   A. If you just give me a second.
21   Q. Sure.
22         (Pause)
23   A. Okay. What was the question?
24   Q. Does reading this refresh your recollection
25 as to what the second due diligence review was about?

PAGE 80

1    A. Well, that is, you know, probably more
2 apparent from a detailed reading of the document than
3 what I could do here after ten seconds.
4    Q. Sure.
5    A. But it just seems to suggest that there were
6 some concerns about derivative contracts, internal
7 accounts, suspense accounts and that further
8 information was asked to PwC in that respect.
9    Q. Did Pricewaterhouse examine the internal
10 controls that were in place at Artesia Bank as part of
11 their second due diligence review?
12   A. I don't know that.
13   Q. It says here that they were going to that
14 in numbered paragraph (2), correct, of the second page
15 of the April 2, 2001 letter?
16   A. If that is what the letter says, that is what
17 the letter says.
18   Q. But you don't have any recollection?
19   A. I don't have any relevant comment to make on
20 that.
21   Q. You can set that aside. I am going to show
22 you next what was previously marked as Van Riet
23 Exhibit 2, if you could take a look at that, please.
24 For the record, Van Riet Exhibit 2 is a two-page Press
25 report in "L'Echo" (L-'-E-C-H-O), dated March 16, 2001.

SHEET 11 PAGE 81

**PAGE 81**

1  Have you seen this document before,
2  Mr Miller?
3    A. This document, no. If your question is
4  whether I saw that article in the Press at that time,
5  I might have. I have no specific recollection of that.
6    Q. There is a statement attributed to Artesia in
7  this Van Riet Exhibit 2, this Press Release and it says
8  that:
9    "The police invited Mr Dauwe to respond to
10 questions regarding the L&H case. 'Nobody else from the
11 bank has been interrogated', said a spokesman from
12 Artesia, stating that there is no indictment."
13   Do you see that?
14   A. Yes.
15   Q. Do you know -- withdrawn.
16   In fact, we have learned through this
17 litigation that there were numerous bank employees that
18 had been interrogated by the Belgian Federal Police at
19 the time this Press Release was made in March 16, 2001.
20   My question to you is: do you know whether
21 Dexia SA or Dexia learned in the due diligence process
22 that, in fact, more than five bank employees had been
23 questioned by the Belgian Federal Police regarding L&H
24 at the time of this March 16, 2001 Press Release?
25   MR WEIDNER: Object to the form. You can

**PAGE 82**

1  answer.
2    THE WITNESS: No, I don't know that.
3  BY MR ROCCO:
4    Q. Did you ever learn why this statement was
5  made that only Mr Dauwe had been questioned, when
6  in fact numerous employees had been questioned?
7    A. No, I don't know.
8    Q. Were you concerned at all that Artesia Bank
9  may be attempting to mislead the public as to their
10 potential exposure in the L&H matter through
11 this statement?
12   A. I'm sorry, what is your question exactly?
13   Q. Were you ever concerned that Artesia Bank
14 might be trying to limit the public's view of its
15 potential criminal liability with regard to the L&H
16 matter by making this statement here about only
17 one witness being questioned?
18   A. Was I concerned, as the legal advisor to
19 Dexia, of that set of circumstances?
20   Q. Exactly.
21   A. I don't remember that we had specific
22 discussions with our client at the time.
23   Q. How about after you got within Dexia SA and
24 then later with Dexia Bank, did you ever become
25 concerned that back in March of 2001 Artesia Bank

**PAGE 83**

1  was not being candid with its public statements about
2  its relationship to the L&H criminal investigation?
3    A. No. As far as I can remember, that was not a
4  source of concern during my tenure between my joining
5  Dexia in May 2001 and later.
6    Q. Did you ever learn whether or not this
7  statement attributed to Artesia was authorized by
8  Artesia Bank that is represented here on Van Riet
9  Exhibit 2?
10   A. No, I don't know.
11   Q. Would it have made a difference to you, in
12 your duties as -- performing any due diligence on the
13 Artesia/Dexia merger if you had known that the Belgian
14 Federal Police had in fact executed a search warrant
15 and seized documents from Artesia Bank and had
16 questioned several of the bank employees regarding
17 their dealings with L&H?
18   A. That is the type of matter that we would have
19 raised with our clients at that point in time, yes.
20   Q. And do you recall whether you raised those
21 issues with your clients at that point in time?
22   A. I don't remember that, no.
23   Q. Is it true that you don't recall specifically
24 reviewing any of the correspondence between
25 Artesia Bank and the CBFA (the Belgian Banking

**PAGE 84**

1  Regulators) during the due diligence process for
2  the merger?
3    MR WEIDNER: Asked and answered.
4    THE WITNESS: I might have done that but
5  I don't recall that specifically.
6  BY MR ROCCO:
7    Q. Do you recall, at any time subsequent to the
8  due diligence, reviewing any of the correspondence
9  between Artesia Bank and the CBFA regarding the
10 Lernout & Hauspie matter?
11   A. I would give the same answer: I might have
12 done that but I don't recall that specifically.
13   Q. Do you recall ever in your review --
14 withdrawn.
15   Let me show you what has been marked
16 previously as Van Riet Exhibit 33. For the record,
17 Van Riet Exhibit 33 is a letter from the
18 Bank and Finance Commission in Belgium to Mr Bruneel,
19 dated November 28, 2000 bearing Bates number DBB-67816
20 to 67819.
21   If you could take a moment to review that,
22 Mr Miller, my first question is: have you seen this
23 document before?
24   A. I might have seen that document, but I have
25 no specific recollection of it.